Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Richard C. Osborne (DC Bar No. 90024046)*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL;<br>JOSHUA GHAYOUM; and<br>EDEN SHEMUELIAN,<br><br>     Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA; MICHAEL V. DRAKE, President of the University of California; GENE D. BLOCK, Chancellor, University of California, Los Angeles; DARNELL HUNT, Executive Vice-President and Provost; MICHAEL BECK, Administrative Vice Chancellor; MONROE GORDEN, JR., Vice Chancellor; and RICK BRAZIEL, Assistant Vice Chancellor, each in both his official and personal capacities,<br><br>     Defendants. | No. 2:24-CV-4702<br><br><br>**COMPLAINT**<br><br><br>**JURY DEMAND** |

* *pro hac vice* application forthcoming

**NATURE OF THE ACTION**

1.    The University of California, Los Angeles, once considered among the most prestigious public institutions in the world, has deteriorated into a hotbed of antisemitism. This rampant anti-Jewish environment burst into view on October 8, 2023, the day after Hamas terrorists attacked Israel in a harrowing rampage that saw over one thousand innocent Jews, including infants and the elderly, murdered, raped, and mutilated.

2.    In the wake of these horrifying events, UCLA should have taken steps to ensure that its Jewish students were safe and protected from harassment and undeterred in obtaining full access to campus facilities. Instead, UCLA officials routinely turned their backs on Jewish students, aiding and abetting a culture that has allowed calls for the annihilation of the Jewish people, Nazi symbolism, and religious slurs to go unchecked.

3.    Matters turned especially ugly the following spring.

4.    Starting on April 25, 2024, and continuing until May 2, 2024, UCLA allowed a group of activists to set up barricades in the center of campus and establish an encampment that blocked access to critical educational infrastructure on campus.

5.    The activists chanted antisemitic threats like "death to the Jews," "free Palestine from the hand of Jews," and "from the River to the Sea, Palestine will be free," proudly trumpeting their hatred of the Jewish people. But their actions went well beyond such chants.

6.    With the knowledge and acquiescence of UCLA officials, the activists enforced what was effectively a "Jew Exclusion Zone," segregating Jewish students and preventing them from accessing the heart of campus, including classroom buildings and the main

undergraduate library. In many cases, the activists set up barriers and locked arms together, preventing those who refused to disavow Israel from passing through.

7.    To enter the Jew Exclusion Zone, a person had to make a statement pledging their allegiance to the activists' views and have someone within the encampment "vouch" for the individual's fidelity to the activists' cause. While this may have prevented a pro-Israel Christian from entering the Zone and permitted access for a Jewish person willing to comply with the enforcers' demands, given the centrality of Jerusalem to the Jewish faith, the practical effect was to deny the overwhelming majority of Jews access to the heart of the campus.

8.    Activists issued wristbands or other forms of identification to those who passed this Orwellian inquisition.

9.    UCLA's administration knew about the activists' extreme actions, including the exclusion of Jews. But, in a remarkable display of cowardice, appeasement, and illegality, the administration did nothing to stop it.

10.    UCLA Chancellor Gene Block publicly acknowledged that "students on their way to class have been physically blocked from accessing parts of the campus."

11.    Yet even as the activists continued to enforce the Jew Exclusion Zone, Defendants not only failed to marshal resources to intervene—they adopted a policy facilitating the Jew Exclusion Zone, ordering, among other things, UCLA campus police to stand down and step aside.

12.    And not only that, but UCLA also hired security staff and stationed them on the outskirts of the encampment and other restricted areas.

13. But rather than instruct this additional staff to assist Jewish students in accessing campus resources, UCLA instead instructed them to discourage unapproved students from attempting to cross through the areas blocked by the activists.

14. The security officers, acting as agents of Defendants, informed Jewish persons that, if they wished to access the encampment or other restricted areas, they would first need to obtain the permission of the encampment members.

15. All told, the Jew Exclusion Zone existed on campus for a full week, wreaking havoc on the lives of Jewish students who were simply trying to attend classes and study for exams.

16. Each of the Plaintiffs was prevented from passing through the Jew Exclusion Zone. Joshua Ghayoum, a sophomore and history major, was repeatedly blocked from passing through the encampment to reach meetings and study sessions. Eden Shemuelian, a second-year law student, was shooed away by a security officer who chastised her and called her "the problem" for attempting to peacefully observe the encampment. And Yitzchok Frankel, a second-year law student, was harassed and blocked from approaching the encampment by antisemitic activists, all with the assistance of UCLA security.

17. UCLA boasts of its "open and inclusive environment that nurtures the growth and development of all faculty, students, administration and staff,"[1] and assures students that it does "not tolerate acts of discrimination, harassment or conduct causing harm to individuals on the basis of race, color, ethnicity," "citizenship," "national

---

[1] *Mission & Values*, UCLA, https://perma.cc/7KUA-8NLV.

origin," or "religious beliefs."[2] UCLA has a number of policies that purport to implement these guarantees.

18. But UCLA has failed to provide Jewish students, faculty, and staff with the protection promised by such policies. Jews should not fear for their safety when they walk around any public space, let alone the campus of a prominent American research university.

19. Yet here we are. The administration's cowardly abdication of its duty to ensure unfettered access to UCLA's educational opportunities and to protect the Jewish community is not only immoral—it is illegal.

20. Specifically, it violates numerous federal and state constitutional guarantees, including the Equal Protection Clause, the Free Exercise Clause, and the freedom of speech.

21. And it contravenes the basic guarantee of equal access to educational facilities that receive federal funding, as well as numerous other statutory guarantees of equality and fair treatment.

22. Plaintiffs need immediate injunctive relief to ensure that neither they nor any other Jew will again suffer from the discrimination they have endured. And because the UCLA administration's actions amount to sanctioning segregation, their clearly unconstitutional actions entitle Plaintiffs to hold the school's administrators personally liable for their reprehensible failures.

23. In 1790, President George Washington wrote to the Hebrew Congregation of Newport, Rhode Island, which had sought assurances about the place of Jews within American society. He wrote, "May the Children of the stock of Abraham, who dwell in this land, continue to

---

[2]  *Inclusive Excellence Framework for Advancing EDI @ UCLA*, UCLA https://perma.cc/3HMJ-F5K6.

merit and enjoy the good will of the other Inhabitants; while every one shall sit in safety under his own vine and figtree, and there shall be none to make him afraid."[3]

24. UCLA has grievously failed to live up to Washington's promise that none shall be made afraid. But this Court can ensure that his promise—and, more importantly, the promises of the United States Constitution and civil rights laws—are kept.

## JURISDICTION AND VENUE

25. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims arising under the Constitution and laws of the United States. The Court has supplemental jurisdiction over Plaintiffs' state law claims because they "form part of the same case or controversy." 28 U.S.C. § 1367(a).

26. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

27. Defendants' constitutional violations are actionable under 42 U.S.C. § 1983.

28. Venue lies in this district under 28 U.S.C. § 1391(b), including because (i) at least one Defendant resides in the Central District of California and all Defendants reside in the State of California, and (ii) a substantial part of the events or omissions giving rise to the claim occurred in the Central District of California.

## THE PARTIES

29. Plaintiff Yitzchok Frankel is Jewish. He is a student at the UCLA School of Law who just completed his second year of law school. Frankel

---

[3] Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), *in Founders Online*, National Archives, https://perma.cc/VUR8-G3BC.

resides in Los Angeles, California.

30. Plaintiff Joshua Ghayoum is Jewish. He just completed his sophomore undergraduate year at UCLA. Ghayoum resides in Los Angeles, California.

31. Plaintiff Eden Shemuelian is Jewish. She is a student at the UCLA School of Law who just completed her second year of law school. Shemuelian resides in Los Angeles, California.

32. Defendant Regents of the University of California is a public agency within the meaning of Cal. Gov't Code § 7920.525(a) and is empowered under the California Constitution, Article IX, Section 9, to administer the University of California, including the University of California, Los Angeles. The Board of Regents is the governing body for the University of California system and under Article IX, Section 9, of the California Constitution has "full powers of organization and government." The Board of Regents has its principal place of operation in Oakland, California.

33. Defendant Dr. Michael V. Drake is the current President of the University of California and has served in that position since August 2020. As President, Drake oversees and is responsible for the operations of the entire University of California system, which includes UCLA. Drake is sued in both his personal capacity and in his official capacity. Drake resides in California.

34. Defendant Dr. Gene D. Block is the current Chancellor of UCLA and has served in that position since August 2007. As Chancellor, Block is the highest-ranking university official at UCLA. Block's duties include establishing campus policies, goals, and strategy. He is sued in both his personal capacity and in his official capacity. Block resides in this judicial district.

35. Defendant Dr. Darnell Hunt is the current Executive Vice Chancellor and Provost of UCLA and has served in that position since September 2022. He is sued both in his personal capacity and in his official capacity. Hunt resides in this judicial district.

36. Defendant Michael J. Beck is the current Administrative Vice Chancellor of UCLA and has served in that position since March 2016. Beck was in charge of the public safety operations of the school at all relevant times from October 7, 2023, through May 5, 2024.[4] Defendant Beck is sued in both his personal capacity and in his official capacity. Beck resides in this judicial district.

37. Defendant Monroe Gorden, Jr., is the current Vice Chancellor, Student Affairs, of UCLA and has served in that position since April 2018. Gorden is sued both in his personal capacity and in his official capacity. Gorden resides in this judicial district.

38. Defendant Rick Braziel is the Associate Vice Chancellor for Campus Safety at UCLA. In this role, Braziel serves as the head of the newly created Office of Campus Safety at UCLA, which as of May 5, 2024, oversees the UCLA Police Department ("UCLA PD"). Braziel is sued in his personal capacity and his official capacity. Braziel resides in this judicial district.

