Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Richard C. Osborne (DC Bar No. 90024046)*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*,<br><br>      Defendants. | Case No.: 2:24-cv-4702<br><br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Date: July 22, 2024<br>Time: 9:00 a.m.<br>Courtroom: 7C<br>Judge: Hon. Mark C. Scarsi |

* admitted *pro hac vice*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................... iii

INTRODUCTION ................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ............................. 2

  A. Antisemitism at UCLA after the October 7 attack........................ 2

  B. A Jew Exclusion Zone is established, and instead of
     dismantling it, UCLA facilitates it.................................. 3

  C. UCLA does not contain the ongoing lawlessness
     on campus ........................................................ 8

  D. Plaintiffs are harmed by UCLA's policies and practices ............... 9

  E. This lawsuit .................................................... 14

PRELIMINARY INJUNCTION STANDARD..................................... 15

ARGUMENT ................................................................ 15

  I.  Plaintiffs are likely to succeed on the merits............................. 15

    A. UCLA's policies and practices violate the
      Free Exercise Clause (Counts III and IV). ............................ 15

      1.  UCLA discriminates against Plaintiffs based
         on their religious status. ...................................... 16

      2.  UCLA's policies and practices treat Plaintiffs'
         religious exercise worse than comparable
         secular activities............................................... 17

      3.  UCLA's policies and practices are not
         uniformly applied. ............................................ 18

      4.  UCLA cannot satisfy strict scrutiny. ......................... 19

    B. UCLA's policies and practices violate the Free
      Speech Clause (Count II). .......................................... 20

1. UCLA's policies and practices are viewpoint-discriminatory. ..................................... 20

2. UCLA's policies and practices compel speech. ..................... 21

C. UCLA's policies and practices violate the Equal Protection Clause (Count I). ..................................... 21

D. UCLA's policies violate Title VI (Count VI). ........................... 22

II. Plaintiffs satisfy the remaining preliminary-injunction factors. ........................................................... 24

A. Plaintiffs are suffering irreparable harm. ................................. 24

B. The public interest and balance of equities favor Plaintiffs. ........................................................ 26

CONCLUSION .......................................................... 26

CERTIFICATE OF COMPLIANCE ....................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ................................................................ 21

*Al Saud v. Days,*
   50 F.4th 705 (9th Cir. 2022) .................................................. 21

*All. for Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................... 15

*Am. Beverage Ass'n v. City and County of San Francisco,*
   916 F.3d 749 (9th Cir. 2019) ........................................... 15, 26

*Bacon v. Woodward,*
   No. 22-35611, 2024 WL 3034850 (9th Cir. June 18, 2024) .............. 18

*Baird v. Bonta,*
   81 F.4th 1036 (9th Cir. 2023) ........................................... 24-25

*Bray v. Alexandria Women's Health Clinic,*
   506 U.S. 263 (1993) ................................................................ 17

*Cal. Chamber of Comm. v. Council for Educ. & Rsch. on Toxics,*
   29 F.4th 468 (9th Cir. 2022) ................................................. 24

*Carson v. Makin,*
   596 U.S. 767 (2022) ........................................................... 16, 20

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ................................................................ 20

*City of Boerne v. Flores,*
   521 U.S. 507 (1997) ................................................................ 19

*Doe v. Harris,*
   772 F.3d 563 (9th Cir. 2014) ................................................. 24

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*
   *Bd. of Educ.,*
   82 F.4th 664 (9th Cir. 2023)..............................................*passim*

*Frudden v. Pilling,*
   742 F.3d 1199 (9th Cir. 2014) ........................................................... 21

*Fulton v. City of Philadelphia,*
   593 U.S. 522 (2021) ....................................................................18, 19

*Green v. Cnty. Sch. Bd. of New Kent Cnty.,*
   391 U.S. 430 (1968) .......................................................................... 21

*Greene v. Solano Cnty. Jail,*
   513 F.3d 982 (9th Cir. 2008) ........................................................... 20

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ........................................................... 26

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) .......................................................................... 22

*Regents of Univ. of California v. Superior Ct.,*
   413 P.3d 656 (Cal. 2018) ................................................................. 25

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) ........................................................................... 24

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) ......................................................................... 20

*Shaare Tefila Congregation v. Cobb,*
   481 U.S. 615 (1987) ......................................................................... 22

*Sherbert v. Verner,*
   374 U.S. 398 (1963) ......................................................................... 18

*Students for Fair Admissions, Inc. v. President & Fellows of
   Harvard Coll.,*
   600 U.S. 181 (2023) ......................................................................... 21

*T.E. v. Pine Bush Cent. Sch. Dist.,*
   58 F. Supp. 3d 332 (S.D.N.Y. 2014) ................................................ 23

*Tandon v. Newsom,*
   593 U.S. 61 (2021) ....................................................................17, 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ...............................................................16, 17, 19

*United States v. County of Maricopa*,
  889 F.3d 648 (9th Cir. 2018) ........................................................ 22

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ....................................................................... 21

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ....................................................................... 22

**Statutes**

42 U.S.C. § 2000d.............................................................................. 22

**Other Authorities**

*Calling for Accountability: Stopping Antisemitic College Chaos
  Before the H. Comm. on Educ. & the Workforce*, 118th Cong.,
  YouTube (May 23, 2024) ...............................................................2, 8

Chabad UCLA (@jewcla), Instagram (June 11, 2024) ........................... 9

Emily Crane, *NYU 'student' at anti-Israel protest praises North
  Korea for supporting Palestinians*, N.Y. Post (May 6, 2024)............. 18

U.S. Dep't of Educ. OCR, Dear Colleague Letter (May 25, 2023),
  https://perma.cc/5NUT-S7AN ......................................................... 23

U.S. Dep't of Educ. OCR, Dear Colleague Letter (Nov. 7, 2023),
  https://perma.cc/S7MQ-B77A.......................................................... 23

**INTRODUCTION**

This case concerns UCLA's ongoing and egregious failure to provide Jewish students with equal access and equal treatment on its campus. Plaintiffs are three Jewish students whose educational experiences at UCLA are suffering because of this ongoing discrimination. Plaintiffs therefore need relief from this Court by August 15, 2024, so they can safely return to campus for 2024-2025 classes, which begin for two of the plaintiffs on August 26, 2024.

