Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Richard C. Osborne (DC Bar No. 90024046)*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*, <br><br>    Plaintiffs, <br><br> v. <br><br> REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*, <br><br>    Defendants. | Case No.: 2:24-cv-4702 <br><br> **DECLARATION OF EDEN SHEMUELIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: July 22, 2024 <br> Time: 9:00 a.m. <br> Courtroom: 7C <br> Judge: Hon. Mark C. Scarsi |

* admitted *pro hac vice*

I, Eden Shemuelian, declare and state as follows:

1. I am over the age of 18 and am capable of making this declaration pursuant to 28 U.S.C. § 1746. I have personal knowledge of all the contents of this declaration.

2. I am a first-generation undergraduate and law student.

3. I attended UCLA as an undergraduate, and I completed my second year at UCLA School of Law in the Spring of 2024

**I. My Jewish Faith and Identity**

4. I am Jewish and grew up learning about and participating in my faith by attending Hebrew school, becoming a *bat mitzvah*, celebrating Jewish holidays, and observing Shabbat.

5. After my *bat mitsvah*, I began teaching Hebrew to younger children each Sunday.

6. I continue to observe Jewish holidays and Shabbat, and I attend synagogue with my family.

7. I wear a Star of David pendant as a sign of my religious faith and commitment to the Jewish people.

8. My father is Israeli, and I have family in Israel.

9. I learned a lot about my Jewish faith during my regular trips to visit my family in Israel, including on a 2018 Birthright trip, where I visited cultural and religious sites important to the Jewish people.

10. Israel is at the core of my Jewish identity. To me, Israel represents the homeland of the Jewish people, which was given to them by God and set aside for them for thousands of years.

11. For me, Judaism is synonymous with supporting Israel. To be a faithful Jew means to support the right of Israel to exist.

12. I also continue my involvement with Judaism by being a member of the Jewish Law Students Association at UCLA.

## II. My Personal Connection and History at UCLA

13. I decided to attend UCLA as an undergraduate after making a campus visit and falling in love with its beauty. In particular, Royce Quad stood out to me as an iconic representation of UCLA's beautiful architecture and spirit of camaraderie.

14. Attached as **Exhibit 1** is a true and accurate copy of a photograph I took of Royce Hall and posted to my Instagram account on April 22, 2016. I captioned the photo "home" followed by yellow and blue hearts for UCLA's colors and a bear emoji for the schools Bruin mascot. I took this picture because, to me, Royce Quad stood out as a representation of the community and warmth I felt during my UCLA visit.

15. I decided to pursue a law degree at UCLA after spending my undergraduate years steeped in UCLA's rigorous academics and strong sense of collegiality.

16. I experienced that same sense of collegiality in my first year of law school, but it evaporated quickly after October 7, 2023.

## III. My experience of rising antisemitism and lack of action from UCLA after October 7th

17. After the terrorist attacks by Hamas on October 7, 2023, I began to witness an increase in antisemitic activity on campus, alongside a corresponding lack of interest by faculty and administration to put it to an end.

18. I saw regular protests at UCLA's law school, replete with antisemitic language and imagery. These protests included chants like "From the river to the sea, Palestine will be free," "There is only one solution, intifada revolution," "UCPD, KKK, IDF, they're all the same," and "Hey hey, ho ho, this occupation has got to go!"

19. On many occasions, I also saw swastikas on campus. For instance, I observed a swastika engraved into a table in the Shapiro Courtyard of UCLA's law school.

20. On October 27, 2023, I received a campuswide email from Chancellor Gene D. Block entitled "Maintaining a Safe Learning and Working Environment for All." Attached as **Exhibit 2** is a true and correct copy of that email.

21. The email acknowledged "a stark rise in anti-Semitism over the course of the past several years" and committed UCLA to "protect[ing] the safety and well-being of all Bruins." *Id.*

22. On October 30, 2023, two activists ripped down "bring them home" posters that my friends and I had hung near the law school featuring the names and faces of the hostages kidnapped and held in captivity by Hamas.

23. I saw similar posters that been ripped down on multiple other occasions, including when posters were hung on bulletin board space set aside for the Jewish Law Students Association.

