MATTHEW R. COWAN (S.B. #281114)
mcowan@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

ANTON METLITSKY*
ametlitsky@omm.com
JENNIFER SOKOLER*
jsokoler@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
Facsimile: (211) 326-2061

MEAGHAN VERGOW*
mvergow@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Defendants*

**Admitted pro hac vice*

[*Counsel continued on next page*]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION – LOS ANGELES**

| | |
|---|---|
| Frankel, et al., | Case No. 2:24-CV-4702-MCS |
| Plaintiffs, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| Regents of the University of California, et al., | |
| Defendants. | Judge: Hon. Mark C. Scarsi<br>Courtroom: 7C<br>Hearing: July 29, 2024, 9:00 AM PT |

1

[*Counsel continued from previous page*]

2

3
Charles Robinson (S.B. #113197)*
Rhonda Goldstein (S.B. #250387)*

4
Norman Hamill (S.B. #154272)*
Morae Kim (S.B. #326819)*

5
The Regents of the University of California

6
1111 Franklin Street, Floor 8
Oakland, California 94607-5201

7
Telephone:   (510) 987-9800

8
Facsimile:    (510) 987-9757

9

*Attorneys for Defendants*

10

11
*Notice of Appearance forthcoming*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' OPP. TO PLFS.' MOT.
FOR PRELIM. INJ.
CASE NO. 2:24-CV-4702-MCS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ................................ 3

    A.    UCLA's Response to the Royce Quad Encampment ................ 3

    B.    Post-Encampment Efforts to Strengthen Capacity to Respond to Protests ......................................................................... 4

    C.    Plaintiffs' Lawsuit and Preliminary Injunction Motion ............. 6

PRELIMINARY INJUNCTION STANDARD ....................................... 6

ARGUMENT ........................................................................................... 8

    I.    THE COURT LACKS JURISDICTION TO ENTERTAIN PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION BECAUSE PLAINTIFFS CANNOT DEMONSTRATE STANDING TO SEEK THE REQUESTED RELIEF ........................................................................................... 8

    A.    Plaintiffs Fail to Allege an Imminent Likelihood of Future Injury ...................................................................................... 8

    B.    Plaintiffs Do Not Allege Facts Clearly Demonstrating That UCLA Will Cause Them Any Future Injury ................... 11

    II.    PLAINTIFFS FAIL TO SATISFY THE STANDARDS FOR A PRELIMINARY INJUNCTION ....................................... 12

    A.    Plaintiffs Cannot Show a Likelihood of Irreparable Harm ...... 12

    B.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims ................................................................................... 13

        1.    None of Plaintiffs' Constitutional Claims Is Viable ...... 13

            i.    Plaintiffs Cannot Bring Constitutional Claims Against UCLA Based on Non-State Action ................................................................... 13

            ii.    Plaintiffs' Constitutional Claims Based on UCLA's Actions Are Meritless ........................... 15

        2.    Plaintiffs Cannot Show That UCLA Was Deliberately Indifferent to Harassment Directed at Them by UCLA Students and Faculty ........................... 18

# TABLE OF CONTENTS

**Page**

    C.    The Public Interest and Balance of Equities Do Not Favor a Preliminary Injunction .............................................................. 19

III.    PLAINTIFFS' REQUESTED INJUNCTION IS VAGUE AND NOT ADMINISTRABLE ....................................................... 21

CONCLUSION ...................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .................................................................................17

*Am.'s Frontline Drs. v. Wilcox*,
2022 WL 1514038 (C.D. Cal. May 5, 2022) .......................................14

*Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles*,
10 F.4th 905 (9th Cir. 2021) ....................................................................6

*Belgau v. Inslee*,
975 F.3d 940 (9th Cir. 2020) ..................................................................13

*Benisek v. Lamone*,
585 U.S. 155 (2018) .................................................................................19

*Blum v. Yaretsky*,
457 U.S. 991 (1982) .................................................................................13

*Burson v. Freeman*,
504 U.S. 191 (1992) .................................................................................18

*Cause & FX Ltd. v. Saban Films, LLC*,
2021 WL 6104414 (C.D. Cal. Nov. 10, 2021) ....................................19

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .....................................................................................9

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................................8

*Danielson v. Wells Fargo Bank*,
2011 WL 4551177 (C.D. Cal. Sept. 29, 2011) .....................................7

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ..............................................................2, 18, 20, 22

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
498 U.S. 189 (1989) .................................................................................14

*Doe v. Bonta*,
101 F.4th 633 (9th Cir. 2024) ...................................................................8

# TABLE OF AUTHORITIES

**Page(s)**

*Elend v. Basham,*
   471 F.3d 1199 (11th Cir. 2006) ........................................................................21

*Feied v. Regents of Univ. of Cal.,*
   188 F. App'x 559 (9th Cir. 2006)....................................................................13

*Fraihat v. U.S. Immigr. & Customs Enf't,*
   16 F.4th 613 (9th Cir. 2021) ............................................................................7

*Gill v. Whitford,*
   585 U.S. 48 (2018) ...........................................................................................22

*Grutter v. Bollinger,*
   539 U.S. 306 (2003) .........................................................................................20

*Hecox v. Little,*
   -- F.4th --, 2023 WL 11804896 (9th Cir. Aug. 17, 2023, *amended*
   June 7, 2024)......................................................................................................7

*J.M. v. Chino Valley Unified Sch. Dist.,*
   2018 WL 6075349 (C.D. Cal. Feb. 23, 2018) .................................................20

*Juliana v. United States,*
   947 F.3d 1159 (9th Cir. 2020)..........................................................................22

*Karasek v. Regents of Univ. of Cal.,*
   956 F.3d 1093 (9th Cir. 2020)..........................................................................18

*Lunn v. City of Los Angeles,*
   629 F. Supp. 3d 1007 (C.D. Cal. 2022)......................................................11, 12

*Martinez v. City of Clovis,*
   943 F.3d 1260 (9th Cir. 2019)..........................................................................15

*Meinecke v. City of Seattle,*
   99 F.4th 514 (9th Cir. 2024) ............................................................................17

*Muhammad v. California,*
   2020 WL 9848693 (C.D. Cal. Oct. 8, 2020) ..................................................21

