# **Exhibit 1**

RICK BRAZIEL
2055 Fort John Court
Gold River, CA 95670
BrazielConsulting@gmail.com

## EDUCATION

**M. A., Security Studies,** U.S. Naval Postgraduate School. 2006

**M. A., Communication Studies,** California State University, Sacramento. 1993

**B. A., Communication Studies,** California State University, Sacramento. 1986

## EXPERIENCE & ACCOMPLISHMENTS

### BOARDS AND COMMISSIONS

CALIFORNIA COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING – COMMISSIONER, VICE CHAIR, 2015-PRESENT

CALIFORNIA ADVISORY COUNCIL ON IMPROVING INTERACTIONS BETWEEN PEOPLE WITH INTELLECTUAL AND DEVELOPMENTAL DISABILITIES AND LAW ENFORCEMENT

### CRITICAL INCIDENT ASSESSMENTS

- Review of the Police Response to the Robb Elementary School Shooting May 24, 2022.
- Review of the Santa Clara County Sheriff's Response to the VTA Mass Shooting May 26, 2021.
- Independent Assessment of the Springfield Oregon Police Response to Demonstrations July 29,2020.
- Independent Investigation of the Oakland Police Department Response to Mass Demonstrations, May through June 2020.
- Independent Review of the Fremont Police Department Shootings on June 1, 2016. Review conducted 2020.
- Review of the Portland Police Responding to Mass Demonstration and Counterdemonstrations in Portland, Oregon. Dec 2020.
- Assessment of the San Bernardino Terrorist Shootings. May 2016
- Assessment of Stockton Police Response to the Bank of the West Robbery and Hostage Taking August 2015.
- After-Action Assessment of the Police Response in Ferguson, Missouri - September 2015.
- Assessment of the Police Response to Attacks on Police by Former Police Officer Christopher Dorner, June 2015.

### ORGANIZATION ASSESSMENTS

- California Department of Corrections and Rehabilitation – Review of training with a focus on cultural change and leadership.
- County of Sacramento. Independently monitor and evaluate high profile or serious complaints, officer involved shootings, deaths in custody, serve as community liaison, and prepare reports of findings to the Board of Supervisors. 2015-2018
- Pasadena, CA Police Department – Death in-custody review, use of force review, change of command audit and leadership development. 2017-2019
- Baltimore Police Department Staffing Study. August 2018.
- Chester, PA Collaborative Reform – Assist with Community Oriented Policing strategies and training.

Exhibit 1
Page 1

RICK BRAZIEL

- Lodi, CA Police Department – Issue identification and prioritization, community recruitment, technology, and efficiency review.
- San Rafael, CA Police Department – Organization health, leadership, issue identification and prioritization.
- Collaborative Reform Initiative – An Assessment of the St Louis County Police Department – September 2015. Assessment areas include use of force, internal affairs, fair and impartial policing, racial profiling, recruitment, retention, diversity hiring, and community engagement.
- Washington State Patrol Trooper Recruitment and Retention Study – Workforce analysis, recruitment, and retention review and analysis.

## AUTHOR/CO-AUTHOR AND INSTRUCTOR

- *Critical Incident Review: Active Shooter at Robb Elementary School*. U.S. Department of Justice. 2024. *Washington, DC: Office of Community Oriented Policing Services.*
- *Independent Assessment of the Springfield Response to Demonstrations on July 29, 2020*. Rick Braziel Consulting. 2021
- *How to Conduct an After-Action Review*. Washington DC: Office of Community Oriented Policing Services. 2020.
- *Preparing for and Responding to Mass Demonstration and Counterdemonstrations in Portland, Oregon.* A Review of the Portland Police Bureau's Response to Demonstrations on June 4, 2017, August 4, 2018, and August 17, 2019. National Police Foundation 2020.
- *Bringing Calm to Chaos: A Police Foundation review of the San Bernardino terrorist attacks*. Washington DC: The Police Foundation. 2016
- *Washington State Trooper Recruitment and Retention Study*. Final Report. Washington State Joint Transportation Committee. The PFM Group. 2016
- *An Assessment of the St. Louis County Police Department. Collaborative Reform Initiative.* Washington, DC: Office of Community Oriented Policing Services. 2015.
- *After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri.* COPS Office Critical Response Initiative. Washington, DC: Office of Community Oriented Policing Services. 2015.
- *A Heist Gone Bad, a Police Foundation Critical Incident Review of the Stockton Police Response to the Bank of The West Robbery and Hostage-Taking*. Washington, DC: The Police Foundation. 2015
- *Police Under Attack: Southern California Law Enforcement Response to the Attacks by Christopher Dorner.* Washington D.C: The Police Foundation.
- *Virtual Reality Training in Law Enforcement*. California Peace Officer. Fall 2011.
- *Impact of Homeland Security Communities of Learning: Developing a Strategy for Training and Collaboration*. Monterey, CA: US Naval Post Graduate School, 2006.
- *COP TALK: Essential Communication Skills for Community Policing*. San Francisco: Acada Books, 1999.

## INSTRUCTOR/FACILITATOR

- **California Department of Corrections and Rehabilitation 2018**-present. Leadership curriculum development and instruction for mid-level management staff.
- **Cal Poly Humboldt 2002- 2021 -** Developed curriculum and instructor in Leadership Studies program. Instruct in the California Peace Officer Standards and Training (POST) Management Course, areas of leadership, communication skills, and community policing.

2

Exhibit 1
Page 2

RICK BRAZIEL

- **Trainer** – United States and Canada providing critical incident leadership, community engagement, organizational development, and communication strategies.

## SACRAMENTO POLICE DEPARTMENT, 1979-2012

### Police Chief, January 2008 – December 2012

Leader of an organization, with over 1,200 employees (65% sworn – 35% civilian) and a $132 million budget, responsible for working in partnership with the community to identify priorities in the delivery of police services.

Using evidence-based practices, academic research, and private sector results driven strategies refocused SPD mission including redesign of crime reduction strategies, staff deployment, and resource allocation resulting in the reduction of Part I Crime by over 21% while reducing department staffing by 28%. Strategies included collaborating with unique partners to develop creative concepts, expanding research and analysis capacity, and improving regional efforts.

Increased transparency and community involvement through the creation of a Police Advisory Committee, Youth Advisory Committee, and redesigned web site including interactive features. Conducted 14 Town Hall meetings as well as an on-line survey to identify community expectations designed to realign staffing to improve service delivery.

### Deputy Chief, August 2002 - January 2008

*Office of Operation and Office of Investigations* –Chief responsible for Patrol, Problem Oriented Policing (POP), Neighborhood Crime Prevention, SWAT, Parole Intervention Team, Air Operations, Traffic, K-9, Bikes, Regional Transit Police Services, Marine, Mounted, EOD-Bomb Squad, Reserves, Court Liaison, Major Crimes, Property Crimes, Narcotics, Vice, School Resource Officers, Magnet Schools, Forensic Identification and CSI.

*Office of Technical Services* – Chief responsible for Personnel, Training, Communications, Records, Property, Fleet, Technology, and Information Divisions. Directed the overhaul of the recruiting, hiring, retention, and training process for police officers and dispatchers. The "Train to Success" and "Grow Your Own" models have received national attention.

*Office of Emergency Services and Homeland Security* – Created the Sacramento Regional Office of Homeland Security with federal, regional, and local law enforcement, regional fire services, emergency services and public health partners. Office Chief of a multidiscipline, multi-agency team responsible for regional planning, training, and coordination related to Homeland Security.

### Captain, April 1994 - August 2002
### Lieutenant, August 1990 - April 1994
### Sergeant, December 1987 - August 1990
### Police Officer, May 1981 - December 1987
### Community Service Officer, October 1979 - May 1981

Exhibit 1
Page 3

# **Exhibit 2**



UNIVERSITY
OF
CALIFORNIA

# Response
# to Protests
# on UC Campuses

## 2012

Exhibit 2
Page 4



Exhibit 2
Page 5

# Response
# to Protests
# on UC Campuses

A Report to University of California President Mark G. Yudof

Christopher F. Edley, Jr.
Dean, University of California, Berkeley, School of Law

Charles F. Robinson,
Vice President and General Counsel, Regents of the University of California

September 13, 2012

Exhibit 2
Page 6

Exhibit 2
Page 7

# Table of Contents

**EXECUTIVE SUMMARY** ................................................1

**INTRODUCTION** ...........................................................5

I.   Background on Protest and Policing
at the University of California ...........................7

II.   Background Principles .....................................9

III.   Methodology and Process ...............................11

IV.   Themes .............................................................12

V.   UC Police Departments Are Essential
On Our Campuses ...........................................15

**DISCUSSION AND RECOMMENDATIONS** ......................17

I.   Explicit Policy Focus on Civil Disobedience
and First Amendment Rights.........................17

    A.   Background ...........................................18

    B.   Recommendation ...................................20

II.   Opening Lines of Communication
and Building Relationships .............................21

    A.   Increasing Regular Avenues for
Communication with the Administration ............21

        1.   Background ...................................21

        2.   Recommendation ...........................22

    B.   Building Familiarity with the Campus Police
and with Rules Governing Protest Activity .........23

        1.   Background ...................................24

        2.   Recommendation ...........................25

III.   Defining Roles of Administrators and Police
With Respect to Responses to Civil Disobedience .....27

    A.   Administrator and Police Coordination ...............27

        1.   Background ...................................28

            (a)   Police Policies, Incident Command
System, NIMS, and SEMS ...................28

            (b)   Event Response Teams.......................29

            (c)   Lack of Formal Coordination
Between Police and Administrators
During Events......................................32

        2.   Recommendation ...........................34

    B.   Assistance from Other Police Departments .........41

        1.   Background ...................................41

        2.   Recommendation ...........................44

IV.   Hiring and Training.........................................45

    A.   Police Hiring...........................................46

        1.   Background ...................................46

        2.   Recommendation ...........................47

    B.   Police Training .......................................48

        1.   Background ...................................49

        2.   Recommendation ...........................51

    C.   Administrator Training..............................52

        1.   Background ...................................52

        2.   Recommendation ...........................53

V.   Communication with Protesters
and the Campus Community ...........................54

    A.   Coordination and Communication with
Protesters in Advance of Planned Protests .........54

        1.   Background ...................................55

        2.   Recommendation ...........................56

    B.   Communicating With Demonstrators
During Protest Events ..............................57

        1.   Background ...................................57

        2.   Recommendation ...........................59

    C.   Communications with the Broader
Campus Community ...............................60

        1.   Background ...................................60

        2.   Recommendation ...........................60

VI.   Response During Events .................................61

    A.   Alternatives to Arrest or Force ....................61

        1.   Mediation ....................................62

            (a)   Background......................................62

            (b)   Recommendation..............................62

        2.   De-escalation Techniques .........................63

            (a)   Background......................................63

            (b)   Recommendation..............................65

        3.   Administrative Citation .........................66

            (a)   Background......................................66

            (b)   Recommendation..............................67

    B.   Response Options ..................................68

        1.   Response Option (Use of Force)
Framework ....................................68

            (a)   Background......................................68

            (b)   Recommendation..............................78

Exhibit 2
Page 8

2.    Procurement of Equipment ......................... 81

    (a)   Background ......................................... 82

    (b)   Recommendation ................................ 82

3.    Evaluation of Safety of Pepper Spray ......... 84

    (a)   Background ......................................... 84

    (b)   Recommendation ................................ 86

VII.  Documenting Activity During Demonstrations ............ 86

   A.   Observers .................................................... 86

     1.    Background .................................................... 87

     2.    Recommendation ......................................... 88

   B.   Video Recording Events ...................................... 89

     1.    Background .................................................... 89

     2.    Recommendation ......................................... 90

   C.   Reporting By Police .......................................... 91

     1.    Background .................................................... 91

     2.    Recommendation ......................................... 93

VIII. Post-Event Review .............................................. 93

     1.    Background .................................................... 94

     2.    Recommendation ......................................... 96

IX.   Implementation .................................................... 98

     1.    Background .................................................... 98

     2.    Recommendation ......................................... 99

**APPENDIX A – RECOMMENDATIONS** ........................... 101

**APPENDIX B – INTERNAL UNIVERSITY OF CALIFORNIA INTERVIEWS** ........................................ 105

**APPENDIX C – EXTERNAL INTERVIEWS** .................... 114

**APPENDIX D – LITERATURE REVIEWED** .................... 116

**APPENDIX E – UCSF SCHOOL OF PHARMACY STUDY** ........................................... 122

Exhibit 2
Page 9

# Executive Summary

After physical conflict erupted between police and protesters during demonstrations at UC Berkeley and UC Davis in November 2011, University President Mark G. Yudof asked Vice President and General Counsel Charles F. Robinson and Berkeley Law School Dean Christopher F. Edley, Jr. to review existing policies and practices regarding the University's response to demonstrations and civil disobedience.  This review was not intended as a fact-finding investigation into the November 2011 protests, or into any other particular incident.  Other reviews have been tasked with that objective.  Rather, this review was aimed at identifying best practices to inform the University's response to *future* demonstrations.  Since work on the review—and this resulting Report—began, additional clashes on other campuses have underscored the need for this analysis.

This Report is premised on the belief that free expression, robust discourse, and vigorous debate over ideas and principles are essential to the mission of our University.   The goal of this Report is to identify practices that will facilitate such expression and encourage lawful protest activity—while also protecting the health and safety of our students, faculty, staff, police, and the general public when protesters choose to violate laws and regulations.

It is important to note that several of these practices have already been adopted by campuses within our system.  Indeed, many of our campuses have long employed these recommended practices to positive effect in responding to protests—the vast majority of which are handled successfully by campuses across the UC system, without conflict.  By recommending these practices in this Report, we do not mean to suggest that they are novel or have never previously been employed within our system.  For some campus administrators and police, however, implementing our recommendations will require a substantial shift away from a mindset that has been focused primarily on the maintenance of order and adherence to rules and regulations.  With this Report, we mean to encourage all our campus administrations and police to consistently implement the best practices recommended herein.  In addition, for some protesters, implementing our recommendations will require taking more responsibility for their activities, including by educating themselves about protest-related rules and considering the impact acts of civil disobedience can have on others in the campus community.

In developing this prospective framework for responding to protests and civil disobedience, the authors examined existing University policies and practices on speech, demonstrations, and use of force by police; the opinions of students, faculty, administrators, staff, and police on all ten campuses; and the views of academics and other experts on speech, civil liberties, and law enforcement.  The objective has been to be as broad and fair as possible in collecting information in order to develop a thoughtful and fact-based Report.

Exhibit 2
Page 10

Ultimately, the Report arrives at 49 recommendations in nine areas:

1. **Civil Disobedience Challenges.**  The Report points out the need for the University to define and communicate more clearly the free speech rights and responsibilities of all members of the University community.  We must ensure that there is no confusion on our campuses about the rights of individuals to express themselves and to assemble lawfully for that purpose.  But the more challenging situations arise when protesters decide to violate laws or regulations—in other words, to engage in civil disobedience.  The University and individual campuses should amend their policies in order to recognize explicitly the historic role of civil disobedience as a protest tactic.  Those policies should also make clear, however, that civil disobedience by definition involves violating laws or regulations, and that civil disobedience will generally have consequences for those engaging in it because of the impact it can have on the rest of the campus community.

2. **Relationship Building.**  The University must endeavor to increase trust and understanding among campus stakeholders, by better utilizing existing communication channels and by building new ones.  Many protests can be avoided if there are effective lines of communication between would-be protesters and administrative officials, and opportunities to raise substantive concerns with the Administration and to obtain a meaningful response.  The University's response to protests can also be handled better and more efficiently by maintaining strong working relationships between police officials and administrators and relationships of trust between campus police and the communities they serve.

3. **Role Definition and Coordination.**  To ensure an effective University response to protests involving civil disobedience, there must be an established system for coordination between police and administrators, with well-defined roles and a shared understanding that ultimate responsibility for the campus's response rests with the Chancellor.  The Chancellor and other administrators should develop and follow a set of guidelines designed to minimize a police response to protests, and to limit the use of force against protesters wherever possible.  Absent exigent circumstances, the Chancellor or the Chancellor's designee must approve any force by police immediately before it is used.  And greater emphasis must be placed on coordinating with outside law enforcement agencies who may provide assistance during large demonstrations.

4. **Hiring and Training.**  The Report advances recommendations regarding hiring police officers and better training them about how to respond to civil disobedience.  It also recommends that University administrators be required to attend regular trainings, in order to educate them about approaches for de-escalating protest situations, and to help them better understand police policies and practices.

Exhibit 2
Page 11

5. **Communications with Protesters.**  With strong communications between demonstrators and the campus Administration, civil disobedience can sometimes be avoided—or, at least, can take place peacefully without any use of force by police.  The Report offers recommendations regarding communication and coordination with protesters in advance of a planned event, as well as during an ongoing demonstration.

6. **Response During Events.**  Once a protest is underway and individual protesters begin to engage in civil disobedience, the decisions made by administrators can directly affect whether the protest ends peacefully rather than with violence.  The Report recommends several strategies for reaching a peaceful accord with protesters without resorting to the use of force by police.  It also proposes adoption of policies to guide our campus police departments if the Administration decides that a police response to the protest is necessary, such as a systemwide response option framework with guidance on appropriate responses to different types of resistance.

7. **Documenting Activity During Demonstrations.**  The Report recommends several parallel methods for creating an accurate record of the actions of police and demonstrators during demonstrations.  These include the use of neutral observers, a policy of videotaping activity at the demonstration, and the creation of police after-action reports following any police response to a demonstration.

8. **Post-Event Review.**  The Report recommends that the University adopt a systemwide structure located outside of the police department and the campus Administration for reviewing the response to civil disobedience.

9. **Implementation.**  Finally, we suggest a process for implementing the recommendations in this Report.  Most significantly, it recommends that the President require each Chancellor to take concrete action to implement our recommendations, and to report promptly to the President on his or her progress.

The recommendations were posted in draft form so they could be commented on and debated.  After considering the public comments and making some revisions in response to them, we have finalized the recommendations and now submit them to the President.  To be sure, no single report can resolve all the issues the University faces regarding protest and civil disobedience.  Successfully laying the groundwork for safe and accountable protest activity will take the commitment and effort of all members of the University community.  This Report is just the starting point—an attempt to assist the University in moving forward to celebrate the diversity of opinion and culture on our campuses, to do so with respect and civility, and to build on the illustrious history of public involvement and free speech that is the DNA of the University of California.

Exhibit 2
Page 12

## Preliminary Statement on Scope

We begin with a couple notes on the scope of this Report.  First, we have found that the most difficult questions concerning how our University should respond to protests center around a narrow band of protest activity involving violations of laws or campus regulations, which we will refer to as civil disobedience.  The issues presented by other protest conduct are more straightforward.  Protests that are lawful and comply with the applicable time, place, and manner restrictions are clearly permissible, and our Administrations and police departments must allow them to proceed—if not encourage them.  On the other end of the spectrum, violent activity by protesters, which threatens the safety of others or significantly damages property, is illegal and cannot be permitted.  The thorniest questions lie between these two extremes.  How should our University respond to protest activity that is not violent, but that violates the law or campus regulations and that may negatively impact the University's mission?  This form of protest activity, which we refer to throughout this Report as "civil disobedience," is the central focus of our Report.

Second, although we recognize the troubling possibility that protests may involve some individuals bent on creating mischief, destroying property, or worse, handling such protesters has not been a primary focus of this Report.  It has been our experience that the vast majority of protests are peaceful, and that the vast majority of protesters see protest as a means of expressing their views and opinions in a peaceful manner.  Most of our recommendations for responding to protests are therefore premised on the assumption that protesters will be acting in good faith and in a peaceful manner, even if violating laws or regulations to emphasize their message.  But we cannot ignore the possibility that some individuals may have less honorable intentions, and may seize on protests as an opportunity merely to cause disruption or damage. We think our campuses should attempt to follow our recommendations regardless of the apparent motivation of the protesters, but to the extent ill-intentioned individuals are among the protesters, we recognize that it may complicate the efforts of our Administrations and police departments to successfully respond, and may render some of the Recommendations in our Report infeasible or ineffective.

Exhibit 2
Page 13

# Introduction

In November 2011, several of our University of California campuses experienced large protests concerning University policies and issues of social inequity.  Many of these protests involved acts of civil disobedience by students and others.  Each campus responded to these events in its own way.  In several cases, the responses included the use of force by police, including the use of pepper spray and batons against student protesters.  The actions by police on two campuses—Berkeley and Davis—have been the subject of particular scrutiny and criticism from within our University and across the nation.  They have generated feelings of anger and distrust among students, faculty, and other members of our community.

The disturbing images arising out of those protests prompted demands for the University to investigate the conduct of the police and administrators, in order to understand what led to the use of force and why.  The University immediately launched reviews of the particular responses at UC Berkeley and UC Davis to the November 2011 protests.  Some of those reviews are ongoing.[1]

At the same time, President Mark Yudof directed us to conduct a different but related review.  Unlike the reviews looking backward at the demonstrations last November, President Yudof asked us to look forward.  He asked us to review current policies and practices and to identify improvements to help the University avoid the use of force in response to future civil disobedience, both small and large in scale.

Protest and civil disobedience are not new issues for our University.  And yet, nearly fifty years after the birth of the Free Speech Movement, we continue to struggle with episodes of physical conflict arising out of civil disobedience.  Our community members—students, faculty, staff, and the citizens who support our University—expect better.  Many consider protests and even civil disobedience fundamental to the University's academic mission.  They want the University to do everything possible to ensure that future civil disobedience does not result in the use of force by police.  And our campus police and administrators also do not relish conflict with

---

[1] At Berkeley, an operational review of the police response was conducted by UCLA Assistant Police Chief Jeff Young.  Chief Young's report was released on Mar. 23, 2012, and is available at http://administration.berkeley.edu/prb/UCPDOperationalReview-Redacted.pdf.  The Berkeley campus Police Review Board, chaired by law professor Jesse Choper, also conducted a broader review of the events of November 9.  A subcommittee of the Police Review Board (which includes student and staff representatives) held two meetings open to students and other community members.  The subcommittee also attended presentations by representatives of the faculty, student body, and campus police department.  On June 6, 2012, the UC Berkeley Police Review Board released a report on the events of November 9, which is available at http://www.berkeley.edu/news2/2012/06/PRBNov9report.pdf.  At Davis, internal affairs investigations of citizen complaints concerning the officers involved in the November 18 incident have been completed.  Pursuant to state law, these investigations are confidential.  *See* Cal. Penal Code § 832.7.  The University also retained the consulting firm Kroll Associates, Inc. to prepare a comprehensive report regarding the events surrounding November 18.  Kroll's report was provided to a task force comprised of students, faculty, staff, and other UC community members and headed by former California Supreme Court Justice Cruz Reynoso.  The Reynoso Task Force Report, which includes Kroll's report, was released on April 11, 2012, and is available at http://reynosoreport.ucdavis.edu/reynoso-report.pdf.  The Executive Council of the Davis Division of the Academic Senate also approved formation of a special committee to investigate the events leading to the use of force on November 18.  That special committee's report is available at http://academicsenate.ucdavis.edu/documents/Executive-Council-Motion-and-Letter-including-Nov-18.pdf.  At the request of Davis Chancellor Katehi, the Yolo County District Attorney's Office, in collaboration with the Yolo County Sheriff's Department, is also investigating the use of force by UC Davis police officers.  Litigation concerning the Berkeley and Davis events has also been initiated.

Exhibit 2
Page 14

protesters; they too want to see future demonstrations proceed peacefully without the need for police action. From all corners of our community, we hear the call for a meaningful change in the way that our University approaches civil disobedience on our campuses.

Our assignment, then, is *prospective*.  Our goal is to identify best practices that will facilitate robust and peaceful discourse on our campuses, in keeping with our academic mission, while also protecting the health and safety of our students, faculty, staff, police, and the general public.  For some campus administrators and police, this will require a substantial shift away from a mindset that has been focused primarily on the maintenance of order and adherence to rules and regulations.  But this inquiry goes beyond police and administration practices.  In our community, all members have a role to play in encouraging peaceful discourse and avoiding any physical conflict.

Toward that end, we spent six months reviewing existing University policies and practices on speech, demonstrations, and use of force by police; seeking the views of students, faculty, administrators, staff, and police on all ten campuses; and looking outside of our system to obtain input from academics and other experts on speech, civil liberties, and law enforcement.  We then issued a draft of this Report and accepted public comments on it for five weeks.  Based on those public comments, we revised the draft to create this final version.

Although we began this project by addressing "protest" activity generally, we soon realized that the central challenge before us related to *civil disobedience* in the context of protests.  There should be no confusion on our campuses about the right of individuals to express themselves, and to assemble lawfully for that purpose.  Such expression is essential to our educational mission.  And it is lawful, so long as those expressing their views do so in accordance with the University's reasonable time, place, and manner restrictions.  These restrictions are established to ensure that protest activity does not infringe on the rights of others or interfere with important functions of the University.  It is only when demonstrators engage in civil disobedience—the refusal to comply with laws or regulations as a *form* of protest or as a means of drawing attention to the demonstrators' message—that more complicated and controversial issues arise.  Exercising its enforcement discretion, what tolerance should our University have for civil disobedience?  What types of civil disobedience should result in a response from the University?  When, if ever, is it appropriate for police to use force in response to civil disobedience?  Finally, and fundamentally, how can we best avoid or minimize conflict before tensions escalate?

In considering these and other issues regarding civil disobedience, this Report will address activity that potentially has a large impact on University functions.  The Report is not intended to cover all possible instances in which protesters exercise their First Amendment rights or choose to engage in civil disobedience. We recognize that some of our recommendations would not make sense for the many small, non-violent, and peaceful protests that our campuses handle every year.  Our focus was on the potential impact that a protest

Exhibit 2
Page 15

might have on the greater University community, and our recommendations are designed to set the stage for appropriate, non-confrontational responses in those situations when a large impact is probable.  There is no single kind of protest that presents this possibility.  Protest events involving large groups of people obviously have the potential to substantially impact the University community.  Some large protests, however, might be unlikely to disrupt the University.  And, importantly, we do not discount the possibility that the conduct of small groups could warrant the application of some of our recommendations as well.

Before turning to the body of the Report, in which we present our findings and recommendations, we offer here a brief background on protests and civil disobedience at our University.  We then address the underlying principles that inform this review and methodology.  Next, we summarize the nine areas in which this Report advances recommendations.  Finally, we comment on the important role our campus police play in protecting our campus communities and explain why we do *not* recommend abolishing our campus police departments, despite the calls from some members of our community to do so.

I.  <u>**BACKGROUND ON PROTEST AND POLICING AT THE UNIVERSITY OF CALIFORNIA**</u>

Our University has ten campuses across the State and is home to more than 235,000 students and 185,000 employees, including almost 20,000 faculty members.  We are responsible for research, public service, the delivery of health care, and—most importantly—the education of Californians and people from across the globe.  Our University is literally and figuratively a community of students, faculty, and staff.

With such a large, diverse, and intellectually vibrant academic community, it is not surprising that our campuses have frequently been the site of protest and civil disobedience.  Indeed, ever since the Free Speech Movement began at our Berkeley campus, our University has been linked in the national consciousness with protest and free expression.  The demonstrations at UC Berkeley's Sproul Plaza in the 1960s became a pivotal period because American college students mobilized *en masse* to demand a right to speak equal to that of other adults.  Establishing students' right to free speech fundamentally altered the University's relationship with its students and sparked similar protests across the country.  Large protests continued in the following decades, first against the Vietnam War, and then on international issues such as apartheid and on more localized issues such as minority representation on campus.  Hunger strikes by students at UCLA in 1993, for example, resulted in the creation of the César E. Chávez Center for Interdisciplinary Instruction in Chicana and Chicano Studies.  Our campuses have also seen large protests concerning labor relations.

Although students often spearhead the protests on our campuses, they are frequently joined by others— faculty, staff, and even those with no formal affiliation to the University.  When protests involve a large number of non-affiliates, they present unique challenges for University officials.  For example, police and administrators will generally have no prior relationship with the non-affiliates; nor can student discipline be used as a response option against such individuals.  And, as a public institution, barring non-affiliates from campus is usually

Exhibit 2
Page 16

inappropriate, as well as all but impossible as a physical matter, for most of those portions of our campuses designated as public forums for speech activity.

Because of the structure of our University, administrators and police on the individual campuses are generally responsible for deciding how to respond to protests and civil disobedience on those campuses.  The University of California has a Board of Regents and a single President.  The President acts as the executive head of the University and leads the administrative headquarters of the University in Oakland.  Each campus also has its own Administration, led by a Chancellor, which answers to the Office of the President.  Campus administrators are responsible for most aspects of the day-to-day management of activities on their campus.  Every campus has its own professional police department, with sworn police officers who meet the same statewide standards for hiring and training as state and municipal police officers.  Although the Office of the President coordinates certain systemwide police functions, it is not involved in the day-to-day management of any police department.[2]  Instead, campus administrators oversee the campus police departments and are responsible for public safety issues on their campuses.  Thus, when civil disobedience occurs on a campus, it is the campus administrators and their police counterparts who typically provide the University's response.

The vast majority of protests on all of our campuses are handled peacefully, professionally, and without major disruption.  These events do not result in the use of force, and many do not involve any police action whatsoever.  Almost every day, demonstrators peacefully assemble and express their views somewhere within our University, and, even in stressful situations, administrators and police interact successfully with protesters most of the time.

But occasionally protests have engendered greater conflict.  In 2009, for example, a group of students protesting against student fee increases and other budgetary issues barricaded themselves inside Wheeler Hall at Berkeley.  During the tense, day-long stand-off that followed, police clashed with a large group that assembled outside of the Hall.  The confrontation ultimately included pushing, baton strikes by the police, and struggles over metal barriers.  In the aftermath, the Berkeley Police Review Board reviewed the incident and issued a 132-page report on the actions of the Berkeley Administration and campus police, including 19 recommendations for the police department and 13 recommendations for the Administration.  This report is frequently referred to as the "Brazil Report," after former United States Magistrate Judge Wayne Brazil, then the Chair of the Review Board.[3]

Also in 2009, a large group protested outside a meeting of the Board of Regents at Covel Commons on the UCLA campus.  One of the agenda items at the meeting was a proposal to increase student fees.  Protesters again clashed with the police.  Some demonstrators attempted to upend barricades and storm into the

---

[2] *See generally* Universitywide Police Policies and Administrative Procedures, University of California, § 301 *et seq.* (Jan. 7, 2011), *available at* http://www.ucop.edu/ucophome/coordrev/ucpolicies/documents/policepol_adminproc.pdf.
[3] *See* November 20, 2009, Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board (June 14, 2010), *available at* http://administration.berkeley.edu/brpb/6-14-10_prb-report.pdf.

Exhibit 2
Page 17

commons, and they threw sticks, water bottles, and vinegar-soaked rags at police.  Police pushed protesters and used batons and "tasers"[4] against them.  Again, a panel conducted a comprehensive review and ultimately issued a 62-page report.  The UCLA report included nine separate recommendations for the Administration and UCLA Police Department.[5]

In 2005, events at the Santa Cruz campus organized in connection with "Tent University," a national movement aimed at reforming higher education, resulted in clashes with police.  A large group of students protesting against fee increases attempted to establish an overnight camp at the base of the campus.  At the instruction of the Chancellor, police sought to disperse the group.  Police used hands-on "pain compliance" methods to remove a group of students who sat in a circle with linked arms and legs.  A series of reviews of the campus's response to student protest emerged from this incident, including reports and recommendations from an Academic Senate task force,[6] an external administrative reviewer,[7] and the UC Santa Cruz Demonstration Planning Team.[8]

Most recently, our community saw physical conflict between police and protesters at Berkeley and Davis in November 2011, and additional clashes between police and demonstrators at the Regents' Meetings at UC Riverside in January and at UCSF in March 2012.

This history establishes that we have more work to do.  Whatever progress we have made as a result of lessons learned from past incidents of civil disobedience, our University still struggles with how to respond to civil disobedience in a manner that avoids strife and violence.

## II.  BACKGROUND PRINCIPLES

We are mindful that this is a Report about civil disobedience and the use of force *on university campuses.*  This context matters.  Our University is charged by the State of California with the profound responsibility of educating its sons and daughters.[9]  Its policies at every level must reflect that core educational mission.  This is particularly true when it comes to protest and civil disobedience—activities that frequently will advance the University's educational mission by allowing students to become active, engaged, and responsible citizens, and

---

[4] A TASER® is a common brand of a "less-lethal" weapon known generically as an "electronic control device" or "ECD."  Throughout this Report, we employ "taser" to refer to all electronic control devices because of the general public's familiarity with the term, and because individuals we interviewed typically referred to "tasers" when discussing electronic control devices.
[5] *See* November 2009 UC Regents Meeting: Post-Event Review Report (Nov. 22, 2010), *available at* http://newsroom.ucla.edu/portal/ucla/document/Regents_Nov_2009_Meeting_Post_Event_Report.pdf.
[6] *See* Report of the Tent University and Restructuring Emergency Response Procedures Task Force (Feb. 1, 2006), *available at* http://senate.ucsc.edu/archives/campus-demonstration-response/TUSCreptSCP1479.pdf.
[7] *See* Patrick Hayashi, *UC Santa Cruz and Student Protests: Observations and Recommendations* (Mar. 15, 2006), *available at* http://senate.ucsc.edu/archives/campus-demonstration-response/HayashiReport.pdf.
[8] *See* Demonstration Planning Team, Final Report (Mar. 1, 2007), *available at* http://senate.ucsc.edu/archives/campus-demonstration-response/Final%20Demonstration%20Planning%20Team%20Report2.pdf.
[9] *See* University of California's Mission, *available at* http://www.universityofcalifornia.edu/aboutuc/mission.html (noting that the University of California's mission includes teaching, research and public service, and providing "individuals with the tools to continue intellectual development over a lifetime and to contribute to the needs of a changing society").

Exhibit 2
Page 18

to express cutting-edge ideas.  We must view civil disobedience by protesters through the lens of the core values of our institution.  In our opinion, these core values include:

- **A commitment to learning, discovery, and imagination, together with their indispensible foundation: freedom of expression and the free exchange of ideas.**  For our purposes, this is a useful formulation of the academic values which must suffuse and nurture our University and which we are duty bound to safeguard.  Specifically, freedom of expression is essential to the University's mission of teaching, research, and public service.  Limitations on the freedom of speech or the exchange of ideas can undermine that mission.  One kind of fuel for speech and exchange in our community is the diversity we seek in our membership—diversity in many dimensions, intended to generate a creative contest of ideas. Protest, which sometimes accompanies expression reflecting a clash of ideas, is an inevitable reality of any modern university.  This Report emphatically is not concerned with stopping protests, curbing criticism of the University, or discouraging debate about larger social issues.  Quite to the contrary, we embrace and encourage those valuable forms of expression and strive to create an environment in which they can occur peacefully and safely—ideally, in furtherance of understanding and critical thinking.

- **Recognition that civil disobedience has been used as a form of expression in respected and important political movements.**  Although civil disobedience involves violating laws or regulations by its very definition, many protesters engage in civil disobedience in an attempt to bring about social or legal change.  Under the best of circumstances, protesters come to civil disobedience as a last resort, only after other efforts to effect change have failed.  In doing so, they are participating in an important and valuable tradition in American democracy, and one that has been particularly prominent on university campuses.

- **Accountability and responsibility for civil disobedience.**  Even when motivated by the best intentions, civil disobedience has an impact on the University community.  It may displace members of the community, interfere with their educational or business activities, or divert scarce resources away from other important priorities.  When motivated by less honorable intentions, civil disobedience can result in fear, intimidation, or even violence.  All of us—including administrators, protesters, and police—have a responsibility to avoid activity that imperils the safety of others in the community.  Additionally, in recognition of the impact of civil disobedience on the University community as a whole, those engaging in civil disobedience should expect that they will be held accountable for their actions, just as those responding to acts of civil disobedience are accountable for their actions.  The management of demonstrations and protests can and should be collaborative, with all parties communicating, coordinating, and working together to make the event meaningful and safe.  Although some believe an approach that asks protesters to work with the Administration is the antithesis of what civil disobedience is, we think it is warranted by the need to protect the University's educational mission and public safety.

Exhibit 2
Page 19

- **Respect for different viewpoints and goals.**  We are a diverse community, with diverse perspectives on almost every issue.  The subjects of this Report are no exception.  Some in our University believe that protesters should always be able to engage in civil disobedience without drawing a police response, unless the protesters engage in physical violence.  Some view protests that prevent a professor from teaching in the classroom as a "teachable moment" that can never justify police involvement.  Still others are concerned with the potential for disruption of classes or the closure of University facilities occasioned by some protests, and call for greater intervention when civil disobedience by demonstrators interferes with the ability of others to study or work.  Our community will never be of one mind on these issues.

- **Inclusion and transparency.**  The subject of this Report affects every member of our campus community.  Such a subject calls for a bottom-up process that considers the diverse perspectives within our community.  We therefore sought to include as many people as possible in the development of our recommendations—staff, students, police, faculty, and the Chancellors of our campuses.  We know that President Yudof will provide other appropriate avenues for input before final decisions are reached on the dozens of recommendations we offer.

We recognize the critical role of these values to the University, and our recommendations aim to reflect and affirm these values.  In particular, we will focus on our shared responsibility for building peaceful avenues for discourse, debate, and protest.  Our University can improve its management of protests and civil disobedience if there are strong relationships and communication between protesters, administrators, and police, and if the expectations and objectives of each group are clear in advance.

## III.  <u>METHODOLOGY AND PROCESS</u>

Our review involved three parts.  First, we collected and analyzed existing UC policies on speech, demonstrations, and use of force by police.  We looked not only at systemwide policies, but also at campus and police department policies at each of our ten individual campuses.[10]  Second, we interviewed members of our campus community, including students, faculty, staff, administrators, members of the Board of Regents, and campus Police Chiefs on all ten campuses.  As part of this internal review, we also held town hall meetings at the Berkeley, Davis, and Irvine campuses.  This process helped us to develop a better understanding of how the University's formal policies are understood and implemented in practice, and to solicit thoughts and concerns from all corners of our community.[11]  Third, we obtained the views of outside experts—including

---

[10] We analyzed the policies from each campus as they existed at the outset of our review, in December 2011.  In some instances, this Report will reference policies developed or adopted more recently.  But we have not comprehensively collected policies adopted since December 1, 2011.

[11] A complete list of members of the UC community we interviewed is presented in Appendix B.

Exhibit 2
Page 20

academics, civil libertarians, and law enforcement officials.  We conducted dozens of interviews with outside experts, and reviewed scores of scholarly articles.[12]

Shortly after President Yudof charged us with conducting this review, he directed the UCSF School of Pharmacy to evaluate the health effects resulting from human exposure to pepper spray, a weapon that is currently available to trained officers on all of our campuses.  The School of Pharmacy reviewed existing literature on this subject and analyzed a decade of data from the California Poison Control System.  As part of this review, we received a detailed report from the School of Pharmacy summarizing their work.[13]

After collecting and synthesizing this information, we drafted the findings and recommendations that follow. We posted a draft version of this Report on the University of California website and provided an opportunity for the public to comment on the Report online over a five-week period.  We received hundreds of comments from students, staff (including police), faculty, administrators, outside experts, and members of the general public. We reviewed and discussed these comments, and then revised the Report, where necessary, to address them. We then prepared this final version of the Report, which we now submit to President Yudof for his consideration.

As we have noted, other reviews and investigations arose from the events of last November.[14]  In particular, former California Supreme Court Associate Justice Cruz Reynoso has led a review of the UC Davis pepper spray incident, and the UC Berkeley Police Review Board investigated the use of batons by police and related matters.  The Reynoso review became available shortly before we released our draft Report, and the UC Berkeley Police Review Board released its report on June 6, 2012, a month after we released our draft Report. We find that the recommendations advanced in the Reynoso and UC Berkeley Police Review Board reports are generally consistent with the recommendations that we make here, although there are some notable differences that we discuss below.  The Reynoso report, the UC Berkeley Police Review Board report, and the results of other pending investigations will, of course, further inform President Yudof's decisions about whether and how to implement the policy recommendations provided here.

## IV.  THEMES

This Report identifies a set of recommended best practices for our University going forward.  The best practices do not all relate to our police, because we do not view this narrowly as a "police" problem.  Rather, our recommendations identify ways in which all of us can work together to enhance dialogue on substantive issues of concern to our community; to facilitate peaceful and lawful protests; and to craft a reasonable response to civil disobedience that minimizes the risk of violence and the use of force by police—in order to protect the safety of all, together with core academic values.

---

[12] A comprehensive list of the outside experts we consulted and the literature we reviewed is presented in Appendices C and D.
[13] The report by the UCSF School of Pharmacy is attached as Appendix E.
[14] *See supra* n.1.

Exhibit 2
Page 21

In drafting these recommendations, we faced a tension between the need to erect a uniform systemwide framework and the desire to accommodate the profound differences among our campuses. A rigid systemwide framework might help ensure a consistent response to civil disobedience across all our campuses, but it would not provide any flexibility for the unique culture and physical setting of each campus. Nor would it allow for innovation at the campus level. Our recommendations thus seek to strike a balance by establishing a broad set of common policies that span our entire system while creating a measure of space for local autonomy.

We have divided our recommendations into the following nine thematic categories:

1. **Civil Disobedience Challenges.** Although the University already has policies regarding free expression, we recommend that it amend those policies in order to recognize explicitly the important and historic role of civil disobedience as a protest tactic. Such a discussion will remind administrators and police that civil disobedience is not generally something to be feared and will not necessarily require force in response. Those policies should also make clear, however, that civil disobedience by definition involves violating laws or regulations, and that because of the impact it can have on the rest of the campus community, civil disobedience will generally have consequences for those engaging in it.

2. **Relationship Building.** Protests are an inevitable reality for any modern university. But some protests can be avoided if there are effective lines of communication between would-be protesters and administrative officials, and robust opportunities to raise substantive concerns with the Administration and to obtain a meaningful response. The University's response to protests can also be handled better and more efficiently by building strong working relationships between police officials and administrators or improving existing relationships. Interactions between protesters and police in the midst of a demonstration will be less fraught if these groups have an opportunity to interact and learn about each other *before* the demonstration. We recommend ways to build each of these relationships in advance of protests or civil disobedience.

3. **Role Definition and Coordination.** In order to ensure an effective University response to protests involving civil disobedience, there must be an established system for coordination between police and administrators, with well-defined roles and a shared understanding that ultimate responsibility for each campus's response rests with its Chancellor. We offer recommendations aimed at improving the coordination between administrators and police and at implementing a consistent approach across our campuses. We also advance recommendations regarding coordinating with outside law enforcement agencies who may provide assistance during large demonstrations.

4. **Hiring and Training.** The most effective way to avoid violent confrontations between police and protesters is to ensure that the police and administrators on the ground have the knowledge and the temperament to help resolve the situation in a peaceful way. We advance recommendations regarding our policies for hiring police officers and for training them about how to respond to civil disobedience. We also

Exhibit 2
Page 22

recommend that the University require the civilian administrators responsible for responding to civil disobedience to attend regular trainings, in order to educate them about methods to de-escalate protest situations and to help them understand police policies and practices.

5. **Communications with Protesters.**  Violent confrontations between police and protesters often result from a break-down in communications.  With strong communications, civil disobedience can sometimes be avoided—or, at least, can take place peacefully without any use of force by police.  We offer recommendations regarding communication and coordination with protesters in advance of a planned event, as well as during an ongoing demonstration.

6. **Response During Events.**  Once a protest is underway and individual protesters begin to engage in civil disobedience, the decisions made by administrators can directly affect whether the protest ends peacefully rather than with violence.  We propose various strategies for reaching a peaceful accord with protesters without resorting to the use of force by police, including employing trained mediators and using administrative citations in place of arrests.  We also recommend policies to guide our campus police departments if the Administration decides that a police response to the protest is necessary.  These include developing a framework to provide detailed guidance on appropriate responses to different types of resistance, adopting consistent policies across our campuses regarding which weapons may be carried by UC police, and devising procedures for improving coordination with outside law enforcement agencies if they are needed to provide assistance.

7. **Documenting Activity During Demonstrations.**  A consistent problem in the area of police response to civil disobedience is determining, after the fact, what actually happened.  We recommend several parallel methods for recording the actions of demonstrators and police: the use of neutral observers, a policy of videotaping activity at the demonstration, and the creation of police after-action reports following both successful and unsuccessful police responses to demonstrations.

8. **Post-Event Review.**  In the wake of any civil disobedience incident involving the use of force, the conduct of the police and the protesters should be the subject of a close and careful review.  Although one of our campuses has a dedicated police review board composed of civilians, the other campuses do not have any established form of post-event review outside of the police department.  We recommend that the University adopt a systemwide structure located outside of the police department for reviewing the police response to civil disobedience.

9. **Implementation.**  Finally, we suggest a process for implementing the recommendations in this Report.  Most importantly, we propose that the President require each Chancellor to take concrete action to implement our recommendations, and to report promptly to the President on his or her progress.

Exhibit 2
Page 23

In some instances, implementing our recommendations will create additional costs.  We recognize that this is a time of severe fiscal constraint for our University and for the State.  But given the importance of the subject at hand and the widespread consensus that the University must improve its response to protest and civil disobedience, we would hope that the necessary funding would be forthcoming.  Moreover, it should not be ignored that conflict arising out of protests—conflict that may be avoidable if the protest is managed successfully—creates both economic and non-economic costs for the University as well.  Economic costs include police overtime, damage to property, payments to outside law enforcement agencies, and civil suits.[15]  Non-economic costs include harm to the University's reputation, mistrust among members of our campus communities, and disruption of the educational mission.  It is our hope that these recommendations will help to avoid at least some of these costs, by encouraging peaceful protest activity and avoiding conflict between police and demonstrators.  Although implementation will require some new expenditures, we expect that the recommendations in this Report would result in many off-setting savings in the long run.

### V.   UC POLICE DEPARTMENTS ARE ESSENTIAL ON OUR CAMPUSES

Before proceeding to the balance of our Report, we emphasize that there is one recommendation we have *not* made.  During our consultations, several members of the University community argued we should not have police on our campuses at all because police presence interferes with the free exchange of ideas.[16]  Some students said they perceive their campus police as a "hostile presence," effectively a "militarization" of the campus.[17]  Others pointed to universities in other countries and other states that do not have police departments.[18]

We do not agree with these calls to abolish our campus police departments.  Creation of the University of California Police Department was specifically authorized by an act of the California Legislature, to protect the peace on and around our campuses.[19]  The total size of the UC police force is almost 400 sworn officers, and the number of officers ranges from just eight at UC Merced to over 60 each at UC Berkeley and UCLA.  Although each department is small in size, collectively they protect hundreds of thousands of people on our campuses and in dormitories, laboratories, and other off-campus University buildings.  The hundreds of sworn officers throughout our University serve honorably to protect us on a daily basis.  The departments respond to

---

[15] For example, when four protesters spent nearly two years in a grove of oak trees in an effort to prevent UC Berkeley from removing the trees and building an athletic facility, the University spent over $2.2 million for police overtime, legal costs, and other related expenses.  *See* Will Kane, *City, UC Berkeley Campus Still Paying Tree-Sit Bills*, DAILY CALIFORNIAN, Dec. 9, 2008. Jennifer Gollan, *Berkeley Crackdown Raises Fear of Move Backward*, N.Y. TIMES, *available at* http://www.nytimes.com/2011/11/18/us/berkeley-crackdown-raises-fear-of-move-backward.html?pagewanted=all; Alison Go, *21 Months Later, Berkeley Tree Sitters Come Down*, U.S. NEWS, *available at* http://www.usnews.com/education/blogs/paper-trail/2008/09/10/21-months-later-berkeley-tree-sitters-come-down.
[16] Jan. 31, 2012 UC Berkeley Town Hall; Jan. 11, 2012 Meeting with UC Berkeley Faculty.
[17] Jan. 6, 2012 Meeting with UC Riverside Students.
[18] Jan. 31, 2012 UC Berkeley Town Hall; Feb. 10, 2012 UC Davis Town Hall.
[19] *See* Cal. Educ. Code § 92600.

Exhibit 2
Page 24

thousands of crimes each year.[20]  Most are property crimes, but some are life-threatening—as when the UC Berkeley Police Department recently responded to a man with a gun at the Haas School of Business at Berkeley.[21]

We believe that having dedicated campus law enforcement agencies is critical.  Having our own campus police who come to understand the academic values of our University and who are accountable to our Chancellors better positions us to respond to civil disobedience than if we were to rely on local police—over whose selection, training, and supervision the University has no control.  The fact that we have dedicated campus police departments will enable us to implement the recommendations in this Report directly, rather than merely urging outside law enforcement agencies to please reform themselves.  Moreover, the Haas School of Business incident, as well as violent episodes outside our system such as the 2007 massacre at Virginia Tech, reinforce a sad reality: our campuses will sometimes face emergencies that require an immediate police response to protect the lives of our students, faculty, and staff.  Recognizing the value of dedicated campus police forces, 74 percent of four-year colleges and universities with more than 2,500 students have a campus law enforcement agency with sworn officers, and 93 percent of all public universities do.[22]

---

[20] In 2010, FBI crime data showed that crime across the University of California decreased by 12.9 percent.  Violent crime decreased by 2.2 percent, while property crime decreased by 13.9 percent.  Property crime offenses represented 90 percent of the 5,424 cases on UC campuses.  University of California Police Department, Annual Report & Crime Statistics: Universitywide Crime Summary (2010), *available at* http://police.ucsf.edu/images/stories/AnnualReport/2010AnnualReport/2010/index.html (referencing FBI reporting criteria contained in the Uniform Crime Reporting (UCR) Program to determine the University of California's 2010 reportable crimes).
[21] Jan. 11, 2012 Meeting with UC Berkeley Faculty; Jan. 26, 2012 Meeting with Council of Executive Vice Chancellors.
[22] Bureau of Justice Statistics, Special Report: Campus Law Enforcement, 2004-05, at 1 (Feb. 2008), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/cle0405.pdf.

Exhibit 2
Page 25

# Discussion And Recommendations

### I.   EXPLICIT POLICY FOCUS ON CIVIL DISOBEDIENCE AND FIRST AMENDMENT RIGHTS

Protests and civil disobedience have been important components of social and political movements throughout the history of this country.  Protests at the University of California in particular have played an important role in that history.  And there is probably nothing more important to a university community than ensuring that members of the community feel free to express their views, regardless of how unpopular those views may be.

But there is also an important distinction between First Amendment-protected speech and civil disobedience.  The First Amendment protects the right to express one's views, but it also allows the government to place reasonable time, place, and manner restrictions on that expression.[23]  The First Amendment does *not* guarantee any right to engage in civil disobedience—which, by its very definition, involves the violation of laws or regulations—without incurring consequences.  Indeed, part of the reason a protester engages in civil disobedience is to express the protester's willingness to be arrested or otherwise sanctioned as a sacrifice to the cause in question; the history of civil disobedience includes a history of consequences.[24]

We noticed in our discussions with some students and faculty that they looked past this distinction—mistakenly viewing civil disobedience as just one form of constitutionally protected speech.  It is not.  Some students and faculty seem not to recognize that civil disobedience can have adverse effects on other members of the community, or that civil disobedience fundamentally is illegal and may therefore have legal consequences.[25]  On the other hand, our conversations with some police and some administrators suggested that they have overlooked the expressive component of civil disobedience and its social and historical importance.

---

[23] The First Amendment provides:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  The Due Process Clause of the Fourteenth Amendment applies the First Amendment to state entities, like the University of California.

In evaluating restrictions of speech on government-owned property, courts apply a "forum analysis."  *See Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S 37 (1983).  This analysis recognizes that any right of access to public property and limitations on such a right depend on the type of property at issue.  *Id.* at 44.  Thus, public speech rights are greatest in areas such as streets and parks that have historically been used for public assembly and communication (known as "traditional public fora") or areas that the government has specifically opened for public discourse ("designated public fora").  On the other hand, the government has more leeway to regulate access to other "nonpublic forum" areas, such as classrooms and dormitories.

Even in public fora, the government may impose reasonable restrictions on the "time, place, or manner" of speech.  *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298 (1984).  Thus, for example, the United States Supreme Court has ruled that the National Park Service could prohibit camping in areas of the Parks, even though demonstrators sought to call attention to political issues such as homelessness by setting up tent cities in these areas.  The Court noted, "Damage to the parks as well as their partial inaccessibility to other members of the public can as easily result from camping by demonstrators as by nondemonstrators.  In neither case must the Government tolerate it."  *Id.* at 298.  Such restrictions, however, may not target some viewpoints over others.  *See id.* at 295.

[24] We note that, if one is arrested or otherwise interacts with the police, there is a Fourth Amendment right not to be subject to excessive force.

[25] *Cf.* Alan Brownstein & Vikram Amar, "College protests stepped beyond free speech," SACRAMENTO BEE, Apr. 27, 2012, at 13A, *available at* http://www.sacbee.com/2012/04/27/4446564/college-protests-stepped-beyond.html ("The important starting point in our First Amendment analysis is that a blockade is not constitutionally protected speech.  It is conduct that government has always had the legitimate authority to proscribe because it so obviously obstructs the liberty and lawful pursuits of others.").

Exhibit 2
Page 26

In this initial section, we consider how to ensure that our campuses' official policies express both the significance of civil disobedience as a component of protest activity and the consequences that may follow from it.

## A. Background

Our review of existing UC policies revealed that there are policies at the system level and on every campus that explicitly recognize First Amendment rights. Our campus policies vary, however, in the degree to which they acknowledge the importance to university life of expressive protest activity. Our policies also vary in the degree to which they recognize that civil disobedience is an important component of protest activity, but one that has consequences.

The systemwide *Policies Applying to Campus Activities, Organizations and Students* express the University's "commit[ment] to assuring that all persons may exercise the constitutionally protected rights of free expression, speech, assembly, and worship." Those policies, which are available on the internet, also recognize that "[t]he time, place, and manner of exercising [such rights] are subject to campus regulations that shall provide for non-interference with University functions and reasonable protection to persons against practices that would make them involuntary audiences or place them in reasonable fear . . . for their personal safety."[26] Consistent with this, our campuses' time, place, and manner regulations are designed to allow expressive activity while minimizing noise levels for surrounding classrooms; ensuring that members of the campus community have avenues for ingress and egress to and from their classes, labs, dormitories, and offices; and so on.

All of the campuses' speech policies either recognize First Amendment rights directly or provide links in their local policies to the systemwide policies described above.[27] Some campuses have adopted additional language affirming the importance of free expression to the academic environment.[28] For example, the *UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties* begin with the introductory statement that "free and open association, discussion and debate are important aspects of the educational

---

[26] *See* Section 30, *available at* http://www.ucop.edu/ucophome/coordrev/ucpolicies/aos/uc30.html. The systemwide "Policy on Use of University Properties" also explicitly recognizes First Amendment rights, as well as the need to avoid interference with the operation of any campus. It states: "On University grounds open to the public generally, as may be described in campus implementing regulations, all persons may exercise the constitutionally protected rights of free expression, speech, assembly, and worship." That policy further instructs that "[s]uch activities shall not interfere with the orderly operation of the campus and must be conducted in accordance with campus time, place, and manner regulations." Section 40, *available at* http://www.ucop.edu/ucophome/coordrev/ucpolicies/aos/uc40.html.

[27] *See, e.g.,* UC Berkeley Statement on Free Speech, *available at* http://campuslife.berkeley.edu/sa/free-speech (referencing and linking to the systemwide policies).

[28] We note that our faculty have taken an active role in considering issues concerning the response to protest, and the proper balance between expression and public safety. For example, the UC Riverside Academic Senate recently debated these issues and passed a resolution affirming "that peaceful protest is not only permissible but protected and valued as a vital form of speech," and "that responses to protests on campus should be led with the presumption that force should not be used against the demonstrators." We think the principles outlined in this Report are generally consistent with the Riverside resolution, and we applaud the active role that faculty are taking in grappling with the proper response to protests and civil disobedience.

Exhibit 2
Page 27

environment of the University, and should be actively protected and encouraged, even where the positions advocated are controversial and unpopular."[29]

Some policies from outside our system contain similar discussions of the importance of free speech.  For example, Harvard's Free Speech Guidelines state:

> "*Free speech is uniquely important to the University because we are a community committed to reason and rational discourse.  Free interchange of ideas is vital for our primary function of discovering and disseminating ideas through research, teaching, and learning.  Curtailment of free speech undercuts the intellectual freedom that defines our purpose.  It also deprives some individuals of the right to express unpopular views and others of the right to listen to unpopular views.*"[30]

We did not find any University or general campus speech policies—within our University or at the other schools we consulted—that address civil disobedience specifically, or its peculiar challenges: that it can serve (and historically has served) to prompt important and beneficial changes, but also can imperil the rights and safety of others in the community.  Accordingly, these policies fail to express any principles or offer any guidance on the most difficult questions that can arise with regard to campus protest activity.

The current policies of our campus police departments vary in the way they discuss First Amendment rights and civil disobedience's important history as part of protest activity.  Several departments, including Irvine, Los Angeles, Berkeley, and San Diego, have adopted formal policies governing the police response to demonstrations and civil disobedience.[31]  In addition, Santa Barbara recently prepared a draft policy, which it has not yet finalized.[32]  These written policies typically discuss the importance of free expression and respecting constitutional rights, and then specifically address police responses to issues that may arise during protests and demonstrations.  For example, the UC San Diego Police Department Demonstrations policy states that the department "strives to ensure the Constitutional rights of individuals to peacefully gather and freely

---

[29] *See* UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties, *available at* http://www.studentactivities.ucla.edu/docs/UCLA%20Regulations102908.pdf.

[30] *See* Harvard Free Speech Guidelines, *available at* http://isites.harvard.edu/icb/icb.do?keyword=k72845&pageid=icb.page368059&pageContentId=icb.pagecontent763341&state=maximize&view=view.do&viewParam_name=Free%20Speech%20Guidelines.  The University of Michigan likewise has a Statement on Freedom of Speech.  The Statement contains guidelines specifically focused on the interaction between a speaker and protesters who object to the speaker; but even in that narrower context it emphasizes the need "to maintain at the University an environment in which the free exchange of opinions can flourish, where the learning that such exchange makes possible can occur."  University of Michigan Statement on Freedom of Speech and Artistic Expression, *available at* http://www.umich.edu/~spolicy/statefree.html.  That policy further instructs that "[s]uch activities shall not interfere with the orderly operation of the campus and must be conducted in accordance with campus time, place, and manner regulations."

[31] UC Berkeley Police Department Crowd Management Policy; UC Irvine Police Department General Orders Nos. 2011-06, 2011-07; UC San Diego Police Department Policy Manual § 423 (Jan. 6, 2012); UCLA Police Department Policy Manual §§ 317, 423.  Several of those campuses are in the process of revising their policies.

[32] *See* Memorandum to All Sworn Personnel from UC Santa Barbara Chief Olson Regarding "Crowd Control and Demonstrations" (undated).

Exhibit 2
Page 28

express views in an environment where the rights of every individual are protected."[33]  That policy then addresses issues including coordinating with the campus Administration and considerations relating to potential use of force.[34]

As of the time of drafting this Report, however, not all of our UC police departments have yet adopted formal policies on demonstrations.  To be sure, we understand that police on all our campuses receive training regarding responding to demonstrations and the rules and laws governing use of force.[35]  And all of the Police Chiefs we spoke to described practices and strategies they have developed for responding to demonstrations.

## B.  Recommendation

We were pleased to see that our systemwide and campus-specific policies all expressly recognize First Amendment rights and values.  This express recognition helps ensure that all subsequent policies are viewed with core speech-endorsing values in mind.  To the extent our campus policies and police department policies do not also recognize the importance of free speech, expression, and discourse to an academic environment, as UCLA's and Harvard's campus policies do, we think they should be amended to do so.

Given the University's history of being at the cutting edge of the free speech movement, we also think it would be helpful for our campus and police policies to explicitly describe the important role protests and civil disobedience have played on our campuses and in bringing about social change.  This discussion should make clear, however, that civil disobedience is not protected speech, that it may have a negative effect on the protected interests of others, and that it may have consequences for the protesters.

Such a discussion will offer assurance to the general University community that University officials are mindful of the history of civil disobedience (particularly within our system) and that their actions are informed by this history.  This is not currently the common understanding.  Policies discussing civil disobedience will serve as a reminder of what is at stake if the response to civil disobedience is not appropriately measured—surely, an appropriately measured response is what we expect for any infraction, but this is of particular import with protests where there is a risk of chilling speech.  To protesters, campus policies addressing civil disobedience can serve as a reminder of the impact of their conduct on the remainder of community—and hence the possibility of consequences.

We also believe that our campus police departments should group all of their policies governing the police response to demonstrations involving civil disobedience (including the express discussions of First Amendment rights, the history of civil disobedience, and the consequences of civil disobedience) into a single publicly

---

[33] UC San Diego Police Department Policy Manual § 423.1.
[34] *Id.* §§ 423.6, 423.13.
[35] Interviews with campus Police Chiefs.

Exhibit 2
Page 29

available volume or chapter of the department's policies.  This will increase transparency by helping protesters understand applicable guidelines.

**Recommendation 1.**     Add to current campus "Free Speech" and police policies language formally recognizing that civil disobedience has had a historic role in our democracy, but that it is not protected speech under the Constitution, and that it may have consequences for those engaging in it.

**II.   Opening Lines of Communication and Building Relationships**

**A.   Increasing Regular Avenues for Communication with the Administration**

A recurring theme during our interviews and Town Hall meetings was the lack of trust between some administrators and some students (and, to a lesser extent, some faculty and staff) on several campuses.  Many faculty and students attributed this problem to what they perceived as inadequate opportunities for dialogue on important substantive issues.  They also suggested that students often resort to civil disobedience because they believe there is no other way to get the Administration's attention.  In particular, students and faculty suggested that there should be more formal mechanisms for raising broad-based grievances and concerns with University policies, and for receiving a substantive response.

**1.   Background**

Many students and some faculty and staff told us that they feel a lack of connection with their campus Administration.  One student said that "we've never really seen administrators willing to engage with students in the kind of communication students want."[36]  A speaker at a Town Hall meeting told us that part of the problem is "that the top administrators are invisible" to the campus community, and many students and faculty with whom we spoke echoed this sentiment.[37]

Some of the students we interviewed told us that it would help avoid civil disobedience and related confrontations if there were more opportunities for students to discuss their underlying concerns with administrators.[38]  Student demonstrators told us that administrators needed to address the substantive problems motivating protests, rather than just discussing the protests themselves.[39]  Similarly, student leaders expressed the view that if the UC Regents were willing to let the students interested in protesting enter Regents' meetings and engage in meaningful dialogue about their concerns, this might eliminate the incentive for many protests during those meetings.[40]  During our public comment period, we also received submissions suggesting that some conflict could be avoided on our campuses and at Regents meetings if Regents made

---

[36] Jan. 24, 2012 Meeting with Student Leaders.
[37] Jan. 31, 2012 UC Berkeley Town Hall Meeting.
[38] Jan. 31, 2012 UC Berkeley Town Hall; Jan. 6, 2012 Meeting with UC Riverside Students.
[39] Jan. 6, 2012 Meeting with UC Riverside Students.
[40] Jan. 24, 2012 Meeting with UC Student Leaders.

Exhibit 2
Page 30

themselves more available to engage in dialogue with students and other members of our University community about their concerns.

Many administrators, on the other hand, pointed out that there are avenues for members of the campus community to communicate with them, ranging from Ombudspersons to Student Affairs staff to administrator attendance at student government meetings.[41]  Regents have also made themselves available individually to talk with students, and time is allotted at Regents meetings for public comment.  The fact that even student leaders appear to be unaware of some of these opportunities for communication suggests that there are some information gaps in this area.

Students and faculty on some campuses also recommended that administrators make an effort to interact casually with students on a routine basis, in order to build better relations and trust.[42]  In their view, if students trusted administrators more, it might be easier to engage in dialogue rather than civil disobedience.  In addition, when civil disobedience occurs, it might be easier to negotiate an end to it.  On other campuses within our system, administrators were praised for the extent to which they were "out and about" on campus, interacting with students.[43]

When we spoke with officials from other universities, they also emphasized the importance of maintaining open lines of communication between administrators and the rest of the campus community as a means of avoiding tensions that could lead to civil disobedience.[44]

## 2.  Recommendation

We recommend that campus administrators ensure that there are meaningful channels for students, faculty, and staff to discuss broad-based concerns with senior administrators.  This involves creating new channels and better publicizing existing ones.

Possibilities might include establishing a dedicated student advocate within the Administration responsible for listening to complaints and concerns and communicating them to the relevant decision-makers; having the Chancellor or a Vice Chancellor periodically attend student government meetings; instituting monthly "office hours" for top administrators during which students, faculty, or staff could make appointments and raise their

---

[41] *E.g.*, Meetings with Campus Counsel.
[42] Feb. 10, 2012 Meeting with UC Davis Student Leaders; Feb. 10, 2012 Meeting with UC Davis Academic Senate Leaders.
[43] For example, we heard that on one campus the Chancellor maintains high visibility within the campus community by walking the campus at various hours of the day and night, and making it a point to stop and speak with students, staff, and faculty in an informal manner.  That Chancellor also attends student government meetings as an observer, regularly joins students for meals in the campus dining commons, and stops when students are tabling or distributing fliers to ask questions and learn about the issues of concern.
[44] Jan. 13, 2012 Interview with Harvard University Police Department Public Information Officer Steven Catalano; Jan. 20, 2012 Interview with the University of Pennsylvania Vice-President for Public Safety Maureen Rush; Feb. 7, 2012 Interview with University of Michigan Public Affairs Director Kelly Cunningham.

Exhibit 2
Page 31

concerns; establishing a process for submitting petitions with requests or concerns and obtaining a substantive response from the Administration; or developing a mediation process in which faculty or staff trained in mediation skills could mediate discussions between students and administrators.

Regardless of the specific approach, campuses should ensure that members of the campus community are able to engage with a senior administrator who, in perception and reality, possesses genuine authority.  Also, administrators should not merely wait for students to bring concerns to them.  It is incumbent upon our senior administrators to pay attention to student concerns, to build relationships with students and student groups, and to solicit the thoughts and views of students at every opportunity.  Some of our administrators already do these things; others must be more proactive in this area.  It is not solely the responsibility of staff in Student Affairs.

As noted above, some have suggested opening greater avenues of communication with Regents as well.  It likely is not possible to accommodate all who wish to address the Regents during their formal meetings and still allow time for the Regents to conduct business.  This said, the President should raise with appropriate Regents whether students and other campus constituencies should have an opportunity outside the business portions of Regents meetings for an informal exchange of views on matters of concern to the campuses.  The purpose is to provide another channel for the Regents to develop information helpful to their role.

To be sure, opening avenues of communication with the Administration (or the Regents) may reduce the perceived need for civil disobedience in many instances, but this approach may or may not be effective when would-be protesters are not UC affiliates, or when the issues motivating potential civil disobedience are outside the University's control.

**Recommendation 2.**  Increase and better publicize opportunities for students, faculty, staff, and others to engage with senior administrators, particularly on issues likely to trigger protest or civil disobedience events.

**Recommendation 3.**  Discuss with the Regents the possibility of increasing opportunities for students and other campus constituencies to address concerns directly with the Regents at times other than during the public comment period at formal meetings.

### B.  Building Familiarity with the Campus Police and with Rules Governing Protest Activity

In our discussions throughout the UC system, students expressed a lack of understanding of the possible responses by authorities to civil disobedience.  Would-be protesters and the community at large should understand which activities are permitted and which ones are prohibited, and how the Administration and police might respond to different types of civil disobedience.  Currently, most lack that understanding.

Exhibit 2
Page 32

Many students and other community members also knew little about the nature and role of campus police generally, but they expressed interest in opportunities to learn more.  Students also said they lack trust in campus police, and that they have too few opportunities to interact with the campus police in a positive way.

### 1.  Background

Our campuses' time, place, and manner regulations governing protest activity have long been accessible to the public on the internet.[45]  For example, UC Berkeley's website states that Sproul Plaza and Lower Sproul Plaza are specifically designated as "areas for public expression" and "are open to the public generally between the hours of 6:00 a.m. and 12:00 midnight."[46]  Berkeley's website also lists other regulations, including requirements that speakers obtain authorization before using sound amplification,[47] and rules governing the use of tables, display of materials, and posting of flyers on bulletin boards.[48]  Similarly, UC Santa Barbara's website specifies locations and hours in which sound amplification may be used, size restrictions for posted flyers and banners, and safety provisions such as the rule that "[t]ables or moveable stands may not be placed in areas where passages to any entrance or walkways are blocked, where the free flow of pedestrian traffic is restricted, or where emergency fire lanes are blocked."[49]

In contrast to time, place, and manner regulations, which have generally been available on campuses' websites, most of our campus police departments' policies have not historically been available to the public.  In recent months, though, some of our police departments have begun to change that by posting on their websites their policies regarding the use of force and the police response to demonstration activity.  For example, the UC Irvine Police Department's *Use of Force* policy was recently posted on the Department's website.[50]  We frequently heard requests from students for greater access to police policies relating to civil disobedience and for more information generally about how the police might respond to acts of civil disobedience.

We also were struck by a more fundamental information gap: most members of our community know very little about our campus police departments.  That is not to say that opportunities for learning more about the police are completely lacking.  Some campus police departments hire students as workers, which provides a rich educational experience for a small number of students.[51]  Some campus police departments also offer academic courses on policing issues.  At UC Santa Cruz, for example, the police department offers a

---

[45] They readily can be located by typing the name of the campus and "time place and manner" into an internet search engine.
[46] *See* UC Berkeley Campus Regulations Implementing University Policies, § 331, *available at* http://students.berkeley.edu/uga/regs.stm.
[47] *Id.* §§ 340-46.
[48] *Id.* §§ 350-69.
[49] *See* UC Santa Barbara Campus Regulations, Chapter III, Campus Activities, Speech and Advocacy, *available at* http://www.sa.ucsb.edu/regulations/campus_activities.aspx.  As for areas on our campuses that are not public forums, such as classrooms, administration buildings, and dorm rooms, some have signs regarding limitations on access by non-students and restrictions on speech.
[50] *See* UC Irvine Police Department Use of Force Policy, *available at* http://www.police.uci.edu/safety/docs/UCI_UseOfForcePolicy300.pdf.
[51] On some campuses, these students serve "community service" functions, allowing them to interact regularly with the community in their capacity as police department employees.  Interviews with campus Police Chiefs.

Exhibit 2
Page 33

quarter-long course titled "Citizen Police Academy," for up to twenty-five students, faculty, and staff.  Class members gain a deep familiarity with the campus police department.[52]  In addition, on some of our campuses, the police make presentations at new student orientations.  But these existing opportunities for students and other members of the University community to educate themselves about their campus police departments apparently have not satisfied the community's desire for information.  Members of our police departments also agreed that greater educational opportunities for students and faculty would be beneficial.

Students and faculty on our campuses repeatedly told us that if they knew the police better and trusted them more, it would help in resolving situations involving civil disobedience.  Some students suggested that building relationships between police and students could be as simple as having more police walk or bike around campus and make an effort to interact with students[53]—a practice that is already common on several of our campuses.  A student leader on one campus also recommended that the Chiefs of Police attend student government meetings as a means of facilitating dialogue.[54]

Similarly, on some campuses, there is not much interaction between the Police Chief and the top campus administrators.  Yet in our conversations with campus administrators and Police Chiefs, it was clear that coordination between the Administration and the police over responses to civil disobedience is most effective when the Chancellor has a good working relationship with the campus Police Chief.[55]

## 2.  Recommendation

We believe that each campus should make accessible to the public its policies about protest activity, use of force, and civil disobedience.  Campuses should continue to post time, place, and manner regulations on their websites.  Likewise, it is important for police departments to be as transparent as possible, and for protesters to know what they may expect from the police if they violate laws or campus policies.  Those police departments that have not yet done so should post their policies regarding use of force and demonstrations on their websites as soon as possible.  To the extent that certain sensitive portions of police policies would reveal information that would endanger police or others, or threaten police operations, however, we think it is appropriate for that information to remain confidential.[56]

Beyond merely making policies accessible, our campuses should be proactive in publicizing them to the campus community.  New-student orientations present one opportunity to reach one of the largest parts of our

---

[52] Id.
[53] For example, students at UC Davis told us there is one campus police officer who rides a bike around campus and regularly chats with students, and that students greatly respect and trust him.  They thought that if other campus police rode bicycles or walked around campus instead of driving police cars, students would build relationships with these officers as well.  Feb. 10, 2012 Meeting with UC Davis Student Leaders.
[54] Jan. 24, 2012 Meeting with Student Leaders.
[55] Interviews with campus Police Chiefs; Feb. 28, 2012 Meetings at UC Irvine.
[56] A similar recommendation regarding policy availability was also made in the Brazil Report.  *See* November 20, 2009: Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board, at 13 (June 14, 2010), *available at* http://administration.berkeley.edu/prb/6-14-10_prb-report.pdf ("For civil disobedience: fix, publicize, and consistently enforce clear policies and rules.").

Exhibit 2
Page 34

campus communities.  The Administration on each campus should work with its police department to create written summaries of the policies on civil disobedience to be distributed at every orientation, including descriptions of the types of protester conduct that could result in a police use of force.  Social media are also important channels for communicating with student populations, and each campus should consider how best to use them to bring attention to policies on civil disobedience.  Students also have a responsibility to read these materials.[57]

Overall, we are not persuaded that deep distrust or hostility to campus police is widespread, but there certainly is some such sentiment.  To help build stronger bridges between the campus community and the police, we think that each campus should offer more opportunities for students and other members of the campus community to learn about the police department.  Examples of protest-related topics that could be covered in programs about the campus police include demonstration policies, the rights and responsibilities of protest participants, alternatives to civil disobedience, and the policies governing use of force by police.  Such programs should be offered at least every year, to allow the newest members of our community to participate.[58]

We also recommend that our campuses work to increase other sorts of opportunities for building relationships between the campus police and the rest of the campus community.  This is in line with the principles of community policing, which a number of campus police and policing experts identified as a good model for campus police.[59]  Community policing is an overall approach to policing that emphasizes establishing and strengthening relationships in the community and, based on those relationships, fostering a pro-active, problem-solving approach to policing.[60]  As one expert noted, policing involves much more than enforcing the law.  Police need to think about how to prevent and anticipate problems, rather than just reacting to them, and how to make use of a variety of community interactions rather than solely enforcing the law.  This in turn requires strong relationships.[61]

As in any relationship, it takes time and familiarity to build trust.  If police and students seldom interact outside of traffic stops and the like, there will be no reservoir of trust to draw upon during protests and acts of civil disobedience.  We know that many of our police already make efforts to reach out to students and faculty; these efforts should be acknowledged, commended, and re-doubled.  In particular, police should build their relationships with student government and leaders of student organizations—seeking their input, attending their

---

[57] Of course, there are limits to how effective such measures will be at preempting conflict, particularly in light of the fact that many participants at protests are non-affiliates and thus would not receive the information distributed to students and other affiliates.
[58] The Brazil Report contained a similar recommendation about educating all parts of the campus community about the rules that apply to civil disobedience and the consequences of violations. *See* November 20, 2009: Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board, at 14 (June 14, 2010), *available at* http://administration.berkeley.edu/prb/6-14-10_prb-report.pdf ("Educate all parts of the campus community, but especially incoming students (undergraduate and graduate) about the rules (criminal, civil, and campus rules that could affect academic standing) that apply to civil disobedience and the consequences of violating those rules.").
[59] Interviews with campus Police Chiefs.
[60] *See, e.g.,* United States Department of Justice, Community Policing Defined, *available at* http://www.cops.usdoj.gov/default.asp?item=36.
[61] Feb. 2, 2012 Interview with Herman Goldstein, Professor of Law Emeritus at University of Wisconsin.  The website "popcenter.org" contains additional information on problem-oriented policing.

Exhibit 2
Page 35

meetings, and listening to their concerns.  When possible, police should consider walking their beats or riding bicycles around campus, to increase the number of positive interactions with other members of our community.[62]  Students organization leaders should take advantage of such opportunities to interact with the campus police and to get to know them better.

Finally, Chancellors and Police Chiefs, as well as key members of their leadership teams, need good working relationships, so that they have the mutual trust to work together effectively in stressful situations. We recommend that the Chancellor and senior administrators on each campus meet regularly with the Police Chief.

**Recommendation 4.**   Collect each campus's current time, place, and manner regulations and all policies governing the response to events of civil disobedience, including applicable systemwide and campus police policies; post collected policies on system and campus websites.

**Recommendation 5.**   Create user-friendly summaries of each campus's time, place, and manner regulations and policies governing the response to events of civil disobedience, and distribute the summaries at least annually during student orientations; highlight in the summaries descriptions of conduct that is or could be perceived as threatening to safety and thus might trigger a police response.

**Recommendation 6.**   Increase opportunities for routine interaction between police and students and between the police and key administrators (especially the Police Chief and the Chancellor).

**III.   Defining Roles of Administrators and Police With Respect to Responses to Civil Disobedience**

**A.   Administrator and Police Coordination**

A successful response to protests involving civil disobedience requires coordination between the police and the campus Administration.  Most campuses currently employ some form of team for the purpose of coordination and planning between police and administrators in advance of campus protests.  These processes have not been formalized, however, and they are inconsistent across the campuses.  Moreover, many of them suffer from ambiguity about how the teams should interact with the Incident Command System used by the police and about the respective roles of administrators and police.

In addition, while most campuses involve senior administrators in the planning for a protest event, on some campuses their involvement ceases once the event begins.  As a consequence, there is sometimes no

---

[62] We recognize that this recommendation will have resource implications.  Officers can cover more area and respond faster to calls for assistance in cars than on bikes or on foot; more officers may be required overall if the University increases bike or foot patrols.

Exhibit 2
Page 36

mechanism for confirming or reconsidering plans as a protest unfolds, and discretion about how to enforce earlier decisions has rested primarily with the police.  Such an approach runs contrary to the widely held desire that senior administrators, and particularly the Chancellor, must be held accountable for any decision to proceed with police action that involves a use of force on protesters engaged in civil disobedience.

## 1.  Background

### (a)  Police Policies, Incident Command System, NIMS, and SEMS

The written policies of our police departments contain little detail regarding coordination between police and administration officials in advance of demonstrations.  Most of the policies on demonstrations merely instruct officers to "work[] with key stakeholders in the . . . community."[63]  One policy directs police to "[n]otify the Office of Student Life, as appropriate, to be present at the event."[64]  Most UC campus police department policies regarding demonstrations also fail explicitly to explain how administrators or other non-police officials should interact with the police during a demonstration.[65]  Similarly, we are aware of only a few written policies governing administrators that bear on coordination with police before or during a demonstration, although we understand that some campuses are currently in the process of devising additional written policies on this subject.[66]

Within the police department, the police use a formal management system for responding to events.  The Incident Command System is a standardized command system for responding to emergencies, as defined by the National Incident Management System ("NIMS") and the Standardized Emergency Management System ("SEMS").  NIMS is a structured framework used nationwide for both governmental and non-governmental agencies to respond to natural disasters or other emergencies at the local, state, and federal levels.[67]  SEMS is a similar framework that was designed to provide effective management of multi-agency and multijurisdictional emergencies in California.[68]  The Incident Command System is one component of the NIMS and SEMS

---

[63] *E.g.*, UC Irvine Police Department General Order No. 2011-06, § 1.2.
[64] UC Berkeley Police Department Crowd Management Policy, at 5, *available at* http://administration.berkeley.edu/prb/PRBCrowdPolicy.pdf.
[65] One exception is UC San Diego.  There, the police demonstration policy provides that, in the event of a peaceful, nonviolent demonstration that does not pose an imminent threat of harm to people or property, the Incident Commander should consult with campus administrators regarding whether civil disobedience should be permitted to continue without police action.  It explicitly identifies several factors that might be relevant to the administrators' decision, including whether the demonstrators' conduct constitutes a substantial disruption of University activities, and whether the administrators believe that immediate action could lead to violence.  UC San Diego Police Department Policy Manual § 423.11.
[66] Interviews with campus Police Chiefs.
[67] *See* Incident Command System (ICS), *available at* http://www.fema.gov/emergency/nims/IncidentCommandSystem.shtm#item1; *see also* University of Wyoming Police Department, questions and answers regarding NIMS and ICS, *available at* http://www.uwyo.edu/uwpd/nims-ics.html ("NIMS is an overall management framework for responding to emergencies, while ICS is the management system established to manage emergency and other incidents.").
[68] *See* Standardized Emergency Management System, *available at* http://www.calema.ca.gov/planningandpreparedness/pages/standardized-emergency-management-system.aspx.  By standardizing key elements of the emergency management system, SEMS is intended to facilitate the flow of information within and between levels of the system, and to facilitate coordination among all responding agencies.

Exhibit 2
Page 37

frameworks and is intended to provide the structure and command system used for the field response to an emergency or other incident.  In the protest context, the Incident Command System typically kicks in once police arrive at the scene, and the Incident Commander is usually the most qualified police officer on site, who directs the actions of the other officers involved.[69]

Currently, the Incident Command System does not formally call for consultation with the campus Administration unless the event and its impact on campus functions are so large as to trigger the campus's Emergency Operations Center procedures.[70]  This means that, for all but the biggest civil disobedience events, there is currently no formal mechanism for administration officials to communicate with the police once an event is underway.

**(b)  Event Response Teams**

Despite the lack of written policies calling for coordination between administrators and police, many administrators and police with whom we spoke described informal processes they have developed for planning and communicating in advance of and during demonstrations.  These largely *ad hoc* processes generally center around a group or team of individuals, which includes representatives from the police department and the campus Administration, and which we will refer to as an "event response team."[71]

The precise membership of event response teams varies across our campuses.  Typically, the teams include at least some of the following officials: the Chancellor; the Provost or Executive Vice Chancellor; the Vice Chancellor for Administration or Business Affairs; the Vice Chancellor for Student Affairs or Dean of Students; the Campus Counsel; a representative from the Communications or Public Information Office; the Chief of Police; and a representative from the Fire Department.  Additionally, the membership of these teams may vary depending on the nature of the demonstration.  For example, if the expected demonstration will involve a labor union, many campuses would include a representative of the Human Resources Department.[72]

Our research revealed that other universities similarly use a team-based approach to plan for and respond to demonstrations or other large-scale events.[73]  Experts in the area of campus policing also confirmed the value of creating teams in which administrators and police work jointly to respond to events.  They advise that

---

[69] *See generally* ICS Review Material, *available at* http://training.fema.gov/EMIWeb/IS/ICSResource/assets/reviewMaterials.pdf.
[70] Interviews with campus Police Chiefs.
[71] These event response teams go by different names on the different campuses, including the Crisis Management Team at UC Berkeley, the Campus Operations Committee at UCLA, and the Demonstration Operations Team at UC Santa Cruz.  Interviews with campus Police Chiefs.  Some of these teams are already quite active.  For instance, the Demonstration Operations Team at UC Santa Cruz meets weekly to plan for the frequent protest events on that campus.
[72] Interviews with campus Police Chiefs.
[73] Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling; Feb. 7, 2012 Interview with University of Michigan Public Affairs Director Kelly Cunningham.

Exhibit 2
Page 38

university administrations and campus police should work together to "ensure campus priorities are represented."[74]

We asked administrators and police on our campuses to describe how their event response teams are intended to function.  Typically, the event response team becomes involved as soon as the police or Administration learn of a demonstration.  For planned demonstrations, the teams try to meet well in advance of the event, and they schedule additional conference calls and face-to-face meetings as necessary in the days leading up to the event and on the day of the event.[75]  The teams have adopted various mechanisms for ongoing communication.[76]

In their initial meetings, event response teams discuss several broad subject areas.  First, the teams share basic information about the upcoming demonstration.  Depending on the circumstances, some team members may have more information—or more accurate information—than others.  It is important that all members of the team are on the same page regarding the basic facts:  Where is the demonstration expected to take place?  How many demonstrators will be involved?  Are they students, staff, faculty, or individuals with no formal affiliation to the University?  What are the objectives of the demonstrators?[77]

Second, the event response teams discuss priorities and objectives for responding to the demonstration, and consider how, if at all, the Administration should respond to unlawful activity by the demonstrators.  For example, the team might address what would happen if demonstrators were to occupy the administration building.  Would the campus tolerate an extended occupation of that building?  Or, would the objective be to clear the building as soon as possible, even if it meant arresting protesters or possibly using force?  Are there certain areas, such as emergency room entrances, that it would never be tolerable for protesters to block?[78]  During these discussions, it is the role of the police representatives to educate other members of the team regarding what would be necessary to accomplish particular objectives, and to explain why certain objectives may be problematic or impossible from a tactical standpoint.[79]  As an example, the police might explain that if they are asked to clear a particular plaza, their officers will need to don helmets and carry batons, and that they might need to use physical force if demonstrators refuse to move after all other means of persuasion are exhausted.[80]

---

[74] Bill Bratton and Major Cities Chiefs Association, Campus Security Guidelines: Recommended Operational Policies for Local and Campus Law Enforcement Agencies, at 29 (Sept. 2009), *available at* https://www.majorcitieschiefs.com/pdf/MCC_CampusSecurity.pdf.
[75] *See, e.g.*, *id.*; Interviews with campus Police Chiefs.
[76] At UC San Diego, for example, all of the members of the team for a particular event exchange cell phone numbers in advance. Interviews with campus Police Chiefs.
[77] Interviews with campus Police Chiefs.
[78] *Id.*
[79] *Id.*
[80] *Id.*

Exhibit 2
Page 39

Third, the teams develop a strategic plan for responding to the demonstration.  This strategic plan includes discussion of how, if at all, the police should respond to different actions by the demonstrators.  The teams also discuss the roles and responsibilities of different team members during the demonstration.  For example, teams share the names and contact information for responsible officials, the time and location for upcoming meetings, and plans for possible responses to the demonstration.  The teams may also decide which of their members should be present at the demonstration.  Several Chiefs of Police told us that it was important to plan to have administrators or faculty present at demonstrations to coordinate with police and interact with demonstrators.[81] These discussions by the event response team inform the more detailed Operations Plan that is drafted by the police department to govern its officers' actions.[82]

For unplanned events, the event response teams generally meet once they become aware of the event.  They engage in as many of the above steps as possible, though in a more condensed timeframe.[83]

Leadership of these event response teams generally is not well defined.  It appears that most of the teams do not have a formal "chair."[84]  We are not aware of any formal or even informal policies regarding who should have the final say on the matters decided by the teams.

Similarly, we learned that the role of the Chancellor varies substantially across our campuses.  Chancellors generally do not personally participate in the activities of the event response team.  On some campuses, however, the Chancellor coordinates directly with the Chief of Police in advance of demonstrations.[85]  On other campuses, the Chief reports to a Vice Chancellor for Administration, but may alert the Chancellor regarding major actions or events.[86]  Members of our faculty said that it was essential for the Chancellor to be ultimately responsible for decisions about how to respond to on-campus protests—and some suggested that if that responsibility is delegated, it should be to the Executive Vice Chancellor Provost, because of the Provost's connection to the academic mission of the university.[87]

Many of our police also told us that it was important for Chancellors to be directly involved in decision-making regarding upcoming protests.  One Chief of Police within our system stressed the importance of maintaining "a functional reporting relationship" between the Chief and the Chancellor, even if it is not direct.  This is consistent with other universities where campus police chiefs have regular access to senior campus administrators and other key decision-makers.[88]  That does not necessarily require a direct reporting relationship, but it does require regular, face-to-face meetings with Chancellors, Provosts, and relevant

---

[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] At UC Santa Cruz, the "Demonstrations Operations Team" is chaired by an Associate Vice Chancellor. *Id.*
[85] Jan. 6, 2012 Meeting with UC Riverside Administrators.
[86] Interviews with campus Police Chiefs.
[87] Jan. 6, 2012 Meeting with UC Riverside Faculty.
[88] Jan. 13, 2012 Interview with Harvard University Police Department Public Information Officer Steven Catalano; Feb. 9, 2012 Interview with John Jay College of Criminal Justice President Jeremy Travis; Feb. 1, 2012 University of Wisconsin at Madison Chief Sue Riseling.

Exhibit 2
Page 40

Vice Chancellors.  This also tracks the recommendation of the U.S. Department of Justice that "[a]ll campus police chiefs and security directors should have access to and meet with college and university presidents and other key decision makers."[89]

We did not find any written policies regarding how our campus administrators make decisions within their event response teams.  However, in recent months many of our campuses have been developing principles to guide their event response team's deliberations about whether particular civil disobedience situations require a response at all, and, if so, what type of response is appropriate.  For example, the Administration at UC Davis has decided that, when faced with civil disobedience, it will consider into which of the following categories the disobedience falls: (1) tolerable, (2) not tolerable, or (3) life threatening.[90]  The notion is that police involvement would be avoided altogether for violations in the first category, though other types of response could be considered.  Another example of such guiding principles, though in the police rather than administrator context, is the Washington D.C. Metropolitan Police Department's Standard Operating Procedures for Handling First Amendment Assemblies and Mass Demonstrations.  There, the Use of Force Protocol begins by requiring police to determine if they are responding to "orderly crowds or marches," "peaceful civil disobedience," or to "non-peaceful civil disobedience."[91]  If the activity is an orderly crowd or march, the protocol permits police presence but no physical contact.  If it is peaceful civil disobedience, the police may consider mass arrests if necessary depending on the scenario and degree of disruption.  And only if the officers are facing non-peaceful civil disobedience may they use force.

**(c)  Lack of Formal Coordination Between Police and Administrators During Events**

Although event response teams actively engage in planning for events, and the objectives of the event response team generally inform the drafting of the police's Operations Plan for the event, the members of the event response team do not always have an opportunity to review the Operations Plan to make sure that it accurately reflects their objectives.  In addition, once an event begins, there is no formal system for the campus Administration to provide further input to the police—unless the event is so large and disruptive as to trigger the campus's NIMS-compliant Emergency Operations Center ("EOC") procedures.  In that case, the EOC procedures provide that the police Incident Commander reports to the Chancellor (or the Chancellor's designee), and the Chancellor necessarily guides all decision-making about any police response.  For smaller events, however, there is currently no formal link between the Incident Command System and the campus Administration.

---

[89] U.S. Department of Justice Office of Community Oriented Policing Services, and Community Oriented Police Services, "National Summit on Campus Public Safety: Strategies for Colleges and Universities in a Homeland Security Environment," at 11 (July 2005), *available at* http://regents.ohio.gov/safetyandsecurity/resources/NationalSummitonCampusPublicSafety.pdf.
[90] UC Merced also recently adopted a "Protocol for Responding to Peaceful Protest, Assembly and Speech on the Property of the University of California Merced."  It states that "actions by police to disrupt a nonviolent, peaceful civil disturbance or demonstration will only be taken in consultation and approval of the Chancellor, who is ultimately responsible for ensuring that force is used as a last resort when negotiations and pleas have failed and the disruption to the mission of the university is substantial."
[91] Washington D.C. Metropolitan Police Department Standard Operating Procedures for Handling First Amendment Assemblies and Mass Demonstrations (Rev. Dec. 2, 2009), Appendix K "Use of Force" Section V(C)(1).

Exhibit 2
Page 41

Despite the lack of formal policies, police and administration officials on some of our campuses described various informal ways that they keep in contact with each other during demonstrations.[92]  On some campuses, senior administration officials who are members of the event response team are typically on the ground at the demonstration to stay abreast of developments.[93]  At one campus, police use a web-based information system to provide the event response team with real-time updates about the demonstration.[94]  Police officials on some of our campuses also told us that they would consult the Chancellor directly before taking a major police action in a demonstration context, unless there were exigent circumstances.  Such consultations are not formally required, however, unless EOC procedures are triggered, and are not a consistent practice across our campuses.

When police and administrators do consult during events, there is also no formal division of decision-making responsibility between them.  To be sure, some campus officials described to us an informal division of decision-making responsibilities.  A consistent theme of our interviews with our campus Police Chiefs was their view that tactical decisions—*i.e.*, what police techniques should be used to achieve a certain objective with the minimum risk to the safety of protesters and officers—must be made by the police.  As one UC Police Chief told us, "when it comes to 'police work,' the Chief is in charge."[95]

At the same time, police officials throughout our system agreed that the Administration should be responsible for setting objectives.  For example, the administrators on an event response team might decide that an extended occupation of a particular plaza by demonstrators is acceptable, and that there should be no physical response by police so long as the situation does not become violent or unsafe.[96]  Or, if the Administration believes that acts of civil disobedience are unreasonably interfering with important campus functions, such as students' ability to get to their classes or to receive their financial aid checks, the Administration might decide that the protesters in question should be arrested and removed if they refuse to disperse voluntarily.[97]

Other universities we contacted said they divide responsibilities along similar lines.[98]  As one Police Chief from an outside university put it, he would not give students a warning that they must disperse or face arrest without first talking to the Administration.  Carrying out the warning and subsequent arrests, however, would be done by the campus police without administrator involvement.[99]  Another expert explained that it is best if the Administration makes strategic choices that allow the Administration to consider the campus values, risks, and

---

[92] Interviews with campus Police Chiefs.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] This was the case, for example, at the University of Michigan, the University of Wisconsin, Harvard, and throughout the CUNY (City University of New York) system. Feb. 7, 2012 Interview with University of Michigan Public Affairs Director Kelly Cunningham; Jan. 13, 2012 Interview with Harvard University Police Department Public Information Officer Steven Catalano; Feb. 9, 2012 Interview with Director of Public Safety for the City University of New York William Barry.
[99] Feb. 9, 2012 Interview with Director of Public Safety for the City University of New York William Barry.

Exhibit 2
Page 42

public relations.[100]  To enable the Administration to do so, it is incumbent upon the campus police to educate administrators about the tactics required to implement the administrators' decisions, including any possibility that force will be used.[101]

## 2.  Recommendation

We believe the framework for coordination between administrators and police in planning for and responding to events needs to be made more formal, and several gaps in current practice should be filled.  While most campuses have event response teams of some type, those teams and their responsibilities are generally not formally defined.  And, for all but the largest events, after the event begins there are no formal procedures for coordination among the campus Administrators and the police leaders operating under the Incident Command System.  To address these problems, we think it is necessary for all campuses to establish a standing event response team, with well-defined roles and responsibilities for planning responses to demonstrations that might involve civil disobedience.[102]  We further believe that the event response team must remain involved once an event begins.  Even if full Emergency Operations Center procedures are not triggered, the police Incident Commander should coordinate with the Chancellor or the Chancellor's designee on the event response team throughout the event.

As for the precise composition of the event response team, we believe this is an area where extensive systemwide rules and requirements might do more harm than good.  Each of our campuses is unique, and each divides leadership responsibilities somewhat differently.  The skills of the incumbent in any particular position vary over time.  For that reason, the Chancellor at each campus should have broad discretion to structure the event response team in a manner that best suits that campus, and to select the chair of the team, subject to a few important requirements.  At a minimum, the team must include the Chancellor, or another administrative official designated by the Chancellor with decision-making authority on behalf of the entire Administration, such as the Executive Vice Chancellor.  It also must include the Chief of Police, the Vice Chancellor to whom the Chief of Police reports, and the Vice Chancellor for Student Affairs.  It is also essential that the team reflects and understands the academic values of the institution, which will make it more legitimate in the eyes of the community.  The team should therefore include one or more administrators who are members of the Academic Senate, and whoever chairs the team should both have the confidence of the Chancellor and be perceived by faculty and students as firmly aligned with our academic values and mission.

---

[100] Feb. 6, 2012 Interview with Police Assessment Resource Center President Merrick Bobb.
[101] Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.
[102] The Brazil Report made similar recommendations, although it did not tie the recommendations to creation of a formal team. *See* November 20, 2009: Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board, at 13 (June 14, 2010), *available at* http://administration.berkeley.edu/prb/6-14-10_prb-report.pdf ("Develop detailed protocols for responding to group acts of civil disobedience.  Specify the roles to be played by the Administration (various units) and UCPD; as part of such protocols, establish rules and provide redundant tools to ensure prompt and clear communication between civilian decision-makers and the police."); *id.* at 14 ("For anticipated demonstrations, use time that is committed to advance planning more productively by identifying specific scenarios and developing multiple detailed strategies (and tactics) for responding to each scenario."); *id.* at 14 ("Set up a system for gathering information independently and for sharing it promptly with all affected entities and persons.").

Exhibit 2
Page 43

The team should meet at least twice a year, even in the absence of demonstrations or other events warranting a meeting.[103]  Such meetings will allow the team members to build working relationships with each other, evaluate responses to past events, identify areas for improvement, and participate in simulations and other training exercises—all without the pressure of planning for a specific upcoming event.

The team also should develop mechanisms for convening rapidly at the request of the team's chair—when, based on considerations such as the number of demonstrators involved in an event, the event's impact on campus operations, or the potential safety risks involved, the chair determines that an event is significant enough to call for the team's involvement.  Additionally, the team should develop a system for real-time communication among members and should designate alternates in case some members are out of town or unavailable when the team needs to convene.[104]

One threshold task for event response teams is to develop principles that will guide administrators in their response to civil disobedience.  We believe that each campus should develop and adopt such guidelines, and present them to the President for review, within one year following the President's acceptance of this Report's recommendations.[105]

Setting out the exact nature of these guidelines is beyond the scope this Report and, we believe, should be the result of a collaborative process that solicits input from the campus's students, faculty, staff, administrators, and police.  That said, we believe that there are certain core principles that should be followed as these guidelines are developed.

First, the guidelines should include clear definitions of the roles of campus administrators and of campus police in responding to demonstrations.[106]  In our view, the administrators set objectives and the police educate administrators regarding the tactical options for pursuing those objectives.  For example, the Administration's objective might be to allow final exams to go forward uninterrupted at a given location.  The police might advise the event response team that removing protesters from a building in which final exams are being administered could require use of force.  Given this risk of physical altercation, administrators might decide to move the exam to an alternate location, or they might confirm that the police should attempt to clear the building.  It is the role of administrators to re-evaluate and confirm or change the objectives after receiving input from the police

---

[103] This frequency was recommended by Grace Crickette, the University's Chief Risk Officer, based on emergency operations industry norms.

[104] *See also* November 20, 2009: Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board, at 14 (June 14, 2010), *available at* http://administration.berkeley.edu/prb/6-14-10_prb-report.pdf ("Set up a system for prompt and reliable communication within the Administration, ensuring that the person or people in charge have all the pertinent information that is known by all the other administrative players.").

[105] *See infra* section IX.

[106] Similar recommendations were advanced in the Brazil Report.  *See* November 20, 2009: Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board, at 13 (June 14, 2010), *available at* http://administration.berkeley.edu/prb/6-14-10_prb-report.pdf ("In a written policy that is developed specifically for responding to group acts of civil disobedience, set forth clearly the allocation and responsibility between the civilian Administration and UCPD.").

Exhibit 2
Page 44

on the feasibility of those objectives and what would be required to achieve them.[107]  At least for planned demonstrations, the police should then develop an Operations Plan for the event based on this input.  Once the Operations Plan is prepared, the police should share it with the event response team to ensure that it properly reflects the Administration's objectives.  The event response team should clearly communicate its objectives and the plans for responding to the demonstration to all other administrators, staff, and faculty who may be involved in that response.

Second, the guidelines should make explicit that the responsibilities of the Administration and the police to discuss both the objectives and the police tactics necessary to achieve them continue throughout the event.  That discussion enables an iterative process through which appropriate changes can be made to the Administration's objectives if, in light of developments during a demonstration, the police response required to achieve an objective would involve tactics that in the moment are no longer acceptable to the Administration.[108]  Civil disobedience that does not require police presence or a physical response on day one might require such a response by day three, and these guidelines should require the campus Administration to evaluate the continually changing context of any protest or civil disobedience activity.  This must be done in conjunction with input from the police, as changing events may alter the Administration's objectives and the police response required to achieve those objectives.  Tactics that had been discussed and approved at one point may no longer be considered acceptable as the event unfolds, and administrators must be able to respond and tell the police to change course, as appropriate.  In some situations, the entire event response team will be able to discuss whether objectives need to be revised in light of developments during the event.  In other situations, an on-site administrator (either the Chancellor or someone the Chancellor designates, as discussed below) will engage in these discussions with the police Incident Commander on the ground.[109]  At a minimum, however, the Administration should re-approve any objectives that could require the use of force by police immediately before force is used, absent exigent circumstances.[110]

Third, we envision that these guidelines would require campus event response teams and administrators to take an incremental and progressive approach when responding to civil disobedience, beginning with the least confrontational option.  Since each step along the progression could escalate the situation, administrators

---

[107] When planning for an event, the event response team should also consider whether other campus resources, such as medical providers, mental health professionals, or the fire department, should be involved in the response.  If evacuations of campus buildings may be required, the event response team should also consider the needs of individuals with disabilities.

[108] We realize that such discussions can be difficult, and that the line between the administration's objectives and possible police tactics will not always be a clear one.  Building stronger relationships and strengthening avenues of communication between the campus Administration and police will help facilitate these difficult but necessary discussions.

[109] Protest Response Guidelines were recently issued at UC Berkeley that are consistent with this recommendation.  They state as follows: "While recognizing that police must at times respond to emergency circumstances, we will attempt to ensure that any decision to authorize police engagement, or to escalate or de-escalate police engagement, will be made only by a fully briefed senior administrator, who will be on-site during police actions."  Feb. 21, 2012 email to Campus Community from George W. Breslauer, Executive Vice Chancellor & Provost, titled "Protest Response Guidelines."  President Yudof gave a similar instruction in a recent letter to Chancellors:  "In the event of a major demonstration, there should be a designated senior official on the ground, working closely with senior police officers, with discretionary authority to intervene with the police in advance of any use of force."  Jan. 10, 2012 Letter from President Yudof to UC Chancellors, at 1.

[110] We believe that exigent circumstances mean an imminent threat of harm to individuals or significant destruction of property.

Exhibit 2
Page 45

should be able to articulate reasons why an earlier option did not or would not work before moving on to more confrontational options.

The first step in such a progression must be to determine whether any police presence is necessary, or if the response can be limited to observation only.  We believe that protests and non-aggressive civil disobedience can often be managed through administrator communication only, without police interaction.  This does not mean that campus police would not be involved in the decision-making process.  As we said earlier, campus police are vital members of the event response teams, and their input would certainly shape administrators' understanding of a situation.  The decision about how to respond, however, should begin with administrators whenever possible.

The second step would be to assess whether a greater police response is required.  The framework recently adopted at UC Davis, which categorizes civil disobedience based on whether it is "tolerable," "not tolerable," or "life threatening," offers one promising approach for making this determination, though each event response team may want to formulate its own framework.  However formulated, we believe that administrators should be guided by their campus's academic mission, because greater police response will generally not be required if there is no significant interference with that mission.  Each campus's definition of its academic mission may differ somewhat, but it would include obvious academic activities like conducting classes and lectures, and could also include key support activities such as the management of the university's business, financial, and clinical functions.

We note that people often think about civil disobedience as solely a matter between protesters and the campus Administration.  However, civil disobedience can also have a significant impact on non-participating students and other members of the campus community.  For example, some students complained to us about protesters occupying an administration building and blocking them from obtaining the financial aid checks they needed to pay for rent and living expenses.[111]  Others were upset that protesters interrupted their midterms or disrupted planned speaker events; they felt that the protesters were unfairly interfering with their education.[112]  One told us during the public comment period that students should not be "prevented from getting their tuition's worth" by protests, writing that "[w]e ALL paid for our education, and should be allowed to go to class."[113]

Staff members described experiences of feeling that their safety was threatened by protesters occupying buildings in which they work, of feeling intimidated by protesters elsewhere on campus, and of being unable to return to their families at the end of the day because of blocked roads or garages.  One staff member related the story of a crowd of protesters surrounding the truck of another staff member and threatening to roll it down an embankment.[114]  Another staff member warned that, if protests were allowed to interrupt the work of

---

[111] Feb. 10, 2012 UC Davis Town Hall.
[112] *Id.*
[113] Online comment received on May 23, 2012.
[114] Online comment received on May 23, 2012.

Exhibit 2
Page 46

essential maintenance personnel on the campuses, "there may be millions of dollars, or years of research lost if a freezer, AC unit" or "building supply fan" fails.[115]

We respect and value the long history of civil disobedience in our University. At the same time, in crafting these guidelines we believe that administrators must also be mindful of their obligations to the greater University community.

Only if administrators have determined that there is a significant interference with their campus' academic mission, as defined through the process described above, should they consider engaging the campus police in any activity that could lead to a use of force.[116] Even then, that engagement should begin with communication and de-escalation, rather than confrontation. We recognize, however, that there will be situations when communication is not effective. In those situations, it is likely that administrators will have to approve some use of force by the police. It is our hope that these situations will be rare and, indeed, we believe that our campus administrators already handle many protests with no need for force. Because other alternatives sometimes fail, however, these guidelines must address when administrators may authorize the use of force by police against protesters. The full contours of these guidelines as they relate to force cannot be established here.

We believe there is one area, however, where we should provide detailed guidance. In gathering comments and input for this Report, many members of our community sought an explicit recommendation regarding the use of pepper spray against protesters who are linking arms. We recommend that the event response team's guidelines should specify that administrators will not authorize any physical police response against protesters non-aggressively linking arms unless the protesters are significantly interfering with the academic mission of the campus. Even then, the response should begin with communication and negotiation. Communication would include explaining why the University felt the protesters needed to move and explaining that protesters would face arrest if they did not move. Next, authorities should give protesters the opportunity to leave or be arrested peacefully. Only if all these other options did not work would any force become necessary, and it is the hope of the authors of this Report that those situations would be extremely rare. In these rare situations, however, we would recommend that campus police utilize hands-on pain compliance techniques before baton strikes or jabs or pepper spray, whenever feasible.[117]

Throughout the event, the police Incident Commander must exercise leadership in the field and ensure that the plans developed with the Administration are carried out appropriately. The Incident Commander's goal always

---

[115] Online comment received on May 24, 2012.
[116] This assessment must be made in a content neutral manner. Administrators should consider risks to health or safety and the extent of interference with the campus's ability to carry out its academic mission, not the message advocated by the protesters in question.
[117] Nothing in this or any other policy should be interpreted as preventing officers from using whatever force is reasonably necessary to protect themselves or others from physical harm, or to prevent significant property damage. All force options should be available to any officer or administrator responding to a threat to life or safety, or a threat of significant property damage. We also realize that it generally takes two or more officers to move a single protester using hands-on techniques. Thus, depending on the number of officers available and the number of protesters (among other factors), it may not always be feasible to rely solely on hands-on techniques if it is determined that protesters must be forcibly moved.

Exhibit 2
Page 47

should be to diffuse tensions with protesters and to have the police use the minimum force necessary to achieve the Administration's objectives.

Although the event response team guidelines should be campus-specific, we believe that a systemwide policy must clarify that ultimate responsibility for the response to civil disobedience during a demonstration—including for any response that might be taken by the campus police department—rests with the Chancellor. Chancellors may delegate decision-making responsibilities, but they must remain sufficiently involved in the process, and/or be sufficiently confident in anyone to whom they delegate, to ensure that the handling of the situation is appropriate.[118]  As in other matters, if the Chancellor delegates decision-making, the Chancellor's responsibility lies in the appropriateness of that delegation.[119]

We also recommend that the Chancellor designate at least one administrator from the event response team to be present at the demonstration to facilitate the Administration's involvement in decision-making at any time in which police action may be imminent.[120]  If that person is not the Chancellor or the person to whom the Chancellor delegated ultimate decision-making responsibility, then the person on the ground must be able to communicate in real-time with the Chancellor or the Chancellor's designated decision-maker.[121]  It is not necessary for the ultimate decision-maker to be on-site at the protest as long as he or she has an adequate understanding of the situation based on real-time communications from the on-site administrator and the police department's Incident Commander.

In the view of Dean Edley, the individual with ultimate decision-making authority must be a member of the Academic Senate, in order to enhance the legitimacy of decision-making from the perspective of the University's academic mission.  In the view of General Counsel Robinson, the individual with ultimate decision-making authority should be whomever the Chancellor trusts, as allowing the Chancellor discretion to select that individual is consistent with the responsibility we seek to assign the Chancellor for the overall protest response.

---

[118] Some have asked whether the Chancellor should have this responsibility if the civil disobedience in question is targeted at a Regents meeting occurring on the Chancellor's campus.  Our view is that the Chancellor should be responsible for decision-making in such circumstances, but that, where time permits, the Chancellor should consult with the University President and the Chair of The Regents.  The Chancellor will be better positioned to respond to civil disobedience on his or her campus than the President or the Chair of The Regents would be, because the Chancellor will have relationships with the campus Chief of Police, will understand the layout of the campus, and will be in a position to oversee the event response team's pre-event planning.

[119] As a practical matter, when the Chancellor has delegated decision-making responsibility, holding the Chancellor accountable will involve evaluating whether the situation was one in which it was appropriate to delegate at all, and, if so, whether the Chancellor appropriately chose to whom to delegate.  The Chancellor is also responsible for choosing appropriate members of the event response team to help with decision-making, and for making sure that the team is appropriately trained, as will be discussed further below.

[120] We realize that it may sometimes be difficult to have an administrator constantly present on the ground if there are multiple protests occurring on a campus at the same time.  In such circumstances, the Administration should, at a minimum, try to have an administrator on the ground at any location where a police use of force is contemplated.  The event response team should plan for and practice such scenarios.

[121] The administrator designated to be present at the site of a protest should be someone who has received the training described in section IV.C infra.  We also acknowledge that, if an administrator needs to remain at a protest event for an extended period of time, this will impact the administrator's ability to carry out other responsibilities.  The event response team's planning should take this into account, possibly by rotating the official serving as the on-site administrator or by lining up people to fill in for the on-site administrator's regular duties.

Exhibit 2
Page 48

**Recommendation 7.**    Establish a standing event response team on each campus to plan and
oversee the campus response to demonstrations—include on the team
faculty members and/or administrators recognized by students and faculty
to be sensitive to the University's academic mission and values.

**Recommendation 8.**    To the extent necessary, modify police policies to require the participation
of senior administrators in decision-making about any police response to
civil disobedience—clearly define the respective roles of administrators
(objectives) and police (tactics) in this process.

**Recommendation 9.**    Develop principles to guide the event response team in determining
whether particular acts of civil disobedience merit a response—when a
response is necessary, specify use of lower levels of force (*e.g.*,
persuasion, hands-on compliance), before resorting to higher levels of
force (*e.g.*, baton strikes or jabs, pepper spray), barring exigent
circumstances.

**Recommendation 10.**   When faced with protesters who are non-aggressively linking arms, and
when the event response team has determined that a physical response is
required, principles should specify that administrators should authorize the
police to use hands-on pain compliance techniques rather than higher
levels of force (*e.g.*, baton strikes or jabs, pepper spray), unless the
situation renders pain compliance unsafe or unreasonable.

**Recommendation 11.**   Place an administrator on-site within viewing distance of the event and with
instant communication to the police Incident Commander and to the
Chancellor or to the individual to whom the Chancellor has delegated
decision-making responsibility.

**Recommendation 12.**   During the course of an event, continuously re-assess objectives, and the
wisdom of pursuing them, in light of necessary police tactics—seek to
pursue only important goals with the minimum force necessary.

**Recommendation 13.**   Absent exigent circumstances, bar commencement or escalation of force
by police unless the Chancellor or the Chancellor's designee approves it
immediately before the action is taken.  If the Chancellor designates
decision-making responsibility, the Chancellor's designee must (Edley) or
may (Robinson) be a member of the Academic Senate.

Exhibit 2
Page 49

## B.   Assistance from Other Police Departments

Because of the small size of our campus police departments, police responses to campus demonstrations often involve obtaining assistance—including mutual aid—from other police departments.  Such assistance might come from other departments within the UC system or from outside law enforcement agencies.  While outside help is sometimes necessary, the presence of officers from other police departments during campus demonstrations creates a potential for problems.  Police from other departments often bring with them different cultures, equipment, and training.  And many police from outside the UC system are perceived, rightly or wrongly, as insensitive to campus constituents and to the academic mission of the University.  In the rush to respond to a rapidly evolving campus demonstration, these external departments sometimes are inadequately briefed.  Policies regarding assistance from other police departments need to better promote effective coordination between departments so that the actions of outside officers during demonstrations will be consistent with the decisions made by the campus Administration.[122]

### 1.   Background

At the statewide level, the California Emergency Management Agency has promulgated a lengthy Law Enforcement Mutual Aid Plan.[123]  This Plan divides the state into seven "mutual aid" regions and describes the standard procedures for acquiring aid and ensuring coordination between law enforcement agencies. The Universitywide Police Policies and Procedures also contain rules regarding the reassignment of police personnel from one campus to another.[124]  These policies direct that requests for assistance from other campus departments will be made before special campus events or incidents of civil disorder, and that "[c]ampuses will make every reasonable effort to provide the requested mutual aid commensurate with available resources and depending on local circumstances."[125]

Outside experts and our campus Police Chiefs stressed the importance of communicating, planning, and training in advance of demonstrations with law enforcement partners who might provide aid.  For example, the Major Cities Chiefs Association (MCC) advises that, in advance of demonstrations, campus police departments

---

[122] The recommendations in this section apply to unplanned events as well, but they will be more difficult to achieve in that context. The campus police department should do as much coordination as possible with police providing assistance when the assistance is in response to an unplanned event.

[123] *See* Law Enforcement Mutual Aid Plan, California Emergency Management Agency (2009 ed.), *available at* http://www2.oaklandnet.com/oakca/groups/police/documents/agenda/oak032688.pdf.

[124] *See* Universitywide Police Policies and Administrative Procedures, § 1301 *et seq.* (Jan. 7, 2011), *available at* http://www.ucop.edu/ucophome/coordrev/ucpolicies/documents/policepol_adminproc.pdf.

[125] *Id.* §§ 1301, 1302, 1303.

Exhibit 2
Page 50

should work together with local law enforcement partners to develop a coordinated response.[126]  The MCC has also suggested that representatives of local law enforcement should meet with the campus police department and campus administrators at least twice a year to share concerns and review events.[127]  Many of the other universities and university police departments with whom we spoke do this and more.  For example, the campus and city police officials in Madison, Wisconsin, meet at least monthly along with their senior staff, and they sometimes include the county sheriff.[128]  They told us that these regular meetings help them build a strong enough relationship to enable them to work together effectively even in responding to unexpected or spontaneous events.[129]

Many of our campus police departments already engage in substantial planning and coordination with other police departments.  Several Police Chiefs told us that, when possible, they meet extensively in advance of large demonstrations with commanders from the law enforcement agencies that may provide assistance.  During these pre-meetings, supervisors from each department survey the site of the event, discuss the command structure and operations plan, and review the rules of engagement.[130]  If time permits, campus police departments also train with outside officers in advance of the event.[131]  On the morning of the event, many Chiefs host a briefing for law enforcement partners, to review again the Operations Plan and ground rules for the demonstration.[132]

A critical issue in the area of outside assistance, however, is command structure—*i.e.*, who commands off-campus personnel who come to a campus to provide assistance during a demonstration?  When another police department provides assistance, the officers of that department often arrive with their own commander.  The assisting officers will report to that commander, who in turn should coordinate with the Incident Commander from the host-campus police department.[133]

Our UC police have advised that, when advance planning is possible, the police from the host campus may request that the assisting police not wear personal protective equipment (known as "riot gear") or carry particular weapons.  *If the assisting agency is not comfortable with those conditions, however, it can refuse to*

---

[126] Bill Bratton and Major Cities Chiefs Association, Campus Security Guidelines: Recommended Operational Policies for Local and Campus Law Enforcement Agencies, at 41-42 (Sept. 2009), *available at* https://www.majorcitieschiefs.com/pdf/MCC_CampusSecurity.pdf.  *See also* Police Executive Research Forum, "Managing Major Events: Best Practices from the Field," at 24 (June 2011) (observing the need to ensure that each agency's role is clear prior to an event, and to build a mechanism for sharing information between mutual aid partners).
[127] Bill Bratton and Major Cities Chiefs Association, Campus Security Guidelines: Recommended Operational Policies for Local and Campus Law Enforcement Agencies, at 41-42 (Sept. 2009), *available at* https://www.majorcitieschiefs.com/pdf/MCC_CampusSecurity.pdf.
[128] Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.
[129] Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.
[130] Interviews with campus Police Chiefs.
[131] *Id.*
[132] *Id.*
[133] *Id.*  Students and other community members have expressed confusion about the chain of command in situations involving outside departments.  One student leader told us that it is "unclear who is in charge," and urged us to address this issue in our Report.  Jan. 24, 2012 Meeting with UC Irvine Student Leaders.

Exhibit 2
Page 51

*provide assistance*.[134]  In an emergency, the assisting department's supervisors have discretion to decide on the equipment to be worn and carried by their officers, and the host campus has virtually no input.[135]

Each police department within and outside the UC system currently has its own use-of-force policy.  Officers are only trained on their own department's policy, which also can pose a challenge for coordination when a campus department obtains outside assistance.[136]

In our discussions with UC Police Chiefs, most voiced a preference for using police from other UC campuses, rather than seeking assistance from law enforcement agencies outside the UC system.  There are two primary considerations behind this preference.  First, campus policing requires a specific skill set, sensitivity to campus populations, and a familiarity with academic values.  Officers from non-UC agencies do not always possess these traits.[137]  Second, because of their different uniforms, it is easy for demonstrators to see that outside officers are not from within the UC system, which can fuel tensions, changing the dynamic of the event.[138]  That said, it sometimes is not possible to rely exclusively on other UC police departments, whose staffing pressures may render them unable to provide assistance, or who may be dealing with parallel civil-disobedience events on their own campuses.[139]  And a few UC Police Chiefs, who had developed strong working relationships with their municipal counterparts, told us they were more comfortable relying on assistance from local law enforcement agencies—in part because those agencies are nearby and their officers can arrive on shorter notice.

In the event that non-UC law enforcement agencies do assist in responding to civil disobedience, many UC Police Chiefs are careful about what responsibilities they are given.  One Chief said that it was important to "be deliberate" in deciding what kind of assignments to give non-UC officers.  For example, if possible, they should not be placed in "hands on" situations such as making arrests.  Several other Chiefs told us that outside law enforcement agencies should be kept on the perimeter of a demonstration, or held in reserve and employed only if the situation escalates or if reinforcements are required.

---

[134] Interviews with campus Police Chiefs.
[135] *Id.*  The ACLU submitted a comment on our draft Report suggesting that California Government Code section 8618 gives host campus police departments the authority to control mutual aid agencies.  As the ACLU's letter itself recognized, however, section 8618 states that "*Unless otherwise expressly provided by the parties*, the responsible local official in whose jurisdiction an incident requiring mutual aid has occurred shall remain in charge at such incident, including the direction of personnel and equipment provided him through mutual aid."  Gov. Code § 8618 (emphasis added).  Our understanding from our Police Chiefs is that outside agencies providing mutual aid often insist upon express agreements allowing them to make decisions about their officers' attire and equipment, as a condition for providing aid—many of which are memorialized in memoranda of understanding between the agencies.
[136] *Id.*
[137] *Id.*
[138] *Id.*
[139] *Id.*

Exhibit 2
Page 52

### 2.   Recommendation

Outside assistance poses challenges for many of our campus police departments.  While the host department is responsible for managing the event, the host department lacks control—particularly when aid from other departments is sought on an emergency basis—over the assisting officers' attire, equipment, and training.  Because the assisting officers typically remain under the supervision of their own supervisors, there is also a need for coordination between those supervisors and the Incident Commander from the host campus police department.

To facilitate coordination and ensure a consistent police response, it is a best practice for the campus police department to engage in pre-event planning with any agencies that may provide assistance during an upcoming demonstration.  Time permitting, an initial face-to-face meeting should take place with all such agencies several days in advance of the event, to share information about the demonstration and to discuss the Operations Plan (the plan that the home campus police department develops to guide police operations in response to the event).  The agencies should stay in contact in the days leading up to the event.  If possible, a law-enforcement briefing should be held on the morning of the demonstration to discuss the final Operations Plan for the event, the command structure, the rules of engagement, the Administration's objectives, and so on.  It is crucial for all participating agencies to understand the need to respect First Amendment rights as well as issues such as how many officers will be participating, each agency's role, the communications system, and limitations on the use of force—issues typically covered in the Operations Plan of the host campus police department.[140]  Because a commander from the department providing assistance may supervise that department's officers, UC police should consider including the commander in the coordination between police and administrators discussed in the previous section.

In most situations, our Police Chiefs should seek assistance from other UC campuses, rather than from non-University agencies.  And, when called upon to offer assistance to other UC campuses, our campus departments should make every effort to provide it.  This approach will help ensure that the assisting officers understand and appreciate academic values and the importance of free expression to the University's mission.[141]  In addition, once the recommendations we make below are implemented, officers on all UC campuses will share similar training and will follow the same response option framework,[142] eliminating some

---

[140] We note that a similar recommendation was included in the Brazil Report.  *See* November 20, 2009: Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board, at 19 (June 14, 2010), *available at* http://administration.berkeley.edu/prb/6-14-10_prb-report.pdf ("When requesting mutual aid, specify the number of officers needed, the purposes for which they will be deployed, the circumstances in which they will be working, what equipment and gear they should bring and what equipment and gear they may not bring, and make sure UCPD will be able to communicate in real time (by radio or otherwise) with every unit that will come on campus.").
[141] The police agency of a local California State University campus may offer another source for officers trained and familiar with operating in a university environment.
[142] *See infra* section VI.B.1.a.iii.

Exhibit 2
Page 53

of the challenges to coordination.[143]  In some circumstances, however, there may be good cause for obtaining assistance from a local law enforcement agency rather than from another campus, such as where parallel demonstrations have sapped the resources of sister campuses, where a municipal police department has a demonstrated history of constructively assisting in the response to campus demonstrations, or where assistance is needed urgently.

Where non-university law enforcement agencies do provide assistance, the campus Police Chief should give careful thought to how best to deploy them, and should consider whether to keep them on the perimeter of the demonstration or hold them in reserve.  We considered but ultimately rejected formal recommendations that officers from outside agencies not be placed in close contact with demonstrators, or that they always be paired with a UC officer.  Although these may be the best approaches in many circumstances, we think that formal recommendations would be too prescriptive, and could hamstring campus administrators and police in responding to particular events.  For example, at least one campus Police Chief told us that he simply did not have enough officers to implement a requirement that non-UC officers be kept away from demonstrators.

**Recommendation 14.**  Coordinate in advance of planned demonstrations with other police departments likely to provide assistance.

**Recommendation 15.**  Require each campus police agency to seek aid first from other UC campuses before calling on outside law enforcement agencies, except where there is good cause for seeking aid from an outside agency.

**IV.  Hiring and Training**

At bottom, the best way to ensure that individual police officers on the ground and their supervisors make good judgments in the heat of an event involving civil disobedience is to hire the right people for the job and give them the right training.

---

[143] We recognize that the report prepared by Kroll regarding the November 2011 events at UC Davis voiced a somewhat different opinion on this subject.  Kroll highlighted as an "issue" the "trend to obtain officers from other UC campuses despite the distance, response time and small size of the other UC police departments," before "turning to the Davis Police Department or the local Sheriff's Department."  In Kroll's view, "there are problems with relying on only the other UC agencies," including, for example, that "on some of the days of public order challenges at UC Davis, there were statewide protests that should have reasonably been expected to demand the police at their home campuses."  Kroll, Report Concerning the Events at UC Davis on November 18, 2011, at 124, *available at* http://reynosoreport.ucdavis.edu/reynoso-report.pdf.  As discussed in the main text, we agree with Kroll that there may be good cause under some circumstances to use local law enforcement instead of police from other UC campuses.  When those circumstances are not present, however, we think that the shared values of our UC police departments, as well as the greater opportunities for shared training, warrant a policy of seeking aid from other UC departments in the first instance.

Exhibit 2
Page 54

## A.  Police Hiring

Campus policing takes a special type of professional—one who understands and appreciates the University's mission and the importance of First Amendment values, and who displays sensitivity to the diverse populations on our campuses.  We have been privileged to meet many officers cut from this cloth during our review.  As our departments hire new officers and promote existing ones, it is crucial for them to identify people who will meet this high standard.

### 1.  Background

University policy requires all campus police departments to adhere to the regulations and standards of the California Commission on Peace Officer Standards and Training ("POST") in the employment of peace officers at the entry level as well as for lateral entrants.[144]  POST was established by the California Legislature to set minimum selection and training standards for California law enforcement.[145]

POST's minimum selection standards include those set forth in California Government Code sections 1029 and 1031: officers must be free of any felony convictions; be a United States citizen or permanent resident who has applied for citizenship; have good moral character as determined by a background investigation; have at least a high school degree; submit to fingerprinting; and be free from any physical, emotional, or mental condition that might adversely affect the exercise of police powers.[146]  POST's minimum selection standards also include passing a reading and writing ability assessment.

Many of our campus police departments have hiring standards that are more rigorous than the POST minimum standards, such as favoring applicants with a college degree.[147]  Many also use the interview process and psychological testing to attempt to find candidates who will best understand the academic environment and who will be creative and flexible in working with students.[148]  Police chiefs from other universities with whom we spoke use similar methods.[149]

Some of our campus Police Chiefs told us that a good source for desirable candidates is UC alumni.  Others emphasized that hiring candidates with some college education is helpful.  Some Chiefs noted, though, that they face challenges finding these types of applicants because neighboring municipal and county agencies generally offer higher pay than our campus departments can afford.

---

[144] Universitywide Police Policies and Administrative Procedures §§ 601-602 (Jan. 7, 2011), *available at* http://www.ucop.edu/ucophome/coordrev/ucpolicies/documents/policepol_adminproc.pdf.
[145] *See* About POST, *available at* http://post.ca.gov/about-us.aspx.
[146] *See* Overview of Peace Officer Selection Standards, *available at* http://post.ca.gov/overview-selection-standards.aspx.
[147] Interviews with campus Police Chiefs.
[148] *Id.*
[149] *E.g.*, Feb. 29, 2012 Interview with University of Nevada Las Vegas Police Department Chief Jose Elique.

Exhibit 2
Page 55

On some of our campuses, police departments include members of the campus community in their hiring processes to ensure that officers will relate well to all segments of the campus community.[150]  For example, at one campus, the interview panels include a representative from student government, student affairs, student health, or human resources.[151]  Additionally, our Police Chiefs consistently told us that it is a best practice for the Chief personally to interview any candidate before he or she is hired for a sworn position, and to emphasize during the interview the unique nature of campus policing to ensure that the candidate will succeed in a campus environment.[152]

In our research and discussions with external experts, we learned that there are currently no national standards that set forth minimum qualifications for hiring campus police or security personnel.  The United States Department of Justice recommends, however, that all law enforcement agencies "should seek to hire and retain a diverse workforce that can bring an array of backgrounds and perspectives to bear on the issues the agencies confront and the choices they must make enforcing the law."[153]  It also advises that departments should use composite examinations that measure job-related cognitive abilities and personality traits, and that departments should assess a candidate's suitability based on the candidates' personal, work, and school experiences.[154]

## 2.   Recommendation

No matter how robust our policies are, we cannot avoid breakdowns in the police response to protests and civil disobedience if individual officers on the ground do not have the appropriate outlook and temperament.  Simply put, we must hire the right people for the job.  To a large extent, this is not a matter of policy.  It is a matter of sound judgment on the part of those involved in police hiring on our campuses.

But there are a few simple policies that can help improve our chances of hiring the right people, in addition to continuing to follow the POST guidelines.  As an initial matter, we should require Police Chiefs personally to interview and approve all newly hired officers.  We understand that is current practice on all of our campuses, but it has not always been so.  Going forward, the head of each of our police departments should be intimately involved in the hiring process for each vacancy—without exception—to help ensure that new hires are cut out for the job of campus policing.  We also recommend that Chiefs attempt to hire candidates with at least some college education, making it more likely that they will appreciate campus life and student perspectives.  We further recommend reviewing compensation practices to ensure they are competitive enough to attract and retain highly qualified officers and supervisors.

---

[150] Interviews with campus Police Chiefs.
[151] *Id.*
[152] *Id.*
[153] US Department of Justice, Principles for Promoting Police Integrity: Examples of Promising Police Practices and Policies, at 19 (Jan. 2001).
[154] *Id.*

Exhibit 2
Page 56

As part of the hiring process for all sworn officers, some members of our campus community from outside the department and the Administration should meet the candidate and provide input to the Police Chief.  This could include students, faculty, staff, or some combination of the above.  Input into hiring decisions from the campus community will enhance the credibility of the campus police department and the community's trust in it, and will increase the understanding that the police are part of the community.  Members of the community should have an even greater role in the hiring of Police Chiefs and command-level positions within the department, and the promotion of current personnel to those positions.

One more point regarding hiring bears mention.  The compensation of UC police officers directly affects the ability of our Departments to recruit and retain well-qualified officers.  We recognize that public employee salaries, pensions, and benefit packages are the subject of tremendous scrutiny in light of the current fiscal situation, and that compensation decisions must be weighed against the other considerable financial demands on our system.  Still, the University should regularly review total compensation packages to ensure that the ranges of compensation for our campus police are sufficiently competitive with neighboring law enforcement agencies so that they are not a deterrent to attracting and retaining the best possible police force.

**Recommendation 16.**    Obtain input from members of the campus community (*e.g.*, students, faculty, staff) in the process for hiring campus police officers and promoting or hiring officers for command-level positions within the department.

**Recommendation 17.**    Require the Chief of Police on each campus personally to interview and approve all newly hired sworn officers.

**Recommendation 18.**    Review UC police compensation practices to ensure that compensation is sufficiently competitive to attract and retain highly qualified officers and police leaders.

**B.   Police Training**

Properly training our campus police is critical to ensuring that they make good decisions in the field and that the policies discussed in this Report are implemented.  Our interviews established that UC police officers currently do receive training related to demonstrations and civil disobedience, both as a part of the required statewide POST curriculum and on an *ad hoc* basis within their own departments.  But it is not clear that all of our officers who might be confronted with situations involving civil disobedience and demonstrations receive the *right* training, including training on how to de-escalate protest situations and avoid the use of physical force if at all possible.  There certainly is a perception held by people on our campuses that current training is inadequate.[155] For that reason, we have considered ways in which current training practices could be expanded and improved.

---

[155] Jan. 6, 2012 Meeting with UC Riverside Students.

Exhibit 2
Page 57

### 1.  Background

Current University policy requires that all campus police officers complete a POST-certified Regular Basic Course and then serve a probationary period of twelve months.[156]  POST-certified Regular Basic Courses are programs of study offered by the forty police academies in California, all of which require at least 664 course hours across 42 subject areas.[157]  The basic topics that the curriculum must cover in each of those subject areas are defined by POST.[158]  Each police academy then develops its own more specific curriculum covering each topic, which is approved in advance by POST.[159]

The protest-related topics that POST requires academies to cover in the "disputes and crowd control" subject area are: "peace officer responsibilities regarding the protection of an individual's right to free speech and assembly"; "the role of law enforcement regarding crowd control"; "psychological factors associated with crowd behavior"; "phases of crowd development from a casual gathering through the development of a riot"; and "the three primary roles individuals play within a crowd."[160]

Police also must complete at least 24 hours of continuing education training every two years.  This training is usually offered by the department, though the curriculum for each training module must be approved by POST.[161]  At least 14 of the 24 hours must be devoted to training in "perishable skills," which include use-of-force techniques.  The additional subjects to be taught are determined by the Chief of each department.[162]  Many of our campus Police Chiefs told us that they make a practice of including topics related to crowd control, protests, and civil disobedience in their department's continuing education sessions.[163]

The Police Executive Research Forum ("PERF"), which is a national membership organization of progressive police executives from the largest city, county, and state law enforcement agencies,[164] recommends that training for the management of demonstrations include the following: (1) applicable federal and state laws and departmental policies; (2) civil liberties issues inherent in demonstrations; (3) rules of engagement, use of force policies, and arrest procedures; (4) instruction on emotional control, teamwork, and adherence to commands; (5) instruction on de-escalation techniques; (6) strong statements of expectations for highly disciplined behavior; and (7) the consequences for failing to comply with laws and policies.[165]  PERF

---

[156] Universitywide Police Policies and Administrative Procedures § 603 (Jan. 7, 2011), *available at* http://www.ucop.edu/ucophome/coordrev/ucpolicies/documents/policepol_adminproc.pdf.
[157] Jan. 6, 2012 Interview with POST Assistant Executive Director Bob Stresak.
[158] *Id.*
[159] *Id.*
[160] *See* Overview of Peace Officer Selection Standards, "LD 24 Handling Disputes/Crowd Control," *available at* http://www.post.ca.gov/regular-basic-course-training-specifications.aspx.
[161] *Id.*
[162] *Id.*
[163] Interviews with campus Police Chiefs.
[164] *See* About PERF, *available at* http://policeforum.org/about-us/.
[165] Police Executive Research Forum, "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches," at 22 (2006).

Exhibit 2
Page 58

further recommends that all departments include demonstration management in their regular training schedule.[166]

Experts with whom we spoke emphasized that training on techniques for de-escalating protest situations is particularly important. For example, officers in a campus police department should be trained on how to limit their response to taunting and other disrespectful but not physically threatening acts by students.[167]

During our review, we learned that our campus Police Chiefs have begun working to establish a joint "special response team" for responding to demonstrations involving civil disobedience. This team would be comprised of officers from each of our campuses, who would receive supplemental training on civil disobedience, crowd control, and use-of-force policies. Some of this supplemental training would be conducted jointly so that the members of the special response team get to know each other and practice working together. Members of this special team would then be the first responders on their own campuses to civil disobedience situations, and, when further assistance was needed, members of the special response team from other campuses could be called upon to help.[168] The California State University System also has this type of special response team, which it calls a Critical Response Unit (CRU). The CRU has officers from each of the 23 California State University campuses, who are organized into squads and are deployed for special events and crowd control. The CRU officers receive specialized training and use a CRU policy manual.[169]

Several of our Police Chiefs also told us that they routinely participate in joint training exercises with local law enforcement agencies, which help build relationships and trust in the event that they need to call on those agencies for assistance in responding to civil disobedience.[170] Experts told us that the best way to develop this type of relationship is through training, drills, and table-top exercises with mutual aid partners. This permits the agencies to understand each other's approach to crowd management and better prepares the agencies to work together.[171]

---

[166] *Id.*
[167] Jan. 9, 2012 Interview with Professor David Sklansky.
[168] Interviews with campus Police Chiefs.
[169] Feb. 29, 2012 Interview with the California State University System Chief Law Enforcement Officer Nathan Johnson.
[170] Interviews with campus Police Chiefs. In our conversations with experts outside the UC system, we learned that other police departments similarly train with nearby departments to prepare to respond to events involving substantial civil disobedience. For example, prior to the 2003 Free Trade Area of America meetings in Miami, the Miami Police Department brought together the 167 agencies that would be participating in the management of the event for table-top exercises and planning. The department also provided a 40-hour "Managing Civil Actions in Threat Incidents" course to officers. *See* Police Executive Research Forum, "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches," at 24-25 (2006).
[171] Jan. 30, 2012 Interview with Professor Geoffrey Alpert; Police Executive Research Forum, "Managing Major Events: Best Practices from the Field," at 4, 24, 30 (June 2011) (Seattle Assistant Chief Paul McDonagh).

Exhibit 2
Page 59

### 2.  Recommendation

Our police departments currently adhere to the minimum POST standards on training, and they should continue to do so.  But we believe that alone is insufficient.  In light of the great likelihood of civil disobedience on our campuses, all of our officers must be given additional training that will equip them to respond in a responsible way.  In particular, we recommend that all of our campus police departments focus more of their training time on First Amendment principles, and on mediation, de-escalation, and crowd management skills.[172]

It also appears to be a best practice to develop greater specialization within departments.  We therefore recommend that select officers from each UC police department be chosen to receive additional training in mediation, de-escalation, and crowd management skills.  Those officers should be the first responders if a police response to civil disobedience is required on their campus.  Several of our police departments have already sent officers to crowd-control trainings put on by experts in other jurisdictions;[173] all of our Chiefs should seek out and take advantage of such opportunities.  Commanders likely to serve as Incident Commanders should also receive such training.

We further recommend that the Chiefs continue developing a regional or systemwide "special response team" consisting of officers from across our campuses who will receive additional, joint training in responding to civil disobedience.  In particular, this training should focus on what one Police Chief called "soft skills," such as learning how to compromise with protesters and de-escalate a protest situation, and practicing facing insults without responding with force.  The officers on the "special response team" would be the officers to go to other campuses when outside assistance is needed.

We also recommend that each campus police department conduct trainings with local law enforcement agencies that are likely to send their officers to provide assistance to the campus.  Such joint training should include briefing on past events, table-top exercises regarding crowd control and demonstrations, and other scenario planning.[174]  These joint exercises should be held often enough to ensure a good working relationship between the departments.  We recognize that such training sessions are costly.  They take substantial time on the part of officers and commanders, and they remove police participants from the field for the duration of the training.  Training exercises may also require special equipment, facilities rentals, outside assistance, and so forth.  Implementing this recommendation therefore may require that additional funds be allocated to our campus police departments.  Given the benefits of additional training, we believe that would be money well spent.

---

[172] Our campus police departments should also be trained on the importance of responding to civil disobedience in a content neutral manner.  In considering the appropriate response to civil disobedience, police should consider risks to health or safety and the impact the activity is having on others' rights, not the views the protesters are trying to express.

[173] Interviews with campus Police Chiefs.

[174] Police Executive Research Forum, "Managing Major Events: Best Practices from the Field," at 24 (June 2011).

Exhibit 2
Page 60

**Recommendation 19.**    Increase training of campus police officers in the areas of crowd management, mediation, and de-escalation of volatile crowd situations.

**Recommendation 20.**    Create specialized response teams with additional training in crowd management, mediation, and de-escalation techniques at the systemwide level.

**Recommendation 21.**    Establish a regular program for joint trainings, briefings, and scenario planning with law enforcement agencies on which each campus police department is likely to call for assistance or mutual aid.

## C.  Administrator Training

As discussed above, we think senior administrators should be deeply involved in decisions about how (if at all) police respond to demonstrations.  To participate constructively, they need training.

### 1.  Background

Our administrators currently receive no formal training in subjects related to police responses to demonstrations.  That is not to say that our administrators are entirely uninformed on topics such as the Incident Command System police use during events, police policies, crowd management tactics, and use-of-force options.  But, for the most part, any knowledge they have on these subjects has been obtained informally—through *ad hoc* conversations with police, or as a result of their involvement in the response to prior demonstrations.[175]  Nor are our administrators systematically trained on issues related to responses to demonstrations that do *not* necessarily involve the police, such as mediation and de-escalation techniques.

This is consistent with the practice at universities outside our system.  We conducted interviews with administrators, police, and general counsels at a number of other universities, and none of them described any sort of formal training programs for administrators regarding responding to demonstrations and civil disobedience.[176]

But there is a growing sense within our community that some formal administrator training is necessary.  President Yudof emphasized the importance of such training in a January letter to all UC Chancellors, which directed that "[s]enior administrators should have rehearsal discussions or simulations with police and, perhaps, student representatives."[177]  In our interviews, administrators repeatedly expressed a desire for more training in crowd management techniques and use-of-force options, so that they can better understand and guide police actions in response to civil disobedience.[178]  And police also thought that formalized training for

---

[175] Interviews with campus Police Chiefs.
[176] *E.g.*, Feb. 15, 2012 Call with Outside University General Counsels.
[177] Jan. 10, 2012 Letter from President Yudof to UC Chancellors, at 1.
[178] Jan. 11, 2012 Meeting with UC Berkeley Administrators.

Exhibit 2
Page 61

administrators would be helpful.[179]  One Chief told us that "we need to be able to speak the same language."[180]  Another told us that administrators need to be able "to understand the different types of force, when force is appropriate, when force is unreasonable, and what are the possible triggers."[181]  Outside experts agreed that it is vital for administrators to understand issues such as the Incident Command System.[182]

### 2.  Recommendation

We agree with those throughout the University who have said that formal training for administrators is essential to improving the response to demonstrations and civil disobedience.  This training will be all the more important if, as we recommend, our campuses establish formal event response teams involving senior administrators and rely on those teams to guide the police response to civil disobedience events at demonstrations.[183]

The University should provide senior administrators with training on policies and concepts related to the response to civil disobedience.  Those subjects would include any systemwide policies arising out of this Report's recommendations, First Amendment principles, mediation skills, de-escalation techniques, use-of-force policies, the Incident Command System, and the specific weapons and techniques available to police on our campuses.  We envision that the University would create this training program at a systemwide level.  The Office of the President would fund the training and identify the instructors and curriculum.  Trainings then would take place on all ten campuses—so that administrators are trained together on their individual campuses.  The campus training sessions should include a discussion of campus-specific issues, such as the Incident Command System and how it is implemented on that campus, the structure of the event response team, and the dynamics of past protests on the campus.  The training should also include table-top exercises conducted with members of the police department to simulate the response to various civil disobedience scenarios.

We recommend that this training be required for all Chancellors, all members of the event response team on each campus (including anyone who might serve as the Chancellor's on-site designee at a protest), and those members of each campus's Communications Department who interact with the media during civil disobedience events.  The campus Police Chief should participate in the trainings to answer questions and to build relationships with the administrators involved.  The training should occur at least annually, to refresh the knowledge of senior administrators and inform them of new issues, and to ensure the prompt training of new administrators.

---

[179] Interviews with campus Police Chiefs.
[180] *Id.*
[181] *Id.*
[182] Jan. 24, 2012 Interview with Professor Christopher Stone.
[183] *See supra* section III.A.2.

Exhibit 2
Page 62

At the system level, various officials at the Office of the President should be involved in setting policies regarding the response to civil disobedience and assisting the efforts of campus Administrations and police in this area.  These officials should receive similar training on these issues so that they can more effectively communicate with their colleagues on the individual campuses.  The University President should direct which officials within the Office of the President are required to receive this training.

**Recommendation 22.**  Implement formal training of administrators, at the system and campus levels, in the areas of crowd management, mediation, de-escalation techniques, the Incident Command System, and police force options, to be refreshed annually.

**Recommendation 23.**  Conduct simulations jointly with campus administrators and campus police to rehearse responses to civil disobedience scenarios.

**V.   Communication with Protesters and the Campus Community**

A recurring theme of our interviews was the importance of communication to a successful response to protests and events involving civil disobedience.  This section describes three different types of communication: communication with protesters in advance of a planned protest; communications with protesters during a demonstration or act of civil disobedience; and communications with the broader campus community regarding protests.  While we make recommendations about each, we recognize that there can be obstacles to effective communication.  Sometimes, individual demonstrators are uncooperative and refuse to communicate with police or administrators.  Often, some of the demonstrators are non-affiliates, who have no pre-existing relationship with University officials.  And, as many of our administrators and Police Chiefs expressed to us, it can be particularly difficult to communicate with "leaderless" groups, especially in advance of an event.

**A.   Coordination and Communication with Protesters in Advance of Planned Protests**

When members of the event response team know that a protest is being planned, such advance notice creates opportunities for administrators proactively to engage with the protesters in question.  Successful pre-event communications can allow for a frank exchange of information and concerns on both sides, set expectations about the intentions of protesters and campus officials, and create channels for communication during the event.  Many officials on our campuses already seek to communicate with leaders of planned protests in advance of an event, but the approaches to such communications vary across the campuses.

Exhibit 2
Page 63

### 1. Background

There are few written policies on our campuses regarding communication between demonstrators and campus officials in advance of a planned demonstration.  One campus's policy instructs that, in advance of a planned demonstration, the police department's "liaison officer" should: "[i]dentify, make contact and attempt to develop a rapport with the organizers of the proposed event"; "[d]etermine intentions and motivations of the group, organizers, and identified leadership"; "[f]acilitate meetings with the organizers/leadership and stakeholders to discuss time, place, and manner issues"; "[i]dentify the actual contact person for the group during the event and identify back up contacts"; and "[c]learly state what activities are and are not permitted."[184]  Many other administrators and Police Chiefs within our system said that they engage in similar outreach as an informal practice.[185]

If possible, the event response team should identify leaders of the protesters with whom to communicate.[186]  One Chief of Police told us that the "first priority" should be to determine who the leaders of the group are. Increasingly, however, demonstrations on our campuses involve nominally "leaderless" groups such as the Occupy movement, where issues are taken before a general assembly and individual members are reluctant to speak on behalf of the group.[187]  Particularly before an event begins, campus Administrators and police have told us that it is difficult to communicate with such "leaderless" groups.

Campuses have adopted different practices regarding who typically initiates pre-event discussions with protesters.  On some campuses, the police frequently initiate these conversations.[188]  On other campuses, it is more typically someone from Student Affairs.[189]  In our meetings with faculty and administrators, many suggested that it could be helpful for faculty to be more involved in discussions with protesters both before and during events, although there was concern that faculty might need some additional training before being called upon to do so.[190]

Whoever initiates conversations with those planning a protest, we were told that it is generally best to conduct such conversations face-to-face, insofar as that is possible before an event begins.[191]  In addition, some faculty

---

[184] UC Berkeley Police Department Crowd Management Policy, at 5, *available at* http://administration.berkeley.edu/prb/PRBCrowdPolicy.pdf.
[185] Interviews with campus Police Chiefs.
[186] *See* Police Executive Research Forum, "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches," at 11 (2006); Interviews with campus Police Chiefs.
[187] We believe that there are actually de facto leaders within every group, but when a group claims it does not have leaders, it makes it much more difficult to coordinate with the group.  To address this, some police have tried to find ways to communicate with the group that do not depend on official leaders, such as by using social media to communicate directly to all the protesters, and by forming relationships and communicating directly with protesters who seem to hold sway with the larger group. Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Occupy Policing, Part II: Setting and conveying the right tone, *available at* http://cops2point0.com/2011/12/occupy-policing-part-ii-setting-conveying-right-tone (describing approaches used by Philadelphia police).
[188] Interviews with campus Police Chiefs.
[189] Feb. 10, 2012 Meeting with UC Davis Student Affairs Administrators.
[190] Jan. 25, 2012 Meeting with Academic Council; Feb. 10, 2012 UC Davis Town Hall; Feb. 28, 2012 Meetings at UC Irvine.
[191] Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling; Jan. 31, 2012; Interview with Professor Lorie Fridell.

Exhibit 2
Page 64

recommended that administrators and faculty should make greater efforts to use social media to communicate to a broader audience regarding protest issues.[192]

**2.   Recommendation**

It is a best practice for campus officials to communicate early and often with demonstrators.  Wherever possible, this communication should begin well in advance of the demonstration.  The event response team should make every reasonable attempt to identify the leaders of a protest group and work with them.  This may be particularly difficult where the demonstration involves a "leaderless" group, or when some protesters are determined not to cooperate.  But, to the extent campus officials can identify some members of the group who are planning the protest, they should pursue communications with those individuals, and/or convey information to the broader protest group.  Social media may provide one promising means of communication.[193]  This effort is important because protests are often composed of a mix of protesters, some of whom may be willing to take a leadership role and communicate with the Administration.  Moreover, the Administration's outreach will often lend greater legitimacy to its efforts to respond to the protest and improve the Administration's credibility in the eyes of the greater community.

We recommend that campus officials make every reasonable attempt to engage those planning a protest in a dialogue that seeks to understand the protesters' concerns and objectives; explains the ground rules such as applicable time, place, and manner regulations; and describes how the Administration and the police are likely to respond to various types of conduct by the protesters.[194]  For example, the message to demonstrators may be that, as long as their demonstration is not violent and there is no damage to property, campus officials will work with the demonstrators to facilitate their event; however, if the demonstrators obstruct traffic or occupy certain buildings, they will be subject to arrest or student discipline.[195]  Campus officials should also make demonstrators aware of alternatives to civil disobedience—including other avenues for airing with the Administration their grievances and substantive policy concerns.  The more objectively credible those alternatives, the more likely they are to help avoid civil disobedience.

Regarding who from the University should reach out to protesters, generally we think that outreach should begin with someone from the campus Administration, selected on a case-by-case basis after considering the experience and skills of individual campus administrators, and any existing relationships they have with the protesters in question.  In all events, our recommendation is that *someone* from the Administration—generally

---

[192] Jan. 25, 2012 Meeting with Academic Council.
[193] The California Commission on Police Officer Standards and Training (POST) Guidelines on Crowd Management, Intervention, and Control also recommend using electronic and social media to communicate with protesters.  *See* Guideline 6.2, available at http://lib.post.ca.gov/Publications/CrowdMgtGuidelines.pdf.
[194] Police Executive Research Forum, "Managing Major Events: Best Practices from the Field," at 10 (June 2011); Police Executive Research Forum, "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches," at 32 (2006); Interviews with campus Police Chiefs.
[195] Interviews with campus Police Chiefs.

Exhibit 2
Page 65

someone from the event response team, though it could be someone designated by that team—should attempt to communicate with demonstrators in advance of each planned demonstration.

**Recommendation 24.**   Make every reasonable attempt to identify and contact members of the demonstration group—preferably one or more group leaders—in advance of the demonstration to establish lines for communication.

**Recommendation 25.**   Inform protesters, in advance of the event, of the availability of alternative avenues for communication of their concerns or proposals.

**Recommendation 26.**   Pursue a dialogue between Administration officials and the demonstration group about protest objectives and applicable rules for campus protest.

### B.   Communicating With Demonstrators During Protest Events

Once a protest begins, it is critical that police and administrators continue to communicate with the protesters through the course of the event.  Some of our campuses pursue these communications primarily through police officials.  Many students and faculty, however, told us that they would prefer that these communications be pursued primarily by senior administrators directly with protesters, with minimal police participation.[196]  Campus administrators, in turn, have encountered challenges in communicating effectively with leaderless groups. These administrators could benefit from developing means to communicate more broadly to the group at large during protests.  Similarly, administrators and police could improve their efforts to communicate with the broader campus community about protest events, the University's response, and any effect on other campus activities.

### 1.   Background

Many UC administrators with whom we spoke stressed that, during a protest, it is important that the "primary line of communication with protesters . . . go through the Administration."[197]  Faculty generally also agreed that the Administration should be primarily responsible for communication, although some mentioned the positive role that faculty have played in past protests, a role that faculty at other universities sometimes also take on.[198] Individual campuses have recently taken steps to ensure that the communication involves the right parties.  UC Davis, for example, is currently working to build an "engagement team," intended to engage protesters and to discuss their substantive concerns in a non-confrontational way.  The team is expected to include staff from

---

[196] Some police officials believe that their participation in the conversations, at least in conjunction with Administration officials, is essential.  In their view, these conversations offer police an opportunity to develop relationships with the protesters that may become important should the potential for police action become more likely.

[197] Jan. 6, 2012 Meeting with UC Riverside Administrators; Meetings with Campus Counsel.

[198] Communication with protesters at past events at UC Berkeley has often been through respected faculty members. Jan. 9, 2012 Interview with Professor David Sklansky.  The University of Michigan and the University of Wisconsin have both relied on faculty to communicate with student demonstrators when appropriate.  Feb. 7, 2012 Interview with University of Michigan Public Affairs Director Kelly Cunningham; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.

Exhibit 2
Page 66

Mediation Services, staff from Student Affairs, faculty members, an experienced negotiator from the police department, and potentially others.[199]

Police on our campuses also emphasized the importance of having administrators on hand at demonstration sites to engage in discussions with protesters.  Some described the important role that Student Affairs staff can have in communicating with demonstrators.  One Chief of Police told us that his preference is to have academic Deans and representatives from Student Affairs and the Office of Student Conduct coordinate with student demonstrators as much as possible, unless the situation escalates, in which case police can become more involved in the communications.  Another told us that he believed it was helpful for both police *and* administrators to talk with the demonstrators during protests.

Experts with whom we spoke emphasized that it is particularly important for the police to warn protesters of any police action before the action is taken, unless exigent circumstances preclude a warning.  They recommended that the police explain what they plan to do, the reasons for doing so—and that, after such an explanation, the police give protesters a chance to leave or otherwise respond before taking the action in question.[200]  Consistent with this approach, some of our campus police departments have policies stating that, "if no exigent circumstances exist," the police incident commander should meet with the demonstration group leadership to discuss the various options available to them prior to any police action taking place.[201]

Several campuses also have specific policies regarding communication of "dispersal orders."  Consistent with legal requirements and POST guidelines, policies at some of our campuses explicitly direct that, when police deliver dispersal orders, they give them in a manner in which they can be heard and understood, that the order specify a route for the crowd to leave, and that the police allow a reasonable time for dispersal to occur before making arrests.[202]

Experts told us that administrators and police can make use of social media to communicate with protesters during events.  Especially when the protesters are a "leaderless" group, police can try using text messages, Facebook, or Twitter to communicate directly with protesters.[203]  Both the Boston and the Philadelphia Police Departments, for example, recently used Twitter to distribute their own requests or concerns during Occupy protests in their cities.[204]  Social media allowed the police departments to set a cooperative, non-violent tone.

---

[199] Interviews with campus Police Chiefs.
[200] Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling; Police Executive Research Forum, "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches," at 58 (2006).
[201] *See, e.g.*, UC Irvine Police Department General Order No. 2011-07, § 1.1; UC San Diego Police Department Policy Manual § 423.6.
[202] *See, e.g.*, UC Irvine Police Department General Order No. 2011-06, § 1.3.
[203] Police Executive Research Forum, "Managing Major Events: Best Practices from the Field," at 36-37 (June 2011); Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans.
[204] Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Occupy Policing, Part II: Setting and conveying the right tone, *available at* http://cops2point0.com/2011/12/occupy-policing-part-ii-setting-conveying-right-tone.

Exhibit 2
Page 67

The Philadelphia Police, for example, Tweeted during the protest that "@phillypolice encourages continued peaceful protesting."[205]

The Associated Students of the University of California (ASUC) Student Advocate's Office at UC Berkeley has also urged campus police to use campus PA systems to communicate with protesters and to "issue clear messages prior to police action (*e.g.*, dispersal orders, notices that encampments will be cleared, etc.) with relevant timeline and explanation."[206]

## 2.  Recommendation

Communication and dialogue must be the cornerstone of any response to a campus demonstration.  The campus Administration should make every reasonable effort to engage demonstrators in a dialogue that addresses the substance of the demonstrators' concerns and aims, with the goal of de-escalating any situation such that police involvement becomes unnecessary.  When the Chancellor or a designee decides who should communicate with protesters, consideration should be given to who will most effectively engage in dialogue on behalf of the University.[207]  We believe that, in many if not most circumstances, it will be most effective for administrators or faculty, rather than the police, to be the primary communicators on behalf of the University.[208] It is also essential that a senior administrator be visibly present at the site of a demonstration, and available to confer with protesters and police as necessary.  There may be some instances in which a campus Administration would have good cause for not having an on-site administrator, such as where the protest is very small and the presence of an on-site administrator would infeasible or unhelpful.[209]  In most cases, however, we believe that the presence of such an administrator will facilitate communications and signal the Administration's commitment to crafting a fair and appropriate response to the demonstration.  We defer to the campus Chancellors as to how to assign these particular responsibilities.  We note that, in many instances, it will make sense for the on-site administrator to be the same person responsible for communicating with protesters on behalf of the University.

---

[205] Occupy Policing, Part II: Setting and conveying the right tone, *available at* http://cops2point0.com/2011/12/occupy-policing-part-ii-setting-conveying-right-tone.  Police from other jurisdictions also told us that they had successfully communicated with leaderless groups by spending time in casual clothes (after identifying themselves as police) at the groups' protests and building relationships with individuals in de facto leadership roles.  The police then exchanged cell phone numbers with them and generally used them as points of contact.  Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans.

[206] Nov. 15, 2011 e-mail to Campus Administrators and UCPD Officials titled "Recommendations re: Nov 9 Events from ASUC Student Advocate's Office and Student Govt Leaders".

[207] Some who commented on our draft report suggested that student leaders should be involved in communications with protesters during a demonstration.  Several student leaders, however, told us that they would be uncomfortable acting in this role, because they represent students and do not want to be seen as aligned with or co-opted by the Administration.  We think student leaders may be useful as a resource for helping to de-escalate conflict in some circumstances.  But we recognize and respect the view of many student leaders that they should not be forced to speak on behalf of the University.

[208] We note that communications issues were also discussed in the Brazil Report.  That Report makes several important recommendations on this subject, including the need for leadership at each campus to communicate directly with protesters. *See, e.g.*, November 20, 2009, Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board, at 14, 19 (June 14, 2010), *available at* http://administration.berkeley.edu/prb/6-14-10_prb-report.pdf.

[209] *See supra* at  pages 6-7.

Exhibit 2
Page 68

We recommend throughout this Report ways to try avoiding any police response to a protest.  If a police response is required, however, we recommend that the police clearly and consistently communicate with protesters regarding rules the police will enforce and how the police will do so.  If the protesting group is "leaderless," the police should make every reasonable attempt to communicate directly with as many of the protesters as possible, possibly using social media.

**Recommendation 27.**    Absent special circumstances, assign administrators or faculty members, rather than police, to serve as the primary University representative communicating with protesters during a demonstration.

**Recommendation 28.**    Establish senior administrators as a visible presence during protests, absent good cause.

**Recommendation 29.**    Make every reasonable attempt to establish a communication link with identified leaders or sponsors of the event—for leaderless groups, communicate broadly to the group as a whole (through social media and otherwise) until relationships form.

**C.   Communications with the Broader Campus Community**

In addition to communicating with those involved in protest activity, the Administration needs mechanisms for communicating with the larger campus community.  Protest activity can raise concerns for the entire campus—students, faculty, and staff alike.  The Administration must be in a position to provide timely updates to the larger community to the extent the demonstration has an effect upon the teaching and research mission of the University, or the safety of other members of the community.

**1.   Background**

In our discussions with students and faculty, many expressed a desire to have more real-time information about protests on campus.  Are any facilities or classrooms blocked?  Is the demonstration peaceful and respectful of the desires of other students to attend class and of faculty to conduct research?  UC students suggested several methods for communicating, including emails from the Chancellor, social media, and the campus "Warn Me" system used to alert students in an emergency.[210]

**2.   Recommendation**

Each campus should determine how to communicate to the campus community as a whole when a demonstration is planned or ongoing, unless the Administration determines that it would be unhelpful to share information about the demonstration.  Such communications can serve several beneficial purposes.  First, they

---

[210] Feb. 16, 2012 Meeting with UC Davis Student Leaders.

Exhibit 2
Page 69

may inform the community about what the Administration is doing to address the demonstrators' underlying concerns.  Second, they may reduce the desire of potential onlookers to come to the site of the protest to find out what is occurring.  Third, they may inform people of areas of campus that are inaccessible (if any) and/or that should be avoided.  Fourth, they may increase transparency by explaining how the Administration—and the police, if they are involved—are handling the demonstration.

To the extent they have not already done so, campuses should consider creating professional, staff-maintained social media accounts with sites such as Facebook and Twitter for high-profile administrators to ensure that messages sent through social media are widely dispersed.  The more students who are already following these pages when protests arise, the more likely it will be that there will be reposting and greater awareness.  Administrators could begin by notifying student leaders of these accounts and encouraging them to start the trend of following them.

**Recommendation 30.**   To the extent not already available, establish a communication mechanism for promptly informing the campus community at large about material developments in ongoing protests, for use when appropriate.

## VI.  Response During Events

It is our hope that the practices outlined in this Report will improve communications in a way that avoids the need for many protests, and will increase the likelihood that protests that do take place are peaceful and do not require a University response.  We recognize, however, that there will be times when these practices fail and some response is necessary.  This section addresses options and responses in those circumstances.

### A.  Alternatives to Arrest or Force

Students and faculty expressed concern to us that administrators and police too often resort to confrontation and arrests before exhausting available alternatives.[211]  Moreover, while most campuses seek to engage protesters in a dialogue in an effort to avoid physical conflict, our review suggested that these efforts generally are *ad hoc* and often are conducted by persons lacking adequate training in dispute resolution.  Below, we discuss three different alternatives that campuses should consider employing before arresting protesters or using physical force to remove them.  First, campuses can turn to trained mediators to facilitate discussions between protesters and the Administration.  Second, administrators and police can employ "de-escalation techniques" designed to minimize tensions and reduce the risk of violent clashes.  Third, particularly when the civil disobedience in question is "tolerable,"[212] campuses may be able to use student discipline processes rather than arrests to sanction student protesters for civil disobedience.  (This third approach would require a major

---

[211] Critics often have accused police officials when it was in fact administrators who determined the objective—*e.g.*, "Clear the building"—and the timing.
[212] See Section III above discussing principles guiding event response team's decision-making.

Exhibit 2
Page 70

redesign of many campuses' existing student discipline systems, which are not currently structured for such a use.)

### 1. Mediation

#### (a) Background

At the Town Hall meetings we conducted, several people suggested that our campuses should train mediators who could facilitate discussion between protesters and the Administration during civil disobedience events. These mediators might be faculty members or staff, or mediation experts from outside the University.[213] Students said that the Administration's "first response should not be 'let's call the police department," and that a mediation approach would offer the Administration a helpful alternative.[214]  Several pointed to instances when faculty members had helpfully facilitated communications between student protesters and the Administration.[215] Regarding one of these instances, a student reported: "I saw a hand reaching out from the faculty.  I see that as one of the ways where we can make progress."[216]

In the comments to our draft reports, we heard divergent views on this subject.  Some praised the idea of mediation and urged that it be made mandatory before police take action at protest events.[217]  Others, particularly some administrators, were less enthusiastic.  For example, one administrator wrote that the presence of a mediation function would improperly suggest that the University will be willing or able to negotiate any demands that protesters advance.

#### (b) Recommendation

We agree with students and faculty who urged that a formal mediation program be established as an *optional* resource for our campuses to look to in responding to protests.  Mediators could help in facilitating resolution of the substantive concerns underlying a protest, to the extent it relates to a subject that the Administration can control.  They could also help in mediating issues related to how the protest will be conducted.

---

[213] Jan. 31, 2012 UC Berkeley Town Hall; Feb. 10, 2012 UC Davis Town Hall.  We also spoke with Ombuds Offices from across our system to discuss the role they might play in a protest situation.  Depending on the circumstances, the Ombuds Offices may be a mediation resource.  The Ombuds Offices provide confidential, informal, conflict-resolution services.  Ombuds services include conflict coaching, option generation, information on various processes and procedures, training in conflict resolution, mediation, and referrals to additional resources.  Given the impartial and independent function of the Ombuds Offices, however, the Ombudsperson would use his or her best judgment and discretion to determine the appropriateness of providing ombuds services in any particular protest situation.  Important factors included in such analysis would be the ombudsperson's ability to act consistently with the *International Ombudsman Association Standards of Practice*, which requires that he or she function in an impartial, confidential, independent, and informal capacity.  In light of these standards, it is the view of the Ombuds Offices that it would be inappropriate for the Ombuds Offices to be given a mandatory role as a mediator in protest situations.  Mar. 20, 2012 Meeting with UC Ombuds Offices.
[214] Jan. 31, 2012 UC Berkeley Town Hall; Feb. 10, 2012 UC Davis Town Hall.
[215] *Id.*
[216] *Id.*
[217] *See, e.g.*, June 8, 2012 Letter from ACLU of Northern California ("We propose instead that mediation should not merely be considered, but that it must first be exhausted prior to resorting to force, absent exigent circumstances.").

Exhibit 2
Page 71

We think it would be preferable to train staff or faculty volunteers to perform this function, rather than to rely on mediators from outside the University.  Mediators internally recruited and trained would be familiar with the University and would require little advance preparation to get up to speed on most issues prompting a demonstration.  Additionally, mediators may be needed on short notice; it would be helpful to have them readily available on campus, rather than relying on external mediators with potentially conflicting commitments.  We therefore recommend that campuses either develop their own team of mediators or join with other campuses in their region to do so.[218]

### Recommendation 31.

Establish an internal mediation function at the campus or regional level to assist in resolving issues likely to trigger protests or civil disobedience.

### Recommendation 32.

Consider deploying this mediation function as an alternative to force, before and during a protest event.

**2.   De-escalation Techniques**

There are moments during protest events when decisions made by those responding can escalate tensions.  At such moments, the approach taken by the responders—whether the campus Administration or police—can tip the balance toward a peaceful resolution or can push the event in a more violent direction.  It is essential that both our administrators and our police be trained in methods for encouraging peaceful resolution.  These methods generally are referred to as "de-escalation techniques."[219]

**(a)   Background**

In our discussion with our campus police, many talked about training in and using "de-escalation techniques," but, perhaps significantly, they had difficulty describing precisely what these techniques involve.  We were unable to identify any internal policies or training materials addressing the subject.  We received greater detail from the policing experts we spoke with from other universities and jurisdictions.  Based on those external discussions, de-escalation techniques generally fall into three broad categories:  communication, tactics, and restraint.

**(a.1)   Communication techniques**

A key theme in our discussions with policing experts was that the manner in which police (and campus administrators) communicate with protesters can serve to escalate or de-escalate tensions.[220]  Voice tone,

---

[218] Such mediators could be useful not only in the context of civil disobedience events involving large numbers of protesters but also in smaller contexts, such as if a small number of protesters attempt to disrupt a class or an invited speaker's presentation.
[219] Obviously, protesters should also make an effort to de-escalate protest situations.  This section, however, focuses primarily on the Administration's and police's response to protests.
[220] Jan. 31, 2012 Interview with Professor Lorie Fridell; Jan. 9, 2012 Interview with Professor David Sklansky; Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.

Exhibit 2
Page 72

volume, and choice of words all will affect how protesters respond.  For example, using a quiet voice to make a one-on-one request that a protester clear a sidewalk can be more effective than using a loudspeaker and issuing a public ultimatum.[221]  Using a respectful tone instead of a condescending tone will encourage a similarly respectful response on the part of protesters.[222]  And speaking calmly rather than in an agitated manner will likewise help prompt less agitated reactions.[223]

**(a.2)  Tactics**

Another key theme in our discussions was that certain police tactics are likely to increase tensions with demonstrators.  Recognizing the likely impact of these tactics and considering alternatives, where possible, can mitigate this risk.  For example, the manner in which officers are outfitted, the types of weapons they carry, and how any weapons are displayed can escalate or de-escalate a situation.  If the police wear personal protective equipment (commonly referred to as "riot gear") or display long batons or similar weapons, this will create a more combative environment, which can escalate a situation.[224]  On the other hand, if the police appear without personal protective equipment and with any weapons carried in a less threatening manner, this can send a signal that officers are prepared to trust that protesters will keep things peaceful, which in turn may help bring about that result.[225]  Similarly, when officers arrive from outside agencies wearing different uniforms, following a request for outside assistance, this likely will signal to protesters that the demonstration has reached a new, dramatically more serious stage, which again can escalate tensions.  Of course, on many occasions, the message communicated by these tactics may be either intentional or unavoidable, due to concerns about officer safety.  As one officer told us, although "riot gear" is commonly criticized, protesters do sometimes "throw things at the police," and "[p]olice officers are University employees" whom "the University still has an obligation" to protect."  Nonetheless, the point made here is that such tactical decisions should be made with full awareness of their likely impact on the dynamic of the event.

Apart from the above, many experts emphasized that dispersal orders can escalate tensions and therefore should be issued only after every available alternative has been exhausted.[226]  Similarly, mass arrests can substantially escalate tensions.[227]  Conversely, making single arrests that are targeted at particular individuals

---

[221] Jan. 30, 2012 Interview with Professor Geoffrey Alpert; Jan. 25, 2012 Interview with Boston Police Superintendent William Evans.

[222] Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Jan. 25, 2012 Interview with Boston Police Superintendent William Evans; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.

[223] Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Jan. 25, 2012 Interview with Boston Police Superintendent William Evans; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.

[224] Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Jan. 25, 2012 Interview with Boston Police Superintendent William Evans; Jan. 31, 2012 Interview with Professor Lorie Fridell.

[225] Jan. 31, 2012 Interview with Professor Lorie Fridell; Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.

[226] Jan. 31, 2012 Interview with Professor Lorie Fridell; Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans.  For example, alternatives might include negotiating different protest sites, re-routing traffic around protest activity, or re-assigning classrooms.

[227] Jan. 31, 2012 Interview with Professor Lorie Fridell; Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray.

Exhibit 2
Page 73

can actually reduce tension.[228]  For example, if particular protesters want to be arrested, and lines of communication are open, handling the arrest respectfully can give both sides what they need and allow the demonstration to proceed peacefully.[229]  Or, if there are particular protesters who are threatening or engaging in violence while those around them are attempting to engage in peaceful protest activity, targeting the arrests to those individuals can de-escalate the situation rather than aggravating it.[230]  Moreover, once individuals are arrested, removing them from the location if the protest is ongoing rather than detaining them within view of the other protesters is a recommended de-escalation technique.

**(a.3)  Restraint**

Some protest tactics are designed to provoke an angry or hostile response from authorities.  But there are techniques for exercising restraint and resisting such provocation.  Policing experts we spoke with emphasized that it is important for police to learn how to stay calm even when faced with taunting and other disrespectful but not physically threatening acts.[231]  One method for resisting provocation is known as "verbal judo."[232]  Verbal judo is the use of tactical communication techniques, both verbal and nonverbal, which allow officers to maintain control while reducing the need to escalate to a use of force.[233]  Officers are trained to respond to hostile audiences, verbal abuse, and disapproval through empathy, verbal disarming, and feedback and negotiation, rather than confrontation and force.[234]

**(b)  Recommendation**

While many of these de-escalation techniques may be based on common sense, the experts we spoke with agreed that these methods can be taught and rehearsed.  We therefore recommend that our campus police—including line officers and incident commanders—and our administrators who will be involved in the on-the-ground response to demonstrations and civil disobedience, receive training in de-escalation techniques.  We further recommend that these techniques be used when responding to protests, with the goal of avoiding, to the greatest extent possible, situations in which force might be needed.

**Recommendation 33.**  Where possible, police should pursue tactics designed to diffuse tensions and avoid tactics likely to increase tensions.

---

[228] Jan. 31, 2012 Interview with Professor Lorie Fridell; Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans.

[229] Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Jan. 31, 2012 Interview with Professor Lorie Fridell.

[230] Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Jan. 30, 2012 Interview with Professor Geoffrey Alpert; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling; Jan. 31, 2012 Interview with Professor Lorie Fridell.

[231] Jan. 9, 2012 Interview with Professor David Sklansky; Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray.

[232] Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Jan. 30 2012 Interview with Professor Geoffrey Alpert.

[233] The Art of Verbal Judo, *available at* http://www.officer.com/article/10248713/the-art-of-verbal-judo.

[234] Verbal Judo: A System for Handling Difficult Audiences, *available at* https://www.msu.edu/course/prr/351/Course%20Readings/Verbal%20Judo.pdf.

Exhibit 2
Page 74

3.   **Administrative Citation**

(a)  **Background**

In our discussions with UC faculty and administrators, some suggested that confrontations with the police could be avoided if we used University student discipline processes rather than arrest to sanction student protesters for violating laws or campus rules.[235]  The suggestion might have particular appeal when the civil disobedience in question is of a form that is tolerable, but is sufficiently disruptive that some sanction for the protesters is necessary.  Rather than arresting the students, the University could issue them a citation that would lead to subsequent student discipline.

Some students thought that the student disciplinary process would provide greater transparency and predictability than does the criminal justice system regarding the consequences for civil disobedience.[236]  Others we spoke with endorsed a student-discipline-centered approach because it might reduce the need for police intervention and would keep decision-making about discipline internal to the University.  In contrast, when police make arrests, the local prosecutor decides whether to press charges in a process that is outside the University's control.  Some pointed out that, unlike the criminal justice process, student discipline can be used when the civil disobedience in question violates campus regulations but not state law.  In such situations, the police generally do not have authority to make arrests unless they issue dispersal orders that are then violated.[237]

Many other students, faculty, and administrators expressed extreme skepticism about the viability or desirability of using the student disciplinary processes to address civil disobedience.[238]  For example, one student leader voiced the opinion that using student discipline would make students feel like their First Amendment activities would imperil their education.  Many students explained that students would be much more concerned about being suspended or expelled than they would be about spending a night in jail or having a misdemeanor on their record.[239]

The near consensus among Vice Chancellors of Student Affairs from across our campuses was that our campuses are not equipped currently to respond to student protest using internal discipline processes.  They were concerned that student conduct officials lack sufficient resources to process the many cases that could arise from mass civil disobedience events, and they feared that the politics often surrounding protest-related infractions could overwhelm the merits in particular cases.  The Vice Chancellors also warned that student affairs officers who run student conduct proceedings are often the same people who serve as mediators or as

---

[235] Feb. 10, 2012 Meeting with UC Davis Chancellor; Meetings with Campus Counsel.
[236] Feb. 10, 2012 Meeting with UC Davis Student Leaders.
[237] Meetings with Campus Counsel.
[238] Feb. 10, 2012 Meetings at UC Davis; Jan. 17, 2012 Meeting with Academic Senate Leaders.
[239] Feb. 16, 2012 Meeting with UC Davis Student Leaders.

Exhibit 2
Page 75

representatives of the Administration during protests events, and that it would be inappropriate for witnesses to a demonstration to preside over subsequent conduct proceedings involving the same event.[240]

Student discipline obviously would not be a viable option for those engaging in civil disobedience who are not students (*e.g.*, faculty, staff, or non-affiliates).  Additionally, even for student demonstrators, it could be difficult to use the student discipline processes if they are wearing masks and refuse to identify themselves, as some have done in recent demonstrations.

At least one of our campuses has had some success in using student discipline to respond to civil disobedience.  UC Irvine has done so—generally in conjunction with, not instead of, arrest.  We were told that using the student conduct process in these circumstances proved to be very time- and resource-intensive, and that the process under these circumstances was difficult to manage.  Nonetheless, the process ultimately was deemed to be a success.

UC Irvine also has a student "citation" program—thus far used only for non-protest-related activity—under which students can be issued a University citation instead of being arrested, and can be directed to report later to student conduct officers for appropriate discipline.  These citations are issued by the campus police and are currently used for infractions such as public intoxication.  We were told that the citation program has been very successful, and that it perhaps could be expanded to address civil disobedience as well.[241]  The police currently have no equivalent option short of arrest for responding to conduct by non-students engaged in civil disobedience, because no law currently authorizes use of citations similar to traffic tickets for any of the activities typically associated with civil disobedience.[242]

**(b)  Recommendation**

There is enough disagreement about the viability of using student conduct processes to address civil disobedience that we do not believe we can require its use on all campuses and in all protest situations.  However, we do believe that each campus should develop or modify existing procedures for student discipline so that they are an available response option for civil disobedience—either in lieu of, or in addition to, arrests that may trigger criminal prosecution.  Just as we believe that we need campus police because they are a part of our community, so we believe that we need a viable disciplinary option that is within our system.  There are many situations in which using internal student discipline might be more appropriate than arrests that may trigger criminal proceedings—for example, if a single student disrupts a classroom lecture.  We recognize that

---

[240] Jan. 25, 2012 Meeting with Vice Chancellors of Student Affairs.
[241] Interviews with campus Police Chiefs; Feb. 28, 2012 Meeting with UC Irvine Student Affairs Administrators.
[242] Interviews with campus Police Chiefs.  The Police Chiefs also told us they thought it would be inappropriate to release students while arresting others who have committed similar criminal offenses based simply upon their status as non-students.  Offering an additional tool for responding to violations by students does indeed mean students might sometimes be treated differently, but we do not believe this means the tool should be unavailable.  We note that we discuss the possibility of urging the California Legislature to pass legislation allowing the police to issue citations for civil disobedience on our campuses, as an alternative to arrest.  If such citations were available, this could provide an option for non-students that would be similar to student discipline for students.

Exhibit 2
Page 76

additional resources and special procedures would probably be needed to put this recommendation into action, and that each campus would need to ensure that it has procedures for a fair and content-neutral process.  We believe, however, that having the option available is sufficiently important to warrant the recommendation.[243]

Consideration also should be given to urging the California Legislature to pass legislation enabling police to issue citations for civil disobedience on our campuses, similar to those issued for infractions (*e.g.*, traffic tickets).  Properly issued citations, just as administrative citations, could be issued without affecting an arrest of the protesters.  We would thus expect them to be less likely to require any use of force by the police.

**Recommendation 34.**   Develop or modify existing student discipline processes to ensure that, in appropriate circumstances, they are an available response option.

## B.  Response Options

### 1.  Response Option (Use of Force) Framework

Earlier in this Report we recommended the creation of guidelines for administrators and event response teams as they determine how to respond to protests and demonstrations.[244]  Campus police departments similarly need guidelines for their responses to demonstrations, particularly regarding use of force.  Current policies at most of our campus police departments rely almost exclusively on a broad "reasonableness" standard governing use of force by police officers.  While this is consistent with the law,[245] critics assert that these policies afford too much discretion to the police and provide too little notice to protesters regarding how police may respond to different types of protest tactics.  At least one of our campus police departments—along with the majority of police departments across the country—has adopted a "force continuum" to establish clearer expectations around the use of force for police and civilians alike.  We have concluded that adoption of such a framework would improve the response to civil disobedience on our campuses, and that the framework should be systemwide.

### (a)  Background

### (a.1)  Existing UC Policies

Because any discussion of "force" options can trigger questions about misplaced priorities and suspect motives, we begin with this basic proposition: *except when exigent circumstances exist, other available options*

---

[243] In retooling their student discipline processes so that they may be used in response to misconduct at demonstrations, each campus should consider the likelihood that UC students may travel away from their home campus and participate in protests at sister campuses.  Consideration must be given to how the student discipline system should work in that situation, including whether the student should be disciplined using the procedures at her home campus or at the campus where she participated in the demonstration.

[244] *See supra* section III.A.2.

[245] In evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Exhibit 2
Page 77

*should be explored in responding to civil disobedience before turning to the police and considering the potential use of force.* This point made, however, in the event that these efforts fail, the use of physical force by police may become a necessity.

Under current policy, and consistent with Fourth Amendment principles and court decisions on police liability, responses to protests on our campuses are governed by a common fundamental standard: the police may use only such force as is reasonable under the circumstances. The policy language varies from location to location, but on many of our campuses, the use-of-force policy provides as follows: "[o]fficers shall use only that amount of force that reasonably appears necessary, given the facts and circumstances perceived by the officer at the time of the event, to effectively bring an incident under control."[246] These policies further state that the "'[r]easonableness' of the force used must be judged from the perspective of a reasonable officer on the scene at the time of the event."[247]

Some of our campuses have endeavored to provide more detailed guidance to officers regarding the level of force that is appropriate.[248] One campus, UC San Francisco, has adopted what is known in the literature as a "force continuum." A force continuum typically ranks different force options in terms of severity, with the explicit purpose of providing officers guidance on what force option to employ.[249] Some force continua also match the force options to specific kinds of resistance, such as "passive resistance" or "active aggression."[250]

At UC San Francisco, the force continuum does not expressly match force options to specific types of resistance, but instead is designed as a general "guide or model used when discussing the use of force."[251] Officers are instructed that "[w]henever possible, any force used shall be progressive in nature and that progression shall not proceed beyond the suspect's submission or the point at which the officer gains control of the suspect."[252] The policy sets out six "levels" of force: (1) presence; (2) verbal commands; (3) physical contact; (4) physical control (*i.e.*, temporary restraints, pressure point manipulation, and takedown techniques like hair pulling); (5) serious physical control (*i.e.*, pepper spray, focused blows, batons, police dogs); and (6) deadly force.[253] The UC San Francisco continuum is not designed specifically for demonstration or civil disobedience situations; it applies in all contexts where an officer might consider using force.

---

[246] *See e.g.,* UC Irvine Police Department Policy Manual § 300.2.
[247] *See e.g., id.*
[248] Many members of our community—including several affiliated with UC police departments—told us that they thought there should be a single, uniform policy on force that extends across all ten campus police departments.
[249] *See* William Terrill *et al.*, "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes," at 1 (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf.
[250] *Id.* at ii.
[251] UCSF Police Department General Order § 4.3.1(C).
[252] *Id.* § 4.3.1(B)(4).
[253] *Id.*

Exhibit 2
Page 78

Other UC police departments have decided not to adopt a formal "force continuum" approach.  That said, several UC police departments do have policies regarding the use of force in demonstrations that align force options to demonstrator resistance in much the way that a continuum might.  One example is the UC San Diego police department Demonstrations Policy.  It limits the force options available in response to certain types of resistance, as described in the table that follows.  (The table format has been added here to assist the reader; these policies do not appear in tabular form in the UC San Diego Police Policy Manual.)

**Table 1. Force Limitations from UC San Diego Demonstration Policy**
UC San Diego Police Department Policy Manual § 423.13

| Activity | Definition | Limits on Force Options |
|---|---|---|
| Passive resistance | Actions that do not prevent the officer's attempt to control a subject.  For example, a subject who remains in a sitting, standing, prone, or limp position with no physical contact (e.g. locked arms with other individuals).[254] | A subject involved in passive resistance shall not be subjected to the use of control devices including tasers, batons, or chemical agents including pepper spray. |
| Active resistance | Evasive physical movements to defeat an officer's attempt at control, including bracing, tensing, linking arms or verbally signaling an intention to avoid or prevent being taken into or retained in custody. | The use of intermediate force (pepper spray, tasers, baton strikes) shall not be used against non-aggressive displays of active resistance during a peaceful protest, such as locking arms while sitting or standing. |
| Active aggression | A threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to a person appears imminent. | Policy implies that police may use the range of approved force options so long as the use of force is reasonable under the circumstances. |

---

[254] To take another example from within our system, the current policy at UC Irvine prohibits the use of pepper spray, batons, or tasers against a subject involved in "passive resistance."  As in San Diego's policy, the term "passive resistance" is defined to *exclude* individuals who have "locked arms."  *See* UC Irvine Police Department General Order 2011-06, § 1.5.

Exhibit 2
Page 79

**(a.2)   Policies in Other Jurisdictions and Expert Opinions**

Outside of our system, all of the departments we studied have a policy implementing some version of the general "reasonableness" standard governing the use of force.[255]  That standard is echoed in myriad guidance documents regarding the use of force, such as the Department of Justice's Principles for Promoting Police Integrity:   "Police officers should use only an amount of force that is reasonably necessary to effectively bring an incident under control, while protecting the lives of officers and others."[256]

There is less consistency within the police industry, however, when it comes to the use of a "force continuum." A recent study funded by the National Institute of Justice surveyed more than 600 police and sheriff departments throughout the United States on this subject.  It found that over 80 percent of the responding agencies used some type of force continuum.[257]  One of the most significant findings of the study is the substantial variation in the types of force continua used by the reporting agencies.[258]

---

[255] *See, e.g., Graham v. Connor*, 490 U.S. 386 (1989).
[256] U.S. Department of Justice, Principles for Promoting Police Integrity: Examples of Promising Police Practices and Policies, at 3 (Jan. 2001).
[257] *See* William Terrill *et al.*, "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes," at ii (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf.
[258] *Id.* at ii.

Exhibit 2
Page 80

More than two-thirds of the agencies reviewed in the NIJ study used a "linear" force continuum.[259]  A linear force continuum is similar to the model used at UC San Francisco.  It lists the different options in order of increasing severity.[260]  At some agencies, unlike at UC San Francisco, the linear force continuum is designed to indicate the type of resistance that can justify a particular force option.  One example cited in the NIJ study of that model comes from the Charlotte Mecklenburg Police Department,[261] and is depicted below:

**Figure 1. Example of "Linear" Approach**



---

[259] *Id.* at 17.
[260] *See generally* Police Executive Research Forum, Exploring the Challenges of Police Use of Force, at 47-49 (Apr. 2005).
[261] *See, e.g.*, William Terrill *et al.*, "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes," at App A-14 (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf.

Exhibit 2
Page 81

About ten percent of the agencies studied in the NIJ report used a "matrix" or "box" continuum.  This design typically depicts the force options on one axis, and the level of resistance by a subject on the second axis.[262] The matrix then designates the acceptable or reasonable responses for different levels of resistance.  Below is an example taken from the survey used in the NIJ study:[263]

**Figure 2. Example of "Matrix" Approach**



<hr />

[262] *See id.* at xi.
[263] *See id.* at App. A-7.

Exhibit 2
Page 82

Another nine percent of the agencies surveyed in the NIJ study used what is known as a "force wheel."[264]  In that design, the officer is often presented in the middle, with the various force options arrayed in a ring around her.[265]  One purpose of the wheel approach, as opposed to a linear format, "is so officers do not think about force progression in a ladder or step-by-step format."[266]  An example from the Colorado Springs police department follows:[267]

### Figure 3. Example of "Wheel" Approach



Finally, about twenty percent of the police departments in the study do not employ a force continuum at all,[268] a result which is consistent with our interviews.[269]  It should be noted that the various force continua surveyed by the NIJ are not specific to demonstrations.  They apply to all situations involving the police, regardless of whether they occur in the context of civil disobedience.

---

[264] *Id.* at 17.
[265] Police Executive Research Forum, Exploring the Challenges of Police Use of Force, at 47-49 (Apr. 2005).
[266] William Terrill *et al.*, "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes," at vi (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf.
[267] *Id.* at App. A-17.
[268] *Id.* at ii.
[269] During our interviews, for example, we learned that the City of Madison, Wisconsin does not use a formal force continuum. Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray.

Exhibit 2
Page 83

Police departments that have adopted force continua appear to "pick and choose," and tweak and adapt, in a multitude of ways—all, unfortunately, without empirical evidence as to which approach is best or even better than another."[270]   Many police departments take an approach similar to that reflected in the UC San Francisco policy—they do not attempt to link the various force options to different types of resistance, or to provide a "resistance progression."   A slight majority of departments surveyed in the NIJ study, however, adopted a force continuum that incorporated the levels of the resistance encountered by police.[271]

A number of industry authorities have endorsed the use of force continua as a general practice.   The U.S. Department of Justice "recommends the force continuum as a best practice."[272]   Others have observed that written departmental policies taken alone can be vague and difficult for officers to apply in the field, and that a use-of-force continuum can clarify written policies by helping officers visualize variations in levels of force.[273]

There is a robust debate within the academic community about the efficacy of force continua.   Some argue that a force continuum provides necessary guidance to police regarding the range of non-force and force options available to them in different situations, encourages consistency, and educates the public about the possible police response to different types of resistance.[274]   A force continuum can provide clear examples of resistance matched with appropriate use-of-force responses whereas "an ambiguous use-of-force policy sends a message that officers have leeway in their actions."[275]   Force continua can also be valuable as training tools to help refocus officers on *when* to use force as opposed to simply *how* to use force.[276]   And they can help ensure that all officers receive consistent training in identifying, assessing, and responding to use-of-force situations.[277]

Others in the academic community, however, express concerns that force continua do not allow for consideration of every factor that might affect the officer's choice of response, and that it may be difficult for officers to remember the model in a stressful situation requiring a quick decision.   Officers also may incorrectly

---

[270] William Terrill *et al.*, "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes," at iv (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf.
[271] *See id.* at 18.
[272] "Promoting Police Integrity: Examples of Promising Police Practices and Policies," U.S. Department of Justice, Jan. 2001 at 4.
[273] J. Peters and M. Brave, "Force Continuums: Are They Still Needed?," *Police and Security News* 22 (1) at 2 (2006), *available at* http://www.ecdlaw.info/outlines/forcecontinuums.pdf.   Within our own system, the review conducted by the Police Assessment Resource Center in the wake of the use of a taser against a UCLA student in 2006 recommended that the UCLA police department "should develop and implement a 'force options' or 'force continuum' system that provides an explicit range of appropriate responses for each level of subject resistance or threat."   *See* M. Bobb, et al., A Bad Night at Powell Library: The Events of November 14, 2006, at 70 (Aug. 2007), *available at* http://www.parc.info/client_files/UCLA/UCLA%20Taser%20Report%20August%20Final.pdf.
[274] For a more complete discussion, see Lorie Fridell, "Taking the Straw Man to the Ground: Arguments in Support of the Linear Use-of-Force Continuum," *The Police Chief* at 20-25 (Dec. 2011), *available at* http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_arch&article_id=2548&issue_id=122011.
[275] Rolando Delgado, An Ideal Use of Force for Law Enforcement: An Assessment of the Austin Police Department, at 16-19 (2011).
[276] Security News Vol. 22, at 3 (2006); Lorie Fridell, "Taking the Straw Man to the Ground: Arguments in Support of the Linear Use-of-Force Continuum," *The Police Chief*, at 20-25 (Dec. 2011), *available at* http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_arch&article_id=2548&issue_id=122011.
[277] R. Humoffman et al., "Canada's National Use-of-Force Framework for Police Officers," *The Police Chief*, at 71 (Oct. 2004), *available at* http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_arch&article_id=1397&issue_id=102004 (discussing Canada's national use of force framework which includes a continuum.).

Exhibit 2
Page 84

believe that they must hit every level or step in the continuum before moving to the next level of force.[278]  Other critics cite literature establishing that a number of factors influence an officer's decisions regarding force, and asserting that continua are too simple and one-dimensional to be truly useful.[279]

In our own campus departments that do not use force continua, we heard similar concerns.  One UC Police Chief told us that a policy that establishes an "escalating ladder of options" can be problematic, because it implies that police must "hit every step" as they move to greater levels of force, rather than giving police the discretion to use the force that is reasonably necessary under the circumstances.  Another UC Police Chief indicated that he thought it was unwise to adopt a rigid continuum setting bright-line rules.

In sum, it is fair to say that there is no consensus among experts on which model of force continuum is best.[280]  Indeed, the NIJ study found that "there is no ideal (or flawed) policy approach across all outcomes," and concluded by "leav[ing] it to police executives to consider those outcomes most important or relevant to them and their constituents, and [to] see which policy approaches performed more favorably in those respects."[281]

**(a.3)   Defining Levels of Resistance**

To the extent that force continua or response matrices seek to match levels of force to levels of offender resistance, the levels of resistance must be defined in policy in real-world terms.  Developing such definitions involves a complicated and potentially controversial exercise in line-drawing.  Depending upon how a continuum or matrix is structured, these threshold definitions can have profound implications for how police will deploy force under different circumstances, including in response to acts of civil disobedience during protests.

Within the UC system, several of our police departments—including UC San Diego, UC Irvine, and UC Los Angeles—currently maintain policies defining different types of resistance.  For example, the Los Angeles policy defines the following resistance levels:

- "**Active Aggression -** A threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to a person appears imminent."

---

[278] T.D. Petrowski, "Use-of-Force Polices and Training: A Reasoned Approach," *FBI Law Enforcement Bulletin* (Oct. 2002), at 3, *available at* http://findarticles.com/p/articles/mi_m2194/is_10_71/ai_93915942/; J. Peters & M. Brave, "Force Continuums: Are they Still Needed?", *Police and Security News*, at 3 (Jan./Feb. 2006), *available at* http://www.ecdlaw.info/outlines/forcecontinuums.pdf.

[279] *See* C. Crawford & R. Burns, Predictors of the Police Use of Force: The Application of a Continuum Perspective in Phoenix, *Police Quarterly*, at 41-64 (Dec. 1998); D. A. Klinger, "The Micro-Structure of Nonlethal Force: Baseline Data from an Observational Study," *Criminal Justice Review*, at 169-186 (Autumn 1995); William Terrill & Stephan D Mastrofski, "Situational and Officer-based Determinants of Police Coercion," *Justice Quarterly*, at 215-248 (June 2002).

[280] *See*  Police Executive Research Forum, "Exploring the Challenges of Police Use of Force," at 47-50 (Apr. 2005) (reviewing debates).

[281] William Terrill *et al.*, "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes," at xvi (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf.

Exhibit 2
Page 85

- "**Actively Resisting -** Evasive physical movements to defeat an officer's attempt at control, including bracing, tensing, linking arms or verbally signaling an intention to avoid or prevent being taken into or retained in custody."

- "**Passive Resistance -** Actions that do not prevent the officer's attempt to control a subject.  For example, a subject who remains in a sitting, standing, or limp or prone position with no physical contact (e.g. locked arms) with other individuals….  A subject who, while sitting or standing, has locked arms with another subject is not engaged in passive resistance, but is engaged in proactive action to obstruct."[282]

Outside our system, other police departments use slightly different terms and definitions.  For example, the Charlotte continuum discussed above defines "passive resistance" as "the subject does not cooperate with an officer's commands, and does not take action to prevent being taken into custody."[283]  A protester who lies down in front of a doorway but allows himself to be carried away upon arrest would satisfy this definition. Charlotte's policy directs that the only permissible force options in the face of passive resistance are presence, verbal dialogue and commands, and "soft empty hand control" (defined to include hands-on pain compliance and "takedowns").[284]

Within our system, the current line between "passive resistance" and more elevated forms of resistance is not clear to students, faculty, and, at times, even to the police.[285]  A particularly controversial and important consideration for our campuses is whether "passive resistance" should be defined to include the act of linking or locking arms.  Linking arms is a frequent tactic for individuals engaged in civil disobedience, a tactic with a pedigree dating back to the Civil Rights Movement.  Current police policies across our campuses direct that linking arms to resist a lawful arrest constitutes an "active" form of resistance.[286]  (Note that, nonetheless, at least one campus police department has adopted a policy explicitly forbidding the use of batons, pepper spray, or tasers against this form of resistance.[287])  Yet, many members of our community hold the view that linking

---

[282] UCLA Police Department Policy Manual § 423.7.  The 2007 report arising out of the taser incident specifically recommended that the UCLA police department "should explicitly distinguish between levels of resistance," and "should define the terms "violent," "active aggression," "active physical resistance," and "passive resistance."  *See* Merrick Bobb, et al., A Bad Night at Powell Library: The Events of November 14, 2006, at 70-71 (Aug. 2007), *available at* http://www.parc.info/client_files/UCLA/UCLA%20Taser%20Report%20August%20Final.pdf.  The definitions quoted in the main text are similar, though not identical, to the definitions proposed by that report.  *Id.*

[283] Charlotte-Mecklenburg Police Department Use of Force Policy.  Similarly, the University of Pennsylvania defines "passive resistance" as "physical actions that do not prevent an officer's attempt at control, but fail to assist in that control."  University of Pennsylvania Police Department Directive Number 1, Section IV.

[284] Charlotte-Mecklenburg Police Department Use of Force Policy.

[285] *See* Merrick Bobb, et al., A Bad Night at Powell Library: The Events of November 14, 2006, at 56 (Aug. 2007), *available at* http://www.parc.info/client_files/UCLA/UCLA%20Taser%20Report%20August%20Final.pdf ("There is no uniform definition of passive resistance.").

[286] *See, e.g.*, UCLA Police Department Policy Manual § 423.7; UC Irvine Police Department General Order No. 2011-06, § 1.12.  Relatedly, in a 2006 national survey of police departments, 82 percent of responding departments said that they would authorize chemical spray in a situation where the person being arrested "tenses his arms and refuses to comply with the officer's orders to stop resisting" and "continues to tense and pull against the officer for 15-20 seconds."  Sept. 29, 2008 Presentation by Lorie Fridell on "Less Lethal Weapon Deployment Policy and Training: Results from a National Survey" (presented at the conference "Police Use of Force: Less Lethal Weapons and In-Custody Deaths" sponsored by the Institute for Law Enforcement Administration).

[287] *See supra* section VI.B.1.a.i.

Exhibit 2
Page 86

arms with other protesters is, at core, a quintessential form of passive resistance.  As such, it is a form of resistance, in their view, that should never be met with any type of force.[288]

**(b)  Recommendation**

As an initial matter, we note that, as applied to protests and demonstrations, any sort of continuum or matrix discussing force options is relevant only if the circumstances dictate a police response.  As discussed above, many acts of civil disobedience might be deemed "tolerable," or at least tolerable for a time.  They might call for responses such as additional opportunities for dialogue with high-level officials, mediation, or student disciplinary citations, rather than a response by police.  *The Event Response Team always should consider whether the civil disobedience in question interferes sufficiently with the mission of the University or with the rights of others to require a police response.*  If not, the police options for responding to various forms of resistance may be rendered moot.

This said, there inevitably will be situations in which police involvement and arrests are required.  To prepare for such situations, our research has persuaded us that the University should adopt a response option framework at the systemwide level to guide our campus police in choosing among the range of approved force options.  While many jurisdictions call this a "force continuum" or "force matrix," we use the term "response option framework" because it is essential for police to consider options other than physical force.

The substantial majority of police departments nationwide employ such a framework, and the U.S. Department of Justice has identified its use as a best practice.  Indeed, many of our campuses already differentiate among types of protester activity and place some limits on the level of force that may be used in response to those activities.  A more comprehensive framework would provide needed guidance, not only to our police officers, but also to administrators who work with them.  It would also promote greater consistency in police response across the system.  Further still, such a framework would provide notice to all members of the community, including would-be protesters, of the normal range of options available to police (subject to exceptions for exigent circumstances) for responding to various types of protester activity.  Such notice would help enable protesters to avoid provoking situations in which force might be warranted.

It would be beyond our mandate and, we think, unwise, for us to define the precise contours of this framework, other than to propose certain guiding principles for the development of the framework.  As the NIJ study indicates, there is considerable disagreement even among police professionals regarding how the various force

---

[288] *E.g.*, Jan. 6, 2012 Meetings at UC Riverside; Feb. 10, 2012 UC Davis Town Hall; (Revised) Resolution Proposed by Professors Barsky and Simon, *available at* http://academic-senate.berkeley.edu/sites/default/files/committees/division/meetings/resolution_b-barskysimon-rev-for_web_4.pdf.

Exhibit 2
Page 87

options should be "ranked" in force continua.[289]  Our interviews with police officials confirmed this.[290]  Therefore, we believe the University should establish a rigorous process for establishing a response option framework for use across the system.  This process should include significant input from students, faculty, administrators, outside experts, and, most critically, our police professionals.  Part of this process should include determining the extent to which the framework should be used for general application or should be tailored for use in protest and civil disobedience situations.[291]

At a high level, we believe that this framework should incorporate the following elements.  First, as noted, the response option framework should be deployed systemwide.  One of the primary reasons for developing a response continuum is to ensure a more consistent response by police to similar types of resistance by demonstrators regardless of the campus; the Regents and the public presumably expect this consistency.  Furthermore, the experts we interviewed repeatedly stressed the need for a use-of-force policy that is uniform across all the campuses in order to facilitate mutual aid among campus police departments and to enable common training programs.[292]

Second, the response option framework should correlate the permissible responses to types or levels of resistance.  We are aware that some police departments—including the UC San Francisco department—have adopted continua that simply rank permissible types of police response, without linking them to levels of resistance.  But we think that the prevailing approach, which builds different levels of resistance into the response continuum, provides greater guidance to officers in the field and better notice to community members at large.

Third, the response option framework should contain clear definitions of the types and levels of resistance it addresses and the appropriate response options.  It must be clear that officers are not required to "move up the ladder" and engage in each response option sequentially, even where the resistance would warrant a higher level of response.  And there should be a clear demarcation between "passive resistance" and more active forms of resistance.  The continuum should provide illustrative examples so that students, faculty,

---

[289]  The NIJ study reports that "[t]he placement of chemical sprays and [tasers] offered the greatest challenge for police administrators as to the proper placement within the force continuum:  Roughly 30 percent of the agencies place chemical sprays with hands-on pain compliance techniques, another 30 percent of the departments place chemical sprays with hard hand tactics, and just over a third of the agencies place chemical sprays with impact weapons….  Nearly 60 percent of the agencies place [tasers] at the impact weapon level, while another 2.0 percent place it along with deadly force. The remaining agencies place [tasers] with some sort of hands on force …."  William Terrill *et al.*, "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes," at ii-iii (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf.
[290]  Within our system, one Police Chief told us that he thought pepper spray would be "higher" on a use of force continuum than batons.  But a second Police Chief cautioned that batons should be considered as a more serious weapon, because they can cause broken bones and even permanent damage.
[291]  At a minimum, the framework must extend to the police response to demonstrations and civil disobedience.  We recognize that most force matrices used throughout the country apply to all situations where police confront resistance—not just to demonstrations—and we expect that the response option framework developed as a result of this Report might have similarly broad application.
[292]  Feb. 9, 2012 Interview with John Jay College of Criminal Justice President Jeremy Travis; Feb. 6, 2012 Interview with Police Assessment Resource Center President Merrick Bobb; Jan. 13, 2012 Interview with Harvard University Police Department Public Information Officer Steven Catalano.

Exhibit 2
Page 88

administrators and officers can understand which actions could trigger a response involving the use of physical force.[293]

Fourth, the response option framework should recognize that a large-scale police presence itself is perceived by many protesters as a show of force.[294]  This is especially so if police wear types of personal protective equipment (PPE) known as "riot gear" or "turtle shell" armor, or if they make an aggressive display of weapons.[295]  Personal protective equipment and aggressive displays of weapons may also escalate tensions with protesters, so the response option framework should take into account these concerns in establishing the potential levels of police response.

Fifth, the response option framework must include explicit exceptions for responding to threats of violence and other exigent circumstances.  Situations involving resistance to police directives can evolve quickly.  When confronted with a dangerous situation, our police officers should not be constrained in their ability to protect against property damage or injury, to themselves or others.  They should instead have the discretion to take those actions that are reasonable under the circumstances.

Sixth, for force options that pose health risks to individuals with particular medical conditions (such as pepper spray for pregnant women or those with asthma), the response option framework should require that, absent exigent circumstances, before using such force options, the police give warnings that individuals with those medical conditions could be at risk of harm.  The police should then allow people sufficient time to leave following the warnings.[296]

Once this response option framework is established, it should be implemented and incorporated into the training regimes at all ten campus police departments.  Senior administrators also should be trained on it.[297]  And, like other police policies on demonstrations and use of force, the response option framework should be made available to the public on the internet.

---

[293] We have previously made recommendations concerning how administrators should respond to protesters who link their arms in a non-aggressive way.  *See supra* section III.A.2.  The response option framework should be consistent with the recommendations in that section.  We note that we received several comments urging us to be more specific in this Report and to state that the linking of arms is, in all events, a form of "passive resistance."  We do not think, however, that linking arms is susceptible to this categorical description.  Rather, whether this form of conduct is "active" or "passive" resistance will necessarily depend on the context.

[294] UC faculty, administrators, and police, as well as outside experts, emphasized that a visible police presence at the site of a demonstration should be considered a show of force, because that is how it is likely to be perceived by demonstrators. Jan. 11, 2012 Meeting with UC Berkeley Faculty; Jan. 20, 2012 Interview with the University of Pennsylvania Vice-President for Public Safety Maureen Rush; Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Jan. 19, 2012 Interview with Police Executive Research Forum (PERF) Executive Director Chuck Wexler; Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.

[295] Jan. 31, 2012 Interview with Professor Lorie Fridell; Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Police Executive Research Forum, "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches" at 58 (2006).

[296] This recommendation is consistent with the California Commission on Police Officer Standards and Training (POST) Guidelines on Crowd Management, Intervention, and Control, which provide that officers shold give clear dispersal orders when declaring an unlawful assembly, and which advise officers to consider including in the dispersal order an explanation of the force that might be used if protesters refuse to disperse. *See* Guideline 5.2, *available at* http://lib.post.ca.gov/Publications/CrowdMgtGuidelines.pdf.

[297] *See supra* section IV.C.

Exhibit 2
Page 89

The response option framework must always be coupled with the best practices and recommendations concerning decision-making during demonstrations already identified in this Report.  In particular, except in circumstances in which delay would result in a risk of injury or significant property damage, police should seek approval from the Chancellor or the Chancellor's designee shortly before initiating any type of physical force against demonstrators, even if it is one of the permissible force options indicated on the response framework.

Finally, we note that as our review was underway, the California Commission on Peace Officer Standards and Training (POST) issued new guidelines on "Crowd Management, Intervention, and Control" at the behest of Governor Brown.  We have reviewed these guidelines, and find them to be helpful and consistent with recommendations made in this Report.  One comment on our draft report suggested that we eliminate our recommendations concerning a response option framework and "replace[]" it "with a recommendation for the adoption of the POST Crowd Management Guidelines."  We do not agree with this suggestion, however, because the POST Guidelines do not specify a detailed response framework of the type described above.  Rather, the POST Guidelines identify general principles and considerations relating to use of force and then recommend that police departments "[d]evelop use of force policies, procedures, and training for managing crowds engaged in unlawful activity."[298]

**Recommendation 35.**   Establish and implement a systemwide response option framework for use on each campus.

**Recommendation 36.**   Require that campus police and other authorities (to the extent controlled by the University) act in accordance with the response option framework, absent exigency or good cause.

**2.   Procurement of Equipment**

Weapons authorization—the process by which weapons and other devices are approved for use by police— is a threshold component of any force option policy.  To be sure, the concerns and considerations underlying weapons procurement and weapons authorization extend well beyond the context of campus protest activity.  Nonetheless, we address the subject briefly here because of its obvious implications for the police response to civil disobedience.  Currently, the University lacks a consistent program across the system for determining which weapons and devices, and specifically which so-called  "less lethal" weapons, or "control devices," should be available for use on our campuses.[299]  We recommend establishing such a program at the system level, while also affording campuses the option to decline deploying devices otherwise approved for use, in order to meet specific campus objectives.

---

[298] *See* Guideline 5.4, *available at* http://lib.post.ca.gov/Publications/CrowdMgtGuidelines.pdf.
[299] We refer in this section to "less-lethal weapons" and "control devices."  Most of the principles and recommendations in this section should apply with equal force to the approval of techniques regarding how such weapons are used—for example, which of the two settings on a taser may be used—and to the approval of weaponless techniques such as the carotid restraint hold or hands-on pain compliance techniques.

Exhibit 2
Page 90

**(a)  Background**

The University's "Universitywide Police Policies and Administrative Procedures" manual leaves selection of weapons largely to the discretion of the campuses, for implementation through local policies.  With respect to so-called "less-lethal" weapons—weapons that are designed to be less likely than conventional firearms to result in death—the "Universitywide Policies" manual adopts a mixed approach.  For certain categories of weapons, including tear gas, pepper spray (formally known as "oleoresin capsicum" spray),[300] and police batons, the manual authorizes use on a systemwide basis.[301]  For tasers and all other "less-lethal" weapons, it defers to the judgment of the individual police departments.[302]  At the campus level, most of our police department policies provide that only those weapons "that have been approved by the Chief of Police or his/her designee are authorized to be carried by members of this department."[303]  One campus expressly requires that the Chief of Police personally approve all weapons.[304]

The current system creates a risk that the various campus police agencies will arrive at different conclusions about the safety record of particular weapons—generally, whether the weapons have a record of being operable and operated as intended—and the appropriateness of the weapons' use in a campus environment.  It also lacks formal, consistent methods for assessing new weapons and keeping current in the evolving field of "less lethal" weaponry.  Such methods would include reviewing new technologies that could render existing weapons obsolete or unsafe, and reviewing new research regarding the relative safety of weapons options.

Additionally, the existing policies of our police departments differ in the level of detail they provide about approved weapons.  On some campuses, the names of all of the approved "less-lethal" weapons are included in the police department use of force policy.  By way of example, the policy on one campus states that "[t]he authorized less-lethal weapons are Chemical Agents, Oleoresin Capsicum, and Impact Weapons (i.e. batons)." It then provides that trained officers shall carry "First Defense MK-4 10% Oleoresin Capsicum (OC) pepper spray," and that "First-Defense MK-9 Magnum OC may be carried by personnel during crowd control situations."[305]  Other campuses do not provide this level of detail about the weapons that are approved for use.

**(b)  Recommendation**

We believe that our current regime for approving which categories of "less lethal" weapons may be used by police officers on our campuses suffers from two flaws.  First, the University has approved *some* "less lethal" weapons on a systemwide basis; but the systemwide policies allow individual police departments unilaterally to

---

[300] Universitywide Police Policies and Administrative Procedures § 812 (Jan. 7, 2011), *available at* http://www.ucop.edu/ucophome/coordrev/ucpolicies/documents/policepol_adminproc.pdf.
[301] *Id.* § 813.
[302] *Id.* §§ 814-15.  The Universitywide policies say nothing about what process should be used to arrive at campus-specific policies governing whether tasers or other "less-lethal" weapons are permissible.
[303] *E.g.*, UC Irvine Police Department Policy Manual § 308.1.
[304] UC Santa Barbara Police Department Policy Manual § 308.1.
[305] UCSF Police Department General Order § 4.3.6.

Exhibit 2
Page 91

approve and use other such weapons that are not on the systemwide approved list.  We think it is essential for the University to have a common understanding of which weapons are "safe" (or not unsafe) and appropriate for use in the campus environment.  Members of our community also occasionally raise questions about the safety and effectiveness of the "less lethal" weapons used by our police; we should have a means of providing a uniform, systemwide response to these questions.

Second, the University lacks an established process for re-evaluating which "less lethal" weapons should be approved.  Weapons technology evolves rapidly, as do best practices in this area.  A category of "less lethal" weapon that is widely accepted and used in one decade might be rendered obsolete in the next by the emergence of more effective devices.  Our University should develop an established process at the system level for staying abreast of these advances, and for reassessing the list of weapons options that should be available to our officers in light of them.

We envision that this process will be led by the existing Council of Chiefs, comprising the leaders of our ten campus police agencies, or by a subcommittee of that group.  But we recognize that authorization of weapons involves complex judgments that must consider the potential health effects of the weapons, their effectiveness with regard to their intended use, officer safety, cost, and a number of other important factors.  The Chiefs of Police should therefore solicit input from medical professionals, law enforcement experts, weapons manufacturers, and the diverse constituencies on our campuses.  They should also, of course, seek advice regarding legal limits on the use of each type of weapon.  Finally, this process should consider both the availability of the weapons generally, and whether they should be permitted for use in the context of demonstrations.  Consistent with current policy, the list of available weapons options should be approved by administrators in the Office of the President before it is finalized.

We presume that the "less lethal" weapons currently approved for use on UC campuses would meet appropriate standards and would be re-approved through this process.  But we lack the expertise to make that final judgment, and we recognize that judgments such as these may change as new technologies and research data emerge in the future.

We also recognize that some of our police departments may decide that it is not necessary to employ the full range of weapons approved through this systemwide process, based on considerations unique to that campus. In that circumstance, we think it is appropriate for each campus Police Chief to have the authority to limit the weapons options available to their officers as he or she see fit.  At bottom, we propose to shift from a model by which the University approves certain weapons on a system-wide basis and permits each campus to *add* to that list, to a model by which the University establishes a comprehensive set of approved weapons and permits each campus to *subtract* from that list.

Exhibit 2
Page 92

Finally, we think it is a best practice for each campus's Chief of Police personally to approve the specific weapons that may be utilized by the department's officers (*e.g.*, "First Defense MK-4 10% Oleoresin Capsicum (OC) pepper spray"). Our departments are sufficiently small—and this decision is sufficiently weighty—that it need not and should not be delegated to more junior officers. And to improve transparency and accountability, the list of devices that are approved for use in response to demonstrations and civil disobedience should be included in each department's use-of-force policies, and made available to the public.

**Recommendation 37.**   Develop a systemwide process for determining which "less lethal" weapons may be utilized by UC police officers.

**Recommendation 38.**   Require each campus Police Chief personally to approve the specific types of less lethal weapons available to officers in their department.

**Recommendation 39.**   Require each campus police department to include the list of weapons approved for use in response to demonstrations and civil disobedience in its use-of-force policies, and to make the list available to the public.

**3.   Evaluation of Safety of Pepper Spray**

As part of our policy review, we received a special charge from President Yudof to review the results of a study he requested from the School of Pharmacy at UCSF on the potential adverse health effects from human exposures to pepper spray—a weapon currently available to trained officers on all of our campuses. The School of Pharmacy's report is now available, and, while its findings are helpful, they do not enable a comparison among the potential health effects of pepper spray and those of alternative weapons or devices. We therefore recommend commissioning further research that would allow for such a comparison.

**(a)   Background**

Coincident with our policy review, President Yudof directed the School of Pharmacy at UCSF to evaluate the potential adverse health effects from human exposures to pepper spray. That evaluation has now been completed.[306]

The School of Pharmacy conducted a review of existing literature on pepper spray and the health outcomes for subjects exposed to oleoresin capsicum ("OC"), the active ingredient in pepper spray. They also analyzed data from over 4,000 accounts of pepper spray exposures reported to the California Poison Control System over a 10-year period. The School of Pharmacy noted in part that "[t]he short- and long-term safety of [oleoresin capsicum] has not been critically reviewed."[307]   The available literature suggested that "[t]he effects of OC products are generally self-limited and resolve within 45 minutes," but that "severe adverse events requiring

---

[306] The report is attached as Appendix E.
[307] Exhibit E (UCSF School of Pharmacy, Evidence-Based Safety Review of Oleoresin Capsicum (Pepper Spray) Exposure in Humans, at 3).

Exhibit 2
Page 93

medical care may occur in 1% to 15% of exposures to [oleoresin capsicum] products."[308]  Severe events can include corneal epithelial defects, pulmonary effects such as asthmatic responses, and cardiovascular effects such as hypertension and tachycardia.[309]  Data from the California Poison Control System established that 6.4% of reported pepper spray cases produced "moderate or more significant symptoms suggestive of tissue injury that warranted a medical evaluation."[310]  The most common health effects included dermal burns or blisters, symptoms suggestive of bronchiospasms, and symptoms suggestive of possible corneal abrasion.[311]  The School of Pharmacy, however, noted that these data may be subject to reporting bias because reports to the poison center are voluntary.[312]

Other studies have examined the efficacy and safety of various other less lethal weapons, using a more comparative approach.  A 2008 study by the National Institute of Justice, for example, studied the "effectiveness" of various less lethal weapons by analyzing and coding five years of data from the Orange County (Florida) Sheriff's Office and the Orlando Police Department.  One of the study's conclusions was that tasers were relatively more effective at ending conflict between officers and suspects than other weapons and techniques such as chemical agents, batons, and compliance holds.[313]  It concluded that "[w]hile TASERs are not injury free (puncture wounds from dart probes, or skin burns from drive stuns), the alternative (broken bones from batons, burning pain from pepper spray, and potential death from firearm) makes them a preferential choice."[314]

A 1991 thesis at California State University, Los Angeles, compared outcomes of "conventional force" methods, such as kicking, punching, and striking with blunt objects, against the use of tasers, pepper spray, and other chemical irritants.  The author found that tasers and pepper spray were less likely to cause significant injuries than the more "conventional" force options.  The data relied on in the study are two decades old and may no longer be reliable.  But the thesis makes the point that any study of force options must consider whether displacing weapons like tasers and pepper spray with other, "conventional" force options, could have adverse consequences.[315]

---

[308] *Id.* at 13.
[309] *Id.*
[310] Exhibit E (UCSF School of Pharmacy, Adverse Health Events Associated with Pepper Spray Products: A 10 year Retrospective Review of the California Poison Control System Reported Cases, at 2).
[311] *Id.*
[312] *Id.* at 6.
[313] William Terrill *et al.*, "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes," at 88 (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf; *see generally* UCLA Assistant Police Chief Jeff Young, Operational Review of the Events of Police Actions: Sproul Hall Protests - November 9, 2011, at 33-36, *available at* http://administration.berkeley.edu/prb/UCPDOperationalReview-Redacted.pdf (discussing advantages and disadvantages of various control devices).
[314] William Terrill *et al.*, "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes," at 93 (May 2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf.
[315] *See* Greg Meyer, "Nonlethal Weapons Versus Conventional Police Tactics" (Mar. 1991) (unpublished M.S. thesis, California State University, Los Angeles).

Exhibit 2
Page 94

**(a)  Recommendation**

While the analysis performed by the UCSF School of Pharmacy contains very helpful insights into the health risks posed by pepper spray, it does not compare those risks with the effects of other weapons that might be used in place of pepper spray, such as batons and tasers.  We note also that pepper spray has not yet been the subject of an official assessment by OEHHA, the California Office of Environmental Health Hazard Assessment, despite efforts by some state legislators.  Although it is beyond the power of the University to initiate an OEHHA assessment, we think a comparative study, like that done by the National Institute of Justice, should be commissioned.  The study should include consideration of the health effects of these devices on specific populations (*e.g.*, the elderly, pregnant women, or those with asthma or cardiovascular problems).  Without information on comparative safety, we think it would be imprudent for us to offer any conclusive recommendations on whether UC police officers should continue to carry pepper spray.

Some of the comments we received on our draft report urged us to recommend a moratorium on the use of pepper spray pending the results of this comparative study.  We decline to make this recommendation.  Removing pepper spray from the tool belt of UC police officers would increase the chance that they use other control devices—such as batons—in situations calling for a use of force.  From the incomplete data we currently have, discussed above, there is reason to believe that the health risks of these alternative devices may *surpass* the risks of pepper spray.  We think the wisest course is to wait for a full and thorough comparative analysis before picking and choosing between different force options.

**Recommendation 40.**  Recommend that appropriate authorities commission further studies on the effects of pepper spray on resisters as compared to the effects of other force options.

**VII.  <u>Documenting Activity During Demonstrations</u>**

A consistent challenge in assessing police response to demonstrations is determining, after the fact, what actually transpired during the event.  Below, we review several methods of documenting events at demonstrations, and recommend several approaches for obtaining accurate, unbiased reporting.

**A.  Observers**

One method already employed on some of our campuses involves the use of neutral observers.  Advocates for observer programs argue that they provide a means independent of the police agencies to verify developments during the event, and that they promote accountability for all parties involved in a demonstration by establishing a record on which any necessary corrective actions may be based.

Exhibit 2
Page 95

### 1.   Background

Some of our campuses have in place formal or informal observer policies.[316]  At UC Berkeley, for example, the "University Observers" program relies on members of the University staff.  They wear nametags to identify themselves as observers, and are permitted access to areas where demonstrations are taking place.[317]  These observers document what they see at demonstrations and create formal reports for the Dean of Students.[318]  This program is an established feature in the policies of the UC Berkeley police department, which affirm that the department "recognizes University Observers and normally intends to allow them access to all areas of the event."  The policies add the important caveat that "[o]bservers not cooperating with police directions or interfering with operations will have their privileges withdrawn."[319]  Most UC campuses have not yet adopted a formal observer program.  Officials on these campuses caution that any policy requiring an observer program should include concrete guidelines on the role and responsibilities of observers.[320]

A number of universities outside of our system also have adopted some variation of an "observer" program.  The University of Oregon, for example, has implemented a program offering trained neutral observers at demonstration sites who are supposed to provide unbiased accounts of the event's developments and have a "calming effect" on the crowd.[321]

Additionally, outside organizations concerned with civil liberties and free expression operate observer programs that are sometimes employed during campus protests.  For example, the National Lawyers Guild (NLG) established a legal observer program in 1968 in response to campus protests at Columbia University.[322]  The ACLU also has sent observers to protests.[323]  We are not aware of any policies within our system that explicitly

---

[316] Jan. 25, 2012 Meeting with Council of Vice Chancellors for Administration (discussing prior observer programs at UC Santa Cruz and UC Berkeley).  Some campuses also have policies regarding "demonstration monitors."  Monitors are not neutral observers, but instead are individuals from within a demonstration group who are responsible for maintaining reasonable order and coordinating with campus officials during a demonstration.  At UC San Diego, the Student Conduct Code requires groups engaging in demonstrations to designate at least two monitors.  The monitors must wear an identifying mark and are responsible for maintaining order and coordinating with Student Affairs.  UC San Diego Student Regulations § 16.15.14.10, *available at* http://students.ucsd.edu/student-life/_organizations/student-conduct/regulations/16.00.html.  At UC Berkeley, the police department's crowd management policy states that officers should "[e]ncourage the group to utilize a method of 'self-monitoring.'"  UC Berkeley Police Department Crowd Management Policy, at 5, *available at* http://administration.berkeley.edu/prb/PRBCrowdPolicy.pdf.
[317] Interviews with campus Police Chiefs.
[318] *Id.*
[319] UC Berkeley Police Department Crowd Management Policy, at 8, *available at* http://administration.berkeley.edu/prb/PRBCrowdPolicy.pdf.
[320] Interviews with campus Police Chiefs.
[321] *See* University of Oregon, Neutral Observer Program, *available at* http://uodos.uoregon.edu/SupportandEducation/ConflictResolutionServices/NeutralObserverProgram/tabid/137/Default.aspx.
[322] *See* National Lawyers Guild, Legal Observer® Program, *available at* http://www.nlg.org/resources/legal-observing/.
[323] At the budget protests in Wisconsin in early 2011, for example, the ACLU organized trained neutral observers to witness the interactions between police and demonstrators.  *See* ACLU Press Release, "ACLU of WI Legal Observers Protect Right to Assemble and Speak," *available at* http://www.aclu-wi.org/News/Releases/20110218_Legal_Observer_Release_Madison.pdf.

Exhibit 2
Page 96

recognize observers from outside organizations.[324]  To the contrary, we heard some anecdotes suggesting that these unofficial observers are sometimes accorded no special status by police during an event, and are not distinguished from protesters.

### 2.  Recommendation

The presence of trained neutral observers at demonstrations provides a useful means for documenting the events that unfold, including any police response to civil disobedience.  Observers often can provide a fuller account of the event's developments than can audio or video recordings, and may offer a more objective view than the event's participants (protesters and responders alike).  Observers also promote accountability—with regard to all participants—for the benefit of the University community and the general public.

To be sure, an observer program is not without its costs in terms of staff time, training expense, and potential safety risk to observers.  Moreover, with the advent of social media and smart phones, and the reality that any important public event is videotaped on such devices from multiple angles, one might argue that the need for observers or monitors has diminished in recent years.  Still, we conclude that the University's response to demonstrations can only be improved by more transparency, greater accountability, and increased objectivity in the reporting of events surrounding a demonstration.  Accordingly, in our view, each campus should establish a formal observer program.  The program should comprise recruits from within our system, who could be drawn from the ranks of faculty, staff, and/or students.  Faculty may be particularly effective as observers, in view of their familiarity with the campuses on which they serve and their credibility with students and staff.  Some have suggested that observers from outside organizations be included as well, but we decline to endorse this suggestion, as our campuses are ill-equipped to assess the objectivity or intentions of outside groups.[325]  We do, however, believe that observer training and procedures should be made transparent in some fashion so that others can be assured that the training is appropriate to the University's mission and values, and consistent with applicable law and regulations.

In order to ensure the effectiveness of the program, official observers should be granted special status and access privileges.  For example, they should be permitted to remain in the vicinity of a protest following the issuance of dispersal orders, absent exigent circumstances.  They also should be made aware of the additional responsibilities that accompany their access privileges.  The observer program should include steps for training recruits, designated attire or badges to enable the police and protesters to readily identify those who are

---

[324] On one campus, the police department's policies state that it "does not grant blanket recognition or any special authority or privileges to 'observers' from other units or from the group sponsoring the demonstration."  UC Berkeley Police Department Crowd Management Policy at 8, *available at* http://administration.berkeley.edu/prb/PRBCrowdPolicy.pdf.  Some of our campus Police Chiefs expressed a concern that outside "legal observers" can interfere with the police response, because rather than actually acting as neutral observers, they sometimes intervene on behalf of demonstrators.
[325] Even when limiting the official observer program to members of the campus community, each campus will need to develop criteria for selecting and registering observers that do not depend on the observers' viewpoints.

Exhibit 2
Page 97

functioning as formal observers, and protections to ensure that observers remain safe during events and that they do not hinder the legitimate efforts of campus officials and police in responding to unlawful activity.

**Recommendation 41.**   Establish at each campus a formal program to allow designated, trained observers to gain access to the protest site for purposes of observing, documenting, and reporting on the event.

### B.  Video Recording Events

At many of our campuses, police create a video record when they are called upon to respond in protest situations.  However, this practice is inconsistent across campuses, and departments sometimes do not use multiple cameras in order to capture different perspectives of the events.  At the same time, some students and faculty object to the practice of videotaping demonstrations, asserting privacy concerns and fears that the practice itself and/or the resulting recordings could be used to deter speech.

### 1.  Background

Our interviews with UC Police Chiefs confirmed that most campuses follow a practice of videotaping demonstrations when a police presence at the event is deemed necessary.  The Chiefs explained that video recording creates a record of the activities of the police and of the demonstrators, and allows the police department to review its work after the fact.  On a few campuses, this practice has been adopted as a formal policy.  The UC Berkeley crowd management policy, for example, provides "[n]ormally all demonstrations or crowd situations will be videotaped to ensure complete documentation of the event.  During periods when there are actual violations, police actions[,] or other significant activities [are] occurring, there should be at least two video cameras being used."[326]  At several other campuses, police policies provide that officers should consider "us[ing] video and/or audio recording for documentation" during demonstrations.[327]

At a few of our campuses, police commanders seek to deploy two or more video cameras at significant demonstrations, in order to increase the odds that they will capture the entire scene and sequence of events.  But other police officials noted that resource constraints limit their ability to develop a complete video record.  One Chief observed that he generally does not have sufficient resources to assign sworn officers to operate video cameras.  Another said that he used his parking enforcement officers to videotape demonstrations, and only had enough resources to run one camera at a time.  A third Chief noted that videotaping may require the assignment of an officer to protect the videographer, and therefore can deplete resources required for more pressing needs.

---

[326] UC Berkeley Police Department Crowd Management Policy, at 8, *available at* http://administration.berkeley.edu/prb/PRBCrowdPolicy.pdf.
[327] *See, e.g.*, UC Irvine Police Department General Order No. 2011-06, § 1.10.

Exhibit 2
Page 98

From other parts of our community, we heard concerns that police videotaping of demonstrations may be used to intimidate protesters and to chill speech.[328]  Indeed, these concerns are so pervasive that at least one campus has adopted a policy to constrain the ability of police to videotape demonstrations.  In particular, at UC San Diego, the student conduct regulations expressly state that "the video-taping of student demonstrations should not occur unless there is probable cause to believe that participants are engaging in illegal activity or activity subject to UCSD disciplinary proceedings."  They further provide that "[n]o information shall be gathered for any other purpose and placed or maintained in police or administrative files."[329]

Outside our system, many jurisdictions have policies on videotaping and recording events, some of which aim to strike a balance between the creation of a video record and the First Amendment concerns expressed above.  For example, the City of San Francisco Police Department has adopted guidelines stating that:

> "*It is the policy of the Department to videotape and photograph in a manner that minimizes interference with people lawfully participating in First Amendment events….  The Department shall videotape or photograph only for crowd control training or evidentiary purposes.*"[330]

Similarly, the policy of the Madison, Wisconsin Police Department permits videotaping of demonstrations for the purpose of "document[ing] evidence of criminal activity for future prosecution, deter[ring] criminal behavior," and "improv[ing] departmental response to demonstrations and assemblies."[331]  Law enforcement experts have identified police videotaping of major protest events as a best practice.[332]

## 2.  Recommendation

We agree that requiring police departments to create a video record of their activities during a demonstration is a best practice.  Videos can be critical to reviewing the actions of officers and demonstrators after the fact. In particular, police should record all dispersal orders, all arrests, and any use of physical force, to the extent possible.  Police should use an appropriate number of cameras to ensure that all relevant events are captured on video.  To the extent that resource constraints are an issue, in our view, the University should re-allocate resources as necessary so that a complete record can be developed.

---

[328] *E.g.*, Jan. 6, 2012 Meeting with UC Riverside Students.
[329] UC San Diego Student Regulations § 16.11, *available at* http://students.ucsd.edu/student-life/_organizations/student-conduct/regulations/16.00.html#16.11.
[330] San Francisco Police Department General Order 8.10, § XI (June 30, 1999), *available at* http://www.aclunc.org/library/additional_info/asset_upload_file391_3284.pdf.
[331] Madison, Wisconsin Police Department Policy No. 9-100, *available at* http://www.cityofmadison.com/police/documents/PolicyandProcedureManual.pdf; Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray.  The University of Wisconsin at Madison has a similar campus policy allowing videotaping, as does the University of Nevada, Las Vegas.  Apr. 18, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling; Feb. 29, 2012 Interview with University of Nevada Las Vegas Police Department Chief Jose Elique.
[332] *See, e.g.*, Police Executive Research Forum, "Managing Major Events: Best Practices from the Field" at 39 (June 2011) *available at* http://www.policeforum.org/dotAsset/1491727.pdf.

Exhibit 2
Page 99

Some participants in our review expressed concerns about the privacy implications of videotaping public demonstrations. We do not share this concern. In this digital age, in which cell phone cameras are ubiquitous, we expect that demonstrators' actions already are the subject of numerous recordings captured by bystanders, by the news media, and by the demonstrators themselves. We expect that would-be protesters on our campuses already are aware of this phenomenon, and we have seen no evidence that their expression has been chilled. Were the University not to adopt the recommendation that we offer here, we suspect that the only parties without a recording of most protest events would be University officials.

This said, the Administration and police can and should take steps to minimize the impact of any program to videotape protest events on free speech rights and privacy. Such a program should be objective and content neutral in the choice of which events to record, should produce a reliable record of conduct by both demonstrators and the police, and should be conducted in a manner that avoids chilling speech.[333] Once created, the recordings should be used only for evidentiary or training purposes.

**Recommendation 42.** Establish a program for video recording protest events designed to develop a fair and complete record of event activity solely for evidentiary or training purposes.

### C.   Reporting By Police

The majority of our campus policies require post-event reports for protest events only when force was deployed, an arrest was made, or a misconduct complaint was filed. As a consequence, there are few official records of protest events—specifically protest events involving civil disobedience—that were resolved successfully (*i.e.*, without protester violence or police use of force), though anecdotal evidence suggests there have been many. The lack of such records makes difficult any effort to identify best practices or to train for future events.

### 1.   Background

Our campus police departments require officers to report every instance when they use force against a person, including instances involving demonstrations. In most of our departments, officers must create a written report following any use of a control device or any application of force that results in an injury. Written reports are then forwarded for review up the chain of command, with the specific reporting obligations and review procedures varying in each department based on the level of force used and the severity of the outcome.

---

[333]November 20, 2009: Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board, at 18 (June 14, 2010), *available at* http://administration.berkeley.edu/prb/6-14-10_prb-report.pdf.

Exhibit 2
Page 100

Consistent with applicable law, each campus agency also follows established processes for investigating, documenting, and responding to citizen complaints.[334]

The police departments at UC Irvine and UCLA have adopted broader reporting requirements regarding the police response to demonstrations.  They require the Incident Commander to complete an "after-action report" as soon as possible following a demonstration, regardless of whether force was used.  The report must include facts about the incident, an evaluation of training needs, and a critique of operations and procedures, among other matters.[335]  At UC Berkeley, police are required to prepare an "overall police report" after each demonstration, and to conduct a critique of their operation.[336]  Additionally, the Chief of Police at UC Berkeley typically reviews the formal reports prepared by the University Observers and filed with the office of the Dean of Students.[337]  On some campuses, the event response team convenes a post-event meeting to debrief and review the response to a demonstration after the fact.[338]

After-action reporting on the police response to demonstrations is routine at many of the other agencies with whom we spoke.[339]  Some of these agencies formally require written after-action reports, while others told us they consider the act of review indispensable but do not have a formal policy requiring it.[340]  At the California State University system, individual campuses are required to prepare an after-action briefing that must be forwarded to the system Vice Chancellor for Public Safety and Risk Management.[341]  The Police Executive Research Forum ("PERF") also recommends after-action reports for protest related events.  It highlights two particularly effective tools for conducting post-event review—a decision log, which memorializes the process of decision-making during an event, and an event file, which captures all relevant documents and correspondence pertaining to the event.[342]

---

[334] *See, e.g.,* UC San Diego Police Department Policy Manual § 1020.
[335] *See, e.g.,* UC Irvine Police Department General Order No. 2011-06, § 1.16.  A draft UC Santa Barbara policy includes the same requirement.
[336] UC Berkeley Police Department Crowd Management Policy at 11-12, *available at* http://administration.berkeley.edu/prb/PRBCrowdPolicy.pdf.  That policy also requires the Overall Commander and Senior Staff to consider whether to request reports from the university observers who attended the event.  *See id.*
[337] Interviews with campus Police Chiefs.
[338] *See, e.g.,* UC San Diego Demonstration Committee Planning Sheet; Interviews with campus Police Chiefs.
[339] Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans; Feb. 3, 2012 Interview with Madison, Wisconsin Police Department Chief Noble Wray; Feb. 1, 2012 Interview with University of Wisconsin at Madison Chief Sue Riseling.
[340] Jan. 20, 2012 Interview with the University of Pennsylvania Vice-President for Public Safety Maureen Rush (stating the department routinely does after-action reports); Jan. 25, 2012 Interview with Boston Police Department Superintendent William Evans (stating that his department does after-action reports but not a formal review process); Jan. 13, 2012 Interview with Harvard University Police Department Public Information Officer Steven Catalano (stating the Harvard Police Department does after-action reporting).
[341] Feb. 29, 2012 Interview with the California State University System Chief Law Enforcement Officer Nathan Johnson.
[342] Police Executive Research Forum, "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches," at 36 (2006).

Exhibit 2
Page 101

### 2.   Recommendation

In order to gain the most from our experience with protests, including both successes and setbacks, we recommend that our campus police prepare an after-action report each time they respond to a demonstration—even if the event does not result in the use of force by police.  We recommend that these reports describe the event and any police response, evaluate the pre-event operations plan and its subsequent implementation, and identify any additional training that may be needed.[343]  Consistent with legal limitations, such reports should be provided to the members of the campus event response team, so that the team can reflect on what worked well and what did not.  Additionally, copies of any reports prepared through the campus observer program should be forwarded to the Chief of Police and to the event response team.  Copies of these reports also should be made available to the UC Office of the President (to the Executive Vice President for Business Operations), so that the Office of the President can facilitate a centralized review of successes and challenges and share lessons-learned systemwide.

**Recommendation 43.**   Amend existing police department policies to require after-action reports for all protest events involving a police response, regardless of whether the response resulted in force, injury, or civilian complaint.

**Recommendation 44.**   Coordinate review of after-action reports on a periodic basis with campus event response teams, and with the Office of the President.

### VIII. Post-Event Review

Perhaps no subject during our study generated as much passion as post-event review of administration and police responses to protest events.  Many in our community hold firm convictions that campus police, in particular, should be subject to scrutiny by some form of civilian review body—an authority external to the campus police agencies.  Advocates for civilian review asserted that the very process of external review enhances transparency and establishes a basis for holding police accountable to the community they serve.  Detractors question the fairness and efficacy of such reviews, which they claim inevitably lead to out-of-the-moment "second-guessing" of professional judgments by untrained laypeople.  While we see merit in both perspectives, ultimately we conclude that an additional avenue for independent review beyond existing campus policies should be established.  The form of that review is the focus of the discussion below.

---

[343] Of course, the thoroughness of the report should be tailored to the significance of the event.  In some circumstances, for example, police may merely watch a small group of protesters from a distance, and then walk away after ascertaining that there is no unlawful behavior or threat to campus activities.  In that scenario, we would expect that the report would be no longer than a few sentences.  But the reporting requirement is still important even in this context, because it allows for the collection of data about both successful and unsuccessful police responses to protests.

Exhibit 2
Page 102

### 1. Background

All of our campus police departments maintain internal programs for reviewing the use of force by their officers. On occasion, and particularly in the past few years, campus leadership has supplemented these programs through the appointment of *ad hoc* committees to review police responses to specific events.  To date, only the Berkeley campus has established a standing committee, consisting of an independent citizen review board, to review police actions.  The UC Berkeley Police Review Board consists of eight members appointed by the Vice Chancellor of Administration: two students, two faculty members, one University staff member, one retired police officer, one member of the local community, and a chair with a "judicial temperament and background."[344] The Board reviews the outcome of civilian complaint investigations by campus police, on appeal by an aggrieved party, and conducts investigations at the direction of the Vice Chancellor for Administration.[345]  In appropriate cases, the Board also has authority to conduct an independent investigation on its own initiative, and to audit the department's policies and practices.[346]  After the Review Board conducts its review and holds any necessary hearings, the findings of the Board are forwarded to the Chief of Police for appropriate action.[347]

The civilian review board model is a popular concept among many students and faculty on our campuses. Student leaders on several campuses voiced the concern that existing review processes within the police departments do little, if anything, to promote transparency and accountability.  They favored the creation of civilian review boards, with the power to review *any* cases involving force by police in response to protest activity, and not simply appeals from the departmental complaint process.[348]  Many faculty representatives, as well as the American Civil Liberties Union of Northern California, similarly supported civilian review boards.[349] The ACLU asserts that civilian review boards should be authorized to conduct initial investigations, and not simply appeals, regarding use of force by police; that they should be empowered to issue conclusive findings; and that they should be assigned dedicated staff to complete their work.[350]  One campus Police Chief told us that civilian review boards would provide helpful oversight.

But many other participants in our review pointed to substantial drawbacks in the civilian review board model. As an initial matter, civilian review boards generally have limited access to material information.  In most cases, the Boards lack the authority to compel testimony from witnesses or the production of key documents.  Access to information is further constrained by laws such as the California's Public Safety Officers Procedural Bill of Rights Act (POBR), and sections of the California Penal Code.  These laws have been held to require that certain information about police officers be kept in confidence and withheld from external reviewing entities, such as civilian review boards.  Among the information subject to these protections in many cases are

---

[344] UC Berkeley Police Review Board Procedures § I(3)(a), *available at* http://administration.berkeley.edu/prb/PoliceReview.htm.
[345] *Id.* § VII(2).
[346] *Id.* § II(1)(e).
[347] *Id.* § V(14).
[348] Jan. 24, 2012 Meeting with Student Government Leaders.
[349] Jan. 11, 2012 Meeting with UC Berkeley Faculty.
[350] *See* Feb. 10, 2012 Letter to Dean Edley and Charles Robinson from the ACLU of Northern California.

Exhibit 2
Page 103

complaints and investigations of complaints about police officers with regard to the performance of their duties. As a consequence of these protections, civilian review boards must rely on voluntary cooperation by the targets of their investigation in order to conduct a meaningful review. Even when such cooperation is secured, the foregoing laws may limit the information that the boards may disclose regarding their findings and conclusions. The challenges posed by these laws were highlighted in March of this year, when a police labor union sought and obtained court orders enjoining the University and a University-appointed Task Force from releasing a full version of a report concerning the November 18, 2011 protest event at the Davis campus.[351]

Apart from difficulties in accessing information, many Police Chiefs, administrators, and some faculty members, expressed a concern that establishing standing civilian review boards would be inefficient. Several of our campus Police Chiefs told us that civilian review boards would duplicate review programs already in place and functioning well within the police agencies and the campus Administrations. Others stated that no single campus generates sufficient numbers of use-of-force incidents in a given time period to warrant establishing a standing board. Administrators and some faculty members voiced a preference for maintaining the status quo, and leaving it to the Chancellor to appoint *ad hoc* review committees when circumstances warrant such action.[352]

Further still, some experts on policing argue that civilian review boards frequently lack the training and experience necessary to evaluate police actions in complex and dynamic situations.[353] Most experts acknowledge that civilian review boards carry credibility with the public because of their independence and diversity.[354] Nonetheless, lack of expertise, combined with limited access to information, led many experts to conclude that civilian review boards are ineffective in performing meaningful review and that there is a risk that boards will set expectations that cannot be met.[355]

Our review revealed an alternative approach for external review: the so-called "auditor" model.[356] Auditor review is conducted by an individual who is employed outside of the police department but within the civilian Administration overseeing the department. The auditor generally has a background or training in police practices and is responsible for reviewing the police department's investigation into use-of-force incidents and for issuing an independent report.[357] Because auditors are employed within the administrations to which the

---

[351] *See, e.g.*, Mary L. Vellinga, "Hearing this week on UC Davis pepper-spray report's delay," SACRAMENTO BEE, Mar. 12, 2012, at 1B, *available at* http://www.sacbee.com/2012/03/12/4329461/hearing-this-week-on-uc-davis.html.
[352] Jan. 15, 2012 Meeting with Vice Chancellors for Administration; Feb. 27, 2012 Meeting with Chair and Vice Chair of Academic Freedom Committee.
[353] Interview with CALEA Executive Director Sylvester Daughtry.
[354] Feb. 6, 2012 Interview with Police Assessment Resource Center President Merrick Bobb; Jan. 18, 2012 Interview with Professor Emeritus Samuel Walker.
[355] Jan. 18, 2012 Interview with Professor Emeritus Samuel Walker; Feb. 6, 2012 Interview with Police Assessment Resource Center President Merrick Bobb; Jan. 30, 2012 Interview with Los Angeles County Office of Independent Review Chief Attorney Michael Gennaco; Jan. 20, 2012 Interview with the University of Pennsylvania Vice-President for Public Safety Maureen Rush.
[356] In our research we found that some use the term "auditor" and some use the term "monitor," but there was not uniform agreement as to the distinctions between the two. We therefore use the term "auditor" to mean both "auditor" and "monitor."
[357] U.S. Department of Justice, National Institute of Justice Issues & Practices, Citizen Review of Police, Approaches & Implementation, at 62-64 (2001).

Exhibit 2
Page 104

police report, they are not subject to the same legal constraints on access to information that challenge civilian review boards.  Several of the experts we consulted view the auditor model as a more effective approach, because auditors are external to the police department but can gain access to the necessary internal information.[358]

**2.   Recommendation**

Meaningful and transparent review of the response to civil disobedience promotes accountability and enhances the credibility of campus and police leadership within the University community, and beyond.  But there is considerable debate over how that review should be conducted.  The debate is waged on several fronts: whether the review body should be employed or established within or outside the campus Administration; whether the review body should consist of a single individual or a larger group; whether it should be charged with reviewing all cases (*i.e.*, review of right) or only those it deems worthy of review (*i.e.*, discretionary review); and whether it should be established on each campus, regionally, or system-wide.

We have considered each of these difficult questions, as well as the concerns voiced by various members of our community.  As a threshold matter, we conclude that the status quo, under which independent review is generally triggered only when a Chancellor deems it appropriate and appoints an *ad hoc* panel, offers insufficient relief to potential grievants.[359]  Recent protest events have shaken the confidence of the University community and the general public in our commitment to responsible discourse and our tolerance for dissent.  We believe that an established independent process for reviewing campus response to protest activity and civil disobedience is an essential precursor to regaining that confidence.

We submit that this formal review process must include several basic elements.  The reviewing body must have real authority, including the power to make findings and issue recommendations.  It must have access to information—consistent with any applicable legal restrictions—including the details of the Administration's actions in response to demonstrations and the conduct of individual police officers.  Its review must be timely, so that when remedial steps are necessary, they are carried out swiftly.  The reviewing body must be independent of both the police and the administrators who made decisions regarding the protest response and/or who are ultimately accountable for those decisions.  Finally, there must be transparency—to the extent permitted by law, our community deserves to know the findings and recommendations that result from the review process.

In order to accomplish these objectives, we make the following recommendations. *First*, we believe that the reviewing body should be housed within the University but outside the Administration and police department on

---

[358] Jan. 18, 2012 Interview with Professor Emeritus Samuel Walker; Jan. 30, 2012 Interview with Los Angeles County Office of Independent Review Chief Attorney Michael Gennaco; *see also* S. Walker, *Police Accountability: The Role of Citizen Oversight* (2001).

[359] The Berkeley campus represents the one exception to this observation, but its process lacks other features we deem essential to effective review.

Exhibit 2
Page 105

the campus in question.  We have considered closely the model of an external civilian review board, favored by many of the people we consulted, including the ACLU.  In view of the considerable concerns raised by experts about the efficacy of civilian review boards, and the state law constraints on their access to relevant information, we conclude that civilian review boards are not the best solution.  We think that the "auditor" model offers a better fit for our University, as it allows for an objective review by a party sufficiently associated with the University to gain access to critical information, but also sufficiently removed from the event decision makers to ensure independence.[360]  While the access to information may come at a cost—potential limits on the publication of review outcomes—we expect that significant information will still be disclosed, based on a more meaningful process than otherwise would be possible under alternative approaches.

*Second*, we believe the review should be conducted by an individual, rather than a board or committee.  This approach will conserve resources and allow for more timely review and earlier implementation of corrective actions.  It also allows the individual to gain experience and knowledge, so that he or she can more effectively examine our internal police procedures.  To the extent the reviewer requires assistance or access to expertise on a particular subject, he or she may call upon existing resources within the University or contract with outside consultants.

*Third*, we believe the reviewer should have the authority to consider or reject requests for review, and to initiate reviews without a request.  As many students and police advised us, the vast majority of protests and civil disobedience incidents do *not* result in the use of force by protesters or by the police.  We think it would be unnecessary and overly burdensome to require a mandatory review of all such incidents.  In many instances, the existing campus review processes are sufficient.  The reviewer should be in a position to focus his or her efforts on significant events and matters where there are reasons to question the efficacy or outcomes of the campus process.  We believe that the auditor should also consider periodic audits of the internal police reviews at each campus, including audits that are not responsive to particular protest incidents but are instead intended to be proactive and preventive in nature.  There are existing protocols that could be followed to reinforce accountability and prevent future incidents.[361]

*Fourth*, we believe that there should be a single, systemwide reviewer, instead of separate reviewers located on each campus.  In part, this recommendation is borne out of a desire for administrative accountability.  As this Report urges, Chancellors and other senior administrators should be deeply involved in the campus response to civil disobedience.  In order for the review of their actions to carry any credibility, the reviewer must be removed from the campus chain of command.  Moreover, establishing a single, systemwide reviewer will promote consistency in the review process and facilitate the application of best practices in event response across the system.  In order to conserve resources and assess demand, this centralized review function might

---

[360] Although the auditor would be independent from campus officials, he or she would serve at the direction and at the pleasure of the President of the University.
[361] Apr. 12, 2012 Interview with Professor Samuel Walker.

Exhibit 2
Page 106

be joined initially to an existing function within the Office of the President, such as to the office of the "Locally Designated Official."

*Fifth,* we believe that the auditor should release public reports summarizing what was reviewed and what the results were, consistent with legal limitations.  There is value to the transparency and accountability that comes with letting the public know what the auditor did, which incidents he or she reviewed, and whether the results were acceptable.[362]  Being accountable to the public, even with the restrictions imposed by POBR and other laws, is vital.

To be clear, none of these recommendations are intended to supplant existing mechanisms for post-event review at the campus level, including the existing discipline or investigative functions that are internal to our campus police departments, or to discourage campuses from conducting their own reviews in the future of the campus response to demonstrations.  Our intent is that the proposed centralized review will complement existing processes on the campuses and provide an additional safeguard for persons engaging in activity central to the University's mission and history.

**Recommendation 45.**  Establish a structure and process at the system level for discretionary review of campus responses to protest activity, consistent with existing legal limitations.

**IX.  Implementation**

A substantial number of our review participants expressed concern that the recommendations in this Report would be "placed on a shelf" and forgotten.  Justified or not, there is widespread perception that prior reviews following similar protests gone awry have produced few tangible changes.  In order to honor the contributions made by participants to this study and to avoid a serious loss of credibility, the University must put into place mechanisms to ensure that those recommendations from this Report accepted by the President are timely implemented.

**1.  Background**

As noted above, prior outcries over protest events have produced several thorough reviews and detailed recommendations.[363]  Perception is widespread, particularly among students and faculty, that many of the recommendations proffered in these reviews have never been implemented.  As one faculty member asserted during a town hall meeting, "the Brazil Report [on the occupation of Berkeley's Wheeler Hall] was thorough and

---

[362] *Id.*
[363] *See* November 20, 2009, Review, Reflection & Recommendations, Report by the UC Berkeley Police Review Board (June 14, 2010), *available at* http://administration.berkeley.edu/prb/6-14-10_prb-report.pdf; November 2009 UC Regents Meeting: Post-Event Review Report (Nov. 22, 2010), *available at* http://newsroom.ucla.edu/portal/ucla/document/Regents_Nov_2009_Meeting_Post_Event_Report.pdf.

Exhibit 2
Page 107

well written—and we still haven't seen a response from the Administration."[364]  A similar sentiment is reflected in a recent resolution adopted by the Berkeley Faculty Senate.[365]  Administrators dispute these claims, citing corrective actions adopted following release of the Brazil Report, the "November 2009 UC Regents Meeting: Post-Event Review Report" commissioned by UCLA,[366] and other similar reports.[367]

## 2.  Recommendation

We are sensitive to the concerns of those who fear that this Report will not result in meaningful changes in policy.  We doubt anyone is more determined than we are to ensure that this project spurs substantial improvements.

The recommendations in this Report necessarily are presented at a high level.  In some areas, such as the development of a response option framework and the standardization of weapons authorization, the details of our recommendations must be developed by others with expertise in law enforcement, the medical sciences, public health, and other disciplines.  In other areas, implementing the recommendations made here will require adopting new policies through the normal University policy-making processes, which provide opportunities for student, faculty, and staff input.  In short, more work must be done to carry these recommendations to fruition.  To ensure that work is completed, we recommend that the President immediately create the temporary position of Systemwide Implementation Manager to propose specific policy language in those areas where recommendations call for common or systemwide policies or practices, and to assist the President and his principal lieutenants in moving these measures through the normal policymaking channels.  Depending on available resources, this temporary position could be filled by an existing employee or a new employee.  During the implementation, the President should consider whether there is a need for a permanent position to help coordinate and implement police policy on a systemwide basis going forward.[368]

We further recommend that the University adopt a formal mechanism to ensure that each campus implements the recommendations ultimately adopted by the President.  Within six months following the President's acceptance of any recommendations in this Report, each Chancellor should be required to submit a status report directly to the President describing the progress made towards implementing the recommendations at his or her campus.  These reports should include a detailed estimate of the fiscal costs of implementing the recommendations, such as increased costs for training and equipment.  Within one year following the President's acceptance of any recommendations in this Report, each Chancellor should be required to submit a

---

[364] Jan. 31, 2012 UC Berkeley Town Hall Meeting.
[365] (Revised) Resolution Proposed by Professors Barsky and Simon, *available at* http://academic-senate.berkeley.edu/sites/default/files/committees/division/meetings/resolution_b-barskysimon-rev-for_web_4.pdf.
[366] *See* November 2009 UC Regents Meeting: Post-Event Review Report (Nov. 22, 2010), *available at* http://newsroom.ucla.edu/portal/ucla/document/Regents_Nov_2009_Meeting_Post_Event_Report.pdf.
[367] Feb. 13, 2012 Council of Chancellors Meeting; Feb. 13, 2002 Meeting with UC Berkeley Student Affairs Administrators; Meetings with Campus Counsel.
[368] The Kroll Report recommended creation of such a position, though the Reynoso Task Force did not adopt that recommendation. *See* Kroll, Report Concerning the Events at UC Davis on November 18, 2011, at 129, *available at* http://reynosoreport.ucdavis.edu/reynoso-report.pdf.

Exhibit 2
Page 108

final report describing how his or her campus has implemented the recommendations, along with a certification that all of the recommendations have been implemented.

As we noted above,[369] this Report has addressed activity that potentially has a large impact on university functions.  The Report is not intended to cover all possible instances in which students or others exercise their First Amendment rights or choose to engage in civil disobedience, and we recognize that some recommendations would not apply to small, non-violent, and peaceful protests.  We expect that the implementation of these recommendations at the campus level will bear this distinction in mind.

Going forward, we also must ensure that future recommendations arising out of the post-event review process described above are implemented.  We think a similar reporting and certification process should be adopted to accomplish this objective.

**Recommendation 46.**  Establish a systemwide Implementation Manager to develop specific policy language in those areas where recommendations call for common or system policies or practices, and to track campus-level measures.

**Recommendation 47.**  Require status reports from each campus six months following the President's acceptance of this Report's recommendations concerning progress on implementation of the recommendations.

**Recommendation 48.**  Require a final report and certification from each Chancellor one year following the President's acceptance of this Report's recommendations confirming that all recommendations so accepted have been implemented.

**Recommendation 49.**  Establish similar reporting and certification requirements for future recommendations arising out of the event review process described above.

---

[369] *See supra* at pages 6-7.

Exhibit 2
Page 109

# Appendix A – Recommendations

**Recommendation 1.**   Add to current campus "Free Speech" and police policies language formally recognizing that civil disobedience has had a historic role in our democracy, but that it is not protected speech under the Constitution, and that it may have consequences for those engaging in it. ............................................... 21

**Recommendation 2.**   Increase and better publicize opportunities for students, faculty, staff, and others to engage with senior administrators, particularly on issues likely to trigger protest or civil disobedience events. ................................................. 23

**Recommendation 3.**   Discuss with the Regents the possibility of increasing opportunities for students and other campus constituencies to address concerns directly with the Regents at times other than during the public comment period at formal meetings. ........ 23

**Recommendation 4.**   Collect each campus's current time, place, and manner regulations and all policies governing the response to events of civil disobedience, including applicable systemwide and campus police policies; post collected policies on system and campus websites. .......................................................................... 27

**Recommendation 5.**   Create user-friendly summaries of each campus's time, place, and manner regulations and policies governing the response to events of civil disobedience, and distribute the summaries at least annually during student orientations; highlight in the summaries descriptions of conduct that is or could be perceived as threatening to safety and thus might trigger a police response. .................... 27

**Recommendation 6.**   Increase opportunities for routine interaction between police and students and between the police and key administrators (especially the Police Chief and the Chancellor). ........................................................................................................ 27

**Recommendation 7.**   Establish a standing event response team on each campus to plan and oversee the campus response to demonstrations—include on the team faculty members and/or administrators recognized by students and faculty to be sensitive to the University's academic mission and values. ......................................................... 40

**Recommendation 8.**   To the extent necessary, modify police policies to require the participation of senior administrators in decision-making about any police response to civil disobedience—clearly define the respective roles of administrators (objectives) and police (tactics) in this process. ................................................................... 40

**Recommendation 9.**   Develop principles to guide the event response team in determining whether particular acts of civil disobedience merit a response—when a response is necessary, specify use of lower levels of force (*e.g.*, persuasion, hands-on compliance), before resorting to higher levels of force (*e.g.*, baton strikes or jabs, pepper spray), barring exigent circumstances. .................................................. 40

**Recommendation 10.**   When faced with protesters who are non-aggressively linking arms, and when the event response team has determined that a physical response is required, principles should specify that administrators should authorize the police to use hands-on pain compliance techniques rather than higher levels of force (*e.g.*, baton strikes or jabs, pepper spray), unless the situation renders pain compliance unsafe or unreasonable. ................................................................................... 40

Exhibit 2
Page 110

---

**Recommendation 11.**     Place an administrator on-site within viewing distance of the event and with instant communication to the police Incident Commander and to the Chancellor or to the individual to whom the Chancellor has delegated decision-making responsibility. ................................................................................................... 40

**Recommendation 12.**     During the course of an event, continuously re-assess objectives, and the wisdom of pursuing them, in light of necessary police tactics—seek to pursue only important goals with the minimum force necessary. ................................... 40

**Recommendation 13.**     Absent exigent circumstances, bar commencement or escalation of force by police unless the Chancellor or the Chancellor's designee approves it immediately before the action is taken.  If the Chancellor designates decision-making responsibility, the Chancellor's designee must (Edley) or may (Robinson) be a member of the Academic Senate. .............................................................. 40

**Recommendation 14.**     Coordinate in advance of planned demonstrations with other police departments likely to provide assistance. .................................................................. 45

**Recommendation 15.**     Require each campus police agency to seek aid first from other UC campuses before calling on outside law enforcement agencies, except where there is good cause for seeking aid from an outside agency. .................................................. 45

**Recommendation 16.**     Obtain input from members of the campus community (*e.g.*, students, faculty, staff) in the process for hiring campus police officers and promoting or hiring officers for command-level positions within the department. .............................. 48

**Recommendation 17.**     Require the Chief of Police on each campus personally to interview and approve all newly hired sworn officers. ................................................................ 48

**Recommendation 18.**     Review UC police compensation practices to ensure that compensation is sufficiently competitive to attract and retain highly qualified officers and police leaders. .......................................................................................................... 48

**Recommendation 19.**     Increase training of campus police officers in the areas of crowd management, mediation, and de-escalation of volatile crowd situations. .................................. 52

**Recommendation 20.**     Create specialized response teams with additional training in crowd management, mediation, and de-escalation techniques at the systemwide level. ............................................................................................................................ 52

**Recommendation 21.**     Establish a regular program for joint trainings, briefings, and scenario planning with law enforcement agencies on which each campus police department is likely to call for assistance or mutual aid. ................................................................. 52

**Recommendation 22.**     Implement formal training of administrators, at the system and campus levels, in the areas of crowd management, mediation, de-escalation techniques, the Incident Command System, and police force options, to be refreshed annually. ........................................................................................................... 54

**Recommendation 23.**     Conduct simulations jointly with campus administrators and campus police to rehearse responses to civil disobedience scenarios. ......................................... 54

**Recommendation 24.**     Make every reasonable attempt to identify and contact members of the demonstration group—preferably one or more group leaders—in advance of the demonstration to establish lines for communication. .................................... 57

Exhibit 2
Page 111

**Recommendation 25.**    Inform protesters, in advance of the event, of the availability of alternative avenues for communication of their concerns or proposals. .............................. 57

**Recommendation 26.**    Pursue a dialogue between Administration officials and the demonstration group about protest objectives and applicable rules for campus protest. ..................... 57

**Recommendation 27.**    Absent special circumstances, assign administrators or faculty members, rather than police, to serve as the primary University representative communicating with protesters during a demonstration. ........................................................................ 60

**Recommendation 28.**    Establish senior administrators as a visible presence during protests, absent good cause. ........................................................................................................... 60

**Recommendation 29.**    Make every reasonable attempt to establish a communication link with identified leaders or sponsors of the event—for leaderless groups, communicate broadly to the group as a whole (through social media and otherwise) until relationships form........................................................................................................................ 60

**Recommendation 30.**    To the extent not already available, establish a communication mechanism for promptly informing the campus community at large about material developments in ongoing protests, for use when appropriate.................................................... 61

**Recommendation 31.**    Establish an internal mediation function at the campus or regional level to assist in resolving issues likely to trigger protests or civil disobedience. ...................... 63

**Recommendation 32.**    Consider deploying this mediation function as an alternative to force, before and during a protest event. ....................................................................................... 63

**Recommendation 33.**    Where possible, police should pursue tactics designed to diffuse tensions and avoid tactics likely to increase tensions. ............................................................. 65

**Recommendation 34.**    Develop or modify existing student discipline processes to ensure that, in appropriate circumstances, they are an available response option.................... 68

**Recommendation 35.**    Establish and implement a systemwide response option framework for use on each campus.......................................................................................................... 81

**Recommendation 36.**    Require that campus police and other authorities (to the extent controlled by the University) act in accordance with the response option framework, absent exigency or good cause. ......................................................................................... 81

**Recommendation 37.**    Develop a systemwide process for determining which "less lethal" weapons may be utilized by UC police officers........................................................................ 84

**Recommendation 38.**    Require each campus Police Chief personally to approve the specific types of less lethal weapons available to officers in their department.............................. 84

**Recommendation 39.**    Require each campus police department to include the list of weapons approved for use in response to demonstrations and civil disobedience in its use-of-force policies, and to make the list available to the public. .......................................... 84

**Recommendation 40.**    Recommend that appropriate authorities commission further studies on the effects of pepper spray on resisters as compared to the effects of other force options. ............................................................................................................... 86

Exhibit 2
Page 112

**Recommendation 41.**  Establish at each campus a formal program to allow designated, trained observers to gain access to the protest site for purposes of observing, documenting, and reporting on the event. ......................................................... 89

**Recommendation 42.**  Establish a program for video recording protest events designed to develop a fair and complete record of event activity solely for evidentiary or training purposes. ...................................................................................... 91

**Recommendation 43.**  Amend existing police department policies to require after-action reports for all protest events involving a police response, regardless of whether the response resulted in force, injury, or civilian complaint. ...................................................... 93

**Recommendation 44.**  Coordinate review of after-action reports on a periodic basis with campus event response teams, and with the Office of the President ........................................ 93

**Recommendation 45.**  Establish a structure and process at the system level for discretionary review of campus responses to protest activity, consistent with existing legal limitations.  98

**Recommendation 46.**  Establish a systemwide Implementation Manager to develop specific policy language in those areas where recommendations call for common or system policies or practices, and to track campus-level measures. ............................. 100

**Recommendation 47.**  Require status reports from each campus six months following the President's acceptance of this Report's recommendations concerning progress on implementation of the recommendations. .......................................................... 100

**Recommendation 48.**  Require a final report and certification from each Chancellor one year following the President's acceptance of this Report's recommendations confirming that all recommendations so accepted have been implemented. ................................ 100

**Recommendation 49.**  Establish similar reporting and certification requirements for future recommendations arising out of the event review process described above. .. 100

Exhibit 2
Page 113

# Appendix B – Internal University of California Interviews

**December 12, 2011**          **Meeting with UC Student Regents**

Alfredo Mireles Jr., Student Regent
Jonathan Stein, Student Regent-designate

**January 5, 2012**          **Meeting with Timothy P. White, Chancellor, UC Riverside**

**January 6, 2012**          **Meeting with UC Riverside Student Leaders**

Nine undergraduate students.

**January 6, 2012**          **Meeting with UC Riverside Faculty Leaders**

Mary Gauvain, Chair, Academic Senate
Ameae Walker, Vice-Chair, Academic Senate
Dan Hare, Vice Chair, Committee on Faculty Welfare
Thomas Morton, Chair, Academic Freedom Committee
Martin Johnson, Chair, Committee on Educational Policy (CEP)
Jose Wudka, Chair, System-wide Committee on Educational Policy (CEP)

**January 6, 2012**          **Meeting with UC Riverside Administrators**

Dallas L. Rabenstein, Executive Vice Chancellor and Provost
Gretchen Bolar, Vice Chancellor Finance and Business Operations
James Sandoval, Vice Chancellor for Student Affairs

**January 10, 2012**          **Meeting with Risk Management Leadership Group**

Bruce G. Flynn, Chair, San Francisco
Brian Oatman, ANR
Jake McGuire, ANR
Andy Goldblatt, Berkeley
Eric Kvigne, Davis
Anna Orlowski, Davis Medical Center
Kathleen Rowe, Davis Medical Center
Rick Coulon, Irvine
Nancy Hove, Irvine Medical Center
Dean Malilay, Los Angeles
Johanna Klohn, Los Angeles Medical Center
Carol Castillo, Merced
Grace Crickette, Office of the President
Cheryl Lloyd, Office of the President
Terri Kielhorn, Office of the President

Exhibit 2
Page 114

Gary Leonard, Office of the President
Karen Vecchi, Office of the President
Kevin Confetti, Office of the President
Erike Young, Office of the President
Norm Hamill, Office of the President
Shaudreya Waterman, Office of the President
Nida Niravanh, Riverside
Pam Lombardo, Santa Barbara
Saladin Sale, Santa Cruz
Jon Schmidt, San Diego
Alexandra Borrego, San Diego Medical Center
Patricia Kicak, San Diego Medical Center
Hillary Ross, San Francisco
Andy Brunner, San Francisco
Susan Penney, San Francisco Medical Center

**January 11, 2012**          **Meeting with UC Berkeley Administrators**

Robert J. Birgeneau, Chancellor
George W. Breslauer, Executive Vice Chancellor & Provost
Christopher M. Patti, Chief Counsel
John Wilton, Executive Vice Chancellor for Administration and Finance

**January 11, 2012**          **Meeting with UC Berkeley Faculty**

Ten members of UC Berkeley faculty

**January 17, 2012**          **Meeting with Academic Senate**

Robert Anderson, Chair
Robert L. Powell, Vice Chair
Martha Kendall Winnacker, Executive Director, Academic Senate

**January 23, 2012**          **Meeting with UC Berkeley Student Leaders**

Jonathan Stein, UC Student Regent-designate
15 additional student campus leaders

**January 24, 2012**          **Meeting with Council of Student Body Presidents and Student Association**

Student Campus Leaders
Judy Sakaki, Vice President-Student Affairs, Office of the President
Jerlena Griffin-Desta, Associate Director Student Affairs,
      Office of the President

106

Exhibit 2
Page 115

| | |
|---|---|
| **January 25, 2012** | **Meeting with Academic Council and Faculty Groups** |

Robert Anderson, Chair, Academic Senate
Robert L. Powell, Vice Chair, Academic Senate
Robert Jacobsen, Berkeley Divisional Chair
Linda F. Bisson, Davis Divisional Chair
Craig Martens, Irvine Divisional Chair
Andrew Leuchter, Los Angeles Divisional Chair
Susan D. Amussen, Merced Divisional Chair
Mary Gauvain, Riverside Divisional Chair
Joel Sobel, San Diego Divisional Chair
Farid Chehab, San Francisco Divisional Vice Chair
Henning Bohn, Santa Barbara Divisional Chair
Susan Gillman, Santa Cruz Divisional Chair
William Jacob, Chair, Board of Admissions and Relations
    with Schools (BOARS)
Rachael Goodhue, Chair, Coordinating Committee
    on Graduate Affairs (CCGA)
Margaret W. Conkey, Chair, University Committee
    on Affirmative Action & Diversity (UCAAD)
Katja Lindenberg, Chair, University Committee
    on Academic Personnel (UCAP)
Jose Wudka, Chair, University Committee on Educational Policy (UCEP)
William Parker, Chair, University Committee on Faculty Welfare (UCFW)
John Crawford, Chair, University Committee on Research Policy (UCORP)
James Chalfant, Chair, University Committee on Planning
    and Budget (UCPB)
Martha Winnacker, Executive Director, Office of the President
Todd Giedt, Associate Director, Office of the President
Clare Sheridan, Committee Analyst, Office of the President

| | |
|---|---|
| **January 25, 2012** | **Meeting with Vice Chancellors for Student Affairs** |

Harry Le Grande, Berkeley
Lora Jo Bossio, Davis
Thomas Parham, Irvine
Jane Lawrence, Merced
James Sandoval, Riverside
Penny Rue, San Diego
Joseph Castro, San Francisco
Michael Young, Santa Barbara
Alma Sifuentes, Santa Cruz
Janina Montero, Los Angeles
Judy Sakaki, Vice President-Student Affairs, Office of the President
Jerlena Griffin-Desta, Associate Director Student Affairs,
    Office of the  President

Exhibit 2
Page 116

---

**January 25, 2012**                    **Meeting with Council of Vice Chancellors for Administration**

John Wilton, Berkeley
Ed Denton, Berkeley
Wendell Brase, Irvine
Jack Powazek, Los Angeles
Jim Genes, Merced
Georgianne Carlson, Assistant Vice Chancellor, Riverside
Steve Relyea, San Diego
Gary Matthews, San Diego
John Plotts , San Francisco
Marc Fisher, Senior Associate Vice Chancellor, Santa Barbara
Ron Cortez, Associate Vice Chancellor, Santa Barbara
Nathan Brostrom, Executive Vice President, UCOP
Peter J. Taylor, Executive Vice President and Chief Financial Officer, UCOP
Dwaine Duckett, Vice President, UCOP
Patrick Lenz, Vice President, UCOP
Debora Obley, Associate Vice President, UCOP
Michael Reese, Associate Vice President, UCOP
Kay Harrison Taber, Associate Vice President, UCOP
Kobie Crowder, Associate Director, UCOP


**January 26, 2012**                    **Meeting with Council of Executive Vice Chancellors**

George Breslauer, Berkeley
Ralph Hexter, Davis
Marie Carter-Dubois, Assistant EVC, Davis
Michael Gottfredson, Irvine
Keith Alley, Merced
Scott Waugh, Los Angeles
Dallas Rabenstein, Riverside
Barbara Sawrey Associate VC, San Diego
Jeffrey Bluestone, San Francisco
Gene Lucas, Santa Barbara
Alison Galloway, Santa Cruz
Lawrence Pitts, Provost and Executive Vice President, UCOP
Susan Carlson, Vice Provost, UCOP
Dwaine Duckett, Vice President, UCOP
Judy Sakaki, Vice President-Student Affairs, UCOP
Patrick Lenz, Vice President, UCOP
Debora Obley, Associate Vice President, UCOP
Todd Greenspan, Director of Academic Planning, UCOP


**January 30, 2012**                    **Meeting with Norman Pattiz, Regent**

Exhibit 2
Page 117

| | |
|---|---|
| **January 31, 2012** | **UC Berkeley Town Hall Meeting** |
| | Approximately 75 students, faculty, and staff |

| | |
|---|---|
| **February 1, 2012** | **Meeting with Council of Chancellors** |

Mark Yudof, President
Robert J. Birgeneau, Berkeley
Linda P.B. Katehi, Davis
Michael V. Drake, Irvine
Dorothy Leland, Merced
Timothy P. White, Riverside
Marye Anne Fox, San Diego
Susan Desmond-Hellmann, San Francisco
Henry T. Yang, Santa Barbara
George Blumenthal, Santa Cruz
Nina Robinson, Interim Chief of Staff, UCOP
Lawrence Pitts, Provost and Executive Vice President, UCOP
Nathan Brostrom, Executive Vice President, UCOP
Peter Taylor, Executive Vice President and Chief Financial Officer, UCOP
Daniel M. Dooley, Senior Vice President, UCOP
John D. Stobo, M.D., Senior Vice President, UCOP

| | |
|---|---|
| **February 1, 2012** | **Meeting with Alumni Regents** |

Alan Mendelson
Ronald Rubenstein

| | |
|---|---|
| **February 2, 2012** | **Meeting with Council of Police Chiefs** |

Mitchell Celeya, Berkeley
Matthew Carmichael, Acting Chief, Davis
Paul Henisey, Irvine
James Herren, Los Angeles
Rita Spaur, Merced
Mike Lane, Riverside
Orville King, San Diego
Pamela Roskowski, San Francisco
Dustin Olson, Santa Barbara
Nader Oweis, Santa Cruz

| | |
|---|---|
| **February 3, 2012** | **Meeting with Chief Campus Counsel** |

Christopher M. Patti, Berkeley
Steven A. Drown, Davis
Diane F. Geocaris, Irvine
Jeff Blair, LBNL
Elisabeth R. Gunther, Merced
Kevin S. Reed, Los Angeles

Exhibit 2
Page 118

Patricia M. Jasper, Los Angeles
Michele C. Coyle, Riverside
Daniel Park, San Diego
Marcia J. Canning, San Francisco
Nancy G. Hamill, Santa Barbara
Carole R. Rossi, Santa Cruz

**February 3, 2012**　　　　　　**Meeting with John Lohse, Director of Investigations, UCOP**

**February 8, 2012**　　　　　　**Meeting with UC Berkeley Student Leaders**

Approximately 15 student campus leaders

**February 10, 2012**　　　　　**Meeting with UC Davis Academic Senate**

Linda Bisson, Chair
Bruno Nachtergaele, Vice Chair
Mary Christopher, Chair of Special Committee

**February 10, 2012**　　　　　**Meeting with UC Davis Academic Federation**

Daniel Wilson, Chair
　Kathleen Ward, Chair, Committee on Academic Freedom
Ana Corbacho, Chair, Committee on Affirmative Action & Diversity
Victoria Cross, Chair, Committee on Educational Affairs

**February 10, 2012**　　　　　**Meeting with UC Davis Administrators**

Linda P. B. Katehi, Chancellor
Ralph J. Hexter, Provost and Executive Vice Chancellor
Griselda Castro, Associate Vice Chancellor
Fred Wood, Vice Chancellor of Student Affairs
Steven A. Drown, Chief Campus Counsel
Anne Myler, Associate Director, Center for Student Involvement

**February 10, 2012**　　　　　**Meeting with UC Davis Student Leaders**

Five student campus leaders
Rahim Reed, Associate Vice Chancellor, Davis

**February 10, 2012**　　　　　**UC Davis Town Hall Meeting**

Approximately 60 students, faculty, staff, and community members.

**February 13, 2012**　　　　　**Meeting with UC Berkeley Student Affairs Administrators**

Harry Le Grande, Vice Chancellor of Student Affairs
Jonathan Poullard, Dean of Student Affairs

Exhibit 2
Page 119

---

| February 16, 2012 | **Meeting with Davis Student Leaders** |
|---|---|

| February 27, 2012 | **Meeting with UC Staff Representatives** |
|---|---|

Ravinder Singh, Chair, Council of University of California
    Staff Assemblies (CUCSA)
Steve Garber, Chair-Elect, Council of University of California
    Staff Assemblies (CUCSA)
Kevin Smith, Staff Advisor Designate to The Regents

| February 27, 2012 | **Meeting with University Committee on Academic Freedom** |
|---|---|

Roberta Rehm, Chair
Cameron Gundersen, Vice Chair

| February 27, 2012 | **Meeting with Chief Campus Counsel** |
|---|---|

Christopher M. Patti, Berkeley
Steven A. Drown, Davis
Elisabeth R. Gunther, Merced
Marcia J. Canning, San Francisco
Nancy G. Hamill, Santa Barbara
Carole R. Rossi, Santa Cruz
Diane Geocaris, Irvine
Kevin S. Reed, Los Angeles

| February 28, 2012 | **Meeting with UC Irvine Student Leaders** |
|---|---|

Approximately 15 student campus leaders

| February 28, 2012 | **Meeting with UC Irvine Academic Senate** |
|---|---|

Craig Martens, Chair
Mary Gilly, Chair-elect

| February 28, 2012 | **Meeting with UC Irvine Administrators** |
|---|---|

Michael Drake, Chancellor
Michael R. Gottfredson, Executive Vice Chancellor and Provost
Diane F. Geocaris, Chief Campus Counsel
Wendell Brase, Vice Chancellor, Administrative and Business Services
Thomas A. Parham, Vice Chancellor Student Affairs
Rameen Talesh, Assistant Vice Chancellor Student Affairs
Daniel Dooros, Associate Vice Chancellor Student Affairs
Edgar Dormitorio, Director of Student Conduct
Leslie Millerd Rogers, Communications Director Student Affairs
Paul Henisey, Chief of Police

Exhibit 2
Page 120

---

**February 28, 2012**                 **Meeting with Chief Campus Counsel, Southern California Campuses**

Diane F. Geocaris, Irvine
Kevin S. Reed, Los Angeles
Michelle C. Coyle, Riverside
Daniel Parks, San Diego


**February 28, 2012**                 **UC Irvine Town Hall Meeting**

Approximately 35 students, faculty, staff, and community members.


**March, 20, 2012**                   **Meeting with UC Campus Ombudspeople**

Michele Bernal, Berkeley
Sunny Lee, Berkeley
Bridget Regan, Berkeley
J. Michael Chennault, Irvine
Katherine Canul, Los Angleles
Thomas Griffin, Los Angeles
Katy Kolodziejski, Los Angeles
Tom Kosakowski, Los Angeles
Andrew Larratt-Smith, Riverside
Judith Bruner, San Diego
Nancy James, San Diego
Randy Daron, San Francisco
Kirsi Aulin, Santa Barbara
Bill Forgie, Santa Barbara
Priscilla Mori, Santa Barbara
Laurie McCann, Santa Cruz


**Individual Interviews with Campus Chiefs of Police**

Pamela Roskowski, Chief of Chiefs, San Francisco (January 4, 2012)
Mitchell Celeya, Berkeley (January 10, 2012)
Matt Carmichael, Acting Police Chief, Davis (January 11, 2012)
Paul Henisey, Irvine (January 12, 2012)
James Herren, Los Angeles (January 12, 2012)
Rita Spaur, Merced (January 26, 2012)
Mike Lane, Riverside (January 6, 2012)
John Freese, Assistant Chief of Police, Riverside (January 6, 2012)
Orville King, San Diego (January 5, 2012)
Dustin Olson, Santa Barbara (January 26, 2012)
Nader Oweis, Santa Cruz (January 17, 2012)

Exhibit 2
Page 121

---

**Additional Meetings Within Office of the President**

       Nathan Brostrom, Executive Vice President, Business Operations
       Kobie Crowder, Associate Director, Business Operations
       Daniel M. Dooley, Senior Vice President, External Relations
       Susan Fogel, Senior Paralegal Specialist, Office of the General Counsel
       Brad Hayward, Chief of Staff, External Relations
       Steve Juarez, Associate Vice President and Director,
         State Governmental Relations
       Jenny Kao, Executive Director, Issues Management,
         Policy Analysis and Coordination
       Peter King, Director, Public Affairs
       Steve Montiel, Director, Media Relations
       Kimberly Peterson, IMPAC Coordinator
       Karen Jensen Petrulakis, Deputy General Counsel,
         Office of the General Counsel
       Nina Robinson, Interim Chief of Staff, President's Executive Office
       Peter J. Taylor, Executive Vice President and Chief Financial Officer
       Lynn Tierney, Associate Vice President, Communications
       Adrienne Witte, Executive Secretary to Charles F. Robinson
       Margaret Wu, Senior Counsel, Office of the General Counsel
       Elisabeth Yap, Senior Counsel, Office of the General Counsel

**Additional Input from The Chief Justice Earl Warren Institute on Law and Social Policy, University of California, Berkeley School of Law**

       Barry Krisberg, Director of Research and Policy, and Lecturer in Residence
       Andrea Russi, Managing Director and Director of Criminal Justice
       Rebecca Sullivan Silbert, Senior Legal Policy Associate
       Eleanor Taylor-Nicholson, Legal Policy Associate

Exhibit 2
Page 122

# Appendix C – External Interviews

**Academic Experts**

| | |
|---|---|
| Anthony Braga | Ph.D., M.P.A., Senior Research Fellow, Harvard University John F. Kennedy School of Government; Professor, Rutgers University School of Criminal Justice |
| Wayne Brazil, Ph.D, J.D. | Professor from Practice, University of California, Berkeley School of Law |
| Geoffrey P. Alpert | Ph.D., Professor, University of South Carolina, Dept. of Criminology and Criminal Justice |
| Lorie Fridell, Ph.D. | Associate Professor/Graduate Director, Department of Criminology, University of South Florida, former Director of Police Executive Research Forum (PERF) |
| Herman Goldstein | Professor of Law Emeritus, University of Wisconsin Law School |
| David Sklansky, J.D. | Yosef Osheawich Professor of Law, University of California, Berkeley School of Law |
| Christopher Stone, J.D. | Professor of the Practice of Criminal Justice & Director of the Hauser Center for Nonprofit Organizations, Program in Criminal Justice Policy and Management, John F. Kennedy School of Government, Harvard |
| Jeremy Travis, J.D. | President, John Jay College of Criminal Justice, CUNY |
| Samuel Walker, Ph.D. | Professor Emeritus, Criminal Justice, University of Nebraska |

**Police Professionals**

| | |
|---|---|
| William Barry | University Director of Public Safety, CUNY |
| Diane Brown | Director, Public Affairs, University of Michigan Police Department |
| Steven Catalano | Special Assistant to Chief of Police/Public Information Officer, Harvard University Police Department |
| Jose A. Elique | Chief of Police, University of Nevada, Las Vegas |
| William Evans | Superintendent, Boston Police Department |
| Victoria Harrison | former Associate Vice Chancellor/Chief of Police, University of California, Berkeley |
| Nate Johnson | Chief of Police, California State University, Chancellor's Office |
| Susan Riseling | Chief of Police/Associate Vice Chancellor, University of Wisconsin, Madison Police Department |
| Noble Wray | Chief of Police, Madison, Wisconsin Police Department |

**Police Oversight & Review Experts**

| | |
|---|---|
| Barbara Attard | Accountability Associates, former President, National Association for Civilian Oversight of Police (NACOLE) |
| Merrick Bobb | Executive Director/President, Police Assessment Resource Center (PARC) |
| Michael Gennaco, J.D. | Chief Attorney, Office of Independent Review, Los Angeles County |
| Joyce Hicks | Executive Director, City and County of San Francisco, Office of Citizen Complaints; member National Association for Civilian Oversight of Police (NACOLE) |
| Tom Hayden | Former California Assemblyman and Senator, and Director of the Peace and Justice Resource Center |

Exhibit 2
Page 123

**Policing Experts**

| | |
|---|---|
| Sylvester Daughtry | Executive Director of the Commission on Accreditation of Law Enforcement (CALEA), former President, International Association of Chiefs of Police (ICAP), former Chief of Police, Greensboro, North Carolina |
| Gary J. Margolis, Ph.D. | Associate Professor, former Chief of Police, University of Vermont, former board member of the Commission on Accreditation of Law Enforcement (CALEA) and the International Association of Chiefs of Police (ICAP) |
| Bob Stresak | Assistant Executive Director, Commission on Peace Officer Standards and Training (POST) |
| Chuck Wexler, Ph.D. | Executive Director, Police Executive Research Forum (PERF) |

**University General Counsel and Administrators**

| | |
|---|---|
| Kelly Cunningham | Director, Public Affairs Office, University of Michigan |
| Laura Bernstein Fjeld | Vice President and General Counsel, University of North Carolina |
| William F. Howard | Senior Vice Chancellor and General Counsel, SUNY |
| G. Andrew Jones | University Counsel, California State University |
| Jamie Lewis Keith | Vice President and General Counsel, University of Florida |
| Karin L. Nyrop | Assistant Attorney General, University of Washington |
| Mark B. Rotenberg | General Counsel, University of Minnesota |
| Maureen Rush | Vice President for Public Safety, University of Pennsylvania |
| Daniel H. Sharphorn | Associate Vice Chancellor and Deputy General Counsel, University of Texas |

Exhibit 2
Page 124

# Appendix D – Literature reviewed

**A.  Academic Publications & Articles**

Alpert, Geoffrey, Michael Smith, Robert Kaminski, Lorie Fridell, John MacDonald and Bruce Kubu, "Police Use of Force, Tasers and Other Less-Lethal Weapons," National Institute of Justice, Research in Brief (2011).

Alpert, Geoffrey and Roger Dunham, "Policy and Training Recommendations Related to Police Use of CEDs: Overview of Findings From a Comprehensive National Study," Police Quarterly 13 (3) (2010) available at http://deadlyforce.com/wp-content/uploads/2010/12/CED-Summary-Police-Quart..pdf.

American Civil Liberties Union, "Pepper Spray Update: More Fatalities, More Questions," ACLU (June 2005) available at http://www.aclu-sc.org/attach/p/Pepper_Spray_New_Questions.pdf.

Ashcroft, John, Deborah J. Daniels and Sarah V. Hart, "Research for Practice: The Effectiveness and Safety of Pepper Spray," Department of Justice Office of Justice Programs, National Institute of Justice (April 2003) available at https://www.ncjrs.gov/pdffiles1/nij/195739.pdf

Bobb, Merrick, "Civilian Oversight of the Police in the United States," Saint Louis University Public Law Review 22 (1) (2003), available at http://www.parc.info/client_files/Articles/1%20-%20Civilian%20Oversight%20of%20the%20Police%20(Bobb%202003).pdf.

Bratton, Bill, "Campus Security Guidelines: Recommended Operational Policies for Local and Campus Law Enforcement Agencies," Major Cities Chiefs Association (September 2009) available at https://www.majorcitieschiefs.com/pdf/MCC_CampusSecurity.pdf.

Burns, Roland and Charles Crawford, "Predictors of the Police Use of Force: The Application of a Continuum Perspective in Phoenix," Police Quarterly 1 (41) (December 1998) available at http://pqx.sagepub.com/content/1/4/41.full.pdf.

California Commission on Peace Officer Standards and Training, "Crowd Management and Civil Disobedience Guidelines," CCOPST (March 2003) available at http://lib.post.ca.gov/Publications/CrowdMgtGuidelines.pdf.

California Emergency Management Agency, "Law Enforcement Mutual Aid Plan," CALEMA (February 2011) available at  http://www.calema.ca.gov/LawEnforcement/Pages/BlueBook%20%20Revision%20dy.2009.pdf.

Committee on Education and Assembly, Committee on Higher Education, "Joint Information Hearing: UC and CSU Policies, Procedures, and Responses, Campus Police and On-Campus Demonstrations," California Senate (December 14, 2011).

Commission on Peace Officer Standards and Training, "Overview of Peace Officer Selection Standards," CPOST available at http://post.ca.gov/overview-selection-standards.aspx.

Crawford Charles and Robert Burns, "Predictors of the Police Use of Force: The Application of a Continuum Perspective in Phoenix," Police Quarterly 1(4)  (1998).

Delgado, Rolando, "An Ideal Use of Force for Law Enforcement: An Assessment of the Austin Police Department" (2011).

Exhibit 2
Page 125

---

Department of Justice, "Examples of Promising Police Practices and Policies," DOJ (January 2001) available at https://www.ncjrs.gov/pdffiles1/ojp/186189.pdf.

Department of Justice, "National Institute of Justice Issues & Practices: Citizen Review of Police, Approaches & Implementation" (2001).

Department of Justice, "Principles for Promoting Police Integrity: Examples of Promising Police Practices and Policies" (January 2001).

Department of Justice and Department of Homeland Security, "Recommendation for First Amendment Protected Events for State and Local Law Enforcement Agencies," Global Justice Information Sharing Initiative (December 2011) available at https://docs.google.com/spreadsheet/ccc?key=0Ap3Cuw3L-4aGdDFmMDVwTEtURDFSNTBaZmdrMktnNEE#gid=0.

Department of Justice, Office of Community Oriented Policing Services, "National Summit on Campus Public Safety: Strategies for Colleges and Universities in a Homeland Security Environment," DOJ (July 2008) available at http://www.eric.ed.gov/ERICWebPortal/search/detailmini.jsp?_nfpb=true&_&ERICExtSearch_SearchValue_0=ED486269&ERICExtSearch_SearchType_0=no&accno=ED486269.

Ederheimer, Josh and Lorie A. Fridell, Eds., "Chief Concerns: Exploring the Challenges of Police Use of Force," The Police Executive Research Forum (2005).

Finn, Peter, "Citizen Review of Police: Approaches & Implementation," National Institute of Justice Issues & Practices (2001).

Fording, Addison and John Holstrom, "University of California Police Study" (1969).

Hoffman, Ron,  Chris Lawrence, and Greg Brown, "Canada's National Use-of-Force Framework for Police Officers." The Police Chief  71 (10) (2004), available at http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_arch&article_id=1397&issue_id=102004.

Fridell Lorie, "Use-of-Force Policy, Policy Enforcement and Training" in Dunham, Roger and Geoff Alpert, Eds, Critical Issues in Policing: Contemporary Readings, Fifth Edition Waveland Press (2010).

Fridell, Lorie, "Taking the Straw Man to the Ground: Arguments in Support of the Linear Use-of-Force Continuum," Police Chief Magazine Online (December 2010) available at http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display&article_id=2548&issue_id=122011.

Fridell, Lorie, "Less Lethal Weapon Deployment Policy and Training: Results from a National Survey," presented at the conference Police Use of Force: Less Lethal Weapons and In-Custody Deaths sponsored by the Institute for Law Enforcement Administration (Sept. 29, 2008).

Exhibit 2
Page 126

Griffith, James D., Harry Hueston, Eddie Wilson, Casey Moyers, and Christian L. Hart, "Satisfaction with Campus Police Services." College Student Journal (March, 2004) available at http://findarticles.com/p/articles/mi_m0FCR/is_1_38/ai_n6073209/?tag=content;col1.

Ikerd, Trent and Samuel Walker, "Making Police Reforms Endure: The Keys for Success," U.S. Department of Justice, Office of Community Oriented Policing (April 2010).

International Association of Chiefs of Police, "Police Use of Force in America" (2001).

Kleining, John, "Ethical Constraints on Taser Use by Police," Policing Vol. 1 no. 3 (2007).

Klinger, David. A., "The Micro-Structure of Nonlethal Force: Baseline Data from an Observational Study," Criminal Justice Review 20 (1998).

Madensen, Tamara D. and John E. Eck, "Student Party Riots," Department of Justice, Community Oriented Policing Services (February 2006) available at http://www.cops.usdoj.gov/Publications/student_party.pdf.

McFarland, Malcolm, Joshua Ederheimer, et al., "Police Management of Mass Demonstrations: Identifying Issues and Successful Approaches," Police Executive Research Forum (2003) available at http://policeforum.org/library/critical-issues-in-policing-series/MassDemonstrations.pdf.

Mesloh, Charlie, Mark Henych and Ross Wolf, "Less Lethal Weapon Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis," National Institute for Justice (September 2008) available at https://www.ncjrs.gov/pdffiles1/nij/grants/224081.pdf.

Miller, Joel, "Civilian Oversight of Policing: Lessons from the Literature," Global Meeting on Civilian Oversight of Police, Los Angeles (May 2002).

National Association of College and University Attorneys, "Campus Police Authority: Understanding Your Officers' Territorial Jurisdiction," NACUA (2006) available at http://www.nacua.org/publications/brochure.pdf.

National Lawyers Guild, "Legal Observer Training Manual," NLG available at http://awesome.nlg.org/wp-content/uploads/2010/02/LO_Manual.pdf.

Peak, Kenneth, Emmanuel Barthe, and Adam Garcia, "Campus Policing in America: A Twenty-year Perspective," Police Quarterly 11 (2) (June 2008).

Peters, John and Michael A. Brave, "Force Continuums: Are they Still Needed," Police and Security News 22 (1) (2006), available at http://www.ecdlaw.info/outlines/forcecontinuums.pdf.

Petrowski, Thomas.D., "Use-of-Force Polices and Training: A Reasoned Approach," FBI Law Enforcement Bulletin (October 2002), available at http://findarticles.com/p/articles/mi_m2194/is_10_71/ai_93915942/.

Exhibit 2
Page 127

Police Executive Research Forum, "Managing Major Events: Best Practices from the Field," PERF (June, 2007) available at http://www.policeforum.org/dotAsset/1491727.pdf.

Police Executive Research Forum & Department of Justice Community Oriented Policing Services, "2011: Electronic Control Weapon Guide," PERF (March 2011) available at http://www.policeforum.org/library/use-of-force/ECWguidelines2011.pdf.

Reaves, Brian A., "Campus Law Enforcement: 2004-2005," Bureau of Justice Statistics (March 2003) available at http://www.bjs.gov/content/pub/pdf/cle0405.pdf.

Scalora, Mario, Andre Simons and Shawn Vanslyke,"Campus Safety: Assessing and Managing Threats," Federal Bureau of Investigation (February 2010) available at http://www.fbi.gov/stats-services/publications/law-enforcement-bulletin/february-2010/campus-safety.

Terrill, William et al., "Final Technical Report Draft: Assessing Police Use of Force Policy and Outcomes" (May 2011), available at https://www.ncjrs.gov/pdffiles1/nij/grants/237794.pdf.

Terrill, William and Stephan D Mastrofski, "Situational and Officer-based Determinants of Police Coercion," Justice Quarterly, 19:2 (2002).

Walker, Samuel, "The New World of Police Accountability," Sage Publications (2005).

Walker, Samuel and Andrea Lorenz, "Policing the Police: Citizens Encourage Ethical Policing." EJournalUSA (April 2011), available at http://iipdigital.usembassy.gov/st/english/publication/2011/04/20110413142023atina0.4837109.html#axzz1qRDuQkt0.

Warshaw, Robert S., "Eighth Quarterly Report of the Independent Monitor for the Oakland Police Department," Office of the Independent Monitor (January 17, 2012) available at http://media.baycitizen.org/uploaded/documents/2012/1/eighth-quarterly-report-independent/QuarterlyReport.pdf.

White, Lawrence, "Protest, Activism and Student Riots," Pennsylvania Department of Education, presented at the University of Vermont 13th Annual Conference on Legal Issues in Higher Education (October 2003).

Wolf, Ross, Tina Pressler and Mark Winton, "Campus Law Enforcement Use-of-Force and Conducted Energy Devices: A National-Level Exploratory Study of Perceptions and Practices," Criminal Justice Review 34 (1) (March 2009).

Exhibit 2
Page 128

B.  **Policy Examples**

Charlotte-Mecklenburg Police Department, "Use of Force Continuum," §§ 600-020, (effective April 17, 2003).

Harvard Office of Student Life, "Student Organization Handbook." Harvard University (revised 2010) available at http://isites.harvard.edu/icb/icb.do?keyword=k72845&pageid=icb.page368059&pageContentId=icb.pagecontent763341&state=maximize&view=view.do&viewParam_name=Free%20Speech%20Guidelines.

Madison Police Department, "Use of Force and Call Response Policy," §§ 6:100-6:400 (revised April, 4, 2010).

Metropolitan Police Department, "Standard Operating Procedures for Handling First Amendment Assemblies and Mass Demonstrations" (revised December 2, 2009).

Montgomery County Police Department, "Special Events Response Team Standard Operating Procedures, Mass Arrest"  (revised June 28, 2005).

Oakland Police Department, "Crowd Control and Crowd Management Policy" § III-G (revised Oct. 28, 2005).

San Francisco Police Department, "Crowd Control Policy" § 8.03 (revised Aug. 3, 1994) available at http://www.sf-police.org/modules/ShowDocument.aspx?documentid=14747.

State of Wisconsin Department of Administration, Wisconsin Capital Police, "Incident Action Plan" (Feb. 26, 2011).

University of Michigan, "Standard Practice Guide: Freedom of Speech and Artistic Expression." Office of the President  (revised July, 1, 1988) available at http://spg.umich.edu/pdf/601.01.pdf.

University of Pennsylvania, "The PennBook" (March 16, 1993) available at http://www.upenn.edu/provost/PennBook/guidelines_on_open_expression.

University of Wisconsin, Madison Police Department, Critical Incident University Response Plan § 46.1 (revised December 31, 2011).

University of Wisconsin, Madison Police Department, Documenting Large Population Events Policy § 42.7 (revised December 31, 2011).

University of Wisconsin, Madison Police Department, Protests, Demonstrations, and Crowd Control § 46.6 (revised December 31, 2011).

University of Wisconsin, Madison Police Department, Special Events Plan § 46.4 (December 31, 2011).

University of Wisconsin, Madison Police Department Use of Force Policy § 1.3 (December 31, 2011).

**Exhibit 2**
**Page 129**

### C.  Investigative Reports on Use of Force Incidents

Bobb, Merrick, Matthew Barge, and Camelia Naguib, "A Bad Night at Powell Library: The Events of November 14, 2006," Police Assessment Resource Center (August 2007)  available at http://www.parc.info/client_files/UCLA/UCLA%20Taser%20Report%20August%20Final.pdf.

Brazil, Wayne, Nilina Bhatia, Michael G. Harris, et. al., "November 20, 2009: Review, Reflection and Recommendations" Police Review Board, (June 14, 2010) available at http://www.berkeley.edu/news2/2010/06/16_prb-report.pdf.

Demonstration Planning Team, "Final Report" (March 1, 2007), available at http://senate.ucsc.edu/archives/campus-demonstration-response/Final%20Demonstration%20Planning%20Team%20Report2.pdf.

Hayashi, Patrick, "UC Santa Cruz and Student Protests: Observations and Recommendations," (March 15, 2006), available at http://senate.ucsc.edu/archives/campus-demonstration-response/HayashiReport.pdf.

Garrell, Robin, Stephen Yeazell and William Cormier, "November 2009 UC Regents Meeting: Post-Event Review Report," (Nov. 22, 2010), available at http://newsroom.ucla.edu/portal/ucla/document/Regents_Nov_2009_Meeting_Post_Event_Report.pdf.

Los Angeles Police Department, "LAPD Report to the Board of Police Commissioners: An Examination of May Day 2007" (October 9, 2007) available at http://www.lapdonline.org/assets/pdf/Final_Report.pdf.

Shaw, Carolyn, et al., "Report of the Tent University and Restructuring Emergency Response Procedures Task Force," (February 1, 2006), available at http://senate.ucsc.edu/archives/campus-demonstration-response/TUSCreptSCP1479.pdf.

Stern, Donald, et al., "Commission Investigating the Death of Victoria Snelgrove Report"  (2005) available at http://www.cityofboston.gov/Images_Documents/sternreport_tcm3-8954.pdf.

Exhibit 2
Page 130

# Appendix E – UCSF Study

Exhibit 2
Page 131

University of California
San Francisco



School of Pharmacy

521 Parnassus Avenue
Box 0622
San Francisco, CA  94143
tel: 415/476-8010
fax: 415/476-6632
http://pharmacy.ucsf.edu

January 13, 2012

Mark G. Yudof
Office of the President
University of California
1111 Franklin St., 12th Floor
Oakland, CA 94607

Re:  Adverse Health Effects of Pepper Spray

Dear President Yudof:

Attached is a report evaluating the potential adverse health effects from human exposures to pepper spray. The report is generated by faculty members in the Medication Outcomes Center and California Poison Control System (CPCS), which are both programs within the Department of Clinical Pharmacy, UCSF School of Pharmacy. The report is in two parts, which complement one another and provide a comprehensive and evidenced-based review of the topic.

PART ONE presents a systematic review of the literature and summarizes the use of pepper spray and the outcomes of subjects exposed to the substance. The review title is "Evidenced-Based Safety Review of Pepper Spray Exposure in Human," and the author is Dr. Sheri VanOsdol who is a faculty member with the Medication Outcomes Center in the UCSF School of Pharmacy.

**Dr. VanOsdol concludes that "severe adverse events requiring medical care may occur in 1% to 15% of exposures to pepper spray products."**

Currently, there are no published data on the effects of chronic or repeated exposure to pepper spray. Nor are there published data on the chronic effects associated with an acute exposure.

PART TWO presents an evaluation of more than 4,000 accounts of pepper spray exposures reported to the CPCS over a 10-year time frame. This analysis further substantiates and clarifies Dr. VanOsdol's findings regarding the potential risk of adverse health effects from exposure to pepper spray products.

Findings appear in the report section entitled "Adverse Health Effects Associated with Pepper Spray Products: A 10-year Retrospective Review of the California Poison Control System Reported Cases." The author is Dr. Thomas Kearney, a managing director of the CPCS.

Exhibit 2
Page 132

January 13, 2012
Adverse Health Effects of Pepper Spray
Page 2

**Dr. Kearney and his colleagues found that 6.4% (or 237 cases) of pepper spray cases had moderate symptoms, which were defined as having significant symptoms suggestive of tissue injury that warranted a medical evaluation.  The most common symptoms were ocular or eye injury cases (54.4%, or 129 of 237 cases) that were suggestive of a possible corneal abrasion; some 31.2 % (or 74 of 237 cases) had respiratory symptoms suggestive of bronchospasm. The remainder had dermal burns.**

The CPCS, which is managed statewide by the Department of Clinical Pharmacy, provides a vitally important 24/7 poisoning hotline service to all Californians—and has since 1997. As well, it is relied upon by hospital emergency room physicians and other health care providers for its unique expertise.

This review is but one example of the exceptional service the CPCS provides, on behalf of the University of California, to Californians—both through CPCS's advice to patients through its hotline and through data collection, analysis, and reviews.

The CPCS serves the state by keeping health care expenditures down. No doubt hundreds of thousands of health care dollars were saved by CPCS professionals as they helped victims manage the effects of pepper spray at home, thus preventing unnecessary admissions to California emergency rooms.

**Unfortunately, the work of the CPCS is always at risk because it is funded through state and federal contracts.**

If further clarification or testimony is needed on this topic, both Dr. VanOsdol and Dr. Kearney are available. Dr. VanOsdol will be in the best position to explicate her report and Dr. Kearney to clarify and expand on experience with these cases.

Respectfully submitted,

*Mary Anne Koda-Kimble*

Mary Anne Koda-Kimble, PharmD
Dean, UCSF School of Pharmacy

*B. Joseph Guglielmo*

B. Joseph Guglielmo, PharmD
Chair, Department of Clinical Pharmacy, UCSF School of Pharmacy

**CC:**  John D. Stobo, MD, Senior V.P., Health Sciences and Services, University of California
      Thomas E. Kearney, PharmD, Professor of Clinical Pharmacy, UCSF School of Pharmacy
          & Director, San Francisco Division, California Poison Control System
      Sherilyn J. VanOsdol, PharmD, Assistant Professor of Clinical Pharmacy,
          Medication Outcomes Center, UCSF School of Pharmacy

Exhibit 2
Page 133



**UCSF** Medication Outcomes Center
Department of Clinical Pharmacy

# Evidence-Based Safety Review of Oleoresin Capsicum (Pepper Spray) Exposure in Humans

Date of Review: December 22, 2011

Prepared for: The University of California
Prepared by: Sheri VanOsdol PharmD, BCPS
University of California San Francisco
School of Pharmacy, Department of Clinical Pharmacy
Medication Outcomes Center

1

Exhibit 2
Page 134

**Table of Contents**

|                                                                              | **Page** |
|------------------------------------------------------------------------------|----------|
| Summary of Oleoresin Capsicum (pepper spray) Evidence-Based Safety Review    | 3        |
| Evidence-Based Safety Review of Oleoresin Capsicum Exposure in Humans        | 4        |
|     Overview of oleoresin capsicum                        | 4        |
|     Literature Review                                     | 6        |
|         Table of clinical trials summaries | 7   |
|         Summarized case reports       | 11       |
|     Safety Considerations                                 | 12       |
|     Summary                                               | 13       |
|     References                                            | 14       |

Exhibit 2
Page 135

**Summary of Oleoresin Capsicum (pepper spray) Evidence-Based Safety Review**

**Background**
Riot control agents are used by law enforcement officers and the military to subdue suspects who are combative or otherwise resisting arrest.  Oleoresin capsicum (OC, "pepper spray") is a commonly used riot control agent.  The use of OC in California was legalized for use by law enforcement agencies in October, 1992, and as a personal protective agent for civilians in March, 1994.  The short- and long-term safety of OC has not been critically reviewed.

**Purpose**
The purpose of this review was to perform an evidence-based review and summarize all literature regarding outcomes of subjects exposed to OC products.

**Search Strategy**
The search terms "pepper spray" or "oleoresin capsicum," were used to search for clinical research and case reports in Pubmed, and Google Scholar.  The tertiary drug information databases Micromedex, Toxdex, MD Consult, UpToDate, LexiComp, and Natural Standard, and the websites for the Occupational Safety & Health Administration, the United States Department of Justice, the United States Pharmacopoeia, the Merck Index, and the Food and Drug Administration (FDA) were also searched.  Relevant "related citations" and cited references from literature found using the above strategies were also reviewed and included as appropriate.  Trials and case reports that utilized OC containing products currently in use in the United States were included in this review.  Trials designed to assess the consequences of OC products in relation to officer or assailant injuries during confrontation or resisted arrest were excluded.

**Published Literature**
Eight clinical trials were included in this review; two were prospective, randomized trials, two were prospective studies, and four were retrospective studies.  Six case reports were also included in this review.

The majority of published studies reveal acute irritating, self-limited effects on the skin, eye lids and mucosa, and lungs.  No evidence exist that skin or oral mucus membrane symptoms persist beyond 45 minutes following decontamination; topical treatments do not improve the severity or duration of dermal pain.  Corneal epithelial defects persisting up to 6 weeks and ranging in severity from mild to severe were reported in 3 of the studies, and 4 case reports; most of these patients received ocular decontamination.  Pulmonary effects of unspecified duration, including 1 case or allergic respiratory response and 4 asthmatic responses, were reported in 2 retrospective studies, and 2 case studies; one case report involved a 4 month old who required extracorporeal membrane oxygenation following respiratory failure.  Cardiovascular effects, including hypertension and tachycardia were reported in 2 retrospective studies, and 1 case report; it is unclear whether these end points were examined in other studies.

One retrospective study examined the role of OC in in-custody deaths.  OC was implicated in 63 in-custody deaths; however, causation could not be determined.  Sixteen deaths were also associated with illicit drug use (e.g. cocaine, phenylcyclidine) and 23 deaths were associated with illicit drug use and/or underlying disease alone or in combination with other factors beyond OC exposure, 7 deaths were associated with positional asphyxia.  Two deaths were associated with OC and pulmonary compromise (i.e. asthma, and positional restraint in an obese subject).

**Conclusions:**
- Published literature on OC exposure is heterogeneous in purpose and study design.  The studies included in this review were small (10 to 100 subjects), and the four prospective trials were conducted in controlled settings.  The results of these studies should be considered in context, as their results may not be indicative of outcomes in combat or other emergency situations.
- Contact with OC produces burning and pain of the skin, eyes, and mucus membranes, and reflex sneezing, coughing, mucus production, and blinking or closure of the eyes.  Some exposed subjects may also suffer bronchospasm, temporary blindness, and/or panic.
- The effects of OC products are generally self-limited and resolve within 45 minutes of exposure
- Severe adverse events requiring medical care may occur in 1% to 15% of exposures to OC products
- Restraint following exposure has been associated with severe adverse outcomes and death following OC exposure, though a causal relationship has not been proven.
- Currently, there are no published data on the chronic effects of OC exposure; additionally, there are no published data on long term consequences of multiple exposures to OC products.
- The paucity of data assessing chronic effects of OC exposure mandates further investigation.

Exhibit 2
Page 136



**Evidence-Based Safety Review of Oleoresin Capsicum (Pepper Spray) Exposure in Humans**

**Date of Review: December 22, 2011**
**Prepared for: The University of California**
**Prepared by: Sheri VanOsdol PharmD, BCPS**
**University of California San Francisco, Department of Clinical Pharmacy**
**Medication Outcomes Center**

**Drug Name**:                    Oleoresin capsicum ("pepper spray")
**Manufacturer:**             Mace Security, First Defense, Sabre, Zarc International, others
**Therapeutic Category:**    Counterirritant
**Chemical Weapon Category:**  Riot control agent, Peripheral chemosensory irritant
**Related Agents:**            Capsaicin, cayenne pepper, chili pepper

## I.  OVERVIEW OF OLEORESIN CAPSICUM

**Background:**
Riot control agents (RCAs) are used by law enforcement officers and the military to subdue suspects who are combative or otherwise resisting arrest. RCAs are also referred to as irritants, lacrimators, or "tear gas." Common RCAs include chloracetophenome (i.e. Mace®), oleoresin capsicum (i.e. pepper spray). chlorobenylidene maloritile, chloropicrin (also a fumigant(, bromobenzylcyanide, and others (Anderson, 2011). The effects of RCAs include burning of nasal mucosa and skin, lacrimation, blurred vision, drooling, rash, and nausea/vomiting; these symptoms typically last 15 to 45 minutes following appropriate decontamination.

Oleoresin capsicum (OC) is a commonly used RCA agent. It is preferred over other RCAs due to immediate subdual of most assailants, whereas other products may take 20 seconds, and effectiveness in up to 85% of the population (Czarnecki, 2003). The use of OC in California was legalized for use by law enforcement agencies in October, 1992, and for civilians in March, 1994 (ACLU, 1995). The short- and long-term safety of OC has not been critically reviewed

**OC exposure in humans:**
The number of OC exposures in humans in the U.S. over any given period of time is unknown. A substantial subset of the population has been exposed to OC sprays and related products due to its use in training practices. Corrections officers, law enforcement agents, and military trainees are commonly exposed to OC during routine training exercises (Busker 1998, Olajos 2004, Czarnecki 2003); however, the number of training- or combat- related exposures has not been reported. A report conducted by the Federal Bureau of Investigation Firearms Training Unit described a volunteer study of 899 OC-exposed subjects who did not suffer adverse effects severe enough to warrant medical care (Busker, 1998). A study of approximately 6000 corrections officers sprayed with OC spray during training resulted in 61 cases in which medical care was sought due to the severity of adverse effects (Olajos, 2004). A report of the use of OC spray in California estimated that in less than 3 years following legalized use by law enforcement officers, it had been used by law enforcement officers nearly 16,000 times (ALCU, 1995).

Because OC products are legally sold to civilians in most states, the number of exposures in the general population is also unknown. Data related to these exposures has primarily been reported as epidemiological studies through poison center or emergency department data, or as case studies. Authors of a study of aerosol container-related eye injuries in a sample of emergency departments in the U.S. from 1997-2009 extrapolated that 493 (95% CI, 130 to 856) eye injuries presenting to emergency departments over that time were related to pepper spray; approximately two-thirds of these injuries occurred in pediatric patients aged 0 to 18 years (Seidman, 2011). The Texas Poison Centers reported 1,531 cases of ocular exposure to pepper spray over a 5-year period from 1998 to 2002; 85% of these exposures were managed outside of health care facilities (Forrester, 2003).

Exhibit 2
Page 137

**Oleoresin capsicum:**
OC has been available since 1973, and became widely adopted by law enforcement agencies in the U.S. during the late 1980s (Chan, 2001).  OC exposure is widely regarded as more effective, less toxic, and safer than other forms of tear gas or mace (Chan, 2001).  Exposure to pepper spray is a common practice in the training of law enforcement officers (Czarnecki, 2003).

**Chemical properties:**
The active ingredient in pepper spray is oleoresin capsicum, an oily extract of pepper plants in the genus Capsicum.  Oleoresin capsicum, the capsaicinoid used in pepper spray, is extracted from the dried fruits of C. annum or C. frutescens (Merck, 2011).  Capsaicin, the main active capsaicinoid, is approved by the FDA as a topical counterirritant for treatment of pain from rheumatoid arthritis, osteoarthritis, and neuropathic pain associated with shingles and diabetes; the FDA does not oversee the use of these products as RCAs.  Other active compounds in OC include dihydrocapsaicin, nordihydrocapsaicin, homohydrocapsaicin, homocapsaicin, and nonivamide (Czarnecki, 2003).  The "hotness factor" of OC is measured in Scoville Heat Units (SHU), where most products fall in the range of 0.5 million to 2 million SHU (Zollman, 2000).  Related compounds include spices used in curries and other edible hot sauces, topical agents in topical anesthetics and analgesics.

Other chemicals present in pepper spray formulations that may cause tissue irritation or injury are product-specific (see Products section).

**Pharmacology:**
Capsaicin interacts with relatively nonselective ion channels in nociceptive nerve fibers causing depolarization and release of substance P (Busker 1998).  Following depolarization, the fibers undergo a selective blockade of nervous conduction, and neurogenic inflammation resulting in swelling, pain, and other local irritant effects (Gerber, 2011).  Contact of capsaicinoids with airway mucosa induces the release of tachykinins, substance P, and neurokinin A, which induce inflammation in airway blood vessels, epithelium, and smooth muscle causing mucus vasodilation, increased vascular permeability, mucus secretion, and bronchoconstriction (Smith, 1999).  The physiological effects of OC exposure and mechanisms are presented in Table 1.

**Table 1. Typical effects of OC exposure on humans** (Smith 1999; Czarnecki 2003; Olajos 2004; Barry 2008)**:**

| System | Effect | Mechanism |
|---|---|---|
| Dermal | Tingling, intense burning, pain | Release of substance P from nociceptive nerve fibers |
| Mucus membranes | Immediate burning sensation, mucus production, irritation, sneezing | Release of substance P from nociceptive nerve fibers |
| Respiratory | Coughing, shortness of breath, inflammation of airways, mucus production, bronchospasm | Transient paralysis of pharynx<br><br>Substance P depletion results in mast cell activation and subsequent histamine release |
| Ocular | Redness swelling, stinging, severe burning pain, conjunctival inflammation, lacrimation<br><br>blepharospasm, reflex closing of eyelids, temporary blindness | Mucus membrane effects on inner eyelids<br><br>Dilation of eyelid capillaries |
| Psychological | Panic, fear of blindness and/or suffocation | Not specified |

**Products:**
The concentration of capsicum in commercially available pepper spray ranges from 2% to 17%; most law enforcement pepper spray products contain a concentration of 5% to 10% (Czarnecki, 2003).  Higher concentrations are associated with more severe and longer-lasting effects.  Pepper spray is dispersed via aerosol, fogger, foam, and liquid stream formulations.  Products that spray in a cone pattern or stream act as liquids when they come into contact with surfaces and may pose an aspiration risk if sprayed directly into the mouth (Olajos, 2004).

Pepper spray products include chemicals that may contribute to tissue irritation or injury such as isobutene and propane, which are used as propellants and either isopropyl alcohol, water, oil, or foam which is used as a carrier agent (Barry, 2008).  Excipients may include UV dyes, propylene glycol, or isopropanol (Olajos, 2004).  Product containers and manufacturer Material Safety Data Sheets should be referenced when determining the propellants and carrier agents present in a given OC-containing product.

Exhibit 2
Page 138

## II.   LITERATURE REVIEW

**Purpose**
The purpose of this review was to perform an evidence-based review and summarize all literature regarding outcomes of subjects exposed to OC products.

**Search Strategy:**
The search terms "pepper spray" or "oleoresin capsicum," limited to "humans" and "English" were used to search for clinical research and case reports in Pubmed, and Google Scholar.   These search terms were also used to search the tertiary drug information databases Micromedex, Toxdex, MD Consult, UpToDate, LexiComp, and Natural Standard, and the websites for the Occupational Safety & Health Administration, the United States Department of Justice, the United States Pharmacopoeia, the Merck Index, and the Food and Drug Administration (FDA).  Finally, the term "MSDS" was added to "pepper spray" or "oleoresin capsicum" in a Google search to capture information present on material safety data sheets for the chemical compounds, as pepper spray is not regulated by the Food and Drug Administration.  Relevant "related citations" and cited references from literature found using the above strategies were also reviewed and included as appropriate.  Trials and case reports that utilized OC containing products currently in use in the United States were included in this review.  Trials designed to assess the consequences of OC products in relation to officer or assailant injuries during confrontation or resisted arrest were excluded.

**Literature summary:**

Eight clinical trials were included in this review; two were prospective, randomized trials, two were prospective studies, and four were retrospective studies (Table 3).  Six case reports were also included in this review.

The majority of published studies reveal acute irritating, self-limited effects on the skin, eye lids and mucosa, and lungs.  No evidence exist that skin or oral mucus membrane symptoms persist beyond 45 minutes following decontamination; topical treatments do not improve the severity or duration of dermal pain.  Corneal epithelial defects persisting up to 6 weeks and ranging in severity from mild to severe were reported in 3 of the studies, and 4 case reports; most of these patients received ocular decontamination.  Pulmonary effects of unspecified duration, including 1 case or allergic respiratory response and 4 asthmatic responses, were reported in 2 retrospective studies, and 2 case studies; one case report involved a 4 month old who required extracorporeal membrane oxygenation following respiratory failure.  Cardiovascular effects, including hypertension and tachycardia were reported in 2 retrospective studies, and 1 case report; it is unclear whether these end points were examined in other studies.

One retrospective study examined the role of OC in in-custody deaths.  OC was implicated in 63 in-custody deaths; however, causation could not be determined.  Sixteen deaths were also associated with illicit drug use (e.g. cocaine, phenylcyclidine) and 23 deaths were associated with illicit drug use and/or underlying disease alone or in combination with other factors beyond OC exposure, 7 deaths were associated with positional asphyxia.  Two deaths were associated with OC and pulmonary compromise (i.e. asthma, and positional restraint in an obese subject).

**Table 2. Evidence Grading For Published Literature** (Concato, 2000)**:**

| Evidence Category | Description |
|---|---|
| Type I | Obtained from at least one properly designed RCT |
| Type II-1 | Obtained from well-designed controlled trials without randomization |
| Type II-2 | Obtained from well-designed cohort or case-control analytic studies, preferably from more than 1 center |
| Type II-3 | Obtained from multiple time series with or without intervention; dramatic results in uncontrolled experiments could also be regarded as this type of evidence |
| Type III | Opinions of respected authorities, based on clinical experience, descriptive studies, or reports of expert committees |

Exhibit 2
Page 139

## Table 3. Summary of Clinical Effects Studies:

| Objective Citation | Study Design | Population (n) | Description of exposure | Clinical effects | Duration of effects | Evidence Grade |
|---|---|---|---|---|---|---|
| To assess the effects of sitting vs restrained positions on respiratory function following OC exposure, or placebo.<br><br>Chan, 2001 | Randomized, controlled, crossover study; subjects served as their own controls | Volunteer subjects aged 22 to 46 years were recruited from a law enforcement training academy; 8 subjects had a history of smoking, lung disease, or respiratory inhaler use<br><br>(34: 24 men, 10 women) | OC exposure: OC or placebo sprayed for 1 second in a small enclosed space, where subject remained for 5 seconds<br><br>Positional restraint: hogtie or hobble position | OC vs placebo, sitting:<br>No difference in FVC or FEV1 at 1.5 and 10 minutes post-exposure; no difference in blood oxygenation levels; a small, but significant decrease in carbon dioxide levels occurred in the OC group<br><br>OC vs placebo, restrained:<br>No difference in FVC, FEV1 between exposure groups; FVC and FEV1 significantly decreased in both groups, compared sitting, non-restrained groups<br>Hypoxemia, hypercapnea, hypoventilation not associated with restraint position<br><br>OC vs placebo, regardless of position:<br>Significant elevations in MAP, and heart rate 3, 6, and 9 minutes post-exposure | Subjects observed 1 hour post-expose without further follow-up<br><br>Long-term consequences not assessed | — |
| To assess the effect of topical preparations on OC-related pain<br><br>Barry, 2008 | Prospective, single-blind, randomized evaluation of 5 different regimens for treatment of topical capsaicin exposure | Military law enforcement trainees, aged 18-36 years<br><br>(49: 44 men, 5 women) | 2-second spray to the face from a predetermined distance (not stated); exposure repeated if subject closed eyes during first exposure; then must complete a 2 minute training procedure before decontamination<br><br>Subjects used tap water to decontaminate exposed skin, then applied a cloth dampened with either magnesium hydroxide-aluminum hydroxide, whole milk, baby shampoo, 2% lidocaine gel, or water<br><br>Pepper spray: 5.5% OC, 64% isopropyl alcohol carrier agent, 30.5% isobutene/propane propellant | Pain scores did not vary between treatment groups for the 60 minutes following OC exposure<br><br>The authors concluded that time was the only factor predictive of improved pain scores<br><br>No serious adverse events were reported | 60 minutes | — |

Evidence-Based Safety Review of Oleoresin Capsicum
December, 2011

Exhibit 2
Page 140

8

| Objective Citation | Study Design | Population (n) | Description of exposure | Clinical effects | Duration of effects | Evidence Grade |
|---|---|---|---|---|---|---|
| To evaluate the effects of OC on the human cornea and conjunctiva and assess effectiveness of topical anesthetics for relief of OC-induced pain<br><br>Zollman, 2000 | Prospective, clinical trial | Cadets in a criminal justice training academy, aged 21 to 47 years<br><br>(47: 35 male, 12 female; 11 of 47 subjects were assessed at the 1 week post-OC exposure time point) | OC sprayed into the face from a 1 meter distance; then must complete a 1 minute training exercise before decontamination<br><br>A shower with copious amounts of water and baby shampoo was used for decontamination; 29 eyes received topical proparacaine, 11 eyes received topical flurbiprofen<br><br>OC used was a water-based formulation; the first 20 subjects were exposed to a 0.5 million SHU spray, and the remaining subjects were exposed to a 1 million SHU spray | Punctate epithelial erosions were evident in 20 of 94 eyes at 10 minutes, and 15 of 94 eyes at 1 hour.<br><br>Eye pain, tearing, and visual blurring were significantly worse than baseline at 1 hour post-exposure; these returned to baseline in subjects assessed 1 week post-exposure<br><br>Corneal sensation was reduced to approximately 1/10 that of baseline 10 minutes post- OC exposure, improved to ½ of baseline at 1 hour post-exposure, and returned to baseline 1 week post-exposure<br><br>There was no difference in tearing, blurring, slit-lamp appearance, or corneal sensitivity between the 2 topical agents tested. | 1-2 days | II-1 |
| To examine potential harmful effects of OC spray on corneal innervation, sensitivity, and structure<br><br>Vesaluoma, 2000 | Prospective, clinical trial | Finnish police officers aged 24-50 years<br><br>(10: 9 men, 1 woman) | OC sprayed into the face at a distance of 1.5 to 2.5 meters for 0.5 to 1.5 seconds; officers were asked to hold eyes open during entire exposure<br><br>Cold water and soap was used to wash face for 5 to 15 minutes for decontamination<br><br>OC used was 5.5%, 30.5% isobutene, 64% isopropyl alcohol | Focal corneal epithelial cell damage was present in 6 corneas at 20 minutes; no corneal damage was visible on the eyes of any subject the following day<br><br>Mechanical sensitivity on the Cochet-Bonnet esthesiometer returned to baseline within 1 day<br><br>Mechanical sensitivity with gas esthesiometer remained below normal for up to 7 days | < 1 day<br><br>< 7 days | II-1 |
| To identify cases, and estimate incidence of corneal abrasion associated with OC-exposure<br><br>Brown, 2000 | Retrospective chart review of OC exposures from 1994 through 1996 | Adult subjects presenting to a hospital jail ward ED<br><br>(100; 87 men [17 to 56 years], 13 women [19 to 54 years]) | All subjects were directly exposed to OC during arrest.<br><br>All subjects received visual acuity testing, ocular pH measurements, and corneal examination with fluorescein stain; normal saline irrigation of the eye followed, if indicated.  Initial decontamination procedures were not described<br><br>OC used was 10% in all cases | <table><tr><td>Symptom</td><td># patients</td></tr><tr><td>Scleral injection</td><td>38</td></tr><tr><td>Corneal abrasion</td><td>7</td></tr><tr><td>Alkalotic conjunctival pH of 8</td><td>2</td></tr></table> | Duration of symptoms not described | III |

| Objective Citation | Study Design | Population (n) | Description of exposure | Clinical effects | | Duration of effects | Evidence Grade |
|---|---|---|---|---|---|---|---|
| To describe the clinical toxicity caused by OC spray during law-enforcement action | Retrospective chart review of patients in a consecutive series of patients presenting after OC exposure from June, 1991 to June, 1994 | Adult patients (mean age 27.6 ± 7.9 years) presenting to the ED after OC-spray exposure secondary to law-enforcement use | OC exposure: occurred during arrest by law enforcement; location, distance, or duration of OC spray not documented | **Symptom** | **# patients** | Mean duration in ED: 1.6 ± 0.9 hours | III |
| Watson, 1996 | | | | Ocular | 63 | | |
| | | | Decontamination with fluid irrigation prior immediately post-OC exposure occurred in 13 patients; the rest did not receive decontamination measures until arrival at the ED | • Burning | 45 | Duration of symptoms not described | |
| | | (81: 91% male, 73% African American) | | • Conjunctival injection | 36 | | |
| | | | | • Erythema | 32 | | |
| | | | | • Lacrimation | 13 | | |
| | | | OC used was a 5% "Cap-stun" spray" product | • Altered vision | 7 | | |
| | | | | • Corneal abrasion* | 7 | | |
| | | | | Dermal | 26 | | |
| | | | | • Burning | 20 | | |
| | | | | • Erythema | 12 | | |
| | | | | Respiratory | 6 | | |
| | | | | • Shortness of breath | 3 | | |
| | | | | • Wheezing | 2 | | |
| | | | | Tachypnea (> 20 rpm) | 16 | | |
| | | | | Tachycardia (>100 bpm) | 32 | | |
| | | | | *7 of 30 patients who received fluorescein staining had corneal abrasions 12 patients had a documented history of asthma; these patients reported respiratory symptoms similar to the test of the study population | | | |
| To describe medical complaints following OC spray during training of corrections officers | Retrospective review of cases reported between February 1993 and August 1995 | Correction officers presenting for medical attention post-training related OC exposure | OC exposure not described | **Condition** | **# affected** | > 1 week in 13% | III |
| | | | Decontamination procedures not describe | Eye irritation^ | 28 | | |
| Smith, 1999 (study not available, summary from Olajos, 2004) | | (61) | | Chest symptoms^ | 20 | | |
| | | | | Nose/eye/throat symptoms | 7 | | |
| | | | | Skin effects# | 5 | | |
| | | | | Hypertension% | 11 | | |
| | | | | Headache$ | 16 | | |
| | | | | Cardiovascular effects* | 2 | | |
| | | | | Loss of consciousness | 2 | | |
| | | | | Hyperventilation | 3 | | |
| | | | | *1 described as an eye burn with 5 days lost from work | | | |
| | | | | ^1 allergic respiratory reaction, 4 asthmatic responses | | | |
| | | | | #2 cases of urticaria | | | |
| | | | | %Blood pressure 180/110 in 1, 200/110 in 1 | | | |
| | | | | $9 reported as "severe" | | | |
| | | | | *1 with EKG changes, 1 requiring nitroglycerine | | | |

| Objective Citation | Study Design | Population (n) | Description of exposure | Clinical effects | Duration of effects | Evidence Grade |
|---|---|---|---|---|---|---|
| To assess the role of OC in in-custody deaths<br><br>U.S. Department of Justice, 2003 | Retrospective analysis of in-custody deaths to assess causality of pepper spray | In-custody deaths that occurred following pepper spray exposure<br><br>(63) | All subjects were directly exposed to OC during arrest.<br><br>Decontamination procedures were not described. | Cause of death:<br>12 deaths: illicit drug use<br>4 deaths: illicit drug use and heart disease<br>7 deaths: positional asphyxia<br>23 deaths: combination of factors including confrontational situation plus illicit drug use and/or underlying disease<br>6 deaths: weapon or health-related<br>2 deaths: asthma; 1 subject was obese and placed in supine positional restraint after multiple OC exposures | NA | III |

Abbreviations: bpm=beats per minute, ED=emergency department, ekg=electrocardiogram, FEV1=forced expiratory volume for 1 second, FVC=forced vital capacity, MAP=mean arterial blood pressure, OC=oleoresin capsicum, rpm=respirations per minute, SHU=Scoville heat units

**Published Case Reports:**

Accidental discharge of a pepper spray device into the face of a 4-week old infant caused rapid onset gasping respirations, apnea, and cyanosis (Billmire, 1996).  Within 20 minutes, the infant suffered respiratory failure, requiring mechanical ventilation, and 96 hours post-exposure required a 138 hour course of extracorporeal membrane oxygenation to sustain life.  The infant survived, but suffered multiple viral lung infections over the 12 month follow-up period.

Two adult females (45 and 20 years of age) were sprayed in the face with pepper spray in a carjacking attempt (Miller, 1996).  The women immediately went to a nearby emergency department and were placed in a cool-water shower for decontamination.  Upon presentation, both women reported burning sensations on exposed skin areas and of their eyes.  The 45 year old woman also suffered labored breathing; her vital signs at presentation were blood pressure of 110/70 mmHg, a pulse of 92 beats/minute, and respirations of 24 breaths per minute, with an oxygen saturation of 98%.  The 20 year old woman reported no other symptoms and presented with a blood pressure of 140/88 mmHg, a pulse of 120 beats per minute, and unlabored respirations at 20 breaths per minute.  Forty-five minutes post-exposure, both women were symptom free, and were discharged home after an additional hour of observation.  No further follow-up was reported.

An adult female sprayed in the eyes with pepper spray while resisting arrest was immediately handcuffed; ocular decontamination did not occur for >9 hours following OC exposure (Epstein, 2001).  She presented for an eye examination 7 days post-OC exposure, at which time her left eye had decreased visual acuity (20/80, baseline 20/20), and a 3.5 mm round epithelial defect with underlying inflammation.  The epithelial defect healed within 5 days, but inflammation persisted.  Twenty-one days post-exposure, an irregular astigmatism associated with a new corneal opacity was present, and patient had 20/40 vision in the left eye with the use of corrective lenses.  No further follow-up was reported.

A 75 year old male presented to an emergency department complaining of redness and swelling in his left eye 18 hours post-OC exposure (Das, 2005).  His eye had been irrigated immediately following OC exposure.  Eye examination revealed severe conjunctival injury including an epithelial defect present in all four quadrants, a subtotal epithelial defect of the cornea, and mild stromal edema.  Topical ascorbate (10%), citrate (10%), atropine sulfate, and chloramphenicol were used topically for 1 week.  One week post-exposure, the conjunctival defect had healed, and the corneal epithelial defect measured 6 x 5 mm.  At 6 weeks, his visual acuity was near normal, and examination of his cornea revealed a few punctate epithelial erosions.  No further follow-up was reported.

Following exposure of a 10% OC product containing 90% benzyl alcohol, a 2.5 year old boy presented to an ophthalmologist with redness, mild pain, and itching around his left eye (Gerber, 2011).  Exposure had occurred a few hours prior, and his mother reported immediately rinsing his face and eyes with water for a few minutes.  Initial treatment included artificial tears with hyaluronic acid, and dexpanthenole.  Three weeks later the boy presented with proliferation of conjunctival tissue, which was treated with topical tobramycin and dexamethasone for 3 weeks.  Surgery, followed by continued tobramycin and dexamethasone, was then required to remove the proliferative tissue; ten days after surgery, complete healing was observed and topical treatment was stopped.

A 21 year old military police officer candidate was sprayed directly in the face with OC as part of a training drill (Shimada 2011).  Immediately following the procedure, he reported blurry vision, mild photophobia in both eyes, which were irrigated with normal saline.  On an eye examination due to continued left eye pain 2 days post-OC exposure, examination revealed a corneal ulcer 1 x 4 mm.  The ulcer was treated with topical scopolamine, erythromycin, and artificial tears; 4 days post-exposure, the ulcer appeared to be healing upon examination.

**Discussion:**

The published literature on OC exposure is heterogeneous in purpose and study design.  The studies included in this review were small (10 to 100 subjects), and the four prospective trials were conducted in controlled settings.  The results of these studies should be considered in context, as their results may not be indicative of outcomes in combat or other emergency situations.  For example, in the latter situations, thorough and immediate decontamination may not be possible and medical care may not be readily available.  Assessment of the chronic effects of OC exposure is lacking.  Additional evaluation of the long-term effects is warranted.

III. **SAFETY CONSIDERATIONS**

**Decontamination and Management:**

Overview:

Most effects of OC last for less than 45 minutes.  Effects lasting beyond 45 minutes warrant emergency medical care (Czarnecki 2003).  All exposed subjects should remove contaminated clothing to prevent secondary exposure following decontamination.  Exposed areas should be rinsed with copious amounts of water for at least 15 minutes.  Baby shampoo or mild soap may be used in addition to water.

Dermal:

Mild soap and water can be used to remove the oil-based OC compounds from skin to prevent secondary contamination; decontamination does not improve pain or irritation caused by OC.  A study that assessed effectiveness of 5 topical treatments for dermal decontamination following tap water irrigation after OC exposure (magnesium hydroxide-aluminum hydroxide, whole milk, baby shampoo, 2% lidocaine gel, further water irrigation) resulted in no improvement of pain regardless of treatment; time after OC exposure was the best predictor of decrease in pain (Barry, 2008).

Ocular:

Eyes should be irrigated with copious amounts of water for a minimum of 15 minutes following ocular exposure to OC (Sciencelab MSDS, 2010).  Contact lenses should be removed immediately and discarded.  Rubbing of the eyes should be avoided.

Capsaicin disrupts the epithelial layer of the cornea, causes a loss of blink reflex, and decreases sensation in the eye (Smith, 1999).  These combined responses to capsaicin may lead to corneal abrasions from contact lens wear, foreign body, or rubbing of the eyes.  Contact lens wearers and populations prone to eye rubbing (e.g. children, developmentally disabled persons) may be at higher risk for corneal abrasions.  Additionally, subjects with impaired corneal integrity (e.g. recurrent corneal erosion, exposure keratitis) are more susceptible to severe ocular effects than those with normal corneas.

Mucus membranes:

Anecdotal evidence suggests rinsing of the mouth followed by ingestion of casein-containing foods (e.g. milk, milk chocolate, bread) may counteract effects of capsaicin in the oral mucosa (Miller, 1996).

Respiratory:

Once contaminated clothing has been removed, exposed subjects should be moved to a well-ventilated area to improve respiratory effects.  The use of humidified oxygen may provide some relief; beta-2 agonists should be used in cases of dyspnea or bronchospasm (Shen, 2006).  There is no consensus in the literature as to whether asthmatic patients or smokers are at higher risk for respiratory complications than those subjects with normal airways (Smith 1999, ACLU 1995, Chan 2001, Watson 1996, Busker 1998).  As a precaution against serious pulmonary injury including pulmonary edema, experts recommend that subjects with underlying lung disease are admitted for observation (Shen, 2006).  If sprayed directly into the mouth, there may be a risk of aspiration

Cardiovascular:

No specific cardiovascular effects are mentioned in material safety data sheets, or publications addressing OC effects.  Two trials described increased mean arterial pressure, tachycardia, or tachypnea following OC exposure (Chan 2001, Watson 1996).  Cases of mortality have been reported in subjects under the effects of illicit substances (e.g. cocaine, phenyciclidine) who were also exposed to pepper spray (U.S. DOJ, 2003).  Mortality was also associated with OC-exposed patients with underlying cardiovascular disease.

**Further Safety Considerations:**

The literature regarding the effects of capsaicinoids, including OC, on subjects with compromised respiratory physiology or other potential sensitivity is lacking.  Anecdotal reports of asthmatic officers exposed to OC suggest no additional side effects occur (Czarnecki, 2003); there was no report of how well- or poorly- controlled baseline asthma symptoms were in these subjects.   Currently, no data exist on the effects of OC exposure during an asthma attack; use in this situation should be avoided due to known physiological responses on bronchospasm and mucus secretion.

There are no data on the toxic or reproductive consequences of OC exposure in pregnancy (Czarnecki, 2003).

No consensus or clear data exist to suggest that OC exposure has a causal relationship with in-custody death; however, numerous in-custody deaths following exposure to OC cases have been reported (Southall, 2008, ACLU 1995, U.S.

12

Exhibit 2
Page 145

Department of Justice, 2003).  OC has not been proven as the causal agent, but exposure was documented in minutes to hours prior to 97 reported in-custody deaths (Southall, 2008, ACLU 1995, U.S. Department of Justice, 2003).  The majority of these patients had at least one of the following characteristics: multiple OC exposures, detectable levels of illicit drugs, high alcohol levels, underlying respiratory or cardiac disease, restraint use.  A study published by the American Civil Liberties Union of Southern California in 1995 estimated that 1 in-custody death occurred for each 600 OC exposures (ACLU 1995).  The role of positional restraint in mortality following OC exposure is unclear.

There are no published reports on the chronic effects of OC exposure (Sciencelab MSDS, 2010).

### IV.  SUMMARY

**Acute effects of OC:**
The acute effects following OC are generally irritating but self-limited.  Typical symptoms include burning and itching of exposed skin, reflex closure or repeated blinking of the eyes, coughing, sneezing, and bronchospasm.  These effects typically last no longer than 45 minutes following usual topical OC exposure (e.g. 1-10% OC sprays no more than1-2 minutes in duration).  Prolonged exposure to OC (i.e. sprays lasting more than 1-2 minutes), and repeated exposures over a short period of time may cause a longer duration of, or more severe symptoms than typical exposure.

Following ocular exposure, subjects may be at increased risk of corneal epithelial defects or abrasions.  The role of immediate ocular decontamination in preventing these effects is unclear.  Effects of OC on the respiratory and cardiovascular systems are also unclear; while some subjects have had pronounced effects in each of these systems, following OC exposure, neither risk factors nor causality have been defined.  Rare, but serious adverse events linked to respiratory failure and severe ocular damage have been reported.

**Chronic effects of OC:**
Currently, there are no published data on the chronic effects of OC in humans (Sciencelab MSDS, 2010).

**Conclusions:**
- Published literature on OC exposure is heterogeneous in purpose and study design.  The studies included in this review were small (10 to 100 subjects), and the four prospective trials were conducted in controlled settings.  The results of these studies should be considered in context, as their results may not be indicative of outcomes in combat or other emergency situations.
- Contact with OC produces burning and pain of the skin, eyes, and mucus membranes, and reflex sneezing, coughing, mucus production, and blinking or closure of the eyes.  Some exposed subjects may also suffer bronchospasm, temporary blindness, and/or panic.
- The effects of OC products are generally self-limited and resolve within 45 minutes of exposure
- Severe adverse events requiring medical care may occur in 1% to 15% of exposures to OC products (Olajos, 2004, Forrester, 2003)
- Restraint following exposure has been associated with severe adverse outcomes and death following OC exposure, though a causal relationship has not been proven.
- Currently, there are no published data on the chronic effects of OC exposure; additionally, there are no published data on long term consequences of multiple exposures to OC products.

**Recommendations:**
- All subjects exposed to OC should undergo immediate decontamination procedures, including removal of contaminated clothing and rinsing exposed areas with water for at least 15 minutes.  Contact lenses should be removed immediately and discarded.
- Subjects requiring physical restraint, particularly in a supine position, following OC exposure should be closely monitored for adverse effects.
- Subjects with underlying cardiovascular disease or under the influence of illicit stimulant substances should be monitored closely following OC exposure.
- Medical services should be offered to any subject exposed to OC complaining of severe adverse effects (e.g. bronchospasm, labored breathing, severe pain of eyes or lungs), or having symptoms that last beyond 45 minutes.
- Prolonged or repeated exposures to OC should be avoided due to the lack of long term safety data.
- The paucity of data assessing chronic effects of OC exposure mandates further investigation.

Exhibit 2
Page 146

## V. REFERENCES

1. American Civil Liberties Union of Southern California. Pepper spray update: more fatalities, more questions. 1995. Available online. http://www.aclu-sc.org/attach/p/Pepper_Spray_New_Questions.pdf. Accessed 12/20/2011.
2. Anderson PD. Emergency management of chemical weapons injuries. *J Pharm Pract*. 2011.
3. Ballantyne B. Medical management of the traumatic consequences of civil unrest incidents: Causation, clinical approaches, needs and advanced planning criteria. *Toxicol Rev*. 2006;25(3):155-197.
4. Barry JD, Hennessy R, McManus JG,Jr. A randomized controlled trial comparing treatment regimens for acute pain for topical oleoresin capsaicin (pepper spray) exposure in adult volunteers. *Prehosp Emerg Care*. 2008;12(4):432-437.
5. Billmire DF, Vinocur C, Ginda M, et al. Pepper-spray-induced respiratory failure treated with extracorporeal membrane oxygenation. *Pediatrics*. 1996;98(5):961-963.
6. Brown L, Takeuchi D, Challoner K. Corneal abrasions associated with pepper spray exposure. *Am J Emerg Med*. 2000;18(3):271-272.
7. Busker RW, van Helden HP. Toxicologic evaluation of pepper spray as a possible weapon for the Dutch police force: Risk assessment and efficacy. *Am J Forensic Med Pathol*. 1998;19(4):309-316.
8. Chan TC, Vilke GM, Clausen J, et al. The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function. *J Forensic Sci*. 2001;47(2):299-304.
9. Concato J, Shah N, Horwitz RI. Randomized, controlled trials, observational studies, and the hierarchy of research designs. *N Engl J Med*. 2000;342(25):1887-1892.
10. Cosmetic Ingredient Review Expert Panel. Final review on the safety assessment of capsicum annum extract, Capsicum annum fruit extract, Capsicum annuum resin, Capsicum annuum fruit powder, Capsicum frutescens fruit, Capsicum frutescens fruit extract, Capsicum frutescens resin, and capsaicin. *Int J Toxicol* 2007;26 Suppl 1:3-106.
11. Czarnecki F. Chemical Hazards in Law Enforcement. *Clin Occ Environ Med*. 2003;3(3):443-456.
12. Das S, Chohan A, Snibson GR, Taylor HR. Capsicum spray injury of the eye. *Int Opthamol*. 2005:26;171-173.
13. Epstein RJ, Majmudar PA. Pepper spray in the eye. *Ophthalmology*. 2001;108(10):1712-1713.
14. Final report on the safety assessment of capsicum annuum extract, capsicum annuum fruit extract, capsicum annuum resin, capsicum annuum fruit powder, capsicum frutescens fruit, capsicum frutescens fruit extract, capsicum frutescens resin, and capsaicin. *Int J Toxicol*. 2007;26 Suppl 1:3-106.
15. Forrester MB, Stanley SK. The epidemiology of pepper spray exposures reported in Texas in 1998-2002. *Vet Hum Toxicol*. 2003;45(6):327-30.
16. Gerber S, Frueh BE, Tappeiner C. Conjunctival proliferation after a mild pepper spray injury in a young child. *Cornea*. 2011;30(9):1042-1044.
17. Hand DG, Chotiner B. Maintenance of visual acuity after exposure to oleoresin capsicum spray following LASIK. *J Refract Surg*. 2002;18(3):293-294.
18. Holopainen JM, Moilanen JA, Hack T, Tervo TM. Toxic carriers in pepper sprays may cause corneal erosion. *Toxicol Appl Pharmacol*. 2003;186(3):155-162.
19. Merck & Co, Inc. *The Merck Index*. 14th ed. Whitehouse Station, N.J: Perkin Elmer; 2006.  Available online: https://themerckindex.cambridgesoft.com/themerckindex/Forms/Search/ContentArea/ChemBioVizSearch.aspx?FormGroupId=200000&AppName=THEMERCKINDEX&AllowFullSearch=true&KeepRecordCountSynchronized=false&SearchCriteriaId=23&SearchCriteriaValue=oleoresin capsicum&CurrentIndex=0. Accessed 12/17/2011.
20. Miller RL. Pepper spray exposure during a carjacking attempt. *J Emerg Nurs*. 1996;22(5):390-392.
21. Olajos EJ, Stopford W, eds. *Riot control agents, issues in toxicology, safety, and health*. Boca Raton, FL: CRC Press, LLC; 2004.
22. Recer GM, Johnson TB, Gleason AK. An evaluation of the relative potential public health concern for the self-defense spray active ingredients oleoresin capsicum, o-chlorobenzylidene malononitrile, and 2-chloroacetophenone. *Regul Toxicol Pharmacol*. 2002;36(1):1-11.
23. Sciencelab.com, Oleoresin capsicum MSDS. Updated 11/1/2010. Available online: http://www.sciencelab.com/msds.php?msdsId=9926319. Accessed 12/17/2011.
24. Seidman CJ, Linakis JG, Mello MJ, Greenberg PB. Aerosol container-related eye injuries in the United States: 1997-2009. *Am J Ophthalmol*. 2011;151:1041-1046.
25. Shen S. Riot-control agent attack. In: Ciottone GR, Anderson PD, Auf Der Heide E, Darling RG, Jacoby I, Noji E, Suner S, eds. *Disaster Medicine*. 3rd ed. Philadelphia, PA: Mosby/Elsevier; 2006:Chap 98, 593-595.
26. Shimada M, Young C, Tanen DA. Corneal ulcer associated with pepper spray exposure during military training. *J Emerg Med*. 2011.
27. Smith CG, Stopford W. Health hazards of pepper spray. *N C Med J*. 1999;60(5):268-274.
28. U.S. Department of Justice. *The Effectiveness and Safety of Pepper Spray*. 2003. Available online: www.ojp.usdoj.gov/nij. Accessed 12/17/2011.

Exhibit 2
Page 147

29. Vesalouma M, Muller L, Gallar J, et al. Effects of oleoresin capsicum pepper spray on human corneal morphology and sensitivity. *Invest Opthamol Vis Sci*. 2000:41(8);2138-2147.

30. Watson WA, Stremel KR, Westdorp EJ. Oleoresin capsicum (cap-stun) toxicity from aerosol exposure. *Ann Pharmacother*. 1996;30(7-8):733-735.

31. Watson WA, Stremel KR, Westdorp EJ, Shimada M, Young C, Tanen DA; Corneal ulcer associated with pepper spray exposure during military training. *J Emerg Med*. 2011;30(7-8):733-735.

32. Zollman TM, Bragg RM, Harrison DA. Clinical effects of oleoresin capsicum (pepper spray) on the human cornea and conjunctiva. *Ophthalmology*. 2000;107(12):2186-2189.



University of California
San Francisco

School of Pharmacy

# Adverse Health Events Associated with Pepper Spray Products: A 10 year Retrospective Review of the California Poison Control System Reported Cases

**Thomas Kearney, PharmD, DABAT** [1], **Patricia Hiatt, BS** [2]**, Elizabeth Birdsall, PharmD**[3]**, Sheri VanOsdol, PharmD, BCPS**[4]**, Craig Smollin, MD**[5]

[1]Managing Director, California Poison Control System, San Francisco Division
Professor of Clinical Pharmacy, Department of Clinical Pharmacy, University of California, San Francisco

[2] Operations Manager, California Poison Control System, San Francisco Division
Department of Clinical Pharmacy, University of California, San Francisco

[3] Clinical Toxicology Specialty Resident, California Poison Control System, San Francisco Division

[4] Medication Outcomes Center, Department of Clinical Pharmacy, University of California, San Francisco

[5]Associate Medical Director, California Poison Control System, San Francisco Division
Assistant Clinical Professor of Emergency Medicine, Department of Emergency Medicine, University of California, San Francisco

Corresponding author: Thomas Kearney,   University of California, San Francisco, UCSF Box 1369, San Francisco, CA  94143, E-mail: pcctk@calpoison.org, and phone: (415) 643-3201

Exhibit 2
Page 149

## ABSTRACT

***Background***:   Pepper sprays, that contain oleoresin capsicum (OC), are used as a non-lethal method to subdue delirious or violent individuals by law enforcement agencies, as an animal repellant, and by the general public for self-defense.  The health consequences and risk factors for humans exposed to pepper spray are poorly understood.

***Objective***: To determine the severity of pepper spray-related adverse health events reported to the California Poison Control System (CPCS).   In particular, the prevalence of symptoms suggestive of tissue injury beyond transient irritation in persons exposed to pepper spray.

***Method***:  A retrospective review of the CPCS electronic database of cases within a 10-year period (2002 to 2011) was conducted.  All cases of humans aged greater than 6 years of age that were exposed to a pepper spray product were included.  Cases were differentiated into 2 outcome groups based on case definition criteria, minor transient symptoms, and moderate or more significant symptoms suggestive of tissue injury that warranted a medical evaluation.  The circumstances and organ system effects were tabulated for the moderate outcome group.

***Results:*** A total of 4,544 cases were identified and 3,809 met the inclusion criteria. Of these, 237 cases (6.4%) had moderate symptoms.  There were no reported deaths. The most common health effects by organ system for the moderate outcome reported following pepper spray exposure included: ocular or eye injury, eg. suggestive of a possible corneal abrasion (54.4%, or 129 of 237 cases ), respiratory, eg. symptoms suggestive of bronchospasms (31.2%, or 74 of 237 cases ), and dermal burns/blisters (16%, or 38 of 237 cases).

The most common known reasons for and circumstances of exposure for the moderate outcome cases included: indirect exposure, eg. contact with sprayed animal or in room where spray discharged (16.9%), intentional direct spray, eg. use by law enforcement, for self-defense, or in the act of committing a crime (13.5%), and unintentional direct spray, eg. accidental discharge  (11.8%).

***Conclusions***:  Our experience with pepper spray exposures in California suggests that there is a risk for more serious adverse health effects in persons exposed to these products and the prevalence is consistent with the range (1-15%) as concluded by the literature review by Dr. VanOsdol.  The most common risk is a potential for ocular injury. Our review is unable to address chronic toxicity or residual disability in persons exposed to pepper spray; we could make no conclusions on its effects on pregnancy.

2

Exhibit 2
Page 150

## INTRODUCTION

Pepper sprays, that contain oleoresin capsicum (OC), are used as a non-lethal method to subdue delirious or violent individuals by law enforcement agencies, as an animal repellant, and by the general public for self-defense.  The health consequences and risk factors for humans exposed to pepper spray are poorly understood.  As concluded by Dr. VanOsdol's review, there may be a risk of serious adverse events requiring medical care in 1% to 15% of exposures to OC products. Therefore, we recognize the importance to substantiate and delineate this risk for future policy decisions. The California Poison Control System (CPCS) has served the state California since 1997 and has an archived case database of all poisons reported to its 24/7 hotline service. It is also the largest poison center system in the United States.  We took the opportunity to review human exposures to pepper spray reported to the CPCS with the goal to determine the severity of pepper spray-related adverse health events.   In particular, the prevalence of symptoms suggestive of tissue injury beyond transient irritation in persons exposed to pepper spray.

## METHODS

### Study Design and Case Inclusion

A retrospective chart review of the CPCS electronic database was conducted for pepper spray exposure consultations provided between October 1, 2002 and September 30, 2011.  The CPCS provides treatment advice and referral assistance to the public as well as to healthcare professionals through four highly integrated sites operating under a single administration.  CPCS services are available to all residents of the state of California through the CPCS toll-free emergency hotline, 24 hours a day, 365 days a year.  Each reported poisoning case is entered prospectively into a clinical database (Visual Dotlab) by trained Specialists in Poison Information (SPIs).  The SPIs are licensed pharmacists or nurses with special training in clinical toxicology through a regional poison center.  They are individually certified by the American Association of Poison Control Centers (AAPCC) after passing a standardized national examination.

For each case, the SPIs enter specific product, symptom, treatment, and outcome codes according to AAPCC criteria; initial and follow-up notes are also entered into a text field.  We searched the electronic database for exposures to pepper spray to retrieve all relevant records.  For all cases meeting the inclusion criteria, we read all case narratives to ensure proper coding of symptoms, outcomes, and treatments.

Eligible cases involved all human cases, aged 6 years or greater, that were exposed to pepper spray.  Most exposures involved aerosolization but non-aerosolized cases, involving exposure to a leaking container or other spill, were included.  In addition, young children, less than 6 years of age, were excluded in this analysis since most of these probably involved non-aerosolized inconsequential exposure (e.g. lick or

3

Adverse Health Events Associated with Pepper Spray Products
January, 2012

Exhibit 2
Page 151

taste of container) exposures and we were targeting health effects in adolescent and adult populations.

**Data Analysis and Coding**

Cases meeting the inclusion criteria were analyzed and aggregated as a cohort over the 10 year time period.  Data fields of interest included: patient demographics (age/gender), product formulation/type (e.g. self-defense spray, animal repellant ), reason or circumstance of  use or exposure, symptoms/types of adverse health effects experienced,  management site (e.g. non-healthcare facility vs. healthcare facility), and outcome.  Outcomes were dichotomized, as minor (transient irritation, as is typical of exposure) vs. moderate (or significant), based on the case definitions below.  Case definitions were developed from the approved triage criteria utilized by the CPCS and Medical Compendia, *Tintinalli's Emergency Medicine* (Chapter 236, eye emergencies), *Current Diagnosis & Treatment in Pulmonary Medicine* (Chapter 33, Drug-induced Lung Disease).

**Case Definitions:**

1. Minor or transient irritation; self-limiting effects involving irritation to body surfaces (i.e. dermal or skin, ocular or eye, respiratory or nose and throat),  in persons exposed to pepper spray. The following are examples of anticipated symptoms:
   A. <u>Dermal/skin</u>: Erythema, swelling, pain, itching. Note that prolonged pain of several hours may be expected in persons not adequately decontaminated.
   B. <u>Ocular</u>: Initial pain, tearing, redness
   C. <u>Respiratory</u>: Initial cough and choking, throat irritation (suggestive of upper airway irritation)
   D. <u>Gastrointestinal</u>: Nausea, vomiting

2. Moderate symptoms; suggest more significant tissue injury that requires a medical evaluation and may require specific medical care beyond field decontamination. The following are examples of  symptoms, diagnostic findings or care rendered for cases assigned to this group:
   A. <u>Dermal/skin</u>: Rash and or blisters suggestive of a persistent dermatitis and/or dermal second degree burn.
   B. <u>Ocular</u>: Persistent pain (more than an hour beyond irrigation), blurred vision, foreign body sensation, photophobia, discharge or exudate, periorbital swelling (symptoms suggestive of a possible corneal abrasion, iritis, or ocular infection). Cases that had documented abnormal ocular (e.g. slit lamp) examinations and diagnosis, as well as administered ocular therapies (e.g. ophthalmic antibiotics or steroids) were noted.
   C. <u>Respiratory</u>: Shortness of breath, chest tightness, wheezing (suggestive of bronchial and/or lower airway irritation or injury). Cases that had documented histories of asthma, abnormal physical or pulmonary function

examinations, as well as administered respiratory therapies (e.g.
bronchodilators) were noted.

For cases that were determined to have moderate symptoms, the circumstances, routes
of exposure, symptoms by organ system, and other specific medical therapies provided
were coded.  The circumstance codes were grouped and defined as follows:

**A.**  **Type of Exposure (Intent):**
1.  Unintentional direct- e.g. accidental exposure but sprayed directly on person
2.  Intentional direct- e.g. purposeful exposure directly on person such as law
    enforcement to subdue suspect or by individual to incapacitate another when
    threatened.
3.  Indirect- e.g. environmental exposure- walk into area where pepper spray
    released
4.  Direct unknown- direct contact with spray, but intent unknown

**B.**  **Individual responsible for incident (e.g. who sprayed):**
1.  Self
2.  Other: e.g. friend, relative, etc.
3.  Law enforcement
4.  Unknown

**C.**  **Intended use of product/product type:**
1.  Self-defense (public)
2.   Animal repellant
3.   Law enforcement-individual victim as target
4.   Law enforcement –crowd control


### RESULTS

A total of 4,544 cases were identified and 3,699 met the inclusion criteria.  Figure
1, algorithm of cases screened and reviewed, provides a summary of reasons for
exclusion of cases, and the final outcomes for included cases. Note that there were no
deaths reported and that for all cases meeting inclusion criteria, 237 cases (6.4%) had
moderate symptoms.  Table 1 summarizes the comparative demographics (age and
gender) between the two groups.  In both groups (minor and moderate symptoms) more
than 50% of exposures involved males.  The average age of individuals with
minor/transient symptoms was 25 years and with moderate symptoms, 29 years. Table
2 summarizes the circumstances and routes of exposures for cases with moderate
outcomes. The common reasons for and circumstances of exposure for the moderate
outcome cases included: unintentional direct spray, e.g. accidental discharge  (11.8%),
intentional direct spray, e.g. use by law enforcement or for self-defense (13.5%), and
indirect exposure, e.g. contact with sprayed animal or in room where spray discharged

5

Adverse Health Events Associated with Pepper Spray Products
January, 2012

Exhibit 2
Page 153

(16.9%).  Table 3 categorizes, by organ system (ocular, dermal, respiratory), the health effects for the moderate outcome cases reported following pepper spray exposure.  The most common were ocular or eye injury, e.g. suggestive of a possible corneal abrasion (54.4%), respiratory, e.g. symptoms suggestive of bronchospasms (31.2%), and dermal burns/blisters (16%).

## DISCUSSION

**Limitations**

There are several limitations to the data.  First, the retrospective review of the data source used (poison control case reports) were an inherent limit to completeness of the data.  SPIs and related personnel responsible for documenting Poison Control Center (PCC) cases focus on patient management and were not under protocol to collect prescribed information, which would be interesting to this particular topic (e.g. specific product name).  As a result, some information may be missing in our data set.  Another factor for missing information in PCC reports is incomplete follow-up of patients.  Patients are frequently lost to follow-up due to various reasons beyond the control of PCC personnel (e.g. patient leaving against medical advice or having already been discharged upon follow-up call), as well as due to workload limitations.  This explains the potential lack of information about long-term health consequences from exposures.

As an observational study and retrospective review, we are unable to claim a definitive causal relationship between the exposure and resultant symptoms or outcomes. There are likely other variables or confounders present. For example, we don't know the precise time and effectiveness of decontamination procedures or other interventions performed on exposure victims. Since exposures to pepper spray are principally from aerosolization of multiple products (with variable concentrations of capsicum, solvents, and propellants), the particle size, dose administered and impact of the ingredients are difficult to estimate.  Our results may also be subject to reporting bias because reports to the poison center are voluntary and may not reflect the true population prevalence of pepper spray exposures and outcomes.

**Conclusions**

Our experience with pepper spray exposures managed by the CPCS suggests that there is a risk for more serious adverse health effects in persons exposed to these products and the prevalence is consistent with the range (1-15%) as concluded by the literature review by Dr. VanOsdol.  The most common risk is a potential for ocular injury.  Our review is unable to address chronic toxicity or residual disability in persons exposed to pepper spray to include effects on pregnancy.  It is also unclear if a past medical history of asthma puts an individual at a higher risk for bronchospasm if exposed to pepper spray.

6

Exhibit 2
Page 154

Although we don't know the degree to which prompt decontamination by irrigation of exposed body surfaces mitigated symptoms or injury, it seems reasonable that individuals or institutions that use or intend to use pepper spray be informed of the importance of performing this first aid procedure. In addition, that exposed persons, to the extent possible, be followed for the potential of developing more severe adverse health effects.

**Acknowledgements**
Terry Carlson, PharmD, for data acquisition.

Adverse Health Events Associated with Pepper Spray Products
January, 2012

Exhibit 2
Page 155

**Figure 1**: Algorithm for outcome of California Poison Control System cases of exposure to pepper spray



**Table 1.  Demographics**

| Demographics | Minor Symptoms | Moderate Symptoms |
|---|---|---|
| **Gender** | | |
| **M** | 1759 (51%) | 131 (55%) |
| **F** | 1636 (40 pregnant) | 106 (4 pregnant) |
| **Unknown** | 67 | |
| **Age** | | |
| **Average** | 25 | 29 |
| **Range** | (6 – 94 years) | (6 – 82 years) |

Adverse Health Events Associated with Pepper Spray Products
January, 2012

Exhibit 2
Page 156

**Table 2.  Circumstances of  Pepper spray exposure that resulted in moderate outcomes (N=237)**

| Type of Exposure (Intent)* | N | % |
|---|---|---|
| Unintentional, Direct | 28 | 11.8 |
| Intentional, Direct | 32 | 13.5 |
| Unknown, Direct | 137 | 57.8 |
| Indirect | 40 | 16.9 |

| Individual responsible for incident | N | % |
|---|---|---|
| Self | 20 | 8.4 |
| Other | 51 | 21.5 |
| Law Enforcement | 12 | 5.0 |
| Unknown | 154 | 65.0 |

| Intended use of product | N | % |
|---|---|---|
| Self-defense | 31 | 13.1 |
| Animal repellant | 8 | 3.4 |
| Law enforcement | 29 | 12.2 |
| Unknown | 169 | 71.3 |

| Route of Exposure* | N | |
|---|---|---|
| Dermal | 95 | |
| Ocular | 154 | |
| Inhalation | 71 | |
| Ingestion | 2 | |

*Definitions: Type of Exposure (Intent): Unintentional direct e.g. accidental exposure but sprayed directly on person; Intentional direct e.g. purposeful exposure sprayed directly on person; Indirect e.g. environmental exposure such as walking into area where pepper spray was released; Direct unknown e.g. direct contact with spray but intent is unknown. Individual responsible for incident (e.g. who sprayed): Self; Other e.g. friend, relative or stranger; Law enforcement (in the course of business or in training exercise); Unknown (circumstances of exposure unknown).  Intended use of product/product type: Self-defense (used by public), Animal repellant (bear or dog most commonly), Law enforcement (individual target or for crowd control); Unknown (original purpose of spray not known).
** Multiple routes of exposure are possible

Adverse Health Events Associated with Pepper Spray Products
January, 2012

9

Exhibit 2
Page 157

**Table 3.  Most common significant adverse health effects from Pepper spray exposure (N=237)**

| Body/Organ System Effect | Associated signs and symptoms | Number | %* |
|---|---|---|---|
| Ocular | Persistent pain, blurred vision, foreign body sensation, discharge or exudate, periorbital swelling ** | 129 | 54.4 |
| Respiratory | Shortness of breath, chest tightness, wheezing *** | 74 | 31.2 |
| Dermal | Rash, Blisters | 38 | 16.0 |

*\* Total is > 100%.  Multiple symptoms were present in many patients but only 6 patients had significant adverse effects in more than one organ system.*
*\*\* 12 cases had a documented corneal abrasion*
*\*\*\* 10 cases had documented wheezing and bronchospasm*

10

Adverse Health Events Associated with Pepper Spray Products
January, 2012

Exhibit 2
Page 158

Exhibit 2
Page 159

Exhibit 2
Page 160



campusprotestreport.universityofcalifornia.edu

Exhibit 2
Page 161

# Exhibit 3



# Robinson/Edley Report

## TWELVE-MONTH IMPLEMENTATION REPORT

*A report on the implementation of the Robinson/Edley Report recommendations to the University of California President Janet Napolitano*

**Nathan Brostrom**
*CDI Steering Committee Chair*

**Lynn Tierney**
*CDI Systemwide Implementation Manager*

# February 14, 2014

UNIVERSITY
OF
CALIFORNIA

Exhibit 3
Page 162

Exhibit 3
Page 163

## Letter of Transmittal

### UNIVERSITY OF CALIFORNIA

BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO          SANTA BARBARA · SANTA CRUZ



1111 Franklin Street
Oakland, California 94607-5200
Phone: (510) 987-9075
Fax: (510) 987-9086
http://www.ucop.edu

February 27, 2014

I am pleased to have reviewed and accepted the completed Robinson/Edley Report titled, 12-Month Implementation Report. From the start, the report was premised on the idea that free expression, robust discourse and vigorous debate are essential to the mission of the University.

The implementation steps taken by the entire University community in the last 18 months will ensure that we have a viable and fair set of best practices that preserve and promote the rights and responsibilities of free speech on the campuses, respond fairly and reasonably to civil disobedience when it occurs, and also provide safety and security to all the students, faculty, staff, and visitors on our campuses.

The Chancellors on all 10 campuses led the effort to create or revise policies that bolster communications efforts to diffuse problems before they reach a flash point, to revise or create police policies related to crowd control and use of force, and to provide students with ample opportunity to understand both the rights and responsibilities that accompany activities related to freedom of speech and civil disobedience.

I want to thank President Emeritus Mark G. Yudof for his commitment to this effort, General Counsel Charles Robinson and Dean Christopher Edley for their leadership, the Chiefs of Police for their thoughtful efforts in critical revisions to Police Policy, and the students, faculty, and staff who gave so much time in the town meetings, briefings and working committees to finalize this report.

This report is a living document. The Office of the President will continue to support each campus community by ensuring that policies and programs remain up to date and responsive to community concerns, that training continues for both police and administrative staff, and that accountability is in place.

Our University system has an obligation to maintain a responsible approach to protecting and managing protests on our campuses, and we are committed to fulfilling that responsibility in the years to come.

Yours very truly,

Janet Napolitano
President

Exhibit 3
Page 164

Exhibit 3
Page 165

UNIVERSITY OF CALIFORNIA

# Robinson/Edley 12-Month Implementation Report

TABLE OF CONTENTS

**Executive Summary**..........................................................3
   Overview....................................................................3
   Implementation Strategy for the CDI...............................4
   Modifications to the Original Recommendations ..........4
   Target Areas and Accomplishments................................7
   Summary ...................................................................8

**Introduction**...................................................................9
   Overview....................................................................9
   Roles and Responsibilities...........................................10
   Systemwide Level.......................................................10
   Campus Level............................................................11
   Recommendation Responses........................................11

**Centrally Addressed Recommendations Summary** ....19
   Overview...................................................................19
   Use of Force .............................................................19
   Administrator Involvement ..........................................22
   Reporting and Evaluation............................................24
   Other Recommendations with Central Lead ...............26

**Campus Summaries** ......................................................29
   Overview...................................................................29
   Campus Project Tracker ..............................................30

   **Berkeley**....................................................................31
      Twelve-Month Summary.............................................32
      Chancellor Certification.............................................34

   **Davis** ........................................................................35
      Twelve-Month Summary.............................................36
      Chancellor Certification.............................................44

**Irvine** .........................................................................45
   Twelve-Month Summary.............................................46
   Chancellor Certification.............................................54

**Los Angeles** .................................................................55
   Twelve-Month Summary.............................................56
   Chancellor Certification.............................................60

**Merced** .......................................................................61
   Twelve-Month Summary.............................................62
   Chancellor's Certification...........................................64

**Riverside**.....................................................................65
   Twelve-Month Summary.............................................66
   Chancellor's Certification ..........................................69

**San Diego** ...................................................................71
   Twelve-Month Summary.............................................72
   Chancellor's Certification ..........................................78

**San Francisco** ..............................................................79
   Twelve-Month Summary.............................................80
   Chancellor's Certification...........................................84

**Santa Barbara** .............................................................85
   Twelve-Month Summary.............................................86
   Chancellor's Certification ..........................................92

**Santa Cruz** ..................................................................93
   Twelve-Month Summary.............................................94
   Chancellor's Certification ..........................................103

**Appendix** ..........................................................104

Exhibit 3
Page 166

Exhibit 3
Page 167

EXECUTIVE SUMMARY

# Overview

In September 2012, General Counsel Charles F. Robinson and Dean Christopher Edley Jr., of Berkeley Law, presented a report entitled "Response to Protests on UC Campuses" (Robinson/Edley Report) to University of California President Mark G. Yudof.

The Robinson/Edley Report "was premised on the belief that free expression, robust discourse, and vigorous debate over ideas and principles are essential to the mission of our University. The goal of the Report [was] to identify practices that facilitate such expression and encourage lawful protest activity—while also protecting the health and safety of our students, faculty, staff, police, and the general public when protesters choose to engage in civil disobedience or possibly violate laws and regulations" (Robinson/Edley Report, page 1).

Based on extensive evaluation of best practices, discussion with campuses within the system and across the nation, and legal research on issues like use of force, First Amendment rights and the role of administrators in protest situations, the report made 49 recommendations. Over the past year, all 10 campuses have instituted practices, created new programs, undergone training and built new strategies to implement the recommendations and build confidence and capability to reduce the likelihood that serious clashes between protestors, the police and administration will occur.

It is important to note that several of the practices identified in the Robinson/Edley Report were already standard operating procedure on the campuses. Indeed, all of our campuses have long employed many of these recommended practices to positive effect in responding to protests—the vast majority of which are handled peacefully, every day, across the UC system.

As noted in the Robinson/Edley Report, "for some campus administrators and police, however, implementing the recommendations [has required] a substantial shift away from a mindset that has been focused primarily on the maintenance of order and adherence to rules and regulations" to a more open and communicative attitude. The goal always is to balance the fundamental right of

protestors to their First Amendment freedoms while still maintaining safety and security on the campus.

With this implementation report, and the collaborative way that the implementation strategies have been developed on each campus, we expect to see continued growth of cooperation and communication related to campus protest among all stakeholders on campus, and also a heightened understanding on the part of protestors that will require them to take more responsibility for their activities. Campuses have increased opportunities for discussions related to civil disobedience, and it is up to the students and other campus constituents to avail themselves of these opportunities to be educated about protest-related rules and consider the impact that acts of civil disobedience can have on others in the campus community.

> "UC Davis has emerged from this process a stronger, more reflective and more responsive institution, capable of working in a cooperative manner with faculty, staff and students and dedicated to cultivating an atmosphere of openness, trust and mutual consideration."—*UC Davis 12-Month Summary*

In order to implement the recommendations, the Office of the President initiated the Civil Disobedience Initiative (CDI), a multilevel, collaborative approach to build communication, consistency and cooperation with campuses across the system. This implementation report provides a summary of the progress that the CDI has made toward fulfilling the goals of the Robinson/Edley Report. It describes implementation strategies at both the system and campus levels, and provides an overview of how recommendations were ultimately carried out. As will be addressed in this report, during the implementation process, some of the

Exhibit 3
Page 168

original recommendations were revised in order to better meet the goals of the Robinson/Edley Report and to accommodate different needs and challenges among the UC campuses.

Each campus has addressed or is in the process of addressing every one of the 49 recommendations. They submitted their strategies for implementing the recommendations, which were then reviewed by the CDI Working Group to ensure the strategy met the spirit and intent of the report. This work took a major effort and focus on the part of the campus points of contact, each of whom was selected by their Chancellor, to reach out to the campus community and develop and review implementation strategies.

The CDI has provided the University of California with a valuable opportunity to engage with important issues impacting the safety and well-being of campus communities. As will be demonstrated in this report, this hard work has increased opportunities for communication and understanding among the campus community—administrators, faculty, staff, police and students—and created a template for working through other systemwide issues in this arena, should they arise.

## Implementation Strategy for the Civil Disobedience Initiative

The CDI encompasses work done on the campus level, the systemwide level, and through collaboration between the campuses and the Office of the President. To coordinate campus-level work, each Chancellor named a campus point of contact to coordinate implementation of the Robinson/Edley recommendations on the campus and communicate progress and concerns to the Office of the President.

At the system level, the Office of the President has been active in facilitating discussion among campuses, police chiefs and a variety of experts in civil disobedience, First Amendment issues and leadership in crisis, as well as implementing recommendations that were best coordinated centrally due to their applicability throughout the system. To support this work, an implementation team was cre-

ated at the Office of the President, comprising a project director and project lead, assisted by the Chief Justice Earl Warren Institute on Law and Social Policy at Berkeley Law, to track progress and verify the submissions. A higher-level Advisory Group and Steering Committee provided guidance and verified that the recommendations have been fully addressed.

## Modifications to the Original Recommendations

During the implementation process, certain recommendations were flagged for further refinement. The concerns and opinions of CDI stakeholders were communicated to the Steering Committee to make a final determination about alterations to recommendation language and requirements. Several of the original recommendations were thus revised in order to meet the goals of the Robinson/Edley Report while accommodating the needs and challenges among the UC campuses.

The most critical and highly sensitive aspects of the Robinson/Edley Report dealt directly with the role of the administration in protest response planning and operation, crowd management and use of force. Though the original recommendations aimed at clarifying roles and responsibilities as well as defining the parameters of use of force more narrowly, they were in some cases overreaching or impractical to implement when tested against real-life situations on the campuses. Changes to two of these recommendations bear explanation here.

### Recommendation 13

*Original language:* Absent exigent circumstances, bar commencement or escalation of force by police unless the Chancellor or the Chancellor's designee approves it immediately before the action is taken. If the Chancellor designates decision-making responsibility, the Chancellor's designee must (Edley) or may (Robinson) be a member of the Academic Senate.

Exhibit 3
Page 169

*Explanation:* Under the original recommendation, the Chancellor or a designee would be required to approve use of force on site. While the Chancellor is ultimately responsible for all of the actions taken by administrators and police on the campuses during protest, having him or her dictate police tactics in the moment is impractical and would be counter to police procedure and incident command protocols. The implementation strategy that was crafted instead requires that the policy makers on the campus, including the Chancellor, meet with their event response teams to discuss the entire range of issues related to any potential protest, that they craft a strategy together, that they discuss issues like whether or not to let a building occupation proceed if it occurs, how forcefully to maintain order, at what point police will be called in and if they are, what the operations plan is. This way, there is a dialogue, all the voices are heard, the what-if scenarios are played out and decisions are made. Once this agreement is reached, it is with the knowledge that the events in the moment may force the police and administrators to reconsider their plan. Thus campuses have added a principle to their event response team charter that states that they will constantly reassess the situation and make adjustments to the plan. According to the implementation plans submitted by each campus, a senior administrator will be either at the scene or in touch with the Police Chief or commanding officer at each event. The bottom line is that all of the contingencies will be reviewed prior to and during management of a demonstration by those responsible, and strategic decisions will be made with the knowledge and involvement of the Chancellor or his or her designee.

The recommendation, as revised, below, is a viable process, particularly in light of the fact that all of the other activities of de-escalation, increased communication and heightened interaction among police, demonstrators and administrators will be in place.

*Revised language:* Absent exigent circumstances and to the extent practicable, the Chancellor or the Chancellor's designee should be consulted prior to commencement of force.

### Recommendation 35

*Original language:* Establish and implement a systemwide response option framework for use on each campus.

*Explanation:* Crowd control issues with a particular focus on their relation to use of force were examined. One of the major discussions in the Robinson/Edley Report was the possible implementation of a response option framework on each campus. Working with the UC Council of Chiefs of Police, and in consultation with California Commission on Peace Officer Standards and Training (POST) and many outside experts in use-of-force litigation, we concluded that the institution of a response option framework was not the optimal approach for the UC system. It is generally not used in California, according to POST, and there is a national debate about the efficacy of the framework concept, noting that officers must have the flexibility to react with reason and appropriateness rather than a proscribed escalation when facing a dynamic situation like a protest. Furthermore, the introduction of this type of framework is not applicable to protest scenarios and may constrict officers in more serious situations, including those involving an active shooter or other circumstances they may encounter.

> "We have worked to redefine and refine the roles of senior administration, academics and the police—and we have forged new ways of working together that have been extremely positive."
>
> —UC Berkeley 12-Month Summary

Exhibit 3
Page 170

## Crowd Management Intervention and Control Strategies*

| Situation | Law Enforcement Response | |
|---|---|---|
| **Lawful Assembly**<br><br>Free Speech and assembly are protected First Amendment activities. :<br><br>⤷ Speeches   ⤷ Picketing<br>⤷ Marches   ⤷ Public assemblies<br>⤷ Demonstrations   ⤷ Protests<br>⤷ Rallies   ⤷ Celebratory events | **Use Crowd Management strategies**<br><br>⤷ Meet with event organizers and stakeholders<br>⤷ Determine the history and risk of the group<br>⤷ Create a planning team<br>⤷ Check permit limitations<br>⤷ Develop Incident Action Plan and objectives<br>⤷ Identify and assign resources<br>⤷ Monitor and assess crowd behavior | ⤷ Separate opposing factions<br>⤷ Maintain video log<br>⤷ Provide direction and expectations at roll call/briefing<br>⤷ Engender facilitation, not confrontation<br>⤷ Interact with organizers and gain their cooperation |
| **Isolated Unlawful Behavior**<br><br>Isolated unlawful activity by individuals or small groups within a crowd should not automatically form the basis for declaring an assembly unlawful.<br><br>⤷ Isolated destruction of property<br>⤷ Isolated acts of violence<br>⤷ Isolated rock or bottle throwers<br>⤷ Individual sit down demonstrators | **Use Crowd Intervention strategies**<br><br>⤷ Use organizers and monitors to gain voluntary compliance<br>⤷ Isolate, arrest and remove law violators as quickly as possible<br>⤷ Video action of officers and law violators<br>⤷ Use amplified sound to communicate intent or to gain compliance<br>⤷ Use low profile tactics when possible. Don't become the focus of the demonstration | ⤷ When it is not possible to make an immediate arrest, identify and track suspects using cameras, observation posts, an air unit or shadow teams<br>⤷ Continue to assess; escalate and de-escalate as behavior changes<br>⤷ Don't increase crowd tension or change crowd focus to law enforcement by unnecessary aggressive appearance or behavior |
| **Unlawful Assembly**<br><br>Assemblies may be dispersed when they are violent, or pose a clear and present danger of violence, or the group is breaking some other law in the process. If a crime is occurring, action may be taken to stop it prior to a Dispersal Order being given.<br><br>Per Penal Code §407, two or more persons assemble to:<br><br>⤷ Commit an unlawful act or<br>⤷ Commit a lawful act in a boisterous or tumultuous manner | **Use Crowd Control strategies**<br><br>⤷ Seek voluntary compliance<br>⤷ Video action of officers and law violators<br>⤷ Act quickly<br>⤷ Request needed resources<br>⤷ Put control forces in place<br>⤷ Identify dispersal routes<br>⤷ Consider a traffic plan<br>⤷ Move media to protected area<br>⤷ Use amplified sound to communicate intent to declare an unlawful assembly<br>⤷ Disperse unlawful crowd | ⤷ Track and contain groups involved in illegal behavior using cameras, observation posts, shadow teams or air unit<br>⤷ Arrest individuals who fail to disperse or who are involved in illegal activity<br>⤷ With proper approval, deploy appropriate less lethal munitions to defend officers or to disperse the crowd<br>⤷ Ensure only reasonable force<br>⤷ Report use of force<br>⤷ Restore traffic flow |
| **Riot**<br><br>Penal Code §404: (a) Any use of force or violence, disturbing the public peace, or any threat to use force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot.<br><br>⤷ Group violent behavior<br>⤷ Group acts of property damage | **Use Crowd Control strategies**<br><br>⤷ Video action of officers and law violators<br>⤷ Request needed resources<br>⤷ Put control forces in place<br>⤷ Stop the illegal activity<br>⤷ Put a traffic plan in place<br>⤷ Track and contain groups involved in illegal behavior using cameras, observation posts, shadow teams or air unit<br>⤷ Arrest law violators<br>⤷ With proper approval, deploy appropriate less lethal munitions to defend officers or to stop violent behavior or property damage | ⤷ Ensure only reasonable force<br>⤷ Report use of force<br>⤷ Restore and maintain order<br>⤷ Restore traffic flow<br>⤷ Discourage groups from forming<br>⤷ Protect lives, property, and vital facilities<br>⤷ Remain present<br>⤷ Reassess the situation<br>⤷ Return to normalcy<br>⤷ Act quickly |

*Situation Severity* (vertical axis label)

*From POST guidelines "Crowd Management, Intervention, and Control," Appendix B*     *Note: This table is neither all-inclusive nor limiting*

Exhibit 3
Page 171

Another consideration is that all sworn police officers in California are certified by POST and train to the POST "Crowd Management, Intervention, and Control" guidelines, adopted in 2012. These guidelines align levels of protester resistance to levels of police response and clearly spell out the likely scenario for both police and protesters should resistance escalate during an event. Given that we often call in mutual aid from other police agencies, it is logical that we would rely on the universal POST crowd control guidelines, rather than a response option framework, to serve as a guideline for officers responding to major crowds or protests. These guidelines, distilled into a matrix, Appendix B to POST's "Crowd Management, Intervention, and Control," detail the appropriate law enforcement response to escalation of resistance on the part of participants (see page 6).

The UC Chiefs of Police, campus points of contact and CDI Steering Committee all felt the approach reflected in the revised language below was more viable than the originally stated Recommendation 35.

*Revised language:* Establish and implement a systemwide framework that guides the officers' response to specific actions in crowd control situations, always using the appropriately reasonable level of force to meet the level of resistance offered and maintain overall safety and control. Officers should be trained on the framework, and its principles should be incorporated into operation plans.

## Target Areas and Accomplishments

### Civil Disobedience and Free Speech

Many of the Robinson/Edley Report recommendations focused on creating a systemwide approach to supporting First Amendment activities as a historical and necessary part of the campus experience while balancing the need to maintain safety and security in the face of civil disobedience or disruptive behavior, and finding ways to implement this approach on each campus. For example, each campus has adopted or is adopting language in policies or other documents that underscores free speech and recognizes the historical significance of civil disobedience, but that

also affirms the university's responsibility to promote safety and uphold the law. Additionally, substantial work has been done to increase opportunities for dialogue and communication throughout the campus community, so that demonstrators may gain more understanding of emerging issues and be less likely to resort to protest as the first action in issue resolution.

> "In addition to recommended practices that UCLA followed prior to the report being issued, the campus has undertaken tangible and meaningful changes as a result of the Robinson/Edley Report recommendations."
>
> *—UCLA 12-Month Summary*

### Relationship Building throughout the Campus Community

Every campus has continued to make concerted efforts to have strong relationships among campus stakeholders. Some campuses have created or better publicized existing office hours where students can bring issues to the attention of administrators and seek redress. Since the publication of the Robinson/Edley Report, many campuses have held town halls and created other events to air grievances related to issues impacting the campus community and likely to trigger protest as a way to give voice to students and others and to ensure the issues and possible solutions are heard. In fact, some of the issues, like the tuition increases of recent years, were the impetus for student support of Proposition 30, a 2012 tax measure that led to a freeze in tuition. Students registered 50,000 voters in the process of advocating for the ballot measure. Programs have also been developed to allow for more interaction and understanding between students and police. The intent of this work is to encourage dialogue, respect processes and include campus communities in productive discussions.

Exhibit 3
Page 172

**Role Definition and Coordination among Event Responders**

To address the recommendations relating to protest response and management, each campus has created a guiding document for its event response team. For example, each campus has procedures in place for communicating with demonstrators and demonstration leaders before, during and after protests, and ensuring that demonstrators are aware of relevant policies and alternative means of communicating their opinions. Each campus's protest response plan also includes steps for communicating with the entire campus community about major developments or any safety concerns. Beyond meeting the relevant recommendations, campuses have latitude in determining how best to coordinate campus response to protests and demonstrations.

> "This review and assessment through the CDI process has provided an opportunity for UCI to improve and enhance a number of policies and procedures and to make additional efforts in engaging our student body to provide the best possible student experience and education."
>
> *—UC Irvine 12-Month Summary*

**Hiring and Training**

Various trainings that reflect the priorities and spirit of the Robinson/Edley Report have been developed for administrators and police. These include more in-depth police training in crowd management and control techniques, low-profile arrest techniques, as well as interagency training with local law enforcement and among UC police departments. Police hiring and promotions on all campuses now require community involvement.

**Documenting and Review**

Several of the recommendations focused on creating an objective record of major events and helping campuses to use each event as an opportunity to reflect and improve upon their event response process. In order to create an objective record of events, each campus has established a process for videotaping major events. Some campuses have also created volunteer observer programs. A new post-event documentation and review process has been established systemwide.

## Summary

As the Robinson/Edley Report stated in the closing paragraph of its executive summary: "To be sure, no single report can resolve all the issues the university faces regarding protest and civil disobedience. Successfully laying the groundwork for safe and accountable protest activity will take the commitment and effort of all members of the university community. This Report is just the starting point— an attempt to assist the university in moving forward to celebrate the diversity of opinion and culture on our campuses, to do so with respect and civility, and to build on the illustrious history of public involvement and free speech that is the DNA of the University of California" (Robinson/Edley Report, page 3).

The implementation of the Robinson/Edley Report recommendations, as adopted by the CDI Steering Committee and implemented by the 10 campuses and the UC Office of the President, furthers the achievement of three important goals:

- To preserve and protect First Amendment rights,

- To promote the peaceful convergence of myriad ideologies and points of view, and

- To ensure the rights of all on the campuses to create and acquire knowledge in a safe and secure environment.

The process has been a substantial effort, and we as a system are better for it.

Exhibit 3
Page 173

INTRODUCTION

# Overview

Over the past 12-plus months the UC campuses, as well as the Office of the President, have worked to implement the recommendations of the Robinson/Edley Report. Many of the campuses had in place or started implementing the recommendations prior to the formal acceptance of the report (September 2012) by UC President Mark Yudof. This implementation report fulfills Recommendation 48:

> *Require a final report and certification from each Chancellor one year following the President's acceptance of this Report's recommendations confirming that all recommendations so accepted have been implemented.*

This implementation report brings together all of the campuses' 12-month summary reports, the Chancellors' certifications and the centrally addressed recommendations into a single document. It also discusses the overall management approach, how the recommendations were addressed at the central level and how the campuses have implemented or are in the process of implementing all 49 recommendations.

## CIVIL DISOBEDIENCE INITIATIVE PROCESS OVERVIEW

The work of the University of California over the past 12 months has focused on moving the organization forward.

| | PROCESS | OUTCOMES |
|---|---|---|
| *Policies, Procedures and Guidelines Recommendations* | • Review for the consistency of civil disobedience policies<br>• Review ease of access to related policies by stakeholders | • Coordinate effort<br>• Best practices identified<br>• Consistent application of civil disobedience best practices |
| *Organization and Structure* | • Review management crisis response structure and communication processes | • Enhance ability for effective crisis management |
| *Communications and Training* | • Review the ongoing training for any gaps<br>• Review existing mechanisms for relationship building | • Align training resources with need<br>• Build systemwide consistency in training<br>• Strengthen relationship building opportunities |

Exhibit 3
Page 174

## Roles and Responsibilities

An organizational structure, along with roles and responsibilities, was established for CDI, as shown on the following pages. The organizational structure was updated as team members changed over the 12-month period.

**Systemwide Level**

President Yudof, in accepting the Robinson/Edley Report, appointed Lynn Tierney as the systemwide implementation manager. Lynn worked with the President as the executive sponsor to establish a steering committee that currently includes:

- Nathan Brostrom (Chair and Project Sponsor), Executive Vice President, Business Operations–University of California Office of the President

- Ralph Hexter, Provost and Executive Vice Chancellor–UC Davis

- Janina Montero, Vice Chancellor for Student Affairs–UCLA (replaced Penny Rue, former Vice Chancellor for Students Affairs–UC San Diego)

- Karen Petrulakis, Chief Deputy General Counsel–UCOP

- Pam Roskowski, Police Chief and UC Systemwide Police Coordinator–UC San Francisco

- Peter Taylor, Executive Vice President and Chief Financial Officer–UCOP

Lynn worked with all of the individual campuses on this effort and regularly consulted and communicated with the various UC leadership groups. Some of the groups that she has worked with include:

- Council of Chancellors (COC)

- Council of Police Chiefs

- Student Body Presidents Advisory Council

- Council of Vice Chancellors of Administration (COVCA)

- Academic Council

- President's Student Advisory Council

- Council of Vice Chancellors of Student Affairs (COVCSA)

- Executive Vice Chancellors (EVC)

- UC Student Association (UCSA)

- Association of Emergency Managers (AEM)

- UC Davis Community Advisory Board

The Civil Disobedience Initiative (CDI) was established to bring structure to the effort. Robert Judd was assigned as the project lead to ensure that the initiative met its primary objective to implement the recommendations of the Robinson/Edley Report by the end of September 2013.

Exhibit 3
Page 175

## Campus Level

Each campus has undertaken the implementation of the Robinson/Edley Report recommendations in a manner that aligns with the recommendations but also allows for flexibility to fit its own environment. One role common to all campuses, however, is the campus point of contact. The campus points of contact were appointed by the Chancellors. Participants include:

- Ann Jeffrey, Assistant Vice Chancellor and Chief of Staff, Administration and Finance–UC Berkeley

- Gary Sandy, Senior Executive Director in the Office of the Chancellor–UC Davis

- Paul Henisey, Police Chief–UC Irvine

- James Herren, Police Chief–UCLA (replaced Jack Powazek, Vice Chancellor, Administration)

- Jane Lawrence, Vice Chancellor of Student Affairs–UC Merced

- Chuck Rowley, Interim Vice Chancellor, Business and Administrative Services–UC Riverside

- Gary Matthews, Vice Chancellor of Resource Management and Planning–UC San Diego

- Pam Roskowski, Police Chief–UC San Francisco

- Dustin Olsen, Police Chief–UC Santa Barbara

- Jean Marie Scott, Associate Vice Chancellor, Risk and Safety Services–UC Santa Cruz (replaced Sarah Latham, Vice Chancellor, Business and Administrative Services)

This group has met regularly to coordinate efforts and discuss implementation of the recommendations. They have provided documentation for the verification of compliance with the Robinson/Edley Report recommendations.

## Recommendation Responses

The recommendations were classified according to the primary group named to address the recommendations: campuses or UCOP. A discussion of the recommendations that were centrally addressed by UCOP begins on page 19. A narrative summary of the campus responses to each recommendation is contained in the appendix. The narratives in some cases detail major policy shifts, exciting programs aimed at building understanding and comaraderie between police and campus constituents, and innovative approaches to engaging all stakeholders. The appendix is a separate document available on the CDI website: http://campusprotestreport.universityofcalifornia.edu/documents/implementation-report-appendices.pdf

Exhibit 3
Page 176

## Project Organization Structure



CIVIL DISOBEDIENCE INITIATIVE ORGANIZATIONAL CHART

**EXECUTIVE SPONSOR**
President Napolitano

**STEERING COMMITTEE**
Nathan Brostrom (Chair)
Ralph Hexter
Janina Montero
Karen Petrulakis
Pam Roskowski
Peter Taylor

**PROJECT SPONSOR**
Nathan Brostrom

**PROJECT DIRECTOR**
Lynn Tierney

**ADVISORY GROUP**
Pam Roskowski–Campus Police
Jerlena Griffin-Desta–StudentAffairs
Karen Petrulakis–OGC
Cheryl Lloyd–Risk Mgmt

COVCA

COC

COVCSA

COUNCIL OF POLICE CHIEFS

EVC

ACADEMIC COUNCIL

UCSA

AEM

COMMUNICATION LIAISONS

**PROJECT LEAD**
Robert Judd

**CAMPUS POINT OF CONTACTS**
Ann Jeffrey—UCB
Gary Sandy—UCD
Paul Henisey—UCI
James Herren—UCLA
Jane Lawrence—UCM
Chuck Rowley—UCR
Dustin Olsen—UCSB
Jean Marie Scott—UCSC
Gary Matthews—UCSD
Pam Roskowski—UCSF

**COMMUNICATIONS LEAD**
Michelle Burns

**INCIDENT MANAGEMENT TRAINING**
Amy Levine (Lead)
Simon Barker—Marsh
Robert Charbonneau—UCOP
David Fukutomi—CalEMA
Phillip VanSaum—UCSD
Glenn Woodbury—US CHDS

**WORKING GROUP**
Elisabeth Yap—Senior Legal Counsel
Pam Roskowski—UCSF Police Chief
Kimberly Peterson—IMPAC Coordinator

**WARREN INSTITUTE**
Morgan Lewis
Andrea Russi

Exhibit 3
Page 177

## CDI Roles and Responsibilities

The Civil Disobedience Initiative (CDI) had as its primary objective to implement the recommendations of the Robinson/Edley Report, "Response to Protests on UC Campuses," accepted on September 13, 2012. The organization of the team helped to ensure a successful implementation. The roles of the team are summarized below, along with their primary responsibilities.

### Executive Sponsor
- Is highest point of contact and escalation for system
- Has final approval authority

### Project Sponsor
- Provides executive support for the initiative
- Ensures alignment of internal organizational support
- Has final authority on recommendations to present to President

### Project Director
- Has overall responsibility for the implementation of the Robinson/Edley Report recommendations
- Negotiates viable solutions for recommendations that conflict, are redundant or don't work
- Oversees team organization and performance
- Provides quality assurance

### Project Lead
- Manages project deliverables to project schedule
- Tracks and updates actions, risks, issues (project log), project reporting
- Keeps project on track

### Communications Lead
- Designs communications structure
- Defines communications objectives
- Monitors and manages project communications with key stakeholders
- Manages Web content

### Warren Institute
- Reviews reports and submissions
- Conducts further analysis
- Assists in drafting the six-month and 12-month reports

### Steering Committee
- Reviews final recommendations and implementation scenarios
- Confirms the final number of recommendations for implementation
- Concurs with the campus methodology

### Advisory Group
- Provides subject expertise and guidance
- Has decision-making capability
- Has understanding of the whole project
- May be in the discussion meetings with the campuses
- Is responsible for keeping their stakeholder groups informed and involved

### Communication Liaisons
- Provide feedback from their stakeholder groups
- Have responsibility for keeping their stakeholder groups informed of initiative's progress
- Work with campuses to maximize opportunities to bolster communication objectives

### Campus Points of Contact
- Serve as the primary point of contact for each campus
- Ensure that deliverables are being completed
- Provide feedback from their stakeholder groups

### Working Group
Comprising internal subject-matter experts who:
- Advise and propose implementation strategies
- Ensure that the recommendations are being implemented consistently across the university and reflect current best practices
- Review submissions from the campuses and the Office of the President

### Incident Management Training Team
- Creates and delivers an incident management training curriculum

Exhibit 3
Page 178

## Recommendations as Implemented

The following is a list of the Robinson/Edley recommendations as implemented. An asterisk (✱) indicates that the implemented recommendation has been revised from the original report. See the Centrally Addressed Recommendations Summary section, beginning on page 19, for comparison and further description.

**Recommendation 1:** Add to current campus "Free Speech" and police policies language formally recognizing that civil disobedience has had a historic role in our democracy, but that it is not protected speech under the Constitution, and that it may have consequences for those engaging in it.

**Recommendation 2:** Increase and better publicize opportunities for students, faculty, staff and others to engage with senior administrators, particularly on issues likely to trigger protest or civil disobedience events.

**Recommendation 3:** Discuss with the Regents the possibility of increasing opportunities for students and other campus constituencies to address concerns directly with the Regents at times other than during the public comment period at formal meetings.

**Recommendation 4:** Collect each campus's current time, place, and manner regulations and all policies governing the response to events of civil disobedience, including applicable systemwide and campus police policies; post collected policies on system and campus websites.

**Recommendation 5:** Create user-friendly summaries of each campus's time, place, and manner regulations and policies governing the response to events of civil disobedience, and distribute the summaries at least annually during student orientations; highlight in the summaries descriptions of conduct that is or could be perceived as threatening to safety and thus might trigger a police response.

**Recommendation 6:** Increase opportunities for routine interaction between police and students and between the police and key administrators (especially the Police Chief and the Chancellor).

**Recommendation 7:** Establish a standing event response team on each campus to plan and oversee the campus response to demonstrations; include on the team faculty members and/or administrators recognized by students and faculty to be sensitive to the university's academic mission and values.

**Recommendation 8:** To the extent necessary, modify police policies to require the participation of senior administrators in decision making about any police response to civil disobedience; clearly define the respective roles of administrators (objectives) and police (tactics) in this process.

**Recommendation 9:** As specified in Peace Officer Standards and Training (POST) and documented in the "UC Police Crowd Management Gold Book Policy" Appendix B, "Crowd Management Intervention and Control," when a response is deemed necessary, limit the use of force to that which is objectively reasonable considering the totality of the circumstances to manage the situation and maintain public safety.✱

**Recommendation 10:** When faced with protesters who are non-aggressively linking arms, and when the event response team has determined that their presence causes an imminent threat to public safety and that a police response is required, police will limit the use of force to that which is objectively reasonable considering the totality of circumstances to maintain public safety, restore order and effect an arrest, if necessary.✱

Exhibit 3
Page 179

**Recommendation 11:** The Chancellor may choose to have a senior administrator on site within viewing distance to communicate immediate situational awareness to the Chancellor and serve as a real-time communication link between the Chancellor and the Chief of Police or police commander at the scene.*

**Recommendation 12:** During the course of an event, continuously reassess objectives, and the wisdom of pursuing them, in light of necessary police tactics; seek to pursue only important goals with the minimum force necessary.

**Recommendation 13:** Absent exigent circumstances and to the extent practicable, the Chancellor or the Chancellor's designee should be consulted prior to commencement of force.*

**Recommendation 14:** Coordinate in advance of planned demonstrations with other police departments likely to provide assistance.

**Recommendation 15:** Require each campus police agency to seek aid first from other UC campuses before calling on outside law enforcement agencies, except where there is good cause for seeking aid from an outside agency.

**Recommendation 16:** Obtain input from members of the campus community (e.g., students, faculty, staff) in the process of hiring campus police officers and promoting or hiring officers for command-level positions within the department.

**Recommendation 17:** Require the Chief of Police on each campus personally to interview and approve all newly hired sworn officers.

**Recommendation 18:** Review UC police compensation practices to ensure that compensation is sufficiently competitive to attract and retain highly qualified officers and police leaders.

**Recommendation 19:** Increase training of campus police officers in the areas of crowd management, mediation and de-escalation of volatile crowd situations.

**Recommendation 20:** Create specialized response teams with additional training in crowd management, mediation and de-escalation techniques at the systemwide level.

**Recommendation 21:** Establish a regular program for joint trainings, briefings and scenario planning with law enforcement agencies on which each campus police department is likely to call for assistance or mutual aid.

**Recommendation 22:** Implement formal training of administrators, at the system and campus levels, in the areas of crowd management, mediation, de-escalation techniques, the Incident Command System and police force options, to be refreshed annually.

**Recommendation 23:** Conduct simulations jointly with campus administrators and campus police to rehearse responses to civil disobedience scenarios.

**Recommendation 24:** Make every reasonable attempt to identify and contact members of the demonstration group—preferably one or more group leaders—in advance of the demonstration to establish lines for communication.

**Recommendation 25:** Inform protesters, in advance of the event, of the availability of alternative avenues for communication of their concerns or proposals.

**Recommendation 26:** Pursue a dialogue between administration officials and the demonstration group about protest objectives and applicable rules for campus protest.

**Recommendation 27:** In all cases, the most appropriate representative—faculty, administrator, police representative, mediator—should be designated by the event response team as the primary university representative communicating during a protest.*

Exhibit 3
Page 180

**Recommendation 28:** Campuses should have senior administrators present and visible during protest absent good cause.✳

**Recommendation 29:** Make every reasonable attempt to establish a communication link with identified leaders or sponsors of the event; for leaderless groups, communicate broadly to the group as a whole (through social media and otherwise) until relationships form.

**Recommendation 30:** To the extent not already available, establish a communication mechanism for promptly informing the campus community at large about material developments in ongoing protests, for use when appropriate.

**Recommendation 31:** Establish an internal mediation function at the campus or regional level to assist in resolving issues likely to trigger protests or civil disobedience.

**Recommendation 32:** Consider deploying this mediation function as an alternative to force, before and during a protest event.

**Recommendation 33:** Where possible, police should pursue tactics designed to defuse tensions and avoid tactics likely to increase tensions.

**Recommendation 34:** Develop or modify existing student discipline processes to ensure that, in appropriate circumstances, they are an available response option.

**Recommendation 35:** Establish and implement a systemwide framework that guides the officers' response to specific actions in crowd control situations, always using the appropriately reasonable level of force to meet the level of resistance offered and maintain overall safety and control. Officers should be trained on the framework, and its principles should be incorporated into operation plans.✳

**Recommendation 36:** Require that campus police and other authorities (to the extent controlled by the university) act in accordance with the response option framework, absent exigency or good cause.

**Recommendation 37:** Develop a systemwide process for determining which "less lethal" weapons may be utilized by UC police officers.

**Recommendation 38:** Require each campus Police Chief personally to approve the specific types of less lethal weapons available to officers in their department.

**Recommendation 39:** Create a systemwide list of approved weapons that police chiefs can choose from for use in their departments. Chiefs may use their discretion in assigning weapons for their campus. For any weapon selected by the campus, individual officers must be trained in the weapon's use prior to deployment.✳

**Recommendation 40:** Recommend that appropriate authorities commission further studies on the effects of pepper spray on resisters as compared to the effects of other force options.

**Recommendation 41:** Establish at each campus a formal program to allow designated, trained observers to gain access to the protest site for purposes of observing, documenting and reporting on the event.

**Recommendation 42:** Establish a program for video recording protest events designed to develop a fair and complete record of event activity solely for evidentiary or training purposes.

Exhibit 3
Page 181

**Recommendation 43:** Amend existing police department policies to require after-action reports for all protest events involving a police response, regardless of whether the response resulted in force, injury or civilian complaint.

**Recommendation 44:** Coordinate review of after-action reports on a periodic basis with campus event response teams and with the Office of the President.

**Recommendation 45:** Establish a structure and process at the system level for discretionary review of campus responses to protest activity, consistent with existing legal limitations.

**Recommendation 46:** Establish a systemwide implementation manager to develop specific policy language in those areas where recommendations call for common or system policies or practices, and to track campus-level measures.

**Recommendation 47:** Require status reports from each campus six months following the President's acceptance of this Report's recommendations concerning progress on implementation of the recommendations.

**Recommendation 48:** Require a final report and certification from each Chancellor one year following the President's acceptance of this Report's recommendations confirming that all recommendations so accepted have been implemented.

**Recommendation 49:** Establish similar reporting and certification requirements for future recommendations arising out of the event review process described above.

*NOTE: "✳" indicates that the implemented recommendation has been revised from the original Robinson/Edley Report. See the discussion beginning on page 19 for comparison and further description.*

Exhibit 3
Page 182

Exhibit 3
Page 183

# Overview

Of the 49 Robinson/Edley recommendations, 26 were handled centrally rather than by the individual campuses. The CDI Working Group, with review by the CDI Steering Committee, developed the implementation strategy for these recommendations because they involved system-wide implementation issues. These recommendations fell into four broad categories:

- Use of force

- Administrator involvement

- Reporting and evaluation

- Other centrally addressed recommendations

To help campuses organize the extensive work done in all of these areas, the CDI Working Group requested that each campus develop a written event response team charter. These guiding documents convey each campus's plan for responding to events and for fulfilling pertinent recommendations. Most of these documents include key features such as a mission statement, clearly defined roles and objectives, plans for event response team meetings to review practices in the absence of events and post-event guidance. These protocols will foster understanding so that in spontaneous events, all parties know their roles and responsibilities. Furthermore, they will help to institutionalize the knowledge and recommendations of the Robinson/Edley Report on each campus, ensuring their continued use as campus leadership changes over time. They are an excellent example of the collaborative work done between the campuses and the Office of the President.

## Use of Force

Use of force is a critical issue on our campuses, just as it is in all of policing. The issue of force was examined in the Robinson/Edley Report from many angles, including reasonableness, decision making, escalation, de-escalation, management of events, safety and the preservation of the right to express ideas freely and also to engage in peaceful, protected activities, which are a common occurrence on campus.

The overall goal of this set of recommendations is to ensure that there is appropriate emphasis on communications, decision making and a full airing of possible scenarios to reduce the possibility of an inappropriate use of force outside the understanding of the Chancellor and the event response team.

After discussion and review, the Steering Committee has elected to revise several of the recommendations to conform to current best practices while still aligning closely with the mission and intent of the Robinson/Edley Report.

The newly revised recommendations aim to ensure the following:

- Police and administrators have full understanding and involvement in the decision-making process as it relates to the appropriate operational plan to handle the situation at hand.

- The relevant people are heard in any discussion of use of force.

- All discussions about use of force begin with the consideration of de-escalation and a thorough look at options for management that don't involve police.

- Absent exigent circumstances, any operation involving contact between the police and protestors will only involve the application of objectively reasonable force considering the totality of the circumstances to accomplish the lawful mission of the operation, maintain public safety and effect arrests, if necessary.

The Steering Committee and Working Group were careful in their review and discussion to ensure that the recommendations set forth implementation strategies related to policy issues and did not dictate tactics.

Exhibit 3
Page 184

## Recommendation 9

*Original Language*

Develop principles to guide the event response team in determining whether particular acts of civil disobedience merit a response—when a response is necessary, specify use of lower levels of force (e.g., persuasion, hands-on compliance) before resorting to higher levels of force (e.g., baton strikes or jabs, pepper spray), barring exigent circumstances.

*Revised Language*

As specified in POST training and documented in the "UC Police Crowd Management Gold Book Policy" Appendix B "Crowd Management Intervention and Control," when a response is deemed necessary, limit the use of force to that which is objectively reasonable considering the totality of the circumstances to manage the situation and maintain public safety.

## Recommendation 10

*Original Language*

When faced with protesters who are non-aggressively linking arms, and when the event response team has determined that a police response is required, principles should specify that administrators should authorize the police to use hands-on pain compliance techniques rather than higher levels of force (e.g., baton strikes or jabs, pepper spray), unless the situation renders pain compliance unsafe or unreasonable.

*Revised Language*

When faced with protesters who are non-aggressively linking arms, and when the event response team has determined that their presence causes an imminent threat to public safety and that a police response is required, police will limit the use of force to that which is objectively reasonable considering the totality of circumstances to maintain public safety, restore order and effect an arrest, if necessary.

## Recommendation 13

*Original Language*

Absent exigent circumstances, bar commencement or escalation of force by police unless the Chancellor or the Chancellor's designee approves it immediately before the action is taken. If the Chancellor designates decision-making responsibility, the Chancellor's designee must (Edley) or may (Robinson) be a member of the Academic Senate.

*Revised Language*

Absent exigent circumstances and to the extent practicable, the Chancellor or the Chancellor's designee should be consulted prior to commencement of force.

## Recommendation 20

*Original Language*

Create specialized response teams with additional training in crowd management, mediation and de-escalation techniques at the systemwide level.

*Implementation*

The Steering Committee has approved the concept of specialized response teams as a fulfillment of the recommendation. The policies to create a systemwide Special Response Team are currently under review. Members have been chosen and training has been scheduled. Not only will the police have a specially trained group of officers from each campus who can respond to major incidents, but each campus will have members who can share their training locally as trainers to heighten skills and awareness of all officers.

Exhibit 3
Page 185

## Recommendation 35

### Original Language

Establish and implement a systemwide response option framework for use on each campus.

### Revised Language

Establish and implement a systemwide framework that guides the officer's response to specific actions in crowd control situations, always using the appropriately reasonable level of force to meet the level of resistance offered and maintain overall safety and control. Officers should be trained on the framework, and its principles should be incorporated into operation plans.

### Context

The Robinson/Edley Report authors recommended that the UC Police adopt a systemwide force matrix that would guide the officers through a series of steps as they confronted civil disobedience on the campus. The intent of that recommendation was to ensure that officers responded with the least amount of force possible to control the situation, that the force was reasonable based on the provocation and that the force matrix remained flexible enough not to impede the officers' response in exigent circumstances.

Further research and simultaneous updating of the UC Police Systemwide Crowd Control Policy that guides all 10 UC police departments found that the POST Crowd Management Intervention and Control Strategies matrix (see page 6) is in essence a framework that, in the spirit of the Robinson/Edley Report, ties the police response to provocation and demonstrates that as resistance escalates, the minimum amount of force to control the resistance is employed. The matrix is consistent with campus police training and in fact reflects the standard operating procedure of the police departments. In addition, our research and discussions with POST indicated that most professional police agencies in California do not operate with a response option framework.

## Recommendation 36

### Original Language

Require that campus police and other authorities (to the extent controlled by the university) act in accordance with the response option framework, absent exigency or good cause.

### Implementation

All California police follow the POST guidelines and are trained to POST standards, which will raise the expectation that they will follow the guidelines in a mutual-aid situation. The campus police will utilize the POST Crowd Management Intervention and Control Strategies matrix (see page 6). Whenever possible, all departments responding for mutual aid will follow the Incident Command System protocols and the POST matrix.

Police throughout California adhere to mutual aid protocols that call for the mutual aid responders to follow the incident command structure and be under the direction of the incident commander, who will be a designee from the home police force. While responding to a mutual-aid request, the mutual-aid responders remain under the direction of their home agency policies. There is no way to force responding agencies to follow any protocol other than their own command. However, Recommendation 21 of the report (which calls for joint trainings, briefings and scenario planning with potential mutual-aid responders) is the opportunity for UC Police to stress the importance of patience, to talk through appropriate tactics and to ensure that objectively reasonable use of force is the priority of all respondents. When mutual aid arrives, the UC Police Incident Commander should consider deploying outside agencies to the demonstration perimeter and, when possible and tactically sound, deploy UC Police personnel in the positions most likely to encounter student demonstrators.

Exhibit 3
Page 186

## Recommendation 37

*Original Language*

Develop a systemwide process for determining which "less lethal" weapons may be utilized by UC police officers.

*Implementation*

The Council of Police Chiefs has developed a method of looking at all weapons annually, not just less lethal weapons.

## Recommendation 39

*Original Language*

Require each campus police department to include the list of weapons approved for use in response to demonstrations and civil disobedience in its use-of-force policies, and to make the list available to the public.

*Revised Language*

Create a systemwide list of approved weapons that police chiefs can choose from for use in their departments. Chiefs may use their discretion in assigning weapons for their campus. For any weapon selected by the campus, individual officers must be trained in the weapon's use prior to deployment.

*Context*

The Council of Police Chiefs will prepare a list of all weapons approved for use by the UCPD. The police chief on each campus will have the discretion to choose weapons from this list for the members of their department. All police personnel must be trained in the appropriate use of the weapon, and verification of that training must be maintained by the police department on each campus. All of the weapons listed should be used appropriately at all times and in keeping with approved training. In the spirit of the recommendation, campuses will include, when appropriate, some information about the use of weapons most likely to be deployed in crowd control situations during student orientations, during police and student meetings, during administrative meetings with student affairs organizations or in discussions with other campus constituencies. Due to security considerations, the full weapons list will not be made public.

## Administrator Involvement

As time, events on campus and discussions have progressed since November 2011, both administrators and police have come to advocate for participation in a formalized pre-event  meeting with the designated event response team during which contingencies are discussed and agreed upon with the full concurrence of the Chancellor and Chief of Police. The event response team can then decide if it chooses to place an administrator with the chief (or incident commander) during an event in either the role of observer or as an informational direct line contact with the Chancellor.

The Steering Committee has decided that agreement on a pre-event meeting of the police, Chancellor (or the Chancellor's designee) and event response team before a major event will produce a consensus on how best to proceed, which will be reflected in the event operational plan. The meeting will also foster communications throughout the event and ensure that all parties understand their roles and responsibilities.

The event response team on each campus must evaluate action in both active protest scenarios and disruption scenarios. There should be discussion and consensus on how to respond when protestors engage in civil disobedience—passive or active—as well as when they disrupt events or functions that deprive other students of participation. These responses are best evaluated in the event team discussion, where the range of options, from no action to police action, can be weighed and decisions made after all voices have been heard.

## Recommendation 8

*Original Language*

To the extent necessary, modify police policies to require the participation of senior administrators in decision making about any police response to civil disobedience; clearly define the respective roles of administrators (objectives) and police (tactics) in this process.

Exhibit 3
Page 187

### Implementation

All campuses now have a defined event response team. Each event response team has a charter or guidelines that clearly outline mission, goals, responsibilities of the team and the threshold for activation of the team. For events that meet the designated threshold, the campus event response team decides when an event merits a police response, recognizing that a mere police presence can be construed as an escalation of force under some circumstances.

At that decision point, the Chancellor or designee, Police Chief, senior administrative officials and those closest to the situation will fully discuss the mission, operation, objectives, ramifications, possible scenarios and outcomes. Consensus should be reached on these points.

### Recommendation 11
*Original Language*

Place an administrator on site within viewing distance of the event and with instant communication to the police incident commander and to the Chancellor or to the individual to whom the Chancellor has delegated decision-making responsibility.

*Revised Language*

The Chancellor may choose to have a senior administrator on site within viewing distance to communicate immediate situational awareness to the Chancellor and serve as a real-time communication link between the Chancellor and the Chief of Police or police commander at the scene.

*Context*

As stated above, the Chief of Police and event response team will have had a thorough discussion of the operations and planned response, including contingency planning, prior to the event. At that point, the Chief of Police and the Chancellor or the Chancellor's representative should arrive at a clear understanding of what the level of communication and involvement will be going forward.

### Recommendation 27
*Original Language*

Absent special circumstances, assign administrators or faculty members, rather than police, to serve as the primary university representative communicating with protesters during a demonstration.

*Revised Language*

In all cases, the most appropriate representative—faculty, administrator, police representative, mediator—should be designated by the event response team as the primary university representative communicating during a protest.

*Context*

The goal is to give the campuses the ability to pick the most appropriate and effective university representative while not putting faculty, students or administrators in an uncomfortable position.

### Recommendation 28
*Original Language*

Establish senior administrators as a visible presence during protests, absent good cause.

*Revised Language*

Campuses should have senior administrators present and visible during protest absent good cause.

Exhibit 3
Page 188

# Reporting and Evaluation

Included among the goals of the Robinson/Edley Report were recommendations to strengthen documentation during events, enhance the post-event review process and create central oversight for the recommendation implementation. The recommendations provide for an ongoing process for event documentation that will allow the central administration to look at individual campus incidents and make additional recommendations. The recommendations in this section speak to the formalization and establishment of existing practices and the creation of new ones that will provide a clear view of how the campus responds to acts of civil disobedience that can be evaluated to reduce the risk of future confrontations.

### Recommendation 41
*Original Language*
Establish at each campus a formal program to allow designated, trained observers to gain access to the protest site for purposes of observing, documenting and reporting on the event.

*Implementation*
Each campus that does not have an observer program should consider setting up and managing a formal trained observer program.

### Recommendation 43
*Original Language*
Amend existing police department policies to require after-action reports for all protest events involving a police response, regardless of whether the response resulted in force, injury, or civilian complaint.

*Implementation*
Following any demonstration that reaches a pre-set threshold (to be determined by the campus event response team chair and the Police Chief, if it is a police matter), which may include convening of the event response team and/or activation of the incident command process, or any incident involving police use of force, submit appropriate documentation, such as a post-event summary, through the chair of the event response team to document decision making, use of force and adherence to event response team guidelines.

### Recommendation 44
*Original Language*
Coordinate review of after-action reports on a periodic basis with campus event response teams and with the Office of the President.

*Implementation*
Police will prepare reports if they respond to activities related to protest or civil disobedience, if that response meets a predetermined threshold level. Those reports will be available for review by UCOP.

Campus police respond to hundreds of instances weekly and it is insensitive to their operational needs to require after action reports for all events. The Robinson Edley intent is to record responses to events involving protestor civil disobedience that reach a certain threshold, and review the responses to insure they are within the spirit and intent of the recommendations and in line with the changes enacted through the implementation process. Each campus will determine the threshold based on their unique circumstances and then maintain and review those reports internally and as well as keep them for possible review by UCOP.

Exhibit 3
Page 189

## Recommendation 45

### Original Language

Establish a structure and process at the system level for discretionary review of campus responses to protest activity, consistent with existing legal limitations.

### Implementation

The Office of the President will designate one official (currently the systemwide CDI Implementation Director) as the single, systemwide reviewer. This recommendation reflects a desire for administrative accountability. The single systemwide reviewer will promote consistency in the review process and facilitate the application of best practices in event response across the system. The current CDI Implementation Director is the appropriate individual to maintain this system initially, in order to conserve resources and assess demand. The reviewer has the authority to consider or reject requests for review and to initiate reviews without a request. Review results will be shared with the individual campus and if applicable with the system and the public.

## Recommendation 47

### Original Language

Require status reports from each campus six months following the President's acceptance of this Report's recommendations concerning progress on implementation of the recommendations.

### Implementation

A six-month report was developed and distributed. It includes a status report from each campus.

## Recommendation 48

### Original Language

Require a final report and certification from each Chancellor one year following the President's acceptance of this Report's recommendations confirming that all recommendations so accepted have been implemented.

### Implementation

This implementation report, which includes a campus summary and certification from the Chancellor for each campus, fulfills this requirement.

## Recommendation 49

### Original Language

Establish similar reporting and certification requirements for future recommendations arising out of the event review process described above.

### Implementation

The Office of the Executive Vice President for Business Operations within the Office of the President has memorialized the CDI process, including campus points of contact, SharePoint site, designated progress report schematic, public input template, organization charts and communications strategies that can be implemented again should the need arise. The formula for working through multi-campus issues is cost effective, minimally invasive and achieved the desired review within budget and on time, not to mention the positive outcomes of campus policy enhancement, increase in police training and enhanced communication across the board. Currently the charge to maintain the process rests with the CDI Implementation Director.

Exhibit 3
Page 190

## Other Recommendations with Central Lead

Additional recommendations have been implemented with a central lead. Some of the recommendations were the sole responsibility of UCOP while others required involvement by the campuses as well as a central group.

### Recommendation 1

*Original Language*

Add to current "free speech" and police policies language formally recognizing that civil disobedience has had a historic role in our democracy, but that it is not protected speech under the Constitution, and that it may have consequences for those engaging in it.

*Implementation*

UCOP provided suggested language for campuses for the police and Student Affairs. The campuses have used this language or their own version of the language and have incorporated it into websites, protocols, policies and brochures as they deemed appropriate.

### Recommendation 3

*Original Language*

Discuss with the Regents the possibility of increasing opportunities for students and other campus constituencies to address concerns directly with the Regents at times other than during public comment period at formal meetings.

*Implementation*

The Regents have increased and documented the opportunities for interaction with students and other campus constituencies.

### Recommendation 4

*Original Language*

Collect each campus's current time, place, and manner regulations and all policies governing the response to events of civil disobedience, including applicable system-wide and campus police policies; post collected policies on system and campus websites.

*Implementation*

UC Office of the President worked with the campuses to obtain links to each campus's current time, place, and manner regulations and all policies governing the response to events of civil disobedience.  These are displayed on the systemwide website as well as on each campus site. (http://campusprotestreport.universityofcalifornia.edu/resources.html)

### Recommendation 18

*Original Language*

Review UC police compensation practices to ensure that compensation is sufficiently competitive to attract and retain highly qualified officers and police leaders.

*Implementation*

The Human Relations Labor Relations group within the UC Office of the President has completed a survey of UC police compensation. The recently negotiated agreement with the Federated University Police Officers Association (FUPOA) reflects this work.

Exhibit 3
Page 191

**Recommendation 22**

*Original Language*

Implement formal training of administrators, at the system and campus levels, in the areas of crowd management, mediation, de-escalation techniques, the incident command system, and police force options, to be refreshed annually.

*Implementation*

Executive seminars in crisis management were conducted on a systemwide basis. Additional training is planned and is currently ongoing on the campuses.

**Recommendation 40**

*Original Language*

Recommend that appropriate authorities commission further studies on the effects of pepper spray on resisters as compared to the effects of other force options.

*Implementation*

Believing that the University of California is not the appropriate entity, the Steering Committee recommended that the appropriate entities commission further studies on the effects of pepper spray on resisters as compared to the effects of other force options. The appropriate entities could include Law Enforcement Agencies, Manufactures, and Federal Agencies who have this expertise.

**Recommendation 46**

*Original Language*

Establish a systemwide implementation manager to develop specific policy language in those areas where recommendations call for common or system policies or practices, and to track campus-level measures.

*Implementation*

Lynn Tierney was appointed by the President as the systemwide implementation manager. She has managed the recommendation implementation as part of the scope of the Civil Disobedience Initiative.

Exhibit 3
Page 192

Exhibit 3
Page 193

CAMPUS SUMMARIES

# Overview

As required by the Robinson/Edley Report, each campus has provided a final campus 12-month summary with the Chancellor's certification. The following summaries highlight each campus's implementation of the Robinson/Edley Report recommendations. The summaries are focused on those recommendations that campuses are taking the lead on, including campus-level policy development, training and outreach to students, faculty and staff.

As the following summaries demonstrate, each campus has been proactive in its effort to implement the Robinson/Edley Report and has adapted the recommendations to its individual campus culture and community. All have spent resources on police training and increasing the opportunities for students and police to interact. Some have begun by establishing new groups and teams to respond to protest events. A number of creative new models and programs have emerged, which the campuses have shared with each other.



## SYSTEMWIDE INVOLVEMENT IN IMPLEMENTATION

All campuses reviewed policies, current and past practices, history, best practices and campus cultural considerations in order to devise workable implementation strategies that align with the recommendations and will work on each campus and for the system.

Implementation strategies reflect engagement and ongoing attention to safety and the rights of individuals, and respect for all communities and campus constituencies.

Exhibit 3
Page 194

# Campus Progress Tracker

As campuses moved through the recommendations, they detailed their implementation strategy for each, on a master tracking summary.  That summary is the appendix to this document and is available at:

http://campusprotestreport.universityofcalifornia.edu/documents/implementation-report-appendices.pdf

Almost all of the campuses are or are close to 100% complete for each recommendation. Those that are less than 100% are generally awaiting approval of a proposed policy that is currently in review, have police training planned for the future, or have events scheduled but not completed.

Exhibit 3
Page 195



Exhibit 3
Page 196

# Berkeley

UC Berkeley shifted its approach to management of civil disobedience events in January 2012. Since then, we have worked to redefine and refine the roles of senior administration, academics and the police—and we have forged new ways of working together that have been extremely positive. Many of these changes foreshadowed recommendations that were made in the Robinson/Edley Report and all of our efforts have been consonant with the spirit of the report. Highlights of these changes include:

- In December 2011, we reconstituted the Protest Response Team (PRT) to manage civil disobedience events. The group is co-chaired by the Executive Vice Chancellor and Provost (EVCP) and the Vice Chancellor for Administration and Finance (VCAF) and includes faculty representatives and appropriate vice chancellors and senior administrators. The group meets at least quarterly to review how we responded to any protests that occurred and discuss what worked well and what could have been improved. The PRT also reviews any current or emerging issues that might lead to protests in the upcoming months and identifies any planning or action that should be started. A charge that includes a roster of current members is included in the UC Berkeley documents folder (Recommendation 7).

- During an event, the EVCP and VCAF are actively involved in monitoring and assessing the situation as it unfolds. The associate vice chancellor who oversees the police department is the primary Senior Administrator on the ground and updates the EVCP and VCAF as the situation changes. Four vice chancellors are designated to serve as potential back-ups if the AVC is not available. In planning for expected protests in November 2012, the senior administrator and a back-up were calendared through the month to accommodate travel and vacation plans and to ensure that the PRT coordinator and UCPD knew whom to contact in the event of a protest. The co-chairs work closely with the Chief of Police, the administrator on the ground, and other faculty and administrators appropriate to the given event to discuss tactics and do scenario planning (Recommendations 8, 11, 12, 13).

- The campus has focused on proactive communications with protesters, before, during and after each event. In 2012, the VCAF produced a series of Web videos on the campus budget and encouraged students to propose and vote on questions that he could address in follow-up videos. He then produced videos addressing the top three. Later in the year, in planning for anticipated protests after the November election, a subgroup of the PRT developed a communications plan. Two forums for students were organized in partnership with student government, an op-ed was published in the campus paper by the EVCP and VCAF, fact sheets were generated and distributed, and communications were prepared by the Chancellor assuming either the success or failure of Proposition 30.

Exhibit 3
Page 197

- In a second example, the occupation of Eschleman Hall in November 2012 was the result of unhappiness over perceived changes in the Multicultural Student Development (MSD) program. The Vice Chancellor of Equity and Inclusion had been meeting with students to discuss the issues. During the occupation, he and the Dean of Students spoke with the occupiers at length and ultimately committed to a follow-up process to further explore their concerns.  The protesters agreed to his offer and left the building. The campus honored its commitment to convene an MSD task force and the group completed a report in May 2013 that provided the Chancellor with recommendations on the future of the MSD programs (Recommendations 2, 24, 25, 27, 29, 30).

- Local involvement of faculty, chairs and deans whose facilities are impacted by protest activity has been an important change to the campus's approach to protest activities since 2012. These individuals are known to the protesters and therefore have more credibility than central administrators or the police.

- Although leading campus administrators, including the EVCP and VCAF, met personally with a delegation of Occupy the Farm protesters in spring 2012, the PRT adopted a wait-and-see approach to responding to some events and worked to partner with neighboring cities to address events that extended beyond campus borders. Through the spring and summer 2012, during Occupy the Farm protests at the Gill Tract and at the multiuse development site adjacent to Albany Village, the campus worked closely with the City of Albany as the situation unfolded to keep city officials informed of expected activities and our approach as events unfolded. Public Affairs, Community Relations and the UCPD worked closely with the city, schools and Little League, and the public to address and alleviate concerns (Recommendations 12, 14, 26, 29, 30). Throughout, the dean of the College of Natural Resources served as a liaison between the protesters and campus senior administrators.

- While it has been campus practice to include the campus community in the search process for command-level positions in the police department, we used the community extensively this year in our chief, captain and lieutenant searches. Representatives from faculty, staff, the ASUC, the Graduate Assembly, and relevant other student and staff groups were included in the interview process. Input received during the search for a new chief helped guide the campus decision to initiate the accreditation process for the department, strengthen outreach to neighboring police departments, identify and implement a means to improve the use of data in our approach to crime reduction, and the continued extensive involvement by the community to help select progressive leaders in our department (Recommendation 16).

Exhibit 3
Page 198

We hereby certify that all the *Robinson/Edley Report* recommendations that were
finalized and accepted through the Civil Disobedience Initiative have been implemented
or are in the process of being implemented at the University of California Berkeley. The
campus is committed to continue to improve our practices in order to effectively
manage civil disobedience in a manner that is consistent with our principles as the
birthplace of the Free Speech Movement.

George Breslauer
Executive Vice Chancellor and Provost
Co-Chair Protest Response Team

John Wilton
Vice Chancellor Administration &
Finance
Co-Chair Protest Response Team

Nicholas B. Dirks
Chancellor

Exhibit 3
Page 199



Exhibit 3
Page 200

# Davis

## *Executive Summary*

In the wake of the demonstrations and incidents of November 18, 2011, UC Davis faced the challenging, and in many ways unique, task of reviewing and implementing recommendations from a variety of groups, including those put forward in the Robinson/Edley Report. The sheer volume of these recommendations, issued by a variety of groups without coordination or a central strategy, made the process a complicated one. The breadth of the Robinson/Edley Report recommendations and their systemwide emphasis provided a still broader context for many of these policies. Nevertheless, UC Davis responded to these challenges with both vigor and dedication.

As an organizing principle, the campus divided recommendations into four separate categories:

- Administrative Leadership and Decision Making
- Freedom of Speech and Protest Policies
- Community Engagement
- Police Operations

A review of the work accomplished within these categories is evidence of an organization committed to deep and lasting change. The process of reform reflected a commitment to improve the campus's ability to make appropriate leadership decisions in a timely manner, to develop a backdrop of appropriate policy to safeguard and protect the role of protests and protestors, to engage the campus community in open and dynamic conversations, and to improve the quality and transparency of police operations. In the process, the campus has reaffirmed its commitment to protect freedom of speech for the students and the community, to recognize protest as a legitimate aspect of those same freedoms that is necessary and vital to the life of any great institution of higher learning and to remind the campus that our police force is a vital and valued member of our community, dedicated to public safety and guardianship of everyone's rights. None of this could have been accomplished without significant analysis, consider-

ation, debate, deliberation and a strategic investment of resources designed to move the campus forward.

Over the course of a year, the administration submitted periodic updates to a special committee convened by the UC Academic Senate. Each of the reports was delivered on schedule and addressed topics of interest to the committee. In response, on June 17, 2013, the Academic Senate committee issued its own review and assessment to the Chancellor, acknowledging a "great deal of progress" in addressing various recommendations. The report was critical of what it deemed to be insufficient progress on formation of a police oversight board. It also urged the administration to take action to "...spread the newly formulated emergency, crisis and policing culture of consultation and communication to all other arenas of interaction between administration, faculty, staff and students."

The UC Davis Academic Senate also exercised significant leadership in working with the administration on freedom of expression issues. The Senate formed its own committee and issued a set of eight recommendations to the campus administration. Upon receipt of the Senate's report, Chancellor Linda Katehi convened a blue-ribbon committee on freedom of expression, with broad representation from campus groups, to consider the Academic Senate's recommendations and to issue a proposed campus policy on freedom of expression. The draft report is due by October 31, 2013.

Moreover, to ensure that the pace of reforms was kept on track, Chancellor Katehi also formed the Post-Incident Reform Review Committee, consisting of faculty, students, staff, representatives from UCOP, the American Civil Liberties Union (ACLU), the Commission on Peace Officer Standards and Training (POST), and elected officials to take testimony and examine progress made on different recommendations. The group took testimony, reviewed the reports and issued a final report to the Chancellor on June 14, 2013. The report concluded that the campus had made significant progress in responding in an effective manner to the host of recommendations and singled out areas that it thought deserved continuing attention.

Exhibit 3
Page 201

To promote greater transparency and access to information, UC Davis also created a website to enable interested parties to track the progress on specific recommendations. Reports submitted to the Academic Senate were posted regularly, along with the Post-Incident Reform Committee's findings. Campus leadership was kept updated through a weekly half-hour meeting designed to promote discussion around key recommendations and related topics.

The campus also engaged the wider UC Davis community by convening Strengthening Campus Community forums with students, faculty and staff. The forums provided an opportunity for members of the campus community to contribute their own thoughts and ideas on how to improve the university's performance and outreach.

Formation of the Campus Community Council was another action resulting in genuine progress. The presence of students, faculty, staff, retirees and others on the council provides for a healthy mixture of perspectives and experiences. The council's monthly meetings serve as an important forum where campus executives can test reactions from a variety of viewpoints and can, in turn, also inform members of the wider campus community about incipient policy changes, emerging trends and areas of concern on campus.

Underlying all of these efforts was the letter and spirit of the Robinson/Edley Report recommendations, which envisioned a perspective on protests that would render them less as occasions for emergencies and police response and more as activities that were consistent with the intellectual discourse and climate of a university environment. This transformation from a police-oriented response system to one based on clear and open communication, a reliance on civility and mediation, and an organizational decision-making process that recognizes the necessity of accommodating divergent viewpoints and debate prior to taking an action has been the capstone of this entire exercise.

UC Davis has emerged from this process a stronger, more reflective and more responsive institution, capable of working in a cooperative manner with faculty, staff and students and dedicated to cultivating an atmosphere of openness, trust and mutual consideration. As a result, UC Davis is better positioned to respond to and deal with emerging issues in a positive, professional and proactive manner. This marks significant progress, and the campus continues these efforts with dedication and diligence.

Exhibit 3
Page 202

### Administrative Leadership and Decision Making

The recommendations regarding administrative leadership and decision making focused on training and new methods of communication for the administration, as well as on decision-making policies and procedures. These efforts included:

- Formation of the Event and Crisis Management Team (ECMT) to address potential campus crises and emergencies. The ECMT is an integrated, multilevel emergency management team of administrators and faculty members with a clear delineation of roles and responsibilities; requirements for administrators to be present at major events or incidents where direct police involvement is contemplated; and systematic weekly review by a policy-level team of emerging (potential crisis) issues. In addition, the ECMT has developed the UC Davis Campus Emergency Operations Plan to ensure full compliance with NIMS/SEMS, to provide training in NIMS/SEMS to the members of the team, including action scenarios, and to put in place a number of other systems such as the All Hazards Building Notification process to augment campus safety and familiarity with emergency planning and response procedures (Recommendations 7, 8, 22).

- Creation of the Campus Community Council, established on April 6, 2011, to serve as the foundation for addressing the creation of a consultative and inclusive process for the campus community. The council reflects the diversity of the campus community and meets regularly (Recommendation 2).

- Establishment of proactive communication efforts and consultation with UC Davis faculty, staff and student groups such as the Academic Senate, Academic Federation, Staff Assembly, Associated Students of the University of California, Davis (ASUCD), etc., which are now practiced.

Training was a significant aspect of the Robinson/Edley Report. The UC Davis administration has received substantial training in decision making, emergency protocols and response and has participated in ongoing emergency training scenarios. Campus police, for instance, hosted an exercise directed by the Department of Homeland Security to allow police supervisors to practice what was learned in a recent NIMS/SEMS update provided by CALEMA and the Department of Homeland Security for supervisory personnel. The exercise included other campus community members and executives. All police supervisors have completed both NIMS/SEMS training. In addition, all police supervisors have been provided with advanced small-group leadership training, and various supervisors have attended critical-incident training for management (Recommendation 22).

The Federal Emergency Management Agency's "Introduction to the Incident Command System, ICS-100 for Higher Education" was completed by all members of the Council of Vice Chancellors (COVC) and the ECMT (40 individuals in all). A separate course in event management training and participation in a series of trainings to improve understanding of the NIMS/SIMS vernacular and decision-making processes was also completed (Recommendation 22).

Exhibit 3
Page 203

## Protest Policies and Management

While there are a few items in this category that are still works in progress, improvements in this area have been significant.

The UC Davis Police Department addressed the rights and responsibilities of protestors in a new crowd management policy. The police department also created a link on its website to information provided by the ACLU that is designed to acquaint potential protestors with their rights. In addition, the UC Davis Police Department will disseminate this same material in printed form to students prior to and during an event (Recommendation 25).

In addition to more conventional means of updates (posting on the campus website, press advisories, emails, etc.), the campus relies on decisions made by the ECMT and the Emergency Manager to utilize the WarnMe system for issuing messages associated with potential immediate and life safety concerns. WarnMe gives the campus the ability to deliver timely and rapid messages to the entire university community (Recommendation 30).

Student Affairs has developed a set of criteria to facilitate the use of Student Judicial Affairs as an alternative to the county court system when considering appropriate responses to violations of campus rules or regulations. In addition, the campus now participates in a "Neighborhood Court" process that provides an alternative to the use of the court system when addressing violations committed on campus. Both approaches employ and rely on the principles of restorative justice (Recommendation 34).

Integrated Critical Incident Negotiations Team training has been instituted to ensure effective communication with the community well in advance of any event. This type of training is also consistent with the adopted use-of-force policy (Recommendation 33).

UC Davis has also organized a Neutral Observer Program (NOP). The mission of this program is to provide trained volunteers to serve as neutral witnesses at protests and demonstrations on campus where there is the potential for illegal activity, violation of campus regulations or police response.

Guidelines indicate that:

- The role of the neutral observers is to watch and report impartially on acts observed.

- Observers do not interpret or evaluate actions or behaviors, give advice or mediate a conflict.

- The Office of Campus Community Relations (OCCR) manages the NOP and is responsible for recruiting, training and coordinating neutral observers.

- The NOP manager schedules neutral observers. The manager also provides neutral observer armbands for identification, supervises neutral observer placement on site, maintains the neutral observer log and follows up as needed on neutral observer reports.

- Volunteer neutral observers participate in a six-hour training session administered by OCCR.

- Training includes topics such as the observer's role, neutrality, report writing, dealing with difficult people, police practices, complaint procedures, safety issues and site logistics.

- UC Davis Police Department, Student Judicial Affairs and the Engagement Team are involved in a portion of the training.

- Written neutral observer reports are provided directly to the NOP manager. These reports are accessible in accordance with the law and university policy. Submitted neutral observer reports are not edited.

- A six-hour neutral observer training is conducted once a year. The first training is expected to take place November 2013.

- When possible, the goal will be to have two or three neutral observers at an event and for those neutral observers to represent more than one role at UC Davis, e.g., student/academic/staff (Recommendation 41).

**Exhibit 3**
Page 204

On April 11, 2013, Chancellor Linda Katehi created a Blue Ribbon Committee on Freedom of Expression to review recommendations made to the university by the Academic Senate on freedom of expression and related areas, and to solicit campus input on a broad range of areas related to free speech. The committee is chaired by King Hall Law School Dean Kevin Johnson. A number of public forums on freedom of speech and expression were held in the fall. A draft report with policy recommendations is currently under review (Recommendation 1).

### Police Operations

Clearly, the lion's share of campus changes has taken place within the police department, although other campus offices, including the administration, Emergency Services and Student Affairs, have also undergone significant changes. As a result, the campus is better equipped to address or respond to major events.

UC Davis aspires to become a model for campus law enforcement. Numerous improvements in policy and procedure are under way. This is evidenced by several changes made in current community policing philosophies. These include the creation of a truly community-based hiring process, a citizens' academy, Police Chief/staff formal monthly meetings, a student cadet program, outreach officers, increased bicycle patrols and a department-wide policy that seeks input from the community on policies and practices.

Police Officers Standards and Training (POST) conducted an audit of all police department background files (June 8–12, 2012). An outside expert was also secured to assist with the review of all policy and protocols. This work included the implementation of formalized policy revisions utilizing LEXIPOL. Community input has also been sought when reviewing draft policy. POST background and training audits are now complete, and corrections have been made and approved.

The Police Chief routinely meets with student groups, including Associated Students of UCD (ASUCD) and the Graduate Student Association (GSA), to exchange information and discuss campus topics of mutual interest. The campus Police Chief's Student Advisory Committee has also been established to review and comment on police policy (Recommendation 6).

The UC Davis Police Department hosted a cultural awareness and diversity training in April 2013. The training was conducted by Peer Education and Community Empowerment (P.E.A.C.E.), a student-to-student "train the trainer" program dedicated to addressing racism, sexism and homophobia and to promoting a welcoming, respectful environment for living and learning. In all, 49 members of the UC Davis Police Department participated, including the chief and command-level officers. P.E.A.C.E. offers UC Davis students, faculty and staff the opportunity to engage in meaningful and productive conversations about diversity issues, facilitated by UC Davis students. Forums are open to all student organizations, departments, residential groups and other UC Davis affiliates (Recommendation 6).

Effective March 2012, all police department operations plans now identify the difference between passive and active resistance and are specific on the appropriate use of force in each category. These plans also include guidelines for police use of chemical weapons, including when they can be deployed and when prior authorization would be needed (Recommendation 9).

All police department supervisors have completed Incident Command Structure (ICS) training along with small-group leadership and critical-incident management training. All officers have received alternative use-of-force techniques as well (Recommendation 10).

All police officers attended a use-of-force training in September 2012. Officers were taught an innovative approach to control and restraint called the Compliance, Direction and Take-Down (CDT) System. Unlike other types of so-called non-deadly force systems, the CDT System teaches individuals to physically control or disarm a hostile aggressor and keep him/her in compliance or completely restrained until help arrives. It addresses peace officer well-being and subject safety while decreasing the liability factors of all concerned. The CDT System is viewed as

Exhibit 3
Page 205

minimal justifiable force and is based on a proven theory that "less is better." Command approval, absent exigent circumstances, for the use of specialized weapons during a crowd control situation is now standard operating procedure (Recommendation 10).

A formalized citizen report database has been established. This database, IAPRO, an internal civilian complaint system, affords police command real-time review of all use-of-force reports, civilian complaints, internal affairs investigations and other various reports. This system also contains an established early-warning mechanism with set thresholds identifying areas for review. This standardized, formal and professional system ensures all appropriate reviews and investigations are completed in a timely fashion.

The UC Davis nationally recognized Volunteers in Police Service program (VIPS) launched a new volunteer cadet program in January 2013 to help prepare UC Davis students interested in a career in law enforcement. Five students received sponsorships to a local police academy upon graduation. Upon successful completion of the academy, three cadets were reclassified as UC Davis Police Officers.

More than 20 student positions were created by eliminating two officer positions to staff the new student-run facility security program through the Aggie Host unit, which currently employs 114 students. These students work on campus seven nights a week ensuring sensitive facilities are locked and secure. This program has been operating since June 2012 and has been very effective. The police citizens' academy was marketed for a January 2013 start date and had its highest level of student enrollment, with more than 30 students.

Hiring and promotional panels now consist of community members from many areas, including the ASUCD and the GSA, faculty and law enforcement command officers (Recommendation 18).

The UC Davis Police Department has adopted the new UCPD policy on Crowd Management, Intervention and Control. The policy emphasizes the importance of safeguarding constitutional rights and the First Amendment, as well as providing an outline of basic steps to be taken and/or considered by the UC Davis Police Department in management of demonstrations. In addition, Chief Matt Carmichael continues to receive input on the policy from the campus community (Recommendation 19).

The UC Davis Police Department has purchased 15 personal-wear video cameras to be used in various situations, including protest activity. The camera, a VIEVU PVR-LE2, is simple to use and contains video and audio recording devices that are pinned to the front of an officer's shirt. Each camera bears a clear, discernible label that reads: "CAMERA." This designation is meant to inform members of the public that an exchange with the police officer is being filmed and audiotaped. UC Davis also developed a procedure to ensure that, during a large or potentially troublesome event, cameras are deployed into the field at specific locations. Typically this includes putting a camera on the field commander, arrest teams and line officers to provide a variety of views of the activity. Each significant incident then may be filmed from five different placements. This is to ensure that the full spectrum of interaction is recorded and available for subsequent viewing. This is a tremendous educational resource and will assist in resolving complaints and in determining how specific events were managed and/or how they might have benefitted from different approaches. The university also utilizes in-car cameras on police vehicles as standard operating procedure. The cameras are activated when transporting prisoners or when near the scene of activity. UC Davis is one of a few departments in the country that actually has a policy, titled "Video Recording and Photographing of UCDPD Members by the Public," related to the public video recording of officers and how officers shall respond. In addition, UC Davis provides officer training on all video devices. Campus Tasers also have video-recording devices built into them as safeguards for officers and the public.

Exhibit 3
Page 206

All recording is covered under the various policies listed below:

- UC Davis Police Department Policy Manual, Policy 378—Public Safety Camera System

- UC Davis Police Department, Policy 379—Video Recording and Photographing of UCDPD Members by the Public

- UC Davis Police Department, Policy 425—Crowd and Demonstration Management

- UC Davis Police Department, Policy 446—Mobile Audio Video

- UC Davis Police Department, Policy 450—Use of Audio/Video Recorders (Recommendation 42)

All events—including protests and preplanned events not related to protests, but out of the ordinary—require an after-action report. These after-action reports are stored for easy access in a computer database (Recommendation 43).

In 2013, the campus held a number of forums with an expert on police review commissions to garner public input into the proposed creation of a police accountability board. The police review commission expert filed a report with the campus on June 6, 2013. The campus held a number of public forums in October to solicit input prior to making a decision on whether to form a police accountability board.

*Community Engagement*

UC Davis held five separate Strengthening Campus Community forums. These two-hour meetings were designed to identify strengths of the university and areas for improvement, including identification of potentially controversial or troubling issues that could lead to demonstrations or civil disobedience. Among other things, forum participants discussed some of the challenges to creating a stronger and more cohesive UC Davis campus community. The forums were held at different times and at different locations in an attempt to boost student participation. The entire campus community was invited to take part. Each of the forums was widely publicized through such channels as *The Aggie*, Friday Update, Academic Senate and Federation listservs, and individual invitations. Participants agreed to guiding principles and then focused on four questions:

- Based on your experience, what are the characteristics of a strong campus community?

- What are the strengths of UC Davis as a campus community?

- What are the barriers to a stronger UC Davis campus community?

- What are your ideas to address challenges and enhance strengths of UC Davis as a campus community?

A trained facilitator moderated each forum and invited input. Feedback was gathered and compiled for a final report to the administration,.

In addition, four open workshops on Crucial Conversations were held in March, April and May. All members of the campus community were invited to participate. The goal of the workshops was to better equip campus staff, faculty and students in handling challenging conversations in a productive manner and to enhance the capacity for leadership. The workshops proved very popular and a few were oversubscribed. In addition, individual departments have asked for interdepartmental workshops on Crucial Conversations (Recommendation 6).

Exhibit 3
Page 207

The Student Affairs staff convened a joint meeting of the Chancellor's Graduate and Professional Student Advisory Board and the Chancellor's Undergraduate Advisory Board to solicit ideas on how to improve communication outreach to students (Recommendation 2).

The Center for Student Involvement (CSI) added a Student Expression and Activity Coordinator, specifically to assist students in engagement, dialogue, assistance with student conflicts and protest activity (Recommendation 34).

UC Davis formed an Engagement Team (ET) comprising three individuals, each with advanced training in group processes, dispute and conflict resolution, and negotiations. These individuals may meet with protestors individually or in teams to communicate alternative means of interaction and resolutions to issues. The ET engages with potential leaders, contacts members of specific organizations, performs extensive outreach to club members and individuals associated with certain groups and engages through a broad range of methods that includes individual meetings and social and campus media (Recommendations 24, 25, 26, 27, 28, 29, 31, 32).

The Office of Student Judicial Affairs staff participated in a UCOP-sponsored training in restorative justice. In addition, a staff member within Student Judicial Affairs has been designated a campus restorative justice facilitator (Recommendations 6, 8).

The campus has established a Director of Campus Dialogue and Deliberation. This position will strengthen UC Davis as a civic-minded campus. The director will serve all aspects of the campus community as a focal point to support, create, convene, design and facilitate civic engagement for UC Davis. The director will work with campus partners such as Student Affairs, the Academic Senate and the University Library to support and enhance civic engagement efforts underway as well as to pilot new and complementary programs. The Director of Campus Dialogue and Deliberation will:

- Plan and initiate a series of training and capacity-building workshops to promote the use of skillful dialogue as a means to understand and appreciate varying viewpoints. Example topics may include freedom of expression, crucial conversations and interest-based negotiation.

- Design custom workshops and dialogue processes for and among a range of campus partners, including, for example, ASUCD, student groups, Academic Senate, Academic Federation and other campus entities.

- Work as a member of the Engagement Team (ET) to plan and prepare for campus demonstrations and protests with an emphasis on effective communication, identification of strategic issues, accepted negotiation techniques and emerging methods of addressing leaderless movements.

- Support ongoing success of the ET by attending to its infrastructure needs, such as training and documenting processes.

- Assist the Freedom of Expression Committee to plan for and convene forums on freedom of expression and related issues.

- Serve as a third-party neutral mediator for group-level conflicts on campus.

- Perform preliminary work on establishment of an engagement office on campus to resolve disputes around difficult topics, improve relations between organizations and assist the campus community in negotiating difficult issues in an effective and productive manner.

- Advise other campus offices, including Student Affairs, on implementing restorative justice and similar initiatives.

- Provide regular reports to the Offices of the Chancellor and the Provost on engagement and dialogue efforts (Recommendation 31).

Exhibit 3
Page 208

## Chancellor Certification

UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO  SANTA BARBARA • SANTA CRUZ

LINDA P.B. KATEHI
Chancellor at Davis

OFFICE OF THE CHANCELLOR
ONE SHIELDS AVENUE
DAVIS, CALIFORNIA 95616-8558
TELEPHONE: (530) 752-2065
FAX: (530) 752-2400

October 24, 2013

President Janet Napolitano
Office of the President
University of California
1111 Franklin Street, 12th Floor
Oakland, CA 94607

Dear President Napolitano:

I hereby certify that to the best of my knowledge all the Robinson/Edley Report recommendations that were finalized and accepted through the Civil Disobedience Initiative have been implemented or are in the process of being implemented at the University of California, Davis.

Along with this letter, I am submitting UC Davis' final report, which describes the steps we have taken to implement the Robinson/Edley recommendations and the efforts we are continuing to develop in that implementation process. UC Davis believes that the Robinson/Edley recommendations are an invaluable guide for best practices in furthering UC Davis' commitment to make appropriate leadership decisions in a timely manner, to employ and implement appropriate policies that safeguard and protect the role of protests and protestors, to engage the campus community in open and dynamic conversations, and to improve the quality of police operations. The report reflects our view that this is an ongoing process, and we invite our students, faculty, staff, and campus community to help us use it as a tool of engagement as we follow the recommendations of Robinson\Edley and the many other recommendations we have received from our community.

Sincerely,

Linda P.B. Katehi
Chancellor

/am

Exhibit 3
Page 209



UNIVERSITY OF CALIFORNIA
I R V I N E

Exhibit 3
Page 210

# Irvine

The University of California, Irvine, takes great pride in the fact that many of the recommendations in the Civil Disobedience Initiative had been included as part of the campus culture well before this initiative began. Our constructive engagement model, which has been in place for several years, emphasizes a collaborative, cooperative working relationship that is a hallmark of UCI. There exists an integrated level of proactive communication and mutual respect among all the departments and divisions throughout the university that facilitates the incorporation of these principles. At the same time, this review and assessment through the CDI process has provided an opportunity for UCI to improve and enhance a number of policies and procedures and to make additional efforts in engaging our student body to provide the best possible student experience and education. UCI has established our foremost commitment to meeting the recommendations of the Robinson/Edley Report and to foster the rights and responsibilities of free speech within its campus community.

To address UC Irvine's efforts in meeting these recommendations, the campus has established two work groups. The first is organized under the Advisory Council for Campus Climate, Culture and Inclusion and is chaired by Daniel Wehrenfennig, director of the Olive Tree Initiative and the Program in Conflict Analysis and Resolution at UCI. The work group is titled Constructive Engagement, Policing and Crisis Response. Members include two faculty members, several administrators, a law professor, an assistant dean, a graduate student, several undergraduate students and the Police Chief. The second group is the UCI administrative work group, including senior administrators from the Office of the Chancellor, Office of Campus Counsel, Office of the Vice Chancellor for Student Affairs, Office of the Dean of Students, and Administrative and Business Services. In addition, the work product, documents and reports have been shared with leadership of both the Associated Student (ASUCI) and Associated Graduate Student (AGS) leadership councils.

As noted above, UCI had engaged in many of the Robinson/Edley Report recommendations well in advance of this report. As an example, UCI has been involved in the practice of constructive engagement for many years. This practice involves the active participation, coordination and communication with students, staff, administrators, faculty and UCI Police to address concerns and issues in a proactive manner. In another example, UCI has regularly activated an event planning team, which includes representatives from Scheduling and Conference Services, Dean of Students, Office of Communications, Student Affairs, student leadership and UCI Police, to effectively manage high-profile events, including known demonstrations or protests. The event planning team uses the concept of the Incident Command System (ICS) to manage events on campus and works in conjunction with the Chancellor's Executive Policy Group (CEPG) to address key issues and crises when appropriate.

While recognizing the success of many of these past efforts, it is important to note the many tangible and meaningful changes UCI has implemented stemming from the recommendations of the Robinson/Edley Report. The following list summarizes many of the existing practices and notes the changes, along with how they have impacted the campus:

Exhibit 3
Page 211

The constructive engagement model is a key component in meeting many of the Robinson/Edley Report recommendations, including facilitating free speech. In general, this is a cross-divisional event planning process to promote constructive, active engagement with the students and among the campus offices responsible for managing student leadership development, community safety and the use of university facilities. There are five principles:

- Active engagement
- Deliberate socialization
- Unique teachable moments
- Collaborative cross-directional planning
- Mutual permeable boundaries

The foundations for effective constructive engagement include:

- Personal engagement of students and all other participants
- Community safety
- Care of university facilities

UC Irvine's commitment to building authentic, open dialogue with students is the foundation for our constructive engagement model. We approach each moment as a teaching moment for our students and for ourselves. Student engagement is the responsibility of every administrator and staff member and requires a campuswide dedication complementing the leadership provided by the Chancellor and the Vice Chancellor for Student Affairs. Some of the key efforts by UC Irvine are:

- Vice Chancellor for Student Affairs (VCSA) meets biweekly with the President of Associated Students to review plans and programs addressing news, issues and events.
- The Associate VCSA attends the weekly Associated Students Legislative Council meeting.
- Senior staff attends all undergraduate and graduate student association meetings. Other staff members attend as requested.
- Members of Chancellor's Cabinet, the Chair of the Academic Senate, the Chair of the Academic Senate Committee on Student Experience, the Deans of Undergraduate and Graduate Divisions, the Dean of Students, the UCI Chief of Police and other key university staff meet monthly with the leadership of Associated Student and Graduate Student Association leadership to discuss issues, share information and define opportunities for students on campus.
- The Assistant Vice Chancellor and Dean of Students have a Student Life Advisory Group composed of 25-plus student leaders.
- The Chancellor, VCSA and/or other senior staff meet quarterly with student newspaper editors and reporters to discuss issues and campus news.
- Student Affairs employs more than 50 percent of all students working on campus, and regardless of the student's role—intern, employee, volunteer, resident assistant—the division strives to provide each student with core competencies in administrative skills, ethical decision making, interpersonal development, valuing diversity and social responsibility.

Exhibit 3
Page 212

- The Vice Chancellor for Budget meets with elected student government and student organization leaders and invites other students to meet with her to provide information on the UC and campus budget process.

- Student Life and Leadership hosts the annual fall student leadership retreat for more than 240 current and emerging student leaders, with most key officials, including the Chancellor and other senior administrators, either attending or presenting at the conference. This year's conference will focus on the constructive engagement effort.

- Leaders from all 599 student organizations are required to participate in an annual online orientation managed by the Student Life & Leadership team.

- As needed, special websites are created to provide up-to-date information on critical issues. Each site will include context for the issue, where to attend programs and public forums to learn and discuss the topic, statements by university officials, and educational information, including UC research or public policy on the topic.

- The VCSA holds open office hours three times a quarter.

- The VCSA and Student Affairs senior leadership attend hundreds of student-sponsored events each year as participants, presenters and guests.

- The Chancellor and Vice Chancellor, along with other senior members, participate in a variety of events involving diverse sets of students (ethnic, LGBT, religious, political, etc.), including fall welcoming events, student-initiated outreach programs, campus cultural traditions and celebrations.

- The Chancellor, VCSA, Dean of Undergraduate Education and Dean of Students all teach undergraduate classes.

- The VCSA walks the campus to talk with students. If there are student-sponsored events that have a high interest from the community, he will engage the student organizers to learn of their desired outcomes for the program.

- The VCSA, Associate VCSA and/or the Dean of Students visit with students staging a public street theater protest to learn about the desired outcomes for the event.

- Students hosting events and programs on topics of high public interest and potential controversy are required to meet with any one or all of the following offices so that the campus can learn how it may support the event goals while keeping within policies and procedures: Scheduling and Conference Services, Dean of Students, UCI Police and Office of the Vice Chancellor for Student Affairs.

- Student Housing professionals hold small-group training sessions, community education, groups meetings, conversation hours and town halls to instill the living-learning community practices to create a culture of mutual respect and appreciation.

- GUSH (Government in Undergraduate Student Housing) is the housing student government body that meets regularly with senior housing administrators.

- The Chancellor and his wife host quarterly dinners with students at Tierney House and University House.

- The Chancellor meets regularly with student leaders to discuss campus life and areas of concern.

- Student Affairs supports and funds a wide array of town halls, special events and programs designed and implemented by students to address the issues and topics identified as critical by students.

- Use of university properties and free speech pamphlets are distributed to each student at new-student orientation programs outlining time, place and manner policies and student rights.

- The VCSA, Dean of Students and/or the Associate VCSA reach out to students and student organizations with concerns about campus climate. Student Affairs works to quickly provide support to explore the concerns through a town hall, group meeting or information sessions to bring the facts forward and to provide a channel of communication for voices of apprehension.

Exhibit 3
Page 213

- The UC Irvine Police Department is committed to active student engagement and community involvement as noted in its mission statement:

  *The UCI Police Department actively collaborates with our community to create a safe and secure campus through education, problem solving and enforcement. We use innovative practices, technology, continuing training and partnerships to provide professional police services to prevent, prepare for, respond to and recover from all criminal activity, hazards and threats. In doing so, we foster and maintain an environment that supports the well-being of our students, faculty, staff and visitors at UCI.*

The police department participates in the university's constructive engagement model and strives for open and authentic dialogue with UCI students. Student engagement is encouraged and expected of all members of the police department. Some of the key efforts by UCIPD include:

- The UCI Chief of Police, along with the Chancellor and other university staff and faculty leaders, meets monthly with the leadership of Associated Students and Graduate Student Association to discuss issues, share information and define opportunities for students on campus.

- The Police Chief meets regularly with the Chancellor's chief of staff to review and discuss issues of importance and interest.

- The Police Chief is a member of UCI's Mental Health Initiative Committee, which includes participation from students, staff and faculty, and reports to the EVC/Provost.

- The Police Chief serves as a presenter in the university's Diversity Development program, the Orientation and Professional Training Program, Department Team Building Workshops, Managing Distress Workshops for staff and faculty, New Athlete Orientations and a wide range of student, staff and faculty lectures and meetings.

- The Police Chief and employees of the police department are active members of UCI's Coordinated Community Response Team and participate in many events and activities throughout the year such as Take Back the Night, Denim Day, Stalking Awareness, RAD Training, Champs, White Ribbon Campaign, Bystander Intervention, the Green Dot program and others.

- The Police Chief is an active participant in the LGBT's Transgender Taskforce.

- The police department's command staff meets quarterly with the ASUCI and AGS leadership council.

* The police department is a key member of the Campus Assault Response Team in managing sexual assault, domestic and dating violence, and stalking.

- The police department participates on the UCI Consultation Team for behavior assessment, resource coordination and threat management.

- Student Life and Leadership hosts the annual fall student leadership retreat for more than 240 current and emerging student leaders with members of the PD command staff attending or presenting at the conference.

- The police department manages CLERY training for over 500 student employees, staff and faculty.

- The police department has received student and staff-led training in Islam 101, LGBT issues and other diversity-specific topics.

- The Police Chief and command staff regularly meet with leaders of many student groups. They actively engage the students in a wide variety of issues and concerns and work to develop professional relationships and mutual respect with the student community. Many student leaders reach out to the UCIPD as part of their planning for programs and protests.

Exhibit 3
Page 214

- The police department employs about 35 students as community service officers. These student workers operate the Safety Escort Program, conduct security patrols, help manage athletic and special events, and provide safety and crime prevention education efforts. Police staff regularly mentor and educate these students in policing operations and career opportunities.

- The police department has a corporal assigned as a liaison with the Cross Cultural Center, and the corporal meets with students and staff from the center on a regular basis.

- Any time a special event is planned on campus, the special event sergeant meets with student groups or outside groups organizing the event and discusses with them ways to ensure their event occurs without any issues or disruptions.

- An officer has been assigned as a liaison with the Department of Social Ecology (Criminal Justice) for the specific purpose of mentoring students and encouraging them to become police officers at UCIPD. Nearly 30 percent of the officers who work at UCIPD are UCI graduates.

- UCIPD has established a social media presence on Facebook, Twitter and Nixle for the specific purpose of providing timely information to the campus community, including crime trend information, emergency management information and crime prevention tips. This same information is also posted on the UCIPD website.

- A sergeant is assigned as a liaison to the English as Second Language students and provides safety presentations several times a year to the students. UCIPD has officers who are fluent in five languages other than English and conduct presentations in those languages.

- A sergeant is assigned as a liaison with the Greek Life organizations on campus and has quarterly meetings with the leaders of those groups.

- UCIPD participates with the Student Affairs office in a restorative justice program at UCI and has established an administrative citation process for managing discipline issues through the Office of Student Conduct.

- UCIPD has divided the UCI campus into three zones and assigned patrol sergeants, corporals and officers to each of those zones. Each sergeant, corporal and officer has the responsibility of developing and maintaining a working relationship with the zone captains, building coordinators, floor wardens, housing assistants or resident assistants, and student groups in their zone.

- A sergeant is assigned as the student housing liaison and regularly meets with housing management staff to discuss issues and problems. This sergeant coordinates meetings, training and activities between housing residential and community advisers at the beginning of every school year and throughout as appropriate.

Exhibit 3
Page 215

The police department has specifically addressed several of the Robinson/Edley Report recommendations as follows:

- The hiring and promotional processes for the police department include students, staff and faculty on the interview panels and town hall presentations. In the current hiring process for police officers, four students and two staff members are included on the panels.

- The UCI Police Chief personally interviews all final candidates for all full-time positions within the police department and includes an extensive discussion of the unique culture in a campus environment.

Training has been and will continue to be conducted at all of the following levels:

- All sworn officers and supervisors have received at least 30 hours of training in the past two years in crowd management, use of force, control techniques and verbal de-escalation techniques.

- Additional train the trainer and advanced instruction has been provided to specific supervisors and commanders.

- Emergency Operations management, Incident Command System and Chancellor's Executive Policy Group training and exercises have been conducted within the SEMS and NIMS guidelines.

- Joint training sessions and planning exercises have included Irvine PD, Newport Beach PD and the Orange County Fire Authority.

- UCIPD is fully participating in the Orange County Mobile Field Force training effort and has taken a leadership role in this project.

One area of change for UCI is the development of a formal Event Management Team (EMT) policy. While UCI has engaged an informal event planning team for significant and high-profile events, there were no specific policies or procedures in place. This formalized policy has now been developed. Key objectives are noted as follows:

- Provide executive administrative leadership oversight and direction before and/or during significant special events, protests, demonstrations or other similar events that could have a major impact on campus operations.

- Implement Incident Command System protocols and identify a senior administration leader as Incident Commander.

- Coordinate planning, communications and decision making before and during such special events.

- Engage student leadership to proactively address student interests, issues or concerns.

- Stay informed of emerging issues and monitor campus climate topics that may impact regular operations.

- Provide context-specific advice/counsel to the Chancellor's Executive Policy Group (CEPG) and other key leaders and decision makers across campus and serve as a connection point for issues.

- Conduct regular assessments of campus practices with regard to special event planning and management.

- Keep the CEPG apprised of key areas of concern.

Exhibit 3
Page 216

The Event Management Team Policy also incorporates all of the Robinson/Edley Report recommendations regarding managing protests and demonstrations.

UCI is addressing several areas in moving forward. First, the formalizing of the Event Management Team will require some degree of more definitive organization and the calendaring of meetings. This effort is now in process. Second, UCI Student Affairs is conducting the All U Leadership Conference for student organization leaders in October. A portion of this conference will include training and discussion on free speech issues and constructive engagement. Third, UCI is working on a tutorial training guide for all incoming undergraduate and graduate students on civility and positive engagement, including education on UCI's values of respect, intellectual curiosity, integrity, commitment, empathy, appreciation and fun. Lastly, the Constructive Engagement, Policing and Crisis Response work group has been established on a permanent basis and will continue to meet and assess UCI's efforts in meeting the Robinson/Edley Report recommendations into the future.

Over the past few years UCI has experienced hundreds of protests and demonstrations covering a wide range of issues and concerns. During 2011 and 2012, UCIPD responded and handled 71 such events without significant or problematic outcome. In each of these circumstances, university staff from Student Affairs, Scheduling and Conference Services, Human Relations, faculty and UCI administration convened together to assess and effectively manage these events. UCI recognizes its role as a leading academic institution with significant responsibilities to ensure the freedom of speech within legal parameters while protecting the health and safety of students, staff, faculty and the general public. We are committed to these efforts.

Exhibit 3
Page 217

## Chancellor Certification



UNIVERSITY OF CALIFORNIA, IRVINE

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

Office of the Chancellor

510 Aldrich Hall
Irvine, CA 92697-1900
(949) 824-5111
(949) 824-2087 FAX

November 18, 2013

President Janet Napolitano
University of California
1111 Franklin Street, 12th Floor
Oakland, California  94607

Dear President Napolitano:

      We hereby certify that all the *Robinson/Edley Report* recommendations that were finalized and accepted through the Civil Disobedience Initiative have been implemented or are in the process of being implemented at the University of California, Irvine.  Our campus takes great pride in the fact that many of the recommendations in the Civil Disobedience Initiative were included as part of the campus culture well before this initiative began and are reflected in our campus values.

Wendell C. Brase
Vice Chancellor
Administrative & Business Services

Thomas A. Parham
Vice Chancellor
Student Affairs

Michael V. Drake, M.D.
Chancellor

Exhibit 3
Page 218

Exhibit 3
Page 219



UNIVERSITY OF CALIFORNIA
LOS ANGELES

Exhibit 3
Page 220

# Los Angeles

The UCLA community has a long history of working to achieve mutual understanding and respect throughout the campus by focusing on building collaborative partnerships among campus departments, student groups and individuals. All involved campus departments are committed to meeting the recommendations of the Robinson/Edley Report and the Civil Disobedience Initiative. The UCLA community understands the need to move forward and improve, and we are confident our implementations of the Robinson/Edley Report recommendations will help us accomplish that purpose. In addition to recommended practices that UCLA followed prior to the report being issued, the campus has undertaken tangible and meaningful changes as a result of the Robinson/Edley Report recommendations.

At UCLA, events involving discussion and debate of ideas and social issues, even conflict itself, are seen as an opportunity for awareness and a component of the developmental process. With a foundation of shared long-term objectives as envisioned by the Student Affairs' True Bruin Values and the police department's Core Values, the implementation efforts for the Robinson/Edley Report recommendations become a continuation and enhancement of current campus practices.

The UCLA campus understands and embraces the value of open lines of communication and strong relationships within the community. Policies concerning free speech and time, place, and manner guidelines are easily accessible from the police department and Student Affairs websites, and links to applicable systemwide policies are also clearly identified. The clear communication practices include handouts and flyers for demonstration participants that explain applicable laws and policies and what the participants can expect from other campus entities such as the police department. Regarding access to the Chancellor and the university administration, programs such as the Chancellor's office hours provide opportunities for students to interact with the Chancellor; UCLA Staff Assembly cohosts Breakfast with the Chancellor, allowing staff members to dine and speak freely with the Chancellor; and the UCLA Academic Senate continues to

be an avenue for faculty members to express their opinions on matters of campus concern. A myriad of other opportunities exist for members of the campus commuity to exchange information.

The Robinson/Edley Report made several recommendations regarding the defining of roles in response to incidents of civil disobedience. UCLA has had and continues to have policies in place that clearly define administrator and police roles in incidents of civil disobedience. The incident response team, consisting of administrators from the police department, Student Affairs, the Academic Senate, Legal Affairs, Human Resources, Community and Public Outreach, Campus Life and the Chancellor's office, plans and oversees the campus's response to demonstrations, in part by attempting to determine whether particular incidents are acts of civil disobedience meriting a response and by providing input on the appropriate response, if needed. UCLA has a long tradition of administrators, faculty and Student Affairs working together on site with the police department to coordinate and strategize responses. These relationships are critical to maintaining university operations while providing for the safety of everyone involved and preserving individuals' constitutional rights during civil disobedience incidents.

The police department continuously assesses all demonstrations and incidents of civil disobedience. Such occasions are coordinated by established Incident Command System guidelines, which include provisions for mutual aid of both local police and police from other UC campuses. UCLA communicates regularly with local mutual aid law enforcement agencies, and when advance planning allows, arrangements are made to seek mutual aid first from the police departments of other UC campuses.

Exhibit 3
Page 221

Hiring and training of police officers was another area that the Robinson/Edley Report addressed. The UCLA Police Department currently involves community members in the promotion/hiring processes of sergeant and command-level positions, and the Chief of Police personally interviews every new police officer candidate prior to final hiring. UCLA police officers are highly trained in areas of crowd management, mediation and communications skills by a variety of in-person and Internet-based training programs. A UCPD systemwide response team (SRT) has been created, and the UCLA Police Department is a founding member.  Participants on the UCPD SRT receive additional specialized training in areas such as crowd control, crowd management and police use-of-force. Training at UCLA doesn't just involve the police department; campus adminstrators regularly participate in training in the form of table-top exercises and scenario drills. More formal training is planned for senior campus administrators on an annual basis to expose the administrators to crowd management techniques, mediation, de-escalation, the Incident Command System and police force options. Such training will better equip campus adminstrators to make appropriate decisions at incidents in the future.

The UCLA campus believes that open communication among police, administrators, protesters and the campus community assists in ensuring safe events and preventing misunderstandings. UCLA Student Affairs has increased outreach efforts, through websites and newsletters to student organizations and the community, in order to ensure that students are aware that Student Affairs is prepared to assist them in support of their First Amendment rights. The Intergroup Dialogues program, an effective alternative for addressing hot button issues, has been expanded.

Student Affairs proactively reaches out to demonstration organizers before their event to strategize on how to make their event safe. Student Affairs advises the organizers on other options to accomplish the demonstration goals, such as alternative methods of communication other than a protest, and they will facilitate delivery of messages to administration when appropriate. Student Affairs provides the organization with a copy of police protocol and applicable campus policies, and they begin a dialogue in support of the organization. They staff events and provide a conduit to the police by taking the lead and acting as the primary university representative with whom the organizers can communicate during events. The Vice Chancellor of Student Affairs, the Associate Vice Chancellor of Student & Campus Life, or the Executive Director of Recreation & Student Activities attend or are represented at all demonstrations. Student Affairs and the police department work closely together, allowing a seamless transition if and when a police response is required.

UCLA uses the Internet, social media and the Bruin Alert System, an email and text-based alert system, to quickly send information to over 60,000 students, faculty and staff members to promptly inform the campus community of ongoing protests or incidents.

Exhibit 3
Page 222

While not all protests can be prevented, UCLA offers several methods of dispute resolution to attempt to resolve issues before they are likely to trigger a protest or demonstration. The UCLA Office of Ombuds Services is an independent, neutral and confidential service that helps facilitate communication and assist parties in reaching their own mutually acceptable agreements when conflicts arise. In addition, Restorative Justice Services is used to bring members of the campus community together in a safe environment for a discussion between those affected by the actions or positions and members of the campus community, with a focus on uniting the community. These preventative services can be used before, after or even during an incident. The UCLA Student Conduct Code allows a more formal response if, in the process of a protest, students violate campus policy.

The UCLA Police Department has increased outreach efforts with all segments of the UCLA community. Senior administrators of the police department periodically provide reports at student government and related meetings. UCPD representatives are on numerous campus committees and organizations that include students and senior staff, such as the Council on Diversity and Inclusion, Consultation and Response Team, Residence Hall Safety and Security, Operations Group (Chancellor's Representative, Communications, Student Affairs, Legal, Human Resources and Government Relations), Emergency Operations Management Group and many more.

UCPD is a founding member of USAC's Campus Safety Alliance, which is chaired by the student government's internal vice president and consists of representatives from varied student organizations and campus services. Police officers serve as mentors for student athletes and are involved in student activities, from safety fairs and presentations to theme weeks and special projects. The Cultural Awareness Workshop program, founded by UCLA police officers, has enabled groups of officers and students to participate in a workshop that provides opportunities to talk about policing and issues of the represented communities. These workshops particularly address areas of concern such as racial profiling, where students and police officers can learn more from each other about their particular issues and concerns. Students are routinely invited on police ride-alongs, and many student government leaders have taken advantage of the invitations. A majority of UCPD officers are former students themselves, with over 60 percent of the sworn personnel having earned bachelor's or master's degrees. In addition, 40 percent of the sworn personnel who are college graduates are UCLA alumni.

For significant incidents occurring at UCLA, UCPD completes after-action reports that are reviewed by police supervisors and the campus incident response team on a periodic basis. When needed, a civilian staff member video records protests for evidentiary and/or training purposes. On a systemwide level, UCLA Police Department managers and staff have played a major role in establishing the UCPD SRT for activation and response to major demonstrations and critical events on all UC campuses. The UCLA Chief of Police has actively worked with the UC Council of Chiefs to develop and implement consistent systemwide policies for crowd management and use of force.

Exhibit 3
Page 223

Ongoing campus efforts to implement the Robinson/Edley Report recommendations include continued community outreach efforts and improved training opportunities for the UCLA police officers and campus administrators. The police officer training concentrates on changes in policies and tactics that apply to crowd management and large demonstrations, all of which incorporate the recommendations from the Civil Disobedience Initiative. Training for campus administrators focuses on the Incident Command System and practical exercises to ensure good communication and effective partnerships during these challenging events. Moving into the future, UCLA remains committed to free expression while also protecting the health and safety of students, faculty, staff, the police and the general public.

Exhibit 3
Page 224

## Chancellor Certification

UNIVERSITY OF CALIFORNIA, LOS ANGELES

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO



UCLA

SANTA BARBARA • SANTA CRUZ

OFFICE OF THE CHANCELLOR
BOX 951405
LOS ANGELES, CALIFORNIA 90095-1405

October 23, 2013

President Janet Napolitano
Office of the President
University of California
1111 Franklin Street, 12th Floor
Oakland, CA 94607

Dear President Napolitano:

I hereby certify that all the Robinson/Edley Report recommendations that were finalized and accepted through the Civil Disobedience Initiative have been implemented or are in the process of being implemented at the University of California, Los Angeles.

Sincerely,

Gene D. Block
Chancellor

Exhibit 3
Page 225



UNIVERSITY OF CALIFORNIA
**M E R C E D**

Exhibit 3
Page 226

# Merced

## Introduction

As the University of California's smallest (fall 2013 enrollment, 6,195) and newest campus (opened in 2005), UC Merced does not have a history of protests or civil disobedience. Over the past eight years, we have worked to create a culture of communication and collaboration between the Chancellor and senior Student Affairs staff and our students. We interact frequently, attempt to address concerns before they become contentious and have found having polices that are quite general, rather than too specific, has provided us with greater flexibility when issues do arise.

The Civil Disobedience Initiative, however, has given the leadership of the campus the opportunity to review best practices from across the UC system and to put into place some procedures, training and mechanisms that could be helpful in managing protests or civil disobedience incidents that may arise in the future.

It also has allowed us to publically reaffirm our commitment to free speech and peaceful assembly, which is discussed prominently in our Protocol for Responding to Peaceful Assembly or Protest on the Property of the University of California, Merced. In addition, the charter for our Events Response Team includes the following principle: "UC Merced's leadership is committed to protecting the free speech rights of students, faculty and staff and will work to ensure that lawful and peaceful assemblies are supported and encouraged on campus." That said, the leadership understands we must ensure that the normal academic, research and administrative activities must be carried out in an environment that is safe and free from intimidation or harassment.

## Review Process

To oversee the implementation of the recommendations included in the Robinson/Edley Report and growing out of the Civil Disobedience Initiative, our campus created a committee comprising Associate Chancellor Janet Young (now retired), Assistant Vice Chancellor for Communications Patti Waid, Police Chief Rita Spaur and Vice Chancellor for Student Affairs Jane Lawrence, who was designated by Chancellor Leland as UC Merced's campus point of contact for CDI.

This committee met regularly to review and formulate UC Merced appropriate responses to the recommendations of the Robinson/Edley Report. The committee, along with the senior leadership of the campus, believes that the Robinson/Edley Report and recommendations should be seen as a guide and that each campus should be allowed flexibility in implementation of the recommendations based upon that campus's context and history. UC Merced's context is unique among the system, given our short history, student culture, and infrequency and small size of protests.

The committee also, through the auspices of the Vice Chancellor for Student Affairs, has been able to reach out to offices across campus and to students about these issues. A priority for the committee was ensuring that the campus Protocol for Responding to Peaceful Assembly or Protest on the Property of UC Merced approved and issued by Chancellor Leland in 2012 was maintained as the principle policy for the campus.

Throughout the past year, Vice Chancellor Lawrence kept Chancellor Leland and campus leadership informed about and, as appropriate, involved in decision making about UC Merced's responses to recommendations. Chancellor Leland, Vice Chancellor Lawrence, Police Chief Spaur and Associate Vice Chancellor and Dean of Students Nies attended the executive training program held at the Claremont Hotel in March 2013. Subsequently, the campus sent 16 staff members to the trainings offered by the Office of the President. The trainings have allowed UC Merced staff at multiple levels and in critical leadership positions on our campus to better understand the range of issues that need to be addressed and responded to prior to, during and following a large protest or civil disobedience event.

Exhibit 3
Page 227

### Recommendations

UC Merced has responded to and complied with all of the recommendations that are the responsibility of a campus rather than the Office of the President. It seems appropriate, however, to highlight a few of the recommendations and their impact on the campus.

Recommendations 7, 8, 11, 12 and 13 speak directly to the creation of response teams on each campus and the importance of clarifying the role of the Chancellor and other senior leadership and the police before and during a protest. As a result of these recommendations:

- The campus Protocol for Responding to Peaceful Assembly or Protest on the Property of UC Merced was revised to reflect practices gleaned from the CDI process.

- An Event Response Team was created and members appointed.

- A charter for the Event Response Team, which clarifies roles and responsibilities, was written and approved by the Chancellor.

The membership of the Event Response Team and a copy of its charter were submitted to the Office of the President as part of the Civil Disobedience Initiative process. The Event Response Team had its first meeting on September 19, 2013. Since this meeting was held prior to the visit of President Napolitano to UC Merced, it gave the group the opportunity to discuss how we might respond to a protest and put into practice the guidelines and procedures outlined in the charter.

Recommendation 23 recommends that Event Response Teams periodically participate in simulation training. Chief Spaur is currently organizing a training exercise for the Event Response Team that will be held on December 19, 2013. Details on this training have been provided to the Office of the President as part of the CDI process.

Recommendations 8 and 13 address specifically the decision-making role of the Chancellor and other senior administrators prior to and during a protest, including the Chancellor's involvement in a request by the police to use or escalate the force being used unless under exigent circumstances. Our campus Protocol and Event Response Team charter puts the responsibility for these decisions solely in the hands of the Chancellor: "The Chancellor has ultimate responsibility to approve strategy before and during a protest."

### Summary

UC Merced is pleased to submit this final report. The campus has fulfilled all of its responsibilities and attempted to comply with all requests made by the Civil Disobedience Initiative staff. We believe that now is the time to allow campuses to assimilate and work with new processes, to identify what may need to be modified given differences in campus culture and history, and to recommend system level efforts that may assist campus leadership and law enforcement in successfully managing major protest events.

Exhibit 3
Page 228

## Chancellor Certification

UNIVERSITY OF CALIFORNIA

BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO        SANTA BARBARA · SANTA CRUZ



DOROTHY LELAND
CHANCELLOR

UNIVERSITY OF CALIFORNIA, MERCED
OFFICE OF THE CHANCELLOR
5200 NORTH LAKE ROAD
MERCED, CA 95343
TEL: (209) 228-4417
FAX: (209) 228-4423

October 29, 2013

President Janet Napolitano
Office of the President
University of California
1111 Franklin Street, 12th Floor
Oakland, CA 94607

Dear President Napolitano:

I hereby certify that to the best of my knowledge all of the Robinson/Edley Repot recommendations that were finalized and accepted through the Civil Disobedience Initiative have been implemented or are in the process of being implemented at the University of California, Merced.

Our campus contact, Vice Chancellor Jane Lawrence, has been submitting required documents and information that describe the steps we have taken to respond to the recommendations. We appreciate your recognition that campus context and culture matters and that especially in the area of responding to peaceful assemblies and protests, one size does not fit all. We hope that the Office of the President will continue to give campuses the latitude to implement the recommendations as appropriate to their unique situations.

If you have any questions about our responses, please do not hesitate to contact Vice Chancellor Lawrence or me.

Sincerely,

Dorothy J. Leland
Chancellor

Exhibit 3
Page 229



Exhibit 3
Page 230

# Riverside

## Executive Summary

The University of California, Riverside, is strongly committed to the values of free speech, freedom of expression, and peaceful and lawful assembly. This commitment to open dialogue and debate is at the heart of any university community, and it is a core, fundamental value at UCR.

UCR is also committed to the notion that any open exchange of ideas must occur within an environment of mutual respect.

These dual values—a commitment to free speech and discourse within an environment of civility and respect—are embodied within UCR's Principles Guiding Speech and Assembly, which was issued in December 2012 (available at chancellor.ucr.edu/expression). The Principles Guiding Speech and Assembly provides context for UCR's responses to the Civil Disobedience Initiative, and it clearly demonstrates UCR's commitment to free speech and expression within a university setting that welcomes, encourages and respects differing points of view.

## UCR Leadership—Commitment to Engagement

Several foundational components and themes are found throughout the Robinson/Edley Report recommendations. An overview of these themes is as follows:

- Free Speech and Civil Disobedience—Context and Vision for Campus Dialogue and Practices Relating to Events, and Gatherings

- Engagement—Senior Leadership and UCPD with Campus Students, Staff and Faculty

- Time, Place, and Manner—Principles, Practices, ans Policies Relating to Free Speech, Assembly and Civil Disobedience

- Practices Relating to Police Training and Hiring

- Event Management and Response—Clear Definitions of Practices and Approaches That Are Repeatable and Auditable

An overview of UCR's responses to the Robinson/Edley Report recommendations is presented below. However, "engagement" is particularly important to successfully meeting the goals and objectives put forth by Robinson/Edley Report. This engagement of senior campus leadership (including police leadership) with students, faculty and staff allows for the formation of relationships, understanding of protocols and approaches, and the promotion of shared values and common understandings.

UCR has a foundational commitment to such interactions, and it has provided the campus with substantive benefits during the past decade. UCR's Chancellor includes both the undergraduate and graduate student body presidents within his cabinet, and UCR's chancellors have historically sought out opportunities to interact with students in a variety of ways. These interactions provide opportunities for dialogue on issues of the day, but they also create relationships that become invaluable during events that may become stressful or lead to acts of civil disobedience.

UCR's Vice Chancellor of Student Affairs and the campus's Dean of Students serve as models for the UC system in terms of student engagement and interaction. The Vice Chancellor of Student Affairs and Dean of Students engage students and student leadership in multifaceted ways, from regular attendance at student leadership (ASUCR) meetings, to participation at commencements and convocations, to partnering on major event planning and promotion. This commitment of senior management to regular, formal interactions with students creates an environment that is "dialogue friendly" when events occur that might result in conflict or tension.

Finally, UCR's police department (which includes many sworn officers who are UCR graduates) actively and regularly interacts with faculty, staff and students in a variety of formal and informal ways, from ad hoc meetings to presentations during student orientation. Moreover, the UCR Police Chief interacts directly with the Chancellor and Provost on a regular basis, and these interactions create a shared understanding of police approaches, protocols and tactics.

Exhibit 3
Page 231

### *Overview of UCR's Responses to the Robinson/Edley Report Recommendations*

Within its responses to the Robinson/Edley Report recommendations, UCR has documented both existing and new practices/initiatives in each of the categories noted above, and the campus has provided this information in a detailed submission to UCOP. A brief summary of UCR's responses within the five broad categories noted above is as follows:

### Free Speech and Civil Disobedience—Context and Vision for Campus Dialog and Practices Relating to Events and Gatherings

In December 2012, in response to both campus and UC-wide dialogue on issues relating to free speech, assembly and civil disobedience, UC Riverside's Task Force on Speech and Assembly issued UCR's Principles Guiding Speech and Assembly (available at chancellor.ucr.edu/expression).

The Task Force on Speech and Assembly included campus faculty, students and staff, and this group engaged in substantive dialogue concerning free speech and assembly. The Principles Guiding Speech and Assembly issued by the task force provides the context and framework guiding UCR's responses to the Robinson/Edley Report recommendations. The following notes are taken from the document's introduction:

> *A core value of the University of California, Riverside, is to provide a safe, nurturing and enabling environment for faculty, students, and staff to freely pursue the academic mission of teaching and learning, research and creative activity, and engagement with the broader community through outreach and service.  Of equal importance are the business and operational activities that enable the academic mission to be executed.*

> *UC Riverside is committed to the belief that free speech, expression and peaceful and lawful assembly are rights that must be protected, valued, and encouraged. Peaceful protest, while assuring an ongoing opportunity for the expression of a variety of viewpoints, is one form of the rich debate and dialogue that are at the heart of a university community. The campus is equally committed to the responsibility and accountability that must accompany the exercise of these rights.*

### Engagement—Senior Leadership and UCPD with Campus Students, Staff and Faculty

- This document has already noted several examples of engagement that currently occur between campus leadership and UCR's faculty, staff and students. In addition to those already highlighted, UCR has also implemented the following:

- The VCSA will make time, place and manner information available during orientation (via the UCR student portal) and will highlight this information for all students during the fall quarter (again, through the UCR student portal).

- UCR's police leadership will dialogue with ASUCR and GSA at least annually concerning assembly, civil disobedience, respect and civility, etc.

- The Vice Chancellor of Student Affairs, Vice Chancellor of Business and Administrative Services, and the Chancellor's Office will host periodic discussions of First Amendment, free speech and other issues at the UCR campus. These discussions will be led by the Office of General Counsel. The discussions will be open forum, and faculty, staff and students will be invited.

Exhibit 3
Page 232

**Time, Place and Manner—Principles, Practices and Policies Relating to Free Speech, Assembly and Civil Disobedience**

- As noted above, UCR has issued its Principles Guiding Speech and Assembly, documentation that formally presents UCR's commitment to free speech and assembly within a campus environment of mutual respect and civility (available at http://chancellor.ucr.edu/messages/scotmail.html).

- Additionally, for scheduled events, UCR has a time, place and manner procedure/process, including access to professional staff, that enables faculty, staff and students to plan events in a fashion that accommodates protests but within the law and campus policy; please see the General Provision section available at http://hub.ucr.edu/EventScheduling/Pages/SchedulingPolicies.aspx.

**Practices Relating to Police Training and Hiring**

- UCR provides its police officers substantial training from a variety of sources, and it formally invites and includes faculty, staff and students on officer search committees. More information concerning these efforts may be found within UCR's detailed responses/submission.

**Event Management and Response—Clear Definitions of Practices and Approaches That Are Repeatable and Auditable**

- The Robinson/Edley Report recommendations provide input and guidance relating to how events and gatherings (in particular, those that might lead to acts of civil disobedience) should be optimally managed. The objective of these recommendations is to ensure, to the extent possible, that practices are adopted that facilitate dialogue with event participants, and use alternative dispute resolution techniques and other approaches that obviate the need for direct police involvement or the use of police force.

- The vast majority of Robinson/Edley Report recommendations relating to event management and response are already standard practices at UC Riverside. These practices have been enumerated within UCR's Campus Event Response Team (CERT) process, practices and procedures.

Exhibit 3
Page 233



Business and Administrative Services

900 University Avenue
Riverside, CA 92521-0101

| | |
|---|---|
| **To:** | **Kim Wilcox, Chancellor** |
| **From:** | **Charles Rowley, Interim Vice Chancellor, Business and Administrative Services** |
| **Date:** | **October 24, 2013** |
| **Regarding:** | **Robinson / Edley Civil Disobedience Initiative (CDI) Recommendations** |

The University of California (UC) has produced a suite of recommendations to better prepare campuses for incidents of civil disobedience (the report was prepared by UC's Chief Counsel and the Dean of UC Berkeley's Law School). As you know, the recommendations are far reaching and address the following broad themes:

- *Free Speech and Civil Disobedience – Providing Context and Vision for Campus Dialog and Practices relating to Events, and Gatherings*

- *Engagement – Senior Leadership and UCPD with campus Students, Staff, and Faculty*

- *"Time, Place, and Manner" – Principles, Practices, & Polices relating to Free Speech, Assembly, and Civil Disobedience*

- *Practices relating to Police Training and Hiring*

- *Event Management and Response – Clear Definitions of Practices and Approaches that are Repeatable and Auditable*

Attached to this memo, please find an overview of UCR's responses to the Robinson / Edley recommendations. These responses have been vetted with various campus stakeholders, including UCR's Deans and Vice Chancellors as well as faculty and student leadership. While UCR's responses will of course evolve over time, the Office of the President is requesting your affirmation that the Robinson / Edley report recommendations have been implemented, or are in the process of being implemented, at UC Riverside.

On a final note, there were many individuals who contributed to formulating and documenting UCR's responses to the Robinson / Edley recommendations. While I can't mention everyone here, please let me thank Police Chief Mike Lane, Assistant Chief John Freese, CFAO Georgianne Carlson, and Analyst Karen Springer who provided invaluable support throughout the entire Civil Disobedience Initiative process. During the past year, there were many competing priorities for their time, and I am therefore extraordinarily grateful for their contributions relating to this important process / project.

*Page 1 of 2*

Exhibit 3
Page 234

*Affirmation that the Robinson / Edley Report recommendations, associated with the Civil Disobedience Initiative, have been implemented, or are in the process of being implemented, at UC Riverside. UCR also affirms that future recommendations will be considered and implemented in a manner consistent with the campus process used to implement the Robinson/Edley recommendations.*

Kim A. Wilcox, Chancellor

cc:   Dallas Rabenstein, Provost
      Mike Lane, Chief of Police
      John Freese, Assistant Chief of Police
      Georgianne Carlson, CFAO, Business and Administrative Services
      Karen Springer, Analyst, BAS Shared Services Group

*Page 2 of 2*

Exhibit 3
Page 235

UNIVERSITY OF CALIFORNIA
SAN DIEGO

Exhibit 3
Page 236

# San Diego

UC San Diego is consistently ranked among the best universities in America and most recently ranked in the top 10 public universities by *U.S. News and World Report*. As a result, we recognize and appreciate the responsibility we have to manage civil disobedience in the least intrusive manner possible in order to continue to build on that legacy.

We understand there is always room for improvement, and we continue to develop new methods of managing significant issues such as those described in the recommendations from the Robinson/Edley Report and implemented through the Civil Disobedience Initiative (CDI). We possess a full understanding of the recommendations and in most cases were already performing them as regular practice prior to the CDI. That said, we have embraced the recommendations as an opportunity to reaffirm our commitment to provide our students, faculty, staff and community with an environment that will enable them to safely pursue their individual goals and activities. Whether they seek a quality education, employment opportunities, cutting-edge research, advanced patient care or an enduring appreciation of the arts, they can feel safe to do so at one of America's finest universities, UC San Diego.

At UC San Diego, approaches used to prevent unintentional violation of campus policies and the law include educating students about their rights and responsibilities involving speech and expressive activities using the online resource http://freespeech.ucsd.edu. This website includes an FAQ on topics such as civil disobedience. It contains a summary of the UCSD speech policy and the forms of expressive activities that violate campus policies. It includes a section on ways students can respond to speakers or events they disagree with in a manner that does not violate campus policies or the law.

The free speech website has a link to UCSD's policy on Free Speech, Advocacy, and Distribution of Literature on University Grounds (PPM 510, Section 9). The policy describes the approach the university uses to respond to speech and expressive activities in violation of the campus policy. Per this policy, "When enforcing this policy, UC San Diego officials authorized to maintain order on the campus shall make a reasonable attempt to warn and advise a university affiliate to cease or modify the prohibited conduct or activity before imposing university sanctions and/or applying appropriate law enforcement measures for violation of this policy, except where the conduct violating this policy reasonably appears to create a threat to or endanger health, safety, or property."

The free speech website also has a link to Section 16 (Expression and Advocacy) of UC San Diego Policies and Procedures Applying to Student Activities. This section explains the procedures the university uses to respond to speech and/or advocacy on the university grounds, including violations of campus policies.

UCSD also maintains a resource for student organizations planning events that may generate opposition, including a protest, which describes how student organizations can work with the university to ensure the event occurs without disruption and the violation of university policies and the law.

Exhibit 3
Page 237

Student engagement is the responsibility of every administrator and all staff members, and requires a campuswide dedication complementing the leadership provided by the Chancellor and the Vice Chancellor of Student Affairs. Some of the key efforts by UC San Diego are as follows:

- Chancellor and Vice Chancellor of Student Affairs have standing meetings with the president of the Associated Students and Graduate Student Association.

- Vice Chancellor of Student Affairs hosts twice-quarterly lunches with student leaders, for a total of six lunches a year, at the UC San Diego Faculty Club for the purpose of developing relationships between the university administration and our student leaders and within the student leadership group.

- Director of Associated Students Administration attends the weekly Associated Students Council meeting. Other staff members attend depending on the council agenda and as requested.

- Assistant Vice Chancellor of Student Life has standing meetings with the presidents of the Associated Students and the Graduate Student Association.

- Deans of Students from each undergraduate college attend the weekly College Council meetings.

- Students appointed by Associated Students and the Graduate Student Association serve on 24 standing university committees.

- Undergraduate and graduate students serve on the Student Conduct Standards Group, which reviews all proposed changes to the Student Conduct Regulations.

- Student Life advises and provides funding support to the *UCSD Guardian*, the campus newspaper.

- The UCSD policy on speech, advocacy and distribution of literature was developed by a committee composed of undergraduate and graduate students appointed by the Associated Students and Graduate Student Association.

- Staff of University Ombuds Office attends AS Council meetings when controversial issues are on the council agenda.

- Representatives of Student Affairs and UCSD Police Department meet and advise student organization principal members when their organization has scheduled an event that may trigger counter protests. In addition, Student Affairs staff members are present at the event, advise the student organizers and respond to any potential disruption.

- Student Affairs manages the Triton Activities Planner, a Web-based tool to help student organizations to plan and schedule their events. The TAP system is a resource for identifying potentially controversial student activities at least three weeks before they occur.

- Student Affairs administers programs for student leaders on intergroup dialogue and effective conflict resolution. Student Affairs coordinates an ongoing dialogue between Muslim and Jewish students.

- Student Affairs established a Diversity Workgroup to develop initiatives to support underrepresented students and continually improve the campus climate.

- Student Affairs has a comprehensive assessment program, which regularly conducts focus groups and surveys to identify and respond to students' needs, interests and concerns. The program is supported by the Student Affairs Research and Information unit and Student Affairs Assessment Coalition, composed of administrators from each Student Affairs unit.

- Student Affairs employs over 800 student employees.

Exhibit 3
Page 238

### Community Interaction

- The Campus Climate Committee comprises representatives from all segments of the university and members of the community. They routinely meet to discuss campus climate and issues that can be defused well before social activism is taken. Issues related to the treatment of the historically underrepresented communities and protected classes are routinely addressed. Topical issues such as enrollment focused on enhanced diversity and campus improvement concerns (resource center development) are also reviewed. An open forum that allows groups and individuals an opportunity to discuss sensitive issues is routinely part of each meeting. Justice in Palestine week, Jewish Muslim relations, LGBT, Chicano, Latino, African American students and community members have all had an opportunity to present concerns.

- The Chancellor's Community Advisory Group comprises community members representing a cross-section of the San Diego community. This group assists in advising the Chancellor on community concerns and issues. They routinely discuss community interface with the university (charter school operation and collaborations, enrollment, community service and outreach efforts).

Student engagement is encouraged and expected of all members of the police department. Some of the key efforts by UCSD PD include:

- The Police Chief meets with the Vice Chancellor, Resource Management & Planning to review and discuss issues of importance and interest.

- The police department is a key member of the Sexual Assault Response Team in managing sexual assault, domestic and dating violence and stalking.

- The police department participates on UCSD's threat assessment and management team.

- The police department coordinates and manages all CLERY training for student employees, staff and faculty.

- The Police Chief has requested training from the LGBT Resource Center.

- The command staff regularly meet with leaders of a variety of student groups. They actively engage the students in a wide variety of issues and concerns, and work to develop professional relationships and mutual respect with the student community. Student leaders reach out to the UCSD PD as part of their planning for programs and protests.

- The police department employs about 60 students as community service officers. These student workers operate the Safety Escort Program, conduct security patrols, help manage athletic and special events, and provide safety and crime prevention education. Police staff regularly mentor and educate these students in policing operations and career opportunities.

- The police department has two community program corporals who are assigned to liaison with a variety of student, staff and faculty entities.

- Any time a special event is planned on campus the Specialized Services Division sworn personnel meets with student groups or outside groups organizing the event and discusses with the groups ways to ensure their event occurs without any issues or disruptions.

Exhibit 3
Page 239

- Safety presentations are provided to international students on an ongoing basis.

- The police department is liason to Greek Life organizations on campus to discuss event planning and liability issues and provide feedback post event for future event planning purposes.

- Unique partnership with Housing, Dining, Hospitality services provides nightly security and safety services in all residential areas via the Residential Security Officer (RSO) program. RSOs work closely with Residential Life staff to ensure the residential environment is safe and conducive to the university's educational mission.

The UCSD Police Department has specifically addressed several of the CDI recommendations as follows:

- The hiring and promotional processes for the police department include non-department personnel from our key stakeholders including Housing and Dining, Student Affairs and Academic Affairs.

- The UCSD Police Chief personally interviews all final candidates for all full-time positions within the police department and includes an extensive discussion of the unique culture in a campus environment.

Training has been and will continue to be conducted at all of the following levels:

- All sworn officers and supervisors have received training in the past two years in advanced officer training, which includes crowd management, use of force, control techniques and verbal de-escalation techniques.

- Sworn personnel are scheduled to attend a DOJ/COPS funded train-the-trainer course in fair and impartial policing. Upon their return they will train remaining department personnel.

- Additional training and advanced instruction has been provided to specific supervisors and commanders.

- Emergency Operations management, Incident Command System and Chancellor's Executive Policy Group training and exercises have been conducted within the SEMS and NIMS[25] guidelines.

- Joint training and planning sessions have included our neighboring partner, San Diego Police Department.

- UCSD is part of the UC systemwide response team.

Exhibit 3
Page 240

UCSD has developed a formal Event Management Team charter and protocol. Key objectives are noted as follows:

- Provide executive administrative leadership oversight and direction before and/or during significant special events, protests, demonstrations or other similar events that could have a major impact on campus operations.

- Implement Incident Command System protocols.

* Coordinate planning, communications and decision making before and during such special events.

- Engage student leadership to proactively address student interests, issues or concerns.

- Stay informed of emerging issues and monitor campus climate topics that may impact regular operations.

- Provide context-specific advice/counsel to the Executive Policy Group (EPG) and other key leaders and decision makers across campus and serve as a connection point for issues.

- Conduct regular assessments of campus practices with regard to special event planning and management.

- Keep the EPG apprised of key areas of concern.

The Event Management Team protocol also incorporates CDI recommendations regarding managing protests and demonstrations, including the following:

- Develop principles to guide the EMT in determining whether particular acts of civil disobedience merit a response, and what that response might entail.

- Place an administrator on site within viewing distance of the event and with instant communication to the police Incident Commander and to the Chancellor or the Chancellor's representative with decision-making authority.

- During the course of an event, continuously reassess objectives and the wisdom of pursuing them, in light of necessary police tactics—seek to pursue only important goals with objectively reasonable force.

- Absent exigent circumstances and in a static event, commencement or escalation of force by police will be initiated in consultation with the Chancellor or Chancellor's representative before action is taken.

- If a demonstration or protest is planned, make every reasonable attempt to identify and contact one or more of the group leaders of the event in advance to establish lines of communication.

- In advance of the event, inform the protestors of alternate appropriate avenues of communication of their concerns or proposals.

- Absent special circumstances, assign administrators rather than police to serve as the primary university representatives to communicate with protestors during a demonstration.

- Make every reasonable attempt to establish a communication link with identified leaders or sponsors of the event; for leaderless groups, communicate broadly to the group as a whole (through social media and otherwise) until relationships form.

Exhibit 3
Page 241

- Identify appropriate staff members to serve as observers of the event activities when the event is significant.

- Determine to the extent necessary or appropriate, the need to communicate to the campus community at large about material developments in ongoing protests, demonstrations or other significant events using social media or other communication means.

- Continue to review and assess the event to determine if the incident objectives or the incident action plan should be revised or modified and ensure notification to all event staff of any such changes.

- Assess the value of initiating a mediation function and consider the use of mediation as an alternative to force, before and during a protest event.

- Ensure the completion of an after-action report following any significant event that has a major impact on university operations. The after-action report is to be completed by the Incident Commander or designee and forwarded to the EMT co-chairs.

Over the past few years UC San Diego has experienced numerous protests and demonstrations that have covered a wide range of issues and concerns. These have included labor, student fees, civil rights, political disagreements, religious and ethnic issues and disruptions regarding the Occupy Movement. We have and continue to embrace a philosophy that police intervention is utilized only when absolutely necessary, and others such as Student Affairs staff are directly involved in the planning and address of all student-based acts of civil disobedience. Our community policing efforts provide a positive supportive environment where police officers are perceived as valuable helping professional members of the community.

UC San Diego is dedicated to the dissemination of information and ideas, and supports the presence of engaged scholarly, cultural and political debate. The ability of the campus community and the community at-large to engage in expressive activity is central to the identity of a public university. UC San Diego continues to promote an open atmosphere and to honor the First Amendment rights of each individual.

Exhibit 3
Page 242

## Chancellor Certification

UNIVERSITY OF CALIFORNIA, SAN DIEGO

UCSD

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO        SANTA BARBARA • SANTA CRUZ

OFFICE OF THE CHANCELLOR

9500 GILMAN DRIVE
LA JOLLA, CALIFORNIA 92093-0005
TEL: (858) 534-3135
FAX: (858) 534-6523

October 30, 2013

**JANET NAPOLITANO**
President
University of California
Office of the President
1111 Franklin Street
Oakland, CA 94607

SUBJECT:   UCSD's Chancellor's Certification of the Robinson-Edley Report
Recommendations

Dear President Napolitano:

I hereby certify that all the Robinson-Edley Report recommendations that were finalized and accepted through the Civil Disobedience Initiative have been implemented or are in the process of being implemented at the University of California San Diego.

Please feel free to contact me with any questions that you may have in regards to this report.

Best regards,

Pradeep K. Khosla
Chancellor

cc.:  C. Kristofco
G. Matthews
O. King

Exhibit 3
Page 243

UNIVERSITY OF CALIFORNIA
SAN FRANCISCO

Exhibit 3
Page 244

TWELVE-MONTH SUMMARY

# San Francisco

---

### *Introduction*

The University of California, San Francisco (UCSF), is committed to the exercise of free speech as protected by the First Amendment and to upholding the Constitutional rights and freedoms of all people while meeting our responsibilities to maintain a safe and secure campus environment where learning, research, patient care, and the free and robust exchange of ideas can thrive.

UCSF has embraced its responsibilities to evaluate and implement the spirit and intent of the Robinson/Edley Report recommendations to best support and facilitate the expression of protected speech while integrating protocols and policy within UCSF campus and public safety operations. UCSF has supported this effort through leadership with the UC Chiefs of Police Council, UC Student Affairs Leadership Council, through participation as a member of the Civil Disobedience Advisory Committees and Workgroups and as part of the systemwide Crisis Leadership Training development team. Additionally, UCSF has experimented and served as a "living lab" for implementation of selected recommendations given the planning and crowd management opportunities attendant to the UC Regents meetings supported by UCSF Police. Lessons learned from this living lab experiment have been shared and integrated into CDI work group discussions and policy positions and UCSF policies and protocols.

### *Civil Disobedience Initiative Value*

In reflecting on the efforts of the past year, we find the Civil Disobedience Initiative and related work has added significant value in how we understand, plan, engage and respond to crisis incidents as a campus leadership team. Key elements of significant added value have included:

### Crisis Leadership and Accountability

- The systemwide executive crisis leadership training was effective in highlighting crisis leadership responsibilities, decision-making skills, relationships, organizational dependencies and crisis communication needs that are now top of mind. This enhanced mindfulness has improved early inclusion of key partners in problem identification, resolution and communication while also more keenly defining roles and accountability. Process tools including the Policy Group Crisis Management Team, Special Event Team and Strike Management annexes to the UCSF Campus Emergency Response Plan grew out of this effort.

### Flexibility of Implementation

- The recognition that each campus organization, environment and demonstration is unique and requires flexibility in how the Robinson/Edley Report recommendations are implemented has been key to success. As UCSF has experimented with implementation of key recommendations—most particularly the administrator on the ground, Special Event Management Team and Student/Staff Police Observer Programs—we have developed a threshold for activation of these protocols that enables us to remain nimble in planning for and responding to minor events, while ensuring full engagement and on-site resources for events most likely to lead to civil disobedience and/or disruption of university business. Flexibility and ongoing communication at all involved levels has been key to our successful strategy.

---

Exhibit 3
Page 245

### Systemwide Police Policy Improvements

- University of California Police Chiefs have worked together collaboratively to draft systemwide policy in some of the most challenging areas impacting police response to civil disobedience, including freedom of speech, use of force, crowd management, approved weapons and development of a Systemwide Police Special Response Team. In completing this work, the police chiefs have brought all 10 police departments into closer alignment in philosophy, tactical training, equipment and deployment practices thereby increasing the likelihood of consistent police leadership, response and mutual-aid preparation across the University of California system.

### Student and/or Staff Police Observer Program

- In implementing a Student and/or Staff Police Observer Program, UCSF began with requiring student observers at every planned demonstration event and quickly encountered challenges in recruiting sufficient volunteers to cover the many demonstration events that occur throughout the year. Experience and the program evolved so that observers are now drawn from students and staff volunteers and are assigned to events meeting the threshold of events likely to result in civil disobedience or significant disruption in university business. Volunteer observers participate in an orientation to police crowd management and use-of-force protocols, are escorted by police for safety, document observations about events witnessed and participate in debriefing of observations. The program serves both as a method to accomplish community observance and transparency of police crowd management and to develop broader UCSF community awareness and understanding of police practices.

### *Key Accomplishments*

During the implementation period, we have conducted an assessment of the 49 recommendations and the state of operations and readiness at UCSF. We have evaluated existing policies, protocols and operations and have incorporated the spirit and intent of the recommendations whenever they add value to our operations and are not already in place. Following are UCSF key accomplishments:

- Police response to demonstrations and crowd management and use-of-force policies have been reviewed with student government leaders, Student Affairs and campus leadership. Additionally, police have demonstrated arrest procedures for removal of passively resisting arrestees for leadership awareness and understanding of policy and techniques for control and safety of bystanders and arrestees.

- Police Operations Orders are now confidentially shared in writing with the Chancellor and Senior Vice Chancellor for Administration and Campus Counsel in advance of each major planned demonstration. Operations Orders related to UC Regents events are shared with the Regents Secretary and Senior Vice President for Business Operations. This process ensures collaboration, communication and common expectations prior to each planned event response.

- Chancellor Desmond-Hellman and Senior Vice Chancellor for Administration John Plotts are personally notified and briefed by the Chief of Police regarding the police operations plan, expected level of conflict and disturbance from demonstrations and use-of-force protocol in advance of each significant event. A threshold for personal presence of the Chancellor or designee has been determined through experience and considers the variable size and complexity of demonstration events, likelihood of civil disobedience and tolerability of disruptions of university business. The Chancellor or designee is otherwise available by cell phone as needed to problem-solve with the Chief of Police.

Exhibit 3
Page 246

- Civilian observers are used at each major demonstration, including volunteer student observers and/or staff as appropriate to the event. Observers are briefed, wear identification, are escorted/protected during the demonstration and document their observations following each event. A formalized observer program protocol is now in place and is reviewed annually as part of the annual police policy review.

- After-action critique and documentation is made following each formal event—whether or not improvements or correction actions are necessary. Beginning January 2014, the campus will report the number of demonstrations requiring a police response as part of its annual police report to the community.

- Orientation regarding police demonstration management and arrest techniques has been completed for the UCSF Chancellor, Provost and Senior Vice Chancellor of Administration and Finance as well as the Secretary of the Regents. Additionally, key executive, senior leaders and Emergency Operations Center members participated in systemwide crisis leadership training, bringing the level of exposure to these important crisis management concepts to key staff at four levels of the organization.

- While students and UCSF community members have long been participants in the interview and selection processes for police managers and supervisors, they are now also included in all interview panels for sworn police officers at every level, providing valuable feedback regarding the candidate fit within the UCSF campus culture.

- Crowd management and free speech policies have been updated and are available on the Police and Student Affairs websites respectively. Additionally, a UCSF Demonstration Management protocol was developed and incorporated as an annex to the UCSF Emergency Response Plan which outlines the principles, roles and responsibilities for all UCSF members involved in responding and managing a demonstration at UCSF.

- UCSF Police and UC Systemwide Police Policies are now available to the public on the Police website and are highlighted on the home page for easy access.

- UCSF Time Place and Manner Guidelines and Special Use Rules have been updated for clarity of understanding are now available to the public on the Police and Student Affairs websites for easy public access.

- UCSF Police officers have ongoing training in crowd control and management tactics including a "soft-hands" approach applying the lowest level of force reasonable and necessary to facilitate arrest of passively resisting arrestees.

- UCSF Police officers have trained with their mutual-aid partners, including San Francisco Police and key UC campuses, to ensure coordination of tactics and procedures. All UCSF officers have been trained in low-profile arrest procedures and employ these procedures during demonstrations.

- UCSF Mediation Services are available through the UCSF Ombudsperson Program and have been made available as resources during emergency events as needed by Vice Provost Sally Marshall (now retired).

- UCSF Emergency Response Plan has been updated to include a new Policy Group Crisis Management Protocol to assist the Chancellor and UCSF senior leadership in executing their roles and responsibilities in a variety of campus crisis situations, including a significant demonstration that interferes with university operations.

- UCSF Chief Pam Roskowski, Assistant Chief Paul Berlin and Lieutenant Barney Rivera have collaborated with other UC Police leaders around the state and provided leadership in development of a UC Systemwide Police Special Response Team. SRT team leaders and members have been selected, and systemwide policy has been developed and submitted to UCOP for review and adoption.

Exhibit 3
Page 247

As UC Systemwide Police Service Coordinator, UCSF Police Chief Pam Roskowski has provided leadership to the UC Council of Chiefs and facilitated development of the following systemwide police policy drafts and documents that have been submitted for UCOP approval:

- Freedom of Speech

- Use of Force

- Crowd Management, Intervention and Control

- System-wide Police Special Response Team

- Approved Weapons

- As UC Systemwide Student Affairs Coordinator, former UCSF Student Affairs Vice Chancellor Joe Castro has provided leadership to the UC Council of Student Affairs Vice Chancellors in review of recommendations related to Student Affairs processes and reviewed and affirmed the current student discipline process as meeting campus needs.

- During FY 2012-13 and 2013-14 to date, in addition to demonstrations at UCSF primarily related to animal rights and labor disputes, UCSF Police have implemented and refined its crowd management protocols in managing security for 15 UC Board of Regents meetings, most with attendant demonstrations. Doing so has provided the living lab for continuous training and protocol improvement.

Exhibit 3
Page 248

## Chancellor Certification

**University of California, San Francisco**
**Civil Disobedience Initiative**
**Highlights and Final Implementation Report**
**October 20, 2013**

**Chancellor Certification**

*" I hereby certify that all the Robinson/Edley Report recommendations that were finalized and accepted through the Civil Disobedience Initiative have been implemented or are in the process of being implemented at the University of California San Francisco."*

Susan Desmond-Hellmann, Chancellor

Exhibit 3
Page 249

UNIVERSITY OF CALIFORNIA
SANTA BARBARA

Exhibit 3
Page 250

# Santa Barbara

For the past 20 years, the response by the UC Santa Barbara campus to student demonstrations has been wholly consistent with the spirit of the Robinson/Edley Report recommendations and has largely met the letter of the recommendations, as well. However, the recommendations have provided the campus an opportunity to review its practices and make improvements in several areas. The first is the documentation of the campus's approach to student demonstrations. The campus recently memorialized in a detailed 30-page paper its practices and philosophy relative to the First Amendment, student activism, protests and civil disobedience.

Additionally, the campus has strengthened our already extensive collaborations between administration and campus police, particularly in the area of shared trainings and exercises; has prepared a clear and concise statement to students on their First Amendment rights (available in hard copy and electronic form); and has developed a more robust method for recording events at student demonstrations.

While one of the keys to our successful interactions with students has been open and transparent flow of information, the Division of Student Affairs and the campus police have used this opportunity to make existing policies and information more readily accessible to students and the public via websites and other means (pamphlets, brochures and handouts). Because the campus's approach to communicating with students and managing protests "in the field" has, for at least two decades, mirrored the Robinson/Edley Report recommendations, the few items that needed to be addressed have been completed in accordance with the report's recommendations.

Laying the groundwork for effective protest management involves attitude and philosophy as well as action. Quality day-to-day interactions with students set the stage for successful communication during times of heightened tension and emotion.

The tenor of our interactions with students has an impact only if we have repeated opportunities to engage with students in both informal and formal dialogue and to take part, alongside them, in the life of the campus. Visibility and accessibility are key components of positive, constructive relationships with students. At UC Santa Barbara, visibility and approachability begin with the Chancellor, who lives on campus, teaches classes and makes a point of strolling the campus and interacting with students. He stops by the dining commons and library to chat with students, attends numerous student events, including Associated Students Senate meetings, and is available for individual meetings with students, including groups of students. He and his wife are known for their open, friendly attitude toward students and have contributed significantly to defining this campus as student friendly.

Much of the same description can be applied to the Executive Vice Chancellor, who is a regular attendee at student events, respects student rights to demonstrate and invites students to meet with him on issues of concern.

Partnering with the excellent staff in Housing and Residential Services, Student Affairs has created a variety of venues in which structured, meaningful interactions with students can and do take place and in which mutual understanding can develop:

- Vice Chancellor meets biweekly with the president of Associated Students, keeping in close communication on issues and events.

- A member of the division's executive group and, as often as possible, the Vice Chancellor attend the weekly meetings of the Student Senate.

- A member of the division's executive group attends all meetings of the Graduate Student Association and other staff members attend as requested or needed.

- The division's executive group members meet quarterly with the leadership of Associated Students, Graduate Student Association, and the Daily Nexus to become acquainted and discuss or preview issues before they become crises.

Exhibit 3
Page 251

- A student intern works in the Office of the Vice Chancellor for Student Affairs, meets with the Vice Chancellor regularly, and works on a variety of projects to facilitate communication between divisional leaders and student leaders.

- Vice Chancellor and Chief Financial Officer for the division meet weekly with the powerful Student Fee Advisory Committee (comprising undergraduate and graduate students as well as faculty and staff representatives).

- The division's executive group attends the annual fall retreat for the Student Fee Advisory Committee during which exec members explain the work, issues and needs of the departments within the division and hear from students about their priorities and concerns.

- Divisional staff members, including the Vice Chancellor when possible, attend hundreds of student events each year as a way of showing support, making connections with students and staying current on issues.

- Vice Chancellor "officiates" at the annual Queer Wedding and, along with various members of the executive group, attends Lavender Graduation.

- Vice Chancellor along with other executive group members participates in a variety of events for students of color, including Black Graduation Celebration and other graduation events for special communities, NUF student presentations, African American leadership retreat.

- Vice Chancellor and other Student Affairs executive group members meet with the Student Regent whenever s/he is on campus.

- The Chancellor, Vice Chancellor and Student Affairs executive group members attend and support events for various "communities" of students, such as the American Indian Harvest Dinner, residence hall welcome receptions for incoming LGBT, Black, Chicano/Latino, Asian, Middle Eastern, Jewish, mixed heritage and Euro-American students, etc.

- Residential Services takes advantage of the fact that the vast majority of our incoming freshmen live in campus-owned residence halls by providing each student resident with a written document that educates students on community living, emphasizes and promotes a sense of mutual respect and appreciation, and explains the rights and responsibilities of each student, highlighting student accountability. The staff follows up with conversations in the halls about the responsibilities of community living.

- The Vice Chancellor and Student Affairs staff collaborate closely with Office of Housing and Residential Services to train the large residence hall staff and convey the values and responsibilities of being a community member. Student Affairs personnel regularly attend residence hall functions.

- Although Housing and Residential Services is not in the Division of Student Affairs, the executive director of Housing and Residential Life periodically attends meetings of the Student Affairs executive team in order to enhance collaboration and identify early any emerging student issues.

- Student Affairs sponsors quarterly dinners for leaders of special student communities, such as LGBT, veteran, African American, Chicano, Jewish, Middle Eastern, Asian, American Indian and international student communities

- Student Affairs sponsors and SA executive group members attend an annual student leadership conference and an annual conference for students working in the Division of Student Affairs where student issues are discussed.

- Student Affairs provides money for a "Critical Issues" fund that can be accessed quickly to support presentations, panels, information sessions, etc. around current events or issues as they arise, particularly around issues that may develop into crises if not addressed in more structured venues.

Exhibit 3
Page 252

The point of this list is not to be comprehensive but to demonstrate the level of accessibility to students and involvement in campus life of the Vice Chancellor and other members of the division's leadership.

Additionally, the division's leadership adheres to a tone for interactions with students set by the Vice Chancellor. Divisional staff members are authentic, respectful, humble and, above all, honest with students. Following the Vice Chancellor's lead, they are always straightforward and candid with students, even when the news is not what the students want to hear. Staff members view student leaders as partners in governing the university, resolving issues and responding to student needs and concerns. The Vice Chancellor often states publically that the A.S. president and the chair of the Student Fee Advisory Committee are his "bosses," and he sincerely values their ideas and input, seeking their counsel and collaboration.

This campus emphasizes positive relationships and productive interactions with students. However, our students are active and do engage in demonstrations and protests on a routine basis. We recognize that protests are a common and valuable way for students to express their ideas and opinions, and we strive to help them get their message across while not violating our campus regulations. Because demonstrations are common on our campus, we have had for at least two decades a standing event response team with an established membership and pre- and post-event protocols as well as standard in-the-field practices.

The UCSB campus has made sustained progress in its efforts to enhance existing protocols, policies, plans and training in order to remain well positioned to effectively handle large campus demonstrations or acts of civil disobedience. Specific focus has been given to enhancing existing mechanisms and formalizing a mutual agreement between campus administrators and students in the form of a memo of understanding that holds each side to a set of community standards that focus on upholding the First Amendment, practicing nonviolence and encouraging civil exchange of opinions.

At UCSB we have an established internal mediation function that is staffed by trained Student Affairs professionals who are able to draw upon already-developed solid relationships with student leaders to communicate effectively and facilitate discussions between protestors and the campus. We believe strongly that using staff members who are known and trusted by students as mediators/negotiators decreases the volatility of a protest, helps to avoid adversarial posturing and sends a message that the situation is not so extreme or overwhelming that a peaceful resolution cannot be reached. Our goal is always to try to normalize the protest situation and rely on the goodwill, trust and communication that have already been established between the administration and students. When negotiations with protesting students have been undertaken in the past, Student Affairs administrators have proven up to the task of successfully communicating with students and eventually arriving at a suitable resolution for students and administrators alike.

Exhibit 3
Page 253

Rarely does a demonstration at UC Santa Barbara cross the line into civil disobedience, and even more rare is a demonstration marred by violence. Despite our best efforts to encourage a lawful protest, some events do take a turn into the arena of civil disobedience. When they do, we try to meet the escalation with the lowest-level response possible—that may mean no response at all beyond the presence of a representative from Student Affairs. We try to make initial contact with almost all demonstrations at UCSB as a way of determining whether the demonstration should continue to be monitored, so in almost all cases a Student Affairs administrator is on hand and can alert colleagues and the police if the character of the demonstration changes.

At UCSB force is used as a last resort in protest situations, and the campus always attempts to give as much latitude as possible to protesting students. We recognize that many acts of civil disobedience can be tolerated, at least for a time, as long as they do not pose a safety or security threat or unduly interfere with the business of the university. We have no desire to thwart students or their efforts to communicate their stands on issues.  With that said, we know from experience that demonstrations and protests go more smoothly and student goals are more often met if the administration and the campus police have an agreed-upon plan of action that includes responding to serious violations of law and campus policy.

UCSB has a robust student disciplinary process (as well as a restorative justice component) that is available should there be a determination that it is an appropriate option in responding to a student violation of campus regulations during protests and demonstrations.  Any incidents of civil disobedience involving serious violations of campus regulations would be reviewed on a case-by-case basis, and the student disciplinary system would be considered and evaluated as a response option.

Additionally, the UCSB campus has formalized an observer program utilizing trained Student Affairs staff members. Specific staff members are designated to observe demonstrations, while one observer is tasked with taking notes on the demonstration as it unfolds and the response by the campus. All demonstrations are recorded in electronic logs (or databases) located in the Office of Student Life and UCPD. Descriptions of larger protests are captured in greater detail in the PD's after-action reports and Student Affairs' notes, which become part of the database and are also reviewed immediately by the event response team.

The Vice Chancellor for Student Affairs, in collaboration with the Associate Vice Chancellor for Administrative Services and the Chief of Police, has established an annual training and exercise calendar for administrators, particularly Student Affairs staff who work with protests and campus police officers. Being launched in fall of this year, the training will address crowd management, mediation, de-escalation techniques, and use-of-force options available to police and will also include simulation exercises that give administrators and police a chance to work together through a variety of protest scenarios.  Ongoing training opportunities will emphasize the roles and responsibilities of the "on-site administrator" and how that individual/individuals will interact with campus police personnel and provide clear guidance and oversight for establishing strategic objectives.

Exhibit 3
Page 254

Campus police have continued to spend a considerable amount of time and resources completing a variety of trainings with an emphasis on best practices in crowd management/control techniques and de-escalation, incident command training, the most up-to-date use-of-force laws and policies, and hands-on "soft techniques." The campus police continue to hold campuswide tabletop exercises (TTX) that involve campus, county stakeholders and allied agencies and that also conform to NIMS/ICS standards. These types of exercises serve to reinforce the roles and responsibilities and enhance communication mechanisms within a simulated scenario environment. Also important is the execution of a memorandum of understanding between the UCSB campus police and the local law enforcement agency (Santa Barbara Sheriff's Office). This MOU establishes command and control during a campus protest or acts of civil disobedience. In addition, the campus police department has maintained a long-standing practice of utilizing other UC campus police personnel, whenever feasible and prudent. Additionally, the campus police have routinely subscribed to the concept of shared governance in its promotion and hiring practices and continue to involve a variety of campus stakeholders in the selection and promotion process. This arduous selection is always completed with a personal interview and hiring decision by the campus Chief of Police.

UCSB is fortunate to have a Police Chief who is also accessible, student oriented and extraordinarily supportive of student rights. He has a student affairs background and approaches his job as one of service to the campus and community. Each quarter he attends a meeting of the Associated Students Senate to introduce himself and entertain any questions or concerns. He also brings new officers to the Senate meeting to introduce them. He has appointed a community relations and education officer who is highly visible around campus, attends a variety of student meetings and trainings, and joins the Police Chief on panels to discuss a variety of issues and police practices.

The past year has entailed working with various campus departments to strengthen existing processes and working relationships and to formalize practice and protocols. An agreement has been reached with the director of the Office of Audit and Advisory Services to investigate student complaints about the campus's handling of a demonstration. In addition, any police complaints are effectively handled in accordance with written policies and applicable statutes.

The Vice Chancellor for Student Affairs has mandated the implementation and use of an electronic form to be the basis for the Student Life demonstration log and to ensure the recording of details of protests and demonstrations. Entries in the log include minimally the date, beginning and ending times, sponsors, issue or reason for the demonstration, and a description of the event with an estimate of the numbers of participants and what occurred (the nature of the demonstration and the campus response). The entries are typically brief but contain these details, unless the demonstration size and nature warrant more elaboration. In addition to photographic documentation of larger demonstrations by police and other campus personnel, demonstration events are recorded (in writing) as they are occurring by a designated Student Affairs staff member, who notes the time, place and actions of the demonstrators, police and other campus personnel.

At the end of each year, the Associate Dean of Student Life and Activities submits to the Vice Chancellor for Student Affairs (convener of the event response team) a summary report of the demonstrations and protests that she has monitored. Larger demonstrations requiring more staff and police involvement are debriefed at a meeting of the event response team in the days shortly following the event, if possible. The debriefing allows the team to review the flow of the event and evaluate the campus's response. The debriefing is especially important if any type of force was used by the police. If there are recommended changes in policy or practice related to the handling of the demonstration, the Vice Chancellor ensures the implementation of the changes.

Exhibit 3
Page 255

The UCPD also documents all demonstrations to which an officer is assigned. For small demonstrations that are simply monitored by the police, a log entry at the police department is all that is required to document the event. For larger events involving police intervention of any kind, after-action reports are used to capture more details of the event and police action. The greater the intervention, the more details are given. If any type of police force is used during a protest, a full and detailed account of the operation is given in the after-action report. The after-action reports are shared with the event response team as a basis for discussion and future strategic planning for demonstrations; they are also available to the Office of the President upon request.

In conclusion, the UC Santa Barbara administration is relaxed, informal, visible, available and respectful of students, their issues and opinions. It is also highly vocal about protecting student rights, encouraging involvement in issues and supporting a variety of ways to express ideas and opinions. The Chancellor, Vice Chancellors, Associate Vice Chancellors and the Chief of Police play central roles in determining the climate on campus and treatment of students, both on a daily basis and in times of tension and unrest. The leadership of the campus is unambiguous in its support of the First Amendment and the value of student engagement with social and political issues. It is also clear in its willingness to work through tense situations with students, hearing them out and attempting to find outcomes acceptable to everyone.

Exhibit 3
Page 256

# Chancellor Certification

UNIVERSITY OF CALIFORNIA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

SANTA BARBARA

Office of the Chancellor
Santa Barbara, CA 93106-2030
Phone:  (805) 893-2231
Fax:     (805) 893-8717
http://www.chancellor.ucsb.edu

September 25, 2013

President Janet Napolitano
Office of the President
University of California
1111 Franklin Street, 12th Floor
Oakland, CA 94607

Dear President Napolitano:

I hereby certify that all the Robinson/Edley Report recommendations that were finalized and accepted through the Civil Disobedience Initiative have been implemented or are in the process of being implemented at the University of California, Santa Barbara.

Sincerely,

Henry T. Yang
Chancellor

92          UNIVERSITY OF CALIFORNIA

Exhibit 3
Page 257



Exhibit 3
Page 258

TWELVE-MONTH SUMMARY

# Santa Cruz

---

***Introduction and Overview***

The following executive summary highlights several topics specific to the UC Santa Cruz campus implementation of the Robinson/Edley Report and the recommendations that were formalized in the University of California Civil Disobedience Initiative.

The intention of the Robinson/Edley Report was to encourage the University of California to identify best practices that facilitate free expression and encourage lawful protest activity while protecting the safety of the UC community and the rights of the community to conduct their business on the campus. The comprehensive process resulted in the identification of a set of 49 proposed recommendations. These recommendations provided a framework for each UC campus to develop policies and practices that would enhance demonstration and protest management and be responsive to the direction outlined in the Robinson-Edley Report.

A UC Office of the President implementation team was assigned to coordinate the systemwide planning. Individual campus implementation was measured through a tracking and documentation system, with final review by a panel that included membership from the UC Office of the President implementation team, Office of General Counsel, Council of Police Chiefs and other experts.

***UC Santa Cruz Civil Disobedience Initiative Project Implementation Strategy***

At the campus level, the implementation responsibilities were assigned to the Business and Administrative Services Vice Chancellor, and direct support for implementation was assigned to the Associate Vice Chancellor, Risk and Safety Services, who served as the campus contact for the UCOP implementation team and coordinated all required submittals. Additionally, the Chief of Police submitted all required materials for university police through the UC Council of Chiefs.

Where appropriate, planning and implementation was coordinated with other campus units, including Chancellor's Office, Campus Provost/Executive Vice Chancellor Office, Campus Counsel, Dean of Students, Student Judicial Affairs, Academic Personnel Office, Staff Human Resources and the Demonstration Operations Team.

***Campus Summary and Background***

UC Santa Cruz has at our core, the mission of education, research and public service. In support of this mission, the university embraces the position that freedom of speech and First Amendment rights are cornerstones of the academic community. Our success as a university is predicated upon our ability to embrace diversity of opinions and to allow safe space for discourse to flourish. The university community and the administration have long held a commitment to upholding First Amendment rights and supporting the ideals of scholarship and social activism. Equally, we strive to support the rights of the community to conduct the business of the campus. Social justice and practical activism are integrated throughout the academic curriculum and into the student engagement programs both in Campus Life and our colleges.

Many of the Robinson/Edley Report recommendations have historically been operational standards of practice for the campus, especially in the areas of early outreach, protest response and support for civil discourse and demonstration activities. UC Santa Cruz has had over 40 years of experience in supporting a very active and engaged student body, faculty and staff, a community that has valued their right to protest and engage in civil disobedience. This engagement has been understood and supported by faculty, Student Life staff, college staff and the administration.

The administration has worked with intention to uphold both First Amendment rights and the need to conduct the business of the campus. Frequently, these two needs are in conflict, which requires delicate leadership and response.

Exhibit 3
Page 259

As a more recent historical reference, in 2007, the Demonstration Operations Team was assembled following several reports that were written specific to campus demonstration response, civil disobedience and protest management. These reports emerged following Tent University in spring 2006. The reports were developed by both internal and external advisory groups, and feedback was provided to the administration by the Academic Senate, Graduate Student Association, Staff Advisory Board and the Council of College Provosts. The Chancellor at that time accepted the report and charged the former vice chancellors of Student Affairs and Business and Administrative Services to form the Demonstration Operations Team (DOT) in 2007. The emphasis for the DOT was essentially to deliver on the same recommendations that were outlined in the Robinson/Edley Report, with a few minor additions. The formation of the DOT in 2007 uniquely prepared UC Santa Cruz to ensure responsiveness to the UC Civil Disobedience Initiative of 2013.

In addition to the charge to the Demonstration Operations Team, during the 2011–12 academic years, the campus substantially redefined the emergency management operational structure and protocols for managing campus emergencies, events and incidents, including demonstration activities. The outcome goals were to streamline analysis, consultation and senior leadership decision making. Through this reframing, the Emergency Management Policy Group emerged. This reframing also allowed for a more defined articulation of the relationship between Incident Command, the Emergency Operations Center and the Demonstration Operations Team. This redefined structure greatly enhanced effectiveness of the leadership team and decision-making structure.

As a campus community, we continue our long-held commitment to protecting the free speech and other First Amendment rights of the community. Additionally, we have integrated the ideals of community policing into our university police program. Our police department is a critical member of the community, and officers and leadership continue their role in supporting First Amendment rights of all and protecting the community.

We are a community of change agents who act at the campus level, in the local community and throughout the world. We are confident that the implementation of the Robinson/Edley recommendations will further enhance and preserve our dedication to student voice and social activism.

Exhibit 3
Page 260



CAMPUS SAFETY AND SECURITY

# Emergency Response Coordination Structure

### Emergency Management Policy Group/Emergency Response Coordination Structure

In 2011–12, the campus adopted a new structure for emergency response and articulated the Emergency Management Policy Group (EMPG) as the team that serves as adviser to the Chancellor on all matters related to policy and decision making in crisis situations, including major demonstrations (see reference graph above).

The core charge for EMPG is to ensure comprehensive management response to crisis situations, to provide the Chancellor with an efficient process for analyzing issues, identifying key policy and decision points that result in strategic decisions, and to ensure campus safety and operations. Ultimate decision-making responsibility resides with the Chancellor in this model.

The Vice Chancellor, Business and Administrative Services, coordinates and the Emergency Management Policy Group documents all critical decision-making activity of the group. The Associate Vice Chancellor, Risk and Safety Services, provides for campuswide operational coordination inclusive of work with the Demonstration Operations Team, Incident Command and the Emergency Operations Center (as applicable).

Exhibit 3
Page 261

Membership in the Emergency Management Policy Group includes:

- Chancellor

- Campus Provost/Executive Vice Chancellor

- Vice Chancellor, Business and Administrative Services, Chair

- Associate Chancellor

- Vice Chancellor, University Relations

Support staff to the Emergency Management Policy Group includes:

- Vice Provost/Dean of Undergraduate Education

- Vice Provost for Academic Affairs

- Dean, Graduate Education

- Special Assistant to the Campus Provost/Executive Vice Chancellor

- Associate Vice Chancellor, Risk and Safety Services

- Campus Counsel

- Director, Public Information

Other (based on nature of incident):

- Chief of Police

- Fire Chief

- Emergency Operations Center Director

- Associate Vice Chancellor/Dean of Students

- Associate Vice Chancellor, Colleges, Housing and Educational Services

- Assistant Vice Chancellor, Staff Human Resources

- Assistant Vice Chancellor, Academic Personnel

- Director Health Services

- Director Risk Services

- Director Environmental Health & Safety

- Campus Veterinarian

Not all demonstration events require the convening of the Emergency Management Policy Group. The Vice Chancellor, Business and Administrative Services, coordinates closely with the Associate Vice Chancellor, Risk and Safety Services, and when appropriate, based on the nature of a planned or emerging demonstration or emergency event, will convene the Emergency Management Policy Group. Sometimes, convening of the group may happen in advance of a planned event, and often it happens when incidents occur. Additionally, the Emergency Management Policy Group is convened to review use-of-force tactics, mutual aid and impacts on campus operations. The group also addresses short and long-term planning and communication planning.

### *Demonstration Operations Team*

The Demonstration Operations Team (DOT) has undergone significant changes in membership and the functions have evolved since the initial inception of the team in 2007. The current charge to the DOT reflects this evolution and aligns directly with the UC Civil Disobedience Initiative. On average, the team will review, plan for and respond to 50–75 events per year. Only a small few require the Emergency Management Policy Group to convene.

The Demonstration Operations Team is charged with coordinating the campus's specific operational planning and response needs related to campus activism, including demonstrations, labor relations activities, labor strikes and other large public events that require campus response, coordination and management. The team is coordinated by the Associate Vice Chancellor, Risk and Safety Services. The three overarching outcome goals for the team are to:

- Provide analysis and planning to support the safety needs of the campus community.

- Support participant First Amendment rights to freedom of expression, open dialogue and discord.

- Support the academic mission of the university.

Exhibit 3
Page 262

The Demonstration Operations Team identifies and implements effective strategies to communicate with the campus community with respect to campus policies and procedures, the campus freedom of speech statement, including the time, place and manner policy, the importance of the Principles of Community, the possible consequences of unacceptable behaviors, and mechanisms to file complaints and/or raise issues through appropriate university processes and policies.

Through the role of the Demonstration Operations Team chair, the following are responsibilities that will be integrated into planning, operations and response. As applicable, these responsibilities are integrated with the Emergency Management Policy Group.

- Monitor emerging issues and campus climate and identify topics that may impact campus operations.

- Provide oversight, coordination, planning and support during protests or major events that may impact campus operations.

- Conduct early outreach to protest or major event organizers.

- If a demonstration or protest is planned, make every reasonable attempt to identify and contact one or more of the group leaders of the event in advance to establish lines of communication.

- In advance of the event, inform the protestors of alternative avenues for communication of their concerns or proposals.

- Absent special circumstances, assign faculty/administrators rather than police to serve as the primary university representatives to communicate with protestors during a demonstration.

- Make every reasonable attempt to establish a communication link with identified leaders or sponsors of the event; for leaderless groups, communicate broadly to the group as a whole (through social media and otherwise) until relationships form.

- Determine to the extent necessary or appropriate, the need to communicate to the campus community at large about material developments in ongoing protests, demonstrations or other significant events.

- Provide policy advice and clarification for protest or major event organizers.

- Coordinate preplanning and provide logistical support required for protest or major events.

- Provide advice and analysis to key executive leaders, advise VC BAS and EMPG on planned and unfolding protest and major events.

- Assign staff and academic administrators to observe, document and report on events. Ensure that observers provide timely observation and feedback to support operational planning and EMPG policy development and strategic decision making. Ensure observers receive orientation and training in the nature of protest and the dynamics of crowd safety and the role of the observer.

- Utilize mediation support as appropriate for events and situations that may be mitigated by the use of internal or external resources to support and encourage positive outcomes.

- Debrief significant events and prepare an After Event Summary for events that have a major impact on university operations. Utilize a standard threshold (events requiring decision making by EMPG) for those events that will require an After Event Summary and ensure appropriate dispensation of records management.

Exhibit 3
Page 263

**DEMONSTRATION OPERATIONS TEAM - ROLES AND RESPONSIBILITIES MATRIX**

| Member | Overview of Roles/Responsibilities | Designated Alternate(s) |
|---|---|---|
| Associate Vice Chancellor Risk and Safety Services | • Chair of Demonstration Operations Team<br>• Coordinates with Emergency Management Policy Group, Incident Command and Emergency Operations Center<br>• Link to Campus Counsel<br>• Process manager for Civil Disobedience Initiative | Associate Vice Chancellor Colleges, Housing and Educational Services |
| Associate Vice Chancellor Colleges, Housing and Educational Services | • On-site lead for Demonstration Operations Team (observers)<br>• Link to Colleges, Housing and Educational Services<br>• Coordinates on-site assignments | Director, Housing Services |
| Director, Public Affairs | • Link to University Relations and Executive Communications | TBA |
| Associate Vice Chancellor Staff Human Resources | • Link to Academic Personnel Office and Staff Human Resources<br>• Link to UCOP Staff Human Resources<br>• Coordinates with Campus Labor Relations | Manager, Employee and Labor Relations |
| Manager, Employee and Labor Relations | • Coordinates with Staff Human Resources<br>• Link to Represented Groups | Partner, Employee and Labor Relations |
| Manager, Emergency Response | • Link to Emergency Operations Center | Business Continuity Planner |
| Chief, University Police | • Campus Safety and Incident Command<br>• Links with mutual aid and local law enforcement | TBA |
| Director, Office of Physical Education, Recreation and Sports | • Link to Campus Life<br>• Coordinates with student organizations, SUA, GSA | Assistant Dean of Students |
| Director, Physical Plant | • Link to Physical Plant Operations<br>• Coordinates with Physical Planning and Construction<br>• Coordinates external communications with contractors | Assistant Director, Physical Plant |
| Planner, Business Continuity | • Admin support to Demonstration Operations Team<br>• Coordinates with major event planners | Executive Assistant, Office of Resource Management, BAS |
| Business and Operations Manager, Campus Provost/Executive Vice Chancellor Office | • Link to CP/EVC and Chancellor's Office<br>• Link to Kerr Hall administrative team | Special Assistant to Campus Provost/ Executive Vice Chancellor |
| Director, Transportation and Parking Services | Link to campus and regional transit services | Assistant Director, Transportation and Parking Services |

Exhibit 3
Page 264

In addition to the membership of the Demonstration Operations Team as noted above, there are 65-plus faculty and staff members who have been trained to serve as on-site observers at demonstration events. These observers include academic faculty/administration who are members of the Academic Senate, Campus Life staff, Labor staff and executive leadership of the campus. Observers are assigned based on the nature of demonstration events and availability. The on-site observers are coordinated by the Demonstration Operations Team on-site lead. Generally, the on-site staff includes two representatives from Labor Relations, four representatives from College/Campus Life and an academic administrator. This varies based on the nature of the protest. The primary role for on-site observers is to provide information and observations to the campus administration, provide support and policy information for protestors, and report emergencies to university police if needed.

The chart below represents the conceptual planning stream that unfolds as the Demonstration Operations Team works to analyze, plan and respond to a major demonstration event. While the chart suggests sequential process flow over time, in many instances, the planning activity may be parallel and in some circumstances, the demonstration emerges and the analysis/planning/decision/response unfolds in real time.



CAMPUS SAFETY AND SECURITY

### DOT Planning Construct: Major Event

| Event awareness | Information gathering | Analysis of events | Outreach to organizers |

| Identification of risks, operational considerations, response, policy issues | Information gathering | Analysis of events | Outreach to organizers |

| Communications & planning | Emergency Operations Center activation (if needed) | Event response | Post-event debrief |

Exhibit 3
Page 265

### *Highlights of Actions Taken to Support Implementation of the Civil Disobedience Initiative*

With respect to specific initiatives that the campus has undertaken, the following were developed as an intentional, comprehensive strategy for strengthening the campus approach for supporting First Amendment rights and responding to demonstration events:

- Reframing the administrative leadership team through the articulation of the Emergency Management Policy Group structure

- Continued solidification of the role of the Demonstration Operations Team and assignment of leadership for the demonstration operations process to the Associate Vice Chancellor, Risk and Safety Services

- Continuance of our practice for having senior academic administrators on site for major demonstration events

- Introduction of a new Police Chief, who has introduced a community policing philosophy

- Ongoing emphasis on early outreach and leadership engagement with students, staff and faculty

- Introduction of a training requirement for all staff that are assigned to support the Demonstration Operations Team on-site observer program. The training includes an overview of roles and responsibilities, incident command structure, Emergency Management Policy Group, Demonstration Operations Team structure and personal safety in crowds

- Increased and repetitive outreach and communication by the campus administration, Dean of Students and Police Chief to labor groups, student leadership, faculty and staff

- Increased training and detailed articulation of roles and responsibilities for membership of the Emergency Management Policy Group, Incident Command, Emergency Operations Center, Demonstration Operations Team and on-site observers

These changes have resulted in the following outcomes:

- Increased awareness and preparedness and improved response for handling events that may be large or potentially disrupt campus operations

- Improved training and preparedness, especially with our regional law enforcement partners for events that intersect with the local community

- Improved coordination of our process for analysis, executive leadership consultation and decision making, and improved understanding of roles and responsibilities

### *Engagement Activity*

The following represents a high-level summary of the ongoing engagement activities between campus administrators, university police and our student leaders and students at large. These efforts have been enhanced during the past three years to support improved communication flow across various sectors of the administration and the community.

Exhibit 3
Page 266

**Engagement between Administration and Students, Faculty and Staff**

- EVC/CP standing meetings with Graduate Student Association and Student Union Assembly
- EVC/CP open office hours for students
- Cops and Coffee sessions
- New student orientation sessions
- Student resource fairs
- Chancellor/student media meetings
- EVC/CP and Student Union Assembly campus budget forums
- Chancellor and EVC/CP meetings with college governments
- PD Chief meetings with college governments, Student Union Assembly and Graduate Student Association
- Chancellor Undergraduate Internship Program (CUIP)
- Sponsored Student Regents visits
- UCPD Citizens Academy
- Chancellor "Work Place Walks"
- EVC/CP and Staff Advisory Board – campus forums
- Chancellor, EVC/CP and Staff Advisory Board—staff appreciation events

**Engagement between Administration and Police**

- Chancellor—Police Chief meetings
- EVC/CP—Police Chief meetings
- Administration participation in emergency operations training and tabletop drills
- Assistant Vice Chancellor, Staff Human Resources and Police Chief outreach with Labor Leadership

**Engagement between Police and Students**

- Cops and Coffee sessions
- Presentations at new student orientation sessions
- Presentations at student resource fairs
- Presentations at graduate student orientation session
- Participation at campuswide events, forums, meetings
- Presentations on safety training, personal safety, activity shooting trainings
- Co-hosting Campus Public Safety Days
- UCPD Citizens Academy
- Cadet Program (Student employees at UCPD)

*Summary*

In summary, the UC Santa Cruz administration continues to embrace our responsibilities for supporting First Amendment rights, providing for the safety of our campus community and ensuring campus operational continuity to support the academic mission.

With commitment and detailed planning, we have implemented the recommendations as outlined in the Robinson/Edley Report and where applicable to the campus for action. Equally, we continue our long-held commitment to the aspirations as offered through the Robinson/Edley Report.

Exhibit 3
Page 267

## Chancellor Certification

UNIVERSITY OF CALIFORNIA, SANTA CRUZ



BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO            SANTA BARBARA · SANTA CRUZ

OFFICE OF THE CHANCELLOR

200 Clark Kerr Hall
1156 High Street
Santa Cruz, CA 95064-1078
Phone (831) 459-2058
FAX (831) 459-2098

October 29, 2013

Janet Napolitano, President
University of California, Office of the President
1111 Franklin Street, 12th Floor
Oakland, CA 94607

Dear President Napolitano:

Re: University of California Santa Cruz Civil Disobedience Initiative Certification

This letter serves as my certification that the University of California, Santa Cruz campus has implemented the Robinson/Edley Report recommendations that were finalized and accepted through the University of California, Civil Disobedience Initiative. While most of the initiatives have been fully implemented, a few are prepared and will be completed by the end of the fall quarter, 2013.

Campus Staff have worked extensively with UCOP Staff to insure that we are in alignment with the initiatives and that the required documentation has been submitted for verification purposes.

Campus Provost/Executive Vice Chancellor Galloway and I continue our commitment to the aspirations of what has been promoted through this process and have encouraged these ideals through our leadership during the past several years. We also believe that we have developed a common understanding across our leadership team in support of these ideals and have created an administrative infrastructure to effectively institutionalize the ongoing implementation of the Civil Disobedience Initiative.

We strive to provide a safe and supportive environment for civil discourse with an active emphasis on early outreach, leadership engagement and measured consideration as cornerstones for our approach.

Please let me know if you should have any questions or need further information.

Sincerely,

George Blumenthal
Chancellor, UC Santa Cruz

cc:    Campus Provost/Executive Vice Chancellor, Alison Galloway
       Vice Chancellor, Business and Administrative Services, Sarah C. Latham
       Associate Chancellor, Ashish Sahni
       Associate Vice Chancellor, Risk and Safety Services, Jean Marie Scott

Exhibit 3
Page 268

## Appendix
## Campus Progress Tracker

This appendix is available in PDF on the Civil Disobedience Initiative website:
http://campusprotestreport.universityofcalifornia.edu/documents/implementation-report-appendices.pdf

Exhibit 3
Page 269

Exhibit 3
Page 270