Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Richard C. Osborne (DC Bar No. 90024046)*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*,<br><br>    Defendants. | Case No.: 2:24-cv-4702-MCS<br><br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Date: July 29, 2024<br>Time: 9:00 a.m.<br>Courtroom: 7C<br>Judge: Hon. Mark C. Scarsi |

* admitted *pro hac vice*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ...................................................................................... 1

ARGUMENT .............................................................................................. 2

    I. Plaintiffs are likely to succeed on the merits. ................................... 2

    II. UCLA's attempts to deny Plaintiffs' need for and entitlement
       to injunctive relief blink reality and misstate the law. ................. 7

      A. Plaintiffs have standing to seek prospective relief and face
         irreparable harm. ....................................................................... 7

      B. The public interest and balance of equities favor Plaintiffs. ... 10

      C. Plaintiffs' requested injunction complies with Rule 65............ 11

CONCLUSION............................................................................................ 11

CERTIFICATE OF COMPLIANCE ......................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ............................................................... 7

*Davidson v. Kimberly-Clark Corp.,*
    889 F.3d 956 (9th Cir. 2018) ........................................... 7-8

*Davis v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999) ............................................................... 5

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*
    *Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023).............................................. 10

*Index Newspapers LLC v. United States Marshals Serv.,*
    977 F.3d 817 (9th Cir. 2020) ............................................... 8

*LSO, Ltd. v. Stroh,*
    205 F.3d 1146 (9th Cir. 2000) ............................................. 8

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ....................................... 10-11

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020) .............................................................. 10

**Other Authorities**

Susan Collins LA (@susancollinsla), Instagram (June 11, 2024) ............ 9

**INTRODUCTION**

UCLA's numerous concessions make resolving this motion straightforward. UCLA does not deny that Plaintiffs and other Jews in the UCLA community have been systematically excluded from UCLA educational facilities, programs, and other parts of campus because they are Jews and because they refuse to denounce the one Jewish nation on Earth. UCLA does not deny that Plaintiffs have been harmed (PI.Mem.9-14), that they engage in sincere exercises of their Jewish faith (PI.Mem.17), or that they have been excluded precisely because of their Judaism (PI.Mem.16-17) and viewpoints (PI.Mem.20-21). UCLA does not deny that it did nothing to protect Plaintiffs from harassment and threats hindering Plaintiffs' ability to attend class (PI.Mem.11-14), take exams (PI.Mem.14), or go to the library (PI.Mem.12). Nor does UCLA deny that it hired the security guards who enforced Jew Exclusion Zones (PI.Mem.4) or that it instructed those personnel not to help Jews access campus (PI.Mem.5) but instead to send students away unless approved by the activists (PI.Mem.5).

Worse yet, UCLA now openly admits that UCLA *itself* erected the physical barricades (UCLA.Mem.3) that excluded Jews from the heart of campus. Nor does it deny that it follows the Robinson-Edley recommendations, which UCLA interprets as prohibiting calling law enforcement "preemptively" unless "absolutely necessary." (PI.Mem.5; Shemuelian Ex.11).

UCLA likewise does not deny that Plaintiffs have faced antisemitism that constitutes discrimination on the basis of religion, race, national origin, and viewpoint, or that the pervasive discrimination on campus has impeded their constitutional and statutory rights. That is no

surprise; the treatment to which Plaintiffs and other Jewish students and faculty members have been subjected is, in a word, indefensible.

Yet despite conceding Plaintiffs' horrible mistreatment, UCLA says this Court is powerless to do anything about it. In UCLA's telling, the venomous state of affairs on its campus is both not its fault and unlikely to continue. But those blithe assurances are no substitute for injunctive relief and cannot be squared with reality. Faced with Plaintiffs' painstakingly detailed (and painfully recounted) narration of what actually transpired on its campus, UCLA simply ignores the many dreadful facts that disprove its rosy account. But the discrimination Plaintiffs have suffered to date is no isolated incident, and UCLA has been no mere bystander. Rather than protect Plaintiffs, UCLA has not just failed in its duties to protect students and ensure non-discriminatory access, but has also affirmatively participated in the deprivation of their rights. The only real way to ensure that Plaintiffs' rights do not continue to be violated when they return to campus next month is for this Court to order UCLA to cease its discrimination against Jewish students and proactively protect them from antisemites.

