<pre>
 1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
 2                   WESTERN DIVISION - LOS ANGELES

 3

 4   YITZCHOK FRANKEL, et al.,   )  Case No. CV 24-4702-MCS (PDx)
                                 )
 5        Plaintiffs,            )  Los Angeles, California
                                 )  Monday, July 29, 2024
 6             v.                )  1:10 P.M. to 2:01 P.M.
                                 )
 7   REGENTS OF THE UNIVERSITY   )
     OF CALIFORNIA, et al.,      )
 8                               )
          Defendants.            )
 9   _____ )

10

11

12

13                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE MARK C. SCARSI
14                 UNITED STATES DISTRICT JUDGE

15

16   Appearances:              See Page 2

17   Deputy Clerk:             Stephen Montes Kerr

18   Court Reporter:           Recorded; CourtSmart

19   Transcription Service:    JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
20                             Encino, California  91436
                               (661) 609-4528
21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
</pre>

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs:     Becket Fund for Religious Liberty
                             By:  ERIC C. RASSBACH
 4                                MARK L. RIENZI
                                  AMANDA G. DIXON
 5                           1919 Pennsylvania Avenue NW
                             Suite 400
 6                           Washington, DC  20006
                             (202) 955-0095
 7                           erassbach@becketlaw.org
                             mrienzi@becketlaw.org
 8                           adixon@becketlaw.org

 9
     For the Defendants:     O'Melveny and Myers LLP
10                           By:  MATTHEW COWAN
                             400 South Hope Street, 18th Floor
11                           Los Angeles, California  90071
                             (213) 430-6000
12                           mcowan@omm.com

13                           O'Melveny and Myers LLP
                             By:  ANTON METLITSKY
14                                JENNIFER SOKOLER
                             1301 Avenue of the Americas
15                           Suite 1700
                             New York, New York  10019
16                           (212) 326-2000
                             ametlitsky@omm.com
17                           jsokoler@omm.com

