1 THOMAS B. HARVEY (SBN 287198)
  Law Offices of Thomas B. Harvey
2 1316 Calle Castano, Thousand Oaks, CA 91360
  Tel: (314) 482-3342
3 Email: tbh1910@gmail.com

4 MARK KLEIMAN (SBN 115919)
  Kleiman/Rajaram
5 12121 Wilshire Blvd.,
  Suite 810
6 Los Angeles, CA 90025
  Tel: (310) 392-5455
7 Fax: (310) 306-8491
  Email: mark@krlaw.us

8

9 Attorneys for Amici Curiae
  FACULTY FOR JUSTICE IN PALESTINE AT UCLA

10

11 **UNITED STATES DISTRICT COURT**
   **CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| 13 YITZCHOK FRANKEL;<br>JOSHUA GHAYOUM; and<br>14 EDEN SHEMUELIAN, | ) Case No. 2:24-cv-04702-MCS-<br>)<br>)<br>) |
| 15               Plaintiffs, | )<br>) |
| 16          vs. | )<br>) |
| 17 | ) |
| 18 REGENTS OF THE UNIVERSITY OF<br>CALIFORNIA; MICHAEL V. DRAKE, | ) (1) EX PARTE APPLICATION FOR<br>) LEAVE TO FILE AMICUS CURIAE |
| 19 President of the University of California;<br>GENE D. BLOCK, Chancellor, University | ) BRIEF ON BEHALF OF FACULTY<br>) FOR JUSTICE IN PALESTINE- |
| 20 of California, Los Angeles; DARNELL<br>HUNT, Executive Vice-President and | ) UCLA<br>) |
| 21 Provost; MICHAEL BECK,<br>Administrative Vice Chancellor; | ) (2) MEMORANDUM OF POINTS<br>) AND AUTHORITIES IN SUPPORT |
| 22 MONROE GORDEN, JR., Vice<br>Chancellor; and RICK BRAZIEL, | ) OF APPLICATION<br>) TO FILE AMICUS CURIAE BRIEF |
| 23 Assistant Vice Chancellor, each in both<br>his official and personal capacities, | )<br>) |
| 24 | ) **Judge: Hon. Mark C. Scarsi** |
| 25               Defendants. | )<br>) |
| 26 | )<br>) |

27

28

---

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Faculty for Justice in Palestine-UCLA hereby applies Ex Parte to the above-entitled Court for leave to file an amicus curiae memorandum in support of Defendants' *Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction*, ECF 62.

Faculty for Justice in Palestine-UCLA have complied with Local Rule 7-19.1, by providing notice to all parties in advance of filing this Application. None of the parties have indicated they oppose this application. On August 7, 2024, counsel for Defendants stated in an email that Defendants take no position on the participation of amicus in this case. Counsel for *amici* emailed and called Counsel for Plaintiffs on August 7, 2024. At the time of this filing, Counsel for *amici* have not heard back from Plaintiffs. A proposed order granting this application is also attached.

As described in the accompanying Memorandum of Points and Authorities, there is good cause to grant this unopposed Application, which is within the Court's discretion.

Pursuant to Local Rule 7-19.1, the contact information for Plaintiffs' counsel is as follows:

Eric C. Rassbach
1919 Pennsylvania Ave. NW,
Suite 400
Washington, DC 20006
202-955-0095 tel.
202-955-0090 fax
erassbach@becketlaw.org

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

*Amici* respectfully request leave to file a brief in support of the motion for a preliminary injunction. The proposed amicus brief will provide the Court with helpful information about the broader context surrounding the UCLA encampment, how other schools have responded, and the impact on anti-genocide, pro-Palestinian student and faculty protesters in particular. A proposed order permitting filing of the *amicus curiae* brief is attached.

*Amicus curiae* assist in cases "of general public interest" by "supplementing the efforts of counsel, and drawing the court's attention to law that might otherwise escape consideration." *Funbus Systems, Inc.* v. *California Public Utilities Com.*, 801 F.2d 1120, 1125 (9th Cir. 1986). "District courts frequently welcome amicus briefs from nonparties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has unique information or perspective." *Sonoma Falls Developers, LLC* v. *Nev. Gold & Casinos*, 272 F. Supp. 2d 919, 925 (N.D. Cal. 2003) (internal quotes omitted).

While no "standard, rule, or statute" governs amicus participation in district court, courts in this Circuit generally consider motions for leave to file an amicus brief under Federal Rule of Appellate Procedure 29. See *Stoyas v. Toshiba Corp.*, 2021 WL 2315200, at *2 (C.D. Cal. June 7, 2021) ("[T]he Federal Rules of Civil Procedure do not address requests to participate as amici, therefore, district courts rely on Federal Rule of Appellate Procedure 29 ... when considering such requests." (cleaned up)). Under Rule 29(a), "amicus curiae may file a brief only by leave of court or if the brief states that all parties have consented to its filing." Fed. R. App. Proc. 29(a).

To seek leave, amici must file an accompanying motion for leave to file the brief that states: (i) "the movant's interest; and" (ii) "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case."

Fed. R. App. Proc. 29(b). "The Touchstone is whether the amicus is helpful." *United States v. State Water Res. Control Bd.*, 2020 WL 9144006, at *3 (E.D. Cal. Apr. 23, 2020)

Here, *amici's* brief is appropriate because Defendants take no position on its filing and Plaintiffs have not responded. As of the filing of this brief, none of the parties oppose its filing. See Fed. R. App. Proc. 29(a). The brief should be permitted on this basis alone.

Leave is additionally appropriate here because the proposed brief, informed by the proposed *amici's* unique insights and experiences, will assist the Court's decision- making process. The UCLA Chapter of Faculty for Justice in Palestine (FJP) is a diverse, multi-religious, multi-generational, multi-ethnic, multi-racial, and multi- disciplinary collective of faculty members at UCLA. To further specify, FJP includes both Jewish and Muslim identifying members, and faculty from schools of law, medicine, social science, public policy, humanities, natural sciences, art, and beyond. FJP emerged in response to the ongoing genocide of Palestinians in Gaza and the need to support diverse groups of students at UCLA and beyond who have sought to exercise their first amendment rights to freedom of speech and protest, in support of Palestinian human rights, in response to the genocide, occupation, and apartheid perpetuated by U.S. funding and foreign policies.

