Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Reed M. Bartley (TX Bar No. 24125115)* ‡
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

Elliot Moskowitz (NY Bar No. 4039160)*
Rebecca L. Harris (NY Bar No. 5607080)*
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*,<br><br>    Defendants. | Case No.: 2:24-cv-04702<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO INDIVIDUAL DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND TO DISMISS**<br><br>Judge: Hon. Mark C. Scarsi<br>Courtroom: 7C<br>Hearing: February 24, 2025, 9:00 AM |

*Admitted *pro hac vice*. ‡Not admitted to the D.C. Bar; admitted only in Texas. Supervised by licensed D.C. Bar members.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION .............................................................................. 1

FACTUAL BACKGROUND .............................................................. 3

LEGAL STANDARD......................................................................... 6

ARGUMENT ..................................................................................... 7

   I. Defendants have not established that they are entitled
     to qualified immunity as a matter of law........................................ 7

     A. As this Court already concluded in finding their claims
       likely to succeed, Plaintiffs have adequately alleged
       numerous violations of their rights. ............................................ 8

       1. Plaintiffs repeatedly allege, this Court found,
         and Defendants concede, state action. ................................... 8

       2. Plaintiffs state free exercise claims. .................................. 11

       3. Plaintiffs state equal protection claims. ............................ 13

       4. Plaintiffs state free speech claims..................................... 15

       5. Plaintiffs state KKK Act claims. ....................................... 16

       6. Defendants have not come close to establishing
         that their actions satisfied strict scrutiny as a
         matter of law...................................................................... 16

     B. The law was clearly established. ............................................. 18

   II. The Title VI claim should not be dismissed ............................... 20

   III. Defendants are not entitled to judgment on
      the state-law claims................................................................... 22

   IV. Defendant Braziel is not entitled to judgment. ......................... 24

   V. Defendants are not entitled to judgment on Plaintiffs'
     demand for punitive damages..................................................... 25

CONCLUSION .................................................................... 26

CERTIFICATE OF COMPLIANCE.................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alden v. Maine,*
    527 U.S. 706 (1999) ................................................................. 7

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................. 6

*Bacon v. Woodward,*
    104 F.4th 744 (9th Cir. 2024) ................................................. 25

*Braunstein v. Ariz. Dep't of Trans.,*
    683 F.3d 1177 (9th Cir. 2012) ................................................. 20

*Brown v. Bd. of Educ.,*
    347 U.S. 483 (1954) ............................................................... 17

*Buchanan v. City of Bolivar,*
    99 F.3d 1352 (6th Cir. 1996) ................................................. 21

*Colorado Christian Univ. v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) ............................................. 13

*Crawford-El v. Britton,*
    523 U.S. 574 (1998) ............................................................... 18

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
    489 U.S. 189 (1989) ................................................................. 9

*Doe 1 v. City of Murrieta,*
    102 Cal. App. 4th 899 (Cal. Ct. App. 2002) .................................. 22-23

*Doe v. United States,*
    419 F.3d 1058 (9th Cir. 2005) ................................................. 6

*Dworkin v. Hustler Mag. Inc.,*
    867 F.2d 1188 (9th Cir. 1989) ................................................. 6

*Est. of Elkins v. Pelayo,*
No. 13-cv-1483, 2020 WL 2571387
(E.D. Cal. May 21, 2020) ...................................................................... 7

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
*Dist. Bd. of Educ.,*
82 F.4th 664 (9th Cir. 2023)............................................................... 12

*Flores v. Morgan Hill Unified Sch. Dist.,*
324 F.3d 1130 (9th Cir. 2003) ............................................................. 9

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ....................................................................12, 17

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) .......................................................................... 18

*AE ex rel. Hernandez v. County of Tulare,*
666 F.3d 631 (9th Cir. 2012) ............................................................. 22

*Hoggard v. Rhodes,*
141 S. Ct. 2421 (2021) ...................................................................... 19

*Holt v. Hobbs,*
574 U.S. 352 (2015) .......................................................................... 16

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa,*
5 F.4th 855 (8th Cir. 2021) ............................................................... 19

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) .......................................................................... 11

*Leite v. Crane Co.,*
749 F.3d 1117 (9th Cir. 2014) ......................................................... 6-7

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .......................................................................... 22

*Mendoza v. Inslee,*
No. 19-cv-6216, 2020 WL 1271574
(W.D. Wash. Mar. 17, 2020) ............................................................. 20

*Morris v. W. Hayden Ests. First Addition Homeowners Ass'n*,
   104 F.4th 1128 (9th Cir. 2024) .......................................................... 25

*Mountain W. Holding Co. v. Montana*,
   691 F. App'x 326 (9th Cir. 2017) .................................................... 20

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) ...............................................................14, 15, 17

*Orn v. City of Tacoma*,
   949 F.3d 1167 (9th Cir. 2020) ........................................................ 18

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ........................................................................14, 15

*Regents of Univ. of Cal. v. Super. Ct.*,
   29 Cal. App. 5th 890 (Cal. Ct. App. 2018) .......................................... 23

*Rios-Diaz v. Butler*,
   No. 13-cv-77, 2014 WL 12591836 (D. Mont. July 25, 2014) ............. 21

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ........................................................................14, 17

*San Jose Charter of Hells Angels Motorcycle Club v.
City of San Jose*,
   402 F.3d 962 (9th Cir. 2005) ........................................................ 19

*Shooter v. Arizona*,
   4 F.4th 955 (9th Cir. 2021)........................................................... 13

*Shotz v. City of Plantation*,
   344 F.3d 1161 (11th Cir. 2003) ........................................................ 21

*Shrum v. City of Coweta*,
   449 F.3d 1132 (10th Cir. 2006) ........................................................ 11

*Singh v. Berger*,
   56 F.4th 88 (D.C. Cir. 2022)........................................................... 16

*Smith v. Metro. Sch. Dist. Perry Twp.*,
   128 F.3d 1014 (7th Cir. 1997) ........................................................ 21

