Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Reed M. Bartley (TX Bar No. 24125115)* ‡
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketfund.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

Elliot Moskowitz (NY Bar No. 4039160)*
Rebecca L. Harris (NY Bar No. 5607080)*
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*, | Case No.: 2:24-cv-04702 |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION** |
| v. | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*, | |
| Defendants. | Judge: Hon. Mark C. Scarsi |
| | Hearing: May 12, 2025, 9:00 a.m. |
| | Courtroom: 7C |

*Admitted *pro hac vice*. ‡Not admitted to the D.C. Bar; admitted only in Texas. Supervised by licensed D.C. Bar members.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ................................................................. 1

FACTUAL BACKGROUND ................................................................. 3

  A. UCLA and its Policies ................................................................. 3

  B. Antisemitism at UCLA after the October 7 attack ......................... 4

  C. Antisemitic lawlessness continues after the encampment's end. ................................................................. 8

  D. Plaintiffs' religious beliefs do not allow condemning Israel ................................................................. 11

  E. This lawsuit ................................................................. 11

LEGAL STANDARD ................................................................. 12

ARGUMENT ................................................................. 13

  I. The undisputed facts show that Defendants violated the Free Exercise Clause. ................................................................. 13

    A. The undisputed facts demonstrate that Defendants facilitated status-based religious discrimination (Count III). ................................................................. 15

    B. The undisputed facts demonstrate that Defendants' policies and practices treated Plaintiffs' religious exercise worse than comparable secular activities (Count IV). ............. 17

    C. The undisputed facts demonstrate that Defendants possess wide discretion, which they used to discriminate against Plaintiffs' religious exercise (Count V). ......................... 18

    D. Defendants' policies fail strict scrutiny ................................. 20

  II. Injunctive relief is needed. ................................................................. 23

1

CONCLUSION .................................................................................... 24

CERTIFICATE OF COMPLIANCE .................................................... 26

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amoco Prod. Co. v. Gambell,*
    480 U.S. 531 (1987) ...............................................................13

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...............................................................13

*Bacon v. Woodward,*
    104 F.4th 744 (9th Cir. 2024).......................................18, 22

*Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023)....................................... 23-24

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993) ...............................................................17

*Carson v. Makin,*
    596 U.S. 767 (2022) ..............................................14, 15, 17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ....................................................... 20-21

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ...............................................................14

*Cuviello v. City of Vallejo,*
    944 F.3d 816 (9th Cir. 2019) ...............................................23

*Edmo v. Corizon, Inc.,*
    935 F.3d 757 (9th Cir. 2019) ...............................................13

*Espinoza v. Montana Dep't of Revenue,*
    591 U.S. 464 (2020) ...............................................................15

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
    *Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023).....................................*passim*

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
   654 F.3d 989 (9th Cir. 2011) ....................................................................13

*Fowler v. Rhode Island*,
   345 U.S. 67 (1953) ..................................................................................15

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021) .......................................................14, 18, 19, 21

*Gartenberg v. Cooper Union*,
   No. 24-cv-2669, 2025 WL 401109 (S.D.N.Y. Feb. 5, 2025) .................16

*Holt v. Hobbs*,
   574 U.S. 352 (2015) ................................................................................21

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ................................................................................20

*Larson v. Valente*,
   456 U.S. 228 (1982) ................................................................................15

*Loffman v. California Dep't of Educ.*,
   119 F.4th 1147 (9th Cir. 2024)................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................13

*McDaniel v. Paty*,
   435 U.S. 618 (1978) ................................................................................20

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ..................................................................23

*Nelson v. Nat'l Aeronautics & Space Admin.*,
   530 F.3d 865 (9th Cir. 2008) ..................................................................23

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................23

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ................................................................24

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ......................................................................15, 17

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ..............................................................14, 17, 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) .......................................................14, 15, 17, 20

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) .................................................................23

**Other Authorities**

Fed. R. Civ. P. 25.................................................................................12

Fed. R. Civ. P. 56.................................................................................13

L.R. 11-5.2 ...............................................................................................1

## INTRODUCTION

In August, this Court issued a preliminary injunction holding that the blatant discrimination against Jews on UCLA's campus—something "UCLA d[id] not dispute"—was "so abhorrent" and "so unimaginable" that it warranted immediate relief under the Free Exercise Clause. Preliminary Injunction Order, Dkt.89 at 2. At a time when Jews around the country were under attack, this Court stepped in to vindicate the constitutional rights of a discrete and persecuted religious minority. And it did so on the basis of a "materially undisputed" factual record. Dkt.89 at 3.

In the six months since, this case has only gotten easier. Over the summer, UCLA did not dispute that "Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith," Dkt.89 at 2, and conceded that students were "physically blocked from accessing parts of the campus," "put[ting] many on our campus, especially our Jewish students, in a state of anxiety and fear," Statement of Uncontroverted Facts ("SUF") ¶81. Since then, UCLA has admitted even more facts that amply show its liability for discrimination.

