Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Reed M. Bartley (TX Bar No. 24125115)* ‡
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketfund.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

Elliot Moskowitz (NY Bar No. 4039160)*
Rebecca L. Harris (NY Bar No. 5607080)*
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*,<br><br>    Defendants. | Case No.: 2:24-cv-04702<br><br>**PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge: Hon. Mark C. Scarsi<br>Hearing: May 12, 2025, 9:00 a.m.<br>Courtroom: 7C |

*Admitted *pro hac vice*. ‡Not admitted to the D.C. Bar; admitted only in Texas. Supervised by licensed D.C. Bar members.

Plaintiffs Yitzchok Frankel, Eden Shemuelian, Joshua Ghayoum, and Dr. Kamran Shamsa submit the following Statement of Uncontroverted Facts and Conclusions of Law pursuant to Fed. R. Civ. P. 56, Local Rule 56-1, and the Honorable Mark C. Scarsi's Standing Order for Civil Cases in support of their Motion for Partial Summary Judgment and Permanent Injunction.

## I.  STATEMENT OF UNCONTROVERTED FACTS

### Issue: Defendants violated the Free Exercise Clause.

| Fact | Supporting Evidence |
|---|---|
| Defendants and Their Roles ||
| 1. Defendant Regents of the University of California is a public agency within the meaning of Cal. Gov't Code § 7920.525(a) and is empowered under the California Constitution, Article IX, Section 9, to administer the University of California, including the University of California, Los Angeles. The Board of Regents is the governing body for the University of California system and under Article IX, Section 9, of the California Constitution has full powers of organization and government. | Dkt.107 ¶47 (Answer). |
| 2. Defendant Dr. Michael V. Drake is the current President of the University of California and has served in that position since August 2020. As President, Drake oversees and is responsible for the operations of the | Dkt.107 ¶¶48, 57 (Answer). |

| | |
|---|---|
| entire University of California system, which includes UCLA, and sets systemwide policy guidance. | |
| 3. Defendant Dr. Gene D. Block served as Chancellor of UCLA from August 2007 until July 31, 2024. As Chancellor, Block was the highest-ranking university official at UCLA, including during the 2023-2024 academic school year. Block's duties included establishing campus policies, goals, and strategy. | Dkt.107 ¶49 (Answer). |
| 4. Defendant Julio Frenk has served as Chancellor of UCLA since January 1, 2025. He is automatically substituted as Defendant for the official-capacity claims against Defendant Block. As Chancellor, Frenk is the highest-ranking university official at UCLA, and his duties include establishing campus policies, goals, and strategy. | 3d Rassbach Decl. Ex. 11 at 552[1]; Fed. R. Civ. P. 25(d); Dkt.107 ¶49 (Answer). |
| 5. Defendant Dr. Darnell Hunt is the current Executive Vice Chancellor and Provost of UCLA and also served in that role at all relevant times from September 2022 through July 31, 2024. Hunt also served as UCLA's Interim Chancellor from August 1, 2024 until December 31, 2024. | Dkt.107 ¶50 (Answer). |

---

[1]  Each pincite to an exhibit in this Statement of Uncontroverted Facts is to the page number added to the bottom of each page of the exhibit pursuant to L.R. 11-5.2, and not (as applicable) to the document's original page number.

| | |
|---|---|
| 6. Defendant Michael J. Beck is the current Administrative Vice Chancellor of UCLA and has served in that position since March 2016. During this time and until May 5, 2024, the UCLA Police Department reported to and took direction from him. Beck has senior management responsibility for a broad spectrum of administrative, operational, and service units at UCLA and is responsible for developing policy, monitoring compliance, and overseeing campus operations. | Dkt.107 ¶51 (Answer); Dkt.62-3 ¶2 (Beck Decl.). |
| 7. Defendant Monroe Gorden, Jr., is the current Vice Chancellor, Student Affairs, of UCLA and has served in that position since April 2018. Gorden oversees numerous functions relating to student life and well-being. His role spans the entire range of student needs and interests. | Dkt.107 ¶52 (Answer); Dkt.62-7 ¶2 (Gorden Decl.). |
| 8. Defendant Rick Braziel served as the Associate Vice Chancellor for Campus Safety at UCLA from May 5, 2024 until January 31, 2025. In this role, Braziel served as the head of the newly created Office of Campus Safety at UCLA, which as of May 5, 2024, oversees the UCLA Police Department ("UCLA PD"). While employed by UCLA, Braziel reported directly to the Chancellor of the University and the Chief of the UCLA PD reported to Braziel. Braziel was involved with decision-making about | Dkt.107 ¶¶53-54, 58 (Answer); Dkt.62-5 ¶¶2, 12-16, 21, 25, 27, 31 (Braziel Decl.); 3d Rassbach Decl. Ex. 12 at 556. |

| | |
|---|---|
| how to address security and campus access issues. | |
| 9. Defendant Steve Lurie serves as the Associate Vice Chancellor for Campus and Community Safety and has served in that position after taking over for Defendant Braziel on February 1, 2025. He is automatically substituted as Defendant for the official-capacity claims against Defendant Braziel. Lurie's job duties and lines of reporting are identical to those of Defendant Braziel while Braziel served in the role. | Dkt.107 ¶¶53-54, 58 (Answer); Dkt.62-5 ¶¶2, 12-16, 21, 25, 27, 31 (Braziel Decl.); 3d Rassbach Decl. Ex. 12 at 556; Fed. R. Civ. P. 25(d). |
| 10. Defendants Hunt, Beck, and Gorden serve on UCLA's "senior leadership team," as did Block during his tenure as Chancellor, and as does Frenk as UCLA's recently installed Chancellor. | Dkt.107 ¶55 (Answer). |
| 11. UCLA's senior leadership team is ultimately responsible for leading and running UCLA's campus. | Dkt.107 ¶56 (Answer). |
| 12. UCLA's senior leadership team managed and oversaw UCLA's response to antisemitism and demonstrations on campus during the 2023-24 academic year, including making critical strategic and operational decisions about UCLA's response to encampments that emerged on campus. | Dkt.107 ¶56 (Answer); Dkt.62-3 ¶¶4-7, 9-10, 17-19 (Beck Decl.). |
| 13. President Drake communicated with members of UCLA's senior leadership team during the 2023-24 academic year about UCLA's response to antisemitism | Dkt.107 ¶57 (Answer). |