39. All individual Defendants are persons acting under color of state law within the meaning of 42 U.S.C. § 1983.

### FACTUAL BACKGROUND

### A.  UCLA

40.  The University of California, Los Angeles is a large public research

---

[4]  Gene D. Block, *Changes to Campus Security Operations*, UCLA Chancellor (May 5, 2024), https://perma.cc/Y9DV-4A3H.

university located in the Westwood neighborhood of Los Angeles, California, which is within the Central District of California

41. UCLA is one of the largest universities in California, with over 33,000 undergraduate students and over 13,000 graduate students.

42. UCLA is part of the 10-campus University of California system, which includes other universities such as the University of California, Berkeley.

43. UCLA's campus is spread across 419 acres of publicly owned land that is, as a general matter, open to the public.

44. UCLA's Younes and Soraya Nazarian Center for Israel Studies is the university's center promoting the study of modern Israel and was the first of its kind on the West Coast when it was founded in 2010.

45. Approximately eight percent of UCLA's 33,000 undergraduate students are Jewish.

46. UCLA tells its students that its policies exist to "create and maintain a safe, supportive, and inclusive campus community that engages students."[5]

47. The UCLA administration has repeatedly trumpeted its commitment to inclusion. Indeed, UCLA stated that it "will never remain silent when unlawful actions threaten our students and community members."[6]

48. As a public university, UCLA has a policy for public protests that

---

[5] *Student Conduct Code*, UCLA Office of the Dean of Students, https://perma.cc/G6JD-E9TG.

[6] UC President Janet Napolitano and UC Chancellors, *A Letter to the UC Community on Today's DACA Decision*, UCLA Chancellor (June 18, 2020), https://perma.cc/A2ZC-TR4F.

includes time, place, and manner restrictions.[7]

49. The policy specifically notes that "speech and assembly on university grounds" "must not interfere with the orderly operation of the campus and must be conducted in a manner that reasonably protects others from becoming involuntary audiences."

50. For instance, it violates the regulations to "block entrances to or otherwise interfere with the free flow of traffic into and out of campus buildings," "knowingly and willfully interfere with the peaceful conduct of the activities of the campus or any campus facility by intimidating, harassing, or obstructing any University employee, student, or any other person having lawful business with the University," and to "camp or lodge, except in authorized facilities or locations."[8]

51. UCLA's policies do not allow private individuals to exercise exclusive control over campus facilities or spaces.

52. UCLA also has an anti-discrimination policy, which protects students and faculty from discrimination and harassment.

53. The policy includes reporting and investigation mechanisms and promises that "[a]ny individual can report conduct that may be Prohibited Conduct. The University will respond promptly and equitably to such reports. This includes appropriate action to stop, prevent, and remedy the Prohibited Conduct."[9]

---

[7] *Your First Amendment Rights as a Student at UCLA* at 3, UCLA Student Affairs, https://perma.cc/FP2Z-8NWC.

[8] *Id.* at 7-8.

[9] *Anti-Discrimination Policy* at 5, University of California Systemwide Office of Civil Rights (Feb. 20, 2024), https://bit.ly/3KqZ1pj.

**B.   Antisemitic Protests at UCLA Following the October 7th Attack**

54.  In the wake of the deadly Hamas attacks against Israel on October 7, 2023, protests emerged around the country, frequently on college campuses.

55.  These protests often included disturbing antisemitic language and imagery.

56.  As Chancellor Block has admitted in sworn testimony, UCLA has not been "immune to the disturbing rise of antisemitism across our country since October 7th."[10]

57.  UCLA was also the site of antisemitic demonstrations.

58.  For example, at an October 12, 2023, demonstration at Bruin Plaza—a thoroughfare in the heart of UCLA's undergraduate campus—activists chanted "*Itbah El Yahud*" ("slaughter the Jews" in Arabic) and carried antisemitic signs.

59.  Counter-protesters present at the time were identifiably Jewish, through cultural or religious clothing and jewelry, or were identifiably pro-Israel, based on holding or wearing insignia of Israeli flags.

60.  Police officers were present but did not intervene.

61.  A few weeks later, a UCLA faculty member found a piece of paper entitled "Loudmouth Jew" accompanied by a book cover prominently featuring a swastika on top of a pile of trash placed outside the faculty member's home.

---

[10]  House Comm. on Educ. & the Workforce, *Calling for Accountability: Stopping Antisemitic College Chaos Before the H. Comm. on Educ. & the Workforce*, 118th Cong. at 41:10-41:17, YouTube (May 23, 2024), https://bit.ly/3R8V3FD (statement of Chancellor Block).

11

62. Figure 1 is a picture of the "Loudmouth Jew" paper.



Figure 1

63. Figure 2 is a picture of the book cover featuring a swastika.



Figure 2

64. Chancellor Block issued a letter to the UCLA community on October 27, 2023, in which he acknowledged that the "ongoing conflict in

the Middle East" had "stirred very deep emotions in many of us." He stated that these emotional responses do "not in the least give anyone in our community—or anyone visiting our campus—license to make our students, staff or faculty feel unsafe."[11]

65.  But the antisemitic protests at UCLA continued unabated.

66.  On November 8, 2023, hundreds of agitators swarmed the UCLA School of Law, holding signs and chanting "from the River to the Sea," "there's only one solution," "*intifada*," "death to Israel," and "death to Jews."

67.  Also on November 8, 2023, at a Students for Justice in Palestine protest, harassers chanted "beat that fucking Jew" through a megaphone while bashing a piñata bearing an image of Israeli Prime Minister Benjamin Netanyahu.[12]

68.  In response to these threats of violence and displays of anti-Jewish hostility, Chancellor Block sent another communication—an email to the campus community that acknowledged a "rise in reprehensible acts of Antisemitism" both globally and on campus. He described the November 8, 2023, outburst as "an event" involving "protected speech under the First Amendment."[13]

69. Yet he was forced to acknowledge that "individuals exhibited

---

[11] Gene D. Block, *Maintaining a Safe Learning and Working Environment for All*, UCLA Chancellor (Oct. 27, 2023), https://perma.cc/Q9A9-7F7T.

[12] Greg Gilman, *UCLA Condemns 'Hateful Behavior,' 'Antisemitic Language' from Pro-Palestinian Student Protesters*, Los Angeles Magazine (Nov. 12, 2023), https://bit.ly/3WMdWBK.

[13] Gene D. Block, *Standing Against Bigotry at the University of California*, UCLA Chancellor (Nov. 10, 2023), https://perma.cc/4SMG-4T6C.

extremely hateful behavior and used despicable Antisemitic language, which was captured on video and shared widely, frightening many within our community."[14]

70.  Chancellor Block pledged to "work against" such "bigotry" and that his "administration [would] launch[] its own set of efforts to strengthen community and reaffirm our values in this period of intense strife."[15]

71. These words proved hollow. In the following months, Jewish students and faculty at UCLA began to raise safety concerns after anti-Israel protests caused numerous incidents affecting Jewish faculty, staff, and students.

72.  For instance, later in November, the Co-Director of UCLA Chabad, Rabbi Dovid Gurevich, "said he thinks many Jewish students have felt unsafe since the Oct. 7 attack and that his organization has recently increased security measures."[16]

73. And a number of Jewish students recounted seeing antisemitic symbols (such as a swastika carved into a tree), hearing anti-Jewish chants, and being subject to harassment because they are Jewish. These instances and others left many Jewish students feeling "honestly scared for" their "life" when walking on campus.[17]

74. In another incident, of which Chancellor Block was aware, pro-

---

[14] *Id.*

[15] *Id.*

[16] Dylan Winward, *Survivor recounts experience of Oct. 7 attack at event hosted by Chabad at UCLA*, Daily Bruin (Nov. 18, 2023), https://perma.cc/94HX-5YEQ.

[17] Dylan Winward & Catherine Hamilton, *Jewish students express concern over antisemitism on UCLA campus*, Daily Bruin (Nov. 19, 2023), https://perma.cc/TDP6-2876.

Palestinian activists were seen on campus holding knives.[18]

75. Several Jewish students, including Shemuelian and Ghayoum, were forced to miss class or attend class remotely to avoid pro-Palestinian rallies on campus and out of fear for their own safety.

76. Activists also tore down and defaced posters depicting the names and faces of the hostages brutally kidnapped by Hamas terrorists.

77. On December 5, 2023, more than 350 faculty circulated an open letter to Chancellor Block and the UCLA administration explaining that these demonstrations resulted in "Jewish students, staff and faculty who are afraid to be on campus, show solidarity with Israel or practice their freedom of religion in public."[19]

78. On another occasion, a UCLA faculty member observed that the message "Free Palestine, Fuck Jews" was scrawled on the bathroom wall in Schoenberg, UCLA's music building. That graffiti was washed away by custodians. But after the cleaning, it was quickly replaced with new graffiti: "Fuck Zionists."

79. Figure 3 is an image of the "Fuck Zionists" graffiti in the music building.

[18] House Comm. on Educ. & the Workforce, *Calling for Accountability: Stopping Antisemitic College Chaos Before the H. Comm. on Educ. & the Workforce*, 118th Cong. at 2:27:14-2:27:40, YouTube (May 23, 2024), https://bit.ly/3WYmUfm (statement of Chancellor Block).

[19] *See, e.g.*, UCLA Faculty Against Terror, *Op-ed: UCLA must condemn Hamas attacks, fight antisemitism on campus*, Daily Bruin (Dec. 5, 2023), https://perma.cc/A6KU-XBFS; Dylan Winward, *UCLA faces scrutiny for safety issues at protests for Israel, Palestine*, Daily Bruin (Dec. 5, 2023), https://perma.cc/QQF8-U8F4.