As UCLA Chancellor Defendant Gene Block has publicly acknowledged in sworn Congressional testimony, UCLA's campus has been part of "the disturbing rise of antisemitism across our country since October 7th," putting Jewish students on UCLA's campus into "a state of anxiety and fear." But rather than enforce existing policies that purport to prohibit such conduct, UCLA facilitated the discrimination by instructing the campus police **not** to help Plaintiffs and other students seeking equal access to campus. Worse, it hired private security guards— **not** to help Plaintiffs, but to actively steer them away from parts of the campus that UCLA ceded to activists chanting "death to Israel" and "death to Jews." Plaintiffs suffered from this discrimination including by being denied access to campus, forced to take classes online, and forced to suffer through threats and harassment to attend class and exams in person; they risk continuing to face the same discrimination when they return to campus in the coming months.

UCLA's actions are morally indefensible and legally impermissible. The Free Exercise Clause forbids UCLA from discriminating against Plaintiffs based on their religious status and their religious exercise of appearing as Jews and refusing to condemn Israel. The Free Speech Clause forbids UCLA from discriminating against Plaintiffs for their

religious and political speech. UCLA is providing neither the "equal protection of the laws" promised by the Fourteenth Amendment nor the equal access to education promised by Title VI of the 1964 Civil Rights Act.

Once classes resume in the fall, Plaintiffs should not be forced to take their classes remotely or transfer to law-abiding schools. Plaintiffs need injunctive relief now to ensure that UCLA ceases its illegal discrimination once and for all and provides the non-discriminatory access and equal treatment that the law requires.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Antisemitism at UCLA after the October 7 attack

After Hamas's terrorist attack on October 7, 2023, antisemitism burst forth on UCLA's campus. Chancellor Block acknowledged as much in sworn testimony, stating that UCLA's campus experienced a "disturbing rise of antisemitism" during this time.[1] Indeed, almost immediately after, antisemitic demonstrations became routine, often involving chants of "from the River to the Sea, Palestine will be free" and "death to Jews." Ghayoum Declaration ¶21; Shemuelian Declaration ¶24; *see also* Complaint ¶58 ("slaughter the Jews"), ¶¶78-79 ("Fuck Jews" graffiti). Swastikas were also seen all over campus, Shemuelian ¶19, and activists chanted "beat that fucking Jew" through a megaphone while bashing an effigy of Israeli Prime Minister Benjamin Netanyahu. Shemuelian ¶40; Rassbach Declaration Ex.3. Students were harassed simply for wearing Jewish garb, Frankel Declaration ¶21, and posters of Hamas hostages

---

[1] *Calling for Accountability: Stopping Antisemitic College Chaos Before the H. Comm. on Educ. & the Workforce*, 118th Cong. ("*Accountability*") at 41:10-41:17, YouTube (May 23, 2024), https://bit.ly/3R8V3FD (statement of Chancellor Block).

were repeatedly torn down and defaced, Frankel ¶17; Ghayoum ¶22; Shemuelian ¶¶22-23. Though many of these incidents were reported to UCLA's administration, UCLA took no action. Frankel ¶21; Shemuelian ¶¶24-33; 44-46.

UCLA PD even felt it necessary to instruct UCLA's Jewish fraternity to hire security for a party it planned to host in early December. Ghayoum ¶25. Around the same time, hundreds of UCLA faculty penned an open letter to UCLA's administration explaining that "Jewish students, staff and faculty … are afraid to be on campus, show solidarity with Israel or practice their freedom of religion in public." Rassbach Ex.6. And in late March 2024, a statue of a large pig holding a bag of money next to a star of David was placed outside a conference center on campus. Ghayoum ¶26; Rassbach Ex.9.

**B. A Jew Exclusion Zone is established, and instead of dismantling it, UCLA facilitates it**

Pro-Hamas encampments began cropping up around the country in April 2024. Rassbach Ex.10. Given the already unstable atmosphere on UCLA's campus—created by the pervasive antisemitism—UCLA quickly followed suit. On April 25, 2024, a group of activists "established" what Chancellor Block described as "an unauthorized physical encampment on part of Royce Quad." Shemuelian Ex.15. Royce Quad is a key thoroughfare used by students to traverse campus and gather socially. Shemuelian ¶¶49-52; Ghayoum ¶¶16-18. It is directly adjacent to several critical educational buildings, including Powell Library and Royce Hall. Shemuelian ¶49.

Map of Royce Quad. Rassbach Ex.1.

To maintain the encampment, activists—at times with help from UCLA security—established a perimeter with plywood and metal barriers and posted guards to secure the entrance. Frankel ¶¶29, 34; Ghayoum ¶37. Inside the encampment, antisemitic demonstrations were frequent. Activists chanted "death to Jews," "death to Israel," "this is the final solution," "*intifada* revolution," and "from the River to the Sea." Frankel ¶31; Ghayoum ¶29. Activists also displayed antisemitic imagery on signs and graffiti, including swastikas and inverted red triangles, a common image used by Hamas to denote Jewish targets. Frankel ¶30; Ghayoum ¶30; Shemuelian ¶102. Other activists chalked Stars of David onto UCLA's sidewalks alongside directions to "Step Here." Frankel ¶31; Ghayoum ¶31.

Activists established checkpoints, creating what was effectively a Jew Exclusion Zone. To pass through these checkpoints, a person needed an activist-approved wristband, which they could only get if they agreed to

the activists' demands, including condemning Israel as a genocidal state unlawfully occupying Palestine. Ghayoum ¶¶39-41; Rassbach Ex.22. No Jewish student who has a religious obligation to support Israel and its right to exist could affirm such a statement. Frankel ¶¶9-13; Ghayoum ¶11; Shemuelian ¶¶11, 128. Jewish students thus could not access Royce Quad and critical educational facilities, including Powell Library and Royce Hall. Frankel ¶¶23-42; Ghayoum ¶¶33-48, 55-56; Shemuelian ¶¶100-29; Rassbach Ex.22.