24. On November 8, 2023, hundreds of agitators—many of them masked—swarmed into the law school and took over the building. They chanted various slogans, including "death to Israel," "death to Jews," "there is only one solution," "*intifada*," and "from the River to the Sea," while standing approximately ten feet away from me. Two of the students participating in this protest were my classmates and  sat very close to me in one of my classes.

25. Two days after this protest, I wrote to Michael Waterstone, the Dean of UCLA's School of Law, copying Chancellor Block, the UCLA law school's Student Affairs Office, and several other officials. Attached as **Exhibit 3** is a true and correct copy of that email exchange.

DECLARATION OF EDEN SHEMUELIAN

3

26. Describing the November 8 protest and the previous instances of poster vandalism in detail, I explained that these events left me and other Jewish students "shaking, crying, unable to breathe, and dizzy." *Id.*

27. I also expressed that "this school has not been a safe space for me and my Jewish peers for the past few weeks. I chose to attend this university to receive an education. If I had known I would be faced with extreme antisemitism on a daily basis, I would have committed elsewhere. I have not been able to sit in class and learn for the past 34 days, especially when these students sit behind me in my classes four days a week with their Palestinian resistance/terrorist scarves (and only seconds before class is to begin, they are chanting for the genocide of my people)." *Id.*

28. I also stated I did not feel safe attending class in person, explaining that I had opted instead to attend my lectures online because of this and other demonstration events. *Id.*

29. The email identified specific students who yelled antisemitic chants during the November 8 protest and who had previously torn down hostage posters.

30. The email also attached a chant sheet used by the activists during the November 8 disruption. *Id.* These included "There is only one solution" with the response phrase "**Intifada revolution,**" "Israel, Israel you will learn" with the response chant "**By the millions we'll return!**," and "1-2-3-4 **(occupation no more/open up the prison doors!)**, 5-6-7-8 **(Israel is a terrorist state!)**."

31. Later in the exchange, Dean Waterstone confirmed that he had forwarded the email to UCLA's Dean of Students, Jasmine Rush, since "this type and the handling of these incidents happens at the University level." *Id.*

32. He also confirmed that the office of the Dean of Students "confirmed receipt" of the email. *Id.*

33. I am not aware of any discipline imposed on these students for these incidents.

34. Because no action was taken, I ceased attending any of my classes for the rest of the semester in person, specifically because of the fear and intimidation caused by hearing antisemitic chants every time I entered the school. Instead, I watched my classes through recorded lectures, which severely compromised my ability to study and to participate in UCLA life.

35. I wrote multiple emails to my professors explaining why I felt compelled to no longer attend class in person, explaining that "it is hard for me to sit in class and focus when I feel uncomfortable and unsafe on campus as a Jewish student."

36. Attached as **Exhibits 4** and **5** are true and correct copies of two such email exchanges with my professors.

37. For the same reason, I also severely curtailed the number of hours I worked for the Ziffren Institute for Media, Entertainment, Technology & Sports Law at the law school.

38. The antisemitic atmosphere permeating UCLA meant I felt afraid to be on campus, and so I opted to limit my time spent on campus as much as possible.

39. On November 10, 2023, I received via email a campus-wide letter from Chancellor Gene D. Block entitled "Standing Against Bigotry at the University of California." Attached as **Exhibit 6** is a true and correct copy of that email.

40. In that email, Chancellor Block acknowledged the "incidents of bigotry, intolerance and intimidation" that took place at UCLA "over the

past several weeks." The email referred to a horrifying incident on November 8, of which I was aware, where harassers chanted "beat that fucking Jew" through a megaphone while bashing an image of Israeli Prime Minister Benjamin Netanyahu.

41. In his November 10 email, Chancellor Block acknowledged that "individuals exhibited extremely hateful behavior and used despicable Antisemitic language, which was captured on video and shared widely, frightening many within our community." *Id.*

42. Chancellor Block pledged to "work against" such "bigotry" and that his "administration [would] launch[] its own set of efforts to strengthen community and reaffirm our values in this period of intense strife." *Id.*

43. Based on my past experiences with antisemitism on UCLA's campus, I had no confidence that Chancellor Block would follow through on this promise.