*Nelson v. King County,*
   895 F.2d 1248 (9th Cir. 1990)............................................................................8

vi

# TABLE OF AUTHORITIES

**Page(s)**

*Nightingale v. U.S. Citizenship & Immigr. Servs.*,
  333 F.R.D. 449 (N.D. Cal. 2019) ........................................................21

*Oden v. N. Marianas Coll.*,
  440 F.3d 1085 (9th Cir. 2006) ...........................................................18

*Ogbechie v. Covarrubias*,
  2020 WL 3103789 (N.D. Cal. June 11, 2020) ....................................15

*Patel v. Kent School Dist.*,
  648 F.3d 965 (9th Cir. 2011) .......................................................13, 14

*Payne v. Travenol Lab'ys, Inc.*,
  565 F.2d 895 (5th Cir. 1978) .............................................................21

*Regents of Univ. of Cal. v. Superior Ct.*,
  4 Cal. 5th 607 (2018) .........................................................................14

*Roman v. MSL Cap., LLC*,
  2019 WL 3017765 (C.D. Cal. July 9, 2019), *aff'd*, 820 F. App'x
  592 (9th Cir. 2020) .............................................................................21

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ...........................................................................16

*S&R Glob. Inc. v. Park*,
  2024 WL 3086638 (C.D. Cal. Apr. 29, 2024)....................................12

*Salmon Spawning & Recovery All. v. Gutierrez*,
  545 F.3d 1220 (9th Cir. 2008)............................................................11

*Schenck v. United States*,
  249 U.S. 47 (1919) .............................................................................20

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ...........................................................................21

*Sessler v. City of Davenport*,
  990 F.3d 1150 (8th Cir. 2021)............................................................22

*Shooter v. Arizona*,
  4 F.4th 955 (9th Cir. 2021) ................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ...................................................................................... 8, 11

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) .............................................................................. 20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ............................................................................................. 9

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) ........................................................................................... 16

*Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*,
374 F. Supp. 3d 1124 (D. Utah 2019) .............................................................. 22

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ........................................................................................... 17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................................... 7, 12

*Wright v. Serv. Emps. Int'l Union Loc. 503*,
48 F.4th 1112 (9th Cir. 2022) .............................................................................. 8

*Yazzie v. Hobbs*,
977 F.3d 964 (9th Cir. 2020) ................................................................................ 7

## **RULES**

Fed. R. Civ. P. 65 ............................................................................................ 7, 22

1

**PRELIMINARY STATEMENT**

2      There is no home at UCLA[1] for conduct that impedes educational access and

3    jeopardizes the safety of the UCLA community, not least—but not only—when the

4    conduct is marked with antisemitism.  When tents were erected at the heart of the

5    UCLA campus in the early morning hours of April 25, UCLA faced a volatile and

6    challenging situation.  The encampment in Royce Quad had to be disbanded; the

7    harder question was how to do so safely.  Violence broke out while UCLA

8    attempted de-escalation, and UCLA had to enlist the aid of law enforcement to

9    clear the Quad—a process that took several days because of the encampment's size.

10    Over the two months since, UCLA has applied the lessons learned from the spring's

11    protests to its ongoing preparations for students' return to campus this fall.  It has

12    created a new Office of Campus Safety, which maintains an Emergency Operations

13    Center that is empowered to take decisive action in response to protests.  Since

14    May, UCLA has already successfully prevented three efforts to occupy parts of

15    campus.

16      Ignoring all this, Plaintiffs' motion for a preliminary injunction asks the

17    Court to take the reins and manage UCLA's response to protest activity on campus,

18    down to ordering when and where law enforcement should be deployed.  Plaintiffs'

19    motion for this extraordinary prospective relief should be denied, for three reasons.

20      <u>First</u>, Plaintiffs lack standing to seek an injunction because they cannot

21    demonstrate that they face imminent *future* harm, let alone future harm *caused* by

22    UCLA.  UCLA has been taking comprehensive action to minimize protest-related

23    disruptions on its campus, and has significantly strengthened its capacity to respond

24    to protest activity.  Even if similar protest activity surfaces on campus again in the

25    fall—itself an uncertainty—UCLA is prepared to take decisive steps to help guard

26    the safety of its community and to preserve access to education for all of its

27

28

---

[1] Unless otherwise noted, all arguments in Defendants' opposition apply to all named defendants, who collectively are referred to as "UCLA."

DEFS.' OPP. TO PLFS.' MOT.
FOR PRELIM. INJ.
CASE NO. 2:24-CV-4702-MCS

students.  Plaintiffs' assertion that they face recurring harm is based in speculation, not fact.

<u>Second</u>, Plaintiffs cannot satisfy any of the prerequisites for preliminary injunctive relief.  For the same reasons Plaintiffs lack standing to seek an injunction, they cannot show that an injunction is necessary to prevent them from suffering irreparable harm attributable to UCLA—again, they cannot even show that any future harm is likely, let alone that an injunction against UCLA could redress it.  Nor can Plaintiffs demonstrate a likelihood of success on the merits of their claims.  Their constitutional claims fail because, among other things, they are based principally on non-state action.  Their Title VI claim should be rejected because UCLA's response is both ongoing and has been anything but "deliberately indifferent."  To the contrary, UCLA has commissioned an independent review of its security processes and an independent investigation into allegations of discrimination and harassment related to the Royce Quad encampment.  Nor do the public interest or the balance of the equities support Plaintiffs' request.  As the Supreme Court has held, the public interest requires universities to be granted broad discretion to respond to alleged discrimination on campus, and for that reason has admonished courts against engaging in exactly the sort of micro-management Plaintiffs seek to impose through their injunction request.  *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999).

<u>Finally</u>, the injunctive relief that Plaintiffs seek is vague and unenforceable.  The purported "policies" that Plaintiffs seek to enjoin do not exist:  UCLA has no policy permitting Jewish students to be prevented from accessing campus or attending class, nor is there any policy that prohibits UCLA from preemptively requesting law enforcement assistance to respond to protest activity that violates UCLA policy.  And Plaintiffs cannot obtain an injunction that merely orders UCLA to follow nondiscrimination law.  Assuming for the sake of argument that Rule 65 permitted such relief, Plaintiffs would still lack standing to obtain it because they

2

cannot demonstrate how it would protect them from any "certainly impending" injury *caused by UCLA*.