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

UCLA quickly retreats to technical defenses precisely because UCLA does not (and cannot) deny that Plaintiffs have experienced rampant discrimination on its campus. UCLA instead just insists that it is not its fault, and that the only "acts that *can* be attributed to UCLA" are lawful. UCLA.Mem.13. UCLA is wrong on both counts.

First, the "crux" of Plaintiffs' motion is *not*, as UCLA claims, that "the Royce Quad encampment" in April and May "injured Plaintiffs."

UCLA.Mem.13. It is that *UCLA itself* has injured Plaintiffs by actively facilitating that and other discriminatory activity. That is why Plaintiffs sued UCLA. UCLA did not just stand idly by as antisemitic activists took over its campus, harassed Jews and demanded denunciations of Israel to access key parts of campus. PI.Mem.4, 9-14. UCLA took action—and it chose to protect the perpetrators rather than the victims. It affirmatively erected barricades to protect the encampments, UCLA.Mem.3, and hired extra security to reinforce those zones and *protect the activists*, Ghayoum ¶¶35-36, all while instructing security not to intervene to assist Jewish students and faculty facing threatened and sometimes actual violence and blocked from accessing campus. Frankel ¶¶32-35, 39-42; Ghayoum ¶¶35-45 Shemuelian ¶¶105-10; Shamsa Declaration ¶¶8-10.

And as much as UCLA wants to make this case solely about the appalling events of April and May, those events are just an especially vivid illustration of a more persistent problem. UCLA has long failed to protect Jewish students from harassment and threats while they do basic things like attend class and take exams. Shemuelian ¶¶24-36, 44-45, 82-86, 98, 113, 121-39. Furthermore, antisemitic activists set up an encampment on June 10 and attacked UCLA's Chabad rabbi. PI.Mem.9 & n.3. Yet, once again, UCLA affirmatively refused to provide protection: The rabbi "sought assistance from nearby police" but "was told 'our main concern is the crowd control.'" PI.Mem.9 & n.4. And he was not alone; others likewise sought help from campus police, only to be told that they were unable to intervene (while simultaneously protecting the antisemitic activists). *See, e.g.*, Shamsa ¶¶6-10 (describing "firsthand" "experience[]" with "UCLA's failure to protect … Jewish faculty and students … even from direct violence"). UCLA has thus shown that it

very much has a policy, and an unconstitutional one at that: When activists discriminate against and threaten Jews, UCLA protects the activists, not their Jewish victims.

UCLA nowhere denies that it affirmatively "instructed police not to interfere as Plaintiffs' rights were being trampled on, and even stationed security staff to reinforce the racial and religious segregation and discrimination." PI.Mem.22. Indeed, it nowhere denies *any* of Plaintiffs' allegations showing "that UCLA facilitated or supported discrimination and harassment." UCLA.Mem.15. UCLA's detour into deliberate indifference is therefore irrelevant, as Plaintiffs absolutely "allege that *UCLA* intentionally singled out Jewish students for unfavorable treatment." UCLA.Mem.16. When a state actor instructs its security force to protect antisemitic activists but leave the Jews they are terrorizing to fend for themselves, it goes far beyond "failing to take action" to prevent discrimination. UCLA.Mem.14. UCLA took action and its actions actively *facilitated* efforts to condition access to its educational facilities and opportunities on denouncing one's faith and heritage. That is about as clear-cut as constitutional and Title VI violations come.