18

19

20

21

22

23

24

25
```

1      LOS ANGELES, CALIFORNIA, MONDAY, JULY 29, 2024, 1:10 P.M.

2           THE CLERK:  Calling item No. 2, CV 24-4702,

3    *Yitzchok Frankel, et al. v. the Regents of The University of*

4    *California, et al.*

5           Counsel, state your appearances, please.

6           ERIC C. RASSBACH:  Eric Rassbach for plaintiffs,

7    and I have my colleagues Mark Rienzi, who's going to be

8    presenting argument, and Amanda Dixon.

9           THE COURT:  Good afternoon.

10          MATTHEW COWAN:  Your Honor, Matthew Cowan for

11   Defendants Regents of The University of California, and I

12   have my colleagues Anton Metlitsky and Jen Sokoler.

13   Mr. Metlitsky will be addressing arguments.

14          THE COURT:  Good afternoon.

15          So just to get some preliminaries of the order,

16   just so the parties are aware, at one point I was a partner

17   at O'Melveny.  I left there to go to Millbank, and that was

18   -- I think I left O'Melveny in -90 -- well, no -- maybe 2003

19   or so?  But I don't think I've ever worked with these counsel

20   before.  So I just wanted to let the plaintiffs know about

21   that.

22          And then, also, there was an amicus brief filed,

23   and the lawyer was Ed Reines and I -- just so the defendants

24   know, I worked with Ed Reines in the past years ago.  We were

25   representing defendants in a case where we were both on the

1    same side, and there was a joint defense agreement there.

2         But I don't think either of those creates a

3    conflict for the Court in this case, but I just wanted to

4    make the parties aware of that.

5         So thank you for the papers.  I've been through

6    them, and I've got some questions, and I wanted to just get

7    to this issue of state action, and let me kind of address

8    this question to UCLA.

9         I take it that the position UCLA is taking is that,

10   if third parties are causing the issue of not allowing Jewish

11   students into a building, say, that there's no legal theory

12   that the plaintiffs have pled that -- under which UCLA is

13   responsible for that if it's purely third parties.  Is that

14   the gist of the argument?

15        MR. METLITSKY:  Yes, Your Honor.

16        THE COURT:  And the evidence -- let me turn to the

17   plaintiff, then.

18        What is the evidence that UCLA took action on its

19   own that led to the circumstances here?

20        MR. RIENZI:  Sure.  Thank you, Your Honor.

21        So, first, UCLA assembled the barricades that were

22   used to keep the Jewish students out of Royce Quad.  Second,

23   UCLA hired the security guards who were used to keep the

24   Jewish students out of Royce Quad.  Third, UCLA instructed

25   those security guards not to intervene to help students

1    through but, instead, to send them away or around from

2    Royce Quad.  And we have sworn and unrebutted testimony in

3    the record that each of the plaintiffs was sent away by those

4    security guards, who were sent by UCLA, by the defendants.

5    We have sworn and unrebutted testimony in the record that

6    there was violence, sometimes against the plaintiffs.

7        So Plaintiff Frankel was surrounded and had his

8    posters torn and was shoved; Plaintiff Ghayoum had four

9    students lock arms and essentially push him back; Dr. Shamsa,

10   the UCLA Medical School professor, who submitted a

11   declaration, was knocked to the ground, all of this in plain

12   view of UCLA security, who on the instruction of the

13   defendants did nothing to intervene, while at the same time

14   the same security was enforcing the zone by sending people

15   away, by allowing for a system where the agitators in the

16   encampment were free to come and go as they pleased during

17   the day under the watchful and protective eye of security

18   while the Jewish students were excluded by those same

19   security guards on the instruction of UCLA.

20       THE COURT:  So based on that sort of recitation, at

21   least as to what the plaintiffs believe is the action here

22   that UCLA took, can you respond to those points specifically?

23       MR. METLITSKY:  Sure.  So -- Your Honor, do you

24   want me to stand at the podium or --

25       THE COURT:  Yeah.  Probably the podium would be

1  better.  This way you're closer to the microphone, and the

2  court reporter can get everything down.

3          MR. METLITSKY:  So, Your Honor, if I could -- I

4  mean, first of all, this is -- we're on a preliminary

5  injunction here.  So there are all sorts of issues beyond the

6  merits that we think precludes an --

7          THE COURT:  Sure.  Yeah, and I'm just -- I wanted

8  to focus on the merits first --

9          MR. METLITSKY:  Yeah.

10          THE COURT:  -- and then we can deal with some of

11  the others.

12          MR. METLITSKY:  Totally understood.

13          So I think -- if I could put in context what was

14  happening.  So even before this Royce Quad encampment formed,

15  you know, there were meetings among the senior leadership at

16  UCLA, who were seeing what's going on around the country.  I

17  think the amicus brief that was submitted today quite rightly

18  points out that there were, like, 130 encampments

19  established, several of them at prominent institutions

20  lasting weeks.

21          UCLA was looking at this and never suggested that

22  "Oh, an encampment would be a good thing to be established."

23  They were trying to figure out how to prevent one from

24  happening, but one was established at 4:00 in the morning on

25  April 25th, and right out of the chute, the policy was "We

1   need to figure out a way to take down the encampment."  At

2   first they wanted to use a de-escalation approach without law

3   enforcement.  After a few days it became very clear that law

4   enforcement was going to be needed, and so by April 28th,

5   that was the decision made, and it took a few days for law

6   enforcement to take down the encampment.

7           But in the meantime, what UCLA was trying to do was

8   prevent violence between folks in the encampment, counter

9   protestors, and the like.  And so two of the things that UCLA

10  did do -- one was set up the -- you know, put sort of bike

11  racks around the encampment with the goal of, first of all,

12  preventing the encampment from spreading and, second of all,

13  preventing interaction between people inside the encampment

14  and folks outside; and also, they set up neutral zones to --

15  that nobody could enter, right, to, again, keep folks in the

16  encampment separated from, you know, counter-protestors --

17  and whoever else -- that are outside the encampment.  And --

18          THE COURT:  So just specifically dealing with the

19  bike rack issue.

20          MR. METLITSKY:  Yeah.

21          THE COURT:  So UCLA put barriers around the

22  encampment.

23          MR. METLITSKY:  Right.

24          THE COURT:  And is it your -- do you agree, then,

25  that the actions of UCLA prohibited Jewish students from

1    entering into the encampment?

2            MR. METLITSKY:  No.  It was the people in the

3    encampment that prevented people from entering the

4    encampment, right.

5            THE COURT:  So you would say that -- again, that

6    that wasn't state action that prohibited Jewish students from

7    entering?

8            MR. METLITSKY:  Right.  The people that were

9    stopping people from going into the encampment were people in

10   the encampment.  The bike racks were -- you know, there were

11   entrances into the encampment.  The bike racks were set up

12   around the encampment generally to sort of prevent it from

13   getting bigger, right.

14           THE COURT:  And so the plaintiff is arguing that

15   the security guards prohibited Jewish students from entering

16   places on the campus that were -- where other students

17   weren't prohibited from entering?

18           MR. METLITSKY:  So the security guards were

19   preventing students from entering the neutral zone, right.  I