*Amici* have a strong interest in ensuring that anti-genocide, pro-Palestinian protesters have equal access to education, and that student protesters do not face harassment and threats because of their point of view. The outbreak of islamophobic incidents not only at UCLA but on university campuses nationwide sharply undercut that interest. At UCLA and many other universities, anti-genocide, pro-Palestinian faculty and student protesters were physically assaulted, arrested, doxxed, subjected academic discipline, criminal prosecution, and banned from campus because of their principled opposition to ongoing war crimes and genocide in Palestine. Anti-genocide, pro-Palestinian faculty and students were also disproportionately targets of

harassment and intimidation because of their dress. Amici therefore have a strong interest in ensuring that UCLA prevents counter protesting self-proclaimed Zionists and white supremacists from attacking students and faculty. Amici also have a strong interest in ensuring that UCLA does not subject faculty and students to more violence from police and private security guards they hired, shootings with less lethal munitions, total campus bans, harassment, and intimidation of anti-genocide, pro-Palestinian faculty members and students protesting mass killings when the academic term begins in the fall.

As outlined in the attached brief, *amici* write to put this litigation into the broader context surrounding the anti-genocide student and faculty protests around the country, refute allegations of antisemitism, show how UCLA and other schools have responded, share the growing consensus about war crimes in Palestine, and highlight the impact on anti-genocide, pro-Palestinian student and faculty protesters in particular. The perspective of amici is particularly relevant to the preliminary injunction factors.

There is no deadline in the Central District for a motion seeking leave to file an *amicus curiae* brief.

For these reasons, the Court should accept the attached *amicus* brief for filing.

DATED: August 8, 2024

BY: /s/ Thomas B. Harvey
THOMAS B. HARVEY (SBN 287198)
Law Offices of Thomas B. Harvey
Attorney for Amici Curiae
Faculty for Justice In Palestine-UCLA

BY: /s/Mark Kleiman
MARK KLEIMAN (SBN
KLEIMAN/RAJARAM
12121 Wilshire Blvd.,
Suite 810
Los Angeles, CA 90025
Tel: (310) 392-5455
Fax: (310) 306-8491
Email: mark@krlaw.us

United States District Court
Central District of California
Case No. 2:24-cv-04702-MCS-PD
*Frankel et al. v. Regents of the University of California et al.*

## **PROOF OF SERVICE**
(Pursuant to Federal Law)

The undersigned certifies and declares as follows:

I am a resident of the State of California and over 18 years of age and am not a party to this action. My business address is 1316 Calle Castano, Thousand Oaks, CA 91360, which is located in the county where any non-personal service described below took place.

On August 8, 2024, a copy of the following document(s):

(1) EX PARTE APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF ON BEHALF OF FACULTY FOR JUSTICE IN PALESTINE-UCLA IN SUPPORT OF DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; (2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION TO FILE AMICUS CURIAE BRIEF

was served on:

Eric C. Rassbach
1919 Pennsylvania Ave. NW,
Suite 400
Washington, DC 20006
202-955-0095 tel.
202-955-0090 fax
erassbach@becketlaw.org

*Attorneys for Plaintiffs*

Service was accomplished **by e-mail**. By transmitting via e-mail or electronic transmission the document(s) listed above to the person at the e-mail address set forth above. Executed on August 8, 2024 at Thousand Oaks, California.

*/s/ Thomas B. Harvey*
Thomas. B. Harvey

1  THOMAS B. HARVEY (SBN 287198)
   Law Offices of Thomas B. Harvey
2  1316 Calle Castano, Thousand Oaks, CA 91360
   Tel: (314) 482-3342
3  Email: tbh1910@gmail.com

4  MARK KLEIMAN (SBN 115919)
   Kleiman/Rajaram
5  12121 Wilshire Blvd., Suite 810
   Los Angeles, CA 90025
6  Tel: (310) 392-5455
   Fax: (310) 306-8491
7  Email: mark@krlaw.us

8  Attorneys for Amici Curiae
9  FACULTY FOR JUSTICE IN PALESTINE AT UCLA

10           **UNITED STATES DISTRICT COURT**
11           **CENTRAL DISTRICT OF CALIFORNIA**

12  YITZCHOK FRANKEL;                    ) Case No. 2:24-cv-04702-MCS-
    JOSHUA GHAYOUM; and                  )
13  EDEN SHEMUELIAN,                     )
                            Plaintiffs,  )
14                                       )
15              vs.                      )
                                         )
16  REGENTS OF THE UNIVERSITY OF         )   BRIEF OF AMICI CURIAE
17  CALIFORNIA; MICHAEL V. DRAKE,        )   FACULTY FOR JUSTICE IN
    President of the University of California; )   PALESTINE AT UCLA
18  GENE D. BLOCK, Chancellor, University )
19  of California, Los Angeles; DARNELL  )
    HUNT, Executive Vice-President and   )
20  Provost; MICHAEL BECK,               )
21  Administrative Vice Chancellor;      )
    MONROE GORDEN, JR., Vice             )
22  Chancellor; and RICK BRAZIEL,        )
23  Assistant Vice Chancellor, each in both )
    his official and personal capacities, )
24                                       )
25              Defendants.              )

26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF *AMICI CURIAE*...................................................................................1

ARGUMENT..............................................................................................................3
  I. Protest Purpose and Context…………….............................................. 3

    A. False Assertions of Antisemitism…...................................................6
    B. Attacks on Anti-Genocide Protesters and UCLA's Failure to Protect..……..9
    C. UCLA Suppresses Anti-Genocide, Pro-Palestinian Speech….....................12
    D.  Growing Consensus on War Crimes and Genocide in Gaza..………………15

CONCLUSION …...................................................................................................16

# TABLE OF AUTHORITIES

**Authority**                                                                                                              **Page**

*Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip* (South Africa v. Israel) International Court of Justice, Summary of the Order of 26 January 2024, (Jan. 26, 2024), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-sum-01-00-en.pdf…......5

*Explainer: Gaza death toll: how many Palestinians has Israel's campaign killed?* REUTERS, July 26, 2024, https://www.reuters.com/world/middle-east/gaza-death-toll-how-many-palestinians-has-israels-campaign-killed-2024-07-25/…….........4

Farida Shaheed UN Special Rapporteur on the Right to Education, *Statement by the Special Rapporteur on the right to education, Ms. Farida Shaheed on her visit to the United States of America*, OFFICE OF THE HIGH COMMISSIONER FOR HUMAN RIGHTS, 29 April – 10 May 2024, https://www.ohchr.org/sites/default/files/documents/issues/education/statements/20240510-stm-eom-sr-education-usa.pdf………………………………………………….......15