*Tandon v. Newsom*,
   593 U.S. 61 (2021) ....................................................................12, 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   582 U.S. 449 (2017) ....................................................................10, 17

*Ward v. City of San Jose*,
   967 F.2d 280 (9th Cir. 1991) ............................................... 25

**Statutes**

42 U.S.C. §1985.................................................................... 15

42 U.S.C. §1986.................................................................... 15

42 U.S.C. §2000d.................................................................. 20

Cal. Educ. Code §220 .......................................................... 22

Cal. Educ. Code §66270 ....................................................... 22

Cal. Gov't Code §820.2.........................................................22, 23

**Other Authorities**

Fed. R. Civ. P. 25 ................................................................. 6

*Antisemitism & Anti-Israel Bias at UCLA*, The Task Force to
   Combat Antisemitism and Anti-Israeli Bias at UCLA
   (Oct. 16, 2024) ....................................................................8, 17

*Independent Investigation & After-Action Review of
   Encampment-Related Events at the University of
   California, Los Angeles, April 2024 through May 6, 2024:
   Recommendations,* 21st Century Policing Solutions
   (Nov. 2024)........................................................................ 8

Letter from Anamaria Loya, Chief Regional Attorney
   for Dep't of Educ., to President Michael Drake,
   UCLA President (Dec. 20, 2024) ......................................... 8

*Nondiscrimination*, UCLA Catalog 2024-25 ............................ 1

*Republican Staff Report: Antisemitism on College Campuses Exposed,* Committee on Education & the Workforce (Oct. 31, 2024) .......................................................... 8

U.S. Dep't of Just., *Title VI Legal Manual* Pt. IX.A............................... 22

*U.S. House of Representatives Staff Report on Antisemitism,* U.S. House of Representatives (Dec. 18, 2024) .................................... 8

**INTRODUCTION**

When Plaintiffs joined the UCLA community, they were promised that the school would not discriminate against them "on the basis of race, color, national origin, [or] religion."[1] That is not just a commitment the school chose to make out of a sense of morality; it is a mandate of federal and state law. Nevertheless, Plaintiffs have been forced to suffer through an environment of unimaginable hostility toward Jewish students and faculty that culminated in the establishment of an exclusionary encampment in the heart of UCLA's campus. The encampment blocked access to critical buildings and services without the inhabitants' blessing—which they would not give to Jews unless they denounced Israel. And while UCLA was well aware of this Jew Exclusion Zone, it not only refused to disrupt it for a full week, but affirmatively aided the activists' exclusionary efforts.

This Court has already found, based on Plaintiffs' well-pleaded allegations and many largely undisputed facts, that UCLA facilitated "unimaginable" and "abhorrent" mistreatment of its Jewish students, staff, and faculty. Preliminary Injunction Order ("PI.Order") at 2, Dkt.89. "Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith." *Id.* "Plaintiffs and other students were denied access to ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs." *Id.* at 10. And UCLA's role in that exclusion was not mere neglect. The school actively facilitated violent and bigoted activists at every turn, deploying campus security to build barricades to protect their encampment, First

---

[1]  *Nondiscrimination*, UCLA Catalog 2024-25, https://perma.cc/3WNX-EZHR.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
MOTION FOR JUDGMENT ON THE PLEADINGS

1

Amended Complaint ("FAC"), Dkt.101, ¶156, discourage Jews from passing through central areas of campus, *id.* ¶161, and even enforce the activists' religiously and racially discriminatory criteria, *id.* ¶163.

Having lost the preliminary-injunction battle, most of the Defendants now ask this Court to award them judgment as a matter of law on, or dismiss entirely, the same claims the Court has already found likely to succeed. But there is nothing new in their motion. Defendants pressed the same arguments in opposing Plaintiffs' motion for a preliminary injunction. Those arguments failed then, and they fare no better now. Indeed, at every turn, Defendants simply relitigate matters they lost. Where the Court found state action, they still insist there was none; where the Court found a duty to prevent discriminatory access, they still insist they may knowingly allow and facilitate it.

Defendants are wrong on the law and the facts. They misconstrue binding precedent, which plainly forbids knowingly facilitating discriminatory access to educational facilities based on race, religion, national origin, or any other protected characteristic. And while Defendants pay lip service to the rule that they must accept Plaintiffs' allegations as true, their motion proceeds to ignore or contradict them at every turn. When Defendants' rhetoric and remonstrances are set aside, one thing is clear: They have not established that they are entitled to judgment on or dismissal of any, let alone all, of Plaintiffs' claims. The Court should deny Defendants' motion.[2]

---

[2]   Per counsel's discussion with the Court at the scheduling conference, Plaintiffs expect to file a motion for partial summary judgment next month after meeting and conferring with Defendants. The Court may wish to consolidate these two motions for a single hearing.

**FACTUAL BACKGROUND**

UCLA is a nationally renowned research university administered by the Regents of the University of California that houses, teaches, and serves roughly 46,000 students from all walks of life. FAC.¶¶1, 47, 61. Of its 33,000 undergraduate students, approximately 8% are Jewish. *Id.* ¶65.

UCLA has created policies that, in its telling, are aimed at "creat[ing] and maintain[ing] a safe, supportive, and inclusive campus community" for all its students. *Id.* ¶66. Among them are rules regulating the time, place, and manner of public protests. *Id.* ¶68. For instance, protesters may not "block entrances to or otherwise interfere with the free flow of traffic into and out of campus buildings." *Id.* ¶70. Nor may they "intimidat[e], harass[], or obstruct[] any University employee, student, or any other person," or "camp or lodge, except in authorized facilities or locations." *Id.*

After the October 7, 2023 Hamas attacks in Israel, protests broke out on college campuses around the country, including UCLA. *Id.* ¶74. The first protests at UCLA featured activists chanting "slaughter the Jews" on Bruin Plaza just days after October 7. *Id.* ¶78. A month later, activists besieged the UCLA law school building, chanting "there's only one solution" (a reference to Hitler's final solution), "intifada," and "death to Jews." *Id.* ¶86.