Start with the report issued by UCLA's own Task Force to Combat Antisemitism and Anti-Israeli Bias, which found (among many other things) that UCLA facilitated the rise of antisemitic checkpoints in which "students" who "w[ore] a Star of David or a kippah" or "refus[ed] to denounce" Israel "were physically blocked." 3d Rassbach Decl. Ex. 1 at 61-62[1]; *see also* SUF ¶45. Or take the November 2024 findings of UCLA's

---

[1]    Each pincite to an exhibit in this memorandum is to the page number added to the bottom of each page of the exhibit pursuant to L.R. 11-5.2, and not (as applicable) to the document's original page number.

independent investigator, 21st Century Policing Solutions, which concluded that UCLA had "instructed" the campus police "to remain wholly unseen by protesters" and had accommodated "[e]ncampment members" who "made clear throughout the encampment period they did not want to engage with police or to see police in or around the encampment." 3d Rassbach Decl. Ex. 2 at 112; *see also* SUF ¶¶73-74.

UCLA admits many of the critical facts in its filings in this Court. UCLA concedes that "since October 7, 2023, disturbing antisemitic language was used and imagery was present at protests that occurred on UCLA's campus," including during "the encampment at Royce Quad." Dkt.107 ¶¶75, 117 ("Answer"). UCLA admits that the activists "limited access to the encampment"—in violation of UCLA policies that purported "not" to "allow unauthorized protestors to exercise exclusive control over campus facilities or spaces." *Id.* ¶¶71, 128. Yet UCLA responded not by shutting down the encampment, but by "barricading" it through "ha[ving] metal bike racks installed around the encampment," "station[ing]" private "security staff" "near the encampment," and "instruct[ing]" them "to prevent anyone from accessing 'neutral zones'" near "the encampment." Dkt.123 at 7 (Defendants' Reply ISO Mot. for Judgment on the Pleadings); Answer ¶¶11-12.

This all comes from UCLA's own mouth. And although the university continues to claim that it is not to blame for the discrimination it has let run rampant on its campus, its objections have become more half-hearted. It dropped its ill-advised appeal of this Court's preliminary injunction, Dkt.95, entered into an agreement with the United States Department of Education Office for Civil Rights to remediate its

behavior, 3d Rassbach Decl. Exs. 5-6, and issued public reports that found that UCLA was at fault for failing to protect its students' and faculty members' constitutional rights, 3d Rassbach Decl. Exs. 1-2. Indeed, UCLA's main report and investigation condemned its own behavior as "de facto or structural antisemitism" and "fail[ing] in its legal obligation to protect First Amendment rights to the free exercise of religion." SUF ¶¶49-50.

Given these undisputed facts, summary judgment is appropriate on Plaintiffs' free exercise claims. This Court's preliminary injunction forbids UCLA "from offering any ordinarily available programs, activities, or campus areas to students if Defendants know" that they "are not fully and equally accessible to Jewish students." Dkt.89 at 15. That injunction should now be made permanent by granting partial summary judgment on Counts III, IV, and V of the First Amended Complaint.

## FACTUAL BACKGROUND

### A. UCLA and its Policies

UCLA houses, teaches, and serves roughly 46,000 students, including a large Jewish population. SUF ¶¶15, 18. The school's policies aim to "create and maintain a safe, supportive, and inclusive campus community" for all. SUF ¶19. Among them are rules, in place at UCLA for many years, regulating the time, place, and manner of public protests. SUF ¶¶20-23. For instance, protesters may not "block entrances to or otherwise interfere with the free flow of traffic into and out of campus buildings." SUF ¶22. Nor may they "intimidat[e], harass[], or obstruct[] any University employee, student, or any other person," or "camp or

lodge, except in authorized facilities or locations." SUF ¶22.[2] UCLA's ostensible goal is to protect students and faculty from discrimination and harassment. SUF ¶25.

### B. Antisemitism at UCLA after the October 7 attack

When antisemitism burst forth on UCLA's campus after the October 7 attack, UCLA failed utterly to meet its claimed goals of protecting students and faculty from discrimination. SUF ¶¶26-107. Over the months that followed, antisemitic demonstrations became routine on campus, including chants of "kill the Jews," "from the river to the sea, Palestine will be free," and "Intifada." SUF ¶¶26-28. In one especially egregious demonstration, activists chanted "beat that fucking Jew" while bashing an effigy of Israeli Prime Minister Benjamin Netanyahu. SUF ¶32.

Swastikas dotted UCLA's campus, intimidating and terrorizing Jewish students and faculty. SUF ¶29. Activists chalked Stars of David onto UCLA's sidewalks alongside directions to "Step Here." SUF ¶31. In one incident, an individual placed on campus a disturbing antisemitic statue, which depicted a large pig holding a bag of money and a birdcage with a keffiyeh, alongside a bucket painted with a star of David. SUF ¶30.