| | |
|---|---|
| and protest activity, and continues to do so today. | |
| **UCLA** | |
| 14. The University of California, Los Angeles is a large public research university located in the Westwood neighborhood of Los Angeles, California, which is within the Central District of California. | Dkt.107 ¶60 (Answer). |
| 15. UCLA is one of the largest universities in California, with over 33,000 undergraduate students and over 13,000 graduate students. | Dkt.107 ¶61 (Answer). |
| 16. UCLA is part of the 10-campus University of California system, which includes other universities such as the University of California, Berkeley. | Dkt.107 ¶62 (Answer). |
| 17. UCLA's campus is spread across 419 acres of publicly owned land that is, as a general matter, open to the public. | Dkt.107 ¶63 (Answer). |
| 18. UCLA has a significant number of Jewish students among its student population. | Dkt.107 ¶65 (Answer). |
| 19. UCLA tells its students that its policies exist to "create and maintain a safe, supportive, and inclusive campus community that engages students in order to foster their academic success, personal growth and responsible citizenship." | Dkt.48-71 at 139 (Rassbach Ex. 34). |

| | |
|---|---|
| 20. As a public university, UCLA maintains policies for public protests that include time, place, and manner restrictions. | Dkt.107 ¶68 (Answer). |
| 21. For example, "[w]hile individuals may exercise the constitutionally protected rights of speech and assembly on university grounds that are generally open to the public, these activities must not interfere with the orderly operation of the campus and must be conducted in a manner that reasonably protects others from becoming involuntary audiences." | Dkt.48-70 at 137 (Rassbach Ex. 33). |
| 22. Under UCLA's Regulations of Activities, Registered Campus Organizations, and Use of Properties, which was in effect from 2017 until September 3, 2024, persons may not "block entrances to or otherwise interfere with the free flow of traffic into and out of campus buildings," "knowingly and willfully interfere with the peaceful conduct of the activities of the campus or any campus facility by intimidating, harassing, or obstructing any University employee, student, or any other person having lawful business with the University," or "camp or lodge, except in authorized facilities or locations." | Dkt.48-75 at 203-04 (Rassbach Ex. 38). |
| 23. Similarly, under UCLA's currently operative Interim Policy 850: General Use of UCLA Property, persons may not "block entrances to or otherwise | 3d Rassbach Decl. Ex. 7 at 532. |

| | |
|---|---|
| interfere with the free flow of campus traffic (pedestrian or vehicular) into and out of campus facilities, or along walkways or roadways," "knowingly and willfully interfere with the peaceful conduct of activities or another individual's ability to participate in their educational program on UCLA Property," "engage in abusive, threatening, harassing, or intimidating conduct," "erect any Temporary Structure or encampment on UCLA Property," or "Camp overnight (between the hours of midnight and 6am)." | |
| 24. UCLA's policies do not allow unauthorized protesters to exercise exclusive control over campus facilities or spaces. | Dkt.107 ¶71 (Answer). |
| 25. The University of California has an anti-discrimination policy that is in effect at UCLA and is intended to protect students and faculty from discrimination and harassment. | Dkt.107 ¶72 (Answer). |
| Antisemitic Protests at UCLA Following the October 7th Attack | |
| 26. After Hamas's terrorist attack on October 7, 2023, UCLA's campus experienced a "disturbing rise of antisemitism," including a number of antisemitic incidents and events, of which UCLA was aware. | 3d Rassbach Decl. ¶14 at 41:10-41:17 (providing website link to Defendant Block's May 23, 2024 congressional testimony); *see also* Dkt.107 ¶¶1, 3, 74-75, 77, 93, 97, 102-104 (Answer); 3d Rassbach Decl. Ex. 1 at 14, 31, 52-58 |

| | |
|---|---|
| | ("UCLA Antisemitism Task Force Report"). |
| 27. Indeed, "since October 7, 2023, disturbing antisemitic language was used and imagery was present at protests that occurred on UCLA's campus." | Dkt.107 ¶75 (Answer). |
| 28. For example, during demonstrations on campus, there were chants of "kill the Jews," "from the river to the sea, Palestine will be free," and "Intifada." | Dkt.107 ¶¶75, 77, 86 (Answer); 3d Rassbach Decl. Ex. 1 at 54-57 (UCLA Antisemitism Task Force Report). |
| 29. Swastikas were also seen around campus. | 3d Rassbach Decl. Ex. 1 at 42, 48, 71 (UCLA Antisemitism Task Force Report); Dkt.107 ¶¶106 (Answer). |
| 30. In one incident, an individual placed a disturbing antisemitic statue on campus, which depicted a several-foot-tall pig holding a bag of money and a birdcage with a keffiyeh, alongside a bucket painted with a star of David. | Dkt.107 ¶102 (Answer). |
| 31. Other activists chalked Stars of David onto UCLA's sidewalks alongside directions to "Step Here." | 3d Rassbach Decl. Ex. 1 at 71 (UCLA Antisemitism Task Force Report). |
| 32. During an event on November 8, 2023, activists bashed a piñata depicting Israeli Prime Minister Benjamin Netanyahu while the crowd cheered and chanted "beat that fucking Jew." | 3d Rassbach Decl. Ex. 1 at 57 (UCLA Antisemitism Task Force Report); Dkt.107 ¶87 (Answer). |

| A Jew Exclusion Zone is Established on Campus | |
|---|---|
| 33. In April 2024, "Palestinian Solidarity" encampments began appearing on university campuses across the country. | Dkt.62-3 ¶4 (Beck Decl.); Dkt.62-5 ¶23 (Braziel Decl.); Dkt.107 ¶107 (Answer). |
| 34. This came to include UCLA. On April 25, 2024, a group of activists "established an unauthorized physical encampment on part of Royce Quad" in the middle of the night. | Dkt.48-23 at 60 (Shemuelian Ex. 15); Dkt.62-3 ¶5 (Beck Decl.); Dkt.107 ¶¶4, 113 (Answer); 3d Rassbach Decl. Ex. 1 at 58-59 (UCLA Antisemitism Task Force Report). |
| 35. Royce Quad, also known as Dickson Plaza, is a large, grassy space located between two buildings to its north (Royce Hall and Haines Hall), and two buildings to its south (Powell Library and Kaplan Hall), which represent the original four buildings of UCLA's campus. | Dkt.107 ¶109 (Answer); Dkt.48-38 at 5 (Rassbach Ex. 1). |
| 36. Royce Quad is one of the most-frequented areas on campus where students gather during the day and between classes. It is also a thoroughfare that students and faculty routinely use to access the rest of UCLA's campus. It is also located a short walk from many academic buildings, including UCLA's business school and law school. | Dkt.107 ¶110 (Answer). |
| 37. Powell Library is UCLA's main undergraduate library and is a popular | Dkt.107 ¶112 (Answer). |