Figure 3

80. On December 6, 2023, Alpha Epsilon Pi—UCLA's Jewish fraternity—was instructed by UCLA PD to hire extra security for a party it hosted as a safety precaution.

81. In February 2024, a scheduled talk at Royce Hall with former Israeli Minister of Foreign Affairs Tzipi Livni hosted by the Younes and Soraya Nazarian Center for Israel Studies was moved online in the wake of planned protests.[20]

82. And, in late March 2024, an individual placed a disturbing antisemitic statue on campus in front of the UCLA Luskin Conference Center. The statue depicted a several-foot-tall pig holding a bag of money and a birdcage with a keffiyeh, alongside a bucket painted with a star of David.[21]

---

[20] *See, e.g.*, Michael Starr, *Tzipi Livni UCLA talk moved online after anti-Israel protest*, The Jerusalem Post (Feb. 28, 2024), https://perma.cc/L9LD-4GC7.

[21] *See, e.g.*, David Myers, *Op-ed: Antisemitic imagery at UC Regents meeting protest threatens campus discourse*, Daily Bruin (Apr. 2, 2024), https://perma.cc/E67X-LSJT.

83. Figure 4 is a photograph of the statue.



Figure 4

84. This antisemitic statue was designed and intended to threaten Jewish students and make them feel unsafe and unwelcome on UCLA's campus.

85. The statue was far from the only public display of antisemitism on the UCLA campus.

86. Antisemitic images and chants became commonplace on UCLA's campus. Swastikas, other Nazi references, and other antisemitic imagery appeared throughout campus.

## C.  A Jew Exclusion Zone is Established on Campus, and UCLA Facilitates It

87. After a pro-Hamas protest encampment was established at Columbia University on April 17, 2024, activists at other colleges and universities around the country quickly began to copy the protest strategy.[22]

88. On April 25, 2024, a group of activists "established," as Chancellor

[22] *See, e.g.*, Jonathan Park et al., *In Photos: A nation shaken by camps for Gaza*, Daily Trojan (May 2, 2024), https://perma.cc/XF2W-FRP8.

Block described it, "an unauthorized physical encampment on part of the Royce Quad."[23]

89.  Royce Quad, also known as Dickson Plaza, is a large, grassy space located between two buildings to its north (Royce Hall and Haines Hall), and two buildings to its south (Powell Library and Kaplan Hall), which represent the original four buildings of UCLA's campus.

90.  Royce Quad is one of the most-frequented areas on campus where students gather during the day and between classes. It is also a thoroughfare that students and faculty routinely use to access the rest of UCLA's campus, including buildings like the Student Activities Center and the main recreational facility, the John Wooden Center, both of which are located just southwest of the Quad. It is also located a short walk from many academic buildings, including UCLA's business school and law school.

91. Royce Hall is considered "the symbol of UCLA," "distinguished by its impeccable beauty."[24] Its award-winning auditorium hosts many performances and events every year. Royce Hall also has seminar and meeting rooms and hosts UCLA classes.

92. Powell Library, in turn, is UCLA's main undergraduate library. Powell Library is not only UCLA's most popular place to study, but "also offers a wide variety of programming, including exhibits, concerts, dances, readings and other events that support student learning and creativity."[25]

---

[23]  Gene D. Block, *Affirming our Values in a Challenging Time*, UCLA Chancellor (Apr. 30, 2024), https://perma.cc/T79X-62MZ.

[24]  UCLA, Royce Hall, https://perma.cc/8FCB-W5HU.

[25]  UCLA, Powell Library, https://perma.cc/VG6D-LA6H.

93. The encampment was set up on the Royce Quad near both Royce Hall and Powell Library.[26]

94. At times, it extended as far west as the Janss Steps, a long staircase leading up to Royce Quad.

95. Those inside the encampment chanted antisemitic slurs like "this is the final solution," "fuck Israel," "death to Jews," "death to Israel," "*intifada* revolution," and "from the River to the Sea."

96. Chancellor Block has admitted in sworn testimony that "*intifada* revolution" and "from the River to the Sea" are antisemitic slogans and are potentially dangerous.[27]

97. The use of antisemitic imagery was common. These images included money symbols and other references that play on well-known antisemitic tropes and posters with drawings of pigs. Inverted red triangles, a common image used by Hamas to denote Jewish targets, were also present.

98. Other activists held signs with the Star of David crossed out, a swastika being compared to the Israeli flag, or reading "Nazionist."

///

///

///

///

///

---

[26] *See* Julia Zhou et al., *Gallery: UCLA students supporting Palestine organize encampment in Dickson Plaza*, Daily Bruin (Apr. 27, 2024), https://perma.cc/27KB-V3Y9.

[27] House Comm. on Educ. & the Workforce, *Calling for Accountability: Stopping Antisemitic College Chaos*, 118th Cong. at 3:06:20-3:07:07:10, YouTube (May 23, 2024), https://www.youtube.com/watch?v=4bu4eGIDNss (statement of Chancellor Block).

99.  Figure 5 is a photograph of an antisemitic sign displayed near the UCLA encampment.



Figure 5

100.  Figure 6 depicts chalking on campus sidewalks with a swastika, a star of David, and the "Nazionist" statement.



Figure 6

101.  On at least one occasion, the word "Royce" on the "Royce Hall" sign was replaced with the word "*Intifada*," so that the sign read *Intifada* Hall.

102.  Figure 7 is a photograph of the activists' sign dubbing Royce Hall *Intifada* Hall.



Figure 7

103.  Others scrawled graffiti on campus buildings and displayed anti-Jewish slogans on campus.

104.  Figures 8 and 9 are photographs of examples of such statements.





Figure 8                 Figure 9

105. Posters depicting the hostages kidnapped and tortured by Hamas were also ripped down and defaced.

106. Some activists chalked Stars of David onto UCLA's sidewalks alongside directions to "Step Here."

107. Figure 10 is a photograph of such a "Step Here" chalking.



Figure 10

108. The encampment was eventually reinforced with barricades, as activists established checkpoints for the creation of a "Jew Exclusion Zone."

109. To pass through these checkpoints, a person needed to agree to the activists' "demands." These "demands" required any person who wished to enter the encampment to condemn Israel as a committer of "apartheid[] and genocide of the Palestinian people," to call for "an end to the occupation and genocide in Palestine," and to agree that UCLA should "[s]ever all UC-wide connections to Israeli universities, including study abroad programs, fellowships, seminars, and research collaborations, and UCLA's Nazarian Center."

110. Even if the person expressed agreement with the activists'

demands, he would still be denied entry if there was no one already in the encampment who would "vouch" for him.

111.  If the person succeeded in finding someone who could vouch for him, then he would be given a wristband or other form of pre-approved identification and allowed to pass through.

112.  At these checkpoints, students were frequently asked if they were a "Zionist," or accused of being "Zionists," and were denied entry. Others were denied passage simply for wearing a Star of David necklace.[28]

113.  For example, one student was stopped by activists at the encampment because "you don't have a wristband" and then, when he questioned why they wouldn't let Jewish students in, he was asked, "[a]re you a Zionist?" When he responded that he is a Zionist, the activists responded that "we don't let Zionists inside."

114.  On information and belief, a case manager within UCLA's Office of Equity, Diversity, and Inclusion called a UCLA student on or about May 20, 2024, and asked the student if he was "aware that the protesters had an agreement with the University to screen students based on their viewpoints."

115.  These checkpoints prevented faculty, staff, and students from accessing the Powell Library, Royce Hall, other classrooms and UCLA facilities, and other areas of campus.

---

[28]  Jenny Jarvie, *'Are You a Zionist?' Checkpoints at UCLA encampment provoked fear, debate among Jews*, LA Times (May 9, 2024), https://perma.cc/X3TG-EF4J.

116. Figure 11 is a photograph of the UCLA encampment and the barricade that the activists erected.



Figure 11

117. Defendants directed the UCLA PD not to intervene in the disturbances on campus, including with respect to the encampment and the Jew Exclusion Zone.

118. For example, on or about April 29, 2024, a parent of a Jewish student called the UCLA PD and reported that her son had been denied access to campus because he was Jewish and did not have an activist-approved wristband. During the conversation, the police dispatcher said: "the police are not intervening with that right now, and this is coming from the University. So if you had any questions or concerns, you would take it with the University itself. … We have received a directive to not intervene at this time, yes. … I would suggest contacting the Chancellor's office or higher ups in the University with your concerns. … We're not forcing them to move out of the area. … All I'm saying is we're not

unblocking the entrances. … The school is saying that they will not be removed at this time."

119.  Moreover, Defendants stationed privately hired "CSC security teams," who wore uniforms or vests reading CSC and/or Event Staff, on the outskirts of the encampment and other restricted areas. Seán Devine, *Campus Activity Updates (April 27th)*, UCLA: Bruins Safe Online (Apr. 27, 2024), https://perma.cc/FN87-7NCM. Defendants also dispatched "[s]afety personnel in Student Affairs Mitigators (SAMs) and Public Safety Aides (PSAs) uniforms … around the encampment site," *id.*, as well as other "campus security."[29]

120.  CSC stands for Contemporary Services Corporation, which is a private security company with experience managing crowds and providing event security, including at colleges and universities.

121.  Figure 12 shows the CSC staff that (as further described below) stopped Plaintiff Shemuelian and ordered her away from the encampment area.

///
///
///
///
///
///
///
///
///

---

[29] Seán Devine, *Campus Activity Updates (April 29th)*, UCLA: Bruins Safe Online (Apr. 29, 2024), https://perma.cc/Q46U-BS7Z.



Figure 12

122. Defendants instructed these various security groups to discourage unapproved students from attempting to cross through the areas blocked by the activists.