Rather than dismantle the encampment, UCLA employed security to facilitate it. It hired "CSC security teams," which it placed on the outskirts of the encampment along with other "campus security." *See, e.g.*, Shemuelian Exs.10-12. UCLA also deployed "student affairs representatives" to inform people "about the encampment, redirect them if desired and to serve as a resource for their needs," Shemuelian Ex.13.

Despite acknowledging the encampment was "unauthorized," Shemuelian Ex.15, UCLA "direct[ed]" campus police not to "intervene" or dismantle the encampment and its checkpoints, Rassbach Ex.37 (UCLA PD explaining that it "received a directive to not intervene" from UCLA officials). Nor would UCLA allow outside police to intervene: it repeatedly informed students that "University of California systemwide policy guidance" requires it "not to request law enforcement involvement *preemptively*," but "only if *absolutely necessary* to protect the physical safety of our campus community." Shemuelian Ex.11 (emphasis added); *see also Accountability* at 43:50-44:04 (same from Chancellor Block). UCLA also directed security to redirect Jewish students away from the encampment, Ghayoum ¶¶35-36; Shemuelian ¶108, and on multiple occasions security refused to intervene to assist Jewish students, Frankel ¶¶32-35, 39-42; Ghayoum ¶¶35-36; Shemuelian ¶¶105-10.

This nonintervention persisted, notwithstanding the recognition that the encampment blocked Jewish students from accessing key parts of campus and had led to violence. On April 29, UCLA acknowledged that "physical altercations [had] broke[n] out among demonstrators on Royce Quad" the day before. Shemuelian Ex.12; *see also* Shemuelian ¶134. The encampment remained.

The next day, on April 30, Chancellor Block sent a campus-wide email addressing the turmoil caused by the encampment. Shemuelian Ex.15. Block began by acknowledging that the "unauthorized physical encampment" had led to "shocking and shameful" "tactics." *Id.* The encampment had given rise to "instances of violence completely at odds with our values" and had resulted in "students on their way to class [being] physically blocked from accessing parts of the campus." *Id.* "These incidents," Block continued, "have put many on our campus, especially our Jewish students, in a state of anxiety and fear." *Id.*

Campus alerts published the same day reiterated that the encampment was impeding students' access to Royce Quad. Shemuelian Ex.13. But instead of announcing plans to remove that impediment, UCLA promised only to "continue to ensure people on campus know about the demonstration so they can avoid the area if they wish." *Id.*

The evening of April 30, when a confrontation arose between encampment activists and counter-protestors, UCLA PD and LAPD intervened to separate the fighters. Shemuelian Ex.16. But they again allowed the encampment to remain in place. *Id.* The next day—May 1— Chancellor Block sent a campus-wide email condemning not the encampment and its exclusionary activities, but the purported "attack [on] the encampment that has been established … to advocate for Palestinian rights." *Id.* Block explained that UCLA had "requested

1  support from external law enforcement agencies to help end this
2  appalling assault, quell the fighting and protect our community." *Id.*
3  Once again, however, he made no promise to have the encampment
4  removed or to ensure Jewish students' access to campus.

5      Instead, UCLA continued to facilitate the encampment by canceling
6  "all classes" on May 1, and announcing that classes would be held
7  remotely on May 2 and 3. Shemuelian Exs.17, 18.

8      It was only early the next morning—May 2—that UCLA finally
9  "direct[ed] UCPD and outside law enforcement officers to enter and clear
10 the encampment." Shemuelian Ex.19. In another email to the campus
11 community, delivered that day, Chancellor Block acknowledged that "the
12 encampment on Royce Quad was both unlawful and a breach of policy,"
13 which his administration had "allowed" "to remain in place." *Id.* Block
14 further acknowledged that the encampment had resulted in
15 "[d]emonstrators directly interfer[ing] with instruction by blocking
16 students' pathways to classrooms" and "violence related to the
17 encampment" that "led to the closure of academic buildings and the
18 cancellation of classes." *Id.* Block also described the "carefully developed"
19 plan that law enforcement used to clear the encampment, which included
20 "giv[ing] [the activists] several warnings" and "offer[ing] the opportunity
21 to leave peacefully with their belongings before officers entered the area."
22 *Id.*

23     Chancellor Block later repeated in sworn testimony that the
24 "encampment was against policy" and "violated time, place, and manner"
25 restrictions, and that UCLA "should have been prepared to immediately
26 remove the encampment if and when the safety of our community was

27

28

put at risk."[2] All told, the encampment obstructed activities on and access to UCLA's campus for a week before it was finally dismantled.

**C. UCLA does not contain the ongoing lawlessness on campus**

In the months since UCLA's late-breaking action to dismantle the initial encampment, activists have made it clear that they will continue to occupy, and have continued to occupy, various campus buildings and facilities. Rassbach Ex.15 ("we will not stop, we will not rest."); Rassbach Ex.16 (similar). Consistent with the policy it has followed since this wave of rampant antisemitism took hold, however, UCLA refuses to address these threats and actions "preemptively." Shemuelian Ex.11.

On May 6, activists briefly occupied Moore Hall before relocating to Bruin Plaza. Rassbach Exs.14, 17, 18; Shemuelian ¶143. One week later, student activists blocked access to parking decks on campus. Rassbach Ex.19. On May 23, the activists established a new encampment, "erecting barricades, establishing fortifications, and blocking access to parts of the campus and buildings" and "disrupting campus operations." on Kerckhoff Patio, near the Bruin Walk thoroughfare. Shemuelian Ex.25; Rassbach Ex.20. After being told to "disperse," the activists relocated to another building, again "barricad[ing] access" and committ[ing] acts of vandalism." Shemuelian Ex.26. Only after all this, and another request to "disperse," did law enforcement move in. Shemuelian Ex. 26; Rassbach Ex.20.