44. On November 29, 2023, I contacted Bayrex Martí, the Assistant Dean of Student Affairs at UCLA Law, along with Michael Waterstone and others, after I saw a post on X while I was walking to study for finals at the library. The post shows two pictures of what appear to be anti-Israel protestors holding knives in their hands that are by their sides while standing and walking out in the open on campus. Attached as **Exhibit 7** is a true and correct copy of my email exchange concerning this social media post.

45. Dean Martí provided only a generic response, passing me off to other campus departments and giving me no assurances that the school would take action to investigate or to ensure the physical safety of Jewish students. When I replied asking for follow up, I received no response.

46. I also discussed this situation on a call with Benito Nieves, Associate Dean of Students for UCLA Law, who also gave no assurances of security, discipline, or investigation.

**IV. Impact of the encampment's Jew Exclusion Zone**

47. I was also personally impacted by UCLA's Jew Exclusion Zone.

48. The encampment's location on Royce Quad was approximately a three-minute walk from the law school building.

49. Royce Quad, also known as Dickson Plaza, is a large, grassy space located between two buildings to its north (Royce Hall and Haines Hall), and two buildings to its south (Powell Library and Kaplan Hall), which represent the original four buildings of UCLA's campus.

50. Royce Quad is one of the most-frequented areas on campus where students gather during the day and between classes. It is also a thoroughfare that students and faculty routinely use to access the rest of UCLA's campus, including buildings like the Student Activities Center and the main recreational facility, the John Wooden Center, both of which are located just southwest of the Quad.

51. It is also located a short walk from many academic buildings, including UCLA's business school and law school.

52. Royce Hall is widely recognized as a symbol of UCLA and a piece of iconic architecture on campus.

53. For this reason, my undergraduate graduation photos and many sorority event photos were taken in front of Royce Hall.

54. Its auditorium hosts many performances and events every year. Royce Hall also has seminar and meeting rooms and hosts UCLA classes.

55. The encampment completely destroyed the beauty of Royce Quad and changed an area associated with friendship and community into one synonymous with bigotry and hate.

56.  I received a number of communications from UCLA alerting me to the situation on campus created by the encampment. These alerts made clear to me that UCLA had no intention of protecting Jewish students or intervening to stop the encampment's anti-Semitism from flourishing.

57.  On April 25, 2024, I received a campus-wide alert noting that "a demonstration with encampments" had "formed early [that] morning … in Royce Quad."  Attached as **Exhibit 8** is a true and correct copy of that email.

58.  The alert committed UCLA to "minimizing disruption to our teaching and learning mission" and stated that "[a]t this time, the typical campus teaching and learning activities will continue as usual and classes will be held as planned." *Id.*

59.  By the next day, those "typical" operations were no longer in force.

60.  On April 26, 2024, I received a campus-wide alert describing the encampment, which had only existed for a day, as "mostly peaceful." Attached as **Exhibit 9** is a true and correct copy of that email.

61.  The alert detailed new "access restrictions" to Royce Hall and Powell Library that had been put in place. *Id.*

62.  On April 27, 2024, I received a campus-wide alert via email stating that the "encampment demonstration" had been "mostly peaceful." Attached as **Exhibit 10** is a true and correct copy of that email.

63.  This time, the alert specifically mentioned additional security UCCLA had employed to assist the encampment activists. It stated that "[s]afety personnel in Student Affairs Mitigators (SAMs) and Public Safety Aides (PSAs) uniforms are around the encampment site, and CSC security teams are also located throughout campus." *Id.*

64. On April 28, 2024, I received another campuswide alert about the encampment. Attached as **Exhibit 11** is a true and correct copy of that email.