Plaintiffs' preliminary injunction motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    UCLA's Response to the Royce Quad Encampment

In April 2024, pro-Palestinian protest encampments appeared on campuses across the country. *See* Decl. of Michael Beck ("Beck Decl.") ¶ 4; Decl. of Monroe Gorden, Jr. ("Gorden Decl.") ¶ 4; Decl. of Rick Braziel ("Braziel Decl.") ¶ 23. UCLA administrators monitored these developments and discussed strategies for the campus's response if protests were to erupt at UCLA. Beck Decl. ¶ 4; Gorden Decl. ¶ 4.

Around 4:30 a.m. on April 25, protesters began erecting tents in Royce Quad at the center of UCLA's main campus. *See* ECF No. 1 ("Compl.") ¶ 4; Beck Decl. ¶ 5. Later that morning, senior UCLA leaders convened the first of many meetings to discuss strategies for their removal. Beck Decl. ¶ 5. Mindful that schools like the University of Southern California ("USC") and Columbia University had recently called law enforcement to end similar protests, only to have new encampments rebuilt within days, UCLA chose to first try de-escalation strategies to remove the encampment peacefully and durably. *Id.* ¶ 5.

The evening of April 25, UCLA installed metal bike racks around the encampment to discourage an expansion of its footprint and eventually to establish "neutral zones" that were intended to deter violence by separating the encampment from counter-protesters. *Id.* ¶¶ 6-8. The following day, UCLA received and granted a request from the Israeli American Council to hold a pro-Israel rally on April 28, 2024, directly opposite the encampment. *See* Compl. ¶ 213; Beck Decl. ¶ 7.

Despite UCLA's efforts to maintain order, violence broke out during the April 28 counter-protest. *See* Beck Decl. ¶¶ 7-10. Based on this experience, UCLA

moved on from the de-escalation strategy and decided to pursue a law enforcement response.  *Id.* ¶ 10.  It took several days for law enforcement to assemble the resources required to remove the large encampment safely, during which more violence occurred, including an attack on the encampment on May 1.  *See id.* ¶¶ 10-13.

Meanwhile, UCLA's senior leadership team took action in response to reports that the encampment was disrupting access to certain buildings adjacent to Royce Quad.  *Id.* ¶ 11; Gorden Decl. ¶ 5.  UCLA increased the security presence in the area to ensure that all students could continue to attend classes in those buildings even before the encampment could be removed.  Beck Decl. ¶ 11.  Third-party security officers policed neutral zones with a charge of deterring violent escalation.  *See id.* ¶¶ 7-9.

On May 2, after the protesters had been offered multiple opportunities to depart voluntarily, law enforcement arrested the more than 200 people who remained in the encampment, and the encampment was cleared.  Compl. ¶¶ 154-55; Beck Decl. ¶ 13.

## B.   Post-Encampment Efforts to Strengthen Capacity to Respond to Protests

Since UCLA removed the Royce Quad encampment, it has created a new Office of Campus Safety and prevented protesters from erecting new encampments.  Braziel Decl. ¶¶ 12-15.

Office of Campus Safety.  On May 5, UCLA created the Office of Campus Safety, headed by Associate Vice Chancellor Rick Braziel, who reports directly to the Chancellor.  Compl. ¶¶ 158-59; Braziel Decl. ¶¶ 2,12-13, 16 .  Braziel has more than 30 years' experience in public safety service, including five years as chief of police for the City of Sacramento.  Braziel Decl. ¶ 3.  Additionally, UCLA reassigned the Chief of the UCLA Police Department at the time of the Royce Quad encampment, *id.* ¶ 17, and hired a nationally recognized law enforcement

consulting firm to review UCLA's security measures, Decl. of Matthew R. Cowan ("Cowan Decl.") ¶ 13 (Ex. 1).

Response to Recent Protest Activity.  Under Associate Vice Chancellor Braziel's leadership, UCLA's day-to-day responsibility for campus safety incident response has shifted to an Emergency Operations Center that is empowered to make critical decisions about responding to protests on campus, including those that violate UCLA policy (i.e., by engaging in violence or obstructing access to campus resources).  Braziel Decl. ¶ 21.  Consistent with University of California ("UC") guidance reflected in what is known as the Robinson-Edley Report, UCLA does not tolerate non-peaceful protest activity and encampments. *Id*. ¶¶ 22, 24 & n.1 (Exs. 2-3).

UCLA has since called law enforcement immediately to respond to protest activity on at least three occasions when UCLA determined that protestors were willfully disrupting campus operations.  Braziel Decl. ¶¶ 27-30; *see also* Compl. ¶¶ 177-78.  On May 6, forty-two individuals were arrested for plans to break in and occupy a building.  Braziel Decl. ¶ 28.  On May 23, protesters attempted to erect an encampment on Kerckhoff Patio, but willingly dispersed after they were informed that they would face arrest and disciplinary action if they failed to do so. *Id.* ¶ 29.  Finally, on June 10, twenty-seven individuals were arrested for disrupting the Shapiro Fountain and Moore Hall. *Id.* ¶ 30.  The students who were arrested received stay-away orders, which prevented them from being on campus for fourteen days. *Id.*

Civil Rights Investigation.  UCLA is also investigating claims of discrimination related to the Royce Quad encampment.  Indeed, Chancellor Block has publicly stated that the UCLA Civil Rights Office is retaining an outside firm to investigate reports of antisemitic discrimination and harassment, anti-Arab or Islamophobic discrimination and harassment, and harassment that may have

interfered with students' abilities to access UCLA's programs.  Cowan Decl. ¶ 13 (Ex. 2).

### C.  Plaintiffs' Lawsuit and Preliminary Injunction Motion

Plaintiffs filed this lawsuit on June 6, 2024.  *See* Compl.  When UCLA learned that Plaintiffs intended to seek a preliminary injunction, UCLA asked opposing counsel to identify what specific measures they were seeking, in an effort to avoid motion practice.  Cowan Decl. ¶¶ 5, 7.  Plaintiffs did not meaningfully respond, *id.* ¶¶ 6, 8, and proceeded to file this motion, which seeks to enjoin UCLA from discriminating against Jewish students and enforcing two "policies" that do not exist.  *See* ECF No. 48 ("PI Mot.").  Specifically, Plaintiffs' proposed injunction includes five parts.  Three seek to enjoin UCLA from "applying any of [its] policies in a way that would give Jewish students less than full and equal access" to campus, ECF No. 48-76 ("Proposed Order") ¶¶ 2, 4, 5—i.e., an injunction requiring UCLA generally to follow the law.  And two purport to enjoin "policies" that (i) "allow[] any person to establish an encampment or checkpoint intended to ... deny[] Jewish students access" to UCLA; and (ii) prohibit "preemptively requesting law enforcement involvement … to intervene immediately when an individual prevents Jewish students from enjoying full and equal access" to UCLA, *id.* ¶¶ 1, 3—two supposed policies that do not exist, as explained below.  Plaintiffs claim that absent this injunction, they face a risk of irreparable harm and that they are likely to prevail on the merits of their federal constitutional and statutory claims.  PI Mot. at 2-3.

### PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is "an extraordinary and drastic remedy" that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 911 (9th Cir. 2021)  To make that showing, a plaintiff "must establish [1] that

he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Only when a plaintiff can demonstrate "*serious* questions going to the merits and a balance of hardships that tips *sharply* towards the plaintiffs" can an injunction issue, and even then, only "so long as the plaintiffs also show that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (emphasis added, alterations and citations omitted).

Further, a plaintiff's request for a preliminary injunction fails at the threshold if he cannot establish: (i) standing to seek such relief by showing an imminent future injury redressable by the relief he seeks, *see, e.g.*, *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020); and (ii) that the requested injunction is "tailored to remedy the specific harm alleged," *Hecox v. Little*, -- F.4th --, 2023 WL 11804896, at *19 (9th Cir. Aug. 17, 2023, *amended* June 7, 2024) (quotations omitted) ("An overbroad injunction is an abuse of discretion.").  Additionally, Rule 65(d) forbids injunctions that do not "describe in reasonable detail … the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).

Courts deciding preliminary injunction motions can consider evidence outside the complaint.  *See, e.g.*, *Danielson v. Wells Fargo Bank*,  2011 WL 4551177, at *1 (C.D. Cal. Sept. 29, 2011); Fed. R. Civ. P. 65(a)(2).  For the reasons below, the record evidence requires rejecting Plaintiffs' request for preliminary injunctive relief, both because Plaintiffs have failed to demonstrate their standing to seek such relief, and because they have failed to satisfy the equitable factors that would justify the drastic remedy of a preliminary injunction.

1

**ARGUMENT**

2   **I.    THE COURT LACKS JURISDICTION TO ENTERTAIN**

3   **PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION**

4   **BECAUSE PLAINTIFFS CANNOT DEMONSTRATE STANDING TO**

5   **SEEK THE REQUESTED RELIEF**

6         At the pleading stage, to establish standing, Plaintiffs must "clearly [] allege

7   facts demonstrating" that they "have (1) suffered an injury in fact, (2) that it is

8   fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to

9   be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S.

10  330, 338 (2016).  Additionally, to seek injunctive relief, Plaintiffs must face a risk

11  of future injury that is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568

12  U.S. 398, 410 (2013); *Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112,

13  1118 (9th Cir. 2022) (same).  Plaintiffs cannot make this showing.

14         **A.    Plaintiffs Fail to Allege an Imminent Likelihood of Future Injury**

15         No Plaintiff alleges that he or she faces a "certainly impending" injury absent

16  injunctive relief.  Nor could they.  Plaintiffs' only allegations of actual harm are

17  based on *past* events, primarily relating to the Royce Quad encampment.  But *past*

18  injuries do not suffice to demonstrate that plaintiffs will necessarily be harmed in

19  the *future*.  *See Wright*, 48 F.4th at 1118 ("Past wrongs are insufficient by

20  themselves to grant standing" for prospective relief.).  Indeed, "past exposure to

21  harm is *largely irrelevant* when analyzing claims of standing for injunctive relief

22  that are predicated upon threats of future harm." *Nelson v. King County*, 895 F.2d

23  1248, 1251 (9th Cir. 1990) (emphasis added).

24         UCLA's actions after the Royce Quad encampment make any such future

25  injury speculative at best. *See, e.g.*, *Doe v. Bonta*, 101 F.4th 633, 640 (9th Cir.

26  2024) ("speculative fears relying upon a 'chain of contingencies' and … 'fears of

27  hypothetical future harm' are insufficient" for purposes of preliminary injunctive

28  relief).  Since early May, despite sustained nationwide protest activity related to the

8

war in Gaza and specific attempts to reconstruct encampments at UCLA, no such encampments have been constructed on UCLA's campus because UCLA has taken decisive action to prevent them. *See supra* at 4-5. Simultaneously, as described above, UCLA is undertaking efforts to further strengthen its capacity to respond to protests that violate its policies, to investigate reports of discrimination, harassment, and other misconduct, and to have a safe return to campus in August for its students. *See id*. In light of these actions, Plaintiffs cannot carry their burden of demonstrating that an injunction is necessary to prevent injuries similar to those that they allegedly sustained during the Royce Quad protest encampment.

Nor can Plaintiffs overcome this deficiency by pointing to *other* types of allegedly antisemitic activity before or after the Royce Quad encampment. Plaintiffs were exposed to these events because they were in the vicinity of a protest occurring on a public university campus, where the First Amendment applies. *See, e.g.*, ECF No. 48-1 ("PI Mot. Memo.") at 9-14; Compl. ¶¶ 206, 245, 289. But there is no way to conclude that unidentified protesters, who may not even be members of the UCLA community, will protest again, much less seek out *these* Plaintiffs. "[I]t is surely no more than speculation" to assert that any Plaintiff "*himself* will again be involved in one of those unfortunate instances," as is necessary to obtain injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (emphasis added). The "emotional consequences" of prior harm (*see, e.g.*, Compl. ¶¶ 75, 252, 290) are no substitute for "a real and immediate threat of future injury by the defendant." *Lyons*, 461 U.S. at 107 n.8.

Finally, Plaintiffs cannot point to any campus or University-wide policy that violates federal, state, or city law. In some circumstances, the existence of a policy that a university is duty-bound to apply can be evidence of future harm if enforcement of the policy would cause such harm. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201

(2023) (enjoining university-wide affirmative action policy).  But here, there is no such policy.