UCLA denies having an affirmative practice or "policy" of protecting the activists first and their victims (if at all) only as a last resort. UCLA.Mem.10. But the Robinson-Edley Report refutes that claim. Administrators are instructed not to even "consider engaging the campus police" until after they have "give[n] protesters the opportunity to leave" and "determined" that the protest activity is causing "a significant interference with their campus' academic mission." Dkt.62-6 at 49 (Robinson-Edley Report). Involving law enforcement to assist victims is a last resort: "The campus Administration should make every reasonable

effort to engage demonstrators in a dialogue that addresses the substance of the demonstrators' concerns and aims, with the goal of de-escalating any situation such that police involvement becomes unnecessary." *Id.* at 70-71. That is why UCLA told the community (and Chancellor Block told Congress) that UC "systemwide policy guidance" *requires* UCLA "not to request law enforcement involvement *preemptively*," but "only if *absolutely necessary* to protect the physical safety of our campus community." Shemuelian Ex.11 (emphasis added); *contra* UCLA.Mem.10.

It is no wonder, then, that Plaintiffs continue to fear for their on-campus safety, and have made the difficult decision to "refrain from several activities" in which they "would otherwise participate" in the new school year. Frankel Reply Declaration ¶3; Shemuelian Reply Declaration ¶3. UCLA avowedly will not step in on their behalf unless and until things become so extreme as to pose a threat to the physical safety of the community—which, judging by the school's actions to date, apparently means the whole community, not the Jewish community whose physical safety activists have unapologetically threatened at every opportunity.

Moreover, even were it merely a question of deliberate indifference, the result would be the same, as UCLA's "response to the harassment" confirms that UCLA was "clearly unreasonable in light of the known circumstances." *Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 648 (1999). As UCLA well knew, myriad "educational facilities" on campus "were open only to those willing to denounce Israel and eschew wearing visible Jewish garb[.]" PI.Mem.16; *see* Frankel ¶¶11, 23-25, 28-42; Ghayoum ¶¶10-11, 34-48, 56-57; Shemuelian ¶¶10, 100-20, 125-30;

Rassbach Ex.22. To say that "UCLA's actions neither suppressed nor coerced speech," UCLA.Mem.16, is thus bizarre. Had UCLA protected its Jewish community members, rather than the activists calling for their death, being Jewish would not have been a safety concern, and Plaintiffs would not have been forced to choose between denouncing the only Jewish nation and accessing campus.

Instead of taking immediate action to protect and restore access to Jewish students, UCLA compounded the problem by not only protecting the perpetrators of the discrimination, but instructing its security not to intervene to protect Jews. And that was no isolated incident; the school has repeatedly and persistently proven deaf to the pleas of Plaintiffs and other Jews begging for UCLA's protection. Even Chancellor Block admitted that the encampments left students "physically blocked from accessing parts of the campus" and caused many in the community, "especially our Jewish students," to live "in a state of anxiety and fear." Shemuelian Ex.15. Yet UCLA chose to protect those spewing (and sometimes acting on) antisemitic threats, but not Jews. If that is not deliberate indifference, it is difficult to imagine what is.

UCLA's half-hearted narrow-tailoring argument fares no better. Of course promoting public safety is a compelling interest. UCLA.Mem.17-18. But that interest cannot override the Constitution's core commands. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 20-21 (2020). "Government is not free to disregard the First Amendment in times of crisis." *Id.* at 21 (Gorsuch, J., concurring). And it certainly cannot protect the public safety of only one side of a debate, let alone the side that is behaving lawlessly. Indeed, UCLA does not even try to explain how responding to a public safety risk by instructing campus security *not*

to protect the targets could possibly satisfy "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Plaintiffs have thus shown far more than a likelihood that their constitutional and statutory claims will succeed.

## II. UCLA's attempts to deny Plaintiffs' need for and entitlement to injunctive relief blink reality and misstate the law.

With little to say about the merits, UCLA insists instead that Plaintiffs have neither standing nor need to seek injunctive relief. That argument blinks reality.