20   think what they're saying was that the effect of that was --

21   because the people in the encampment were not allowing some

22   students, including Jewish students, to enter the encampment,

23   the effect of UCLA preventing from people entering the

24   neutral zones and the encampment people preventing other

25   people from entering the encampment was that students had to

1    go a different way.  But the people preventing Jewish

2    students, and maybe others, from entering the encampment were

3    individual non-state actors, and the neutral zones were

4    neutral zones --

5           THE COURT:  And so --

6           MR. METLITSKY:  -- nondiscriminatory.

7           THE COURT:  And so you would say, yeah, the neutral

8    zone allowed no one to enter?

9           MR. METLITSKY:  Correct.

10           THE COURT:  And so what about the statements in the

11    record from individuals who say that security guards told

12    them that they couldn't enter those particular areas?  So

13    you're saying that you believe those statements are referring

14    to not being able to enter the neutral zones, not the

15    encampment?

16           MR. METLITSKY:  I believe so.  And I -- there's no

17    -- certainly there was no instruction or policy from UCLA --

18    I mean, this is an injunction against officers at UCLA that

19    they're asking for -- of preventing people from entering the

20    encampment.  The instruction was to prevent people from

21    entering the neutral zone.

22           Now, it's true that UCLA did not immediately call

23    law enforcement to take down the encampment, and so the

24    effect of that was there were people in the encampment that

25    were keeping people out, but that is not state action.  And,

 1  you know, I think the real argument is that law enforcement

 2  should have been called sooner, and, you know, we can talk

 3  about that, but, like, for purposes of the preliminary

 4  injunction, UCLA has changed its entire approach, as is laid

 5  out in the record, which I think is probably the most

 6  important thing to focus on at this hearing, as opposed to a

 7  hearing about sort of past harms.

 8          THE COURT:  So the -- so your argument -- it does

 9  boil down to with respect to the specifics here, there was no

10  state action conducted by UCLA; the actions that prohibited

11  Jewish students from having full access to the campus

12  facilities were taken by third parties?

13          MR. METLITSKY:  There was state action.  It was

14  just not discriminatory state action.  The discriminatory

15  state action that they allege was taken by just individuals,

16  third parties.  That's right.

17          THE COURT:  Okay.  The -- let's get to -- I want to

18  come back to the merits, but since you brought it up, the

19  changes that UCLA has made between then and now --

20          MR. METLITSKY:  Yeah.

21          THE COURT:  -- you're arguing, lead to the

22  conclusion that this is not likely to happen again.  The

23  obvious response to that is that these changes or the time

24  period between then and now has been the summer -- you know,

25  the presence on campuses is fairly light compared to what it

1   would be in the fall, and what are the specifics that you

2   believe have changed that means -- that, at least, should

3   inform the Court that there's no likelihood that this is

4   going to happen again?

5            MR. METLITSKY:  So I think -- they fall into two

6   buckets, and I think one of the buckets -- it's -- are the

7   events that have actually transpired on campus since this

8   encampment was taken down on the night of May 1st, I think it

9   was.  There were three attempts -- this was while students

10  were still there, not during the summer -- three attempts to

11  either occupy buildings or set up an encampment and -- one on

12  May 6th, one on May 23rd, and one on June 10th, and in each

13  of those circumstances, UCLA, either through the threat of

14  law enforcement or the actual invocation of law enforcement,

15  actual arrests of people, prevented those things from

16  happening.  No building was occupied, and no encampment was

17  formed and -- so that's the one bucket.  I mean, it's just --

18  there have been three attempts.  They've all been thwarted.

19           I think the other bucket is the policy -- I don't

20  know -- changes, alterations -- whatever it is -- that have

21  contributed to that result.  So on May 5th, Chancellor Block

22  announced the creation of a new office called the "Office of

23  Campus Safety" and transferred oversight of the UCLA UCPD to

24  that office, and the chancellor appointed Rick Braziel as the

25  associate vice chancellor for that office, and he was meant

1  to start that office up to review the protest response and to

2  advise on leadership and organizational changes.  He says,

3  quote -- at paragraph 12 of his declaration -- "all with the

4  goal of ensuring that the Royce Quad encampment and related

5  incidents could never happen again."

6           On May 21st, after review of the campus security

7  processes, the chief of the UCPD -- the UCLA UCPD was

8  reassigned, and a new acting chief replaced him.  Day-to-day

9  responsibility for UCLA's incident response has been shifted

10  to what's called the "Emergency Operation Center."  The

11  effect of that is that while senior leadership still sets

12  general policy, they no longer need to be consulted before

13  on-the-ground responders make critical decisions in response

14  to, among other things, protests; so they can just act

15  faster.

16           The Office of Campus Safety has instructed the --

17  this is all in Mr. Braziel's declaration.  The Office of

18  Campus Safety has instructed UCLA UCPD to inform disruptive

19  protestors, such as protestors who try to occupy parts of

20  campus, that, if they don't disperse, they'll face arrest.

21  And -- you know, and sort of the -- that is what happened on

22  May 6th, May 23rd, and June 10th.  You know, there were

23  attempts to set up encampments or occupy buildings, and

24  again, by the end of the day, those were all cleared either

25  through the actual use of law enforcement or through the

1    threat of law enforcement.

2              THE COURT:  Okay.  Let me hear from the plaintiffs.

3              Why doesn't UCLA's actions taken since the

4    Royce Hall incident create a sufficient background such that

5    there's not a likelihood that this is going to happen again?

6              MR. RIENZI:  Sure.  Short answer to that,

7    Your Honor, would be UCLA claims that there were no

8    encampments after they made these changes, and that's simply

9    false, and I'd direct Your Honor's attention to Exhibit 21 of

10   the Rassbach Declaration, which is the UCPD's public

11   statement about what happened on June 10th.  They don't say

12   there were no encampments.  They don't say nobody was

13   blocked.  They don't say nobody's exams were stopped.  They

14   said protestors set up an unauthorized and unlawful

15   encampment with tents, canopies, wooden shields, water-filled

16   barriers.  They restricted access to the public.  They

17   disrupted nearby final exams.  They were then told to

18   disperse, they went someplace else, and they set up another

19   encampment.  They set up another encampment, an unauthorized

20   and unlawful encampment.  They restricted access to the

21   general public.  They disrupted nearby final exams.  It

22   happened again later in the day.  I'll agree these were

23   shorter encampments than the last time.

24             But the basic problem, I think, is that UCLA does

25   not understand and, I think, has not yet acknowledged that

1   its behavior has been illegal and unconstitutional.  In other

2   words, a public college is simply not allowed to accept the

3   idea that there are portions of its campus where Jews cannot

4   go, and they've repeatedly accepted that.  So they don't

5   understand that -- when they're sitting around making their