Jewish Voice for Peace, Jewish Voice for Peace – Los Angeles, Jewish Voice for Peace at UCLA, *JVP at UCLA Passover Seder*, jointly posted on the Instagram accounts of Jewish Voice for Peace, Jewish Voice for Peace – Los Angeles, Jewish Voice for Peace at UCLA (April 28, 2024), https://www.instagram.com/p/C6VFHPrrICA/?igsh=MTc4MmM1YmI2Ng%3D%3D&img_index=1................................................................................7

Jewish Voice for Peace at UCLA, *Letter to UCLA and Los Angeles Community*, Instagram account of Jewish Voice for Peace at UCLA dated April 30, 2024. This statement by Jewish Voice for Peace at UCLA is dated April 30, 2024 and was posted on JPV UCLA's official Instagram account. Image on file with author but link not available……………………………………………………………7

Jewish Voice for Peace at UCLA, *JVP at UCLA Havdalah Saturday April 28th 8pm at Royce Encampment*, INSTAGRAM ACCOUNT OF JEWISH VOICE FOR PEACE AT UCLA, April 27, 2024, https://www.instagram.com/p/C6SHmpHv6tx…………………………….............8

*Legal Consequences Arising from The Policies And Practices Of Israel In The Occupied Palestinian Territory, Including East Jerusalem,* Advisory Opinion, I.C.J. Rep. ¶ 5 (July 19, 2024). https://www.icj-cij.org/sites/default/files/case-related/186/186-20240719-adv-01-00-en.pdf…...................................................5

Open Letter to the UCLA Community from UCLA Jewish Faculty and Staff, April 30, 2024, https://sites.google.com/view/ucla-jewish-faculty-staff/……........9

Robin D.G. Kelley, *UCLA's Unholy Alliance*, BOSTON REVIEW, May 18, 2024. https://www.bostonreview.net/articles/uclas-unholy-alliance/…..........................11

UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism, First Report, 4, May 15, 2024, https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&e=1&st=6s3n3uvu&dl=0………6, 8, 10, 12, 13-14

UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism, Second Report, June 28, 2024, https://racialviolencehub.com/wp-content/uploads/2024/06/June-28-Task-Force-Report-on-AntiPalestinian-Racism.pdf...............................................................................................................13-14

*UN expert raises alarm over treatment of pro Palestinian student protesters in US*, UN NEWS – HUMAN RIGHTS, May 10, 2024, https://news.un.org/en/story/2024/05/1149616#:~:text=%E2%80%9CI%20am%20deeply%20troubled%20by,Rapporteur%20on%20the%20right%20to…….......15

United Nations Office of the High Commissioner for Human Rights, *UN experts declare famine has spread throughout Gaza strip*, UN MEDIA CENTER – PRESS RELEASE, July 9, 2024, https://www.ohchr.org/en/press-releases/2024/07/un-experts-declare-has-spread-throughout-gaza-strip…………………………………………………….........................4

United Nations Office for the Coordination of Humanitarian Affairs, *Reported Impact Snapshot – Gaza Strip*, OPT HOME, July 3, 2024, https://www.ochaopt.org/content/reported-impact-snapshot-gaza-strip-3-july-2024……………...............................................................................4

United Nations Office of the High Commissioner for Human Rights, *UN experts deeply concerned over scholasticide in Gaza*, UN MEDIA CENTER – PRESS RELEASE, April 18, 2024, https://www.ohchr.org/en/press-releases/2024/04/un-experts-deeply-concerned-over-scholasticide-gaza…………………………….........4

University Network for Human Rights, International Human Rights Clinic – Boston University School of Law, International Human Rights Clinic – Cornell Law School, Centre for Human Rights – University of Pretoria, Lowenstein Human Rights Project – Yale Law School, *Genocide in Gaza: Analysis of International Law and Its Application to Israel's Military Actions Since October 7, 2023*,

University Network for Human Rights, 105, (May 15, 2024), https://static1.squarespace.com/static/5b3538249d5abb21360e858f/t/66475850eceb152a52fd55fe/1715951696844/Genocide+in+Gaza+-+Final+version+051524.pdf…...............................................................................5

United Nations Office of the High Commissioner for Human Rights, *USA: Free speech on campus needs to be protected, not attacked, say experts,* UN MEDIA CENTER – PRESS RELEASE, July 25, 2024, https://www.ohchr.org/en/press-releases/2024/07/usa-free-speech-campus-needs-be-protected-not-attacked-say-experts……………………………...............................................................16-18

AMICUS BRIEF OF FACULTY FOR JUSTICE IN PALESTINE-UCLA Case No. 2:24-cv-04702-MCS-PD

### INTEREST OF *AMICI CURIAE*

The UCLA Chapter of Faculty for Justice in Palestine (FJP) is a diverse, multi-religious, multi-generational, multi-ethnic, multi-racial, and multi- disciplinary collective of faculty members at UCLA. To further specify, FJP includes both Jewish and Muslim identifying members, and faculty from schools of law, medicine, social science, public policy, humanities, natural sciences, art, and beyond. FJP emerged in response to the ongoing genocide of Palestinians in Gaza and the need to support diverse groups of students at UCLA and beyond who have sought to exercise their first amendment rights to freedom of speech and protest, in support of Palestinian human rights, in response to the genocide, occupation, and apartheid perpetuated by U.S. funding and foreign policies.

*Amici* have a strong interest in this case. FJP is falsely alleged to have been aware of and supported antisemitism in the encampment. FJP denies this claim and notes that its membership, like the composition of the encampment, has at all times included Jewish members. This is not the exception but rather the rule at FJPs throughout the nation. FJP embraces and supports members of all faiths and backgrounds, and seeks to ensure that any student, faculty member, or staff at UCLA has equal access to education, that they do not face harassment or discrimination for exercising their first amendment rights, and that they are safe on UCLA's campus.

*Amici* also have a strong interest in the proposed injunctions parties submitted. This injunction will have a profound impact on FJP membership's ability to exercise their first amendment rights. Even before this injunction between UCLA and the plaintiffs in *Frankel*, diverse FJP members at UCLA have faced significant harms while exercising first amendment rights. Faculty members have been beaten, arrested, doxxed, they have had their civil rights violated, sustained other physical injuries, and faced serious administrative retribution while acting to support students who are speaking out against war crimes and human rights violations. In addition, students and faculty of the Palestine Solidarity Encampment have been subjected to police

brutality and mob attacks by self-proclaimed Zionists and white Supremacists, representing an almost total failure of UCLA to provide timely intervention or protection. FJP members faced ongoing harassment and traumatic targeting through an unpermitted Jumbotron, doxxing, suppression of their free speech rights, punitive disciplinary actions, and other civil, constitutional, and human rights violations.