In April 2024, following the lead of students at Columbia University, anti-Israel activists formed an encampment in Royce Quad, a heavily trafficked thoroughfare in the heart of UCLA's campus surrounded by the school's four original buildings. *Id.* ¶¶107-10. Those buildings include the main library, and Royce Quad is also a primary access route for other

administrative buildings and recreational facilities. *Id.* ¶¶109-10, 112. From within the encampment, activists chanted "this is the final solution," "intifada revolution," and "death to Jews." *Id.* ¶115.

These activists were not just shouting hateful bile. They used their encampment's central location to exercise dominion over UCLA's campus, establishing checkpoints where anyone wishing to pass through the encampment—*i.e.*, through Royce Quad—was forced to affirm the activists' beliefs. *Id.* ¶¶128-29. Specifically, they were forced to denounce Israel and call on UCLA to divest from Israeli universities and programs. *Id.* ¶¶129-32. Even then, unless one knew someone within the encampment willing to vouch for him and his fealty to the activists' anti-Israel cause, he would be turned away. *Id.* ¶130. More troubling still, people were turned away *simply for displaying outward symbols of their Jewish faith*, such as wearing a Star of David necklace. *Id.* ¶132. This Jew Exclusion Zone remained a fixture on UCLA's campus until early May 2024. *Id.* ¶191.

UCLA officers facilitated the Jew Exclusion Zone, both passively and actively. They declined to disperse the encampment when it formed even though it violated University policy multiple times over. *Id.* ¶¶152-55, 176-85, 191. Instead, they affirmatively aided the encampment in entrenching its position by installing bike racks as barriers around its borders. *Id.* ¶¶156-58. And, at University officials' direction, instead of intervening to protect the Jews who were being excluded, campus security staff aided the Jew Exclusion Zone: They denied entry to those (particularly Jews) who did not meet the activists' admissions criteria. *Id.* ¶¶137, 158-67. All the while, UCLA faculty hosted classes within the

Zone—classes they knew their Jewish students couldn't attend. *Id.* ¶¶145-46.

Even after the Royce Quad encampment was finally dispersed, others continued to form. Less than two weeks later, activists blocked access to the entry to a parking deck on campus. *Id.* ¶207. Later that month, they established an encampment on Kerckhoff Patio. *Id.* ¶214. More encampments formed in June, *id.* ¶217, and again the next semester in October, *id.* ¶232. With each recurrence (that UCLA failed to prevent), Plaintiffs became increasingly fearful for their safety, and increasingly aware that they are unwelcome at UCLA.

In June 2024, Plaintiffs filed this lawsuit, alleging that UCLA and its agents have violated their rights to free speech, free exercise, and equal protection; violated Title VI of the Civil Rights Act of 1964; violated the Ku Klux Klan Act of 1871; and violated a host of California state-law constitutional and statutory rights. *Id.* ¶¶441-567. Plaintiffs sought injunctive relief and money damages, including compensatory and punitive damages. *Id.* ¶¶568-72.

Shortly after filing suit, Plaintiffs requested a preliminary injunction to protect their rights in the interim, which this Court granted. PI.Order.15-16. In doing so, the Court found that Jews on UCLA's campus had been treated "unimaginabl[y]" and "abhorrent[ly]" during the 2023-24 academic year. *Id.* at 2. And it concluded that Plaintiffs were likely to succeed on, at a minimum, their free exercise claims, noting that Defendants operated "programs, activities, and campus areas" despite knowing that Plaintiffs and other Jews "were excluded because of their genuinely held religious beliefs." *Id.* at 11-12. Claiming the Court's order would "hamstring [its] ability" to "meet the needs of the Bruin

community," UCLA filed an appeal, which it subsequently abandoned. FAC.¶26; Dkt.91.

Plaintiffs then filed a First Amended Complaint, which, among other things, added as a plaintiff Dr. Kamran Shamsa, a cardiologist in UCLA's medical school who was blocked by campus security from accessing the encampment. FAC.¶17. All Defendants jointly filed an Answer, and all Defendants except the Regents of the University of California (the "Individual Defendants") have moved for judgment on the pleadings and to dismiss for lack of jurisdiction, *see* Motion for Judgment on the Pleadings ("Mot."), Dkt.108-1, which Plaintiffs now oppose.[3]

**LEGAL STANDARD**

A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a motion to dismiss under Rule 12(b)(6). *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Thus, "the same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog." *Id.* That is, "the court must construe the complaint in the light most favorable to the plaintiff, taking all her allegations as true and drawing all reasonable inferences from the complaint in her favor." *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). At that point, the Court must ask whether the "factual matter [in the complaint], accepted as true, … 'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A defendant challenging the Court's jurisdiction under Rule 12(h)(3) may do so through a facial or factual challenge. *See Leite v. Crane Co.*,

---

[3]   Julio Frenk became UCLA's new Chancellor on January 1, 2025, and thus is automatically substituted for the official-capacity claims against former Chancellor Gene Block. Fed. R. Civ. P. 25(d).

749 F.3d 1117, 1121 (9th Cir. 2014); *see also Est. of Elkins v. Pelayo*, No. 13-cv-1483, 2020 WL 2571387, at *1 (E.D. Cal. May 21, 2020) (Rule 12(b)(1) and 12(h)(3) apply the same standard). A facial challenge, which Defendants make here, is analogous to a motion to dismiss—the defendant "accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite*, 749 F.3d at 1121. The Court then decides, as a legal matter, whether it has jurisdiction. *Id.*

## ARGUMENT

## I. Defendants have not established that they are entitled to qualified immunity as a matter of law.

Having lost the battle over the preliminary injunction, the Individual Defendants now ask that all individual-capacity claims against them be dismissed on the ground that they are entitled to qualified immunity as a matter of law. They have not come close to making that showing.[4] Plaintiffs have alleged in detail that Defendants violated Plaintiffs' rights under the U.S. Constitution, federal statutes, the California constitution, and California statutes. And that law was no surprise; it had been clearly established for years, if not decades, when Defendants charted that unlawful course. Defendants' efforts to resist those conclusions rest largely on the premise that they did not engage in any state action—a premise that this Court has already rejected, and that

---

[4]   That said, Plaintiffs agree that the Eleventh Amendment bars seeking damages against the Individual Defendants in their official capacities (save for the Title VI claim). But, *contra* Mot.18, it doesn't bar them from seeking injunctive relief against those Defendants (or the Regents) or damages against them in their individual capacities. *Alden v. Maine*, 527 U.S. 706, 756-57 (1999).

ignores the allegations of Plaintiffs' Complaint. In short, the law was clearly established at all relevant times. Defendants simply chose not to follow it.