All of that was only the beginning. As anti-Israel encampments began cropping up around the country in April 2024, UCLA quickly—and unsurprisingly—followed suit. SUF ¶¶33-34. On April 25, 2024, a group of activists "established" what then-Chancellor Block described as "an

---

[2]  UCLA updated these policies in September 2024. SUF ¶23. The new policies contain similar restrictions. SUF ¶23.

unauthorized physical encampment on part of Royce Quad," SUF ¶34, a key thoroughfare used by students to traverse campus and gather socially and directly adjacent to critical educational buildings, including Powell Library and Royce Hall, SUF ¶¶35-38.

To maintain the encampment, activists established a perimeter with plywood and metal barriers. SUF ¶42. Inside the encampment, antisemitic demonstrations were frequent, with activists chanting antisemitic slogans and displaying antisemitic imagery on signs and graffiti. SUF ¶¶40-41. Violence was also commonplace. SUF ¶¶43, 78-79.

Exclusion was the point all along. In particular, activists established checkpoints, creating what was effectively a Jew Exclusion Zone, where they used human phalanxes to block persons from entering Royce Quad and critical campus facilities if they refused to denounce Israel or wore visibly Jewish garb, such as a Star of David or a kippah. SUF ¶¶44-46. As UCLA's Task Force to Combat Antisemitism concluded, these actions "denied Jews and others free passage and access to campus classrooms and facilities" and "resulted in Jews and others who would not renounce the State of Israel being hindered in their efforts to freely and fully avail themselves of campus offerings." SUF ¶46. And "after social media posts about Jewish students being excluded from portions of campus went viral, administrators were inundated with complaints … about why the University was allowing it to continue." SUF ¶47.

"From the beginning," it was "obvious to many campus leaders that the encampment … presented a clear and present danger to Jewish students." SUF ¶57. Yet rather than dismantle it, UCLA took several actions that supported it. The same day it arose, UCLA "barricad[ed the]

campus encampment" by directing the installation of metal bike racks around it, installing more two days later. Dkt.123 at 7; *see* SUF ¶¶42, 59. It hired "CSC security teams," which it placed on the outskirts of the encampment along with other "campus security." SUF ¶¶63, 68. UCLA directed these security staff "to prevent anyone from accessing" so-called "neutral zones" located to the immediate east and west of the location of the encampment on Royce Quad. SUF ¶¶69-70. UCLA also deployed "student affairs representatives" to inform people "about the encampment, redirect them if desired[,] and to serve as a resource for their needs." SUF ¶67. Although Defendants' security staff purported to prevent anyone from getting through the neutral zones, SUF ¶¶69-70, the encampment grew significantly throughout the week of its existence. SUF ¶39. Faculty held classes from within the encampment and, as UCLA's Task Force described it, they "participat[ed] in the encampment activities including denial of campus access to Jews and those supporting Israel." SUF ¶¶52-53. UCLA even turned off the sprinklers on Royce Quad so the activists could stay dry. SUF ¶60.

Despite acknowledging that the encampment was "unauthorized," SUF ¶¶34, 81, UCLA directed the UCLA PD not to intervene, overruling the UCLA PD Chief's "advi[ce]" "from the beginning" that UCLA should not "allow the encampment" to stand. SUF ¶¶71, 102. UCLA accommodated "[e]ncampment members" who "did not want to engage with police or to see police in or around the encampment." SUF ¶73. Indeed, UCLA repeatedly informed students that "University of California systemwide policy guidance"—i.e., a report commonly referred to as the Robinson-Edley report—requires the school "not to request law

enforcement involvement preemptively," but "only if absolutely necessary to protect the physical safety of our campus community." SUF ¶¶76-77.

As the week wore on, the encampment remained—even after UCLA knew that it had blocked Jewish students and faculty from accessing key parts of campus and had led to violence. SUF ¶¶44-49, 81, 104. Physical altercations broke out, including one incident where the "child of a Holocaust survivor" was "pepper sprayed by encampment participants" and "a Jewish student" was "thrown to the ground by members of the encampment and repeatedly kicked in the head." SUF ¶¶78-79. By April 30, Chancellor Block was forced to acknowledge that the "unauthorized physical encampment" had led to "shocking and shameful" "tactics," including "instances of violence completely at odds with our values" and "students on their way to class [being] physically blocked from accessing parts of the campus." SUF ¶81. "These incidents," Block stressed, "put many on our campus, especially our Jewish students, in a state of anxiety and fear." SUF ¶81. Campus-wide alerts sent out by UCLA reiterated that the encampment was impeding access to Royce Quad. SUF ¶¶82-85. But instead of announcing plans to remove that impediment, UCLA promised only to "continue to ensure people on campus know about the demonstration so they can avoid the area if they wish." SUF ¶85.