| | |
|---|---|
| place to study on campus. It offers a wide variety of programming, including exhibits, concerts, dances, readings and other events. | |
| 38. At times, the encampment extended as far west as the Janss Steps, a long staircase leading up to Royce Quad. | Dkt.107 ¶114 (Answer). |
| 39. The encampment grew throughout the week it existed, at one point reaching "an estimated 250-300 tents inside the heavily fortified encampment" and "at least 500 individuals during the day." | 3d Rassbach Decl. Ex. 3 at 143 ("U.S. House Committee Report on Antisemitism"); Dkt.62-3 ¶¶6, 12 (Beck Decl.). |
| 40. Inside the encampment, activists chanted antisemitic slogans. | Dkt.107 ¶115 (Answer). |
| 41. Activists also displayed antisemitic imagery on signs and graffiti. | 3d Rassbach Decl. Ex. 1 at 61, 73, 78 (UCLA Antisemitism Task Force Report); Dkt.107 ¶¶117, 123 (Answer). |
| 42. Activists established a perimeter around the encampment with metal barriers and plywood, using metal bicycle racks that UCLA had placed on the periphery of the encampment. | 3d Rassbach Decl. Ex. 1 at 60 (UCLA Antisemitism Task Force Report); Dkt.107 ¶¶7, 128-29, 156 (Answer); Dkt.62-3 ¶¶6-7 (Beck Decl.); Dkt.123 at 7 (Defendants' Reply ISO Mot. for Judgment on the Pleadings) (conceding that Defendants "barricad[ed the] campus encampment"). |

| | |
|---|---|
| 43. "As early as April 25, violence was documented within and around the encampment." | 3d Rassbach Decl. Ex. 3 at 142 (U.S. House Committee Report on Antisemitism). |
| 44. Activists "began using human phalanxes (with protesters shouting, 'human chain') to block certain persons from moving freely through public areas of Royce Quad, and surrounded some other individuals to forcibly move them from areas in or adjacent to the encampment." | 3d Rassbach Decl. Ex. 1 at 61-64, 68, 70, 81 (UCLA Antisemitism Task Force Report); *see also* Dkt.107 ¶¶4, 128-33 (Answer); Dkt 48-23 at 60 (Shemuelian Ex. 15); 3d Rassbach Decl. Ex. 4 at 447-448 ("U.S. House Antisemitism Report"). |
| 45. Jews "wearing a Star of David or a kippah" or "refusing to denounce" Israel "were physically blocked by the protesters' phalanxes from entering or passing through the occupied area of Royce Quad, entering Royce Hall, or entering Powell Library." | 3d Rassbach Decl. Ex. 1 at 61-64, 68, 70, 81 (UCLA Antisemitism Task Force Report); *see also* Dkt.107 ¶¶4, 128-33 (Answer); Dkt 48-23 at 60 (Shemuelian Ex. 15); 3d Rassbach Decl. Ex. 4 at 447-448 (U.S. House Antisemitism Report). |
| 46. These actions "denied Jews and others free passage and access to campus classrooms and facilities" and "resulted in Jews and others who would not renounce the State of Israel being hindered in their efforts to freely and fully avail themselves of campus offerings." | 3d Rassbach Decl. Ex. 1 at 68, 70, 81 (UCLA Antisemitism Task Force Report); *see also* Dkt.107 ¶¶4, 128-33 (Answer); Dkt 48-23 at 60 (Shemuelian Ex. 15). |

| | |
|---|---|
| 47. "[A]fter social media posts about Jewish students being excluded from portions of campus went viral, administrators were inundated with complaints and concerns from parents, politicians, and community members about why the University was allowing it to continue." | 3d Rassbach Decl. Ex. 2 at 108 ( "UCLA Independent Investigation Report"). |
| 48. "[T]he encampment's denial of passage and access to certain parts of campus to 'supporters of Israel' ended up targeting Jews" and "constitutes de facto discrimination against a protected class." | 3d Rassbach Decl. Ex. 1 at 64 (UCLA Antisemitism Task Force Report); *see also* Dkt.107 ¶¶4, 128-33 (Answer); Dkt 48-23 at 60 (Shemuelian Ex. 15). |
| 49. Indeed, "the denial of common rights or access to supporters of Israel constitutes a form of de facto or structural antisemitism and should be viewed as discrimination against a protected class." | 3d Rassbach Decl. Ex. 1 at 81 (UCLA Antisemitism Task Force Report); *see also* Dkt.107 ¶¶4, 128-33 (Answer); Dkt 48-23 at 60 Shemuelian Ex. 15). |
| 50. "In so far as conditions on campus resulted in Jews and others who would not renounce the State of Israel being hindered in their efforts to freely and fully avail themselves of campus offerings, the University also failed in its legal obligation to protect First Amendment rights to the free exercise of religion …." | 3d Rassbach Decl. Ex. 1 at 81 (UCLA Antisemitism Task Force Report). |
| 51. Some UCLA "faculty members supported the encampment." | Dkt.107 ¶140 (Answer). |
| 52. "[T]he administration was informed that instructors were moving their classes (many of which were the final | 3d Rassbach Decl. Ex. 3 at 143 (U.S. House |

| | |
|---|---|
| review sessions before midterm exams) into the encampment." | Committee Report on Antisemitism). |
| 53. Indeed, the activists involved in blocking students included UCLA faculty, who "entered the encampment in support of its activities" and "participat[ed] in the encampment activities including denial of campus access to Jews and those supporting Israel" and thus "participated in and abetted discrimination against and harassment of Jews and supporters of Israel." | 3d Rassbach Decl. Ex. 1 at 70 (UCLA Antisemitism Task Force Report); *see also* Dkt.107 ¶140 (Answer). |
| 54. Faculty members called for fellow faculty to excuse student absences related to presence at the encampment, and reports indicated that some faculty offered "extra credit for attendance at the encampment or related events." | 3d Rassbach Decl. Ex. 1 at 70 (UCLA Antisemitism Task Force Report); *see also* Dkt.107 ¶143 (Answer). |
| UCLA Facilitates the Anti-Jewish Segregation | |
| 55. By April 23, 2024, members of UCLA's senior leadership team had discussed plans for confronting a potential encampment. "The initial discussions were about what steps [UCLA] could take to prevent an encampment from being formed on campus." | Dkt.62-3 ¶4 (Beck Decl.); *see also* Dkt.107 ¶151 (Answer). |
| 56. On the morning of April 25, 2024, members of the senior leadership team became aware that an encampment had formed on UCLA's campus. | Dkt.107 ¶154 (Answer). |
| 57. "From the beginning, … it was obvious to many campus leaders that the | 3d Rassbach Decl. Ex. 3 at 142 (U.S. House |