123. Campus security staff, acting as agents of Defendants, directed students away from the encampment and, in some cases, stated that they needed permission from the activists to access the encampment, essentially acting as force multipliers to the activists manning the barricades.

124. The campus security staff turned away students, including Plaintiffs Josh Ghayoum and Eden Shemuelian, who were not approved by the activists and thus refused to allow or to help them pass through Royce Quad to Powell Library or Royce Hall.

125. Dozens of faculty members supported the activists in their efforts to set up and maintain the encampment.[30]

---

[30] *See, e.g.,* UCLA Department of History, *Statement of Members of the Department of History in Response to the Attack on the Encampment on*

126. Figure 13 is a photograph of a pro-encampment faculty protest on April 29, 2024.[31]



Figure 13

127. On information and belief, these faculty encouraged the activists to maintain the encampment despite the rampant violations of stated policy and encouraged the UCLA administration to continue to allow the illegal encampment to remain in place unabated.

128. Faculty members called for fellow faculty to excuse student absences related to presence at the encampment, and the UCLA Faculty for Justice in Palestine called for "faculty to show support through [their] physical presence at the protest."

---

*30 April 2024*, UCLA: Division of Social Sciences (May 1, 2024), https://perma.cc/AB66-7BKK (members of the department were at the encampment overnight); UCLA Department of History, *Statement of Members of the Department of History in Response to Clearing the Encampment,* UCLA: Division of Social Sciences (May 2, 2024), https://perma.cc/W727-9GV7.

[31] Clara Harter, *UCLA faculty walk out as pro-Palestinian demonstrations, counterprotests grow across California campuses*, East Bay Times (Apr. 30, 2024), https://perma.cc/94DE-ZG37.

129.  Figure 14 is a screenshot of a faculty group encouraging faculty to attend the protest and excuse encampment-related absences.



Figure 14

130.  Some UCLA staff and faculty members chose to host classes and study sessions from inside the encampment and offered students participating in the encampment better grades and extra credit.

131.  For example, on April 30, 2024, while the encampment was still in place, a lecturer within UCLA's labor studies department posted on X a picture of himself standing outside a graffiti-covered barricade and stated: "At UCLA's Free Palestine zone in solidarity with the students in my class. I will do all our classes for from [sic] the encampment. Free Palestine."

132.  Other faculty cancelled classes or held office hours near the encampment.

133.  Faculty members were aware of the antisemitic nature of the encampment and the systematic exclusion of Jewish students from the encampment.

134.  In fact, in an email sent on April 30, 2024, Plaintiff Ghayoum's history professor stated that he would hold additional "office hours … across from the encampment, if there is some space" because he wished

to "give students holding down the encampment a chance to meet with me." If a student, such as Ghayoum, did not "feel comfortable coming in close proximity to th[e] encampment," such a student was required to contact the professor separately to set up an appointment.

135.  Students who disagreed with the encampment faced physical violence.

136.  On April 25, 2024, a group of agitators left the encampment, surrounding members of a counter-protest, tearing down their signs, taking pictures of them, and assaulting them. Some held images of an inverted red triangle, a well-known symbol employed by Hamas to mark Jewish military targets. In response, personnel wearing UCLA jackets brought in metal barricades and directed staff to use them to expand the protected area given to those in the encampment.

137.  And on April 28, 2024, a female student suffered a concussion after clashing with an encampment member. That same night, another female student was pepper-sprayed by a member of the encampment.

**D.  UCLA's Response to the Anti-Jewish Segregation**

138.  The encampment operated for five days without any interference from Defendants, and indeed with their support via the failure to enforce stated policies or allow ordinary law enforcement intervention.

139.  According to UCLA, the University would not "request law enforcement involvement preemptively," but "only if absolutely necessary to protect the physical safety of our campus community."[32]

140.  This toleration of clear violations of stated policies persisted

---

[32]  Seán Devine, *Campus Activity Updates (April 28th)*, UCLA: Bruins Safe Online (Apr. 28, 2024), https://perma.cc/33DY-F74E.

even though UCLA acknowledged on April 29, 2024, that "some physical altercations broke out among demonstrators on Royce Quad" the previous day.[33]

141. The very next day, Chancellor Block sent a letter to the entire UCLA community acknowledging that the "unauthorized physical encampment" had led to "frankly … shocking and shameful" "tactics," that the encampment included "instances of violence completely at odds with our values," and that the encampment had resulted in "students on their way to class [being] physically blocked from accessing parts of the campus."[34]

142. He further acknowledged that these "shameful" tactics left students feeling "bullied, threatened and afraid," and left many, "especially our Jewish students, in a state of anxiety and fear."[35]

143. Yet despite this knowledge, Defendants continued to refuse to eliminate the Jew Exclusion Zone at the heart of its campus.

144. Instead, Chancellor Block continued to instruct the UCLA PD not to intervene. As a result, many Jewish students, faculty, and staff continued to be barred from accessing areas of campus.

145. The same day Chancellor Block sent his letter, the University acknowledged that the encampment was impeding student access to certain parts of campus.

146. At 8:00 AM, the University sent a Campus Activity Update tagged as a "Public Safety" alert stating that "The access to Royce Quad

---

[33] Seán Devine, *Campus Activity Updates (April 29th)*, UCLA: Bruins Safe Online (Apr. 29, 2024), https://perma.cc/Q46U-BS7Z.

[34] Block, *supra* note 23.

[35] *Id.*

is limited and as such, please enter Powell and Kaplan Hall from the south-facing entrances; Royce and Haines Hall are accessible through the north or west entrances. We will continue to ensure people on campus know about the demonstration so they can avoid the area if they wish. This includes having student affairs representatives stationed near Royce quad to let Bruins and visitors know about the encampment, redirect them if desired and to serve as a resource for their needs."[36]

147.   That same afternoon, the University announced that "[a]ccess to Royce Hall is now closed through Friday. Alternate locations are being identified as options for classes taking place in Royce. Instructors will inform students about further information regarding class location. Faculty should reach out to their departments for possible classroom reassignments." UCLA also closed Powell Library early at 5 PM.[37]

148.   The alerts did not direct activists to remove the barricades—and did nothing to ensure that Jewish faculty and staff could access academic buildings and Royce Quad.

149.   In sum, Defendants acknowledged the threat to Jewish students, opted to officially close crucial academic buildings to facilitate the encampment, and did nothing to clear the illegal encampment or stop agitators at the encampment from blocking access to Powell Library and other buildings on Royce Quad or to guarantee the ability of Jewish students to traverse campus safely and freely.

150.   After refusing to intervene to protect the rights of Jewish students for days, Defendants authorized UCLA PD and outside law

---

[36]   Seán Devine, *Campus Activity Updates (April 30th at 8:00AM)*, UCLA: Bruins Safe Online (Apr. 30, 2024), https://perma.cc/39EX-FXGR.

[37]   Seán Devine, *Campus Activity Updates (April 30th at 4:25PM)*, UCLA: Bruins Safe Online (Apr. 30, 2024), https://perma.cc/2XHC-8HKB.

enforcement to intervene when a confrontation between encampment members and counter-protesters escalated into a violent clash on the evening of April 30, 2024.

151. UCLA PD and LAPD intervened to separate the fighters but continued to allow the encampment to remain in place, including the barricades.

152. Defendants made the decision to allow the encampment to remain in place. On the morning of May 1, Chancellor Block sent an email to the entire campus community, condemning "the attack on the encampment that has been established … to advocate for Palestinian rights" by "a group of instigators." It was only after this "attack" that UCLA decided to "request[] support from external law enforcement agencies to help end this appalling assault, quell the fighting and protect our community." The email said nothing about prior attacks—both physical and verbal—on Jewish students as they tried to access academic buildings and traverse Royce Quad, nor did it promise to allow safe passage to Jewish students going forward.

153. In fact, the encampment remained in place on May 1, 2024. UCLA and Defendants did not restore full access to campus for Plaintiffs or other Jewish faculty, staff, and students. Instead, UCLA took several actions, including cancelling "all classes" on May 1, keeping Royce Hall closed at least through May 3, closing Powell Library through the weekend, and requiring remote classes during May 2 and 3.[38] UCLA also closed other areas of campus, including Geffen Academy, Lab School,

---

[38]  Seán Devine, *Campus Activity Updates (May 1st at 8:00 AM)*, UCLA: Bruins Safe Online (May 1, 2024), https://perma.cc/8SLY-QNLW.

and Early Care and Education.[39]

154. The next day, Chancellor Block sent a second email, acknowledging that the encampment was "unlawful" and "a breach of policy" that his administration had nonetheless "allowed … to remain in place" and that it had resulted in "demonstrators directly interfer[ing] with instruction by blocking students' pathways to classrooms" for "several days."[40] The email explained that on the morning of May 2, UCLA finally asked "UCPD and outside law enforcement officers to enter and clear the encampment."[41]

155. The email went on to describe the "carefully developed" plan that law enforcement used to clear the encampment, which included "giv[ing] [the activists] several warnings" and "offer[ing] them several opportunities to leave peacefully before officers entered the area."

156. Chancellor Block has admitted in sworn testimony that the "encampment was against policy" and "violated time, place, and manner." And he has stated that he and the University administration "should have been prepared to immediately remove the encampment if and when the safety of our community was put at risk."[42]

---

[39] Seán Devine, *Campus Activity Updates (May 1st at 6:30PM)*, UCLA: Bruins Safe Online (May 1, 2024), https://perma.cc/3XXA-FLEC ("all in-person classes are authorized and required to pivot to remote" for May 2-3).

[40] Gene D. Block, *Our Community is in Deep Pain,* UCLA Chancellor (May 2, 2024), https://perma.cc/E66L-Q5UA.