Most recently, on June 10, activists "marched to the walkway at the top of the Janss Steps and set up an unauthorized and unlawful encampment with tents, canopies, wooden shields, and water-filled barriers." Rassbach Ex.21. "The group then marched to the Kerckhoff

---

[2]   *Accountability* at 2:45:21-2:45:27, 45:03:00-45:08:00.

patio, where they set up an unauthorized and unlawful encampment," "restricted access to the general public," and "disrupted nearby final exams." *Id.* Finally, "[t]he group then marched to the courtyard between Dodd Hall and the School of Law, where they set up another unauthorized and unlawful encampment. The group restricted access to the general public in violation of University policy and also disrupted nearby final exams." *Id.* The attempted occupations and accompanying demonstrations proceeded through the heart of campus and into Shapiro courtyard in front of the law school. Shemuelian ¶¶151-58. UCLA acknowledged that as a result, some students "miss[ed] finals because they were blocked from entering classrooms," while others were "evacuated in the middle of" their exams. Shemuelian Ex.27. Amid the melee, an activist assaulted UCLA's Chabad rabbi while others called him a "Zionist pedophile rabbi," "not [a] human being[]" and a "fucking fake-ass Jew[]."[3] When he sought assistance from nearby police, he was told "our main concern is the crowd control."[4]

### D. Plaintiffs are harmed by UCLA's policies and practices

Plaintiffs have been personally harmed by UCLA's policies and practices which have allowed and facilitated the Jew Exclusion Zone and the antisemitic environment that precipitated its rise.

***Yitzchok Frankel.*** Frankel is a law student at UCLA and an Orthodox Jew. Frankel ¶¶2-13. Frankel believes that, as a matter of his religious faith, he must support Israel. *Id.* ¶¶11-13. He is visibly Jewish,

---

[3] Chabad UCLA (@jewcla), Instagram (June 11, 2024), https://www.instagram.com/p/C8D9vvKNptN/.

[4] *Id.*

as he always wears a kippah and regularly wears a shirt including an Israeli flag. *Id.* ¶¶5, 15.

Frankel experienced the rise in antisemitic activity on UCLA's campus after October 7. *Id.* ¶¶16-18 (vandalism of Jewish Law Student Association bulletin board space); *id.* ¶20 (November 8 and 21 invasion of law-school courtyard, including antisemitic chants); *id.* ¶21 (harassed for being visibly Jewish with no response from administration).

He also experienced the effects of the Jew Exclusion Zone. On April 25, 2024, Frankel attended a peaceful rally supporting Israel held in Royce Quad. *Id.* ¶¶28-29. One activist stood close behind him, holding a sign depicting a red triangle. *Id.* ¶30. Activists left the encampment and surrounded the Israel supporters, tearing at their signs and pushing them. *Id.* ¶32. Two protesters held a blinking red triangular bike light in his face, taking pictures of him and mocking him for being visibly Jewish. *Id.* ¶36-37. UCLA's nearby security did not intervene to stop this harassment. *Id.* ¶35. Instead, a UCLA security guard brought metal barricades, directing other UCLA staff to set them up around Frankel and other Jewish students, leaving them trapped inside with the hostile activists. *Id.* ¶34. A line of UCLA CSC security guards sat idly by, refusing to intervene. *Id.* ¶35.

On April 28, Frankel participated in another rally near the encampment with fellow Jewish students. *Id.* ¶39. Masked activists again left the encampment, beginning to yell, push, and shove the Jewish students. *Id.* ¶40. UCLA security was present but again did not intervene. *Id.* ¶42. While there, Frankel assisted a friend who had been pepper-sprayed by activists. *Id.* ¶43. Because Frankel knew he could not pass through the encampment without violating his faith, he also avoided

areas of campus that he otherwise frequents, and he stopped bringing his young children to campus to socialize in Royce Quad. *Id.* ¶¶23-26, 41.

Based on his personal experiences with the encampment, and UCLA's ongoing refusal to act, Frankel no longer feels that UCLA's campus is safe for him. The June events demonstrate that the law school is no longer safe from the activists, and even the rabbi with whom he enjoyed participating in a Chanukah menorah lighting with his children has now become a target. *Id.* ¶¶44-50.

***Joshua Ghayoum***. Ghayoum is a rising UCLA junior and a Jew. Ghayoum ¶¶2-3. Ghayoum believes support for Israel is a religious obligation and part of his cultural identity. *Id.* ¶¶3-11. Ghayoum is visibly Jewish, as he wears a necklace depicting a star of David. *Id.* ¶10.

Ghayoum experienced the rise in antisemitism after October 7. After witnessing several antisemitic demonstrations and seeing hostage posters torn down with impunity, Ghayoum began missing class or attending remotely to avoid the antisemitism. *Id.* ¶¶19-24.

Once the encampment formed, Ghayoum was denied entry to parts of campus twice. *Id.* ¶¶33-48. First, Ghayoum encountered a massive barricade flanked by UCLA security while attempting to study at Powell Library. *Id.* ¶35. Multiple UCLA security guards wearing "CSC" insignia were present, but instead of escorting him through this effort to deny him access to campus, they informed him that he could not proceed past the barricade. Ghayoum knew that if he disobeyed, he risked facing violence, so he was forced to abandon his plans. *Id.* ¶¶35-38.

Second, Ghayoum attempted to meet a friend at Ackerman Union. *Id.* ¶39. As he approached Janss Steps, he was stopped by four young males, who informed him he needed to show a wristband to proceed. *Id.* ¶41. The males formed a line and walked aggressively toward Ghayoum, forcing

him backward. *Id.* ¶¶41-42. The males occasionally made physical contact with Ghayoum, making it clear that they would not tolerate resistance. *Id.* ¶42. Because his faith does not permit him to disavow Israel, and he recognized that the situation would escalate if he resisted, Ghayoum cancelled the meeting with his friend. *Id.* ¶¶43-45. At the encampment, Ghayoum saw swastikas, chalked images of Stars of David next to the words "Step Here,' and heard chants of "death to Jews." *Id.* ¶¶29-31 & Ex.1.