65. The message stated that "UCLA is following University of California systemwide policy guidance, which directs us not to request law enforcement involvement preemptively, and only if absolutely necessary to protect the physical safety of our campus community." *Id.*

66. Instead of ensuring that Jewish students could pass through the area, the alert goes on to note that "We've taken several steps to help ensure people on campus know about the demonstration so they can avoid the area if they wish." *Id.* The alert also noted that "[w]e also have safety teams who are wearing Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs) and CSC security uniforms throughout the demonstration site." *Id.*

67. The alert concludes by providing a link where students can learn "more information about emergencies at UCLA." *Id.*

68. On April 29, 2024, I received another campus alert detailing that "physical altercations broke out among demonstrators on Royce Quad" on April 28. Attached as **Exhibit 12** is a true and correct copy of that email.

69. The alert also noted that UCLA "instituted additional security measures and increased the numbers of our safety team members on site, including our uniformed Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs), CSC and campus security." *Id.*

70. The email did not explain why the acknowledged violence did not make it "absolutely necessary" for police to intervene.

71. At 8:00 AM on April 30, 2024, I received another campus alert about the encampments. Attached as **Exhibit 13** is a true and correct copy of that email. Despite stating that the school was "committed" to the

"safety and wellbeing of Bruins" and "minimizing disruption to our teaching and learning mission," the update noted that "[e]vents and activities are being evaluated on a case-by-case basis" to determine whether they could continue as scheduled. *Id.*

72. The alert also noted that UCLA had "enhanced security measures and increased the numbers of our safety team members on site, including our uniformed Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs), CSC and campus security." *Id.* It stated that "access to Royce Quad is limited and as such, please enter Powell and Kaplan Hall from the south-facing entrances; Royce and Haines Hall are accessible through the north or west entrances." *Id.*

73. And instead of helping students pass through the area, the alert stated that UCLA would "continue to ensure people on campus know about the demonstration so they can avoid the area if they wish. This includes having student affairs representatives stationed near Royce quad to let Bruins and visitors know about the encampment, redirect them if desired and to serve as a resource for their needs." *Id.*

74. It once again concluded with a link for learning "more information about emergencies at UCLA." *Id.*

75. Later that day, at 4:25 PM, I received an additional alert that noted that "[a]ccess to Royce Hall is now closed through Friday" and that "[s]tudent affairs representatives, along with signage, are stationed near Royce Quad to let Bruins and visitors know about the encampment and closed buildings, redirect them if desired and serve as a resource for their needs. We have also enhanced security measures and increased the numbers of our safety team members on site, including our uniformed Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs), CSC and

law enforcement officers." Attached as **Exhibit 14** is a true and correct copy of that email.

76. A few hours later, at 6:01 PM, I received via email a campus-wide letter from Chancellor Block entitled "Affirming our Values in a Challenging Time." Attached as **Exhibit 15** is a true and correct copy of that email.

77. The email explicitly acknowledged that the activists had "established an unauthorized physical encampment on part of Royce Quad." *Id.*

78. He further acknowledged that this "unauthorized physical encampment" had led to "frankly … shocking and shameful" "tactics," that the encampment included "instances of violence completely at odds with our values," and that the encampment had resulted in "students on their way to class [being] physically blocked from accessing parts of the campus." *Id.*

79. And he also acknowledged that these "shameful" tactics left students feeling "bullied, threatened and afraid," and left many, "especially our Jewish students, in a state of anxiety and fear." *Id.*

80. But Chancellor Block did not commit to helping Jewish students, let alone to dismantling the encampment. Instead, he stated that "[w]e have significantly increased our security presence in the area, including adding greater numbers of law enforcement officers, safety personnel and student affairs mitigators." *Id.*

81. The letter made no commitments about ensuring that Jewish students could freely access campus or stop feeling threatened, bullied, and harassed on campus. This failure to respond was completely consistent with my prior experiences with UCLA failing to address anti-Semitism on UCLA's campus.

82. So I was not at all surprised that, despite the April 29 alert acknowledging that violence had broken out the day before, and despite Chancellor Block's acknowledgement of the fear that Jewish students were experiencing, the encampment remained standing on April 29 and 30.

83. The same remained true on May 1, 2024. At 2:16 PM, I received via email a campus-wide letter from Chancellor Block entitled "Condemning Violence in our Community." Attached as **Exhibit 16** is a true and correct copy of that email.