Plaintiffs' conclusory allegations that such a policy exists are contradicted by the actual facts.  Plaintiffs generally allege the existence of UCLA policies that (i) permit the construction of discriminatory encampments; and (ii) preclude the use of law enforcement in response.  *See* Compl. ¶ 73; PI Mot. Memo. at 24-26.  But Plaintiffs fail to identify any written policies consistent with these allegations.  In fact, Plaintiffs elsewhere acknowledge that UCLA policies explicitly *prohibit unauthorized encampments and the discrimination and exclusion of Jewish students*.  *See* Compl. ¶¶ 52, 141, 156 & nn.7-9.

Indeed, UCLA's conduct makes clear that the policies Plaintiffs allege do not exist.  As explained above, after attempting de-escalation, UCLA engaged law enforcement to take down the Royce Quad encampment on May 2, and has since involved law enforcement to defeat three subsequent attempts to establish new encampments.  *See supra* at 4-5.  That actual conduct definitively forecloses Plaintiffs' unsupported assertion that UCLA has a policy of allowing such encampments.

UCLA's actual conduct also demonstrates that there is no policy that bars calling law enforcement "preemptively" to ensure that all students, including Jewish students, have access to UCLA facilities and programs.  UCLA has repeatedly relied on law enforcement in response to recent protests and, since dismantling the Royce Quad encampment on May 2, has acted decisively to prevent encampments *before* they form.  *See supra* at 4-5.  Plaintiffs' contrary view relies on press releases and Chancellor Block's congressional testimony.  Compl. ¶¶ 141-45, 156-59; PI Mot. Memo. at 5, 8, 26.  But the cherry-picked statements on which they rely are shorthand references to the Robinson-Edley Report—a 100-page University of California ("UC") systemwide guidance document—that does not contain the word "preemptive" and affords UC campuses broad discretion to

respond to protests that violate their policies without unduly impeding freedom of expression. *See supra* at 5. Such discretion is, again, why UCLA *has* relied on law enforcement repeatedly.

Plaintiffs' inability to demonstrate a non-speculative likelihood of future injury means that their request for preliminary injunctive relief fails at the threshold.

**B.**     **Plaintiffs Do Not Allege Facts Clearly Demonstrating That UCLA Will Cause Them Any Future Injury**

Plaintiffs also lack standing for prospective relief because they have not pleaded facts demonstrating that *UCLA* would be the *cause* of any future injury that they might suffer, such that an injunction directed *at UCLA* would redress those alleged injuries. *See Spokeo*, 578 U.S. at 338. That is crucial because Plaintiffs are not entitled to a preliminary injunction if the future injury they allege is caused by "the independent action of some third party not before the court." *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) (quotations omitted). "[A]n injury that results from [a] third party's voluntary and independent actions or omissions cannot serve to establish standing." *Lunn v. City of Los Angeles*, 629 F. Supp. 3d 1007, 1012-13 (C.D. Cal. 2022). Yet future injuries caused by third parties are the only future harms Plaintiffs assert as the basis for injunctive relief.

Both the Complaint and the Motion contain claims of discrimination and harassment that Plaintiffs allegedly experienced on the UCLA campus, but those bad acts were not perpetrated *by UCLA*. Rather, Plaintiffs' injuries were caused by unidentified "activists" whose antisemitic conduct UCLA has condemned and sought law enforcement support to end. *See* Compl. ¶¶ 148, 155; PI Mot. Memo. at 6-9. Plaintiffs will presumably respond that they were injured by alleged weaknesses in UCLA's response to the Royce Quad encampment. But even if that characterization were accurate, it would not suffice to show that those alleged

weaknesses in UCLA's past response persist, especially in light of UCLA's already improved, and improving, capacity to respond.  *See supra* at 8-9.  To establish standing, Plaintiffs must show *UCLA's* efforts are insufficient to prevent future injury to *them* caused *by UCLA*, and there is simply no way Plaintiffs can make that showing.

That does not mean, of course, that there will never again be disruptive protests on UCLA's campus.  The question is whether any harm from future protests—including injuries caused by independent third parties—can be attributed to UCLA, given its extensive efforts to prevent and redress such incidents with de-escalation, dispersal, and arrests.  *See, e.g.*, *Lunn*, 629 F. Supp. 3d at 1013 (plaintiffs lacked standing to sue the City for injuries caused by "deliberate choices" of third parties).

## II.   PLAINTIFFS FAIL TO SATISFY THE STANDARDS FOR A PRELIMINARY INJUNCTION

### A.   Plaintiffs Cannot Show a Likelihood of Irreparable Harm

To secure a preliminary injunction, Plaintiffs must "demonstrate a *likelihood*, rather than a *possibility*, of irreparable harm" absent the requested injunctive relief. *S&R Glob. Inc. v. Park*, 2024 WL 3086638, at *1 (C.D. Cal. Apr. 29, 2024) (citing *Winter*, 555 U.S. at 20).  Plaintiffs cannot make either showing for much the same reasons they cannot demonstrate standing: the alleged past harm from the Royce Quad encampment does not establish future harm—particularly in light of UCLA's many mitigation efforts, including preventing the creation of new encampments on several occasions.  And again, to the extent Plaintiffs say they will be irreparably harmed by alleged UCLA policies that permit discriminatory protest encampments or that prevent UCLA from calling law enforcement to respond to protests, *there are no such policies.  See supra* at 10.

**B.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims**

Plaintiffs also fail to show any likelihood of success on the merits of their claims.

1.    *None of Plaintiffs' Constitutional Claims Is Viable*

Plaintiffs are unlikely to prevail on their Free Exercise, Free Speech, and Equal Protection claims for two principal reasons: (i) with few exceptions, the conduct about which Plaintiffs complain is not "state action"; and (ii) the few acts that can be attributed to UCLA are constitutional.[2]

i.    Plaintiffs Cannot Bring Constitutional Claims Against UCLA Based on Non-State Action

It is black-letter law that "'merely private conduct, however discriminatory or wrongful,' falls outside the purview of the Fourteenth Amendment." *Belgau v. Inslee*, 975 F.3d 940, 946 (9th Cir. 2020) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).  Plaintiffs' constitutional claims fail this threshold step.