### A. Plaintiffs have standing to seek prospective relief and face irreparable harm.

UCLA does not and cannot deny that Plaintiffs have sufficiently alleged past injuries that are traceable to UCLA and redressable by *damages*; they only seek to show that Plaintiffs lack standing to seek *prospective* relief. *See* UCLA.Mem.8-12. UCLA thus insists that the concrete harms Plaintiffs have already suffered are "*largely irrelevant*" to whether they face any continuing risk of future injury. UCLA.Mem.8 (quoting *Nelsen v. King Cnty.*, 895 F.2d 1248, 1251 (9th Cir. 1990)). UCLA's premise and conclusion are both wrong.

To be sure, a plaintiff seeking "a prospective remedy" must establish "an 'actual and imminent, not conjectural or hypothetical' threat of future harm." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967-69 (9th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). And a plaintiff seeking injunctive relief must demonstrate a "sufficient likelihood that he will again be wronged." *Id.* (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)); *see also id.* at 971 n.7. But "[p]ast wrongs, though insufficient by themselves to grant standing, are 'evidence bearing on whether there is a real and immediate threat of repeated

injury.'" *Id.* at 967 (quoting *Lyons*, 461 U.S. at 102). Indeed, past exposure to harmful conduct justifies injunctive relief when (as here) it continues to cause adverse effects. *See Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 825-26 (9th Cir. 2020). And "the possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Id.* at 826. Moreover, where government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing" to seek preliminary injunctive relief. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000). The harms Plaintiffs have already suffered thus cannot be waved away, as they are what makes it so glaringly obvious that Plaintiffs' injuries are no mere thing of the past.[1]

Unable to deny those harms, UCLA assures this Court that they will not recur. As evidence, UCLA claims that, after the encampments initially appeared in April, it took "decisive action" when activists returned and has "prevented" further discriminatory incursions "[s]ince early May." UCLA.Mem.8-9. That is revisionist history in the extreme. *Contra* UCLA.Mem.5, activists did not just "attempt[]" to establish

---

[1]  As *Kimberly-Clark*, *Index Newspapers*, and other cases show, the supposedly contrary authority UCLA cites (*i.e.*, *Nelsen*) does not mean what UCLA says it does. *Nelsen* "does not control here because it dealt with a situation 'where the litigant's claim relie[d] upon a chain of speculative contingencies … that include[d] the violation of an unchallenged law.'" *LSO*, 205 F.3d at 1156 n.10 (as in original) (quoting *Nelsen*, 895 F.2d at 1252). Furthermore, in deciding "at this stage of the proceedings" whether plaintiffs have "standing to pursue injunctive relief," courts are "required … to presume the truth of [plaintiffs'] allegations" and "construe [them] in [plaintiffs'] favor." *Kimberly-Clark*, 889 F.3d at 971-72.

another encampment on May 23, and they did not quickly "disperse[]" after being told they would face discipline. Instead, as Defendants said at the time, the activists again succeeded in "erecting barricades, establishing fortifications, and blocking access to parts of the campus and buildings"—and UCLA again held law enforcement back as multiple requests to disperse went unheeded. Shemuelian Exs.25-26 (UCLA campus communications).

On June 10, activists *again* "set up an unauthorized and unlawful encampment with tents, canopies, wooden shields, and water-filled barriers," and *again* "restricted access" to university facilities. PI.Mem.8-9 (quoting Rassbach Ex.21). UCLA reduces the June 10 melee to a single, self-congratulatory sentence and trumpets its response as evidence that Plaintiffs have nothing to fear when they return to school. UCLA.Mem.5. But UCLA did not "call[] law enforcement immediately" in response to the June 10 activity. UCLA.Mem.5. Instead, as UCLA has acknowledged publicly, things came to a head "around 3:15 p.m." and persisted "[t]hroughout the evening"—and, "as a result," "some students 'miss[ed] finals because they were blocked from entering classrooms,' while others were 'evacuated in the middle of' their exams." PI.Mem.9; Shemuelian Ex.27. Indeed, the violence was so severe that the Vice Chancellor had to be escorted out with armed security. Frankel Reply Decl. ¶10.[2]