6   plans for "What am I going to do in the fall?" they don't

7   understand that that's not a tool in the toolbox, right.

8   They did planning the first time around, they did a lot of

9   thinking the first time around, they knew it was coming, and

10  they thought, and then they decided to leave this in place

11  for a while.

12         And while I understand the argument that they were

13  just enforcing the neutral zone and no one from either side

14  was allowed to go through, I just -- I think it's just

15  verifiably not true, right.  In the Beck Declaration that was

16  submitted for UCLA, Mr. Beck's got a diagram there.  We know

17  people were allowed to come and go from the encampment,

18  right.  So, if you were one of the approved people in the

19  encampment, if you, you know, shouted "Death to Israel" and

20  said the things that they wanted you to say, you were allowed

21  to leave and come back.

22         And so in paragraph 12 of the Beck Declaration, he

23  talks about the encampment had grown to at least 500

24  individuals during the day, right -- during the day -- and

25  they were there during the day, but then they left, right.

1   You want to take a bathroom break, go sleep someplace else,

2   go to class, you can go.  So those people were obviously

3   being allowed to cross back through.  So it's simply not true

4   that the security under the system they're describing in the

5   past was treating everybody equally.  It was not.

6          And it's also not true that their plan today

7   successfully stops the encampments.  It hasn't.  So this

8   happened right up until the end of the semester.

9   Commencement was, I think, June 16th.  So right up until the

10  end of the semester, this was going on.  They're planning

11  what are they going to do in the fall? and what my clients

12  really want and need is an order that tells them, "As you're

13  making the plans for the fall, the thing you're not allowed

14  to accept as, you know, sort of acceptable collateral damage

15  while you figure stuff out is the exclusion of Jews from

16  public areas of the campus."

17         THE COURT:  Okay.  Let me ask you this: What's the

18  -- you know, going back to the state action issue again --

19  and I want to try to tease this out a little bit but -- so

20  let me do it by way of a hypothetical.

21         So let's suppose a third party came in and

22  established a barricade around the library on campus and

23  refused to allow Jewish students to enter the library.  What

24  -- that -- the -- how is UCLA constitutionally liable for

25  those actions?

 1            MR. RIENZI:  One -- so, one, just not to fight the

 2    hypothetical but just to be clear, in my real word stories --

 3            THE COURT:  No.

 4            MR. RIENZI:  -- UCLA set up the barricade, sent

 5    security, and so forth.

 6            THE COURT:  Sure.  No.  No.

 7            MR. RIENZI:  So this is simply UCLA has nothing to

 8    do with it.  UCLA went home, took a rest, took a nap --

 9            THE COURT:  Came --

10            MR. RIENZI:  -- bad guys showed up and blockade the

11    library.

12            THE COURT:  Right.

13            MR. RIENZI:  If UCLA has absolutely nothing to do

14    with it and UCLA doesn't have a policy that they're choosing

15    to enforce for some people and not for others, right, then I

16    think UCLA would have a much better no-state-action argument.

17    But UCLA claims they recognize this is an open violation of

18    their policies.  They chose not to enforce it.  They sent

19    security that sent the Jews away, that -- you know, in one

20    instance -- in Dr. Shamsa's instance shoved him with two

21    hands in the chest to get him away.  I just don't think it's

22    anything like random -- to be clear, like, I don't think --

23    someone gets murdered in L.A. today, right, I don't think you

24    generally have a constitutional claim that says, "L.A.

25    violated my constitutional rights," but I also don't think

1   this is anything like that.

2          THE COURT:  Okay.  So let me push back on that a

3   little bit, and stick with my hypothetical because I think it

4   allows us to avoid the issue of state action was there, was

5   there not.

6          What if, under my hypothetical, you know, UCLA

7   wakes up in the morning and finds out overnight the bad guys

8   set up a blockade around the library on campus and refused to

9   allow entry to Jewish students and UCLA didn't do anything

10  about it?  Wouldn't UCLA then be providing services to

11  students that were non-Jewish and -- when they weren't

12  available to students that were Jewish?

13         MR. RIENZI:  Yeah, so that sounds rights.  If in

14  your blockade situation, you know, non-Jews were still

15  allowed to use UCLA's library -- so I apologize --

16         THE COURT:  Right.

17         MR. RIENZI:  -- if I missed that point.

18         THE COURT:  Yeah.

19         MR. RIENZI:  If non-Jews were allowed to go in and

20  out to UCLA's library and use their services day-in and

21  day-out and the Jews are locked out on the outside, then I

22  think, yes, UCLA is treating its Jewish students differently

23  from its non-Jews.  That would be a constitutional problem

24  and equal protection of the law's problem.  It would also be

25  a Title VI problem, right.  Under Title VI they're obligated

1  to ensure that no one gets discriminated based on national

2  origin.  So in all those things I think --

3          THE COURT:  So it would seem that, if UCLA was

4  providing services to non-Jewish students that weren't

5  available to Jewish students, UCLA would be violating the

6  Constitution?

7          MR. RIENZI:  Yes.  I think that's true.

8          THE COURT:  And so UCLA would have a choice, either

9  take care of the situation somehow or not provide services to

10 anybody?

11         MR. RIENZI:  I think that sounds right, Your Honor.

12 I think their obligation is to provide the Jewish students

13 with equal services to what everyone else gets.

14         THE COURT:  So in my hypothetical again -- and I

15 apologize.  I know lawyers always want to say, "But that's

16 not really the facts," but I'm just --

17         MR. RIENZI:  And I apologize for doing the

18 predictable lawyer answer, sir -- Your Honor.

19         THE COURT:  I've done it a thousand times.  But I'm

20 just trying to get my arms around it.

21         So, if UCLA allowed non-Jewish students to access

22 the library knowing that Jewish students were being

23 prohibited from accessing the library, then they would be

24 violating the constitutional protection of Free Exercise?

25         MR. RIENZI:  I do think they would.  Free exercise,

1  free speech and viewpoint -- a lot of this is wrapped up in

2  viewpoint to, but yes, I think they would be.

3          THE COURT:  And UCLA could remedy that problem by

4  closing the library down so it wasn't accessible to anybody

5  or by trying to do something to remove the barricade?

6          MR. RIENZI:  I think either one of those would

7  result in equality, which I think is the goal of those

8  things.  Yeah.

9          THE COURT:  Okay.  Okay.  Thank you.  I just wanted

10 to just set this up because now I want to turn to the

11 defendants.

12          Why shouldn't the Court enjoin UCLA from providing

13 services to students that aren't available to Jewish students

14 regardless of who caused the barrier?

15          MR. METLITSKY:  Well, Your Honor, first of all, I'm

16 not sure what services we're talking about.  So --

17          THE COURT:  Okay.  Let's say there's a section of

18 the quad --

19          MR. METLITSKY:  Yeah.

20          THE COURT:  -- that's being -- where Jewish

21 students are denied access, right.

22          MR. METLITSKY:  Right.  By private parties.

23          THE COURT:  By anybody, right.

24          MR. METLITSKY:  Yeah.

25          THE COURT:  Is UCLA allowed to make that quad

 1    available to non-Jewish students when Jewish students are