Expressing criticism of genocidal acts which have been the subject of international tribunals and are funded with U.S. taxpayer money is not anti-Jewish. In fact, it is vital for a vibrant university life and democracy to have space to critique public and foreign policy, engage in political debate, and express viewpoints even and perhaps especially when they run counter to the status quo. Protesting human rights violations and a genocide that has claimed the lives of tens of thousands of civilians is not about any individual or group's religious beliefs. Neither proposed injunction considers the concerns of UCLA's Jewish, Muslim and Christian protesters against war crimes and genocide in Palestine.

Antisemitism, along with Islamophobia, xenophobia, anti-Black racism, anti-Arab racism, and other forms of racial discrimination exist in societies around the world, yet plaintiffs' complaint mischaracterizes the real issues of discrimination, injustice, and civil rights violations at UCLA. FJP is referenced in plaintiffs' filing. Compl. ¶¶ 128-134. Plaintiffs falsely claim that FJP members "were aware of the antisemitic nature of the encampment and the systematic exclusion of Jewish students." Compl. ¶ 33. This assertion along with numerous other aspects of the complaint, is false.

The legal claims elaborated in *Frankel* are misapplied. It is in fact pro-Palestine, anti-genocide protesters—whether Muslim, Jewish or any other religion–whose state and constitutional rights have been violated by UCLA. These protesters have been beaten, shot, arrested, banned from campus, denied access to housing, healthcare, food, and employment because of protected First Amendment activities. They have endured countless hours of student disciplinary hearings, suffer

from PTSD due to the constant police presence on campus, and continue to face the threat of criminal prosecution from UCLA and the state of California because they want genocide to end and their university to stop profiting from the weapons that facilitate it. FJP has an interest in clarifying the issues for the court, presenting briefing critical for the court to consider, and ensuring a campus environment that is safe, equitable, and protective of the rights of all students to access education, exercise free speech, and oppose complicity in genocidal violence.

## ARGUMENT

*Amici* agree with Defendant that an injunction is neither needed nor appropriate, but write separately so the Court may learn of our understanding of the immense harms and rights-based violations inflicted on anti-genocide protesters at UCLA. Additionally, Amici ask the Court to allow additional time for more parties to be heard in the case. *Amici* also write to show that Jewish students and faculty created and participated in the encampment without fear or concerns for their safety from the Palestine solidarity community, and that plaintiffs do not represent the interest of Jewish people at UCLA. Further, we write to contextualize this litigation within a broader framework of pro-Palestine, anti-genocide protests across the nation and the repression of those efforts at UCLA and beyond. It is in the public interest to have a robust debate about US involvement in what many bodies have deemed war crimes, in violation of US and international law. Creating an injunction that further limits the exercise of First Amendment rights on UCLA's campus in the name of exaggerated or misstated claims of the scope of fear by three Jewish students at UCLA is counter to these bedrock constitutional principles.

## I.  PROTEST PURPOSE AND CONTEXT

Across the country and around the world, hundreds of thousands, if not millions of diverse peoples have been moved to protest war crimes and genocide in Palestine. Israeli military assaults have bombed refugee encampments, entire residential blocks

full of families, as well as schools and medical facilities, all of which are now reduced to ashes and rubble. Israeli military offensives intentionally target journalists, and children comprise the majority of the casualties of its bombing of Gaza. While numbers continue to rise, nearly 40,000 Palestinians have been killed, so far, in this ongoing genocide.[1] The hospitals in Gaza have become graveyards and there are no universities left. Every single university in the Gaza strip has been destroyed, in what many have now labeled scholasticide.[2]

Context matters and Michael Fakhri, the UN Special Rapporteur on the Right to Food, and other UN experts, have declared that based on the attack on Gaza's health and social structures, widespread famine has spread across the Gaza strip.[3] Namely, UN experts, have urged,

> We declare that Israel's intentional and targeted starvation campaign against the Palestinian people is a form of genocidal violence and has resulted in famine across all of Gaza. We call upon the international community to prioritise the delivery of humanitarian aid by land by any means necessary, end Israel's siege, and establish a ceasefire.[4]

Examining the Palestine solidarity protests at UCLA and around the world, in the context of the immense injustices being protested, reveals that these diverse members of the campus community are in fact human rights defenders.

A report, by the University Network for Human Rights, the Boston University School of Law International Human Rights Clinic, the Cornell Law School International Human Rights Clinic, the University of Pretoria Centre for Human Rights, and the Yale Law School Lowenstein Human Right Project concludes that

---

[1] *Explainer: Gaza death toll: how many Palestinians has Israel's campaign killed?* Reuters (July 26, 2024), https://www.reuters.com/world/middle-east/gaza-death-toll-how-many-palestinians-has-israels-campaign-killed-2024-07-25/; United Nations Office for the Coordination of Humanitarian Affairs, *Reported Impact Snapshot - Gaza Strip*, OPT Home (July 3, 2024), https://www.ochaopt.org/content/reported-impact-snapshot-gaza-strip-3-july-2024
[2] United Nations Office of the High Commissioner for Human Rights, *UN experts deeply concerned over scholasticide in Gaza*, UN Media Center - Press Release (April 18, 2024), https://www.ohchr.org/en/press-releases/2024/04/un-experts-deeply-concerned-over-scholasticide-gaza
[3] United Nations Office of the High Commissioner for Human Rights, *UN experts declare famine has spread throughout Gaza strip*, UN Media Center - Press Release (July 9, 2024), https://www.ohchr.org/en/press-releases/2024/07/un-experts-declare-famine-has-spread-throughout-gaza-strip
[4] *Id.*

"Israel has violated its obligations under the Genocide Convention of 1948, setting forth the facts that establish the requsite *mens rea* associated with genocidal intent, and the acts that violate Articles II and III of the Convention."[5] The report states,

> Israel's violations of the international legal prohibition of genocide and other related crimes amount to grave breaches of peremptory norms of international law that must be ceased immediately. Furthermore, these violations give rise to obligations by all other States to refrain from recognizing Israel's breaches as legal or taking any actions that may amount to complicity in these breaches; and to take positive steps to suppress, prevent, and punish the commission by Israel of further genocidal acts against the Palestinian people in Gaza.[6]

Furthermore, the International Court of Justice has ordered Israel to comply with provisional measures to stop genocidal acts, because it has found that there is a plausible case that Israel is committing genocide against Palestinians in Gaza.[7]