## A. As this Court already concluded in finding their claims likely to succeed, Plaintiffs have adequately alleged numerous violations of their rights.

### 1. Plaintiffs repeatedly allege, this Court found, and Defendants concede, state action.

This Court has already found, and Defendants have effectively conceded, that all Defendants engaged in state action: They knowingly took affirmative steps to provide access to educational services and facilities to non-Jewish students while depriving Jewish students of those same opportunities.[5]

Defendants' effort to dismiss their discriminatory conduct as mere "failures to act," Mot.19, defies both this Court's preliminary injunction

---

[5]  Even UCLA's self-appointed task force, as well as the Department of Education's Office for Civil Rights and the U.S. House of Representatives Committee on Education and the Workforce, concluded that UCLA violated its Jewish students' and faculty's rights. *See Antisemitism & Anti-Israel Bias at UCLA*, The Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA, 55 (Oct. 16, 2024), https://perma.cc/4V63-FX4G; Letter from Anamaria Loya, Chief Regional Attorney for Dep't of Educ., to President Michael Drake, UCLA President, 28, 30-31, 33 (Dec. 20, 2024), https://perma.cc/RX76-K9YM; *Republican Staff Report: Antisemitism on College Campuses Exposed,* Committee on Education & the Workforce, 24-30 (Oct. 31, 2024), https://perma.cc/92HQ-C84X; *U.S. House of Representatives Staff Report on Antisemitism,* U.S. House of Representatives, 5-6 (Dec. 18, 2024), https://perma.cc/LJJ8-F89Z; *cf. Independent Investigation & After-Action Review of Encampment-Related Events at the University of California, Los Angeles, April 2024 through May 6, 2024: Recommendations,* 21st Century Policing Solutions (Nov. 2024), https://perma.cc/PR4B-4GMK.

decision and Plaintiffs' well-pleaded allegations. As this Court correctly recognized, the Complaint does not just allege that Defendants failed to address discriminatory conduct by third parties on campus. It alleges that Defendants "*knew* that some Jewish students, including Plaintiffs, were excluded based on their genuinely held religious beliefs" on account of the encampment, yet consciously chose to aid rather than ameliorate that discriminatory exclusion by continuing to provide access and benefits to some community members that were not available to Jewish students and faculty. PI.Order.5 (emphasis added); FAC.¶¶145-46, 156-61, 179, 185. Faced with a decision whether to help the perpetrators or the victims of discrimination, Defendants chose the former. That is no mere "failure to act." It is overt discrimination. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."); *see also Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135 (9th Cir. 2003).

Defendants' insistence that *they* "did not exclude any individual 'based on their religious status,'" Mot.20, fails for the same reason: That is just an argument that the activists are the only responsible parties here. Again, that argument is contradicted both by the factual allegations in the Complaint, which the Court must accept as true, and by the conclusions this Court has already reached. *See, e.g.*, FAC.¶¶132, 137; PI.Order.11-12. Simply put, making a conscious decision to continue providing access and benefits to non-Jews while allowing Jews to be excluded from campus areas suffices to constitute the kind of affirmative act necessary for disparate-treatment liability under the First and

Fourteenth Amendments. By Defendants' logic, a school administrator that stood guard to ensure that the doors stayed open while third parties blocked members of one race from entering to attend class would face no liability. That is not the law.

And, of course, Defendants didn't stop there. As Plaintiffs allege, UCLA not only ordered its security not to intervene in the encampment, but deployed security with instructions to protect the Jew Exclusion Zone and even help enforce its discriminatory criteria. FAC.¶161. Defendants ordered campus security to erect metal barricades around the encampment, thereby helping entrench and defend it. FAC.¶156; Answer, Dkt.107, ¶156. They also ordered security to direct Jewish students and faculty away from the encampment, thereby acting as force multipliers. FAC.¶163; Answer.¶¶161, 163. While Defendants attempt to write these actions off as an effort to de-escalate, *id.*, that is both contrary to the rule that Plaintiffs' well-pleaded allegations must be accepted as true, and irrelevant to the question of whether Defendants engaged in state action. State action accompanied by even the best of intentions (which Defendants' conduct didn't demonstrate) is still state action.

### 2. Plaintiffs state free exercise claims.

Defendants attempt to avoid liability under the Free Exercise Clause by artificially cabining its reach to overt statements of hostility toward religion and to policies that are not neutral toward and generally applicable to religion. Mot.22. That effort fails several times over.

First and foremost, discrimination against religion—that is, treating people of one faith differently than people of other faiths or no faith—is subject to strict scrutiny under the Free Exercise Clause. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017).

To be sure, state action taken out of overt hostility toward religion must be "'set aside' … without further inquiry." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022). But religious discrimination can still violate the Free Exercise Clause when it is motivated by mistaken legal premises, misguided paternalism, bureaucratic inertia, or some other seemingly less egregious justification, *see, e.g.*, *id.*—which is precisely why *all* such discrimination is subject to strict scrutiny. *See also Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006) (McConnell, J.) ("[T]he Free Exercise Clause is not confined to actions based on animus.").

Thus, what matters is whether Plaintiffs have adequately alleged that Defendants treated Jewish students and faculty less favorably than other students and faculty. And as this Court recognized, Plaintiffs plainly have. PI.Order.11-12. Plaintiffs were denied access to campus when they refused to denounce Israel or wore visibly Jewish garb. FAC.¶¶129-33. But other students and faculty—i.e., those *not* clothed in Jewish religious wear and those *not* religiously motivated to support Israel—were freely allowed to traverse campus. *Id.* And Defendants chose to continue providing services to and even aiding the activists, while doing nothing to address the exclusion of Jews. That is discrimination on the basis of religion, full stop.