Predictably, a violent confrontation eventually arose between the encampment activists and counter-protesters. SUF ¶90. At that point— on April 30—UCLA finally allowed UCLA PD and LAPD to intervene. SUF ¶91. But the police merely worked to end the confrontation, while UCLA again allowed the encampment to otherwise remain in place. SUF

¶92. In response to the conflict, Chancellor Block sent a campus-wide email condemning not the encampment and the exclusion it bred, but rather the "attack [on] the encampment that has been established … to advocate for Palestinian rights." SUF ¶93. While Block promised "a thorough investigation" into "the attack [on] the encampment," he promised no similar investigation into the encampment's exclusionary tactics. SUF ¶93. Instead, UCLA continued to facilitate the encampment, announcing that classes would be canceled on May 1 and held remotely on May 2 and 3. SUF ¶¶95-97.

It was only early on the morning of May 2, 2024, that UCLA finally "made the decision to direct UCPD and outside law enforcement officers to enter and clear" the encampment. SUF ¶98. In another message to the campus explaining this decision, Chancellor Block acknowledged that "the encampment on Royce Quad was both unlawful and a breach of policy," which his administration had "allowed" "to remain in place," resulting in "[d]emonstrators directly interfer[ing] with instruction by blocking students' pathways to classrooms." SUF ¶99. All told, the encampment obstructed access to UCLA's campus for a week before it was finally dismantled. SUF ¶¶34, 98. But despite the administration's acknowledgment that the encampment violated university policies, SUF ¶99, "[n]o UCLA students were disciplined for blocking Jewish students from accessing public areas of UCLA's campus during the encampment," SUF ¶107.

## C. Antisemitic lawlessness continues after the encampment's end.

The initial encampment was only the beginning of the activists' resolve. Since its demise, anti-Israel activists have repeatedly disrupted

campus, occupied facilities, and installed new encampments. SUF ¶¶108-31 (describing several instances).

On May 6, 2024, less than a week after the end of the initial encampment, a large group of activists unlawfully occupied Moore Hall in the early morning. SUF ¶110. After being told to leave eight different times, the activists finally marched to and entered Dodd Hall, where they created a disturbance and interrupted midterm exams. SUF ¶¶111-12. In response to these disturbances, UCLA required classes to be held remotely from May 6 to May 10, 2024. SUF ¶114.

A couple of weeks later, on May 23, the activists established a new encampment on Kerckhoff Patio, where they "erect[ed] barricades," "establish[ed] fortifications," and "block[ed] access to the area and nearby buildings" and "disrupt[ed] regular campus operations." SUF ¶116. After being told to "disperse," the activists relocated to another building, again "barricad[ing] access" and "committ[ing] acts of vandalism." SUF ¶117. Only after all this, and another request to "disperse," did law enforcement move in. SUF ¶118.

Just over two weeks later, on June 10, activists set up "unlawful encampments" at "three locations": first near the Janss Steps, where they "restricted access to the general public" and "disrupted nearby final exams"; then on the Kerckhoff Patio, where they again "restricted access" and "disrupted nearby final exams"; and finally in "the courtyard between Dodd Hall and the School of Law," where they once more "restricted access to the general public" and "disrupted nearby final exams." SUF ¶¶119-23. UCLA acknowledged that students were "block[ed]" from "access[ing] parts of campus," including some who

"miss[ed] finals" and others who were "evacuated in the middle of" their exams. SUF ¶124.

Chaos has continued in the 2024-2025 school year. SUF ¶¶126-31. Indeed, Defendants themselves have been affected by the chaotic conditions they have facilitated—on September 19, 2024, activists disrupted a meeting of the Defendant Regents of the University of California. SUF ¶127. Shortly thereafter, on the anniversary of Hamas's terrorist attacks in Israel, UCLA's Cultural Affairs Commission, which is part of the university and funded by mandatory student fees, "posted a series of images and statements" depicting hateful symbols that "celebrate[d] overt violence against Israeli civilians." SUF ¶128. The same day, UCLA's chapter of "Students for Justice in Palestine[]" organized and held a demonstration in North Di[cks]on Court" commemorating the terrorist attacks, all "in violation of campus time, place, and manner restrictions[] and other campus and University rules." SUF ¶129.

The ongoing unrest has also resulted in yet more encampments and blockades in recent months. On October 21, 2024, another "unauthorized demonstration" afflicted UCLA's campus when activists set up "unauthorized structures" in Dickson Court North; they finally dispersed after orders from the police. SUF ¶130. Not a month later, a large crowd of activists "block[ed] pedestrian access on Bruin Walk," "the main pedestrian thoroughfare on campus," by "form[ing] a human chain" with their "arms" "link[ed] … together." SUF ¶131. Law enforcement eventually cleared this blockade. SUF ¶131.