| | |
|---|---|
| encampment on Royce Quad violated a long list of University policies and presented a clear and present danger to Jewish students." | Committee Report on Antisemitism). |
| 58. As of that day, the senior leadership team "agree[d]" that the encampment "needed to be removed at some point" but did not make specific plans to remove it "immediately." | Dkt.62-3 ¶5 (Beck Decl.). |
| 59. Also on April 25, Defendants directed the installation of metal bike racks around the encampment. More bike racks were installed two days later, again at Defendants' direction. | Dkt.107 ¶156 (Answer); Dkt.62 at 3 (Defs.' Opp. to Mot. for Prelim. Inj.); 3d Rassbach Decl. Ex. 1 at 60 (UCLA Antisemitism Task Force Report); Dkt.62-3 ¶¶6-7 (Beck Decl.); Dkt.123 at 7 (Defendants' Reply ISO Mot. for Judgment on the Pleadings) (conceding that Defendants "barricad[ed the] campus encampment"). |
| 60. "[A]dministrators" also "acted to make it easier for the encampment to remain in place: the sprinklers on Royce Quad were turned off, and University leadership was informed by facilities staff that they would stay off for the duration of the encampment." | 3d Rassbach Decl. Ex. 3 at 141-42 (U.S. House Committee Report on Antisemitism). |
| 61. UCLA repeatedly issued campus-wide communications stating that it was "actively monitoring this situation to support a safe and peaceful campus | Dkt.48-16 at 53 (Shemuelian Ex. 8); *see also* Dkt.48-17 at 54 (Shemuelian Ex. 9); |

| | |
|---|---|
| environment that respects our community's right to free expression while minimizing disruption to our teaching and learning mission." | Dkt.48-18 at 55 (Shemuelian Ex. 10); Dkt.48-19 at 56 (Shemuelian Ex. 11). |
| 62. UCLA stationed security personnel, which included third-party security and crowd-management personnel, around the encampment. | Dkt.107 ¶12 (Answer); Dkt.48-18 at 55 (Shemuelian Ex. 10); Dkt.48-19 at 56 (Shemuelian Ex. 11); Dkt.48-20 at 57 (Shemuelian Ex. 12); Dkt.62-3 ¶¶7-8 (Beck Decl.). |
| 63. An April 27, 2024 campus-wide alert announced that UCLA had placed "[s]afety personnel" wearing certain "uniforms … around the encampment site" and that "CSC security teams [were] also located throughout campus." | Dkt.48-18 at 55 (Shemuelian Ex. 10). |
| 64. CSC stands for Contemporary Services Corporation, which is a private security company with experience managing crowds and providing event security, including at colleges and universities. | Dkt.107 ¶158 (Answer). |
| 65. Part of the role of outside security personnel like CSC is to "enforce boundaries by ensuring barriers remain in place and telling people where they are allowed to go." | 3d Rassbach Decl. Ex. 2 at 110 (UCLA Independent Investigation Report). |
| 66. An April 28, 2024 campus-wide alert further noted that UCLA "ha[d] safety teams who are wearing Student Affairs Mitigators (SAMs), Public Safety Aides | Dkt.48-19 at 56 (Shemuelian Ex. 11). |

| | |
|---|---|
| (PSAs) and CSC security uniforms throughout the demonstration site." | |
| 67. This alert also noted that UCLA had "taken several steps to help ensure people on campus know about the demonstration so they can avoid the area if they wish," including by "having student affairs representatives stationed near Royce [Q]uad to let Bruins and visitors know about the encampment, redirect them if desired and to serve as a resource for their needs." | Dkt.48-19 at 56 (Shemuelian Ex. 11). |
| 68. An April 29, 2024 campus-wide alert stated that UCLA had "increased the numbers of our safety team members on site, including our uniformed Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs), CSC and campus security." | Dkt.48-20 at 57 (Shemuelian Ex. 12). |
| 69. UCLA's security staff participated in limiting access to the encampment. UCLA admits that it "instructed" the "security staff" "to prevent anyone from accessing" so-called "'neutral zones' between the encampment and counter-demonstrators." | Dkt.107 ¶161 (Answer); *see also* Dkt.62-3 ¶¶7-8 (Beck Decl.). |
| 70. These "neutral zones" were located to the immediate east and west of the location of the encampment on Royce Quad. | Dkt.62-3 ¶7 (Beck Decl.). |
| 71. UCLA also directed the UCLA PD not to intervene in the encampment. | 3d Rassbach Decl. Ex. 1 at 68 (UCLA Antisemitism |

| | |
|---|---|
| | Task Force Report); 3d Rassbach Decl. Ex. 2 at 100, 112 (UCLA Independent Investigation Report). |
| 72. There was a "widespread belief among UCLA Police Department officials that they were not allowed to take any action to respond to behavior that began as a policy violation." | 3d Rassbach Decl. Ex. 2 at 100 (UCLA Independent Investigation Report). |
| 73. "[T]he UCLA administration was responsive to … requests" from "[e]ncampment members" who "made clear throughout the encampment period they did not want to engage with police or to see police in or around the encampment." | 3d Rassbach Decl. Ex. 2 at 112 (UCLA Independent Investigation Report). |
| 74. Indeed, "there is general agreement across most accounts that police were instructed to remain wholly unseen by protesters." | 3d Rassbach Decl. Ex. 2 at 112 (UCLA Independent Investigation Report). |
| 75. In one incident, "when protesters objected to officers' presence in a nearby building, where they had positioned themselves to gain information about the state of the encampment, administrators instructed officers to leave." | 3d Rassbach Decl. Ex. 2 at 112 (UCLA Independent Investigation Report). |
| 76. UCLA repeatedly informed the campus community that "University of California systemwide policy guidance" requires it "not to request law enforcement involvement | Dkt.48-19 at 56 (Shemuelian Ex. 11); Dkt.74-2 (Suppl. Rassbach Ex. 2). |

| | |
|---|---|
| preemptively," but "only if absolutely necessary to protect the physical safety of our campus community." | |
| 77. This statement of UCLA's policy not to request preemptive assistance refers to the senior leadership team's interpretation of the Robinson-Edley Report, a document published by the University of California system that, according to UCLA, "affords UC campuses broad discretion to respond to protests." | Dkt.62 at 10-11 (Defs.' Opp. to Mot. for Prelim. Inj.); *see also* Dkt.107 ¶171 (Answer); Dkt.62-6 at 4-161 (Braziel Ex. 2) (Robinson-Edley report). |
| 78. On April 28, 2024, "physical altercations broke out among demonstrators on Royce Quad," as UCLA acknowledged in a campus-wide message. | Dkt.48-20 at 57 (Shemuelian Ex. 12). |
| 79. The violence included "the child of a Holocaust survivor" being "pepper sprayed by encampment participants" and "a Jewish student" being "thrown to the ground by members of the encampment and repeatedly kicked in the head." | 3d Rassbach Decl. Ex. 3 at 143 (U.S. House Committee Report on Antisemitism); *see also* 3d Rassbach Decl. Ex. 1 at 65-66 (UCLA Antisemitism Task Force Report). |
| 80. While UCLA increased the number of security staff around the encampment, it did not immediately clear the encampment. | Dkt.48-20 at 57 (Shemuelian Ex. 12); 3d Rassbach Decl. Ex. 1 at 65-66 (UCLA Antisemitism Task Force Report). |
| 81. On April 30, 2024, Defendant Block sent a campus-wide email addressing | Dkt 48-23 at 60 (Shemuelian Ex. 15). |