[41] *Id.*

[42] House Comm. on Educ. & the Workforce, *Calling for Accountability: Stopping Antisemitic College Chaos*, 118th Cong. at 2:45:21-2:45:27, 45:03:00-45:08:00 YouTube (May 23, 2024), https://www.youtube.com/watch?v=4bu4eGIDNss (statement of Chancellor Block).

157.  His administration's failed response to the encampment led Chancellor Block to conclude that "urgent changes [were] needed in how we administer safety operations."[43]

158.  Thus, on May 5, 2024, Chancellor Block announced the creation of a new "Office of Campus Safety" that reports directly to Block and that is tasked with overseeing UCLA PD and other departments.[44] Block also announced the creation of "a formal advisory group with expert leaders" to assist this newly created office.[45]

159.  Chancellor Block tapped Defendant Rick Braziel to lead the Office of Campus Safety "as its inaugural associate vice chancellor."[46]

## E.   Radical Groups Threaten Further Lawlessness on UCLA's Campus

160.   UCLA's tardy decision to finally end the blatant segregation and targeted harassment of Jews did not bring an end to the matter.

161.  Radical groups affiliated with the encampment have continued to call for similar actions and have even threatened that bolder actions are soon to follow.

162.  Even after the encampment was taken down, UCLA's campus has been consumed with anti-Israel protests and further attempts at occupying parts of campus.

163.  The same day the encampment was finally cleared, Students for Justice in Palestine at UCLA, one of the primary organizers of the

---

[43] Gene D. Block, *Changes to Campus Security Operations*, UCLA Chancellor (May 5, 2024), https://perma.cc/Y9DV-4A3H.

[44] *Id.*

[45] *Id.*

[46] *Id.*

encampment, promised "we will not stop, we will not rest."[47]

164. And, four days after the encampment was cleared, activists associated with the encampment posted a letter in the name of the "The Determined Palestine Solidarity Encampment," stating "we will not rest until they divest."[48]

165. Some have already made good on these threats. For example, activists attempted to occupy Moore Hall—home to the UCLA School of Education and Information Studies—on May 6, 2024.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

---

[47] UCLA Palestine Solidarity Encampment, *Precursory Statement from UCLA Palestine Solidarity Encampme*nt (May 2, 2024), https://perma.cc/Y3P9-3MCK.

[48] Palestine Solidarity Encampment at UCLA, *Refusing Co-optation* (May 6, 2024), https://perma.cc/TW3A-BZXY.

166. Figure 15 shows an Instagram post from Students for Justice in Palestine at UCLA calling for students to occupy Moore Hall on May 6, 2024.[49]

167. Figure 16 shows a door in Moore Hall with text over the top posted by Students for Justice in Palestine at UCLA.[50]

 

Figure 15                          Figure 16

168. One week later, on May 13, 2024, Students for Justice in Palestine at UCLA and other affiliated groups called for activists to block access to two parking decks on campus.[51] In response, numerous activists marched and chanted in front of the parking deck and blocked access to the entrance point.

---

[49] @SJPatUCLA, Instagram (May 6, 2024), https://bit.ly/3RAE1R5 (call to assemble at Moore Hall).

[50] @SJPatUCLA, Instagram Story (May 6, 2024) (photo of occupation of Moore Hall).

[51] @SJPatUCLA, Instagram (May 13, 2024), https://perma.cc/44CJ-XEJW?type=image.

169.  Figure 17 shows an image of an Instagram post by Students for Justice in Palestine at UCLA calling for activists to assemble to block the parking decks.



Figure 17

170. These actions and the aftermath of the encampment have continued to wreak havoc on normal University operations and access to campus.

171.  For instance, Transfer Bruin Day, originally scheduled to be held on May 11, 2024, was postponed and moved online in response to ongoing threats of disruption.[52]

---

[52] *See* Seán Devine, *Recent Updates*, UCLA: Bruins Safe Online (May 6-11, 2024), https://perma.cc/NQM2-YGK9; *see also* Alexandra Crosnoe, *Transfer Bruin Day postponed, moved online following on-campus demonstrations*, Daily Bruin (May 9, 2024), https://perma.cc/Q6CG-LMFE.

172. UCLA also extended its requirement for classes to be held remotely over the weekend of May 4 and 5.[53] And though UCLA attempted to return to in-person learning on May 6, that plan proved to be short-lived.

173. Early on the morning of May 6, 2024, the University declared that "[c]lasses and work in Moore Hall will be remote today due to ongoing disruptions."[54]

174. Later that same day, the University announced that "[a]ll classes are moving remote today and campus operations are limited due to ongoing disruptions."[55] An announcement that afternoon declared that classes would be remote for May 6th through 10th.[56]

175. That announcement also stated that "Royce Hall and Powell Library are closed and will remain so through Friday, May 10."[57]

176. Starting May 14, 2024, the same groups that ran the encampment put on a series of full-day "teach-in" events on Royce Quad "to reclaim both [their] space and ideas."

177. On the morning of May 23, 2024, the same day that Chancellor Block testified to Congress about antisemitism on UCLA's campus, the groups who instigated the original encampment established a new

---

[53] Seán Devine, *Campus Activity Updates (May 3rd)*, UCLA: Bruins Safe Online (May 3, 2024), https://perma.cc/R2F8-MKVS.

[54] Seán Devine, *Campus Activity Updates (May 6th at 8:30AM)*, UCLA: Bruins Safe Online (May 6, 2024), https://perma.cc/L4FM-VM4Y.

[55] Seán Devine, *Campus Activity Updates (May 6th at 10:15AM)*, UCLA: Bruins Safe Online (May 6, 2024), https://perma.cc/P5N7-4GW6.

[56] Seán Devine, *Campus Activity Updates (May 6th at 4:00PM)*, UCLA: Bruins Safe Online (May 6, 2024), https://perma.cc/E5KD-Y67Y.

[57] *Id.*

encampment, setting up tents and barricades on Kerckhoff Patio, near the Bruin Walk thoroughfare.

178. In response, law enforcement and security staff set up a perimeter to prevent food and supplies from reaching the encampment. After UCLA issued a statement declaring the encampment unlawful[58] and law enforcement began moving in, the activists relocated to Murphy Hall and then Dodd Hall before finally calling off the efforts.

**F.  Yitzchok Frankel**

179.  Yitzchok Frankel is a law student who completed his second year at UCLA School of Law in the Spring of 2024.

180.  Frankel is an Orthodox Jew, and has been so for his whole life.

181.  Frankel is also the descendant of Holocaust survivors on both sides of his family. His family was so severely impacted by the Holocaust that only four members of his paternal grandfather's family survived.

182. Consistent with his Orthodox Jewish faith, Frankel keeps kosher, strictly observes Shabbat and all Jewish holidays, and wears a kippah.

183.  Frankel and his wife are also dedicated to raising their four children in the Jewish faith and send them to Orthodox Jewish schools. The Frankel family regularly attends synagogue in the Los Angeles area.

184.  Frankel attended Orthodox Jewish day schools for his primary education and completed his undergraduate degree at Yeshiva University—a leading Orthodox Jewish institution of higher learning in the United States.

---

[58]  UCLA Newsroom, *Statement on demonstrators on Kerckhoff patio* (May 23, 2024), https://perma.cc/FYC3-M648.

185. After completing his undergraduate degree, Frankel worked at an Orthodox Jewish boys school, YULA High School, in Los Angeles for five years, and completed an online masters degree from Yeshiva University.

186. Frankel has strong ties to Israel. He has visited Israel approximately eight times, including one trip where he spent six weeks studying the Talmud at a yeshiva.

187. Each time Frankel journeys to Israel, he visits the *Kotel*—the only remaining vestige of the Temple destroyed by the Roman Empire in 70 CE along with the rest of Jerusalem. While there, he engages in "tearing *kriah*," the ritualistic act of rending one's garments as an act of mourning for the destruction of the Jewish Temple.

188. Frankel seeks to follow Jewish law (*halacha*), which prohibits speaking ill of or defaming the land of Israel. *See, e.g.*, Rabbi Eliezer Melamed, Peninei Halakhah, The Nation and the Land 3:11; *see also* Talmud Bavli, *Erchin* 15a (describing punishment meted out for speaking ill of the land of Israel); Talmud Bavli, *Ketubot* 112a-112b (describing precautions taken by rabbis to ensure that no ill would be spoken of the land of Israel). Thus, Frankel believes, as a matter of his religious faith, that he must support Israel.

189. Like many other Jews around the world, Frankel also engaged in a ritual at his wedding that marks the connection between all Jews and Israel: as the bridegroom, he crushed a glass with his foot at the end of the wedding ceremony. This is meant to symbolize and recall to memory the destruction of the Temple in Jerusalem by the Roman Empire. Immediately before Frankel broke the glass, those assembled sang "If I forget you, Yerushalayim, let my right hand forget how to work. Let my tongue stick to the roof of my mouth if I do not remember you. If

I do not set Yerushalayim above my chiefest joy." For this reason, too, Frankel cannot disavow his connection to Israel.

190.  Frankel also engages in the daily *Amidah* prayer petitioning for the coming of the Messiah and the return of all Jews to Israel. To Frankel, these prayers emphasize that all Jews, whether living in Israel or abroad, have a religious duty to support Israel.

191. Frankel is a vice president for the Jewish Law Students Association which, among other things, bakes pastries for Jewish holidays, holds Shabbat dinners, and occasionally gathers to study Torah.

192. After the October 7 attacks, Frankel began to wear a shirt depicting an American and Israeli flag nearly every day as a sign of his support for Israel and his Jewish identity.

193.  Frankel began to notice a rise in antisemitic activity on UCLA's campus after October 7, 2023.

194.  Frankel observed on repeated occasions that "Bring Them Home" posters depicting the names and faces of hostages kidnapped and tortured by Hamas had been torn down, including posters displayed in areas specifically reserved for the Jewish Law Students Association.