After these experiences and UCLA's failure to ensure his access to campus, Ghayoum understood that further attempts to access the Jew Exclusion Zone would be futile. *Id.* ¶46. As a result, Ghayoum had no choice but to miss classes in Haines Hall (which is next to Royce Quad) and stop studying in Powell Library. *Id.* ¶47-48; 55-57.

Because of these experiences, Ghayoum now hesitates to enter campus. The same rabbi who frequently comes to Ghayoum's fraternity was viciously assaulted, which left Ghayoum feeling "horrified," and he has no reason to believe that UCLA will put an end to these disturbances anytime soon. *Id.* ¶¶58-61. He also no longer feels safe vocally defending Israel, as he used to do. *Id.* ¶¶27, 62.

***Eden Shemuelian***. Shemulian is a rising third-year law student and a Jew. Shemuelian ¶2-4. For Shemulian, Judaism is synonymous with supporting Israel, and being a faithful Jew means supporting Israel's right to exist. *Id.* ¶¶4-12. She wears a star of David pendant. *Id.* ¶7.

Since the October 7 terrorist attacks, Shemuelian has been affected by the rise in on-campus antisemitism. Shemuelian has frequently seen swastikas on campus, *id.* ¶19, witnessed hostage posters she hung being torn down and antisemitic protests, *id.* ¶¶22-24, and endured fellow

students who sat behind her in lectures singing chants calling for the genocide of Jewish people right before the start of class, *id.* ¶24.

Shemuelian wrote about these incidents to law school officials and Chancellor Block, explaining that "this school has not been a safe space for me and my Jewish peers for the past few weeks." *Id.* ¶25-30. The email was forwarded to the University's Dean of Students, but neither the Dean nor Block took action. *Id.* ¶¶31-33.

Because of the fear generated from these and other antisemitic activities, Shemuelian felt compelled to stop attending classes in person and reduce her hours at her on-campus work-study position. *Id.* ¶¶34-38 & Exs.4, 5.

The Jew Exclusion Zone also affected Shemuelian. On April 26, 2024, while observing the encampment, Shemuelian saw signs reading "Fuck Israel" and "From the River to the Sea," and depicting red inverted triangles—including on the encampment's official sign. *Id.* ¶102. Shemuelian witnessed UCLA security actively preventing individuals from entering. *Id.* ¶104-10. When she approached the encampment area herself, UCLA CSC Security told her that they "been asked to keep this area clear," that she was "the issue," and to "keep going unless you're going in." *Id.* ¶¶107-08. A group of UCLA CSC security guards sitting on bikes mocked Shemuelian and the other Jewish observers, laughing at a male student singing in Hebrew, jeering at the students when they expressed anger at the inability to access campus, and repeatedly telling Shemuelian and the other Jewish students that they needed to leave. *Id.* ¶109-10. Because Shemuelian knew she could not pass through without disavowing her religious beliefs, and the UCLA security who were supposed to be protecting her right to access were instead actively facilitating its denial, she was forced to leave the area. *Id.* ¶¶111-12.

The encampment has also affected Shemuelian's typical access to campus. Shemuelian often used to walk through Royce Quad to access other parts of campus. *Id.* ¶118. She also frequently took study breaks to walk around Royce Quad. *Id.* ¶119. Because of the encampment and her knowledge of the UCLA-protected Jew Exclusion Zone, she had to stop visiting Royce Quad, opting either to stay in the law school building or at home. *Id.* ¶120.

The encampment also negatively affected Shemuelian's ability to prepare for final exams. *Id.* ¶124-25. On April 28, she was forced to walk near the encampment and hear antisemitic chants just so she could access the law school building to study. *Id.* ¶¶126-29. As she studied for her finals, she was forced to listen to those same chants. *Id.* ¶130. Shemuelian was also aware of violent attacks on other Jewish students near the encampment, *id.* ¶134, leaving her with a pervasive sense of fear throughout the already-stressful finals period. *Id.* ¶¶131-33. While Shemuelian had learned from experience that UCLA would not intervene to protect Jewish students, she emailed several law school deans asking if they would at least accommodate her fears for her safety by letting her take her exams remotely. *Id.* ¶137. All of her requests were denied; indeed, no one even responded to her final message. *Id.* ¶¶138-39.

**E. This lawsuit**

Given the current campus atmosphere and continued antisemitic events, Plaintiffs fear that returning to campus in the fall will expose them to further discrimination and violations of their rights. Frankel ¶¶44-50; Ghayoum ¶¶58-62; Shemuelian ¶¶159-67. On June 5, 2024, Plaintiffs filed this lawsuit. Dkt.1. Plaintiffs served all Defendants by June 17, 2024. Dkt.30-42, 44-47. Plaintiffs now seek preliminary relief on

Counts I (Equal Protection), II (Free Speech), III and IV (Free Exercise), and VI (Title VI) of the Complaint.

## PRELIMINARY INJUNCTION STANDARD

A preliminary injunction should issue when a plaintiff "establish[es] that he is likely to succeed on the merits, that he is likely to suffer irreparable harm" without relief, "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 683 (9th Cir. 2023) (en banc) ("*FCA*"). In assessing these factors, this Court employs a "version of the sliding scale approach" where "a stronger showing of one element may offset a weaker showing of another." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). And in First Amendment cases, likelihood of success on the merits is often decisive. *Am. Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019).