84. Chancellor Block sent the letter after a confrontation between encampment members and counter-protesters escalated into a violent clash on the evening of April 30, 2024.

85. The letter condemned the "attack [on] the encampment that has been established … to advocate for Palestinian rights" by "a group of instigators." *Id.* It was only after this "attack" that UCLA decided to "request[] support from external law enforcement agencies to help end this appalling assault, quell the fighting and protect our community." *Id.*

86. The email said nothing about prior attacks—both physical and verbal—on Jewish students like myself as we tried to access academic buildings and traverse Royce Quad, nor did it promise to allow safe passage to Jewish students going forward.

87. Neither did the campus alerts we received that day.

88. At 8:02 AM on May 1, I received a Campus Activity Alert email stating that "all classes are cancelled today" because of "the distress caused by the violence that took place on Royce Quad late last night and early this morning." Attached as **Exhibit 17** is a true and correct copy of that email.

89. The alert instructed that we were to "[p]lease avoid the Royce Quad area." *Id.* It noted that "all classes are cancelled today," that "Royce Hall remains closed through Friday," and that "Powell Library is also closed and is scheduled to reopen on Monday." *Id.*

90. Later that evening, at 6:30 PM, another campus alert announced that "[c]ampus operations will be limited tomorrow and Friday" and to "[p]lease continue to avoid campus and the Royce Quad area." Attached as **Exhibit 18** is a true and correct copy of this alert as published on UCLA's Bruins Safe Online website.

91. The alert also notified me that UCLA would hold classes remotely on May 2 and 3, and that it had closed other areas of campus, including Geffen Academy, Lab School, and Early Care and Education. *Id.*

92. On May 2, 2024, I received via email a letter from Chancellor Block to the campus community entitled "Our Community is in Deep Pain." Attached as **Exhibit 19** is a true and correct copy of that email.

93. In that message, Chancellor Block explained that UCLA had finally reached the conclusion to "direct UCPD and outside law enforcement officers to enter and clear the encampment" early in the morning on May 2. *Id.*

94. The letter acknowledged that "the encampment on Royce Quad was both unlawful and a breach of policy" that his administration had "allowed … to remain in place." *Id.*

95. The letter further acknowledged that the encampment had led to "several days of violent clashes" and had resulted in "[d]emonstrators directly interfer[ing] with instruction by blocking students' pathways to classrooms" and "violence related to the encampment" that "led to the closure of academic buildings and the cancellation of classes." *Id.*

96. The letter also described the "carefully developed" plan that law enforcement used to clear the encampment, which included "giv[ing] [the activists] several warnings" and "offer[ing] the opportunity to leave peacefully with their belongings before officers entered the area." *Id.*

97. In the same message, Chancellor Block claimed that the university would "continue to support our Jewish students and employees who are reeling from the trauma of the brutal Oct. 7 attacks and a painful spike in antisemitism worldwide." *Id.*

98. I understood this as a lack of concern for the safety, wellbeing, and education of myself and other Jewish students. The letter never once condemned the act of excluding Jewish students like myself from various parts of campus, simply because we refused to disavow Israel or remove our Jewish garb. So it was unclear how the administration's approach to the encampment supported the safety and well-being of Jewish Bruins like myself and my Jewish friends who were blocked from parts of campus simply for being Jewish.

**V. Personal experiences with the encampment**

99. All told, the campus alerts and responses from Chancellor Block made clear to me that UCLA had no interest in protecting Jewish students or in stopping the encampment. They were also completely consistent with my own personal experiences.

100. On April 26, 2024, I attempted to observe the encampment and its activities. I approached the barricade, joining other students who, like me, wore Jewish garb such as kippahs and Stars of David or holding Israeli flags.

101. While standing about three feet from the barricade, I attempted to read the signs and hear the chants taking place within the encampment.

102. I saw signs reading "Fuck Israel" and "From the River to the Sea," and depicting red inverted triangles—including on the encampment's "official" sign.

103. I also saw signs equating Israel and the Israeli Defense Force to the Ku Klux Klan and white supremacy. Many of the activists that I observed inside the encampment were masked.