The crux of the Complaint and the instant motion is that the Royce Quad encampment injured Plaintiffs and that UCLA is responsible for those injuries because UCLA should have ended the encampment sooner by "preemptively" seeking law enforcement assistance.  *See, e.g.*, Compl. ¶¶ 11, 139, 117-18; PI Mot. Memo. at 25-26.  But a university's obligations under the Constitution are limited (more than, for example, in the context of Title VI).  Because the Fourteenth Amendment does "not impose a duty on [the state] to protect individuals from third parties," a "state is not liable for its omissions," even where state action is "necessary to secure life, liberty, or property interests."  *Patel v. Kent Sch. Dist.*,

---

[2] At minimum, to the extent that the Court enters an injunction based on Plaintiffs' likelihood of success on their constitutional claims, such injunction should not issue against the Regents of the University of California, which is an "arm of the state" and therefore immune from suit in federal court for claims brought under § 1983. *See, e.g.*, *Feied v. Regents of Univ. of Cal.*, 188 F. App'x 559, 561 (9th Cir. 2006).

DEFS.' OPP. TO PLFS.' MOT.
FOR PRELIM. INJ.
CASE NO. 2:24-CV-4702-MCS

648 F.3d 965, 971 (9th Cir. 2011) (quotations omitted).  Neither of the exceptions

to this general rule applies here.

Under the "special-relationship" exception, a state can be held accountable

for failing to take action to protect individuals who it has "take[n] ... into its custody

and holds ... there against [their] will."  *Id.* at 972 (quotations omitted).[3]  UCLA has

no such relationship with its students under federal law.  The Ninth Circuit has held

that despite a state law requiring mandatory school attendance, a public high school

did not have a special relationship with a "developmentally disabled" student

injured by another student on its premises.  *Id.*  The court reasoned that

"compulsory school attendance does not restrict a student's liberty such that neither

the student nor the parents can attend to the student's basic needs."  *Id.* at 973.

Clearly, Plaintiffs here—a rising UCLA junior and two law school students—have

far greater autonomy than the developmentally disabled student who was injured in

*Patel.  See Am.'s Frontline Drs. v. Wilcox*, 2022 WL 1514038, at *10 (C.D. Cal.

May 5, 2022) ("UC undergraduate and graduate students" are not in a custodial

relationship with the University for the purposes of establishing a "special

relationship").  There is thus no plausible argument under Ninth Circuit precedent

---

[3] It is not relevant whether parties have a "special relationship" for the purpose of
state tort liability.  *See* PI Mot. Memo. at 25 (citing *Regents of Univ. of Cal. v.
Superior Ct.*, 4 Cal. 5th 607, 620-21 (2018)).  State-law duties owed as a matter of a
special relationship were not "constitutionalized by the Fourteenth Amendment."
*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 498 U.S. 189, 201-02 (1989).
And California's "special relationship" test is far easier to satisfy than the
Fourteenth Amendment's.  Compare *Regents of Univ. of Cal.*, 4 Cal. 5th at 620-21
(extending California special-relationship duty to relationships that have "an aspect
of dependency in which one party relies to some degree on the other for
protection," including "common carrier and innkeeper" with customers and
"business or landowner with invited guests"), with *Patel*, 648 F.3d at 972
(explaining that special relationships for purposes of Fourteenth Amendment
include only those defined by "incarceration, institutionalization, or other similar
restraint of personal liberty").

DEFS.' OPP. TO PLFS.' MOT.
FOR PRELIM. INJ.
CASE NO. 2:24-CV-4702-MCS

that UCLA has the sort of special relationship with Plaintiffs that UCLA could be held liable under the Constitution for inaction.

Separately, states can be liable for failing to act when an individual is injured by a third party *after* the state affirmatively placed that individual in danger. *See, e.g.*, *Ogbechie v. Covarrubias*, 2020 WL 3103789, at *5 (N.D. Cal. June 11, 2020). But Plaintiffs plead no affirmative action by UCLA that created a "particularized danger" to which they would otherwise not have been exposed. *See* Compl. ¶¶ 11, 19, 117-18.[4]

          ii.    <u>Plaintiffs' Constitutional Claims Based on UCLA's Actions Are Meritless</u>

Plaintiffs also contend that UCLA is liable based on its own actions, but those claims fail on the merits. When the Royce Quad encampment was constructed on April 25, in violation of UC and UCLA policies, UCLA administrators had to decide how to respond. Cognizant of recent experiences at peer institutions, UCLA reasonably chose to try to de-escalate the situation by allowing the protest to continue, while attempting to confine its footprint, prevent violence, and facilitate access to academic programs. When this approach no longer proved feasible, UCLA sought law enforcement assistance to remove the encampment. Plaintiffs assert that they suffered constitutional injuries from actions that UCLA took while pursuing the de-escalation strategy and coordinating with law enforcement to remove the encampment. More specifically, Plaintiffs contend that UCLA facilitated or supported discrimination and harassment by:

---

[4] Even where a state actor affirmatively exposes an individual to a particularized danger, the state is only liable if it is deliberately indifferent to that danger. *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). As explained *below*, Plaintiffs cannot make that showing either. *See infra* at 18-19.

1    • Discouraging and/or preventing students from entering the Royce Quad
2      encampment over the objection of the protesters. *See, e.g.,* Compl. ¶¶ 13,
3      121-22;
4    • Setting up metal bicycle racks around the encampment to deter expansion
5      and establish neutral zones intended to reduce the risk of direct
6      confrontations with counter-protesters. *See, e.g., id.* ¶ 136.[5]
7    Plaintiffs will not prevail on the merits of their constitutional claims based on these
8    actions.
9         To start, UCLA's actions did not burden interests protected by the Free
10   Exercise, Free Speech, or Equal Protection Clauses.  Plaintiffs' Free Exercise and
11   Equal Protection claims fail because Plaintiffs nowhere allege that *UCLA*
12   intentionally singled out Jewish students for unfavorable treatment. *See Trinity*
13   *Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (the Free
14   Exercise Clause "protects religious observers against unequal treatment and
15   subjects to the strictest scrutiny laws that target the religious for special disabilities
16   based on their religious status") (alterations and quotations omitted); *Shooter v.*
17   *Arizona,* 4 F.4th 955, 960 (9th Cir. 2021) ("To state a claim ... for a violation of the
18   Equal Protection Clause ... a plaintiff must show that the defendants acted with an
19   intent or purpose to discriminate ... based upon membership in a protected class.").
20   To the contrary, Plaintiffs allege only neutral policies—not based on any student's
21   religion or ethnicity—that were focused entirely on deescalating and preventing
22   violence.  And Plaintiffs' Free Speech Clause claim fails because—unlike the cases
23   they cite—UCLA's actions neither suppressed nor coerced speech. *See*
24   *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830-37 (1995)
25   (Free Speech Clause violated when a university silenced a student publication by
26
27   ───────────────
     [5] Plaintiffs also allege that due to the Royce Quad encampment, UCLA canceled
28   classes on May 1 and held classes remotely on May 2 and 3. *See* PI Mot. Memo. at
     7.  But Plaintiffs do not cite these actions as the basis for their federal claims.