In short, the initial April encampment was no one-off, and UCLA was no helpless bystander. It is little surprise, then, that Plaintiffs still do not "feel safe walking around campus." Shemuelian Reply Decl. ¶6. UCLA's

---

[2] *See* @susancollinsla, Instagram (June 11, 2024), tinyurl.com/bp399kce (video of activists mobbing Vice Chancellor Beck and shouting, "you're not safe").

blithe assurance that Plaintiffs need not fear that they "will again be involved in one of those unfortunate instances," UCLA.Mem.9 (quoting *Lyons*, 461 U.S. at 108), ignores everything they have personally experienced. And though summer is quieter on campus, nothing in the actions of the activists (PI.Mem.8-9; Rassbach Exs.15-16) or the university provides any serious reason to doubt that the cycle will resume once school does. To the contrary, UCLA all but concedes that it will, making the remarkable claim that Plaintiffs should *expect* to be "exposed" to the kinds of harassment they have faced "on a public university campus, where the First Amendment applies." UCLA.Mem.9.[3]

Worse still, UCLA expressly holds out the prospect that it could again "cho[o]se to try to de-escalate the situation by allowing the protest to continue," because there was nothing wrong with de-escalation the first go-round. UCLA.Mem.15. This threat alone justifies injunctive relief. *See Diocese of Brooklyn*, 592 U.S. at 20 ("injunctive relief is still called for because the applicants remain under a constant threat that the area in question will be reclassified.").

**B. The public interest and balance of equities favor Plaintiffs.**

UCLA does not (and cannot) deny that "'rais[ing] serious First Amendment questions' … alone 'compels a finding that the balance of hardships tips sharply in [plaintiffs'] favor,'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc), or that "it is always in the public interest to

---

[3]  UCLA elsewhere admits that the activists' actions were not protected speech, but "unauthorized," "unlawful," and "not peaceful," Shemuelian Exs. 15, 19, 26-27, and involved harassment and assault, UCLA.Mem.9. *Cf.* Dkt.62-6 at 26 ("civil disobedience" not "protected speech").

prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Since its policies and practices continue to violate Plaintiffs' constitutional rights and subject Plaintiffs to discriminatory treatment—and since Plaintiffs have every reason to fear that, absent injunctive relief, the discriminatory treatment will continue in the fall—the balance of equities and the public interest strongly support granting a preliminary injunction.

**C. Plaintiffs' requested injunction complies with Rule 65.**

Finally, UCLA's objections to the requested injunction's metes and bounds misstate the law and misrepresent Plaintiffs' position. Of course a federal court can order a public university to provide Jewish students with equal access and treatment in university programs. The complexities of running a university hardly make it "vague" or "inadministrable" to order that university to treat Jews equally UCLA.Mem.21. In fact, Plaintiffs' requested injunction *explicitly recognizes* that UCLA should be ordered to provide a remediation plan to achieve that constitutionally-required end. Dkt.48-76. UCLA's continued refusal to acknowledge that it can and must meet the basic requirements of the Constitution simply confirms that Plaintiffs have every reason to fear for their safety when they return to campus in a few short weeks, and that the only thing that can ensure that the unconstitutional and unlawful acts visited upon Plaintiffs and other Jews over the past year do not recur is an order from this Court instructing UCLA to cease its ongoing discrimination against Jewish students.

## CONCLUSION

The Court should grant Plaintiffs' requested injunction.

Dated: July 15, 2024          Respectfully submitted,

/s/ *Eric C. Rassbach*
Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Richard C. Osborne (DC Bar No. 90024046)*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

*Attorneys for Plaintiffs*

* admitted *pro hac vice*

### CERTIFICATE OF COMPLIANCE

Undersigned counsel of record for Plaintiffs certifies that this brief contains 2,998 words, which complies with this Court's word limit for reply memoranda.

Dated: July 15, 2024

/s/ *Eric C. Rassbach*
Eric C. Rassbach

*Counsel for Plaintiffs*