 2    being precluded from using it regardless of who caused the

 3    barrier?

 4              MR. METLITSKY:  UCLA is not preventing anybody from

 5    entering that quad.

 6              THE COURT:  No, no --

 7              MR. METLITSKY:  Individuals are --

 8              THE COURT:  I agree.  UCLA is not putting up the

 9    barrier.

10              MR. METLITSKY:  Right.

11              THE COURT:  But if the barrier is there, is UCLA

12    allowed to operate an institution where a portion of it's

13    available to non-Jewish students and not available to Jewish

14    students regardless of who caused it?

15              MR. METLITSKY:  I suppose that if UCLA just didn't

16    do anything about it -- I'm not sure.  It would be a weird

17    hypothetical.  But in this case, UCLA the whole time was

18    trying to get rid of the encampment, first, through a

19    de-escalation approach, which obviously didn't work, and -- a

20    de-escalation approach and at the same time trying to prevent

21    violence.  That's what the sort of barricades and all that --

22    the neutral zones -- were for.

23              Once it turned out that de-escalation didn't work,

24    they decided that they were going to need to use law

25    enforcement, and it took a few days for law enforcement to

1  actually get it done, to take the encampment down.  In the

2  meantime, there was nothing UCLA -- UCLA was doing what it

3  could.  It had obviously broad discretion to figure out how

4  to get an encampment down, right.  I don't think there's any

5  question about that.  And there's no dispute that the whole

6  time UCLA was trying to get the encampment down.  It took a

7  few days.  As the amicus brief filed today makes clear, it

8  happened much faster than at a lot of other places.

9          But I don't know how there can be a constitutional

10  violation when a third party plants themselves somewhere and

11  you're trying to get them out of there.  That is the sort of

12  overarching thing that was happening.  And there were no

13  services provided, by the way. There was -- you know, they

14  took over a piece of the quad, but it's not like they were in

15  the library and they were getting air condition and food and

16  stuff like whereas others were not.

17          THE COURT:  Well --

18          MR. METLITSKY:  They planted themselves in the

19  middle of the quad and didn't let people in.

20          THE COURT:  And you don't think a quad -- I mean,

21  quad's a part of a campus, just like a library is, right.  I

22  mean, there's no -- being restricted from the quad is no

23  different than being restricted from the library.

24          MR. METLITSKY:  Sure.  But if the Court thinks that

25  the, you know, third parties, non-state actors, taking over a

1  piece of the quad is sort of automatically going to turn into

2  state action because they're going to be there for a time,

3  you're going to completely collapse the distinction between

4  state action and private action.

5       In this case, the state -- let's -- you know, UCLA,

6  the state actor, was trying to get rid of the encampment.  It

7  took it a few days because this is hard, right.  There is an

8  obvious cost, even when they're misbehaving, to arresting

9  your own students.  It takes a long time to get a police

10 presence to plan a police operation to get rid of 500 kids in

11 a safe way.  It took a few days, that's true, but UCLA was

12 trying to get rid of them the whole -- you know, get rid of

13 the encampment.  It eventually did through the use of law

14 enforcement after, I think, a little bit less than a week,

15 and in the meantime it was individual actors that were, you

16 know, restricting access to the encampment.

17      THE COURT:  How do you respond to the plaintiffs'

18 argument -- and I say -- I got this from the tone of the

19 opposition as well.  It seemed like, from my reading of the

20 opposition, that UCLA's mindset was they see the encampment;

21 they know it's a problem; they're trying to figure out what

22 to do about it; and they were hoping that they could -- that

23 it would go away; when it got -- when there was danger of

24 physical violence, they took action to shut it down.

25      MR. METLITSKY:  Right.  So I think that --

1      THE COURT:  And -- I'm sorry.  And so what

2  plaintiffs would argue is that UCLA view to wait until there

3  was physical violence -- you know, that's obviously a big

4  concern of UCLA, but exclusion based on religious faith is

5  just as important or just as egregious as physical violence.

6      MR. METLITSKY:  Right.

7      THE COURT:  So, as soon as UCLA knew that Jewish

8  students were being excluded, that should have been the point

9  where they said, "Okay.  Well, we need to call in the police

10  and get rid of this because Jewish students are being

11  excluded."  It seems, instead, from the briefing, that it was

12  -- the threat of physical violence is what finally caused the

13  -- was the straw that broke the camel's back.

14      MR. METLITSKY:  So two points: one -- the first

15  point about what happened during the Royce Quad encampment,

16  and the second one about what happened after.

17      So the point -- with respect to the Royce Quad

18  encampment, it wasn't that UCLA was just hoping it would go

19  away.  It was trying to get the students to leave in a manner

20  that would be -- that would prevent violence and, also, that

21  would last because it was seeing other universities around

22  the country calling the police and all of a sudden a new

23  encampment pops up --

24      THE COURT:  And so --

25      MR. METLITSKY:  -- a few days later.  So --

1        THE COURT:  -- just let me push back on that

2  argument.

3        The -- it seemed to me that the -- again,

4  plaintiffs would argue that UCLA's concern is -- "We want a

5  solution that's going to last" was a bigger concern than the

6  immediate issue of Jewish students being excluded.

7        MR. METLITSKY:  Well, it's --

8        THE COURT:  And they would argue that -- you know,

9  that that -- the priority of those issues should have been

10  reversed.

11        MR. METLITSKY:  Well, I'm not sure why.  I mean, if

12  you take down the encampment the first day and then another

13  encampment forms three days later, you have the same problem.

14  It's just three days later, right.  So -- and by the -- very

15  quickly, you know, after 2 -- 2 1/2 days, became clear that

16  this wasn't working, and so they switched to a different

17  approach, and again, this encampment came down much quicker

18  than many of the other ones around the country.

19        But there's a second point that, I think, is

20  especially crucial for purposes of the preliminary

21  injunction, which is -- a lot of this has to do -- I think --

22  they've been relying on this Robinson-Edley guidance, right.

23  The -- UCLA determined after the encampment was taken down

24  that this kind of protest activity, the kind that tries to

25  take over -- occupy parts of campus, inhibits the --

1  significantly inhibits the mission of the university, which

2  is why they've made all of these changes that I recounted

3  before to deal with it, you know, sort of right away.

4         And, you know, the example of June 10th -- if you

5  look at that exhibit -- I think it was Exhibit 21 that my

6  colleague pointed to -- these folks showed up at 3:15; they

7  were gone by 8:00.  You know, I mean, obviously it takes

8  time.  If you want to call law enforcement when something

9  like this starts, it's not going to happen immediately.

10  People were arrested that day.  I think 20-some-odd people

11  were arrested that day, and the encampment that they tried to

12  form was taken down within hours.  I'm not sure how an

13  injunction could require -- could do anything that gets a

14  result that's better than that, right.

15         THE COURT:  Well, yes, I mean, if you could

16  guarantee the 24 hours, I think you're probably right, but I