The forced famine, scholasticide, and ongoing genocide in Gaza, are occurring in the broader context of an apartheid system and an illegal occupation of Palestine. In a historic decision on July 19th, the International Court of Justice ruled in an advisory opinion, that Israel's occupation of East Jerusalem, the West Bank, and Gaza are illegal.[8] The International Court of Justice found that the occupation is illegal based on Israel's wrongs, including annexation, denial of the right to self-determination, and violations of the Convention on the Elimination of All Forms of Racial Discrimination.[9] The International Court of Justice has determined that Israel is in

---

[5] University Network for Human Rights, International Human Rights Clinic - Boston University School of Law, International Human Rights Clinic - Cornell Law School, Centre for Human Rights - University of Pretoria, Lowenstein Human Rights Project - Yale Law School, *Genocide in Gaza: Analysis of International Law and Its Application to Israel's Military Actions Since October 7, 2023*, University Network for Human Rights, 105, (May 15, 2024), https://static1.squarespace.com/static/5b3538249d5abb21360e858f/t/66475850eceb152a52fd55fe/1715951696844/Genocide+i n+Gaza+-+Final+version+051524.pdf

[6] *Id.*

[7] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip* (South Africa v. Israel) International Court of Justice, Summary of the Order of 26 January 2024, (January 26, 2024), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-sum-01-00-en.pdf

[8] *Legal Consequences Arising from The Policies And Practices Of Israel In The Occupied Palestinian Territory, Including East Jerusalem,* Advisory Opinion, I.C.J. Rep. ¶ 5 (July 19, 2024). https://www.icj-cij.org/sites/default/files/case-related/186/186-20240719-adv-01-00-en.pdf

[9] *Id.*

1    violation of Article III of Convention on the Elimination of Racial Discrimination,
2    which prohibits racial segregation and apartheid.
3        It is in response to this grave historical injustice that UCLA students, staff, faculty,
4    and community members protested the university's investments in the companies
5    supplying Israel the weapons to maintain an apartheid government and carry out war
6    crimes, including genocide. It is no secret that those who speak out in support of
7    Palestinian human rights have faced immense backlash, retribution, personal costs,
8    physical injuries, and a multitude of other material consequences. This backlash
9    perpetuates violence while also attempting to silence dissent. In the words of the
10   UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism,
11   silencing "critical voices serves to authorize the merciless killing and destruction of
12   Palestinian communities, including the total destruction of dozens of schools and
13   every single university in the Gaza strip, as well as the murder of hundreds of
14   Palestinian teachers, students, professors, deans and university presidents, which
15   should concern all of us in academic institutions and indeed the institution itself."[10]

16   **A. FALSE ASSERTIONS OF ANTISEMITISM**

17       Many of the plaintiffs' material claims, characterizations, and assertions are false,
18   but most critically false are the claims that the encampment's purpose was antisemitic
19   and known to be so by FJP. One does not need to be Palestinian to understand that
20   bombing a civilian population which has been under siege, occupied, and forcibly
21   starved is unconscionable, morally reprehensible, and against international law. In
22   this transnational movement of Palestinian solidarity, Jewish peace activists have led
23   protests against genocide across the U.S. and around the world. The same is true at
24   UCLA.

---

[10] UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism, First Report, 4 (May 15, 2024), https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&e=1&st=6s3n3uvu&dl=0

1   It is not true that anyone was denied entrance to the Palestine solidarity

2   encampment based on their identity. In fact, UCLA Jewish Voice for Peace, Jewish

3   Voice for Peace - Los Angeles, and the national body of Jewish Voice for Peace

4   issued a joint post to more than one million followers celebrating the Passover Seder

5   at the UCLA Palestine Solidarity Encampment hosted by JVP at UCLA.[11] As UCLA

6   Jewish Voice for Peace (JVP) students affirmed on their official Instagram account,

7   "Like other members of the UCLA community, we have been welcomed into the

8   encampment. […] Entrance to the encampment is contingent on principles, politics,

9   and solidarity with the Palestinian struggle, and not on identity."[12] Thus, contrary to

10   plaintiffs' assertions, students wearing a Kippah were not denied entrance because

11   they were Jewish. Moreover, as UCLA JVP explained,

12   Many Jewish students including members of Jewish Voice for Peace at
      UCLA have been active participants in the Encampment…We have been

13   informed that some who were not let in are saying it was because they
      are Jewish. We soundly reject this and ensure that any accusation that

14   Jewish people are not allowed into the encampment is false. Jewish
      students have hosted Shabbat services, Passover Seders, and daily spaces

15   for Jewish learning and community building.[13]

16   Jewish students and faculty helped organize the Palestine solidarity encampment at

17   UCLA, including FJP. Jewish presence at the Palestine solidarity encampment was

18   also multigenerational, including the presence of families, from children to adults.

19   The misleading characterizations in plaintiffs' complaint and preliminary injunction

20   motion paint a false and extremist picture suggesting that the Palestine Solidarity

21   Encampment at UCLA is antisemitic, which is simply not true. FJP and the members

22   of the Palestine Solidarity Encampment do not espouse or condone any type of racial,

23   religious, or gender-based discrimination.

24   _____

25   [11] Jewish Voice for Peace, Jewish Voice for Peace – Los Angeles, Jewish Voice for Peace at UCLA, *JVP at UCLA
     Passover Seder*, jointly posted on the Instagram accounts of Jewish Voice for Peace, Jewish Voice for Peace – Los

26   Angeles, Jewish Voice for Peace at UCLA (April 28, 2024),
     https://www.instagram.com/p/C6VFHPrrICA/?igsh=MTc4MmM1YmI2Ng%3D%3D&img_index=1

27   [12] Jewish Voice for Peace at UCLA, *Letter to UCLA and Los Angeles Community*, Instagram account of Jewish Voice
     for Peace at UCLA dated April 30, 2024. This statement by Jewish Voice for Peace at UCLA, dated April 30, 2024, was

28   posted on JPV UCLA's official Instagram account. Image on file with author but link not available.
     [13] *Id.*

1    Palestine solidarity organizers at UCLA observed Jewish religious ceremonies

2    inside the encampment. According to the UCLA Task Force on Anti-Palestinian,

3    Anti-Muslim, and Anti-Arab Racism (Task Force),

4             Muslims, Jews, Christians, and followers of other faiths as well as
         atheists were welcome. Muslim salat and Jewish shabbat were
5         commonplace. Families with children were also welcome on the first day
         of the encampment. Food was made available to all, and precautions
6         were taken to protect anyone with severe allergies.[14]

7    The encampment was set up during Passover. Both Seder and Shabbat were held

8    inside the encampment, alongside Muslim prayer. In addition, on Saturday April 28th,

9    at the UCLA Palestine solidarity encampment, organizers held the Jewish religious

10   ceremony of Havdalah, marking the end of the Sabbath.[15] Jewish students were part

11   of the core group of organizers of the Palestine solidarity encampment, including

12   members wearing a Kippah. Jewish students formed part of the encampment's

13   organizing leadership and media team. The encampment included Jewish faculty,

14   staff, and Jewish graduate and undergraduate students who held active facilitation and

15   leadership roles in the encampment programming. These facts of Jewish organizers

16   and Jewish religious observances held within UCLA's Palestine solidarity

17   encampment are irreconcilable with plaintiffs' assertions of antisemitism.