That also defeats Defendants' insistence that Plaintiffs haven't "allege[d] the existence of policies that are not neutral or generally applicable." Mot.23. Plaintiffs have alleged in spades that Defendants embraced and enforced a policy of providing access and benefits to some students that wasn't available to Jewish students, and even aiding the activists' exclusionary acts. Indeed, while UCLA *ostensibly* had a neutral

and generally applicable policy that should have required them to disband the encampment, FAC.¶¶69-71, Defendants chose to abandon that neutral policy in favor of protecting and aiding the activists, *id.*¶¶156, 161, 163. By declining to evenhandedly enforce UCLA's written anti-encampment policies, Defendants effectively established a new, de facto set of policies—one for Jewish students and faculty members and another for activists who discriminate against them. In doing so, they forfeited any claim to be enforcing a "neutral and generally applicable" policy and subjected their actions to strict scrutiny. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

Defendants cannot escape that conclusion by invoking the Robinson-Edley policy. Mot.22-23. To be sure, that policy provides general guidance on how University of California schools should respond to illegal but generally nonviolent protest activity. *See* FAC.¶171. But it leaves each school with broad discretion to "make informed judgments based on the context of each situation." *Id.* ¶172. Indeed, Defendants admit as much— they argue that their actions are protected by California's *discretionary*-acts immunity because they (purportedly) were following the *discretionary* Robinson-Edley policy. Mot.27. That broad discretion defeats any claim that Robinson-Edley is a neutral and generally applicable policy, regardless of whether it contains a "formal mechanism for granting exceptions." Mot.23. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc) ("[T]he mere existence of government discretion is enough to render a policy not generally applicable.").

On top of that, the Complaint alleges that Defendants did not deploy Robinson-Edley evenhandedly, as they finally shifted away from their policy of "non-intervention" only once they decided that doing so was necessary to protect the *activists*—after having chosen not to intervene for nearly a week while *Jewish* students and faculty repeatedly faced verbal and physical attacks. *See* FAC.¶¶186-88. Defendants do not even acknowledge those allegations, let alone try to square them with their arguments. That is because there is no response.

### 3. Plaintiffs state equal protection claims.

Defendants' equal protection arguments likewise misstate the law and mischaracterize the Complaint. To be sure, the Equal Protection Clause is violated only when "defendants acted with an intent or purpose to discriminate … based upon membership in a protected class." *Shooter v. Arizona*, 4 F.4th 955, 960 (9th Cir. 2021). But that does not mean, and the cases Defendants cite do not hold, that the defendants must be "motivated by animus." Mot.21. The relevant intent is the intent to treat individuals differently based on a protected characteristic, not the specific intent to do one class harm. *See Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008).

How Defendants personally feel about Jewish students, faculty, and staff—and how many toothless statements they issued generically condemning discrimination—is therefore beside the point. Mot.21. Plaintiffs have alleged that Defendants willingly participated in the exclusion of Jewish community members from large swaths of campus. *E.g.*, FAC.¶¶108-35. Under UCLA's practices, there were functionally two categories of students: mostly Jewish students who supported Israel, and were consequently denied access to campus services, and students

primarily of other faiths (or no faith) who were not. That is discrimination *simpliciter* regardless of whether it was motivated by animus against Jews.

Beyond that, Defendants just rehash their argument that they aren't responsible for the discrimination, but merely for inaction against it. Mot.22. But the Complaint alleges that Defendants affirmatively acted to support the encampment in its exclusion of Jews, including by erecting barricades, directing security to enforce the encampment's discriminatory admissions policies, ordering the UCLA PD not to intervene, and permitting class sessions and other critical university functions to be held inside the encampment's Jew Exclusion Zone and the buildings it blocked. FAC.¶¶137, 145-46, 156, 179. There is thus no need to rely on Defendants' inaction to find them liable; their affirmative acts are more than enough.

### 4. Plaintiffs state free speech claims.

Defendants' efforts to avoid Plaintiffs' free speech claims again ignore Plaintiffs' allegations. Defendants do not and cannot deny that the government violates free speech when it forces individuals to espouse an unwanted message. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 766 (2018). They also do not deny that the government may not coerce individuals into speaking a message by forcing them to choose between espousing that message and receiving a benefit, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), nor make benefits (including facilities) available on the basis of viewpoint, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 832-33 (1995). They just insist that it was the activists, not them, who violated Plaintiffs' free speech rights. Mot.24.

Once again, that is not what the Complaint says. Plaintiffs have alleged that Defendants aided the encampment in enforcement of its admissions criteria for the Jew Exclusion Zone, which included disavowing Israel; indeed, Plaintiffs allege that access to those areas of campus occupied by the activists was offered only to those who were willing to disclaim Israel's right to exist. FAC.¶¶129, 132, 163. By abetting activists in conditioning access to UCLA's grounds, facilities, and resources on willingness to publicly disavow Israel, Defendants imposed a nakedly unconstitutional condition on Plaintiffs' free speech rights. *Sindermann*, 408 U.S. at 597. They also engaged in textbook viewpoint discrimination: They ensured that students espousing certain views, but not others, would have access to UCLA's campus and programs. *NIFLA*, 585 U.S. at 766. Defendants cannot escape scrutiny of those actions by blaming the activists they chose to aid.

### 5. Plaintiffs state KKK Act claims.

Plaintiffs' Ku Klux Klan Act claims, *i.e.*, their claims under 42 U.S.C. §§1985 and 1986, likewise survive. In arguing otherwise, Defendants hang their hat on the fact that §1985 and §1986 claims are derivative of §1983 claims and rely solely on their arguments against those claims; they offer no independent basis for dismissal of the KKK Act claims. Mot.24-25. Because Plaintiffs have stated valid claims under §1983, they likewise have stated valid claims under §1985 and §1986.