**D. Plaintiffs' religious beliefs do not allow condemning Israel.**

Plaintiffs are three Jewish UCLA students and one professor. SUF ¶¶132-49. Like "a large majority of Jews," each Plaintiff's faith prevents him or her from denouncing Israel. SUF ¶¶134-35, 138, 141-42, 148-49. Law student Yitzchok Frankel seeks to follow Jewish law, which prohibits speaking ill of or defaming the land of Israel, and so he believes, as a matter of his religious faith, that he must support Israel. SUF ¶¶134-35. So too, junior Joshua Ghayoum believes that support for Israel is his religious obligation, and thus he cannot in good conscience forswear Israel and its right to exist. SUF ¶138. Similarly, for law student Eden Shemuelian, Judaism is synonymous with supporting Israel, and being a faithful Jew means supporting Israel's right to exist, so she cannot disavow her beliefs about Israel. SUF ¶141. And finally, for Associate Clinical Professor Kamran Shamsa, his Jewish faith requires that he support Israel as a homeland for Jews, and he cannot forswear Israel. SUF ¶147.

**E. This lawsuit**

In June 2024, Plaintiffs Frankel, Ghayoum, and Shemuelian filed this lawsuit, alleging that UCLA and its agents have violated their rights to free speech, free exercise, and equal protection; Title VI of the Civil Rights Act of 1964; the Ku Klux Klan Act of 1871; and a host of California state-law constitutional and statutory rights. Dkt.1 ¶¶320-430 (original complaint); *see also* Dkt.101 ¶¶441-567 (First Amended Complaint).

Shortly after filing suit, Plaintiffs requested a preliminary injunction to protect their rights during the pendency of this lawsuit. Dkt.48. Defendants defended against the request on the ground that UCLA was

not responsible for the illegal encampment and the unlawful conduct directed at Jewish students and faculty. Dkt.62.

This Court disagreed and granted a preliminary injunction. Dkt.89 at 15-16. In doing so, the Court found that Jews on UCLA's campus had been treated "unimaginabl[y]" and "abhorrent[ly]" during the 2023-24 academic year. *Id.* at 2. And it concluded that Plaintiffs were likely to succeed on, at a minimum, their free exercise claims, noting that Defendants operated "programs, activities, and campus areas" despite knowing that Plaintiffs and other Jews "were excluded because of their genuinely held religious beliefs." *Id.* at 11-12.

Plaintiffs then filed a First Amended Complaint, which added as a plaintiff Dr. Kamran Shamsa, a cardiologist in UCLA's medical school. Dkt.101 ¶46; SUF ¶144. All Defendants jointly filed an Answer, Dkt.107, and all Defendants (except the Regents) moved for judgment on the pleadings, Dkt.108-1. Plaintiffs now move for partial summary judgment and a permanent injunction on their free exercise claims in Counts III, IV, and V.[3]

## LEGAL STANDARD

Summary judgment is warranted where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of

---

[3] The Court may wish to consolidate the hearings for this motion and the motion for judgment on the pleadings into a single hearing. Plaintiffs also note that Julio Frenk became UCLA's new Chancellor on January 1, 2025, succeeding Defendant Block, and Steve Lurie became UCLA's new Associate Vice Chancellor for Campus and Community Safety on February 1, 2025, succeeding Defendant Braziel. Thus, Frenk and Lurie are automatically substituted for the official-capacity claims against Block and Braziel, respectively. *See* Fed. R. Civ. P. 25(d).

law. Fed. R. Civ. P. 56(a). A fact is material when, under relevant law, the resolution of that fact affects the outcome of the case, and a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or assert that a "metaphysical doubt" about a material factual issue precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "[t]he nonmoving party must come forward with 'specific facts showing that there is a genuine [dispute] for trial.'" *Id.* at 587 (cleaned up).

The standard for a permanent injunction is "essentially the same" as for a preliminary injunction, except that Plaintiffs must show actual success on the merits. *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 546 n.12 (1987)). There is no heightened standard for granting a mandatory permanent injunction. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 n.13 (9th Cir. 2019).

## ARGUMENT

## I. The undisputed facts show that Defendants violated the Free Exercise Clause.

Under the Free Exercise Clause, governmental policies "that burden religious exercise must be both neutral and generally applicable." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc) ("*FCA*"). If they are not, they are subject to strict scrutiny. *Id.*

To begin, policies are not neutral or generally applicable if they target religious observers based on their religious status or religious exercise. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017); *Carson v. Makin*, 596 U.S. 767, 787 (2022). Neither are policies that "treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasis in original). And finally, a policy is not generally applicable if it "ha[s] 'a mechanism for individualized exemptions.'" *FCA*, 82 F.4th at 686 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). That means "the mere existence of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable, regardless of the actual exercise." *Id.* at 687-88.

Here, Defendants actively facilitated the exclusion of students and faculty based on their Jewish faith, which clearly burdened their religious exercise. *Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1166-67 (9th Cir. 2024). That triggers strict scrutiny three times over.

First, UCLA discriminated against Jews based on their religious status. Second, UCLA treated Plaintiffs' religious exercise worse than comparable secular activities. And third, UCLA did not uniformly apply its policies, and it retains—and in this case exercised—significant *ad hoc* discretion in applying those policies.