| | |
|---|---|
| the encampment. Block acknowledged that the "unauthorized physical encampment" had led to "shocking and shameful" "tactics." He stated that the encampment had given rise to "instances of violence completely at odds with our values" and had resulted in "students on their way to class [being] physically blocked from accessing parts of the campus." "These incidents," Block continued, "have put many on our campus, especially our Jewish students, in a state of anxiety and fear." | |
| 82. The same day that Defendant Block sent his message, UCLA acknowledged that the encampment was impeding access to certain parts of campus. | Dkt.48-21 at 58 (Shemuelian Ex. 13). |
| 83. Specifically, UCLA sent a Campus Activity Update announcing that "access to Royce Quad is limited and as such, please enter Powell and Kaplan Hall from the south-facing entrances; Royce and Haines Hall are accessible through the north or west entrances." | Dkt.48-21 at 58 (Shemuelian Ex. 13). |
| 84. The update also stated that UCLA had "stationed" "student affairs representatives … near Royce [Q]uad" to, among other things, "redirect" "Bruins and visitors … if desired." | Dkt.48-21 at 58 (Shemuelian Ex. 13). |
| 85. The update further noted that UCLA would "continue to ensure people on campus know about the demonstration so they can avoid the area if they wish." | Dkt.48-21 at 58 (Shemuelian Ex. 13). |

| | |
|---|---|
| 86. That same afternoon, UCLA announced that Royce Hall would be closed through that Friday and Powell Library until the following Monday. | Dkt.48-22 at 59 (Shemuelian Ex. 14). |
| 87. The same announcement again noted that "[s]tudent affairs representatives" were "stationed near Royce Quad" and that UCLA had "increased the numbers of our safety team members on site." | Dkt.48-22 at 59 (Shemuelian Ex. 14). |
| 88. The announcement did not direct activists to remove the barricades around the encampment or to permit access to campus facilities. | Dkt.48-22 at 59 (Shemuelian Ex. 14). |
| 89. That evening (on April 30, 2024), "[w]hen campus administrators attempted to close Royce Hall and Powell Library … , a UCPD lieutenant reported that encampment members were 'controlling' the east entrance, allowing encampment members unrestricted access to the building and its bathrooms." | 3d Rassbach Decl. Ex. 3 at 144 (U.S. House Committee Report on Antisemitism). |
| 90. Later that evening (on April 30, 2024), a violent confrontation arose between the encampment activists and counter-protesters. | Dkt.48-24 at 62 (Shemuelian Ex. 16). |
| 91. In response to this confrontation, Defendants instructed UCLA PD and LAPD to intervene, which they did. | Dkt.48-24 at 62 (Shemuelian Ex. 16); Dkt.107 ¶¶186-87 (Answer). |
| 92. UCLA PD and LAPD did not "remove the Royce Quad encampment" as part of the intervention. | Dkt.107 ¶¶186-87 (Answer); *see also* Dkt.48-24 at 62 (Shemuelian Ex. |

| | |
|---|---|
| | 16); Dkt.62-3 ¶¶12-13 (Beck Decl.). |
| 93. The next day—May 1, 2024—Chancellor Block sent a campus-wide email condemning the "attack [on] the encampment that has been established … to advocate for Palestinian rights" and stating that "I can assure you that we will conduct a thorough investigation that may lead to arrests, expulsions and dismissals." | Dkt.48-24 at 62 (Shemuelian Ex. 16). |
| 94. This email did not condemn the encampment or the conduct of those involved with the encampment, including the exclusion of supporters of Israel from campus. It also did not mention disbanding the encampment. | Dkt.48-24 at 62 (Shemuelian Ex. 16). |
| 95. The encampment remained in place that day (May 1, 2024). | Dkt.107 ¶190 (Answer). |
| 96. The same day, UCLA cancelled "all classes" because of the "distress caused by the violence that took place on Royce Quad." | Dkt.48-25 at 64 (Shemuelian Ex. 17); *see also* Dkt.107 ¶190 (Answer). |
| 97. And later that day, UCLA announced that people should "continue to avoid campus and the Royce Quad area" and that classes would be held remotely on May 2 and 3. | Dkt 48-26 at 65 (Shemuelian Ex. 18); *see also* Dkt.107 ¶190 (Answer). |
| 98. "[E]arly" in the "morning" on May 2, 2024, Defendants "made the decision to direct UCPD and outside law enforcement officers to enter and clear the encampment." | Dkt 48-27 at 68 (Shemuelian Ex. 19). |

| | |
|---|---|
| 99. In another email to the campus community, delivered that day, Defendant Block acknowledged that "the encampment on Royce Quad was both unlawful and a breach of policy," which his administration "had allowed … to remain in place," resulting in "[d]emonstrators directly interfer[ing] with instruction by blocking students' pathways to classrooms." | Dkt 48-27 at 68 (Shemuelian Ex. 19). |
| 100. Defendant Block described how his administration had met with "demonstration leaders to discuss options for a peaceful and voluntary disbanding of the encampment," but "that meeting did not lead to an agreement." | Dkt 48-27 at 68 (Shemuelian Ex. 19). |
| 101. Defendant Block also described the "carefully developed" "plan" that law enforcement used to clear the encampment, which included "giv[ing]" the activists "several warnings" and "offer[ing] the opportunity to leave peacefully with their belongings before officers entered the area." | Dkt 48-27 at 68 (Shemuelian Ex. 19). |
| 102. The "UCLA Police Department Chief stated on May 2, 2024, that he had advised UCLA leadership, from the beginning, not to allow the encampment since it violated campus rules against overnight camping and he feared it could lead to problems, but University leadership decided to allow it 'as an | 3d Rassbach Decl. Ex. 1 at 68 (UCLA Antisemitism Task Force Report). |