195. On information and belief, UCLA has not taken any action against these individuals.

196. Frankel also frequently observed individuals wearing "anti-Zionist social club" t-shirts.

197.  Frankel was also present at UCLA School of Law on November 8 and November 21, 2023, when large numbers of activists took over the law school and its courtyard, chanting antisemitic phrases like "there is only one solution, *intifada* revolution," and carrying signs.

198. Frankel also reported an antisemitic incident after another

41

student accused him of harassing other students on campus merely because he was wearing a kippah and a shirt showing an American and Israeli flag.

199. Frankel was directly impacted by UCLA's refusal to dismantle the Jew Exclusion Zone.

200. Frankel frequently traverses Royce Quad to get from the law school to other locations on campus, including Kerckhoff Coffeehouse and other food establishments, and to purchase items from the campus store.

201. Frankel also frequently walks around Royce Quad in between classes, sometimes to take breaks, other times while engaged in long telephone conversations or when meeting with his law school mentee.

202. Frankel has also brought his young children to Royce Quad on numerous occasions to socialize as a family.

203. Because of the establishment of the Jew Exclusion Zone and his knowledge that he could not go through the encampment without violating his faith by disavowing Israel, Frankel ceased all of these activities.

204. Frankel was the direct recipient of antisemitic harassment resulting from the encampment.

205. On April 25, 2024, the first day the encampment was in place, Frankel attended a peaceful rally held by Jewish students and other protesters who support Israel's right to exist.

206. While he was there, a masked female student came up to Frankel, holding a sign with an inverted red triangle in his face.

207. Later, masked participants in the encampment left the encampment and surrounded these observers, including Frankel, tearing at their signs and pushing them.

208. Security not only failed to intervene, it actively assisted the encampment participants.

209. A UCLA security guard brought out metal barricades and directed other staff to set up the barricades around the protesters—in effect expanding the protected area of the encampment and leaving Jewish students including Frankel stranded inside.

210. A line of security guards wearing blue shirts and mounted on bicycles also sat idly by, refusing to intervene.

211. Later, three masked female students holding a triangular red bike light stood in front of Frankel, mocking him and taking pictures.

212. Frankel knew that he could not approach the barricades and walk through the encampment without disavowing Israel's right to exist in direct contravention of his Jewish faith.

213. On April 28, 2024, Frankel again participated in a rally near the encampment with other Jewish students.

214. Again, masked participants from the encampment left the encampment and flanked the protesters, beginning to yell, push, and shove.

215. As was the case in the April 25, 2024, encounter with the encampment, security did nothing to intervene.

**G.  Joshua Ghayoum**

216. Joshua Ghayoum is a UCLA sophomore studying history and pre-law. Ghayoum is Jewish and the child of Persian immigrants who came to the United States fleeing antisemitism in Iran.

217. Ghayoum grew up learning Judaism from his family and attended Hebrew school from age five through thirteen, when he had his *bar mitzvah*.

43

218. Ghayoum has visited Israel on three different occasions. He plans to return a fourth time this summer as part of the Onward Birthright program, which aims to "create a long-lasting connection with Israel and to make the strong commitment to Jewish life and community that future generations depend on."

219. Ghayoum has family and a significant number of friends who live in Israel and a significant interest in Israel's religious sites. He considers Israel a second home.

220. Ghayoum observes the religious tenets of Judaism including observing Shabbat, attending synagogue weekly, and keeping the Jewish holidays.

221. Since he was 13, Ghayoum has worn a necklace that displays a Star of David.

222. For Ghayoum, support for Israel is both a religious obligation and part of his ethnic cultural identity. For these reasons, he cannot forswear Israel and its right to exist.

223. Ghayoum is a member of UCLA's Jewish fraternity, Alpha Epsilon Pi. The fraternity's building is adorned with a Star of David and a mezuzah hangs on the doorpost.

224. Members of Alpha Epsilon Pi observe Jewish holidays together. For example, they frequently host Shabbat dinners and annually construct a Sukkah.

225. The fraternity often hosts UCLA's Chabad rabbi at the fraternity's house to pray, discuss Jewish history, and spend time together.

226. Ghayoum is closely involved with the Persian Community at Hillel (PCH), a subgroup of UCLA's chapter of Hillel. Ghayoum observes

Shabbat along with other members of the PCH community and attends other Jewish events.

227.  Ghayoum chose to attend UCLA for its prestigious reputation, but his relationship with Royce Quad began long before.

228.  As an area resident living near UCLA, Ghayoum often traveled to Royce Quad with his family to play soccer, throw frisbees, play on scooters, and engage in other social activities with family and friends.

229.  Ghayoum and his family took pictures at Royce Quad to commemorate a sibling's *bar mitzvah*.

230.  Beginning after Hamas's vicious attack on Israel, Ghayoum witnessed numerous raucous anti-Israel demonstrations, which often included antisemitic chants.

231.  These demonstrations normally started at the bottom of the Janss Steps and went up through Royce Quad, the same area where the encampment would later be set up.

232.  During these demonstrations, Ghayoum repeatedly heard chants of "from the River to the Sea, Palestine will be free" and "this is the final solution."

233.  Ghayoum also witnessed demonstrators tearing down posters showing Jewish hostages of Hamas.

234.  Ghayoum experienced the effects of these demonstrations personally.

235.  In early December 2023, the UCLA PD informed Alpha Epsilon Pi that it should consider hiring private security for a party it planned to host on December 6. The fraternity hired private security, and UCLA police officers ended up standing outside the fraternity house for the duration of the party.

236.  Even though anti-Israel protests were common, Ghayoum actively and proudly voiced his opposition to these anti-Jewish sentiments, challenging students who were expressing anti-Jewish views.

237.  Ghayoum has personally been impacted by UCLA's segregationist encampment.

238.  On one occasion while he was near the encampment, Ghayoum heard activists chanting "death to Israel" and "death to Jews."

239.  Ghayoum was stopped twice at encampment checkpoints while attempting to enter Powell Library and to access Ackerman Union.

240.  On the first occasion, while attempting to get to Powell Library to study for his midterms, Ghayoum encountered a massive barricade flanked by security. A security guard informed Ghayoum that he could not proceed past the barricade. Ghayoum walked to the other end of the barricade, only to be confronted by a second security guard who gave the same instruction.

241.  Both security guards wore yellow vests reading "CSC."

242.  Based on knowledge of the encampment's lawlessness, Ghayoum knew that if he jumped the barricade, he risked facing violence. So he abandoned his plans to study in the library altogether.

243.  On a second occasion, Ghayoum attempted to meet a friend at Ackerman Union. He had made his way through approximately two-thirds of the occupied area, and was approaching Janss Steps, when he was stopped by a male approximately in his early twenties and told he could not proceed without showing a red wristband.

244.  Ghayoum attempted to continue walking, but the individual signaled for three other male individuals of the same approximate age to join him. The four men stood in a line in front of Ghayoum, repeatedly

demanding to see his hands and wristband and telling him he could not walk down Janss Steps.

245.  The four men aggressively walked toward Ghayoum, forcing him to walk backward away from the Steps. Occasionally, the activists made physical contact with Ghayoum.

246.  Ghayoum felt as though, had he continued to walk forward, the four activists would have physically stopped him, and he felt confident that they would have also called in reinforcements.

247.  Disavowing Israel would be a betrayal of Ghayoum's Jewish faith.

248.  Knowing that the situation would escalate if he continued to assert his rights, Ghayoum abandoned his effort and cancelled the meeting with his friend. He also understood that any further attempts to access the Jew Exclusion Zone would be futile.

249.  The presence of the encampment limited Ghayoum's access to the undergraduate library. He generally uses the library as a resource and a place for solo and group study. But because the encampment members blocked access to the library, Ghayoum was not able to use the library to study for midterm exams.

250.  In an email sent on April 30, 2024, Ghayoum's history professor stated that he would hold additional "office hours … across from the encampment, if there is some space" because he wished to "give students holding down the encampment a chance to meet with me." If a student, such as Ghayoum, did not "feel comfortable coming in close proximity to th[e] encampment," such a student was required to contact the professor separately to set up an appointment.

251.  That same professor later scheduled a "teach-in at or near the site of the encampment" in lieu of having class. He stated that students

were not required to attend, explaining that "I know there are folks so traumatized by the fascist/zionist/police assaults on those very grounds that returning can be triggering."

252.  As a result of the encampment, Ghayoum feels that it is no longer safe to voice opposition to activists expressing anti-Jewish sentiments, and thus he has in fact ceased doing so. For instance, when discussion over a class group project turned to criticizing Israel for its "genocide," Ghayoum opted to stay silent rather than express his views.

253.  The encampment directly affected Ghayoum's class attendance.

254.  Ghayoum has one class located in Haines Hall, which abuts Royce Quad. Thus, to attend class, Ghayoum would need to directly confront the encampment and its activists.

255.  Because of his class's close proximity to the encampment, the encampment's overall threatening atmosphere, and his knowledge that he could not pass through the encampment due to his Judaism, Ghayoum was forced to miss at least four days of class, opting instead to listen to class recordings.

256.  The intimidating atmosphere of the encampment meant that Ghayoum did not wish to enter campus at all.

**H.  Eden Shemuelian**

257.  Eden Shemuelian is a first-generation undergraduate and graduate student. She attended UCLA as an undergraduate and completed her second year at UCLA School of Law in the Spring of 2024.

258.  Shemuelian is Jewish and grew up learning about and participating in her faith by attending Hebrew school, becoming a *bat mitzvah*, celebrating Jewish holidays, and observing Shabbat.