## ARGUMENT

### I.  Plaintiffs are likely to succeed on the merits.

#### A. UCLA's policies and practices violate the Free Exercise Clause (Counts III and IV).

UCLA's policies and practices violate the Free Exercise Clause in three separately sufficient ways: (1) they discriminate against religious Jews based on religious status; (2) they treat Plaintiffs' religious exercises worse than comparable secular activities; and (3) UCLA employs a system of discretionary individualized exemptions. Although UCLA can invoke a strict scrutiny affirmative defense regarding the second and third violations, it cannot meet that burden.

### 1. UCLA discriminates against Plaintiffs based on their religious status.

The Free Exercise Clause "'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (alteration in original) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 542 (1993)). In particular, the Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson v. Makin*, 596 U.S. 767, 778 (2022).

Here, UCLA's policies and practices have excluded and will continue to exclude Plaintiffs and other Jews from educational facilities, programs, and parts of campus because of their Jewish religious status. UCLA has demonstrated that allows such exclusions. With UCLA's knowledge and support, activists and UCLA security officials prevented Plaintiffs from accessing the library, other classroom buildings, and Royce Quad. Frankel ¶¶23-25, 28-42; Ghayoum ¶¶34-48, 56-57; Shemuelian ¶¶100-120, 125-30. And the reason for the exclusion was no secret. As the activists explained, these educational facilities were open only to those willing to denounce Israel and eschew wearing visible Jewish garb, such as a kippah or a Star of David, preventing Plaintiffs' sincere religious exercise. Frankel ¶¶11, 37; Ghayoum ¶¶10-11; Shemuelian ¶10, 110; Rassbach Ex.22. But rather than intervene and end this segregation of Jewish students, UCLA not only required the campus police to step aside as Jewish students were excluded, but even hired security to facilitate the exclusion by reinforcing the encampment's barriers, Frankel ¶34-35, 42; Ghayoum ¶¶35-38; Shemuelian ¶¶104-110.

Plaintiffs, as tuition-paying students, have a right to access UCLA's educational facilities and campus on an equal basis with others. Yet the religion-based exclusions UCLA has facilitated prevent that access. The policies therefore subject Plaintiffs to special disfavor and violate the First Amendment's most "basic principle": that excluding religious people because they are religious "is odious to our Constitution." *Trinity Lutheran*, 582 U.S. at 458, 467.

### 2. UCLA's policies and practices treat Plaintiffs' religious exercise worse than comparable secular activities.

UCLA's policies and practices violate Plaintiffs' Free Exercise Clause rights in several other ways as well. And there is nothing "neutral and generally applicable" about those policies and practices, as government action flunks that test when it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam); *FCA*, 82 F.4th at 686.

Here, UCLA has burdened two different categories of Plaintiffs' religious exercise. First, Plaintiffs believe they must support Israel and Israel's right to exist. Frankel ¶11; Ghayoum ¶11; Shemuelian ¶11. Second, Plaintiffs engage in religious exercises related to their outward expression of Judaism—specifically wearing a kippah or Star of David. Frankel ¶¶5, 49; Ghayoum ¶10; Shemuelian ¶7.

UCLA's policies and practices burden both forms of religious exercise. Because UCLA requires campus and outside police not to disrupt activists, Plaintiffs cannot fully access UCLA's educational benefits and facilities like everyone else unless they forgo these religious exercises. *Trinity Lutheran*, 582 U.S. at 463; *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). These policies therefore put Plaintiffs to an impossible choice:

suppress their religious exercise or surrender their access to UCLA's educational facilities and campus. *See Sherbert v. Verner*, 374 U.S. 398, 406 (1963).

Thus, UCLA deprives those who engage in religious exercise (*e.g.*, wearing a kippah or refusing to denounce Israel) of access to the same educational facilities and benefits other students retained full access to—a clear-cut violation of the *Tandon* principle. *See Tandon*, 593 U.S. at 62; *FCA*, 82 F.4th at 694 (government cannot "treat comparable secular groups more favorably"); *see also Bacon v. Woodward*, No. 22-35611, 2024 WL 3034850, at *6 (9th Cir. June 18, 2024).

Many examples of secular activities comparable to Plaintiffs' religious exercises were allowed in the Jew Exclusion Zone. For example, a student could wear a hat or religious symbol of almost any sort and still enter the Zone—but students were kept out for wearing a kippah. Frankel ¶37. And a student could openly support almost any country in the world and enter the Zone—but not Israel.[5] This open discrimination cannot be squared with *Tandon* or *FCA*.

### 3. UCLA's policies and practices are not uniformly applied.

UCLA's policies and practices are also not "generally applicable" because they involve "discretionary mechanism[s]" of "individualized exemptions." *FCA*, 82 F.4th at 686, 688 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). UCLA's policies therefore are not uniformly applied to all students. UCLA's written policies say that students may **not** "block entrances to or otherwise interfere with the free flow of traffic into and out of campus buildings." Rassbach Ex.38. And

---

[5] *Cf.* Emily Crane, *NYU 'student' at anti-Israel protest praises North Korea for supporting Palestinians*, N.Y. Post (May 6, 2024), https://perma.cc/PD6N-3969.

those policies say that private individuals may **not** exercise exclusive control over campus facilities or spaces by creating "camp[s]" that "obstruct[] any University employee, student, or any other person having lawful business with the University." *Id.* Yet here, UCLA allowed the activists to do both of those things when it ordered campus and outside police not to interfere with the activists' Jew Exclusion Zone. *Supra* p.5. UCLA thus effectively has one set of policies for Plaintiffs and other students, but another set for activists who discriminate against Jews. That makes this an even easier case than *Fulton*, where Philadelphia officials merely possessed discretion to deviate from a policy but had not exercised it. *See Fulton*, 593 U.S. at 537; *FCA*, 82 F.4th at 685. Here, UCLA officials exercised their discretion to exempt the activists from the rules that it had said applied to all, creating an entirely different set of rules for them. And those students in turn exercised their own discretion to decide who could access UCLA's campus—something that it appears no other students could do even if they wanted to.