104. Rather than ensuring that Jewish students could pass safely through the areas to access Royce Quad, Powell Library, Royce Hall, and other locations on campus, I witnessed security acting to stop individuals from passing through.

105. Thus, rather than helping Jewish students like me, I observed the security staff serving to facilitate the encampment's exclusion.

106. For instance, a man in a light blue polo shirt that said "Security Staff" with a logo depicting "CSC" who was standing on the outside of the barricade began to chastise me for being near the barricade.

107. Though I simply stood and watched silently, the CSC staff member told me "to move away from the barricade and keep going unless you're going in."

108. The CSC member told me that he had "been asked to keep this area [in front of the encampment] clear" and that he was "not the issue, you guys are."

109. Additionally, a group of security guards sitting on bikes and wearing blue shirts emblazoned with CSC mocked me and the other Jewish observers, laughing at a male student singing in Hebrew who was yelled at by activists. They also jeered at the students when they professed anger at not being able to pass through and repeatedly told me and the other Jewish students that we needed to leave.

DECLARATION OF EDEN SHEMUELIAN

15

110. I also witnessed a student wearing a kippah and holding a pro-Israel sign being told by these same security guards to leave the area near the encampment.

111. I knew that I could not pass through the encampment without disavowing my beliefs about Israel, which I could not do both as a matter of faith and as a matter of my ethnic identity as a Jew.

112. As a result of these actions by security, I was forced to leave the area.

**VI. Impact of the encampment on my campus experience and studies**

113. Because of the encampment and my knowledge that Jewish students were being denied access to Royce Quad and academic buildings, I ceased many social activities as well, opting instead to stay home or to not leave the law school at all.

114. Before the encampment, I strongly associated Royce Quad with the highlights of my UCLA experience.

115. Powell Library is UCLA's main undergraduate library. It is a popular place for undergraduates and sometimes graduate students to study.

116. A variety of programming also takes place in Powell Library including exhibits, readings, and other events that support student learning and creativity.

117. I studied in Powell Library frequently as an undergraduate at UCLA. I still occasionally choose to study there because of my fond undergraduate memories associated with Powell Library.

118. Along with many other law students, I frequently walk through Royce Quad from the law school to access other parts of campus, including to get food and coffee at other campus locations.

119. Because of Royce Quad's central location and my affinity for the space developed as an undergrad, I also frequently take study breaks to walk around Royce Quad to get some exercise and fresh air.

120. But because of the encampment, and my knowledge that I could not traverse Royce Quad without violating my religious beliefs, I ceased all of these activities.

121. Additionally, the encampment negatively impacted my ability to study for final exams.

122. Unlike other academic departments and programs, the law school did not cancel or suspend in-person classes or exams due to the encampment.

123. Unlike other programs, which were still in regular class session during the lead up to and existence of the encampment, the law school was scheduled to hold final exams from April 29, 2024, through May 9, 2024. Attached as **Exhibit 20** is a true and correct copy of UCLA's academic calendar, which I retrieved from UCLA's website and consult regularly during my academic studies.

124. My ability to study for final exams was severely compromised due to encampment activity. I was forced to walk near the encampment to enter the law school, and my studies were routinely drowned out by the antisemitic chants rising from the encampment.

125. In a normal semester, I would have spent many hours in the law school and its library preparing for finals because I am better able to focus there. However, this semester I mostly avoided going to campus to study because of the encampment.

126. On April 28, 2024, while I was trying to access the law school to study for an exam taking place on April 30, I was again forced to confront

the encampment due to parking restrictions that prevented me from parking near the law school.

127. Because of the parking restrictions, I was forced to park near the encampment and to walk around the encampment to get to the law school.

128. Once again, I knew I could not simply cut through the encampment, because to do so would require me to violate my faith by disavowing Israel's right to exist.

129. So instead, I was forced to walk around the encampment, with antisemitic chants ringing in my ears and antisemitic signs in my face.

130. This experience severely and negatively impacted my ability to study for my final exam once I reached the law school library, where I could still hear the chanting from the encampment.

131. The ongoing encampment caused the entire finals period to be pervaded with a sense of fear for me, and I felt that I and other Jewish students were unsafe and subject to harm if we went anywhere near the encampment.