DEFS.' OPP. TO PLFS.' MOT.
FOR PRELIM. INJ.
CASE NO. 2:24-CV-4702-MCS

refusing to pay its printing costs); *see generally 303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (First Amendment precludes state nondiscrimination law from compelling a website designer to provide her services to same-sex couples purchasing wedding websites).

But even if UCLA's conduct implicated constitutionally protected interests, Plaintiffs will not prevail on these claims because UCLA's actions were narrowly tailored to further a compelling governmental interest. *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) (upholding content-based restriction on speech that survived strict scrutiny).

UCLA undoubtedly has a compelling interest in promoting "public safety and security" on its campus. *Meinecke v. City of Seattle*, 99 F.4th 514, 525 (9th Cir. 2024). Plaintiffs themselves allege that the encampment and its environs quickly became a flashpoint. *See* Compl. ¶¶ 135-36; PI Mot. Memo. at 6. Faced with a rapidly evolving situation that entailed a significant risk of violence, UCLA took appropriate steps to keep the peace until it could make the necessary arrangements with law enforcement to have the Royce Quad encampment removed, all while giving counter-protesters space on Royce Quad to express their views directly opposite to the encampment. *See supra* at 3-4.

Plaintiffs appear to argue that UCLA could have maintained safety without burdening their (allegedly) constitutionally protected interests if UCLA had "preemptively" removed the first encampment at Royce Quad. *See* Compl. ¶¶ 11, 19, 117-18; PI Mot. Memo. at 25-26. But that is 20/20 hindsight. UCLA reasonably attempted a de-escalation response to the Royce Quad encampment; when the situation devolved, UCLA took steps to remove it with all possible haste. Plaintiffs question why law enforcement did not remove the Royce Quad encampment when responding to an attack on the encampment on May 1, PI Mot. Memo. at 6-7, but the law enforcement presence that night focused on the immediate violence and lacked the resources to remove the encampment, Beck

Decl. ¶ 12. In any case, the precise time at which law enforcement was operationally equipped to remove the encampment is not "a question of constitutional dimension." *Burson v. Freeman*, 504 U.S. 191, 210 (1992) (citation omitted). And of course, Plaintiffs do not and could not plausibly allege that there is any *ongoing* constitutional violation requiring injunctive intervention.

> 2. *Plaintiffs Cannot Show That UCLA Was Deliberately Indifferent to Harassment Directed at Them by UCLA Students and Faculty*

Plaintiffs' Title VI claim is also unlikely to succeed. The Supreme Court has held that schools can only be liable for peer-on-peer harassment when the school's "own deliberate indifference effectively caused the discrimination." *Davis*, 526 U.S. at 642-44 (quotation omitted); *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020). It is not enough that a school's response was "negligent, lazy, or careless." *Karasek*, 956 F.3d at 1105; *see also Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). Rather, Plaintiffs must show that a "school's 'response to the harassment or lack thereof [was] *clearly* unreasonable in light of the known circumstances.'" *Karasek*, 956 F.3d at 1105 (quoting *Davis*, 526 U.S. at 648) (emphasis added). Here, however, UCLA proactively responded to the Royce Quad encampment and has successfully prevented subsequent efforts to occupy portions of the UCLA campus. *See supra* at 3-5.

Specifically, with respect to the Royce Quad encampment, UCLA promptly determined that "the encampment was 'unlawful' and a 'breach of policy'" and attempted a de-escalation response. Compl. ¶ 154 (quotation omitted); Beck Decl. ¶¶ 5-13; Gorden Decl. ¶ 7. When violence broke out, UCLA decided to move from the de-escalation response and "asked UCPD and outside law enforcement officers to enter and clear the encampment." Compl. ¶ 154 (quotation omitted). The fact that UCLA spent several days trying to convince the encampment to disband voluntarily before activating a law enforcement response does not render UCLA's

response "clearly unreasonable."  That is especially so given what UCLA knew at the time:  other schools' early activation of law enforcement had proved unsuccessful in removing pro-Palestinian protest encampments.  *See* Beck Decl. ¶¶ 4-5.

In the wake of the encampment, UCLA has taken numerous actions to further improve its response capacity and to address claims of discrimination and harassment.  *See supra* at 4-5.  The implication that UCLA might be deliberately indifferent going forward—as Plaintiffs must show to secure extraordinary preliminary injunctive relief—borders on frivolous.  UCLA's response has been robust and extensive, and well within the bounds of "flexibility" that the Supreme Court held in *Davis* must be afforded to school administrators.  562 U.S. at 648.

## C.   The Public Interest and Balance of Equities Do Not Favor a Preliminary Injunction

The Royce Quad protest encampment remains disbanded, and UCLA's actions over the past two months demonstrate UCLA's commitment to preventing new encampments from taking its place.  Thus, the balance of the equities cannot support this Court entering a vague and impractical injunction ordering UCLA to do what it is already doing or to stop enforcing policies that do not exist.  The Supreme Court held in *Davis* that school administrators must be afforded "flexibility" responding to student harassment and discrimination.  *Id.* at 648-49. The vague and far-reaching order Plaintiffs request is impossible to administer and will do nothing but "needlessly" and "disruptive[ly]" interpose this Court into UCLA's ongoing effort to promote a safer school environment in the fall.  *Benisek v. Lamone*, 585 U.S. 155, 161 (2018).  It certainly will not benefit Plaintiffs, who have not pointed to any harm they are likely to suffer absent their proposed injunction.  *See Cause & FX Ltd. v. Saban Films, LLC*, 2021 WL 6104414, at *4 (C.D. Cal. Nov. 10, 2021) ("[I]t simply does not appear equitable to" enter

injunction where "Plaintiff has not adequately shown a likelihood of irreparable harm.").