17  think that the plaintiffs would argue that there's no -- you

18  know, there's nothing that -- Jewish students coming back on

19  campus in the fall -- what tells them that things are going

20  to be different? which -- I mean, there's nothing that --

21  until something happens again, there's no way for them to

22  know that the responses will be different from the

23  university.

24         MR. METLITSKY:  Well, three things have already

25  happened when students were still there and each time the

1    encampment -- any encampment that tried to be formed was

2    taken down within the same day.  So that's one thing.

3         The second thing is just the declaration of the

4    officer who is in charge of the Office of Campus Safety, who

5    says all of these changes and approach are done with the goal

6    -- again, quote -- "all of this" -- "all with the goal of

7    ensuring that the Royce Quad encampment and related incidents

8    could never happen again."

9         So what would -- the injunction would have to be

10   against that person, right.  This is paragraph 12 of the

11   Braziel Declaration.  Would the injunction say, "Keep doing

12   what you're doing"?  That's not usually the kind of thing

13   that warrants a preliminary injunction.  Usually in a

14   preliminary injunction case, the defendant is saying, "What

15   we did in the past we're going to continue to do in the

16   future, and it's fine, and even if it isn't fine, it doesn't

17   cause irreparable harm, and so you can't order a preliminary

18   injunction."  I've never seen a -- a preliminary injunction

19   case where the defendant has altered its approach to get at

20   exactly the result that the injunction is asking for and

21   still be enjoined.

22        THE COURT:  Okay.  Let me give the plaintiffs an

23   opportunity to respond to that argument.  It seems that the

24   -- defendants' arguing UCLA has done -- made the adjustments

25   it needed to make to ensure that this doesn't happen again.

1   Shouldn't the Court look at the good faith that UCLA has

2   shown in making these adjustments and kind of hold back from

3   issuing an injunction?  Why shouldn't we take UCLA at its

4   word -- I mean, obviously, none of us thinks UCLA wants to

5   have Jewish students excluded.  I think that was made pretty

6   clear from its brief.  So why shouldn't the Court take UCLA

7   at its word and look at the good faith and restrain the Court

8   exercising the authority to issue an injunction?

9           MR. RIENZI:  Because UCLA is in this courtroom

10  asking for the discretion to make changes as they go, to

11  figure it out as they go.  They're planning all summer long.

12  They don't want to be told -- they don't want the order that

13  says, "You may not accept the exclusion of Jewish students,

14  and you may not allow that to continue."  So, you know, they

15  claim they didn't really have a policy or maybe they had a

16  policy and it was changed, right.  Throughout their brief

17  they say numerous times plaintiffs are complaining about a

18  policy that doesn't exist.  That policy exists.  It comes

19  from the Robinson-Edley Report.  It's on their website right

20  now.  It's still there, right.  It was posted on a sign at

21  the encampments.  They sent it out to the whole campus on

22  April 28th (reading):  UCLA is following University of

23  California systemwide policy guidance, which directs us not

24  to request law enforcement involvement preemptively and only

25  if absolutely necessary to protect the physical safety of our

1    community.

2            THE COURT:  Yeah, and that's -- it's interesting

3    because they -- UCLA would argue that that's a -- it's an

4    advisory policy that's put out by the UC that they don't have

5    to follow, that it's not binding on them.  But the statement

6    that they issued as expressed in one of the declarations --

7    you're reading from one of the declarations; correct?  I mean

8    --

9            MR. RIENZI:  No.  I was reading from the

10   "Bruin Alert" that they sent to the campus.

11           THE COURT:  Right.  Right.  And that "Bruin Alert"

12   is recounted in one of the declarations.  And that says that

13   they -- well, I'm sorry.  Could you -- would you mind reading

14   that again?  I'm sorry.

15           MR. RIENZI:  So the policy that they said, which is

16   the same policy that was posted and that Chancellor Block

17   said under oath to Congress on May 23rd and the like

18   (reading): UCLA is following University of California

19   systemwide policy guidance, which directs us not to request

20   law enforcement involvement preemptively --

21           THE COURT:  Right.  And that's the language I was

22   looking for -- "directs us."

23           MR. RIENZI:  Yeah.

24           THE COURT:  So it seems like, even though UCLA is

25   arguing now that it's just advisory and it's not a policy,

1  the statement that they made in the alert was that it

2  directed them to do something so they were bound by it.  I'd

3  like to get a reaction to that.

4          But let me let counsel finish.

5          MR. RIENZI:  Yeah.  If I can just finish,

6  Your Honor.

7          The point is the Robinson-Edley Report is from

8  2012.  It's been around a long time.  It's what they -- still

9  saying they operate under, right.  That directs them not to

10  intervene.

11          And so, you know, Your Honor asked a good question.

12  Like, are they treating violence and exclusion of Jews

13  exactly the same such that they immediately go in the same

14  way?  I think an injunction that specifically told them that

15  would be useful, and it would lock them into it, as opposed

16  to letting them walk out with the discretion to figure out

17  how they're going to deal with the next tough situation the

18  next time it comes up.  They're thinking about it now.

19  They're planning for it now.  They should be told in a

20  binding way that what they did the first time, which was

21  allow for the exclusion of Jews for a period of time, is not

22  acceptable, and their policy guidance says they should do

23  that, and that's Robinson-Edley.  And again, it's not just

24  what happened in April and May.  Chancellor Block said that

25  to Congress under oath on May 23rd, and again, you know, at

1    least as of Saturday night, it's still on their website from

2    the vice chancellor of strategic communications.

3        THE COURT:  Okay.  And let me hear from UCLA

4    because this Robinson-Edley policy -- again, it was -- it

5    seemed -- I'm a little unsure as to what UCLA's position is

6    now in why it issued an alert saying it was directed by the

7    policy to do something.

8        MR. METLITSKY:  I think that might have been not

9    exactly the right wording.  "Directed" in the general sense

10   of "this is the policy guidance," but the policy guidance is

11   very flexible, and if I could just take a step back and --

12       THE COURT:  Sure.

13       MR. METLITSKY:  -- explain what it is.

14        So the scope of Robinson-Edley is about any protest

15   activity that violates the time, place, and manner rules of

16   one of the universities, but very often that kind of protest

17   activity is going to be discrete, it's not going to be

18   violent, it's not going to interfere with much of anything,

19   and the policy guidance from Robinson-Edley is "Don't call

20   the police preemptively in that sort of situation when there

21   is no significant interference with the mission of the

22   university," and that is likely going to be the mind run of

23   that kind of protest, and that is generally -- you know,

24   that's right, and it seems correct as a general matter.  You

25   don't want to call the police on your students when they're

1    not harming much of anything.

2            But Robinson-Edley makes clear that sometimes, when

3    there is significant interference with the mission of the

4    university, then law enforcement is going to have to be

5    called, and you can look at the Beck Declaration at