18       In the wake of the violent mob attack on the encampment on April 30, entrance

19   criteria to the encampment changed to prevent further violence. In place of the initial

20   community agreements, encampment security protocol tightened to specify that

21   people could only be let in if someone already inside the camp could vouch for them,

22   or if they had been in the camp on a previous day as evidenced by colored wrist

23   bands handed out at the entrance. This new protocol meant that many people were

24   turned away from the encampment in its final 24 hours. This included people who

25

26   _____

27   [14] UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism, First Report, 4 (May 15, 2024),
     https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-
     ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&e=1&st=6s3n3uvu&dl=0

28   [15] Jewish Voice for Peace at UCLA, *JVP at UCLA Havdalah Saturday April 28th 8pm at Royce Encampment*,
     Instagram account of Jewish Voice for Peace at UCLA, (April 27, 2024), https://www.instagram.com/p/C6SHmpHv6tx/

arrived wearing keffiyehs, a visual symbol deeply associated with Palestinian resistance, culture, and activism. Entry and exit to the encampment was not in any way based on racial, ethnic, cultural or religious beliefs. That those wearing keffiyehs were denied entry to the encampment does not render the encampment anti-Palestinian. Similarly, it defies logic to claim that the encampment, on one area of UCLA's vast campus, organized by Jewish activists among a diverse coalition, with a focus on ending a genocide, was anti-Jewish.

Jewish faculty and staff beyond FJP were open and vocal supporters of the encampment. An open letter signed by 78 Jewish faculty and staff at UCLA, states:

> Jews who support the liberation of Palestine must not be devalued: We reject the notion that those Jews who embrace and work with the people of Palestine, whether in Palestine or in the United States, have sacrificed their Jewishness. We emphasize the view that many Jews who embrace pro-Palestinian work regard themselves as fully Jewish and act as Jewish people of conscience. We also reject the narrative pitting Jews against pro-Palestine protesters. This narrative ignores the diversity of the Jewish community and the presence of Jews within the protest movement.[16]

Notably, the letter critiques the University's treatment of Jewish people as homogenous and the University's misuse of "Jews as justification for the arrest of those associated with Students for Justice in Palestine and their sister organizations, including Jewish Voice for Peace, among others."[17]

**B. ATTACKS ON ANTI-GENOCIDE PROTESTERS AND UCLA'S FAILURE TO PROTECT THEM**

On Saturday April 27th, UCLA permitted counter protesters to organize directly facing the encampment. That protest could have been organized anywhere on the sprawling UCLA campus, yet UCLA allowed counter protesters to choose a location adjacent to the Palestine Solidarity Encampment. Counter protesters erected a jumbotron–a 10-12-foot-high flat screen television with powerful speakers—blaring

---

[16] An Open Letter to the UCLA Community from UCLA Jewish Faculty and Staff (April 30, 2024), https://sites.google.com/view/ucla-jewish-faculty-staff/.
[17] *Id.*

1    loud music and screening traumatic, triggering images of sexual violence. As the

2    Task Force explained,

> Protected by metal barriers and paid private security guards employed by the Apex Security Group, the jumbotron remained in place for five days, constantly playing footage of the October 7th attacks, audio clips of graphic descriptions of rape and sexual violence, sounds of gunshots, screaming babies, clips of President Biden pledging unconditional support for Israel, loud music, including a loop of the Israeli song 'Meni Mamtera', a children's song Israeli soldiers used as a form of "noise torture" on Palestinian captives. The jumbotron was paid for by a GoFundMe account that had raised $73,000 by Sunday night. The taunts and harassment continued throughout the day. One inebriated agitator harassed several Black women and femmes who were on encampment security, calling them slaves and racial slurs, followed by threats of rape. A Neo-Nazi, identified later as a member of the Proud Boys, actually shouted that they were "here to finish what Hitler started," without any apparent protest from the self-identified Zionists.[18]

11    The unmitigated presence of the jumbotron and sexually violent images displayed by

12    counter protest organizers has resulted in civil rights complaints to the university. The

13    jumbotron was unpermitted yet remained on campus for days. In fact, the unpermitted

14    jumbotron was on campus and still being taken down after UCLA removed the

15    encampment.

16         On the night of Tuesday April 30th, an armed mob of self-proclaimed Zionists and

17    white supremacists, including Proud Boys, launched an attack on students in the

18    encampment. White nationalists and neo-Nazis joined forces with Zionists (including

19    some identifying as Israelis) to attack UCLA's Palestine Solidarity Encampment,

20    whose residents included a large number of Jewish students.[19]

21         The assailants were armed with a variety of weapons, and "[u]sing metal pipes,

22    wooden planks, fists, knives, bricks, noise, chemical weapons, and incendiary

23    fireworks, the mob sent at least twenty-five students to the hospital for broken bones,

24    head trauma, and severe lacerations, while police stood by and watched for hours,

25

26

---

[18] UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism, First Report, 7, (May 15, 2024),
https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&e=1&st=6s3n3uvu&dl=0
[19] Robin D.G. Kelley, *UCLA's Unholy Alliance*, Boston Review (May 18, 2024),
https://www.bostonreview.net/articles/uclas-unholy-alliance/

1    electing to neither detain nor interrogate the perpetrators."[20] In spite of the extreme

2    violence perpetrated against anti-genocide protesters at UCLA, "[n]o arrests took

3    place that night." The following day, only students and faculty defending the

4    encampment were arrested.[21]

5        This is the punitive context in which human rights defenders at UCLA speak out

6    for Palestine solidarity. The accounts of the violent attack that night are not only

7    terrifying and shocking to the core, but they flat out contradict the plaintiffs' claims

8    that UCLA protects Palestine solidarity activists.

9        The lived reality of students at the Palestine solidarity encampment who were

10   under attack on April 30th reads like a horror movie.