### 6. Defendants have not come close to establishing that their actions satisfied strict scrutiny as a matter of law.

Defendants' half-hearted argument that their actions satisfied strict scrutiny does not begin to establish that they are entitled to judgment on the pleadings. As an initial matter, Defendants failed to plead as an

affirmative defense that they satisfied strict scrutiny, which they must do. *See Singh v. Berger*, 56 F.4th 88, 92-93 (D.C. Cir. 2022) ("'compelling interest test' is an 'affirmative defense' for which the Government bears the burden of persuasion"). For that reason alone, they are not entitled to judgment on the pleadings.

On the merits, Defendants assert that they pursued a compelling governmental interest, namely, "public safety and security." Mot.25. Even if *specific* campus safety concerns could *theoretically* constitute a compelling government interest, that interest cannot be articulated so generally; Defendants must state an interest particularized "to the person"—*i.e.*, they must show that they had an interest in specifically discriminating against *these Plaintiffs. See, e.g., Holt v. Hobbs*, 574 U.S. 352, 363 (2015). Defendants have not.

Moreover, policies adopted in pursuit of the government's goal must be "the least restrictive means of furthering that compelling governmental interest." *Id.* at 362. And the burden of proving that Defendants chose the "least restrictive means" falls on Defendants. *Id.* Yet apart from a bald assertion that "administrators' responses were at all times narrowly tailored to promote campus safety and security," Mot.25, Defendants don't even try to explain why they couldn't advance public safety without discriminating against Jewish students and faculty. PI.Order.12.

That omission is unsurprising. Defendants had a host of nondiscriminatory options to address the encampment. To start with the obvious, dispersing the illegal encampment immediately would have alleviated the public safety concern without infringing upon Plaintiffs' rights. FAC.¶191. And it would not have infringed on any rights of the

activists, who, after all, weren't entitled to be there and were violating school policy. *Id.* ¶70. Defendants' purported concerns that "a hasty disbandment" of the encampment might have violated the activists' First Amendment rights, Mot.26, are not credible given the unambiguous violations of UCLA's own time, place, and manner restrictions. FAC.¶¶68-70, 193. At the very least, Defendants could've redirected the security officers they deployed to *protect* Jewish and other students as they passed the Royce Quad encampment or instructed them to prevent activists from denying access on a discriminatory basis. But they instead instructed security officers to protect and help enforce the activists' Jew-excluding actions. *Id.* ¶163. If anyone is entitled to judgment as a matter of law on strict scrutiny, it is Plaintiffs.

**B. The law was clearly established.**

None of those principles is new, as UCLA's own Task Force to Combat Antisemitism has already concluded. *See Antisemitism and Anti-Israel Bias at UCLA*, 55, https://perma.cc/4V63-FX4G; *see also* FAC.¶¶28-34 (quoting the report). The law has been clear since at least *Brown v. Board of Education*, 347 U.S. 483 (1954), that providing discriminatory access to educational facilities on account of a protected characteristic violates equal protection. It is equally well-settled that discriminating against individuals by depriving them of access to public services based on their religious beliefs, or their failure to verbally disavow those beliefs, violates the First Amendment. *See, e.g.*, *Trinity Lutheran*, 582 U.S. at 467; *Fulton*, 593 U.S. at 542. It is also clear that the government cannot limit access to public benefits only to those who hold a specific viewpoint or who are willing to espouse the government's. *See NIFLA*, 585 U.S. at 766; *Rosenberger*, 515 U.S. at 829, 832-33. And no reasonable administrator

could claim ignorance of the rule that discriminating between religious and secular activity is unconstitutional. *See, e.g.*, *Tandon*, 593 U.S. at 63. None of this is new.

Defendants do not seriously argue otherwise. They instead resort again to assertions that they were motivated by good faith and a desire to de-escalate the situation on campus. Mot.26. Maybe the facts will ultimately bear that out (although Plaintiffs sincerely doubt it). But, at this stage, that possibility does not matter. The qualified immunity analysis is not a subjective one; "the defendant's subjective intent is simply irrelevant." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998). Whether Defendants acted in subjective good faith has no bearing on whether they are immune. All that matters is whether they were on constructive notice of what the law required. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). And even if Defendants' subjective motivations did come into play, that is a quintessential fact question, not one on which Defendants can prevail on the pleadings alone.

Defendants' real complaint seems to be that, while they knew what the law was, they were not sure exactly how to apply it in the specific situation they faced. That is a highly dubious claim. *See, e.g., Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020) (plaintiffs need not "identify prior cases that are 'directly on point,'" but merely "precedent that holds 'certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand'"). It doesn't take any special expertise to recognize that, when faced with a choice between protecting the victims of discrimination or aiding its perpetrators, the Constitution requires the government to choose the former. It is also an argument Defendants are particularly poorly

situated to make. While Defendants describe the situation they faced as "tense, uncertain, and rapidly evolving," Mot.26, Defendants are nothing like the police officers in the cases they invoke, who were forced to make potentially life-or-death decisions about "the use of force" in a split second during high-stress altercations. Defendants are university administrators and officials who had ample time to consider their options and make these decisions, all with the aid of high-powered legal counsel.

That fact alone strongly weighs against granting qualified immunity here. When a defendant can "plan ahead" (and thereby assess the legality of his conduct in advance), qualified immunity is ordinarily not appropriate. *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 978 n.17 (9th Cir. 2005). In such a context, where the defendant has a full opportunity to assess the legality of his conduct, granting immunity would not serve qualified immunity's core purpose of shielding public officials from the chilling effect of litigation over decisions made in the heat of the moment. For that reason, judges have questioned whether qualified immunity should even apply to defendants like these. *See, e.g.*, *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., statement respecting denial of certiorari); *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 867 (8th Cir. 2021).

In all events, Defendants' qualified immunity arguments turn on factual assertions they have not established—*e.g.*, how they instructed the security they deployed, why they erected barricades, what ultimately prompted them to disband the encampment. *See, e.g.*, Mot.25. Defendants are certainly free to try to disprove the allegations in the

1  Complaint—at trial. But they cannot avoid defending against Plaintiffs'

2  claims by refusing to take those allegations at face value.