Defendants' actions must therefore satisfy strict scrutiny, "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). They cannot. This Court should conclude once again—and now with the benefit of an even more fulsome, and

---

undisputed, record—that Plaintiffs succeed on their Free Exercise Clause claims and are entitled to injunctive relief.

### A. The undisputed facts demonstrate that Defendants facilitated status-based religious discrimination (Count III).

The Free Exercise Clause "protect[s] religious observers against unequal treatment" and subjects government actions to strict scrutiny when they "target the religious for 'special disabilities' based on their 'religious status'" or exercise. *Trinity Lutheran*, 582 U.S. at 458 (alteration in original)); *see Carson*, 596 U.S. at 787 (2022); Dkt.89 at 9. One such unconstitutional "disability" arises when a state actor "excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778; *see Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 484 (2020). And that is all the more true when the state intentionally discriminates against one religion in particular. *See Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953) (First Amendment bars state from discriminating among religions); *Larson v. Valente*, 456 U.S. 228, 244-46 (1982) (rooting this rule in both the Free Exercise Clause and the Establishment Clause); *see also Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (Free Exercise Clause forbade discriminating against Saturday worshippers in favor of Sunday worshippers).

That principle was violated when UCLA decided to make its campus accessible to others even as it knew it was inaccessible to Jews. Dkt.89 at 11-12. The critical facts supporting that conclusion were "materially undisputed" even at the preliminary-injunction stage. *Id.* at 3. That is all the more true now.

As UCLA admits, in the spring of 2024, activists established and maintained an "unauthorized physical encampment" in one of the most

frequented areas of campus. SUF ¶¶34-36. From the beginning, this encampment was "unlawful," "against policy," and "violated" UCLA's "time, place, and manner" rules. SUF ¶¶99, 103. Yet UCLA helped establish the barriers around the encampment by installing metal bike racks on multiple occasions—as UCLA puts it, the university itself "barricad[ed the] campus encampment." Dkt.123 at 7; *see* SUF ¶¶42, 59. The activists "limited access to the encampment," Answer ¶7, using human phalanxes to block persons from Royce Quad and critical educational buildings if they refused to denounce Israel or wore visibly Jewish garb, such as a Star of David or a kippah. SUF ¶¶44-46. UCLA ordered its police department not to intervene in the encampment, while stationing private security staff around it with instructions to prevent persons from entering "neutral zones" located to the immediate east and west of its location on Royce Quad. SUF ¶69-74; *cf. Gartenberg v. Cooper Union*, No. 24-cv-2669, 2025 WL 401109, at *18 (S.D.N.Y. Feb. 5, 2025) (permitting Title VI claim against school that instructed police not "to intervene" in antisemitic confrontation). Despite these instructions, the encampment grew over time and faculty held classes within it. SUF ¶¶39, 53.

Defendants did all of this, knowing that the encampment's exclusionary tactics prohibited Jews from accessing parts of campus. SUF ¶¶44-50, 81, 104. Indeed, Jews were excluded precisely *because of* their Jewish faith—had they worn garb associated with other religious traditions (like a cross) and held different religious beliefs about Israel, they could have passed through the checkpoints. SUF ¶¶44-46. Defendants thus knowingly facilitated the "exclu[sion of] religious

observers from otherwise available public benefits" and "den[ied]" them "benefit[s] based on [their] religious exercise"—and in so doing, Defendants "violate[d] the Free Exercise Clause." *Carson*, 596 U.S. at 778, 785.

### B. The undisputed facts demonstrate that Defendants' policies and practices treated Plaintiffs' religious exercise worse than comparable secular activities (Count IV).

UCLA's facilitation of discrimination also triggers strict scrutiny because it treats "comparable secular activit[ies] more favorably than religious exercise." *Tandon*, 593 U.S. at 62; *see also FCA*, 82 F.4th at 685.

UCLA undisputedly burdened Plaintiffs' religious exercise: supporting Israel and its right to exist in its homeland. SUF ¶¶134-35, 138, 141-42, 148-49. Because UCLA required campus and outside police to cater to activists, Plaintiffs could not fully access UCLA's educational benefits and facilities like everyone else unless they forwent these religious exercises. *Trinity Lutheran*, 582 U.S. at 463. Indeed, as UCLA's own Task Force found, those who "w[ore] a Star of David or a kippah" were "blocked." SUF ¶45; *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). These policies, which UCLA facilitated, put Jews on UCLA's campus to an impossible choice: suppress their religious exercise or surrender their access to UCLA's educational facilities and campus. *See Sherbert*, 374 U.S. at 406.

At the same time, UCLA imposed no similar burden on a comparable secular activity: supporting any other country in the world. SUF ¶¶44-49. By depriving those who engage in religious exercise of access to the same educational facilities and benefits to which other students and

faculty retained full access, UCLA violated the *Tandon* principle. *See Tandon*, 593 U.S. at 62; *FCA*, 82 F.4th at 694 (government cannot "treat comparable secular groups more favorably"); *see also Bacon v. Woodward*, 104 F.4th 744, 751-52 (9th Cir. 2024).