| | |
|---|---|
| expression of students' First Amendment rights.'" | |
| 103. Defendant Block subsequently admitted that the "encampment was against policy" and "violated time, place, and manner" restrictions, and that UCLA "should have been prepared to immediately remove the encampment if and when the safety of our community was put at risk." | 3d Rassbach Decl. ¶14 at 2:45:21-2:45:27, 45:03:00-45:08:00 (providing website link to Defendant Block's May 23, 2024 congressional testimony). |
| 104. Indeed, "[c]ampus officials continued to refuse to break up the encampment even after the protesters denied Jews and others free passage and access to campus classrooms and facilities on grounds that allowance of such behaviors and activities was part of their 'de-escalation strategy.'" | 3d Rassbach Decl. Ex. 1 at 68 (UCLA Antisemitism Task Force Report). |
| 105. UCLA "failed to issue any suspensions or probations against students for conduct related to antisemitic protests, disruptions, and harassment[.]" | 3d Rassbach Decl. Ex. 3 at 184 (U.S. House Committee Report on Antisemitism). |
| 106. "Of the 96 UCLA students arrested on May 2, 2024, following their refusal to leave the school's unlawful encampment, 92 signed an agreement with the Office of Student Conduct that allowed them to evade discipline in return for stating they would refrain from future violations of the Student Conduct Code." "Of the four students [who] did not sign the agreement, three of them are listed as 'graduation hold in | 3d Rassbach Decl. Ex. 3 at 184 (U.S. House Committee Report on Antisemitism); *see also* 3d Rassbach Decl. Ex. 4 at 454 (U.S. House Antisemitism Report). |

| | |
|---|---|
| place,' while one remains enrolled at UCLA." | |
| 107. "No UCLA students were disciplined for blocking Jewish students from accessing public areas of UCLA's campus during the encampment[,]" and "UCLA has failed to identify any of those responsible for the blocking [of] Jewish students from accessing these areas." | 3d Rassbach Decl. Ex. 3 at 184 (U.S. House Committee Report on Antisemitism); *see also* Rassbach Decl. Ex. 4 at 454 (U.S. House Antisemitism Report). |
| **Radical Groups Continue Constructing Encampments on UCLA's Campus, and UCLA Fails to Respond** | |
| 108. Further demonstrations and encampments have appeared on campus since the first one. | 3d Rassbach Decl. Ex. 1 at 73 & n.178 (UCLA Antisemitism Task Force Report); Dkt.62-5 ¶¶27-30 (Braziel Decl.); 3d Rassbach Decl. Ex. 8 at 546-47; Dkt.48-61 at 126 (Rassbach Ex. 24); Dkt.48-62 at 127 (Rassbach Ex. 25); Dkt.48-63 at 128 (Rassbach Ex. 26); Dkt.48-33 at 83 (Shemuelian Ex. 25); Dkt.48-34 at 84 (Shemuelian Ex. 26); Dkt.48-35 at 86-87 (Shemuelian Ex. 27); Dkt.48-36 at 88 (Shemuelian Ex. 28). |
| 109. Early in the morning on May 6, 2024, "a group of approximately 40 individuals" occupied a parking structure on UCLA's campus while "wearing masks and in possession of | 3d Rassbach Decl. Ex. 8 at 546. |

| | |
|---|---|
| metal pipes" and other "tools and items that could be used to unlawfully enter and barricade a building," such as "bolt cutters" and "heavy-duty chains." | |
| 110. Around the same time that morning, "while the group at Parking Structure 2 was still detained, a group of at least 30 individuals were seen inside Moore Hall," which "was closed to the public at that time." "UCPD learned via social media that a UCLA registered student organization had just posted a statement encouraging people to occupy Moore Hall." | 3d Rassbach Decl. Ex. 8 at 546. |
| 111. "Officers responded to the building and … secured the perimeter to prevent additional access into the building. UCPD officers announced eight times that the building was closed and that all occupants were required to leave. After approximately 25 minutes of announcements, … a group of about 60 individuals exited the building and left the area." | 3d Rassbach Decl. Ex. 8 at 546. |
| 112. "[T]he group of … individuals who left Moore Hall marched to Dodd Hall and entered that building, which was open to the public and being used for midterm exams. The group created a disturbance inside the building and interrupted at least one midterm exam." | 3d Rassbach Decl. Ex. 8 at 547. |
| 113. "As officers were preparing to enter the building, the group exited, joined a crowd of about 150 protesters outside, | 3d Rassbach Decl. Ex. 8 at 547. |

| | |
|---|---|
| and started to protest outside the building" before then "march[ing] to Bruin Plaza, where they eventually dispersed." | |
| 114. In response, UCLA required classes to be held remotely from May 6 to May 10, 2024. | Dkt.48-62 at 127 (Rassbach Ex. 25); Dkt.48-63 at 128 (Rassbach Ex. 26); Dkt.107 ¶204 (Answer). |
| 115. Another encampment arose a couple of weeks later. | Dkt.48-57 at 111 (Rassbach Ex. 20); Dkt.48-33 at 83 (Shemuelian Ex. 25); Dkt.48-34 at 84 (Shemuelian Ex. 26). |
| 116. On May 23, 2024, "shortly before 7 a.m., demonstrators arrived on the Kerckhoff patio and began to erect barricades," "establishing fortifications," "blocking access to the area and nearby buildings and disrupting regular campus operations." | Dkt.48-34 at 84 (Shemuelian Ex. 26); Dkt. 48-33 at 83 (Shemuelian Ex. 25). |
| 117. After being told to "disperse," the activists relocated to Dodd Hall, again "barricad[ing] access" and "committ[ing] acts of vandalism" before being ordered to "disperse." | Dkt.48-34 at 84 (Shemuelian Ex. 26). |
| 118. "The group was ordered to disperse and, while some demonstrators left, ultimately UCPD cleared the building." | Dkt.48-34 at 84 (Shemuelian Ex. 26). |
| 119. Then, on June 10, 2024, activists "set up an unauthorized and unlawful encampment" at "the walkway at the top of the Janss Steps" with "tents, | Dkt.48-58 at 112 (Rassbach Ex. 21); *see also* Dkt.48-35 at 86 (Shemuelian Ex. 27). |