259.  After her *bat mitsvah*, Shemuelian continued her involvement by teaching Hebrew to younger children each Sunday.

260.  Shemuelian continues to observe Jewish holidays and Shabbat, and attends synagogue with her family.

261.  Shemuelian wears a Star of David pendant as a sign of her religious faith and commitment to the Jewish people.

262.  Shemuelian's father is Israeli, and she has family in Israel.

263.  Shemuelian has learned a lot about her Jewish faith on her regular trips to visit her family in Israel, including on a 2018 Birthright trip, where she visited cultural and religious sites important to the Jewish people.

264.  Israel is at the core of Shemuelian's Jewish identity. Israel represents the homeland of the Jewish people, given to them by God and set aside for them for thousands of years.

265.  For Shemuelian, Judaism is synonymous with supporting Israel. To be a faithful Jew means to support the right of Israel to exist.

266.  Shemuelian decided to attend UCLA as an undergraduate after making a campus visit and falling in love with its beauty.

267.  In particular, Royce Quad stood out to Shemuelian as an iconic representation of UCLA's beautiful architecture and spirit of camaraderie.

///

///

///

///

///

///

///

///

///

1

2

268. Figure 18 is a picture Shemuelian took of Royce Hall while touring UCLA's campus in 2016.

3

4

5

6

7

8

9

10

11

12

13

14



Figure 18

15

16

269. Shemuelian decided to pursue her law degree at UCLA after spending her undergraduate years steeped in UCLA's rigorous academics and its strong sense of collegiality.

17

18

19

20

270. That sense of collegiality carried over into Shemuelian's first year of law school, but evaporated quickly beginning after October 7, 2023.

21

22

271. After October 7, 2023, Shemuelian began to witness an increase in antisemitic activity on campus, alongside a corresponding lack of interest by faculty and administration to put it to an end.

23

24

25

26

272. Protests regularly took place at UCLA's law school, replete with antisemitic language and imagery.

27

28

273. On many occasions, Shemuelian saw swastikas on campus.

274. On October 30, 2023, two activists ripped down "bring them home" posters that Shemuelian and her friends had hung near the law school featuring the names and faces of the hostages kidnapped and held in captivity by Hamas. Shemuelian saw these posters ripped down on multiple other occasions, including when posters were hung on bulletin board space dedicated to the Jewish Law Students Association.

275. On November 8, 2023, hundreds of agitators—many of them masked—swarmed into the law school and took over the building. They chanted various slogans including "death to Israel," "death to Jews," "there is only one solution," "*intifada*," and "from the River to the Sea" while standing approximately ten feet away from Shemuelian.

276. After this protest, Shemuelian wrote to Michael Waterstone, the Dean of the School of Law, copying Chancellor Block and the Student Affairs Office. The email described the protest and poster vandalism in detail, explaining that these events left Shemuelian and other Jewish students "shaking, crying, unable to breathe, and dizzy."

277. The email continued: "this school has not been a safe space for me and my Jewish peers for the past few weeks. I chose to attend this university to receive an education. If I had known I would be faced with extreme antisemitism on a daily basis, I would have committed elsewhere. I have not been able to sit in class and learn for the past 34 days, especially when these students sit behind me in my classes four days a week with their Palestinian resistance/terrorist scarves (and only seconds before class is to begin, they are chanting for the genocide of my people)."

278. Shemuelian also stated that because of this and other protests, she did not feel safe to attend class in person, opting instead to attend her lectures online.

279.  The email identified specific students who had participated in the protests.

280.  Dean Waterstone also forwarded the email to UCLA's Dean of Students, Jasmine Rush, since "this type and the handling of these incidents happens at the University level." The Dean of Students "confirmed receipt" of the email.

281.  On information and belief, none of these students was ever punished.

282.  Because no action was taken, Shemuelian ceased attending any of her classes in person because of the fear and intimidation caused by hearing antisemitic chants every time she entered the school.

283.  Shemuelian also severely curtailed the number of hours she worked for the Ziffren Institute for Media, Entertainment, Technology & Sports Law at the law school.

284.  Shemuelian was also personally impacted by UCLA's Jew Exclusion Zone.

285.  The encampment's location on Royce Quad was approximately a three-minute walk from the law school building. Along with many other law students, Shemuelian frequently leaves the law school and walks through Royce Quad to access other parts of campus, including to get food and coffee at other campus locations.

286.  Because of Royce Quad's central location, and her affinity for the space that developed as an undergrad, Shemuelian also frequently takes study breaks to walk around Royce Quad to get some exercise and fresh air.

287.  Because of the encampment and her knowledge that Jewish students were being denied access to Royce Quad and academic

buildings, Shemuelian ceased all of this activity, opting instead to stay home or to not leave the law school at all.

288. On April 26, 2024, Shemuelian attempted to observe the encampment and its activities. Shemuelian approached the barricade, joining other students wearing Jewish garb such as kippahs and Stars of David or holding Israeli flags.

289. While standing about three feet from the barricade, she attempted to read the signs and hear the chants taking place within the encampment. Shemuelian saw signs reading "Fuck Israel" and "From the River to the Sea," and depicting red inverted triangles—including on the encampment's "official" sign. She also saw signs equating Israel and the Israeli Defense Force to the Ku Klux Klan and white supremacy. Many of the activists inside the encampment were masked.

290. Rather than ensuring that Jewish students could pass safely through the areas to access Royce Quad, Powell Library, Royce Hall, and other locations on campus, Shemuelian witnessed security instead acting to stop individuals from passing through.

291. Thus, security acted as a force multiplier for the activists in the encampment.

292. For instance, a man in a light blue polo shirt that said "Security Staff" with a logo depicting "CSC" who was standing on the outside of the barricade began to chastise Shemuelian.

293. Though Shemuelian simply stood and watched silently, the CSC staff member told her that she either needed to come into the encampment and participate or leave the area.

294. The CSC member told Shemuelian that he had "been asked to keep this area [in front of the encampment] clear" and that he was "not the problem, you guys are."

295. Additionally, a group of security guards sitting on bikes and wearing blue shirts emblazoned with CSC mocked Shemuelian and the other Jewish observers, laughing at a male student singing in Hebrew who was yelled at by activists, jeering at the students when they professed anger at not being able to pass through, and repeatedly telling Shemuelian and the other Jewish students that they needed to leave.

296. Shemuelian also witnessed a student wearing a kippah and holding a pro-Israel sign being told by these same security guards to leave the area near the encampment.

297. As a result of these actions by security, Shemuelian was forced to leave the area.

298. Shemuelian knew that she could not pass through the encampment without disavowing her beliefs about Israel, which she could not do both as a matter of faith and as a matter of her ethnic identity as a Jew.

299. On April 28, 2024, Shemuelian was again forced to confront the encampment due to parking restrictions that prevented her from parking near the law school.

300. Shemuelian had attempted to go to the law school to study for a final exam that would take place on April 30, 2024. Because of the parking restrictions, she was forced to park near the encampment and to walk around the encampment to get to the law school.

301. Here, too, Shemuelian knew she could not simply cut through the encampment, because to do so would require her to violate her faith by disavowing Israel's right to exist.

302. So instead, Shemuelian was forced to walk around the encampment, with antisemitic chants ringing in her ears and antisemitic signs in her face.

303.  This experience severely and negatively impacted Shemuelian's ability to study for her final once she reached the law school library, where she could still hear the chanting from the encampment.

304.  Shemuelian was also forced to walk near the encampment to attend one of her final exams.

305.  Unlike other academic departments and programs, the law school did not cancel or suspend in-person classes or exams due to the encampment.

306.  Unlike other programs, which were still in regular class session during the lead up to and existence of the encampment, the law school was scheduled to hold final exams from April 29, 2024, through May 9, 2024.

307.  Shemuelian's ability to study for final exams was severely compromised due to encampment activity. She was forced to walk near the encampment to enter the law school, and her studies were routinely drowned out by the antisemitic chants rising from the encampment.

308.  The ongoing encampment caused the entire finals period to be pervaded with a sense of fear for Shemuelian, and she felt that she and all Jewish students were unsafe and subject to harm if they went anywhere near the encampment.

309.  Because of the law school's proximity to the encampment, Shemuelian also feared activists would enter the law school building as well.

310.  The antisemitic activities taking place at the encampment caused Shemuelian to feel immensely afraid as a Jewish student at the thought of needing to cross by the encampment to attend her finals.

311.  On May 1, 2024, Shemuelian raised these concerns to several different law school deans, explaining she felt "unsafe" coming to the law

school for her final exam of the semester due to the encampment's Jew Exclusion Zone and related protest activity on campus.

312.  But, despite the previous assurances that such requests would be accommodated, Shemuelian's request was denied, and her repeated entreaties for reconsideration were ignored. In fact, Shemuelian did not receive a response to her final plea that she not be subjected to the "violence and harassment" she feared by being required to come to campus for the exam.

313.  Because the law school administration never responded to her final request, Shemuelian had to go to campus in order to not miss her final exam.

## I.   Relief needed

314. As set forth above, Defendants knowingly allowed activists to establish a Jew Exclusion Zone on UCLA's campus for several days during the spring quarter in 2024.

315. Defendants had the ability to disband the encampment, which violated stated University policies, but instead chose to allow it to persist.

316. Defendants had the ability to order UCLA PD and private security officers to help Jewish students obtain equal access to campus, but did not and instead reinforced the exclusion zone.

317. Protest groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so.

318. Plaintiffs have been harmed by Defendants' previous allowance of the Jew Exclusion Zone on UCLA's campus and seek an order from this Court to be able to continue their educational and professional pursuits on campus in peace and freedom.