### 4. UCLA cannot satisfy strict scrutiny.

UCLA may try to argue that it can prove that its religious discrimination satisfies strict scrutiny—an affirmative defense.[6] But strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). UCLA would have to show not only that its policies and practices in fact advance "interests of the highest order," *Lukumi*, 508 U.S. at 546, but that they are also "narrowly tailored" to achieve that interest, *id.* "A law that targets

---

[6]  UCLA has no strict scrutiny affirmative defense with respect to its discrimination against religious beliefs "as such." *See Trinity Lutheran*, 582 U.S. at 466 n.4 (quoting *Lukumi*, 508 U.S. at 533) (citing *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality opinion)).

religious conduct for distinctive treatment … will survive strict scrutiny only in rare cases." *Carson*, 596 U.S. at 780-81.

Here, UCLA fails at the outset because it has no compelling or even legitimate interest in discriminating against Jewish students. *Id.* at 781. Indeed, UCLA's own stated policies purport to forbid such discrimination, meaning that UCLA has no interest in discriminating, let alone one of the "highest order." *Lukumi*, 508 U.S. at 546. Nor could categorically excluding Jewish students from parts of campus ever be "narrow tailoring"—a ban is one of the bluntest means UCLA could possibly have used. *Cf. Greene v. Solano Cnty. Jail*, 513 F.3d 982, 989 (9th Cir. 2008) (government must "actually consider[] and reject[] the efficacy of less restrictive measures").

## B. UCLA's policies and practices violate the Free Speech Clause (Count II).

UCLA is violating the Free Speech Clause because its policies and practices (1) discriminate based on viewpoint; and (2) compel speech.

### 1. UCLA's policies and practices are viewpoint-discriminatory.

UCLA's policies and practices are viewpoint-discriminatory because they deny Plaintiffs access to UCLA's facilities and educational opportunities due to "specific motivating ideology or the opinion or perspective of" Plaintiffs. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). UCLA has denied full access to anyone (including Plaintiffs) who will not denounce Israel or deny its right to exist. *See, e.g.*, Ghayoum ¶11. Indeed, after UCLA learned that activists had established viewpoint-discriminatory checkpoints, it ordered campus and outside police not to dismantle the checkpoints or otherwise intervene. *See supra* p.5. Then, UCLA reinforced the checkpoints by employing private security as a buffer keeping Plaintiffs and others out.

*See, e.g.*, Frankel ¶¶28-35; Shemuelian ¶¶104-06. Thus, UCLA's policies and practices not only allow for, but actively facilitate, viewpoint-discriminatory checkpoints and other actions that exclude Jewish students based on their political and religious speech.

### 2. UCLA's policies and practices compel speech.

UCLA also compels Plaintiffs "to speak contrary to [their] beliefs on … significant issue[s] of personal conviction": support for Israel and its right to exist. *303 Creative LLC v. Elenis*, 600 U.S. 570, 598 (2023). By allowing and actively facilitating checkpoints that deny access to Plaintiffs and others who refuse to denounce Israel, UCLA deprives Plaintiffs of equal access unless they "speak" the government's "preferred message." *Id.* at 586. But government cannot "force[] an individual ... to be an instrument for fostering public adherence to an ideological point of view" that is "repugnant to [her] moral and religious beliefs." *Wooley v. Maynard*, 430 U.S. 705, 707, 715 (1977); *see also Frudden v. Pilling*, 742 F.3d 1199, 1205 (9th Cir. 2014) (same). UCLA is violating this core First Amendment rule and cannot satisfy strict scrutiny. *See supra* I.A.4.

### C. UCLA's policies and practices violate the Equal Protection Clause (Count I).

Denying access to public educational institutions on the basis religion or ethnicity is a clear-cut violation of the Equal Protection Clause. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 202-03 (2023). Indeed, under the Equal Protection Clause, "school officials have the continuing duty to take whatever action may be necessary to create a unitary, nonracial system." *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 440 (1968) (cleaned up). And because "both race and religion are suspect classes," *Al Saud v. Days*, 50 F.4th 705, 711 (9th Cir. 2022), policies that discriminate on these bases

must survive strict scrutiny, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

UCLA has failed—and continues to fail—to equally protect Plaintiffs. Instead, it has abetted activists in their segregation and harassment of Jews. Indeed, UCLA instructed police not to interfere as Plaintiffs' rights were being trampled on, and even stationed security staff to reinforce the racial and religious segregation and discrimination, Shemuelian ¶¶104-06. Protecting the perpetrators of discrimination rather than the victims is the opposite of equal protection of the laws. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886).

UCLA's practices have discriminated against Jews on the basis of both ethnicity and religion and, *supra* I.A.4., UCLA cannot satisfy strict scrutiny.

**D. UCLA's policies violate Title VI (Count VI).**

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. That mandate requires federally-funded schools like UCLA not only to refrain from their own affirmative acts of discrimination, but to protect students when they are suffering such discrimination at the hand of their peers. *See, e.g.*, *United States v. County of Maricopa*, 889 F.3d 648, 652-53 (9th Cir. 2018).

The Supreme Court has long recognized that antisemitism is a form of discrimination on the basis of race or national origin. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987). Consistent with that understanding, executive agencies have long interpreted Title VI to

prohibit discrimination against Jewish people.[7] As DOE recently reminded schools post-October-7th, discrimination against members of a religious group falls within Title VI's purview when it is based on actual or perceived "shared ancestry or ethnic characteristics" or "citizenship or residency in a country with a dominant religion or distinct religious identity." U.S. Dep't of Educ. OCR, Dear Colleague Letter at 1-2 (Nov. 7, 2023), https://perma.cc/S7MQ-B77A.