132. Because of the law school's proximity to the encampment, I also feared activists would enter the law school building.

133. The antisemitic activities taking place at the encampment caused me to feel immensely afraid as a Jewish student at the thought of needing to cross by the encampment to attend my finals.

134. I was also aware of incidents earlier in the week when one of my Jewish friends was pepper sprayed by encampment members, and my cousin was hit in the head near the encampment and had to go to the hospital.

135. On May 1, I received an email from Dean Waterstone describing the encampment as a "hard moment" and instructing "anyone [who] is

experiencing personal circumstances and wants to request an exam accommodation" for final exams should reach out to the student affairs office. Attached as **Exhibit 21** is a true and accurate copy of that email.

136. That same day, I informed Dean Martí that I felt unsafe coming to the law school for my final exam of the semester due to the encampment's Jew Exclusion Zone and related protest activity on campus. Attached as **Exhibit 22** is a true and accurate copy of that email exchange.

137. But, despite UCLA's previous assurances that such requests would be accommodated, my request was denied. *Id.* I responded, this time copying several other law school deans and the law school student affairs office, but my repeated entreaties for reconsideration were ignored.

138. In fact, I did not receive a response to my final plea that I not be subjected to the violence and harassment that I feared by being required to come to campus for the exam.

139. Because the law school administration never responded to my final request, I had to go to campus and walk through areas affected by and in close proximity to the encampment in order to not miss my final exam.

**VII. Ongoing disturbances on campus**

140. Despite having left campus for the summer, I continue to receive campus messages and updates on UCLA email. Through these messages, I am aware that antisemitism remains alive and well at UCLA's campus, and the administration continues to refuse to put an end to it.

141. For example, on May 2, 2024, at 6:02 PM, I received a campus alert via email that noted that "[c]ampus operations [would] be limited" on Friday, May 3rd, that all in-person classes would be remote, and that

1  those on campus should "continue to avoid the Royce Quad area."

2  Attached as **Exhibit 23** is a true and correct copy of that email.

3  142. On May 3, 2024, I received another campus alert via email

4  informing me that the university had moved the "limited" campus

5  operations "through the weekend." The update also instructed students

6  to "[p]lease continue to avoid the area of Royce Quad." Attached as

7  **Exhibit 24** is a true and correct copy of the email.

8  143. I was also aware of a number of disturbances on campus in early

9  May. These included an attempt to occupy Moore Hall—home to the

10  UCLA School of Education and Information Studies—on May 6, 2024,

11  attempts to block access to two parking decks on May 13, 2024, and an

12  attempt to set up yet another encampment on May 23, 2024.

13  144. These continuing attempts to create exclusionary zones

14  convinced me that the situation on campus continued to be uncontrolled

15  and UCLA had no interest in protecting its Jewish students.

16  145. I also received a campus alert via email at 5:15 PM on May 23

17  saying that "[c]lasses in Moore Hall continue to be held remotely for the

18  remainder of the day." Attached as **Exhibit 25** is a true and correct copy

19  of that email.

20  146. The alert noted that "[a]ccess to Dodd Hall is limited and we are

21  asking the community to avoid the area." *Id.*

22  147. The update explained that this request was made because

23  "demonstrators on Kerckhoff Patio" had again been "erecting barricades,

24  establishing fortifications, and blocking access to parts of the campus and

25  buildings" and "were disrupting campus operations." *Id.* After noting that

26  the "[d]emonstrators willingly dispersed, and no arrests were made," the

27  notice went on to reveal that the band of activist were still roaming about

28  campus. *Id.* It stated that "[d]emonstrations may continue to shift to

different parts of campus" and once again relayed the link for "information about emergencies at UCLA." *Id.*

148. On May 24, 2024, at 10:01 AM, I received via email a statement to the campus community from Associate Vice Chancellor for Campus Safety Rick Braziel entitled "Updates on Campus Safety and Recent Demonstrations." Attached as **Exhibit 26** is a true and correct copy of that email.