Nor can Plaintiffs carry their "initial burden" to show that a preliminary injunction will serve the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). In fact, the public interest strongly favors permitting UCLA to proceed into next semester with full control of its own policies and programs. *Cf. Davis*, 526 U.S. at 648-49 (school administrators need "flexibility" to balance "substantial burdens as a result of legal constraints on their disciplinary authority"); *J.M. v. Chino Valley Unified Sch. Dist.*, 2018 WL 6075349, at *9 (C.D. Cal. Feb. 23, 2018) (quotations omitted) ("[C]ourts have recognized a public interest to enable school districts ... to allow districts flexibility in administering their programs."). It is difficult to administer a public university in times of intense debate. Yet it is central to UCLA's mission to protect and advance "the expansive freedoms of speech and thought associated with the university environment." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). That is so even—and especially— when the speech is controversial. UCLA draws the line when individual liberties infringe on public safety. *See Schenck v. United States*, 249 U.S. 47, 51-52 (1919) (Holmes, J.). When speech and safety interests collide on campus, as they did in Royce Quad last semester, school administrators must make extraordinarily difficult decisions. UCLA is well equipped to make those decisions, and to adapt— as it has in the past two months—in the face of evolving circumstances. An injunction on the eve of the fall semester would do nothing but derogate "the serious consideration of the public interest ... that has already been undertaken by the responsible state officials" who oversee the campus. *Stormans*, 586 F.3d at 1139-40.

### III.   PLAINTIFFS' REQUESTED INJUNCTION IS VAGUE AND NOT ADMINISTRABLE

The fact that Plaintiffs' proposed injunction is vague and inadministrable is an independent reason to deny it.  Rule 65 requires that an order granting injunctive relief "state its terms specifically" and "describe in reasonable detail … the act or acts sought to be restrained." *Roman v. MSL Cap., LLC*,  2019 WL 3017765, at *5 (C.D. Cal. July 9, 2019) (citation omitted), *aff'd*, 820 F. App'x 592 (9th Cir. 2020). Those mandates "are no mere technical requirements.  The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

Uncertainty and confusion is the sum total of Plaintiffs' proposed preliminary injunction.  They seek an order enjoining UCLA from applying nonexistent policies and "from applying any of [its unspecified] policies" in a way that prevents "Jewish students from enjoying full and equal access" to the school.  Proposed Order ¶¶ 1-5. Such an order is at the same time too vague for UCLA to follow and too far-reaching for the Court to administer.

Plaintiffs' proposed injunction is vague because it would direct UCLA to follow antidiscrimination law without "specify[ing] what act [i]s being enjoined." *Nightingale v. U.S. Citizenship & Immigr. Servs.*, 333 F.R.D. 449, 463 (N.D. Cal. 2019).  Courts routinely reject such "obey the law" injunctions. *Id.*; *see also, e.g.*, *Muhammad v. California*,  2020 WL 9848693, at *14 (C.D. Cal. Oct. 8, 2020) (injunction stating "[d]efendants [shall] … cease any policy or practice that interferes with the Plaintiff's exercise of her right to petition the government" violates Rule 65(d)); *Elend v. Basham*, 471 F.3d 1199, 1209-10 (11th Cir. 2006) (same, for hypothetical injunction stating "the Secret Service shall ensure there's no violation of the First Amendment"); *Payne v. Travenol Lab'ys, Inc.*, 565 F.2d 895, 897 (5th Cir. 1978) (same, for injunction against discrimination "on the basis of

color, race, or sex in employment practices or conditions of employment in defendants' Cleveland, Mississippi facility"); *Sessler v. City of Davenport,* 990 F.3d 1150, 1157 n.3 (8th Cir. 2021) (same, for order enjoining city "from restricting and limiting [Plaintiff's] rights to peacefully share his message of faith").

And the proposed injunction is not administrable because it would make this Court, rather than UCLA, the ultimate arbiter of how to implement any and all UCLA "policies" to prevent discrimination against Jewish students (while also, presumably, fulfilling all of UCLA's other goals and obligations, including fostering education, promoting safety, and protecting all students' rights to engage in robust, sincere debate and be free of discrimination). That is not something Article III courts are empowered or equipped to do. *See Davis*, 526 U.S. at 648-49; *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020) ("[I]t is beyond the power of an Article III court to order, design, supervise, or implement" a requested "remedial plan" that "would necessarily require a host of complex policy decisions."); *Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*, 374 F. Supp. 3d 1124, 1136 (D. Utah 2019) (no standing to pursue "overbroad" request that is not "tied to ... [a] cognizable injury"). And it is particularly not something *this* Court can do based on these Plaintiffs' claims, because the broad administrative oversight of UCLA's policies that Plaintiffs request has nothing to do with the core conduct that they say injured them: UCLA's past response to the (now nonexistent) Royce Quad encampment. A "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff" alleges, *Gill v. Whitford*, 585 U.S. 48, 68 (2018) (quotations omitted), and the remedy Plaintiffs seek here is a complete mismatch with the harms they allege.

In the end, Plaintiffs cannot identify any policy likely to injure them in the future, because no such policy exists. And because Plaintiffs cannot draft an injunction tethered to a real UCLA policy, they are not seeking a proper injunction at all. *See* Fed. R. Civ. P. 65(d); *Gill*, 585 U.S. at 68.

1

## CONCLUSION

For all of the foregoing reasons and based on the declarations submitted herewith, Plaintiffs' motion for preliminary injunction should be denied.

Dated:  July 8, 2024

Respectfully submitted,

By:      */s/ Matthew R. Cowan*
            MATTHEW R. COWAN
            *Attorney for Defendants The Regents of*
            *the University of California; Michael V.*
            *Drake; Gene D. Block; Darnell Hunt;*
            *Michael Beck; Monroe Gorden, Jr.;*
            *and Rick Braziel*

23

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,981 words, which complies with the word limit of L.R. 11-6.1.

Dated:  July 8, 2024                     Respectfully submitted,

By:     /s/ Matthew R. Cowan
        MATTHEW R. COWAN
        *Attorney for Defendants The Regents of the University of California; Michael V. Drake; Gene D. Block; Darnell Hunt; Michael Beck; Monroe Gorden, Jr.; and Rick Braziel*

24