6    paragraph 14 or the Braziel Declaration at paragraph 22 that

7    explain that Robinson-Edley is more than broad enough to

8    allow for the threat or the actual use of law enforcement to

9    prevent another one of these encampments from forming because

10   in UCLA's own experience with the Royce Quad encampment,

11   you've determined that that kind of encampment -- that

12   attempt to occupy buildings at UCLA does significantly

13   interfere with the mission of the university, and, again,

14   that is exactly what happened three times already when

15   students were on campus.

16           So, you know, my colleague says we're relying --

17   you know, we're asking for the Court to rely on our

18   discretion, but I think that flips the burden of a

19   preliminary injunction, which is, as the Ninth Circuit

20   explained, a drastic remedy, and they have the burden of

21   proving that it is overwhelmingly likely that what happened

22   in the past is going to happen in the future, and there is no

23   basis for that kind of finding based both on UCLA's policies

24   but also based on what in fact has happened, and if they

25   can't satisfy that requirement, then the Court has no

1    authority to issue an injunction, obviously.  That's what a

2    "lack of standing" means, and it's not just a lack of

3    standing.  It's a lack of showing of -- that there would be

4    irreparable harm absent the grant of an injunction.

5              THE COURT:  Okay.  Thank you.

6              Let me turn back to the plaintiff.

7              So the issue I've got with the proposed injunction

8    and the way that it's worded is that it prohibits UCLA from

9    preventing Jewish students from enjoying full and equal

10   access, prohibits UCLA from adopting policies that restrict

11   -- or that prevent Jewish students from enjoying full and

12   equal access, and it enjoins them from applying policies in a

13   way that would give Jewish students less than full access.

14   So it's really focused on UCLA policies that restrict access

15   and enjoyment of Jewish students, and it's hard to find

16   direct policies in place at UCLA that do that, but what I'm

17   wondering about is that -- and I don't know that -- how the

18   Court could fashion an injunction that really gets to that

19   point, but I'm wondering about if we flipped it.  If UCLA is

20   not allowed to provide facilities or access to any students

21   if Jewish students are excluded, doesn't that get to the same

22   place?

23             MR. RIENZI:  I'd have to think about it,

24   Your Honor.  On the surface I think that's right.  I think,

25   if the answer is you have to give the Jews equal access to

1   everything that everybody else gets, that may just be the

2   other side of the same coin.

3        I have to say I do think -- and some of the things

4   have been suggestions from Your Honor.  I do think there are

5   specific, concrete things that can be instructed for them to

6   do that I'm not sure -- you know, like, as I hear the

7   arguments today, maybe they just agree to.  I mean, honestly,

8   I was shocked they didn't just agree when we filed the case.

9        But, like, look, one is, if the Jews are being

10  excluded, you need to make sure they're not excluded, right.

11  Treat that like violence.  They can say, "Well, you know, as

12  soon as it became clear it was a problem, we stopped it."

13  That's just really not the story of what happened from

14  April 25th to May 2nd.  They were content to leave it going

15  until it got to actual violence, right.  The exclusion was

16  not what made them stop it.  I don't think they've claimed

17  the exclusion is what made them stop it.  That certainly

18  wasn't their public statement was that it was exclusion that

19  made them stop it.  It was violence that they cited that made

20  them stop it.  So telling them to treat that -- treat it that

21  way, that would work.

22       Another thing that would work would be instructing

23  them that, when Jews have been excluded, they should instruct

24  their police officers to help them get access, as opposed to

25  keep them out.  And just to give an example, on June 10th

1  they sent a security escort to get Defendant Vice Chancellor

2  Beck safely through the campus because they thought it was

3  dangerous for him.  Well, they could do that to help Jews

4  access campus.

5         So I think there are a lot of specific things they

6  can do.  I take Your Honor's point that their policies are,

7  you know, thick and mushy and flexible, and I understand

8  that, it's a big system to run, but I still don't think it

9  means you can't order them to ensure that their Jewish

10  students get equal treatment on campus.  I think you can do

11  that.  I think -- and, honestly, I think that's what the law

12  requires here.

13         THE COURT:  And the issue, though, is that it seems

14  like -- again, flipping it -- if Jewish students are denied

15  access by anybody -- you know, whether it's a third party,

16  UCLA -- anybody -- then UCLA is not -- UCLA is not allowed to

17  provide those services to other students would seem from, at

18  least the Court's standpoint, a clearer way to say it that

19  would be -- that every -- that would be understandable.  So,

20  for example, let's say, you know, there's an encampment set

21  up and it prevents Jewish students from accessing a part of

22  the quad.  Well, UCLA would be required to make sure that

23  they weren't -- that no one could access that part of the

24  quad.  If there was an encampment set up that prevented

25  Jewish students from entering the science building, then no

1   one would be able to enter the science building.  So it would

2   seem to be -- we'd have a clearer -- what I want to make sure

3   is that, if we issue an injunction, we know when it's been

4   violated.

5           MR. RIENZI:  Yes.  And I think, Your Honor, that

6   that -- I think that works.  I think we would know when it's

7   been violated, and I think it's -- it feels like it's two

8   sides of the same coin.  So I think that's right, Your Honor.

9           THE COURT:  Now, let me ask you this: Have the

10  parties sat down and had a discussion about how they might

11  fashion something that they could agree to?  Because, again,

12  the Court's reluctant not knowing all the ins and outs of

13  what a potential injunction would do to the administration of

14  UCLA and would be much more comfortable if the parties could

15  come up with something that they would agree on.  What have

16  been the efforts the parties have had to try to reach

17  agreement?

18          MR. RIENZI:  There was an initial discussion before

19  we filed the preliminary injunction order, but I don't --

20  and, actually, I was not part of it.  These two gentlemen

21  were.  But I do not think the type of formulation Your Honor

22  is proposing was part of that discussion.  It was -- I think

23  the discussion was at a higher level more general than that.

24          THE COURT:  Okay.

25          Let me hear from the defendants on the formulation

1  of an injunction that I'm thinking of, and tell me why that

2  doesn't work.

3          MR. METLITSKY:  Your Honor, I think it doesn't work

4  because -- I mean, take what happened on June 10th, right,

5  where people try to take over a piece of -- part of the

6  campus, set up an encampment, they do it for a few hours, and

7  then the police come and arrest a bunch of people, and then

8  they're gone.  Does that violate the injunction or not?

9          THE COURT:  I wouldn't think so because when -- I

10 mean, if the -- and I guess I'm thinking of once UCLA knows

11 that students are being excluded based on their religious

12 faith, then they need to take action.

13         MR. METLITSKY:  Right.  I mean --

14         THE COURT:  Either to deny access to everyone or to

15 remove the barrier.

16         MR. METLITSKY:  But if the injunction is phrased in

17 the terms that Your Honor has suggested, I'm not sure it's