11           They came armed with bear mace and other chemical irritants, hammers,
         knives, stink bombs, high grade fireworks, baseball bats, metal and
12         wooden rods, and reportedly at least one of the attackers had a gun in his
         backpack. Just prior to the attack, students were subjected to loud
13         recordings of screaming babies, followed by a fusillade of fireworks shot
         directly into the encampment. One student recalled "agitators
14         congregated at every entrance, probably to try to distract us. . . I thought
         they were shooting at us. Men in full-faced white masks began breaking
15         down the barriers using knives, hammers, and their feet. One armed with
         a long metal rod "would try and, like, spear people and bash people with
16         this big pole." Others started throwing chunks of wood and stink bombs
         and spraying chemicals–bear mace, tear gas, pepper spray. "I saw planks
17         of wood come sailing into the camp and strike some girl in the back of
         the head and she just fell to the ground." Another student was struck in
18         the back of the head by fireworks and had to be hospitalized. The
         volunteer medics were simply overwhelmed, forcing students with little
19         experience to attend to wounds. "People were crying and being like, 'can
         you call my mom? I need to call my mom, please help me'. . . We were
20         trying to do the best that we could but we ran out of saline needed to
         flush the chemicals out of people's eyes."[22]

21

22   UCLA's failure to protect students that night not only shows that what occurred is

23   starkly different from the plaintiffs' depictions, but also reflects the University's utter

24   disregard for the safety of diverse students and faculty who speak out for Palestine.

25

26   _____

27   [20] *Id.*
     [21] *Id.*

28   [22] UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism, First Report, 10 (May 15, 2024),
     https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-
     ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&e=1&st=6s3n3uvu&dl=0

In fact, the university did not protect any Palestine solidarity activists, regardless of their background. A Jewish graduate student and Palestinian solidarity protester was choked and arrested by police on Royce scaffolding. Jewish students expressing solidarity with Palestine experienced great unsafety and endangerment at the hands of UCLA administration and self-proclaimed Zionist mobs. While those violent perpetrators attacked with impunity and faced no consequences, protesters have faced physical assault, jail, doxing, harassment, threats to their academic progress, and more. The University should protect human rights defenders of all racial and religious backgrounds, including Palestine solidarity activists, yet UCLA has in fact endangered, injured, penalized, and criminalized Palestinian human rights defenders indiscriminately.

## C. <u>UCLA SUPPRESSES ANTI-GENOCIDE, PRO-PALESTINIAN SPEECH</u>

The Task Force was convened by the University to "address the increased harassment, violence, and targeting of our Palestinian, Arab and Muslim communities, and anyone subjected to discrimination, repression and marginalization for their Palestinian solidarity advocacy."[23] It was one of two task forces appointed at UCLA and worked alongside a Task Force on Anti-Semitism. We share some of the Task Force's findings, to illustrate how antisemitism has been weaponized at UCLA to suppress pro-Palestinian speech and even more broadly, anti-racist curricula in general. In their first report, the Task Force stressed,

> …at a time when all of our attention should be directed at the genocide in Gaza, the mendacious narrative of "antisemitism" was being deployed in order to delegitimize protest against state violence and hence to screen or obscure the visibility of the genocide. We demonstrated that few avenues of violence protection were open to those who were harassed or who faced sanctions. For example, a guest speaker in a course on structural racism received death threats alarming enough to force the cancellation of events hosted by the Luskin Institute on Inequality and Democracy. The Structural Racism course itself was "paused." We have reported many incidents where faculty with Zionist viewpoints were using their position of power against students and in some cases, against staff. Academic staff have also reported a hostile work environment and

---

[23] UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism, Second Report (June 28, 2024), https://racialviolencehub.com/wp-content/uploads/2024/06/June-28-Task-Force-Report-on-AntiPalestinian-Racism.pdf.

retaliation through personnel reviews and merit processes for their defense of Palestinian rights.[24]

To fully understand civil rights and racial discrimination at UCLA within the context of Palestine solidarity protests, requires recognition of the imbalance in power between those who criticize the US and Israeli governments, sometimes at great personal sacrifice, and those who claim to be harmed by hearing that critique. On this point, it is particularly insightful that the Task Force concluded their first report with the following,

> [W]e believe that given the extraordinary tensions on campus and the widespread suppression of speech that is critical of Israeli policy, speech often unreflectively declared to be antisemitic, the best approach to combatting anti-Palestinian, anti-Muslim and anti-Arab racism and to protecting academic freedom lies in an acknowledgement that there is no parity between what is happening to speakers who advocate Palestinian rights and to those who claimed to be rendered uncomfortable by speech critical of Israel and as such to be experiencing a rise in antisemitism. There cannot be a dialogue across difference, unless this asymmetry is recognized.[25]

Furthermore, in its second report, the Task Force concluded that "the militarization of our campus, the persistent attacks on students, faculty, and staff for supporting ceasefire, divestment and disclosure, the punitive measures deployed by the administration toward anyone even mildly critical of Israeli policies, have made UCLA less safe than ever for Palestinian, Arab, Muslim students and faculty, and for those in solidarity with Palestinians."[26]

In terms of questions of campus safety, the Task Force explained, "The university is now overrun with police and private security, draining precious financial resources without making our community any safer – indeed, making it far less safe for students and faculty exercising their constitutionally protected right to protest and criminalizing protest across the board. We have heard repeatedly from students in a

---

[24] UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism, First Report, 3-4, (May 15, 2024), https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&e=1&st=6s3n3uvu&dl=0
[25] *Id* at 4.
[26] UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism, Second Report (June 28, 2024), https://racialviolencehub.com/wp-content/uploads/2024/06/June-28-Task-Force-Report-on-AntiPalestinian-Racism.pdf.

variety of contexts that the police presence on our campus makes them feel unsafe and we have witnessed aggressive policing actions taken towards our students."[27] Far from what is asserted by plaintiffs, UCLA did not facilitate the encampment, nor does it protect Palestine activists. Rather it has suppressed the right to speech and protest, violently, clearing the encampment and calling in multi-agency police forces to do so. Despite the peaceful nature of the Palestine Solidarity Encampment, UCLA responded to students and faculty speaking out about Palestinian human rights by militarizing the campus. In fact, in subsequent protests too, students and faculty on their own campus faced brutality and droves of armed police. Given that there is no higher moral or legal calling than to oppose the destruction of a people, it is particularly dangerous to suppress protests against genocide.