3  **II. The Title VI claim should not be dismissed.**

4  Defendants' argument that the Court should dismiss the Title VI

5  claims against them (but not the Regents) is wrong as a matter of law.

6  While Title VI does not permit claims against individual defendants in

7  their *individual* capacities, it does permit claims against individual

8  defendants in their *official* capacities. *See, e.g.*, *Mendoza v. Inslee*, No. 19-

9  cv-6216, 2020 WL 1271574, at *4 (W.D. Wash. Mar. 17, 2020) (citing

10  *Braunstein v. Ariz. Dep't of Trans.*, 683 F.3d 1177, 1189 (9th Cir. 2012)).

11  Indeed, the Ninth Circuit has permitted such claims. *Mountain W.*

12  *Holding Co. v. Montana*, 691 F. App'x 326 (9th Cir. 2017). Defendants

13  cite no binding authority to support their argument that Title VI falls

14  away when it comes to individual defendants. Instead, they rely on an

15  atextual parsing of the words "program" and "activity" in Title VI, and a

16  hodgepodge of district court and out-of-circuit cases. Mot.28-29. Neither

17  avails.

18  As for the former, Defendants insist that Title VI doesn't cover

19  individuals because it prohibits only "discrimination by 'program[s]' and

20  'activiti[es].'" Mot.28. That is not what the statute says—and for good

21  reason, as it would make little sense to speak of discrimination "by" a

22  program or activity. What the statute *actually* says is: "No person in the

23  United States shall, on the ground of race, color, or national origin, be

24  excluded from participation in, be denied the benefits of, or be subjected

25  to discrimination under any program or activity receiving Federal

26  financial assistance." 42 U.S.C. §2000d. The statute thus sensibly

27  assumes that someone is doing the excluding, denying, or discriminating,

28

not that the inanimate program or activity is doing it of its own volition. To be sure, whoever is acting must be acting in an official capacity. But nothing in the statute indicates that a claim can lie only against the institution, rather than against the individual(s) charged with administering the program or activity. If anything, the statute's passive wording strongly indicates that it does *not* have to be the entity, but can be anyone who administers the program or activity.

Defendants cite *Shotz v. City of Plantation*, 344 F.3d 1161 (11th Cir. 2003), for the proposition that individual defendants may not be sued under Title VI. But *Shotz* involved a suit against individuals in their private capacity, so it did not address official-capacity claims. *Id.* at 1165. As the Seventh Circuit has recognized, individual defendants may be sued in their official capacity when they exercise sufficient control over the program or entity receiving federal funds. *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1020 (7th Cir. 1997); *see also Rios-Diaz v. Butler*, No. 13-cv-77, 2014 WL 12591836, at *2-3 (D. Mont. July 25, 2014).[6]

*Buchanan v. City of Bolivar*, 99 F.3d 1352 (6th Cir. 1996), doesn't help Defendants either. That case's brief, unreasoned treatment of the issue was dicta, as it directly followed a paragraph in which the court found that the plaintiffs had failed to adequately allege any program or activity receiving federal funds in the first place. *Id.* at 1356. This Court should not reject Plaintiffs' well-pleaded claims based on a paragraph of dicta from an out-of-circuit case that cited no supporting precedent—especially

---

[6]   The district court opinions Defendants cite (Mot.28-29) likewise did not grapple with the individual-capacity/official-capacity distinction recognized in *Smith*.

when that dicta contradicts the reasoned position of the Department of Justice in its Title VI Legal Manual, which says that Title VI provides a private right of action to sue individual defendants in their official capacity. *See* U.S. Dep't of Just., *Title VI Legal Manual* Pt. IX.A, https://perma.cc/J4MX-8VSZ ("The private right of action under [Title VI] for intentional discrimination cannot be brought against individuals except in their official capacity."). Although that guidance is not binding, the Department's extensive experience with Title VI claims makes its studied position on this issue persuasive. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

## III. Defendants are not entitled to judgment on the state-law claims.

Defendants argue that the California-law claims are all barred by state-law discretionary-acts immunity. Mot.27.[7] But it is "odd indeed" to claim that a complaint alone "establish[es] a basis for finding discretionary act immunity." *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 640 (9th Cir. 2012). And this Complaint plainly does not.

The state-law immunity Defendants invoke—Cal. Gov't Code §820.2—shields state actors from liability for an "act or omission" that is "the result of the exercise of the discretion vested" in them. *Id.* The goal of §820.2 immunity is to protect state officers when they make "'those basic

---

[7]  UCLA correctly notes that Cal. Educ. Code §220 applies only to primary and secondary schools. This citation in Plaintiffs' Complaint was a scrivener's error. Plaintiffs intended to cite Cal. Educ. Code §66270, which is substantively identical but governs postsecondary educational institutions. The Court should construe Plaintiffs' §220 claim as arising under §66270 instead. Because the provisions are substantively identical, doing so does not require amending the Complaint.

policy decisions [which have] … been [expressly] committed to coordinate branches of government,' and as to which judicial interference would thus be 'unseemly.'" *Doe 1 v. City of Murrieta*, 102 Cal. App. 4th 899, 911 (Cal. Ct. App. 2002). Section 820.2 immunity isn't available, however, when a state official violates a pre-existing policy. *Id.* That is for an obvious reason. Section 820.2 protects state officers when they act *within the discretion they have been given*. Cal. Gov't Code §820.2. But when an officer violates an existing policy, he necessarily exceeds his lawful discretion. Moreover, while establishing a policy in the first place may be entitled to immunity, the operational decisions involved in *implementing* the policy are not. *Regents of Univ. of Cal. v. Super. Ct.*, 29 Cal. App. 5th 890, 894 (Cal. Ct. App. 2018).

Plaintiffs' allegations do not establish that Defendants are entitled to immunity as a matter of law. If anything, they demonstrate the opposite. The Complaint alleges that Defendants wildly exceeded their lawful discretion when they acted under *de facto* policies that violated Jewish students' rights numerous times over. Moreover, Defendants flatly contradicted established UCLA policy by allowing an encampment to be established and maintained on UCLA grounds, despite UCLA's express policy prohibiting such encampments. *See* FAC.¶70. And Defendants allowed and aided the activists, while doing virtually nothing to protect their victims. To be sure, Defendants may dispute those allegations. But that is no basis for granting them judgment as a matter of law.