### C. The undisputed facts demonstrate that Defendants possess wide discretion, which they used to discriminate against Plaintiffs' religious exercise (Count V).

UCLA's policies and practices trigger strict scrutiny in still a third undisputed way: by permitting "discretionary mechanism[s]" of "individualized exemptions," which makes them not generally applicable. *FCA*, 82 F.4th at 686, 688 (quoting *Fulton*, 593 U.S. at 533). As UCLA itself repeatedly emphasizes, the university retains "obviously broad discretion" in choosing how to respond to campus demonstrations, even ones that expressly and discriminatorily burden religious exercise. Tr. of Preliminary Injunction Hearing at 21, Dkt.80; *see* SUF ¶¶44-49, 76-77; *FCA*, 82 F.4th at 687 ("[Defendant] admits that it retains (and exercises) significant discretion in applying exceptions to its own programs."). UCLA even seeks to dismiss some of Plaintiffs' claims precisely *because of* the discretion it asserts that it retains. *See* Dkt.108-1 at 27. Under *Fulton*, the mere *existence* of this sort of discretion—no matter *whether* or *how* it is even exercised—proves that a policy is not generally applicable and thus triggers strict scrutiny. *See Fulton*, 593 U.S. at 537; *FCA*, 82 F.4th at 685; *Bacon*, 104 F.4th at 751.

UCLA argues that it *has* acted according to a neutral and generally applicable policy, the Robinson-Edley report. Dkt.108-1 at 23. But as UCLA emphasizes, the Robinson-Edley report itself confers on UCLA the "broad discretion" it has exercised in responding to campus unrest. SUF

¶¶76-77. This sort of discretion, which "invites" the government to treat secular interests with greater "solicitude" than religious ones, proves that the Robinson-Edley report is *not* generally applicable and thus does *not* allow UCLA to avoid strict scrutiny. *Fulton*, 593 U.S. at 537.

The picture gets even worse when examining how UCLA has actually *exercised* its discretion (an analytical step that, again, this Court needn't even take to find that strict scrutiny applies, *see FCA*, 82 F.4th at 685). Indeed, despite the encampment's rampant discrimination against Jews, the university repeatedly made the discretionary decision not to enforce its policies prohibiting it, instead adopting a policy of providing access and benefits to some students and faculty while denying those same benefits to Jews. SUF ¶¶44-49, 81, 104; Dkt.89 at 11-12 ("UCLA made available certain of its programs, activities, and campus areas when certain students, including Plaintiffs, were excluded because of their genuinely held religious beliefs."). Simply put, even though UCLA's written policies called for the removal of the discriminatory encampment, Defendants chose instead, as a matter of their self-described discretion, to adopt a *de facto* policy of facilitating it. SUF ¶¶21-24, 42-49, 59-63, 67-77, 81, 103-04. Indeed, UCLA ordered law enforcement to remove the encampment only after the *activists* were attacked, SUF ¶¶90, 98, despite "instances of violence" arising earlier that "put many on our campus, especially our Jewish students, in a state of anxiety and fear," SUF ¶81. This sort of "case-by-case analysis" and "pattern of selective enforcement" is "antithetical to a generally applicable policy." *FCA*, 82 F.4th at 688-89.

UCLA tries to argue that it exercised its discretion in a benevolent way: to protect the activists' free speech rights and public safety. *See*, *e.g.*, Dkt.62 at 1, 9, 20, 22; Dkt.108-1 at 25; SUF ¶¶61, 102. These arguments failed once, *see* Dkt.89 at 12, and they should fail again. The intentional and often violent exclusion of Jews from accessing part of campus is the furthest thing from protected speech, as even UCLA itself has acknowledged in deeming the encampment "unlawful" and a "breach of policy." SUF ¶99; *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022) ("[I]n no world may a government entity's concerns about phantom constitutional violations justify actual violations of an individual's First Amendment rights."). And UCLA's appeals to public safety cannot be taken seriously, given its repeated acknowledgments of the violence and chaos that the encampment bred. SUF ¶¶81, 96. In sum, Defendants' "alleged good intentions do not change the fact that" they knowingly exercised their discretion to facilitate the encampment in violation of UCLA's written policies and at the expense of Jews' access to campus. *FCA*, 82 F.4th at 688; *see* Dkt.89 at 11-12.

**D. Defendants' policies fail strict scrutiny.**

Any of the above arguments, standing alone, would be enough to trigger strict scrutiny.[4] And Defendants cannot come close to satisfying that standard. To do so, Defendants must show that UCLA's policies and practices advance "interests of the highest order" and that they are "narrowly tailored" to achieve that interest. *Church of the Lukumi*

---

[4] UCLA has no strict scrutiny affirmative defense with respect to its discrimination against religious beliefs "as such." *Trinity Lutheran*, 582 U.S. at 466 n.4 (quoting *Lukumi*, 508 U.S. at 533) (citing *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality opinion)).

*Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541.

To justify their actions, Defendants have repeatedly pointed to a generalized interest in "promoting 'public safety and security.'" Dkt.108-1 at 25; Dkt.62 at 17. But a governmental interest cannot be articulated at such "a high level of generality"; rather, "the First Amendment demands a more precise analysis." *Fulton*, 593 U.S. at 541. Defendants must show that their interest is compelling as to "the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt v. Hobbs*, 574 U.S. 352, 363 (2015). This they have not done.

Nor have Defendants ever explained how their actions advanced "public safety." *See id.* at 363-64. Defendants were well aware that the activists in the encampment engaged in illegal conduct against Jews, including violently assaulting them and physically blocking them from accessing portions of campus. SUF ¶¶44-50, 57, 78-79, 81, 104. And UCLA not only refused to disband the encampment, which led directly to the violent melee between encampment militants and counter-protestors. SUF ¶¶90-94. Rather, UCLA actively facilitated the encampment by "barricading [the] campus encampment," directing the installation of metal bike racks around it, and posting security guards on the outskirts "to prevent anyone from accessing" so-called "neutral zones" located to its east and west. Dkt.123 at 7; *see* SUF ¶¶42, 59, 63, 68-70. Those actions allowed the activists to persist in terrorizing and

excluding members of UCLA's Jewish community. Thus, allowing admittedly unlawful and violent actions predictably did not further Defendants' interest in public safety—it *hindered* it.

Nor can Defendants show that their actions were "the least restrictive means" of furthering public safety. *Bacon*, 104 F.4th at 752. Defendants had at their disposal a host of less restrictive and nondiscriminatory alternatives to burdening Plaintiffs' religious exercise that were available to them. To begin, UCLA's eventual decision to clear the encampment proves that there *was* an obvious less restrictive alternative: disbanding the illegal encampment swiftly after it arose. Defendants have acknowledged as much: Defendant Block conceded to Congress that UCLA "should have been prepared to immediately remove the encampment … when the safety of our community was put at risk." SUF ¶103.

At the very least, Defendants could have directed campus security teams and the UCLA PD to protect Jewish students and faculty by facilitating their access or escorting them through the area. SUF ¶¶63-71. But instead, Defendants knowingly ceded the heart of campus to activists who brazenly discriminated against Jewish students and faculty. SUF ¶¶44-49, 57, 81, 104. Not only that, Defendants then facilitated that exclusion through their own actions of installing barricades and enforcing the encampment's boundaries and exclusionary policies, instead of protecting their Jewish students and faculty. SUF ¶¶42, 59, 62-77.

In short, Defendants fail to satisfy strict scrutiny. Plaintiffs thus succeed on their Free Exercise Clause claims.

## II. Injunctive relief is needed.

Having demonstrated success on the merits of their free exercise claims, all that remains is for Plaintiffs to show that they will suffer irreparable harm without injunctive relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998). As with the preliminary injunction, each factor is met here.

***Irreparable harm.*** "It is axiomatic that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *FCA*, 82 F.4th at 694 (cleaned up). That's because "[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages." *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd and remanded on other grounds*, 562 U.S. 134 (2011); *Cuviello v. City of Vallejo*, 944 F.3d 816, 834 (9th Cir. 2019). This factor is therefore satisfied.

***Balance of equities and the public interest.*** When, as here, "the party opposing injunctive relief is a government entity, the third and fourth factors … 'merge.'" *FCA*, 82 F.4th at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *see* Dkt.89 at 13; SUF ¶14. And here, both factors favor granting a permanent injunction. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), and Defendants "cannot reasonably assert that [they are] harmed in any legally cognizable sense by being enjoined from constitutional violations." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023); *see also Rodriguez v.*

*Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (government "cannot suffer harm from an injunction that merely ends an unlawful practice").

## CONCLUSION

This Court should grant Plaintiffs' motion for partial summary judgment and enter a permanent injunction.

Dated: February 28, 2025

Respectfully submitted,

/s/ *Eric C. Rassbach*
Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Reed M. Bartley (TX Bar No. 24125115)* ‡
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketfund.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

Elliot Moskowitz (NY Bar No. 4039160)*
Rebecca L. Harris (NY Bar No. 5607080)*
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

*Attorneys for Plaintiffs*

* Admitted *pro hac vice*.

‡ Not admitted to the D.C. Bar; admitted only in Texas.
  Supervised by licensed D.C. Bar members.

# CERTIFICATE OF COMPLIANCE

Undersigned counsel of record for Plaintiffs certifies that this brief contains 6,091 words, which complies with this Court's word limit for memoranda of points and authorities.

Dated: February 28, 2025

/s/ *Eric C. Rassbach*
Eric C. Rassbach
*Counsel for Plaintiffs*