| | |
|---|---|
| canopies, wooden shields, and water-filled barriers." | |
| 120. The group "restricted access to the general public" and "disrupted nearby final exams." | Dkt.48-58 at 112 (Rassbach Ex. 21). |
| 121. After "multiple dispersal orders," "[t]he group then marched to the Kerckhoff [P]atio, where they set up an unauthorized and unlawful encampment with tents, canopies, and barricades," "restricted access to the general public," "enter[ed] Moore Hall," and "disrupted nearby final exams." | Dkt.48-58 at 112 (Rassbach Ex. 21). |
| 122. After more "dispersal orders," "[t]he group then marched to the courtyard between Dodd Hall and the School of Law, where they set up another unauthorized and unlawful encampment," "restricted access to the general public," and "disrupted nearby final exams." | Dkt.48-58 at 112 (Rassbach Ex. 21). |
| 123. "As a result of the unauthorized and unlawful encampments at the three locations, the group damaged the Shapiro fountain, spray-painted brick walkways, tampered with fire safety equipment, damaged patio furniture, stripped wire from electrical fixtures, and vandalized vehicles." | Dkt.48-58 at 112 (Rassbach Ex. 21). |
| 124. Further, the June 10 encampments resulted in "the blocking of student access to parts of campus," with some students "miss[ing] finals because they | Dkt.48-35 at 86 (Shemuelian Ex. 27). |

| | |
|---|---|
| were blocked from entering classrooms" and others "ha[ving] to be evacuated in the middle of taking their final exams." | |
| 125. Moreover, "[t]hroughout the evening, there were also violent attacks on safety personnel and law enforcement, resulting in at least six injuries to UCPD personnel and other safety officers." | Dkt.48-35 at 86 (Shemuelian Ex. 27). |
| Antisemitic Chaos Continues in the 2024-2025 School Year | |
| 126. Defendant Braziel spent the summer months preceding the new 2024-25 academic year "run[ning] through various scenarios with the senior leadership and experts to proactively put strategies in place to respond to potential civil unrest." | Dkt.62-5 ¶31 (Braziel Decl.). |
| 127. "[I]ndividuals disrupted a portion of the September 19, 2024 meeting of The Regents of the University of California." | Dkt.107 ¶228 (Answer). |
| 128. On October 7, 2024—the one-year anniversary of Hamas's terrorist attacks on Israel—"UCLA's Undergraduate Student Association Council (USAC) Cultural Affairs Commission," which is part of the university and "is funded by mandatory undergraduate student fees," "posted a series of images and statements that depicted paragliders and inverted red triangles, which are used by Hamas as symbols to indicate Israeli targets and are now associated with torture, rape, and murder of unarmed civilian victims" which | 3d Rassbach Decl. Ex. 1 at 78 (UCLA Antisemitism Task Force Report) (footnotes omitted). |

| | |
|---|---|
| "dehumanizes Jews and Israelis and … celebrate[s] overt violence against Israeli civilians." | |
| 129. Also on October 7, 2024, "the UCLA student group, Students for Justice in Palestine, organized and held a demonstration in North Di[cks]on Court … in violation of campus time, place, and manner restrictions, and other campus and University rules." "No disciplinary actions have been taken against these student groups or individuals who are in violation of campus policies." | 3d Rassbach Decl. Ex. 1 at 79 (UCLA Antisemitism Task Force Report). |
| 130. There was another "unauthorized demonstration" on UCLA's campus "on October 21, 2024" when demonstrators set up "unauthorized structures" in Dickson Court North before dispersing after orders from UCLA PD. | Dkt.107 ¶232 (Answer); 3d Rassbach Decl. Ex. 9 at 549. |
| 131. And on November 19, 2024, "approximately 75 people" involved in "protest activity" "formed a human chain by linking their arms together" and "block[ing] pedestrian access on Bruin Walk," "the main pedestrian thoroughfare on campus." Law enforcement eventually cleared the blockade. | 3d Rassbach Decl. Ex. 10 at 551. |
| Plaintiffs' Religious Exercise | |
| 132. Yitzchok Frankel is a third-year law student at UCLA School of Law. | Dkt.107 ¶233 (Answer). |

| | |
|---|---|
| 133. Frankel is an Orthodox Jew. | Dkt.48-2 ¶3 (Frankel Decl.). |
| 134. Frankel seeks to follow Jewish law (halacha), which prohibits speaking ill of or defaming the land of Israel. Thus, Frankel believes, as a matter of his religious faith, that he must support Israel. | Dkt.48-2 ¶11 (Frankel Decl.). |
| 135. Disavowing Israel's right to exist would directly contravene Frankel's Jewish faith. | Dkt.48-2 ¶¶38, 49 (Frankel Decl.). |
| 136. Joshua Ghayoum is a junior at UCLA. | Dkt.107 ¶286 (Answer). |
| 137. Ghayoum is Jewish. | Dkt.48-4 ¶3 (Ghayoum Decl.). |
| 138. Ghayoum believes support for Israel is a religious obligation, and thus he cannot in good conscience forswear Israel and its right to exist. | Dkt.48-4 ¶¶11, 44 (Ghayoum Decl.). |
| 139. Eden Shemuelian attended UCLA as an undergraduate and is a third-year student at UCLA School of Law. | Dkt.107 ¶332 (Answer). |
| 140. Shemuelian is Jewish. | Dkt.48-8 ¶4 (Shemuelian Decl.). |
| 141. For Shemuelian, Judaism is synonymous with supporting Israel, and being a faithful Jew means supporting Israel's right to exist. | Dkt.48-8 ¶11 (Shemuelian Decl.). |
| 142. As a matter of her Jewish faith, Shemuelian cannot disavow her beliefs about Israel. | Dkt.48-8 ¶¶111, 120 (Shemuelian Decl.). |

PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

30

| | |
|---|---|
| 143. Dr. Kamran Shamsa is currently an Associate Clinical Professor at UCLA. | Dkt.107 ¶404 (Answer). |
| 144. Since 2011, Shamsa has been a member of the UCLA faculty in the David Geffen School of Medicine and the Department of Medicine/Division of Cardiology. Prior to joining the faculty, Shamsa completed an internship in Medicine/Pediatrics in 2005, a residency in Internal Medicine/Pediatrics in 2008, and a fellowship in Adult Cardiovascular Disease in 2011, all at the David Geffen UCLA School of Medicine. | Dkt.107 ¶¶404-05 (Answer). |
| 145. Shamsa received a Bachelor of Science in Physiological Science from UCLA in 1998. | Dkt.107 ¶406 (Answer). |
| 146. Shamsa is an observant Jew, and his Jewish faith and identity are at the core of who he is. | Suppl. Shamsa Decl. ¶2. |
| 147. As a matter of his Jewish faith, Shamsa believes that Israel has a right to exist, that it is the homeland of the Jewish people, and that he must support Israel as a homeland for Jews. | Suppl. Shamsa Decl. ¶8. |
| 148. Shamsa's Jewish faith does not allow him to disclaim Israel or its right to exist. | Suppl. Shamsa Decl. ¶8. |
| 149. "Jewish support of a nation-state in their historic homeland of Israel … is integral to religious belief and identification among a large majority of Jews." | 3d Rassbach Decl. Ex. 1 at 81 (UCLA Antisemitism Task Force Report). |

## II.  CONCLUSIONS OF LAW

### *Legal Standards*

1. Summary judgment is warranted where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

2. A fact is only material when, under relevant law, the resolution of that fact affects the outcome of the case; a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3. Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or assert that a "metaphysical doubt" about a material factual issue precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

4. Rather, "[t]he nonmoving party must come forward with 'specific facts showing that there is a genuine [dispute] for trial.'" *Id.* at 587 (emphasis omitted).