319. To know that they will be safe on campus, be free to exercise their

56

religion, and receive the equal protection of the laws, Plaintiffs need an order requiring Defendants to ensure that no Jew Exclusion Zone will be allowed on UCLA's campus, both during the pendency of this case and beyond.

## CLAIMS FOR RELIEF

### Count I
### 42 U.S.C. § 1983
### Equal Protection Clause

320.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

321. Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

322. The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

323. Defendants have deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiffs differently than similarly situated individuals because Plaintiffs are ethnically and religiously Jewish.

324. Defendants have knowingly allowed private individuals to bar Jewish persons from parts of the UCLA campus because of their Jewish ethnicity and religion, while non-Jewish persons are permitted access to all areas of campus. Indeed, Defendants affirmatively assisted these actions by hiring private security guards that reinforced the zone, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers not to intervene.

325. Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

326. Defendants failed to tailor their actions narrowly to serve any such interest.

327. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

328. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

329. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

## Count II
## 42 U.S.C. § 1983
## Freedom of Speech

330. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

331. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

332. Government efforts to regulate speech based on the "specific motivating ideology or the opinion or perspective of the speaker" is a "blatant" and "egregious" form of impermissible speech restriction.

58

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

333. And the government cannot "coerce an individual to speak contrary to her beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from its own." *303 Creative v. Elenis*, 600 U.S. 570, 598 (2023).

334. Plaintiffs believe that Israel has the right to exist and maintain a Jewish state in the Jewish ancestral homeland.

335. Plaintiffs were prohibited from accessing areas of the UCLA campus because they expressed this viewpoint and refused to disavow Israel.

336. By failing to guarantee Plaintiffs access to campus and campus resources, and affirmatively aiding the denial of such access, on the same terms as others based on their viewpoint, Defendants engaged in viewpoint discrimination against Plaintiffs.

337. Moreover, by coercing Plaintiffs to confess a belief with which they disagree, Defendants compelled them to speak in violation of the First Amendment of the United States Constitution.

338. Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

339. Defendants failed to tailor their actions narrowly to serve any such interest.

340. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

341.  As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

342. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

**Count III**
**42 U.S.C. § 1983**
**Free Exercise Clause – Status Discrimination**

343.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

344.  The Free Exercise Clause "protect[s] religious observers against unequal treatment" "based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

345.  Defendants deprived Plaintiffs of the free exercise of religion, as secured by the First Amendment, through policies and practices that subjected Plaintiffs to unequal treatment based on their religious status.

346.  Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

347.  Defendants failed to tailor their actions narrowly to serve any such interest.

348.  As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life

of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

349.  As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

350. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

**Count IV**
**42 U.S.C. § 1983**
**Free Exercise Clause – Not Generally Applicable**

351.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

352.  The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

353. Under the Free Exercise Clause, a government action that burdens religious exercise triggers strict scrutiny when it is not neutral or generally applicable. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc).

354. A policy is not generally applicable if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

355. Defendants treated Plaintiffs' religious exercises, including wearing Jewish symbols and expressing support for Israel, less favorably than comparable secular activities.

356.  Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

357.  Defendants failed to tailor their actions narrowly to serve any such interest.

358.  As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

359.  As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

360. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

**Count V**
**42 U.S.C. § 1983**
**Free Exercise Clause – Religious Targeting**

361.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

362. A law or policy "targeting religious beliefs as such is never permissible." *Lukumi*, 508 U.S. at 533.

363. Defendants targeted Plaintiffs' Jewish religious beliefs and practices for special disfavor in violation of the Free Exercise Clause.

364. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and

62

classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

365.  As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

366. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

## Count VI
## 42 U.S.C. § 2000d *et. seq.*
## Title VI of the Civil Rights Act of 1964

367.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

368.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

369. UCLA receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

370. Discrimination against Jews—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI. *Cf. Shaare Tefila*, 481 U.S. at 616

(discrimination against Jews is discrimination based on race); *see also* 34 C.F.R. § 100.3(b)(1)(iv), (vi).

371. Defendants excluded Plaintiffs from participation in UCLA programs, denied Plaintiffs the full benefits of UCLA programs, and subjected Plaintiffs to discrimination, all in violation of Title VI.

372. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

373. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

374. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

**Count VII**
**42 U.S.C. § 1985**
**Conspiracy to Interfere with Civil Rights**

375. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

376. Section 1985 of the Ku Klux Klan Act provides that "[i]f two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the

laws … the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

377. Defendants conspired both among themselves and with the others for the purpose of depriving Plaintiffs of their constitutional rights and equal protection under the law, specifically access to all parts of the UCLA campus equal to the access enjoyed by others.

378. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

379. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

380. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

### Count VIII
### 42 U.S.C. § 1986
### Failure to Prevent Conspiracy

381. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

382. Section 1986 of the Ku Klux Klan Act provides "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 … , are about to be committed, and having

power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented." 42 U.S.C. § 1986.

383. Section 1986 is, in other words, "derivative of § 1985 violations" and holds liable anyone who "knew of a § 1985 conspiracy and, having the power to prevent or aid in preventing the implementation of the conspiracy, neglected to do so." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997). The statute does not require the individual to have "participated in the conspiracy or shared in the discriminatory animus with members of the conspiracy." *Id.*

384. Defendants knew of a conspiracy to deprive Plaintiffs of their civil rights.

385. Although Defendants had the power to prevent or aid in preventing the implementation of the conspiracy, Defendants neglected to do so in violation of Section 1986.

386. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

387. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

388. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

### Count IX
### California Constitution Art. I, § 7(a)
### Equal Protection Clause

389. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

390. Under California's Equal Protection Clause, "[a] person may not be … denied equal protection of the laws." Cal. Const. art. 1, § 7(a). The Clause prohibits discrimination based on race, ethnicity, and religion.

391. Defendants have deprived Plaintiffs of equal protection of the laws, as secured by the California Constitution, through policies and practices that treat Plaintiffs differently than similarly situated individuals because Plaintiffs are Jewish.

392. Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

393. Defendants failed to tailor their actions narrowly to serve any such interest.

394. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

395. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to

compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

396. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

**Count X**
**California Constitution Art. I, § 4**
**Free Exercise Clause**

397.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

398. The California Constitution guarantees "[f]ree exercise and enjoyment of religion without discrimination or preference." Cal. Const. art. I, § 4.

399. Defendants have deprived Plaintiffs of the free exercise and enjoyment of religion without discrimination or preference, as secured by the California Constitution, through a policy and practice that treats Plaintiffs differently than similarly situated non-Jewish individuals because Plaintiffs are Jewish.

400. Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

401. Defendants failed to tailor their actions narrowly to serve any such interest.

402. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

403.  As a direct and proximate result of Defendants' actions, Plaintiffs

have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

404. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

## Count XI
## Cal. Educ. Code § 220
## Prohibition of Discrimination

405.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

406.  Section 220 of the California Education Code provides that "[n]o person shall be subjected to discrimination on the basis of … race or ethnicity … in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid." Cal. Educ. Code § 220.

407.  UCLA both receives state financial assistance and enrolls pupils who receive state student financial aid and is therefore subject to suit under Section 220.

408. Section 220—as part of its prohibition of race discrimination—prohibits discrimination against Jews. *See* Cal. Educ. Code § 201(g) ("It is the intent of the Legislature that this chapter shall be interpreted as consistent with … Title VI of the federal Civil Rights Act of 1964 …."); *Shaare Tefila*, 481 U.S. at 616 (discrimination against Jews is discrimination based on race).

409.  Defendants subjected Plaintiffs to discrimination on the basis of Plaintiffs' race or ethnicity in violation of California Education Code § 220.

410.  Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

411.  Defendants failed to tailor their actions narrowly to serve any such interest.

412.  As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

413.  As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

414.  Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

**Count XII**
**Cal. Civil Code § 51.7**
**Ralph Civil Rights Act of 1976**

415.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

416.  The Ralph Civil Rights Act of 1976 provides that "[a]ll persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their

persons or property because of" race or ethnicity. Cal. Civ. Code § 51.7(b)(1).

417. Defendants allowed activists to harass, threaten, and assault Plaintiffs because of their Jewish identity in violation of the Ralph Civil Rights Act.

418. Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

419. Defendants failed to tailor their actions narrowly to serve any such interest.

420. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

421. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

422. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

### Count XIII
### Cal. Civil Code § 52.1
### Tom Bane Civil Rights Act

423. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

424. The Tom Bane Civil Rights Act provides a right of action against

any "person or persons, whether or not acting under color of law, [who] interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]." Cal. Civil Code § 52.1(b).

425. Defendants interfered by threat, intimidation, or coercion, with Plaintiffs' exercise or enjoyment of rights secured by the Constitution or laws of the United States and rights secured by the Constitution or laws of California.

426. Defendants furthered no legitimate or compelling state interest by engaging in this conduct.

427. Defendants failed to tailor their actions narrowly to serve any such interest.

428. As a result of Defendants' actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

429. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

430. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court:

 a. Declare that Defendants have violated the First and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, Sections 1983, 1985, and 1986 of the Ku Klux Klan Act, the California Constitution, the California Education Code, the Ralph Civil Rights Act of 1976, and the Tom Bane Civil Rights Act;

 b. Issue preliminary and permanent injunctive relief prohibiting Defendants' unequal treatment of Plaintiffs in violation of Plaintiffs' constitutional and statutory rights;

 c. Award Plaintiffs compensatory, punitive, and nominal damages for the loss of their rights under federal and state law;

 d. Award Plaintiffs the costs of this action and reasonable attorneys' fees; and

 e. Award such other and further relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Dated: June 5, 2024          Respectfully submitted,

/s/ *Eric C. Rassbach*
Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Richard C. Osborne (DC Bar No. 90024046)*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

*Attorneys for Plaintiffs*

* *pro hac vice* application forthcoming