The exclusion, harassment, and violence that Plaintiffs and other Jewish students are experiencing at UCLA plainly fits that bill. Indeed, the perpetrators of those acts have made unambiguously clear that their hostility toward Jewish people is grounded in their actual or perceived connection to Israel. To take just a few examples, agitators have chanted "death to Israel" and "death to Jews" interchangeably on multiple occasions. *E.g.*, Shemuelian ¶24. When their "Fuck Jews" graffiti was removed, they promptly replaced it with "Fuck Zionists." Compl. ¶78. And activists manning the checkpoints of the Jew Exclusion Zone deemed wearing a Star of David sufficient to label someone a forbidden "Zionist." Rassbach Ex.22. As courts and agencies have recognized, discriminating against students based on a "style of dress that reflects both ethnic and religious traditions," or is based on where "a student came from or is perceived to have come from," easily falls within Title VI. November 2023 Dear Colleague Letter at 2, *supra*; *see also, e.g.*, *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F.Supp.3d 332, 354-55 (S.D.N.Y. 2014) (collecting cases).

Under Title VI UCLA must prevent such forbidden discrimination from denying Jewish students full and equal participation in the benefits

---

[7]   *See* U.S. Dep't of Educ. OCR, Dear Colleague Letter (May 25, 2023), https://perma.cc/5NUT-S7AN (listing documents detailing consistent agency position over 20 years).

of a UCLA education. Instead, UCLA compounded its Title VI violation by actively facilitating the activists' discriminatory and exclusionary activities, stationing security teams around the Jew Exclusion Zone and its checkpoints to protect the perpetrators rather than the victims. *See, e.g.*, Frankel ¶¶34-35. UCLA has thus gone far beyond the deliberate indifference to discrimination by others that suffices for Title VI liability, and affirmatively facilitated efforts to deny Jewish students the equal access to education they deserve. Title VI violations do not get much more clear-cut than that.

## II. Plaintiffs satisfy the remaining preliminary-injunction factors.

### A. Plaintiffs are suffering irreparable harm.

Plaintiffs have suffered and will continue to suffer irreparable harm without injunctive relief. Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *FCA*, 82 F.4th at 694 (same). Thus "[i]rreparable harm is relatively easy to establish in a First Amendment case"—all that's necessary is a "colorable First Amendment claim." *Cal. Chamber of Comm. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022).

Plaintiffs easily clear this low bar. Denying Plaintiffs' constitutional and statutory rights by denying them access to UCLA's facilities and educational opportunities on an equal basis with their peers because of their religion, ethnicity, and viewpoint suffices to show "irreparable injury sufficient to merit the grant of relief." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *see also Baird v. Bonta*, 81 F.4th 1036, 1044 (9th Cir.

2023) (any "constitutional violation" sufficient for "showing" "irreparable harm").

Moreover, UCLA is forcing Plaintiffs to endure traumatic antisemitic harassment, leaving them afraid to attend class and engage in other activities on campus. Shemuelian, for example, stopped attending class on campus after hundreds of activists swarmed her law school building while chanting "death to Jews" and other antisemitic rhetoric—an experience that left her "shaking, crying, unable to breathe, and dizzy." Shemuelian ¶24-36. Frankel and Ghayoum have similarly restricted their campus activity. Frankel ¶¶23-26, 48; Ghayoum ¶¶41-46, 57. Thus, if the activists' discriminatory and exclusionary campaign resumes in the fall—as they have promised—UCLA's policies and practices will force Plaintiffs to continue avoiding campus.

Universities like UCLA "have a special relationship with their students and a duty to protect them from foreseeable violence during curricular activities." *Regents of Univ. of California v. Superior Ct.*, 413 P.3d 656, 660 (Cal. 2018). But here, UCLA failed in that duty. It knew about the "extremely hateful behavior" taking place on its campus shortly after the Hamas attack. Shemuelian Ex.6. And it knew Jewish students raised many safety concerns throughout the months following. *See, e.g.*, Shemuelian ¶¶25-32, 44-46. Yet despite all these warnings, UCLA clung to its policies and practices of allowing activists to intimidate, harass, and segregate Jewish students.

Nor has UCLA changed course because of these horrific events; it's still UCLA's policy "not to request law enforcement involvement *preemptively*." Shemuelian Ex.11 (emphasis added). The fruits of this policy have been evident in UCLA's reaction to the numerous attempts to re-establish exclusionary zones during May and June of 2024,

including the refusal to assist a rabbi mid-assault. That, in turn, means that no matter how many times activists threaten to establish additional encampments and checkpoints—and succeed in doing so—UCLA will *never* preemptively protect Plaintiffs from continued harm. And because UCLA has proven unable or unwilling to protect its Jewish students, Plaintiffs reasonably fear returning to campus this fall. Frankel ¶¶44-50; Ghayoum ¶¶58-62; Shemuelian ¶¶159-67.

A student's college and law school experience is precious and lasts but a few years. UCLA has already stolen one of those years from Plaintiffs; it should not get to steal another. Plaintiffs need injunctive relief now, so they can safely return to campus in August.

**B. The public interest and balance of equities favor Plaintiffs.**

Courts grant preliminary injunctions upon a showing that First Amendment rights are likely being violated because the Constitution strikes the remaining balance. *See, e.g.*, *Am. Beverage Ass'n*, 916 F.3d at 758. So when, as here, "the party opposing injunctive relief is a government entity, the third and fourth factors … 'merge.'" *FCA*, 82 F.4th at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Here, because Plaintiffs have "raised serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in [their] favor." *Id.* Similarly, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Since UCLA's policies violate Plaintiffs' constitutional rights, the balance of equities and the public interest strongly support granting a preliminary injunction.

**CONCLUSION**

The Court should grant the injunction requested.

Dated: June 24, 2024      Respectfully submitted,

/s/ *Eric C. Rassbach*
Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Richard C. Osborne (DC Bar No. 90024046)*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

*Attorneys for Plaintiffs*

\* admitted *pro hac vice*

---

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

27

## CERTIFICATE OF COMPLIANCE

    Undersigned counsel of record for Plaintiffs certifies that this brief contains 6,998 words, which complies with this Court's word limit for memoranda of points and authorities.

Dated: June 24, 2024

*/s/ Eric C. Rassbach*
Eric C. Rassbach

*Counsel for Plaintiffs*