149. The email stated that on the morning of April 23, "shortly before 7 a.m., demonstrators arrived on the Kerckhoff patio and began to erect barricades, blocking access to the area and nearby buildings and disrupting regular campus operations." *Id.*

150. The email continued: "Later, demonstrators arrived at Dodd Hall, barricaded access to the building and committed acts of vandalism. The group was ordered to disperse and, while some demonstrators left, ultimately UCPD cleared the building." *Id.*

151. On June 11, 2024, at 4:31 PM, I received an email message to the campus community from Associate Vice Chancellor Braziel entitled "Condemning Monday's violence on campus." Attached as **Exhibit 27** is a true and correct copy of that email.

152. The email described yet another occupation, which Braziel called "demonstration activity," that once again "resulted in violence, destruction of property and the blocking of student access to parts of campus. … These actions also prevented students from completing their final exams." *Id.*

153. The email went on to describe how the "activity" involved a series of violent attacks and vandalism, including "dy[ing] the water in Shapiro Fountain red, us[ing] water-filled barriers and chicken wire to block the area, us[ing] amplified sound, and set[ting] up tents and canopies." *Id.*

154. Rather than taking swift action, these protesters were simply told to "disperse." *Id.* They did not. Instead, they "moved to Kerckhoff patio carrying wooden shields," where they "proceeded to vandalize property with permanent red paint and erected barriers that blocked students and the public from accessing that part of campus." *Id.*

155. Simultaneously, "another group at Moore Hall" disrupted final exams. *Id.*

156. Apparently, blocking access to campus still wasn't enough to get the administration to step in; the Kerckhoff protesters were again simply told to "disperse." *Id.* And again, they did not, instead "mov[ing] to an area near Dodd Hall," which "resulted in some students having to miss finals because they were blocked from entering classrooms" and "some students [needing] to be evacuated in the middle of taking their final exams." *Id.*

157. The letter never condemned the views or the attempts to exclude other students from campus. It never once stated that it is categorically impermissible for students to explicitly block others from parts of campus because of their views or religious beliefs on Israel. Rather, the letter simply stated that "we will not tolerate violence." *Id.*

158. That letter corroborated an alert I had received earlier in the day from the law school, informing me that "There were demonstrations in Shapiro Courtyard last night." Attached as **Exhibit 28** is a true and correct copy of that email. Shapiro Courtyard is the law school's courtyard.

**VIII. Fears about returning to UCLA**

159. The events that took place after the encampment was dismantled only confirm that UCLA has not committed itself to putting a stop to the increasingly escalating attempts by others to exclude me and other

Jewish students from an ever-broadening swath of campus, simply because we are Jewish.

160. They also confirm that the law school is no longer a safe space for me, and that I have every reason to believe that this activist and exclusionary activity will occur at or near the law school in the future.

161. I am scheduled to begin my last year of law school on August 26, 2024. I am experiencing immense fear about returning to campus in the fall for my final year of law school. Based on my personal experiences and UCLA's responses both before, during, and after the encampment, I have no confidence that UCLA will ensure my safety and freedom of access on campus as a Jewish student.

162. UCLA repeatedly failed to protect me and other Jewish students from being blatantly excluded from areas of campus that we have every right to access on the exact same bases as our non-Jewish peers. I have every reason to suspect this failure will occur again.

163. UCLA and its administration have never once condemned the fact that students excluded me and other Jewish students from accessing parts of campus simply because we are Jewish.

164. UCLA and its administration have never once stated that such blatant segregation is a violation of the U.S. Constitution and other statutory protections, nor have they committed to never allowing such exclusion to arise again.

165. Meanwhile, rampant anti-Semitic activity continues to arise on campus, with no end in sight.

166. For these reasons, I have no confidence that, were another encampment to arise, UCLA would take action to protect me and my fellow Jewish students.

167. I am a first-generation student, both at the undergraduate and graduate level. I have worked exceedingly hard to obtain the academic and professional accomplishments I have achieved thus far, often working multiple jobs to pay my way through school. UCLA should not be allowed to deprive me of the fruits of my hard work, especially on the basis of my religion and ethnic identity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of June, 2024.

Eden Shemuelian