18 obvious that what happened on June 10th wouldn't violate it.

19 And that's the concern, right, because, if there's an

20 injunction, especially an injunction that requires the use of

21 law enforcement, which is obviously a huge deal for --

22         THE COURT:  No.  But this injunction wouldn't,

23 right, because --

24         MR. METLITSKY:  -- would not.

25         THE COURT:  Well, because the -- let's say students

1    are blocking a portion of the quad and they're not allowing

2    students of particular faith in.  Well, then UCLA would have

3    to shut down the quad.

4             MR. METLITSKY:  Right.  But the problem -- just

5    operationally I'm not sure how that works.  Like, just take

6    what happened on April 25th.  A bunch of people take over a

7    piece of the quad.  They're just there now, right.  So if the

8    injunction -- and they're not letting other people in.

9             THE COURT:  Right.

10            MR. METLITSKY:  So what does the injunction require

11   UCLA to do?  It requires them, I assume, to call law

12   enforcement because they tried to do something else and it

13   didn't work, in which case they would have violated the

14   injunction because they tried something and it didn't work.

15   They decided on April 28th to call law enforcement, and

16   operationally it took three days to actually get it done.

17   Would that violate the injunction even though they've decided

18   -- they've asked law enforcement to come up with a plan, but

19   there are a lot of people, and it's very difficult to figure

20   out a way to do this safely.  Would that violate the

21   injunction?  I mean, I -- you know, I think that's a huge

22   problem with this kind of injunction, and again, I think it

23   is unnecessary because of the changes that UCLA has already

24   made.

25            THE COURT:  Okay.

1          MR. METLITSKY:  It's just very difficult

2    practically to understand how you would know if you're in

3    violation or not.  You -- walking into contempt, especially

4    for a university, right, that has to have, you know, a lot of

5    discretion figuring out how to run its campus.  It can't

6    engage in viewpoint discrimination under the First Amendment

7    -- all sorts of things that a public university has to do.

8    It just seems like that kind of injunction is asking for

9    trouble, and it's just very difficult to figure out how you

10   know whether it's being violated or not.

11         THE COURT:  Does -- from UCLA's standpoint, have

12   there been any discussions about whether the parties could

13   come to some agreement on a scope of an injunction that would

14   provide the Jewish students on campus with a sense that

15   there's some legal protection for their, you know, rights?

16         MR. METLITSKY:  So I don't think there was -- I was

17   not part of the meet-and-confer, and I can turn it over to

18   Mr. Cowan.

19         MR. COWAN:  Short answer: No, Your Honor.  There

20   was discussion with Mr. Rassbach.  We talked -- and you can

21   certainly respond.  We talked -- we posed the question to

22   plaintiffs' counsel which specific policies they're asking us

23   to change, remove.  They did not provide us with a specific

24   policy that needed to be changed.  They did offer as far as a

25   way of avoiding a preliminary injunction motion was to enter

1   into a consent decree.  Again, that was at a very high level.

2   Specifics were not discussed.

3            So, you know, feel free to add to that.

4            MR. RASSBACH:  Yeah.  I mean, I think we raised the

5   issue first saying that we'd be happy to talk.  I think that

6   the consent decree idea we said, you know, "Take a look at

7   what we're putting in the proposed order.  See if that's

8   something you could live with," and I don't think they can

9   live with it, but I think that that's -- you know, we are

10  open, of course, to talking about details.  I just think it

11  would need to be something that's judicially enforceable from

12  our point of view because, you know, that's -- I think that's

13  what our clients probably need to be -- feel sure because,

14  again, we're hearing the word "flexibility" and "discretion"

15  repeated many, many times, and our whole point of this

16  lawsuit is you don't have discretion to discriminate in the

17  name of de-escalation; you actually don't have that

18  discretion as a public university.

19           THE COURT:  Okay.  So this is what I would like the

20  parties to do: I'd like the parties to meet and confer to see

21  if you can come up to some agreeable stipulated injunction or

22  some other court order that would both give UCLA the

23  flexibility it needs to administer their campus but also

24  provide the Jewish students on campus some reassurance that

25  the -- their Free Exercise rights are not going to be -- not

1  going to play second fiddle to anything else.  I'd like to

2  you to get back to me within a week, so by next Monday, and

3  so, if you can, get on this right away because I know campus

4  is opening up soon.  So the Court is responsive to that, and

5  I want to do something.

6          You kind of know where I'm thinking, and I'm trying

7  to -- if the Court does issue an order, I wanted to do it in

8  a way that was as clean as possible, which is why I was

9  thinking about the reverse there because I think it gets you

10  to the same point but it's easier for everybody to know, but

11  you all could probably do a better job than I could in

12  fashioning that.  So I'll give you a week to get back to the

13  Court on that -- by next Monday, and then if I -- depending

14  on what the parties come back with, the Court will try to

15  issue an order sometime next week.

16          When does campus open?

17          MR. RIENZI:  (Indecipherable.)

18          THE COURT:  I'm sorry.  When does the fall semester

19  start?

20          MR. RIENZI:  August 15th is when the law school

21  begins again for the fall semester.

22          THE COURT:  And the regular campus is on a quarter

23  system; right?

24          MR. RIENZI:  I believe that's September 23rd,

25  Your Honor.

1          THE COURT:  Okay.

2          MR. RIENZI:  We have two law student plaintiffs and

3     one undergrad.

4          THE COURT:  Right.  Yeah.  I saw that.  Okay.

5          Okay.  So then I'd also -- I didn't -- the parties

6     didn't really talk about a bond for an preliminary

7     injunction, and I don't know whether there's any -- I mean,

8     the rules indicate that the Court should require a bond.  I

9     really had a hard time trying to figure out what -- how I

10    could get my arms around what a bond might be, but while

11    you're talking, you know, think about that as well because I

12    know it's something the Court has to consider.

13         MR. METLITSKY:  Yes.

14         MR. RIENZI:  Your Honor, my understanding -- and I

15    can get you the case cites for it -- or I think I can -- is

16    that, generally speaking, in civil rights cases the courts

17    are allowed not to require a bond, but we'll --

18         THE COURT:  Yeah.  I'm definitely allowed not to

19    but I just --

20         MR. RIENZI:  Yeah.

21         THE COURT:  -- I need to consider it -- I mean, it

22    needs to be part of the consideration.

23         MR. RIENZI:  Understood.

24         THE COURT:  Okay.  Okay.  Thank you, counsel.

25    Appreciate it.  Appreciate the briefing.  Appreciate the

1    arguments.    Thank you.

2                MR. RIENZI:    Thank you, Your Honor.

3          (Proceedings adjourned at 2:01 p.m.)

4    ///

5    ///

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                                    CERTIFICATE

5          I certify that the foregoing is a correct transcript

6   from the electronic sound recording of the proceedings in the

7   above-entitled matter.

8   /s/ Julie Messa_____         July 30, 2024_____
    Julie Messa, CET**D-403         Date
9   Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25