## D. GROWING CONSENSUS ON WAR CRIMES AND GENOCIDE IN GAZA

There is a growing consensus emerging across the United Nations and other U.S. and international Human Rights organizations that the violent suppression of peaceful protest in the United States—including but not limited to protest in solidarity with the people of Palestine—is an alarming sign of the erosion of our democracy. At the end of an official visit to the US, UN Special Rapporteur on the right to education, Farida Shaheed said, "I am deeply troubled by the violent crackdown on peaceful demonstrators, arrests, detentions, police violence, surveillance and disciplinary measures and sanctions against members of the educational community exercising their right to peaceful assembly and freedom of expression."[28] The civil rights issues raised in this case, related to Palestine solidarity protests, must be addressed in the context of free speech, the right to protest, and the unfairness with which Palestine

---

[27] *Id.*
[28] Farida Shaheed UN Special Rapporteur on the Right to Education, *Statement by the Special Rapporteur on the right to education, Ms. Farida Shaheed on her visit to the United States of America,* United Nations (29 April – 10 May 2024), https://www.ohchr.org/sites/default/files/documents/issues/education/statements/20240510-stm-eom-sr-education-usa.pdf

solidarity protesters have been treated. Notably, "The UN Human Rights Council-appointed expert said she is particularly concerned by the way protesters are unfairly treated based on their political viewpoint – specifically pro-Palestinian protestors."[29]

Twenty UN experts including the Special Rapporteurs on the rights to education, right to freedom of opinion and expression, peaceful assembly, and on the situation of human rights defenders have come together to affirm the importance of free speech on U.S. college campuses.[30] Jointly, these experts declare,

> It is inaccurate and unjustified to bluntly label all peaceful demonstrations of solidarity with the Palestinian people or calls for a ceasefire in Gaza or criticism of Israel's policies as antisemitic…We strongly denounce antisemitism as a serious form of racial hatred and intolerance and urge authorities to properly investigate and take effective measures against it in line with international human rights law.[31]

The UN human rights experts also acknowledged the improper political pressures that exist on universities across the United States, to take certain positions against these protests, in ways that interfere with academic freedom and erode democracy.[32] Universities have long been epicenters of free speech, and in this role, they provide a litmus test for the strength of our democracy. While every single university in Gaza has been deliberately bombed, we ask the court to protect this role of Universities in the United States, and not be swayed by the argument that, at UCLA and elsewhere, Palestinian solidarity protest is antisemitic.

## CONCLUSION

Amicus requests that this Court protect the rights of all students, including the civil, constitutional and human rights of free speech and protest, without fear of retribution or violence, whether institutional violence, extremist violence, or violence

---

[29] *UN expert raises alarm over treatment of pro Palestinian student protesters in US*, UN News - Human Rights (May 10, 2024),
https://news.un.org/en/story/2024/05/1149616#:~:text=%E2%80%9CI%20am%20deeply%20troubled%20by,Rapporteur%20on%20the%20right%20to,
[30] United Nations Office of the High Commissioner for Human Rights, *USA: Free speech on campus needs to be protected, not attacked, say experts*, UN Media Center - Press Release (July 25, 2024), https://www.ohchr.org/en/press-releases/2024/07/usa-free-speech-campus-needs-be-protected-not-attacked-say-experts
[31] *Id.*
[32] *Id.*

1   carried out by police forces.  Students, faculty, and staff should not be criminalized or

2   denied access to education, campus, campus housing, or other campus services and

3   opportunities, on the basis of human rights speech. Students, faculty, staff, and the

4   campus community should also not be subjected to time restrictions or the imposition

5   of a curfew on the grounds of a public university. As the campus community,

6   students, faculty, and staff have a right to access campus facilities, gather, assemble,

7   and protest – even in the form of encampments. In the context of Palestine solidarity

8   protests that have emerged on college campuses across the United States, including at

9   UCLA, we note that University policies have been marshalled to systematically and

10   disproportionately harm members of the campus community who speak out against

11   this genocide.

12       Not only should the University have policies that reflect a deep commitment to

13   protecting the free speech rights of all people, but existing rules and policies, at the

14   discretion of UCLA's decision-makers should also never be wielded in ways that

15   chill the speech of the campus community as they raise the alarm on an ongoing

16   genocide. Even where there may be technical violations of specific university rules,

17   the University must not suppress the right to freedom of speech.

18       We request that this Court analyze the issues in the context of the findings made

19   by the UCLA Task Force on Anti Palestinian, Anti Muslim, and Anti Arab Racism.

20   We ask that this Court adjudicate this case in a way that prioritizes the safety, rights,

21   and dignity of the hundreds of anti-genocide students, faculty, and staff most

22   proximate to the multitude of harms inflicted by the University in suppressing

23   dissent.

24       Additionally, we request that this Court order the University of California to adopt

25   the guidance of the twenty United Nations human rights experts on the issue of free

26   speech and the right to campus protests in the United States. As declared by the UN

27   Special Rapporteurs on the right to education, assembly, and freedom of opinion,

28   amongst others, who have expressed their concerns to the US government in a

previous communication, "The banning and attacks on student protests are a grave violation of the rights to peaceful assembly and freedom of expression guaranteed by international human rights law, and must stop immediately."[33] Furthermore, as UN experts have urged, "The United States must ensure that freedom of peaceful assembly is respected, as required by Articles 19 and 21 of the International Covenant on Civil and Political Rights, ratified by the United States, and by Article 5 of the Declaration on Human Rights Defenders."[34] The harm, trauma, and damage of violating students' right to protest, militarizing a campus, and criminalizing students who seek to oppose a genocide cannot ever be fully undone.

There are, however, steps to remedy the ways in which the rights of Palestine solidarity protesters, including Jewish faculty, students, and staff, have been violated. One step forward is for this Court to order the University of California to grant blanket amnesty to all Palestine solidarity protesters. Another is for the University of California to pay all medical expenses for injuries sustained when the university failed to protect the campus from outside agitators and from the police brutality that the University unleashed on the campus community. Finally, the University should be ordered to disclose and divest all of its financial investments in corporations and stocks that profit off of the killing of the Palestinian people, the military occupation of Palestine, and the perpetuation of an unlawful apartheid regime.

DATED: August 8, 2024

By: */s/ Thomas B. Harvey*
Thomas B. Harvey
LAW OFFICES OF THOMAS B. HARVEY
By: */s/ Mark Kleiman*
Mark Kleiman
KLEIMAN/RAJARAM
Attorneys for Amici Curiae
Faculty for Justice in Palestine-UCLA

---

[33] *Id.*
[34] *Id.*