Defendants alternatively invoke a state-law immunity for claims of failure to provide sufficient police protection. Mot.27-28. But Plaintiffs' state-law claims do not boil down to a gripe that UCLA failed to provide police protection. Instead, Plaintiffs allege that Defendants took a host of

affirmative acts in support of the Jew Exclusion Zone—including instructions given to the campus security that Defendants *did* deploy— acts that enabled and encouraged the Zone's conduct. The crux of the Complaint is that Defendants decided to aid the encampment—a decision that violated both federal and state law several times over.[8]

## IV. Defendant Braziel is not entitled to judgment.

Defendants seek judgment for Associate Vice Chancellor Braziel on all claims on the ground that he was not a UCLA employee when the Royce Quad encampment was active. Mot.29. While Plaintiffs agree that they cannot seek damages against Braziel relating to the Royce Quad encampment, Plaintiffs have also sought prospective injunctive relief, and Braziel is now in charge of campus safety. The UCLA Police Department "reports [to] … and takes direction" from him. FAC.¶216. He is therefore a proper defendant for all of Plaintiffs' injunctive-relief claims, because he is the individual in charge of seeing through any public-safety initiatives on UCLA's campus. Indeed, it would be nonsensical to direct a claim for injunctive relief against the individual who held Braziel's job a year ago, and who no longer has any power to affect the situation on campus. Moreover, Plaintiffs have alleged that further encampments have been erected even after the dispersal of the Royce Quad encampment. FAC.¶¶204-10, 214-17. Braziel thus is not entitled to judgment as a matter of law on any of Plaintiffs' claims.

---

[8]  Defendants cursorily argue that Plaintiffs haven't adequately pleaded their state-law claims. But they concede that the allegations supporting those claims are "substantially the same" as the allegations supporting the federal-law claims, Mot.28, so Plaintiffs have adequately pleaded their state-law claims for the same reasons as their federal-law claims.

## V. Defendants are not entitled to judgment on Plaintiffs' demand for punitive damages.

Plaintiffs are entitled to pursue punitive damages. Plaintiffs brought their claims under §1983, and "[p]unitive damages are proper under section 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Ward v. City of San Jose*, 967 F.2d 280, 286 (9th Cir. 1991).

The Complaint alleges that Defendants acted with "reckless or callous indifference" toward Plaintiffs' federally protected rights. *Id.* Indeed, it alleges that Defendants actively facilitated the encampment activists' unlawful discrimination against Plaintiffs. And this Court implicitly agreed that the allegations meet the high bar for punitive damages: Relying on those allegations, it described Plaintiffs' mistreatment as "unimaginable and so abhorrent." PI.Order.2. Certainly abetting abhorrent mistreatment at least opens the door to punitive damages.

Defendants cite no case supporting their argument that punitive damages are available only for "claims for excessive force, unlawful arrest, or police brutality," Mot.30—because there is none. It is commonplace for courts to award punitive damages in religious-discrimination cases when the defendant's conduct was especially egregious. *E.g.*, *Bacon v. Woodward*, 104 F.4th 744, 749-50 (9th Cir. 2024) (§1983 Free Exercise claim); *Morris v. W. Hayden Ests. First Addition Homeowners Ass'n*, 104 F.4th 1128, 1135 (9th Cir. 2024) (Fair Housing Act religious-discrimination claim). And Defendants' actions to date have done nothing to undermine the conclusion that punitive damages and their deterrent effect may well be warranted here. To the contrary, even now, Defendants continue to brush off their conduct and downplay their

involvement. And to the extent they have made changes, they did so only after this Court entered an injunction. That was no voluntary remedial action. *Contra* Mot.31. It was the product of compulsion, and the fear of still more liability in the future. Under these circumstances, Defendants have certainly not demonstrated as a matter of law that Plaintiffs could not establish that punitive damages are necessary and appropriate to ensure that neither UCLA nor any other university discriminates against its Jewish students in the future.

## CONCLUSION

This Court should deny Defendants' motion.

Dated: January 13, 2025

              Respectfully submitted,

              */s/ Eric C. Rassbach*
              Eric C. Rassbach (CA SBN 288041)
              Mark L. Rienzi (DC Bar No. 494336)*
              Daniel L. Chen (CA SBN 312576)
              Laura Wolk Slavis (DC Bar No. 1643193)*
              Jordan T. Varberg (DC Bar No. 90022889)*
              Amanda G. Dixon (DC Bar No. 90021498)*
              Reed M. Bartley (TX Bar No. 24125115)* ‡
              The Becket Fund for Religious Liberty
              1919 Pennsylvania Ave. NW, Suite 400
              Washington, DC 20006
              202-955-0095 tel. / 202-955-0090 fax
              erassbach@becketlaw.org

              Paul D. Clement (DC Bar No. 433215)*
              Erin E. Murphy (DC Bar No. 995953)*
              Matthew D. Rowen (CA SBN 292292)
              Clement & Murphy, PLLC
              706 Duke Street
              Alexandria, VA 22314

              Elliot Moskowitz (NY Bar No. 4039160)*
              Rebecca L. Harris (NY Bar No. 5607080)*
              Davis Polk & Wardwell LLP
              450 Lexington Avenue
              New York, NY 10017

              *Attorneys for Plaintiffs*

              * Admitted *pro hac vice*.

              ‡ Not admitted to the D.C. Bar; admitted only in Texas.
                Supervised by licensed D.C. Bar members.

## CERTIFICATE OF COMPLIANCE

Undersigned counsel of record for Plaintiffs certifies that this brief contains 6,975 words, which complies with this Court's word limit for memoranda of points and authorities.

Dated: January 13, 2025

_/s/ Eric C. Rassbach_
Eric C. Rassbach
_Counsel for Plaintiffs_