5. The standard for a permanent injunction is "essentially the same" as for a preliminary injunction, except that Plaintiffs must show actual success on the merits. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011).

6. To obtain a permanent injunction against the government, a plaintiff must "show 1) actual success on the merits, 2) the inadequacy of legal remedies, irreparable injury, and 3) that the injunction was warranted by a balance of the equities." *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998).

7. There is no heightened standard for granting a mandatory permanent injunction. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 n.13 (9th Cir. 2019).

**The Free Exercise Clause**

8. Under the Free Exercise Clause, "laws that burden religious exercise must be both neutral and generally applicable." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc) ("*FCA*"). If they are not, they are subject to strict scrutiny. *Id.*

9. First, a law is not neutral or generally applicable if it targets religious observers based on their religious status or religious exercise. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017); *Carson v. Makin*, 596 U.S. 767, 787 (2022).

10. Second, laws that "treat *any* comparable secular activity more favorably than religious exercise" are not neutral or generally applicable. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

11. Third, "a purportedly neutral 'generally applicable' policy may not have 'a mechanism for individualized exemptions.'" *FCA*, 82 F.4th at 686 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). That means "the mere existence of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable, regardless of the actual exercise." *Id.* at 687-88.

12. Plaintiffs' exclusion from resources and facilities in the heart of UCLA's campus because of their religious beliefs burdened their religious exercise by denying them an equal share of those resources and facilities. *See Trinity Lutheran*, 582 U.S. at 458; *Carson*, 596 U.S. at 780; *Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1166-67 (9th Cir. 2024).

PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

33

13. Defendants' actions violated the Free Exercise Clause in at least three ways.

14. First, as this Court already concluded, Defendants violated this principle when it made its campus accessible to others even as it knew it was inaccessible to Jews who could not forswear Israel. In other words, Defendants knowingly facilitated the "exclu[sion of] religious observers from otherwise available public benefits" and "den[ied] the benefit based on a recipient's religious exercise," thereby "violat[ing] the Free Exercise Clause." *Carson*, 596 U.S. at 778, 785.

15. Second, due to Defendants' actions, Plaintiffs could not fully access UCLA's educational benefits and facilities like everyone else unless they forwent these religious exercises. *Trinity Lutheran*, 582 U.S. at 463; *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). By depriving those who engage in religious exercise of access to the same educational facilities and benefits to which other students and faculty retained full access, UCLA violated the *Tandon* principle. *See Tandon*, 593 U.S. at 62; *FCA*, 82 F.4th at 694 (government cannot "treat comparable secular groups more favorably"); *see also Bacon v. Woodward*, 104 F.4th 744, 751-52 (9th Cir. 2024).

16. Third, Defendants' policies contained numerous discretionary mechanisms and were not uniformly applied, meaning its actions were not generally applicable. While acting under the discretionary Robinson-Edley policy, Defendants repeatedly made the decision not to enforce various policies prohibiting the encampment. Instead, UCLA adopted an ad-hoc policy of providing access and benefits to some students and faculty while denying those same benefits to Jewish students and faculty.

These discretionary decisions render those policies not generally applicable, as this sort of "case-by-case analysis is antithetical to a generally applicable policy." *FCA*, 82 F.4th at 688.

17. Defendants' actions are thus subject to strict scrutiny, which they fail.

18. To satisfy strict scrutiny, Defendants must show that UCLA's policies and practices advance "interests of the highest order" and that they are "narrowly tailored" to achieve that interest. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546 (1993). Targeting "religious conduct for distinctive treatment … will survive strict scrutiny only in rare cases." *Carson*, 596 U.S. at 780-81. "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541.

19. It is not enough for Defendants to articulate their interest at "a high level of generality." *Id.* at 541. Instead, they must show that their interest is compelling as to "the particular claimant whose sincere exercise of religion is being substantially burdened" and that the challenged actions and policies actually further that interest. *Holt v. Hobbs*, 574 U.S. 352, 363 (2015).

20. Here, Defendants have asserted the interest of promoting public safety and security. But they haven't demonstrated how this generalized interest justifies allowing and facilitating the exclusion of these Plaintiffs from parts of campus. Nor have they shown that their actions actually furthered public safety; the evidence is to the contrary, including UCLA's acknowledgment that the encampment gave rise to "instances of violence" that left "[UCLA's] Jewish students[] in a state of anxiety and fear." Dkt 48-23 at 60 (Shemuelian Ex. 15).

21. Nor were Defendants' policies and actions the "least restrictive means" to achieve public safety. *Bacon*, 104 F.4th at 752. Disbanding the encampment at the outset would have prevented subsequent violence and allowed Plaintiffs equal access to campus. Alternatively, rather than deploying its security to limit access to the encampment, UCLA could have deployed security to ensure safe passage through the encampment for Jewish students and faculty. This would have prevented violence while ensuring equal access to campus.

### *Remaining Injunction Factors*

22. To obtain a permanent injunction, Plaintiffs must show that they will suffer irreparable harm without injunctive relief, that the balance of equities tip in their favor, and that an injunction is in the public interest. *Walters*, 145 F.3d at 1048. All three remaining factors are satisfied here.

23. "It is axiomatic that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *FCA*, 82 F.4th at 694 (cleaned up).

24. When "the party opposing injunctive relief is a government entity, the third and fourth factors … 'merge.'" *Id.* at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

25. Here, both factors clearly favor granting a permanent injunction. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), and Defendants "cannot reasonably assert that [they are] harmed in any legally cognizable sense by being enjoined from constitutional violations." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (government

"cannot suffer harm from an injunction that merely ends an unlawful practice").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: February 28, 2025

Respectfully submitted,

/s/ *Eric C. Rassbach*
Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Reed M. Bartley (TX Bar No. 24125115)* ‡
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketfund.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

Elliot Moskowitz (NY Bar No. 4039160)*
Rebecca L. Harris (NY Bar No. 5607080)*
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

*Attorneys for Plaintiffs*

\* Admitted *pro hac vice*.

‡ Not admitted to the D.C. Bar; admitted only in Texas. Supervised by licensed D.C. Bar members.

PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
38