# Exhibit 1

Third Declaration of Eric Rassbach



# Antisemitism and Anti-Israeli Bias at UCLA

**Prepared for**

**Dr. Darnell Hunt**
**Interim Chancellor UCLA**

**October 16, 2024**

# ANTISEMITISM AND ANTI-ISRAELI BIAS AT UCLA

Report Submitted To

Dr. Darnell Hunt
Interim Chancellor
UCLA

By

The Task Force to Combat Antisemitism
and Anti-Israeli Bias at UCLA

16 October 2024

**The official version of this document can be found at
http://antisemitismreport.org**

# Table of Contents

**EXECUTIVE SUMMARY**

Executive Summary .......................................................... **1**

**I. INTRODUCTION**

Introduction .................................................................. **4**

**II. RECENT RISE IN ANTISEMITISM**

Recent Rise in Antisemitism ............................................. **8**

**III. FINDINGS OF A 2024 SURVEY OF ANTISEMITISM AND ANTI-ISRAELI BIAS AT UCLA**

Summary ....................................................................... **11**

A. Methodology .............................................................. **11**

   1.  Survey Items .......................................................... **12**

   2. Recruitment ........................................................... **13**

B. Analysis and Findings .................................................. **14**

   1.  Sample ................................................................ **15**

   2. Age ..................................................................... **15**

   3. Gender ................................................................. **15**

   4. Race and Ethnicity .................................................. **16**

C. Results ...................................................................... **16**

   1.  University Affiliation ................................................ **16**

   2. Jewish and Israeli Identity ......................................... **17**

   3. Perceptions of Antisemitism and Anti-Israeli Bias .......... **20**

   4. Experiences of Antisemitism and Anti-Israeli Bias .......... **31**

D. Limitations ................................................................. **43**

THIRD RASSBACH DECLARATION EXHIBIT 1

# IV. THE POST-OCTOBER 7TH EXPERIENCE AT UCLA

INCIDENTS OF ANTISEMITIC AND ANTI-ISRAELI BIAS AND VIOLATIONS OF LAWS AND RULES

Post-October 7th Experience at UCLA ..... **44**

A. Marches and Rallies ..... **45**

B. The Encampment ..... **50**

C. Faculty Behavior ..... **60**

D. Other Incidents on Campus ..... **63**

E. Disciplinary Procedures and Enforcement ..... **66**

F. University Response in *Frankel v. Regents* ..... **67**

G. Summary of the Post-October 7 Experience at UCLA ..... **69**

# V. POLICY AND PROCEDURAL RECOMMENDATIONS

Policy and Procedural Recommendations ..... **72**

A. Implement Relevant Training and Education Initiatives ..... **73**

B. Overhaul Means of Enforcement and Complaint System ..... **75**

C. Consistent, Timely, and Effective Enforcment ..... **76**

D. Rule Clarification and Cooperation with Stakeholders ..... **77**

E. Implement New Law and Other Actions ..... **79**

# VI. CONCLUSION

Conclusion ..... **81**

# APPENDIX

A. 2023-24 Registered Campus Organizations and UCLA Centers (Jewish, Israeli) ..... **84**

B. Invitation Letters ..... **85**

C. Invitations to Participate in the Survey ..... **87**

# Executive Summary

In the wake of increased antisemitic incidents and tensions both broadly and on campus, UCLA Interim Chancellor Darnell Hunt established the Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA in February 2024. The Task Force was charged with contributing evidence and analysis regarding the campus climate for Jewish and Israeli community members. To contextualize the recent rise in antisemitism and anti-Israeli bias, the Task Force undertook efforts to gather summary evidence and to conduct a related literature review. Next, the Task Force developed a survey to solicit feedback directly from Jewish and Israeli community members at UCLA. To better understand the lived experiences of the diverse Jewish and Israeli communities at UCLA, the Task Force recruited survey participants from religious, secular, Zionist, non-Zionist, and anti-Zionist identities and organizations. The Task Force then analyzed perceptions of the community, using a mixed-methods approach.

Survey findings suggest that the Jewish and Israeli communities at UCLA are diverse in beliefs, religious denomination, experience, race, ethnicity, and attachment to Israel. Most of the 428 respondents reported being negatively impacted by antisemitism and anti-Israeli bias at UCLA during the 2023-2024 academic year, particularly following the events of October 7, 2023. For example:

- Two-thirds of respondents reported that antisemitism is a problem or a serious problem at UCLA and three-quarters reported that anti-Israeli bias is a problem or serious problem.

- The majority of respondents (70%) perceived the Spring quarter Encampment to be a source of antisemitism.

- Three-quarters of respondents felt that antisemitism is taken less seriously than other forms of hate and discrimination at UCLA.

- Collectively, there were over 100 reports of individuals experiencing a physical attack or physical threat.

- Nearly 40% of respondents (N=394), noted that they experienced antisemitic discrimination at UCLA.

- Almost half (49%) of the undergraduate student respondents reported that teaching assistants engaged in behaviors that included offensive comments,

verbal attacks, or discrimination, and 76% reported that their peers engaged in these behaviors.

- One-third of respondents indicated that they had made an informal or formal complaint to UCLA because of mistreatment or discrimination based on their Jewish or Israeli identity. Notably, most respondents did not have confidence that reporting discrimination to UCLA administrators would lead to any effective action by the campus.

- Forty-one percent of respondents indicated that they had considered leaving UCLA due to their experience of antisemitism or anti-Israeli bias. This was far more common among faculty (53%) and staff (42%) compared to undergraduate students (37%) and graduate students, professional students, and postdoctoral scholars (33%).

- Overall, the bias experienced by Jews and Israelis led to an increase in stress of survey respondents and resulted in negative impacts on mental health and overall well-being.

- Despite experiencing stressors, Jewish and Israeli members of the UCLA community expressed pride in their identities and want to work to make UCLA a safe and welcoming place for all.

Given findings of broad-based perceptions of antisemitic and anti-Israeli bias on campus, the Task Force documented related events occurring on campus and conducted an analysis to determine if violations of federal law, state law, or UCLA, University of California Office of the President (UCOP), and UC Regents policies and protocols had occurred. The report raises substantial concern regarding such violations and related inconsistencies in campus application of policy and law.

Collectively, the literature, survey-based perceptions, and available evidence of legal and policy violations contribute to our recommendations to the University. To address bias and to promote a more inclusive and safe space for Jewish people, Israelis, and all members of the UCLA community, the Task Force recommends a 5-prong approach. First, we recommend the enhancement of relevant training and education among UCLA community members. Second, we recommend a substantial review and overhaul of the current discrimination reporting system. Third, we recommend that the University clarify rules. Fourth, we recommend consistent, timely, and effective enforcement of laws and rules (including new California legislation recently signed into law by Governor Newsom). Finally, we provide additional specific actions to protect and support persons of Jewish and Israeli identities. Addressing the campus climate and adopting and implementing

recommendations outlined in this report are necessary to provide a safe, accessible, and non-discriminatory environment for all community members and to assure that UCLA adheres to and advances its community goals.

In sum, this report provides new evidence, assessment, and recommendations pertinent to the recent rise of antisemitism and anti-Israeli bias at UCLA. It is vital that the University address these matters in a timely manner to prevent attrition of Jews and Israelis from UCLA and to mitigate discrimination and antisemitism on campus. The Task Force is prepared to begin our next phase of work with administrators and other groups on campus through the *Dialogue Across Differences Initiative* to model and promote the values of intellectual engagement, empathy, active listening, critical thinking, and collaboration. We look forward to engaging with administrators, leaders, groups on campus, and the entire campus community to ensure an inclusive, accessible and non-discriminatory campus environment that upholds Bruin Values and principles of democracy.

# I.    Introduction

The Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA was convened by Interim Chancellor Darnell Hunt in February 2024.[1] The goal of the Task Force was to generate substantive contributions to affect positive change in campus climate in the wake of unrest, protest, and hostilities associated with events on October 7, 2023, and the aftermath in Israel and Gaza. The Task Force was created under the *Dialogue Across Differences Initiative* at UCLA alongside a similar task force to combat Islamophobia and anti-Palestinian bias.

Our Task Force notes from the outset that Antisemitism and Islamophobia should not be seen as competing or mutually exclusive concerns. The same pertains to bias against Israelis or Palestinians. Rather, the rise in patterns of prejudice based on religious or national identities can be dangerous for all since no group is immune. If slurs, stereotyping and scapegoating of one minority group are allowed to flourish, those same aggressions can, and likely will, be used against other groups. History has shown that prejudice often clusters and the holding of negative views and stereotypes of one group can increase the propensity to be bigoted against other groups as well. Principled opposition to *all* prejudice is in every group's best interest.

The conflict in the Middle East has roiled campuses in the United States and many other parts of the world in dramatic ways. U.S. universities have witnessed tense ideological conflict and polarization among community members that has resulted in lawsuits and battles over free speech.[2] Recorded antisemitic and anti-Israeli incidents and perceptions of bias have surged at U.S. universities.[3] According to a recent report by the University of Chicago Project on Security and Threats, the impact of the conflict on campuses across the country is far reaching, with 56% of Jewish and 52% of  Muslim students reporting feeling unsafe on campus.[4,5]

---

[1] Task Force Members include Sarah Blenner, JD, MPH (Fielding School of Public Health), Stuart Fine, BS (David Geffen School of Medicine); Stuart A. Gabriel, PhD (Anderson School of Management, Task Force Chair); Kian Kohanteb (College of Letters and Sciences); Deborah Lehman, MD (David Geffen School of Medicine); Maytal Sarafian, BA (School of Law); Richard Steinberg, JD, PhD (School of Law); Jonathan Zasloff, JD, PhD (School of Law) and additional members who prefer to remain anonymous. The Task Force is deeply grateful to Tom Basin, MA (Department of Economics) and Etai Dayani, BA (School of Law) for their excellent research assistance.

[2] Sharon Nazarian, *Jewish Students Have a Right to Feel Safe. Universities Can't Let Them Down Again*, USA TODAY (Sept. 9, 2024), https://www.usatoday.com/story/opinion/voices/2024/09/09/jewish-students-antisemitism-universities-college-protests/75001014007/.

[3] Trends in antisemitic events generally and on U.S. college campuses are discussed in Section II.

[4] GRAHAM W. WRIGHT ET AL., IN THE SHADOW OF WAR: HOTSPOTS OF ANTISEMITISM ON US COLLEGE CAMPUSES (2023), https://scholarworks.brandeis.edu/esploro/outputs/report/9924312184701921.

[5] As charged, this Task Force focuses on antisemitism and anti-Israeli bias on the UCLA campus. Matters of Islamophobia and anti-Palestinian bias are the topic of reports of the task force addressing those

The rise in antisemitism and anti-Israeli bias on U.S. college campuses has occurred against a backdrop of a sharp upward trend of antisemitism nationally and globally, as documented by many journalists, scholars, and government agencies. Since the 2010s, antisemitism has become increasingly normalized, including many instances of everyday antisemitism[6] as well as heinous acts of violence against Jewish houses of worship.[7] In Section III, we report the findings of a survey on antisemitism and anti-Israeli bias completed by Jewish or Israeli identified UCLA students, faculty, and staff in June 2024. We also report salient incidents of antisemitism and bias against Israelis as evidenced on the UCLA campus during the 2023-24 academic year. The assessment of survey responses and related incidents together provide the basis for recommendations to address ongoing concerns and to improve the campus climate.

Survey responses indicate that many Jewish and/or Israeli community members have deep concern over the fair and efficacious implementation and enforcement of protocol, policy, and law at UCLA. Faculty, staff, and students report avoiding campus due to fears of harassment or wariness about the campus climate. Respondents describe hiding their Jewish identity, when possible, to avoid harassment and discrimination. Antisemitism and anti-Israeli bias on UCLA's campus have a negative impact on the mental health, wellbeing, and stress levels of many Jewish and Israeli community members, with faculty and staff members particularly affected. Discriminatory patterns and practices are leading to a negative impact on the ability of many Jewish and Israeli students, faculty, and staff to learn and work on UCLA's campus, and many report consideration of leaving UCLA, either temporarily or permanently. The University is at risk of attrition of Jewish faculty, staff, and students with potential adverse consequences for the University's research, teaching, and service mission.

---

issues. We also note that criticism of the policies of elected or ruling governments can be legitimate and protected. The concern is when—in the current context—such criticism veers into antisemitic and anti-Israeli or Islamophobic and anti-Palestinian bias or discrimination.

[6] *Audit of Antisemitic Incidents 2023*, ANTI-DEFAMATION LEAGUE (Apr. 16, 2024), https://www.adl.org/resources/report/audit-antisemitic-incidents-2023.

[7] *See, e.g.*, Aaron Bandler, *Jewish Community Members Attacked by Anti-Israel Protestors in Front of Adas Torah*, JEWISH J. (June 27, 2024); https://jewishjournal.com/news/372674/jewish-community-members-attacked-by-anti-israel-protesters-in-front-of-adas-torah-speak-out/; Aaron Bandler, *Lawsuit Filed Against Organizers of Anti-Israel Protest at Adas Torah*, JEWISH J. (Jul. 26, 2024), https://jewishjournal.com/community/373474/lawsuit-filed-against-organizers-of-anti-israel-protest-at-adas-torah/;Michael Hill & Maysoon Khan, *Man Who Fired Shotgun Outside New York Synagogue Cited Events in the Mideast, Federal Agent Says*, ASSOCIATED PRESS, Dec. 8, 2023, https://apnews.com/article/jewish-temple-shots-albany-new-york-hanukkah-alkhader-eaea5e4a1c3ae71a0d4c857aac7eb921; Christine Hauser and Alyssa Lukpat, *Gunman in California Synagogue Shooting is Sentenced to Life in Prison*, N.Y. TIMES (Sep. 30, 2021), https://www.nytimes.com/2021/09/30/us/synagogue-shooting-sentence.html; Luke Barr, *Pittsburgh Synagogue Shooting Evidence of Increased Anti-Semitism in US: ADL*, ABCNEWS (Oct. 29, 2018), https://abcnews.go.com/US/pittsburgh-synagogue-shooting-evidence-increased-anti-semitism-us/story?id=58825423.

In Section IV, our report further provides evidence that: (1) a substantial number of blatant antisemitic and anti-Israeli events and behaviors occurred at UCLA post-October 7, 2023; (2) this pattern of events and behaviors intensified during the timeframe of the encampment and related protests on campus in the spring of 2024; (3) throughout most of 2023-2024, campus leadership repeatedly decided not to enforce federal law, state law, and University and campus rules; and (4) many students, faculty, and staff who identify as Jewish and/or Israeli perceived high levels of antisemitic and anti-Israeli bias during this period, felt unsafe on the UCLA campus, and viewed the UCLA response to antisemitism and anti-Israeli bias as severely inadequate.

This report makes the case in Section V for strengthening the awareness and education among all campus affiliates of the diversity of the Jewish community, antisemitism, and anti-Israeli bias. We also recommend trainings for UCLA affiliates and robust enforcement of existing anti-bias and anti-discrimination protocols and laws in order for UCLA to achieve stated campus climate goals of respect and inclusion. Concerted and swift action must be taken to protect the safety, well-being, and productivity of the Jewish and Israeli community on campus. The University must prevent discrimination against Jewish and Israeli community members, implement new state legislation, and rapidly address the work environment concerns for faculty, staff, and students, in order to mitigate adverse consequences to the University. Finally, we believe that these necessary changes on campus may require a cultural shift that will take place only with clear, consistent directives from the most senior level of campus leadership.

This report proceeds as follows. Section II provides a summary of the rise in antisemitism in the U.S. since October 7, 2023, as compiled through review of media, think tank briefs, survey research, and other sources. Section III includes findings of a survey conducted to assess the presence and impact of antisemitism and anti-Israeli bias at UCLA. The survey was developed by the Task Force and disseminated to members of the Jewish and Israeli communities at UCLA in June 2024. Section IV documents antisemitic and anti-Israeli bias events and related violations of laws and rules at UCLA during the 2023-2024 academic year. Section V identifies opportunities for improvement in campus climate and policy recommendations. A summary and concluding remarks are included in Section VI.

In short, this report provides new evidence and insights related to the marked rise of antisemitism and anti-Israeli bias as directed toward and perceived by members of the Jewish and Israeli communities at UCLA. It provides baseline data and a resource to assist the campus in developing strategies and programs to combat antisemitism and anti-Israeli bias. Throughout, our objective is to provide useful input and guidance in pursuit of campus climate objectives consistent with University rules, protocols, and law.

Our hope is that the Interim Chancellor, incoming Chancellor, other UCLA staff and administrators, faculty leaders, student leaders, and members of the UCLA community will review this report and collectively work with the Task Force to enact change that promotes inclusion in a non-discriminatory manner and consistent with Bruin values and aspirations.

# II.   Recent Rise in Antisemitism

Recent years have witnessed a significant jump in antisemitic attitudes and events in the U.S. and beyond.[8] Despite only accounting for 2.2% of the U.S. population,[9] from October through December 2023, Jews became the group most targeted for hate crimes nationally, in California, and in Los Angeles.[10] FBI crime data indicate that over the past decade, Jews consistently have ranked in the top 4 most targeted groups nationwide, and the number one targeted religious group.[11] The Anti-Defamation League (ADL) reported a 200% increase in antisemitic incidents as a whole since October 7, 2023, and a 500% increase in antisemitic incidents on college campuses compared to the same period during the prior year.[12] According to the Anti-Defamation League's 2023 survey of antisemitic attitudes in the United States, 24% of Americans believe six or more anti-Jewish tropes, compared to 11% in 2019.[13] Closer to home, the State of California

---

[8] Resources on the history and significance of antisemitism can be accessed via the UCLA Library's *Research Guide on Antisemitism*. *Research Guide on Antisemitism*, UCLA LIBRARY (Oct. 15, 2024), https://guides.library.ucla.edu/antisemitism. The Task Force chose to use terms throughout our report that mirror the name and scope of the Task Force (i.e., antisemitism and anti-Israeli bias). As with our survey, we intentionally did not provide definitions of antisemitism or bias against Israelis so as to allow for lived experiences and perceptions of Jewish and Israeli community members to inform the way we analyze the climate at UCLA. As background, there exist numerous definitions of antisemitism, including the 2016 "working definition of antisemitism" by the International Holocaust Remembrance Alliance (IHRA), which was adopted by the U.S. Department of State, the City of Los Angeles, and UCLA student government. *See Defining Antisemitism*, U.S. DEP'T OF STATE (May 26, 2016), https://www.state.gov/defining-antisemitism/; *International Holocaust Remembrance Alliance (IHRA) / Antisemitism Definition Adoption*, LA CITY CLERK (Dec. 13, 2022), https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=22-1241; and *A Resolution Condemning Anti-Semitism,* UNDERGRADUATE STUDENTS ASSOCIATION COUNCIL https://www.usac.ucla.edu/s/A-Resolution-Condemning-Anti-Semitism.pdf. Other definitions include the "Jerusalem Declaration on Antisemitism" (JDA) published in 2021 and the "Nexus Document" definition of antisemitism introduced in 2021. JERUSALEM DECLARATION ON ANTISEMITISM (2021), https://jerusalemdeclaration.org/; *The Nexus Document*, NEXUS PROJECT (2021), https://nexusproject.us/the-nexus-document/.

[9] *Jewish Population in the United States by State*, JEWISH VIRTUAL LIBRARY (2024), https://www.jewishvirtuallibrary.org/jewish-population-in-the-united-states-by-state#google_vignette (last visited Oct. 9, 2024).

[10] Prior to October 2023, Anti-Black or African American hate consistently ranked as the leading source of hate crimes in the U.S., with anti-Jewish hate often the second leading source of hate. To access data for specific time periods, select the hate crime parameters as follows: (1) type of bias - all biases, (2) time frame - custom, (3) date range - October 2023 to December 2023. The data can also be adjusted to view rates for different years, time periods, and reporting agencies. *See* FBI CRIME DATA EXPLORER, https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime (last visited Oct. 9, 2024).

[11] *Id.*

[12] *Over 10,000 Antisemitic Incidents Recorded in The U.S. Since Oct. 7, 2023, According to ADL Preliminary Data*, ANTI-DEFAMATION LEAGUE, (Oct. 6, 2024) https://www.adl.org/resources/press-release/over-10000-antisemitic-incidents-recorded-us-oct-7-2023-according-adl (last visited Oct. 9, 2024).

[13] *See* ANTI-DEFAMATION LEAGUE, ANTISEMITISM WORLDWIDE REPORT FOR 2023, at 17 (2024), https://cst.tau.ac.il/wp-content/uploads/2024/05/AntisemitismWorldwide_2023_Final.pdf.

reported a 24% increase in anti-Jewish bias events from 152 in 2021 to 189 in 2022.[14] That report further indicated that anti-Jewish hate crimes accounted for 62% of all reported hate crimes in the state in 2024.[15] Locally, the Los Angeles Police Department recorded 165 anti-Jewish hate crimes in Los Angeles in 2023, up from 86 in 2022.[16] Of the reported anti-Jewish hate crimes, 75 (or 45%) occurred over the three month period between October and December of 2023.[17] Antisemitism often takes the form of a conspiracy theory and is prevalent on both ends of the political spectrum.[18] As suggested above, the incidence of antisemitic events jumped in the wake of the October 7, 2023, attack on Israel and subsequent Israeli military response in Gaza.[19]

Universities have not been immune to the rise in antisemitic behaviors and actions. A notable 2024 study by the University of Chicago Project on Security and Threats assessed antisemitism and Islamophobia on U.S. university campuses. That study is based on two national surveys of 5,000 college students from 600 four-year academic institutions, with an additional 5,000 American adults as a comparison set. The surveys were fielded in December 2023 through January 2024. A previous baseline survey of 8,000 American adults fielded in spring of 2023 contributed to the study's analysis. The study provides the broadest survey evidence to date regarding the extent of campus concerns, increases in antisemitic attitudes, and increases in antisemitic events after October 7, 2023.

Major findings of the University of Chicago Project on Security and Threats include:

- At the time of the survey, 56% of Jewish college students felt that they were in personal danger on campus; 52% of Muslim college students and 16% of other college students felt similarly.

- Jewish and Muslim students were most likely to fear physical harm or violence; other students were more likely to fear auxiliary repercussions such as social stigma or fear losing academic or employment opportunities.

---

[14] *See* GOLDEN STATE PLAN TO COUNTER ANTISEMITISM 1 (2024), https://www.gov.ca.gov/wp-content/uploads/2024/04/Golden-State-Plan-to-Counter-Antisemitism.pdf. That same State of California source reported anti-Muslim hate crimes increased from 25 in 2022 to 40 in 2023. CAL. DEP'T OF JUST., 2023 HATE CRIME IN CALIFORNIA 2 (2023), https://data-openjustice.doj.ca.gov/sites/default/files/2024-06/Hate%20Crime%20In%20CA%202023f_0.pdf.

[15] GOLDEN STATE PLAN TO COUNTER ANTISEMITISM, *supra* note 14, at 1.

[16] ANTI-DEFAMATION LEAGUE, *supra* note 15, at 17.

[17] *Id.*

[18] UNIV. OF CHI., CHI. PROJECT ON SEC. & THREATS & ANTI-DEFAMATION LEAGUE, ANTISEMITISM AND SUPPORT FOR POLITICAL VIOLENCE (Oct. 2023), https://www.adl.org/sites/default/files/pdfs/2023-10/CPOST-Antisemitism-and-Support-for-Political-Violence.pdf.

[19] *See* ANTI-DEFAMATION LEAGUE, *supra* note 13, at 10; *Audit of Antisemitic Incidents 2023*, *supra* note 6.

- More than 80% of students across all identities disavowed calls for genocide and violence. However, about 10% of college students would permit calls for genocide against Jews, and 13% of college students say that when Jewish individuals are attacked, it is because they deserve it.

- Overall, survey findings indicate broad support for calming actions, including public statements by university senior administrators, that condemn violence of any kind and directed toward any group of people. Results further suggest that administrators should clarify policies on permissible political action on campus as well as mechanisms and obligations to report and respond to concerning incidents.

The Maurice and Marilyn Cohen Center for Modern Jewish Studies at Brandeis University's report, "In the Shadow of War: Hotspots of Antisemitism on US College Campuses," provides comparative analysis of campus antisemitism in 2016 and 2023. The report finds a 40-50% rise in students' perception of a "somewhat hostile" university environment towards Jews. Fifty-one college campuses with large Jewish populations are included in the findings, with responses from around 2,000 Jewish undergraduate students at these schools. UCLA ranked in the top quartile of the report's "antisemitic hostility index" of schools analyzed in the study.[20]

In sum, there is broad, substantial, and warranted concern regarding antisemitism and anti-Israeli bias at U.S. university campuses and beyond. In Sections III and IV of this report we provide evidence and assessment of antisemitism and anti-Israeli bias at UCLA during the 2023-2024 academic year.

---

[20] WRIGHT ET AL., *supra* note 4.

# III.  Findings of a 2024 Survey of Antisemitism and Anti-Israeli Bias on the UCLA Campus

In June 2024, 428 Jewish and Israeli members of the UCLA community completed an anonymous survey on their experiences of antisemitism and anti-Israeli bias at UCLA. The sample included senate and non-senate faculty, including lecturers (n = 172); staff and administrators (n = 59), graduate students, professional students and postdoctoral scholars (n = 90), and undergraduate students (n = 107). The survey was conducted through an on-line, anonymous Qualtrics survey that required a UCLA SSO log in. Recruitment took place through outreach to all registered Jewish organizations on campus and subsequent word of mouth. Although there is no known data on the exact number and composition of the Jewish and Israeli community at UCLA, our survey indicates that the community at UCLA is very diverse in beliefs, religious denomination, experience, race and ethnicity, and connection to Israel. Most respondents reported being negatively impacted by antisemitism and anti-Israeli bias at UCLA during the 2023-2024 academic year. Of particular concern, were significant reporting of (1) physical threats and physical attacks, (2) discrimination based on religion or national origin, and (3) substantial negative impact of antisemitism and anti-Israeli bias on respondents' mental health, well-being, stress levels, as well as their ability to work and learn. Jewish and Israeli survey respondents lack confidence in UCLA's ability to effectively address reports of antisemitism and in some cases are fearful of reporting such events to administration. The environment on campus has led a significant portion of respondents to consider leaving UCLA and taking time off or leaves of absence.

## A. Methodology

Charged with gathering data on antisemitism and anti-Israeli bias at UCLA, the Task Force explored ways to methodically gather experiences and insights from a broad sector of the Jewish and/or Israeli population at UCLA. Our initial plan was to field in-person listening sessions, inviting members of various groups on campus to come together to share their experiences, as many other campus task forces have done. Privacy concerns, perceived hostilities on campus, feasibility, and timing caused us to pivot to an anonymous on-line survey.

The benefits of the survey approach are efficiency (collecting a large number of responses in a short period of time), anonymity (creating an opportunity to share without being "known" or identified with any views), and the ability to collect both quantitative and qualitative data. The limitations of such a survey included the possibility of participation in the survey among those who are not part of the intended group (Jewish and Israeli identified people at UCLA) and an inability to access a closer, more personal listening

experience. All in all, the Task Force agreed that the benefits of the survey approach outweighed the limitations.[21]

## 1. Survey items

A team approach was used to create this survey including both closed-ended and open-ended questions. We began with some key open-ended questions (e.g., tell us about your experience) and added numerous scales and close-ended responses to provide a snapshot of data and anchor points. Some measures and scales were taken from other surveys, including instruments used to (1) assess racism and discrimination,[22] (2) characterize the state of the Jewish community in the United States,[23] and (3) quantify and describe antisemitism on college campuses.[24,25] The team also created some questions very specific to UCLA and the events of the Spring quarter, such as "tell us about your experience with the encampments." We attempted to word questions with neutrality and objectivity to reflect the diverse experiences of Jewish and Israeli people at UCLA and as not to bias respondents. Further, language used in the survey was crafted to mirror the given name and scope of the Task Force (i.e., Antisemitism and Anti-Israeli bias).[26] We intentionally did not provide definitions of antisemitism or anti-Israeli bias so that respondents could answer based on their own lived experiences and perceptions.

---

[21] To mitigate the effects of the survey limitations, we implemented several strategies. First, a UCLA single sign-on (SSO) was required to prevent individuals external to the UCLA community from completing the survey. The UCLA Information Security Office then de-coupled survey results from sign-on information to preserve anonymity of respondents. Additionally, recruitment for the survey was limited to organizations identified as serving Jewish and/or Israeli members of the community and word of mouth. The survey opened with a series of screening questions, which required that the respondent self-identify as Jewish, Israeli, or both in order to complete the survey. During analysis, responses were removed if the respondent did not classify as a current student, faculty, or staff member.

[22] David R. Williams et al., *Racial Differences in Physical and Mental Health: Socioeconomic Status, Stress, and Discrimination*, 2 J. HEALTH PSYCH. 335 (1997).

[23] *Jewish Americans in 2020*, PEW RSCH. CTR. (2021), https://www.pewresearch.org/religion/2021/05/11/jewish-americans-in-2020/.

[24] WRIGHT ET AL., *supra* note 4.

[25] ANTI-DEFAMATION LEAGUE & HILLEL INT'L, THE ADL-HILLEL CAMPUS ANTISEMITISM SURVEY: 2021 (2021), https://www.adl.org/sites/default/files/documents/2022-08/The%20ADL%20Hillel%20Antisemitism%20on%20Campus%20Survey%202021.pdf.

[26] While efforts were taken to both mitigate concerns of bias in questions and maintain consistency with the scope of the Task Force's charge, some organization representatives and respondents expressed concern that variations of the word Zionism were absent from the survey text. Despite an omission of the word Zionism from the survey, themes related to Zionism did arise in the open-ended answers and were considered in the analysis.

## 2. Recruitment

Recruitment took place over a three-week period in June 2024. The team purposively recruited people through all Jewish and/or Israeli affiliated organizations on campus – ranging from larger organizations such as Hillel to smaller groups within specific schools at UCLA. The organizations also spanned alternative political perspectives, including Zionist, non-Zionist, and anti-Zionist. This list of organizations, and associated emails, was obtained from the division of Campus Life (see Appendix A). The team composed an email to these groups, asking them to send a recruitment invitation and survey link to members of their group through their list-serves. Subsequently, we sent two reminder emails during the study period. A copy of these emails is provided in Appendix B. Template outreach email text was provided to the organizations, as were images that could be used to support recruitment of participants, a copy of which is provided in Appendix C. Additionally, the survey was further spread through word of mouth.

As illustrated below (Figure 1), we received responses from a very diverse array of Jewish-affiliated UCLA groups, with the largest representation from Hillel. Forty-five percent of respondents indicated that they were affiliated with more than one Jewish group on campus.

As survey responses were submitted, the Task Force monitored the number of responses received from across campus. Task Force members conducted targeted outreach to schools (e.g., Schools of Dentistry and Nursing) and position types (i.e., staff) to promote representation from across campus. In the end, every school at the University was represented in the survey responses, as were individuals who did not affiliate with a specific academic unit (e.g., student affairs and external affairs).

The major limitation of our sampling is that we do not know the size of each organization, or how many people were asked to participate in the survey. Without that information, we are unable to determine a precise response rate or sampling bias. We are also unsure about the total population of Jewish and/or Israeli community members at UCLA. That said, given the range of organizational affiliations as well as the diversity in responses to the survey, we are confident that the participants reflect the range of views of the diverse Jewish and Israeli community at UCLA.



Figure 1: Respondent-Identified Affiliations with Jewish Organizations and Centers

## B. Analysis and Findings

All survey responses were collected on-line via Qualtrics. Close-ended responses were downloaded in Microsoft Excel and analyzed using both the statistical analysis program, R, and Microsoft Excel. Open-ended responses were clustered into concepts by the authorship team. The open-ended responses are presented in this report to provide context to the overall findings; a deeper analysis of those responses by group (i.e., affiliation with campus groups, type of respondent, Israeli and Jewish identity group) is warranted and is planned for future study.

## 1. Sample

Overall, 477 individuals took part in the survey. Of those, 49 respondents answered fewer than four questions and were excluded from this analysis due to insufficient data. As such, the analytic sample for this report represents data from 428 completed surveys. The details of the sample regarding age, gender, ethnicity, and race are described below.

## 2. Age

The age of the sample varied widely with the largest group of respondents (23.8%, n=102) being less than 23 years of age and the second largest being 24-30 years of age (16.8%, n=72). While the two younger groups are the largest in the study, the majority of the sample were 41 years of age or older (see Table 1).

Table 1: Age of Respondents

| What is your age in years? | Count (N=428) | % |
|---|---|---|
| Less than 23 years | 102 | 23.8 |
| 24 - 30 years | 72 | 16.8 |
| 31 - 40 years | 49 | 11.4 |
| 41 - 50 years | 64 | 15.0 |
| 51 - 60 years | 54 | 12.6 |
| 61 - 70 years | 45 | 10.5 |
| More than 70 years | 26 | 6.1 |
| Decline to State | 16 | 3.7 |

## 3. Gender

Just under half of respondents (49.5%, n=212) identified as female and 40.0% (n=171) as male. The remainder identified as non-binary/other or declined to state. (See Table 2).

Table 2: Gender Identity of Respondents

| What is your gender identity? | Count (N=428) | % |
|---|---|---|
| Female | 212 | 49.5 |
| Male | 171 | 40.0 |
| Non-binary/Other | 15 | 3.5 |
| Decline to State | 30 | 7.0 |

### 4. Race and Ethnicity

We asked two questions related to ethnicity and race.[27] The first was "*are you Latino or Hispanic*?" In this sample, 22 (5.1%) answered yes. The second question asked: "*How do you describe yourself*?" Respondents could select from a list of races used by the U.S. Census Bureau and had the option to select multiple racial identities, resulting in counts that exceed the number of respondents. Respondents were classified as multiracial if they made more than one selection for race. The majority (67.3%, n=288) of the sample identified as White, and the second largest group as Middle Eastern or North African (18.9%, n=81). Seventy-five people who responded to the survey identified with more than one race (see Table 3).

Table 3: Self-Identified Race and Ethnicity

| Race/Ethnicity | Count | % |
|---|---|---|
| White | 288 | 67.3 |
| Middle Eastern or North African | 81 | 18.9 |
| Latino/a or Hispanic | 22 | 5.1 |
| American Indian or Alaskan Native, Asian, Black or African American, Other Pacific Islander, or Other Race[28] | 92 | 21.5 |
| Multiracial | 75 | 17.5 |

## C. Results

### 1. University Affiliation

The Task Force aims to provide the UCLA community with insights into the unique needs of surveyed sub-populations at UCLA. Such insights could help to inform UCLA Administration's development and implementation of policies. While there are numerous ways to disaggregate data from the survey (e.g., by gender or age), the Task Force primarily disaggregated these data into self-reported affiliate status at the University,

---

[27] Due to methodology considerations, the Task Force used racial and ethnic categories used by the U.S. Census Bureau. However, we recognize that Jewish race and ethnicity is nuanced and is the subject of debate. A proportion of Jews do not identify as white, despite often being categorized as such by others. *See also* Robert S. Weisskirch et al., *The Complexity of Ethnic Identity Among Jewish American Emerging Adults*, 16 IDENTITY 127 (2016), https://doi.org/10.1080/15283488.2016.1190724; *Jewish Americans in 2020*, *supra* note 23.

[28] Data for American Indian or Alaskan Native, Asian, Black or African American, Other Pacific Islander, or Other Race were collapsed into a single category due to low counts for each specific category.

considering differences between four groups: (1) senate and non-senate faculty, and lecturers (hereinafter, "faculty"), (2) staff and administrators (hereinafter, "staff"), (3) graduate students, professional students, and postdoctoral scholars,[29] hereinafter "graduate students," and (4) undergraduate students (see Table 4).

Table 4: Self-Reported Affiliation Status at UCLA

| UCLA Affiliation | Count (N=428) | % |
|---|---|---|
| Faculty | 172 | 40.2 |
| Staff or Administrator | 59 | 13.8 |
| Graduate Student, Professional Student, or Postdoctoral Scholar | 90 | 21.0 |
| Undergraduate Student | 107 | 25.0 |

## 2. Jewish and Israeli Identity

All survey respondents identified as Jewish in some way and 15.4% (n=66) of respondents identified as Israeli. Some respondents described having close family ties to Israel or being of Israeli heritage, even if they did not identify as Israeli per se. Of the 428 respondents, nearly half (48.8%, n=209) indicated that being Jewish was very much a part of their daily life and 48.4% (n=207) indicated that being Jewish was either somewhat or a little part of their daily life. Only 1.9% (n=8) of respondents indicated that being Jewish was not at all a part of their daily life. Most respondents did not report being very active in Jewish or Israeli campus activities. Of note, 42.1% (n=180) of respondents indicated that they are not at all active in Jewish campus activities, followed by 25.5% (n=109) a little active, 17.5% (n=75) somewhat active, and 14.3% (n=61) very active in Jewish campus activities. Undergraduate students were more likely to be somewhat or very involved with Jewish activities on campus. To the contrary, staff were significantly less likely to be involved with Jewish life on campus. Respondents were even less active in Israeli campus activities, with 66.6% (n=285) reporting *not at all active*, 17.1% (n=73) reporting *a little active*, 10.0% (n=43) noting *somewhat active*, and only 5.6% (n=24) indicating *very much active*.

---

[29] Due to the low number of responses from post-doctoral scholars and the nature of their positions at UCLA, the Task Force grouped post-doctoral scholars with graduate and professional students.

Figure 2. Self-Reported Affiliation with UCLA and Involvement with Jewish Activities on Campus (N=425)



Of the 428 respondents who completed the survey, nearly half identified as either Reform (23.6%, n=101) or secular/culturally Jewish (23.6%, n=101). The remaining respondents identified as Conservative (18.5%, n=79), "Just Jewish" (14.7%, n=63), Orthodox (8.4%, n=36), Other (5.6%, n=24), and Reconstructionist (3.7%, n=16), with 1.9% (n=8) opting not to provide details about their Jewish identity.[30] Jewish identity of faculty, staff, graduate student, and undergraduate student respondents across the institution were similarly distributed, with a few exceptions. For example, staff respondents more commonly identified as Reform (28.8%, n=17) or "culturally/secularly Jewish" (27.1%, n=16), and none of the staff respondents identified as Orthodox or Reconstructionist. More than a quarter (26.2%, n=28) of undergraduate students identified as Reform, while only 14.4% of graduate students identified as Reform (See Figure 3).

---

[30] Often referred to as denominations, Orthodox, Conservative, Reform, and Reconstructionist, represent different movements of American Jewry associated with varying levels of adherence to Jewish law (halacha). "Just Jewish" typically includes individuals who are non- or trans-denominational, while secular or culturally Jewish individuals typically include those who do not consider themselves religiously Jewish. It is important to note that the denominations, also referred to as streams, movements, and branches of Judaism, include a wide range of perspectives, traditions, and practices. Further, the terms just Jewish and secular or culturally Jewish carry different definitions and meaning for individuals. For more information, see *The Jewish Denominations*, MY JEWISH LEARNING https://www.myjewishlearning.com/article/the-jewish-denominations/ (last visited Oct. 4, 2024); *Jewish Americans in 2020*, *supra* note 23.

Figure 3: Jewish Identity by Self-Reported Affiliation with UCLA



A large majority (77.3%, n=331) of respondents had been to Israel at least once, with only 20.3% (n=87) indicating that they had never been to Israel. Of the 331 respondents who had been to Israel, 24.8% (n=82) had been one time, 13.3% (n=44) had been there twice, 36.3% (n=120) had been there three or more times, and 25.7% (n=85) had lived there. Respondents were also asked to what extent they feel a connection to Israel. The majority (57.7%, n=247) of respondents noted very much, compared to 18.0% (n=77) who somewhat felt a connection to Israel, 14.5% (n=62) who felt a little connection to Israel, and only 9.1% (n=39) who did not feel a connection with Israel at all. Not surprisingly, the proportion of individuals who felt a strong connection to Israel increased the more times the respondent visited Israel. Those who did not feel a connection with Israel were less likely to have travelled to or lived in Israel.

Figure 4. Frequency of Travel to Israel and Strength of Feeling a Connection to Israel (N=416)



### 3. Perceptions of Antisemitism and Anti-Israeli Bias

    i. Antisemitism and Anti-Israeli Bias at UCLA

Using 5-point Likert scales coupled with opportunities to provide qualitative feedback, respondents were asked about their perceptions of antisemitism and anti-Israeli bias at UCLA.

Across all respondents, 67.1% (n=285) reported that antisemitism is a problem or a serious problem at UCLA and 74.9% (n=311) reported that anti-Israeli bias is a problem or serious problem at UCLA. While the overwhelming majority identified both antisemitism and anti-Israeli bias as a problem or serious problem at UCLA, respondents rated the severity of the problem as stronger for anti-Israeli bias than antisemitism. A larger proportion of faculty and staff identified these issues as a problem or serious problem, compared to graduate students, for whom a larger proportion rated antisemitism and anti-Israeli bias as not a problem (Figures 5 and 6).

Figure 5. How Much of a Problem is <u>Antisemitism</u> at UCLA? (N=425)



Figure 6. How Much of a Problem is <u>Anti-Israeli Bias</u> at UCLA? (N=415)



Perceptions of the severity of antisemitism and anti-Israeli bias varied based on religious affiliation, with a larger proportion of respondents identifying as Conservative Jewish, just Jewish, and Orthodox Jewish indicating antisemitism and anti-Israeli bias at UCLA is a serious problem. A smaller proportion of secular or culturally Jewish, and Reconstructionist or other Jewish indicated antisemitism and anti-Israeli bias at UCLA is a serious problem.

Figure 7. Perceived Extent of <u>Antisemitism</u> Grouped by Religious Affiliation (N=417)



Figure 8. Perceived Extent of <u>Bias Against Israelis</u> Grouped by Religious Affiliation (N=409)



A large majority of respondents believed that antisemitism (84.4%, n=358) and anti-Israeli bias (85.6%, n=356) have worsened or significantly worsened at UCLA since October 7, 2023. Only 2.1% (n=9) of respondents believed that antisemitism was better at UCLA after October 7 and 3.1% (n=13) of respondents believed that anti-Israeli bias was better at UCLA after October 7, 2023. Both graduate students and undergraduate students were somewhat less likely to consider antisemitism and anti-Israeli bias worse after October 7, 2023, compared with faculty and staff.

Figure 9. Perception of Severity of <u>Antisemitism</u> at UCLA after October 7, 2023, Compared to Before October 7, 2023 (N=424)



Figure 10. Perception of Severity of <u>Anti-Israeli Bias</u> at UCLA After October 7, 2023, Compared to Before October 7, 2023 (N=416)



Following these questions, respondents were given space to provide comments. The general tenor of responses suggests visible, increased, and escalated antisemitism and anti-Israeli bias post-October 7, 2023. Respondents described antisemitism and anti-

Israeli bias as rooted in a historical and political context and lack of knowledge or awareness of the issues. Some indicated that antisemitism and anti-Israeli bias has been normalized, and that antisemitism and anti-Israeli bias stems from structural and system-wide discrimination that includes University leadership, classrooms, and clubs. Some open-ended responses also discussed feeling more "marginalized" or "othered" based on their identity following the October 7th attacks.

Open ended responses to questions about antisemitic and anti-Israeli bias also compared experiences pre- and post- October 7th, as well as the experience of Israelis, Jews, and other minority groups. Respondents provided details about campus units that they perceive to engage in antisemitism as well as specific instances of physical assault, marginalization, and exclusion.

Table 5. Respondent Experiences of Antisemitism and Anti-Israeli Bias at UCLA

| Historical and Political Context | "For me, the difficulty has been folks who all of a sudden have become experts on 5000 years of displacement and trauma in region and do not actually understand the how's and whys of what has occurred and how it influences what continues to occur. It is also difficult for people to separate Jews and the religion from Israel and the decisions of the government. And when that protest uses language and phrases that are inherently violent to a group of people, that is no longer protesting the government." |
|---|---|
| | "Today, continuing to allow campus groups and faculty to promote propaganda vilifying Israel, Israelis, and Jews, (e.g. by saying Israel is committing a genocide, which is so obviously untrue to anyone who looks at facts in the region, and especially in a context of worldwide wars and countries that are committing actual genocides), in what is a modern-day blood-libel, the antisemitic/anti-Israel/anti-Zionist campus climate is essentially repeating the German Universities climate that preceded WWII Nazi Germany. I would call that a very REAL and SERIOUS problem." |
| Lack of Knowledge | "I really believe they don't know half the things they're standing for and wish there could be some real education on the movement they're trying to represent" |
| | "I think a lot more people are taking an interest in what is happening in the Middle East than ever before. I don't particularly feel that it is biased against Israel or antisemitic, but not everyone knows the power of certain types of language, or the complicated history. More dialogue is better than demands and rallying cries." |
| Structural | "The lack of pushback from the professors, administration, deans, chancellor, allows this to get worse daily." |
| | "Antisemitism and anti-Israel bias was still a big problem for me prior to October 7th, as my classroom environment often expressed anti-Israel sentiment and clubs that were not supposed to be political strayed political." |
| | "Antisemitism feels mostly subtle but pervasive. Anti-Israeli bias is rampant and explicit." |
| Normative | "Students and faculty at UCLA feel comfortable with antisemitic behavior (e.g. "Are Jewish/Israeli? Then you cannot be here") that, if it were directed to any other minority they'd be expelled (e.g. "Are you black? Then you cannot be here" or "Are you gay? Then you cannot be here"). Imagine what would have happened" |

| | |
|---|---|
| **Othering and Identity** | "After October 7th Antisemitism became vocal, popular thing to do. Did people feel this way before or is it new, I do not know. The fact is there is a lot more outspoken Antisemitism and kids are afraid to be recognized as Jewish." |
| | "It also feels like the movement has been co-opted to make Jews and Israelis out to be "white" and therefore our communities of color have joined on to create the environment of one that is anti-White, anti-Police, etc. This then makes many Jews feel targeted and unsupported especially as a group that has historically stood with many civil rights movements. It may not be directly Antisemitism but it feels like Jews are now being looped in with a majority class or movement. And this, historically, is how Jews have been targeted as the scapegoat group." |
| | "The antisemitic issues at UCLA campus since I was a student in 1998 and continuing to this day are so upsetting, racist, and pervasive. It makes me ashamed for the first time in my life to be an alum and spending my career (15+ years) at UCLA" |

ii.  The Encampment as a Source of Antisemitism and Anti-Israeli Bias

To understand how the encampment was experienced by people who identify as Jewish or Israeli, we included a series of questions asking for feedback from respondents on the encampment.[31] The majority of respondents perceived the encampment to be a source of antisemitism (69.6%, n=293), combining a 4 or 5 rating on this question (agree or strongly agree).

Looking at each UCLA affiliate group, 76.5% (n=130) of faculty and 76.3% (n=45) of staff experienced the encampment as a source of antisemitism. Students, both graduate and undergraduate, were more mixed in their responses to these questions. As shown below, 67.0% (n=69) of undergraduate students and 55.1% (n=49) of graduate students experienced the encampment as a source of antisemitism. Notably a significant share of graduate students (42.7%, n=38) did not experience the encampment as a source of antisemitism, compared to 24.2% (n=102) overall, and 16.5% (n=28) of faculty, 18.6% (n=11) of staff, and 24.3% (n=25) of undergraduate students.

The encampment was largely viewed as a source of anti-Israeli bias, with 75.5% (n=318) of all respondents indicating they experienced the encampment as a source of anti-Israeli bias (rating a 4 or a 5 on this question). Like the previous question regarding the encampment as a source of antisemitism, faculty (82.9%, n=141) and staff (78.0%, n=46), were more likely than graduate students (60.6%, n=54) and undergraduate students (74.8%, n=77) to indicate that they either agreed or strongly agreed with this question.

---

[31] One limitation to the way the question was framed, is that some individuals may not have considered themselves to have "experienced" the encampment. As one respondent wrote, "I only followed from a distance...."

THIRD RASSBACH DECLARATION EXHIBIT 1
33

25

Across all groups, 18.8% (n=79) of respondents did not experience the encampment as a source of anti-Israeli bias.

Figure 11. Number of Respondents Who Experienced the Encampment as a Source of <u>Antisemitism</u> (N=421)

Figure 12. Number of Respondents Who Experienced the Encampment as a Source of <u>Anti-Israeli Bias</u> (N=421)





Respondents had the opportunity to elaborate on their responses through an open-ended question. Four main clusters of responses emerged: the duality of the encampment, comfort with the encampment, disruption to both the campus business and individual lives, and the different standards held for different groups of people. The responses demonstrated strong feelings about the encampment, regardless of whether it was experienced as peaceful or discriminatory. Some respondents displayed conflicting feelings about the encampment. Respondents also described differing standards applied to encampment participants compared to Jews or Israelis on campus. There were comments about the outward facing view of the encampment and what was revealed following the encampment. Concerns over graffiti, access to campus, and harassment and assault were raised. None of the comments supported violence towards pro-Palestinian protesters.

Table 6. Respondent Perspectives of the Encampment at UCLA

| Duality | "The encampment was weird because it was at once claiming to be peaceful and anti-war, but also had a critical mass of people who were in support of Hamas, and who would refuse to disassociate with them. Also, they completely ignored the hostages and the horrific attacks of October 7th. Things intensified after the pro-Israel rally, and after the screen with videos from October 7th was put up directly across the encampment. For so much of the war being on people's private screens, streamed through goPro cameras, through social media, it was jarring to have that screen brought into a public space. It's a lot harder to look away from the atrocities when it is glaring in your face. But, I am not sure how impactful it was for people in the encampment and for passersby. They may have just seen it as Israeli propaganda. I have friends who thought the encampment was "beautiful" and "peaceful." But, that all felt like a facade. And there was a lot of antisemitic and Anti-Israeli imagery and messaging everywhere." |
|---|---|
| | "This one was tough for me. I would say at first, I didn't see it as necessarily antisemitic or Anti-Israeli. However, once it cleared and I saw the spray painting, signs, etc. - that for me was antisemitic."[32] |
| | "I didn't find it threatening or upsetting in its first few days, even if some of what the students in the encampment were doing made me feel a bit uncomfortable. Once the counter-protestors came, however, things quickly got out of hand, and I was extremely upset to learn about some of the horribly violent words and actions of these outsiders towards our students." |
| **Comfort** | "I felt welcomed there! It felt like a place where I could express my values as a person who is proudly Jewish and proudly for Palestinian freedom, dignity and equality." |
| | "Are you serious? Look at the F'ing videos and pictures online. Multiple assaults, "death to Israel", "Die you fucking Jew", "Israel=Nazis", "burn Tel Aviv", multiple swastikas. I didn't imagine I would see shit like this after the 1940s, let alone in 2024 America - but I did! Here, at UCLA." |
| **Disruption** | "Was denied entry through it because I'm a Jew" |
| | "Walking by campus and having routes blocked while seeing signs emblazoned with "Israelis are native to hell"[33] and swastikas was a sight I will never forget. It was extremely hard to focus and go on as usual, and I have heard of experiences of those being physically blocked or slapped because they showed signs of Jewish identity or were known to not agree with the encampment's values. My roommate was walking home when someone from the encampment screamed "We are terrorism" at her. While I am extremely dedicated to free speech, there is no context in which swastikas are ok, Hamas headbands are on. or this level of disrupment is accepted." |
| **Different Standards** | "Prior to the pro-Israel goons descending on Tuesday night, it was an overwhelming (and one-way) tide of hatred towards Jews and Israelis." |
| | "[…] for me it was such bullshit (sorry) that people participating in the encampment were worried about COVID. Those people, students, staff, faculty, etc., haven't worn a mask in years. I know because my students who participated in the encampment have been in my office for the last two years without a mask. So that just feeds the Antisemitism for me - it feels Klan's esque. Oh you don't want to show your face at this protest but you'll come into my office without one. I've never needed to wear a mask or cover my face for any civil rights protest I've participated in." |

---

[32] For examples of spray paintings and signs from the Encampment, see Images 2 and 5, infra.

[33] See Image 5, infra.

iii. Antisemitism and Anti-Israeli Bias as a form of Hate and Bigotry.

We asked respondents to share their opinion on whether antisemitism is taken more seriously, less seriously, or considered to be the same as other forms of hate and bigotry on the UCLA campus. Of the 398 respondents who answered the question, the majority (74.6%, n=297) felt that antisemitism is taken less seriously than other forms of hate and bigotry, 16.3% (n=65) felt that is taken more seriously, and 9.0% (n=36) of respondents considered it about the same. As with previous questions in this section, there was some variation between affiliate groups, with faculty (81.3%, n=135) and staff (83.9%, n=47) considering antisemitism to be taken less seriously than graduate students (55.4%, n=46), and undergraduate students (74.2%, n=69). Notably, 37.3% (n=31) of graduate students who responded to the question felt that antisemitism is taken more seriously at UCLA than other forms of hate and bigotry.

Figure 13. Respondents' Opinion Regarding How Seriously UCLA Considers Antisemitism Compared to Other Forms of Hate and Bigotry on the UCLA Campus.



It is well documented that discrimination, racism, and other forms of bigotry have a negative impact on a wide range of outcomes, including health, overall well-being, mental health, and other socio-economic factors.[34] To measure the potential impact of

---

[34] *See e.g.*, Kilian Huber, *Discrimination Harms the Economy and Business*, CHI. BOOTH REV. (Jul. 15, 2020), https://www.chicagobooth.edu/review/how-discrimination-harms-economy-and-business; Elizabeth A. Pascoe & Laura Smart Richman, *Perceived Discrimination and Health: A Meta-Analytic Review*, 135 PSYCH. BULL. 531 (2009), https://doi.org/10.1037/a0016059.

discrimination based on Jewish or Israeli identity of UCLA affiliates, a modified version of the short everyday-discrimination scale[35] was included in the survey. Of the respondents who answered the questions, 27.1% (113 of 417) agreed or strongly agreed that they were treated with less respect than other people because of their Jewish and/or Israeli identity in the past twelve months. Similarly, 27.3% (113 of 414) agreed or strongly agreed with the following statement: *people acted as if they are better than you are due to your Jewish or Israeli identity*. Twenty-six percent (108 of 415) agreed or strongly agreed that they have been threatened or harassed because of their Jewish or Israeli identity. An additional 22.9% (95 of 414) agreed or strongly agreed that they had been treated unfairly at campus venues because of their Jewish and/or Israeli identity. Additional forthcoming analysis will assess the impact of everyday discrimination and its correlation with outcomes such as self-reported respondent mental health, well-being, stress, ability to learn or work, and thoughts about leaving UCLA.



Related open-ended responses primarily focused on UCLA's policies regarding antisemitism. While a large majority of the responses described a failure or lack of action regarding antisemitism, a minority characterized UCLA's policy as one which does not address other forms of hate—Islamophobia and Anti-Arab racism. The varied and strong feelings in these responses indicate that many survey participants care about combatting hatred in all forms and are in deep pain about the events that have unfolded at UCLA. In the following tables we present several examples.

Image 1. A sculpture of a pig featuring a clock with the words "Time is Running Out," a bag with a dollar sign, a Jewish star, and flames around the words "UC Regents."[36]

---

[35] Michelle J. Sternthal et al., *Racial Disparities in Health: How Much Does Stress Really Matter?*, 8 DU BOIS REV. 95 (2011), https://doi.org/10.1017/S1742058X11000087.

[36] *See* Table 7 for reference to the "Jewish Pig." *See also* Table 8 reference to professors discussing UC Regents as "Jewish Pigs." Photo credit: Jewish Faculty Resilience Group at UCLA.

Table 7. Perspectives on UCLA Policies Regarding Antisemitism and Anti-Israeli Bias.

| | |
|---|---|
| **Failure to Address Antisemitism and Anti-Israeli Bias** | "There have been several instances of plain-out hate and stereotypes of Jewish and Israeli individuals, which persisted for several days on campus without anything being done. The "Jewish Pig" statue[37] erected during the Regents meeting winter quarter was left up for an entire week. A van both covered in and amplifying hate speech was able to parade around campus and spread stereotypes, anti-Israel conspiracy theories, and fear.[38] The encampment was able to openly hate on Jews, Jewish culture and customs, and Israel, all while disrespecting the UCLA campus as well, promoted the idea that UCLA has no opposition to the hateful events on campus. The situations could have been handled much better if UCLA took an active initiative to create a safe environment on campus by controlling protests rather than producing security for those spewing hate." |
| | "The police don't stop Jewish civil rights violations on campus. The EDI office doesn't enforce Regents Policy 2301, and indoctrination in the classroom against Israel is given a free pass under the guise of first amendment rights. This is also true for hateful threatening speech in campus housing for students. People on campus are allowed to wear identity concealing masks and harass Jewish students and faculty with impunity while the campus community calls them "peaceful" and comes to their defense. Meanwhile I know Jewish faculty who have been written up for microaggressions, as Jews are attacked for weaponizing antisemitism against free speech and racial equity simply for speaking out against civil rights violations. Insanity reigns." |
| **Different Standards Applied to Different Groups** | "In a university setting, we failed to educate and teach people to peacefully disagree with each other and respect each other individuality. We failed to teach that terrorism and aggression are not OK. We failed to teach that all minorities matter, not just some." |
| | "Look at the statements the DEI office made after the George Floyd murder. Look at what [was done] after an offensive video about Asians was distributed. Now compare those to what the DEI office and administration did after October 7 and in response to anti-Israel, anti-Jew protests and encampments. Why is there no pushback against divestment by virtue of it being immoral and wrong? Why is the pushback only that it may violate academic freedom." |
| | "If it were hate directed against any other minority group, there would be zero tolerance. It is becoming normalized at UCLA." |
| | "The university disproportionately supports Jewish and Israeli students and prioritizes the nonexistent threat of antisemitism over other forms of discrimination. Anti-Arab racism and Islamophobia are particularly ignored in favor of granting resources and attention to antisemitism initiatives." |
| **Dialogue and Neutrality** | "Campus should have immediately organized respectful dialogues and teach-ins on antisemitism, anti-Israelism, Zionism, the Middle East conflict, Jewish history, Arabic history, Islamic history, for students and professors, and strongly encourage everyone to attend, as exemplars of how informed people discuss and disagree on these complex issues. It did not and failed in its mission as a university." |
| | UCLA should declare a policy of absolute neutrality on the world's events and conflicts and sorrows, while encouraging the most diverse study of these occurrences by the university community." |

---

[37] *See* Image 1, *supra.*
[38] *See* Image 12, *infra.*

### 4. Experiences of Antisemitism and Anti-Israeli Bias

As part of the survey, respondents reported whether they had experienced or witnessed various forms of antisemitism or anti-Israeli bias. The results indicate that antisemitism and anti-Israeli bias are widespread within the UCLA campus, with some heterogeneity of personal experiences reported. Percentages were calculated based on the number of respondents who answered each question.

Of the respondents that recorded their experiences, an alarming 38.8% or 153 individuals indicated that they experienced discrimination at UCLA. Many respondents reported an environment where they experienced offensive comments or slurs, with respondents noting these comments and slurs occurred in person at UCLA (40.0%, n=160), in campus media (41.1%, n=162), and online (43.0%, n=171). Of great concern to campus safety, nearly one fifth (n=74) of reporting respondents indicated that they had experienced a physical threat and 7.1% (n=28) of those responding reported experiencing a physical attack. Combined, there were over 100 reports of either physical threats or physical attacks to members of the Jewish community participating in the survey. Vandalism was experienced by 30.4% (n=119) of those who recorded a response to the question.



Image 2. Walls of a building at UCLA with graffiti. Phrases on the wall include "FUCK UCLA," "FUCK ALL Jews," and "students 4 A free Palestine." Symbols include a Jewish star, the letter A in a circle (representing anarchy) and a hammer and sickle (representing communism).[39]

---

[39] Example of vandalism on UCLA's campus. Photo credit: Jewish Faculty Resilience Group at UCLA.

Figure 14. Respondents Who <u>Experienced</u> Offensive Comments or Slurs, Vandalism, Physical Threats, Physical Attacks and Discrimination Based on Antisemitism or Anti-Israeli Bias.



The survey also asked the Jewish and Israeli community to share details about antisemitism and anti-Israeli bias that they witnessed. Strikingly, of those who responded to the question, nearly two-thirds (63.6%, n=101) witnessed discrimination based on Jewish or Israeli identity, more than half (54.1%, n=94) witnessed antisemitic or anti-Israeli physical threats, and nearly half (44.9%, n=70) witnessed antisemitic or anti-Israeli physical attacks. Three hundred respondents, or 74.3% (N=404), witnessed vandalism. The majority of the sample witnessed offensive comments or slurs in person (65.8%, n=104), online (79.5%, n=129) and in campus media (65.9%, n=110).

Figure 15. Respondents Who <u>Witnessed</u> Offensive Comments or Slurs, Vandalism, Physical Threats, Physical Attacks and Discrimination Based on Antisemitism or Anti-Israeli Bias.



Overall, antisemitism and anti-Israeli bias sentiments were reported by this sample as pervasive across campus, with 68.5% (n=293) of all respondents indicating that they experienced or witnessed UCLA affiliated individuals making offensive comments or slurs in person, online or through campus media, vandalizing, physically threatening, physically attacking, or discriminating based on Jewish or Israeli identity. We asked respondents to share who perpetuated the antisemitism and anti-Israeli bias. Of concern, nearly half (48.6%, n=52) of all undergraduate student respondents witnessed or experienced teaching assistants engaging in these behaviors. Nearly a quarter of all faculty (23.3%, n=40), staff (22.0%, n=13), and graduate student (22.2%, n=20) respondents noted that they witnessed or experienced teaching assistants engaged in these activities. More than three quarters (75.7%, n=81) of undergraduate students indicated that they heard their undergraduate peers engaged in these activities. Across all respondents, nearly half (46.5%, n=199), experienced or witnessed graduate or professional students engaged in these activities. More than half (55.8%, n=239) of respondents witnessed or experienced undergraduate students making these comments or engaging in these activities. Faculty were reported as perpetrators by 44.6% (n=191) of all respondents, compared to 24.8% (n=106) of respondents who indicated staff were perpetrators.

Figure 16. Types of Affiliated Individuals Who Made Offensive Comments or Slurs, Vandalized, Physically Threatened, Physically Attacked, and Discriminated Based on Antisemitism or Anti-Israeli Bias



Some respondents shared in detail about their experiences, which mainly focused on physical attacks, slurs, and vandalism. Table 8 presents several examples.

 

Images 3 and 4. A parking garage and elevator defaced with the swastika symbol.[40]

---

[40] Examples of vandalism on UCLA's campus. Photo credit: Jewish Faculty Resilience Group at UCLA.

Table 8. Respondent Experiences of Antisemitism and Anti-Israeli Bias

| | |
|---|---|
| **Physical Attacks** | "The issue with much of the antisemitism on campus is that it's largely anonymous. For instance, I don't know who exactly was driving the "swastika bus"[41] or who exactly spray painted swastikas,[42] just that somebody was. The only incident I saw personally was during the first few hours of the encampment, in which a pro-Palestinian girl (a history TA, according to herself) walked up to the pro-Israeli counter protestors and started shouting at them. A girl started recording the incident, which caused the TA to threaten her with violence if she continued. Because it was within her legal right and also for safety purposes, she continued. In return, the TA promptly slapped her several times and then tried to run away." |
| | "I was approached and told by a protestor that she belongs to Hamas. A friend of mine was pepper sprayed by a protestor for her Jewish identity. I put up posters of kidnapped Israelis on the Jewish Law Students Association, as I was authorized to do, only for them to be repeatedly ripped down.[43] I had to walk past chants calling for the extermination of my people and chants supporting genocidal terrorist organizations on a regular basis." |
| | "YEAH FROM THE FUCKING COPS YOU HIRED TO BEAT UP MY ALLIES CALLING FOR A FREE PALESTINE. And the constant emails saying "oh but we're protecting jews" like no the FUCK you are not. If you wanted to protect jews, you'd ABOLISH UCPD." |
| **Slurs** | "Faculty and TA's have literally asked class to join the Palestinian group. tried dividing the group in to tears...1 only speaking up and 5 representing that you are willing to get violent for the cause. I have it on a recording." |
| | "Right after October 7th, which was an awful day for me and my people, where I lost multiple family members, friends, and colleagues from Israel I was going around on campus to my classes and was faced by protests calling for death to Israel, long live the intifada, slurs and other hate forms just since I was wearing my Star of David. Later it got worse as I am a considerably known student on campus as I got threats in person and over social media due to my support of my country." |
| | "I was assaulted, threatened, and harassed during the encampment. I had an Israeli flag and a man ran towards me in order to push me. I was blocked for being Jewish. They were calling for an intifada collectively which is to kill the Jews. They had a star of david on the floor with the writing "step here" next to it.[44] Some of the people there were praising Hamas who's main goal (also stated in their charter) is to kill Jews. I was told to kill myself from people. It also prevented me from getting to class on time and utilizing campus resources. The people at the protest were told not to talk to me because I'm from Israel. I also think that it's a shame that UCLA let the protestors stay in the quad (which they did illegally) but they wouldn't let me and my friends who weren't doing anything violent or illegal go past the fence (on the Israeli side) with the press to talk on TV." |
| | "I was personally subjected to a lot of verbal harassment, particularly while participating in seder or shabbat with other Jewish people in the encampment or at protests. Fellow Jewish students or outside people would stand outside or around us and verbally berate us, weaponizing antisemitic language against us despite both of our Jewish identities. I also felt really uncomfortable with the amount of people coming on to campus and many older men tried to speak to |

---

[41] *See* Image 12, *infra.*

[42] *See* Images 3 and 4, *supra.*

[43] *See* Image 11, *infra*, for an example of posters taken down similar to those referenced in this response.

[44] *See* Image 10, *infra.*

| | |
|---|---|
| **Vandalism** | me when I was walking to and from my home on days where their were counter protests." |
| | "My synagogue was spray painted with swastikas. Had classmates and TAs make holocaust jokes and prof discuss how the UC regents were "a bunch of jewish pigs"" |

## 5. Impact on Work and Life at UCLA

In this section of the survey, we asked a series of questions about how the climate on campus has affected work and life at UCLA, including if participants had thoughts about leaving UCLA or seeking other places to work or study.

### i. Reporting Experiences of Discrimination

Respondents were prompted to share their experiences and perceptions about informally and formally making complaints to UCLA because of discrimination or mistreatment based on their Jewish or Israeli identity. Of the 397 respondents who answered the question, nearly one third (32.5%, n=129) indicated that they had made an informal or formal complaint to UCLA. This number was highest among undergraduate students, where 46.9% (n=46) had made a complaint.

Figure 17. Proportion of Respondents Who Submitted Formal or Informal Complaints About Antisemitism and Anti-Israeli Bias



In an open-ended follow up question, we asked respondents to identify how the University handled their complaints. Regardless of the type of complaint mentioned (e.g., abusive

treatment, concerns about the jumbotron displaying October 7th footage, feeling harassed for participating in the encampment), not one respondent indicated that the campus handled their complaints efficiently, compassionately, clearly, or effectively. Some also reported being deterred from filing complaints due to fear of retaliation. The concepts around reporting included being useless, unclear, or fearful.

Table 9. Respondent Perceptions of the Complaint Process

| Useless | "Totally useless and invalidating. Non-responsive." |
|---|---|
| | "No action was taken, yet another example of the Administrations total abdication of responsibility and leadership." |
| | "It was shit. I was completely ignored. No one replied and it they did it was hollow and no real measures of any sort were taken, even after I reported an assault." |
| Unclear | "I filed several reports at my school and have no idea what happened after that because they said it's confidential." |
| | "There was not really any response." |
| Fearful | "I was advised that reporting to EDI would make things worse because… I could be vulnerable to direct retaliation by my colleagues. My work environment has felt hostile since then, and I no longer enjoy working on campus." |

For those respondents who chose not to report any discrimination or harassment to UCLA, we asked why they chose not to do so. Participants who answered this question identified that there was no discrimination or actionable items to report. A few others felt that the university would not do much. The major concepts included: "nothing to report" and "lack of trust in the process or the consequences of such reporting."

Table 10. Reasons Respondents Did Not Utilize the Complaint Process

| Nothing to Report | "Nothing happened to me specifically." |
|---|---|
| | "I have no personal experience with discrimination." |
| Lack of Trust | "I know the University will not stop doxing and harassment efforts against faculty from pro-Israeli groups." |
| | "I worried that it would cause me to be targeted or my family to be targeted." |

ii. Impact of Antisemitism and Anti-Israeli Bias

We asked respondents how much they agree or disagree with the following statements about the personal impact of antisemitism at UCLA on their work, life, and health on a 5-point Likert scale.

Figure 18. Negative effects of antisemitism at UCLA

Figure 19. Negative effects of anti-Israeli bias at UCLA





Average reports from stress levels among respondents seem to range from moderate to higher stress, particularly for faculty and staff, and lower for graduate students. A similar pattern was reflected in the mean ratings for well-being and mental health. Staff reported the highest levels of impact, but very similar to faculty and undergraduate students. Effects on physical health were reported as slightly lower.

Regarding a sense of belonging at UCLA, faculty and staff survey respondents were most negatively affected, and graduate students less affected. A negative impact on the ability to learn was highest among undergraduate students and ability to teach was highest among faculty.

A similar question was asked about anti-Israeli bias. Anti-Israeli bias was also considered a source of stress, following a similar pattern to the previous question. Overall,

undergraduates, faculty, and staff reported feeling more stress and impact on well-being, health and physical health than graduate students. Most means hovered near the "agree" level of 4.0 for all groups except for graduate students, who were more neutral on these questions (means around 2.5-3.2). It should be noted that staff reported higher levels of stress and compromised well-being than any other subgroup on this set of questions.



Image 5. Three signs next to a tent at UCLA. One sign has a drawing of a teddy bear, Palestinian flag, and watermelon with the phrases "FREE PALESTINE" and "FROM THE RIVER TO THE SEA PALESTINE WILL BE FREE." A second sign reads: "israelis Are Native 2 HELL." A third sign includes the slogan: "STOP THE US WAR MACHINE."[45]

Overall, bias against Jewish people and/or Israelis was experienced by most respondents in the form of stress and negative impacts on overall well-being.

The open-ended responses to this set of questions were remarkable for the degree of anguish, disbelief, and sadness at the blatant discrimination that was experienced at UCLA. Still some others expressed a sense that the protest situation has been mistaken as antisemitic in a way that also creates stress for them. The three main concepts included: compounded stressors (including stress related to discrimination, negative stereotyping, anger at Jews or Israelis, as well as how the campus handled protests and

---

[45] See Table 6 for a reference to similar signs. Photo credit: Jewish Faculty Resilience Group at UCLA.

arrests), feeling marginalized (as a Jew or Israeli, or a Zionist, Non-Zionist or Anti-Zionist Jew), and maintaining pride, despite the mental and physical stress.

Table 11. Reasons Respondents Did Not Utilize the Complaint Process

| Compound Stressors | "I had to increase my CAE support, fell behind in schoolwork, and often felt my entire life and experiences as a UCLA student often revolved around these issues" |
| --- | --- |
| | "The Jew-hatred at my school triggered cluster headaches and I had to go to the ED a couple weeks after 10/7 because the headache was so bad. I have woken up screaming during the night several times since Oct 7.' |
| | "What brings stress to students on campus is the administration condoning the arrest of their students for protesting." |
| Feeling Marginalized | "I don't feel safe sharing that I am Jewish with my peers." |
| | "I have been particularly disturbed by calls for discrimination against Israeli academics." |
| Maintaining Pride | "I feel welcomed and celebrated as a Jewish student and educator at UCLA. As a TA I make references to my Jewish identity that are well received and affirmed by other students." |
| | "I have never sought more Jewish connection, support, community, and unity in my entire life." |
| | "I am a proud Jew and a conditional Zionist. I'm proud of our students who have found ways to peacefully share their dissenting views." |



Image 6. Students sit in a classroom before the start of class. In the background, a chalkboard has the words "FREE PALESTINE" with a swastika drawn in the middle.[46]

---

[46] Photo credit: Jewish Faculty Resilience Group at UCLA.

### iii. Thoughts about leaving UCLA

An alarming 41.4% (n=177) of all 428 respondents affirmatively stated that they had thought about leaving UCLA due to antisemitism or anti-Israeli bias. Of great concern to UCLA's ability to fulfill its mission, more than half (52.7%, n=87) of the 165 faculty who answered the question stated they had thought about leaving UCLA and 42.4% (n=25) of 59 responding staff members had thought about leaving UCLA. Proportionately, faculty and staff were more likely to consider leaving UCLA, compared to undergraduate (37.4%, n=37) or graduate students (32.6%, n=28).

Figure 20. "Have you thought about leaving UCLA based on experiences of antisemitism or anti-Israeli bias?



For the qualitative responses to this question, we asked "why or why not?" For students, it appeared that they felt their time was more limited at UCLA. For example, one reported, "I was about to graduate." However, a few students reported being upset that they did not enroll in other universities. One respondent wrote: "Being here has been a nightmare since October 7th. I regret not accepting other offers I had from places where antisemitism wasn't as rampant as in UCLA, Like Duke, UNC Chapel Hill, Cornell, and more. I am looking into options to transfer."

For faculty and staff respondents, two major concepts were identified: (1) considering options (for various reasons including feeling upset with the ways that the university has handled the protests) and (2) staying strong (i.e., confronting discrimination and not letting antisemitism win).

Table 12. Faculty and Staff Reflections on Whether to Leave UCLA Due to Antisemitism or Anti-Israeli Bias

| Considering Options | "Its not easy to get a new job at my age." |
| --- | --- |
| | "I feel ashamed to spend time at a place where so much hatred to me and other jews is not shut down." |
| | "I have thought of leaving but maybe not because of my experience with Antisemitism but just because I feel done... done with having to deal with all this." |
| | "I no longer feel supported by UCLA." |
| Staying Strong | "I would not leave in defeat." |
| | "I love my UCLA community and know this is a hurdle we will get past eventually." |
| | "I refuse to cede the territory to the haters." |

We asked respondents about how antisemitism and anti-Israeli bias has affected the amount of time they spend on campus and time away from the university. The majority (59.6%, n=255) of all respondents reported spending less time on campus due to antisemitism and anti-Israeli bias, with a larger proportion of undergraduate students (65.4%, n=70) and staff (61.0%, n=36) choosing to utilize this option. Less respondents indicated that they had taken time off or a leave of absence (6.3%, n=27) or were considering taking time off or a leave of absence (13.3%, n=57).

Figure 21: "Have you spent less time on campus, taken time off, considered taking a leave of absence, or taken a leave of absence from UCLA based on experiences of antisemitism"?



Open-ended comments on this question were consistent with other comments, that many respondents experienced the campus climate as hostile toward Jewish people and/or Israelis and unsafe. Strategies that people adopted included working remotely when possible, and avoiding risk, meaning making decisions about where to go on campus to feel safe.

Table 13. Reflections on Safety Concerns and Being Physically Present on Campus.

| Remote | "I've chosen to work from home because I don't feel safe or comfortable on campus." |
|---|---|
| | "I did not physically go on campus for a few weeks and my academics were so dramatically affected by this that I considered taking a leave of absence." |
| | "There are multiple days that I chose to wfh <work from home> because of the intense anti-Israel sentiment on campus." |
| Avoiding Risk | "I avoid walking on campus as much as possible. When I do, I no longer have headphones in and I am aware of my surroundings." |
| | "I avoid going to campus unless necessary. I avoid leaving my office when I am on campus." |
| | "During the encampments and protests during finals, I would spend much more time at home than at the UCLA dorms in fear of my safety." |

## D. Limitations

This survey has several limitations including generalizability, variations of shared definition or terms, and selection bias. We are unsure of the total number of Jewish and/or Israeli members of the UCLA community, and moreover, our sampling strategy may have not reached unaffiliated Jews or Israelis who are not identified members of Jewish organizations on campus. While we worked earnestly to publicize the survey to collect rapid response data, we do not purport to know if this survey is generalizable or representative of the range of Jewish and Israeli views at UCLA.

Moreover, we purposively did not define terms for respondents, including terms such as "antisemitism" or "anti-Israeli bias." The reason for this decision was to allow respondents to make decisions about their experience within their own frames of reference, a practice consistently used in other contexts in the university and in the Equity, Diversity, and Inclusion (EDI) field (see discussion in Section IV). Moreover, as these definitions are often debated, it did not feel useful for us to propose a definition that would assume any shared agreement. The open-ended responses, however, reflected that some respondents would have liked definitions provided, some would have liked clearer distinctions between terms, and some would have liked us to ask explicitly about anti-Zionism. Last, selection bias may have led people with more difficult or painful experiences to complete the survey. The responses may have clustered along more distinct or polarized views rather than being reflective of a random, non-select sample.

# IV. The Post-October 7th Experience at UCLA: Incidents of Antisemitic and Anti-Israeli Bias and Violations of Laws and Rules

To complement our survey analysis, we report on and assess events on campus during the post-October 7, 2023, period. Based on our analysis of available evidence, cited events appear to (1) violate law, (2) violate University or campus rules or policies, or (3) likely contribute to a hostile campus climate for Jews and Israelis. We discuss instances in which decisions by University or campus officials to not enforce law, rules, or policies constituted violations of law or undermined the Constitutional rights of Jews. Accordingly, we document and assess six sets of pertinent events, behaviors, or decisions, notably including hate crimes and hate incidents against Jews and Israelis. We review marches and rallies; the encampment; faculty behavior; other events or incidents; disciplinary rules and procedures; and the University's response in *Frankel et al. v Regents of the University of California et al.*[47]

While the matters discussed in this section do not constitute a full rendering of antisemitic and anti-Israeli behaviors and events, they corroborate experiences described by respondents to the survey and indicate a fact pattern of an adverse and discriminatory climate towards Jews and Israelis at UCLA during this period.[48] Additional antisemitic and anti-Israeli incidents and crimes on campus have been documented by other groups and individuals.[49] The Task Force finds substantial evidence of actions by students, faculty, and staff of the University, University and campus leadership, and non-affiliates, that contravened University or campus rules and policies, state or federal law, or the U.S. Constitution and resulted in reprehensible antisemitic and anti-Israeli outcomes.

---

[47] Frankel v. Regents of Univ. of California, No. 2:24-CV-04702, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024); *see also* Complaint, *Frankel*, No. 2:24-CV-04702, 2024 WL 3811250, https://becketnewsite.s3.amazonaws.com/20240605222051/Complaint-in-Frankel-v.-Regents-of-UCLA.pdf.

[48] While, in many instances, Task Force members did not personally observe some of the incidents or behavior memorialized here, the Task Force finds reports or evidence of these events sufficiently credible to document them in this report.

[49] *See, e.g.*, JEWISH FAC. RESILIENCE GRP., ANTISEMITISM AT UCLA (2024), [hereinafter JEWISH FAC. RESILIENCE GRP., ANTISEMITISM AT UCLA]; Letter from Jewish Fac. Resilience Grp. to C. Block and President Drake 32-34 (Jan. 12, 2024); JEWISH FAC. RESILIENCE GRP., ADDRESSING THE CONDITIONS OF SYSTEMATIC ANTISEMITISM AT UCLA AND THE UC SYSTEM (2024), [hereinafter JEWISH FAC. RESILIENCE GRP., ADDRESSING THE CONDITIONS OF SYSTEMATIC ANTISEMITISM AT UCLA AND THE UC SYSTEM]; Frankel et al. v Regents of the University of California et al. Complaint; Letter from Comm. on Educ. & the Workforce, to Dr. Michael V. Drake, President, Univ. of California, Mr. Richard Leib, Chair, UC Bd. of Regents, and Mr. Gene D. Block, C., UCLA (May 15, 2024), https://edworkforce.house.gov/uploadedfiles/ucla_final.pdf.

We document and compile these events both to help build a historical record of antisemitic and anti-Israeli bias and events at UCLA post-October 7, 2023, and to better understand the experience and concerns of Jewish and Israeli Bruins. This rendering of behaviors and events provides some context for our survey results discussed in Section III. As previously described, the majority of Jewish and Israeli survey respondents perceive substantial antisemitic and anti-Israeli bias and a hostile environment on campus. We outline numerous laws and rules that appear to have been broken on campus by large numbers of protesters, including but not limited to participants of the encampment; demonstrate that University and campus officials decided, in many instances, not to enforce those laws and rules (resulting in failure to protect the Constitutional rights of Jews on campus); show the complexity of and difficulty in accessing the University and campus rules and procedures that could be used to discipline antisemitic and anti-Israeli behavior; and contextualize recommendations for future appropriate action by campus and University officials to remediate the above and improve campus climate.

## A. Marches and Rallies

Between October 7, 2023, and mid-May 2024, there were numerous marches and rallies at UCLA protesting various aspects of University, U.S., and Israeli policy and events related to the Israel-Hamas war. The marches and rallies sometimes included hundreds of protesters, many of whom were UCLA affiliates, and took place in or across various parts of campus, including in and around buildings that house classrooms, faculty offices, and other University workspaces. These marches and rallies almost always took place without a permit and, as we illustrate below, violated University and campus time, place, and manner rules.[50]

This last point is crucial. Members of the UCLA community have the right to free speech and protest, guaranteed to them by the federal and state Constitutions as well as the best University traditions. However, breaking laws and rules, obstructing the functioning of the University, vandalizing and trespassing on University property, and disrupting the work of other students, faculty, or staff are not protected speech.

---

[50] *Policies Applying to Campus Activities, Organizations, and Students*, Univ. of Cal. Off. of the President §§ 40.30-.40 (Sept. 25, 2006), https://policy.ucop.edu/doc/2710524/PACAOS-40 [hereinafter *UCOP Policies Applying to Campus Activities, Organizations, and Students*], provides, in relevant part: "All use of University properties and services must conform to applicable campus time, place, and manner regulations […] On University grounds open to the public generally, as may be described in campus implementing regulations, all persons may exercise the constitutionally protected rights of free expression, speech, assembly, and worship (including the distribution or sale of noncommercial literature incidental to the exercise of these freedoms). Such activities shall not interfere with the orderly operation of the campus and must be conducted in accordance with campus time, place, and manner regulations."

These marches and rallies were often loud, disrupting classes, faculty engaged in research or writing, and staff and administrators doing their work.[51] These disturbances of teaching, research, and administration disrupted and interfered with the orderly operation of the campus and violated UCOP policy[52] and the UCLA Group Conduct Code.[53]

The marches usually featured chants of several slogans, including[54] "Intifada,"[55] "from the river to the sea, Palestine will be free," and "kill the Jews."[56] To be clear, "from the river to the sea…" is an anti-Zionist chant that is often considered, although not viewed by all, to be antisemitic. The chant references the land area between the Jordan River and the Mediterranean Sea, which constitutes the geography of the State of Israel and the West Bank. Some argue that the phrase simply calls for a binational democratic state in Palestine – a position that is not antisemitic in and of itself. However, such an interpretation is decontextualized and does not reflect the interpretation of the phrase held by the majority of Jews.[57]

---

[51] *See e.g.*, Jewish Faculty Resilience Group at UCLA, *UCLA Jewish Faculty on Disruptions of Classes by Protesters Regents Mtg 2024 03 20*, YOUTUBE (July 14, 2024). https://www.youtube.com/watch?v=sJ5tw9vLSOw.

[52] *UCOP Policies Applying to Campus Activities, Organizations, and Students*, *supra* note 50, §§ 40.30-.40, provides in relevant part: "[…] all persons may exercise the constitutionally protected rights of free expression […] Such activities shall not interfere with the orderly operation of the campus and must be conducted in accordance with campus time, place, and manner regulations."

[53] *Student Group Conduct Code*, UCLA DEAN OF STUDENTS § 202.13, https://deanofstudents.ucla.edu/group-student-code (last visited Sept. 3, 2024) [hereinafter *UCLA Student Group Conduct Code*] prohibits "Obstruction or disruption of teaching, research, administration, disciplinary procedures, or other University activities."

[54] Corinne Purtill et al., *Dueling Gaza Protests at UCLA Draw Hundreds as USC Sees Peaceful Demonstration*, L.A. TIMES, (Apr. 28, 2024), https://www.latimes.com/california/story/2024-04-28/gaza-ucla-usc-protests.

[55] "Intifada" means "an armed uprising of Palestinians against Israeli occupation of the West Bank and Gaza Strip". *Intifada*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/intifada (last accessed Sept. 4, 2024). The term translates from Arabic as "shaking off." Historically, the first Intifada occurred from 1987-1993 and the second Intifada dates to 2000-2005. The second intifada included suicide bombings targeting civilians in Israel at places like nightclubs, restaurants, and bus stops. "Globalize the Intifada" can be interpreted as the violent targeting of Jews, Israelis, and institutions supporting Jews and Israelis around the world, including places of worship and cultural centers. *See Translate Hate: "Globalize the Intifada"*, AM. JEWISH COMM., https://www.ajc.org/translatehate/Globalize-the-Intifada (last visited Oct. 4, 2024).

[56] Complaint, *Frankel*, No. 2:24-CV-04702, 2024 WL 3811250; See also Jewish Faculty Resilience Group.

[57] *Translate Hate: "From the River to the Sea"*, AM. JEWISH COMM., https://www.ajc.org/translatehate/From-the-River-to-the-Sea (last visited Oct. 4, 2024).

Hamas uses the phrase "from the river to the sea..." in its 2017 Charter (Section 20)[58] and declares its intention to hunt down Jews everywhere in the world in its 1988 charter,[59] a sentiment which has not been superseded. The phrase has also been used in speeches by Osama bin Laden,[60] Hezbollah's leadership,[61] and Iran's leadership.[62] For many, "from the river to the sea," calls for elimination of the State of Israel, and for the land of Israel to be placed entirely under Arab rule.[63] Given the record of many Arab regimes in the region, there is a high probability of the forced displacement of Israeli Jews in these hypothetical circumstances.[64]

Some organizations associated with the UCLA protests have lauded the October 7th massacres as great resistance victories, which appears to celebrate the slaughter of Israeli, U.S., and other foreign national civilians.[65] For example, on October 9, 2023, an official statement issued by the Undergraduate Student Association Council (USAC) Cultural Affairs Commissioner stated in part: "Thus, we honor the Palestinians on the frontlines taking their land and sovereignty back! From the River to The Sea, Palestine Will Be Free."[66] Many groups who organized, attended, or provided support to the

---

[58] *A Document of General Principles and Policies*, HAMAS (May 2017), https://web.archive.org/web/20170515114724/http://hamas.ps/ar/uploads/documents/06c77206ce934064ab5a901fa8bfef44.pdf.

[59] Hamas, *The Covenant of the Islamic Resistance Movement*, THE AVALON PROJECT (Aug. 18, 1988), https://avalon.law.yale.edu/20th_century/hamas.asp, which provides, in relevant part: (Preamble) "Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it,"; (Article 7): "The Day of Judgment will not come about until Moslems fight Jews and kill them. Then, the Jews will hide behind rocks and trees, and the rocks and trees will cry out: 'O Moslem, there is a Jew hiding behind me, come and kill him.'" *See also* Elliott Colla, *On the History, Meaning, and Power of "From the River to the Sea"*, MONDOWEISS (Nov. 16, 2023), https://mondoweiss.net/2023/11/on-the-history-meaning-and-power-of-from-the-river-to-the-sea/.

[60] Osama bin Laden, *To the American People*, DIR. OF NAT'L INTEL., https://www.dni.gov/files/documents/ubl/english/Letter%20to%20the%20American%20people.pdf (last visited Sept. 3, 2024).

[61] Barry Rubin, *Israel's "Northern Front": Relations with Syria and Lebanon*, AMBASSADORS REV. (2008).

[62] *Iran's Raisi: The Only Solution Is 'A Palestinian State from the River to the Sea'*, TIMES OF ISR., (2024), https://www.timesofisrael.com/liveblog_entry/irans-raisi-the-only-solution-is-a-palestinian-state-from-the-river-to-the-sea/.

[63] *Translate Hate: "From the River to the Sea"*, AM. JEWISH COMM., https://www.ajc.org/translatehate/From-the-River-to-the-Sea (last visited Oct. 4, 2024).

[64] *Fact Sheet: Jewish Refugees from Arab Countries*, JEWISH VIRTUAL LIBR., https://www.jewishvirtuallibrary.org/jewish-refugees-from-arab-countries (last visited Oct. 4, 2024).

[65] *See, e.g.*, Center on Extremism, *Students for Justice in Palestine (SJP)*, ANTI-DEFAMATION LEAGUE (Aug. 9, 2024), https://www.adl.org/resources/backgrounder/students-justice-palestine-sjp; *see also* Michael Starr, *Pro-Terror Rhetoric Rises as Anti-Israel Activists Think They're Winning – Analysis*, JERUSALEM POST (Apr. 21, 2024), https://www.jpost.com/diaspora/antisemitism/article-798176; Center on Extremism, *Support for October 7 Attack, Glorification of Terror Mark 2024 Nakba Day Events*, ANTI-DEFAMATION LEAGUE (May 24, 2024), https://www.adl.org/resources/blog/support-october-7-attack-glorification-terror-mark-2024-nakba-day-events.

[66] Alicia Verdugo, Cultural Affairs Commissioner, *The Cultural Affairs Commission of UCLA Stands in Solidarity with Palestinians in Their Struggle for Liberation from Israel*, INSTAGRAM (Oct. 9, 2023), https://www.instagram.com/p/CyMSRCuSIAR/?img_index=2

protests have refused to condemn Hamas, and blamed Israel for the October 7, 2023, attacks or suggested that the attacks, rapes, and mass murders did not happen[67]; a denial that is deeply painful for many Jews and reinforces a climate of hostility toward a minority group and a sense that Jewish pain and grieving is not deserved or worthy of empathy.

Whether or not "from the river to the sea" is intended by those chanting it to be antisemitic, it has been University policy and practice to focus on mainstream understandings by those on the receiving end of any number of subjectively disturbing statements or slogans.[68] Hence, we note that "from the river to the sea" is viewed by prominent mainstream Jewish organizations (including the Anti-Defamation League[69] and American Jewish Committee),[70] and two-thirds of Jewish college student respondents in a University of Chicago study[71] as antisemitic, hate speech, and incitement to genocide. The Task Force notes that UCLA protest leaders never attempted to address concerns about their statements or use of phrases like "from the river to the sea," and indeed repeatedly claimed that Jews have no historic or spiritual connection to the land of

---

[67] See Images 13 and 14, *Infra*. As another example, the UC Ethnic Studies Faculty Council, sent a letter to the Board of Regents, President Drake, and the Chancellors from all UC Schools condemning a UC statement characterizing the October 7, 2023, attack on Israelis as terrorism, which was supported by around 300 Ethnic Studies Faculty from UC institutions, presumably including faculty from UCLA. UC Regent Jonathan "Jay" Sures responded to the Ethnic Studies Faculty Council requesting that the Ethnic Studies Faculty Council retract their statement and condemn the October 7, 2023, attacks as terrorism. In response, the Ethnic Studies Faculty Council issued a second letter calling upon the removal of Regent Sures from Office. Letter from UC Ethnic Stud. Fac. Council to Univ. of California Bd. of Regents, President Michael V. Drake, C. Gene Block, UCLA, C. Juan Sanchez Munoz, UCM, C. Carol Christ, UCB, C. Sam Hawgood, UCSF, C. Gary May, UCD, C. Cynthia Larive, UCSC, C. Howard Gilman, UCI, C. Kim A. Wilcox, UCR, C. Henry T. Yang, UCSB, C. Pradeep K. Khosla, UCSD, (Oct. 16, 2023); https://static1.squarespace.com/static/653821343640f73d00465584/t/65a9acdfcd414d62815a0438/1705618655382/Statement+on+bias+in+UC+statements+%281%29.pdf; Letter from Jonathan "Jay" Sures to UC Ethnic Stud. Fac. Council (Oct. 31, 2023), https://x.com/yudapearl/status/1719583465195364713; Letter from UC Ethnic Studies Faculty Council to Jonathan "Jay" Sures (Nov. 15, 2023), https://static1.squarespace.com/static/653821343640f73d00465584/t/659dc333d86acc486c873baf/1704837939525/UCESFC+Letter+to+Regent+Jay+Sures+%281%29.pdf

[68] *See, e.g.*, "Micro-aggressions are the everyday verbal, nonverbal, and environmental slights, snubs, or insults, whether intentional or unintentional, that communicate hostile, derogatory, or negative messages to target persons based solely on their marginalized group membership." UCLA DIVERSITY & FACULTY DEVELOPMENT, DIVERSITY IN THE CLASSROOM 10 (2014), https://equity.ucla.edu/wp-content/uploads/2016/06/DiversityintheClassroom2014Web.pdf. We identify this University policy not to endorse it, but rather to underscore the University's disparate approach vis a vis Jews and Israelis.

[69] Jonathan Guyer & Tom Perkins, *Anti-Defamation League Staff Decry 'Dishonest' Campaign Against Israel Critics*, GUARDIAN (Jan. 5, 2024), https://www.theguardian.com/news/2024/jan/05/adl-pro-israel-advocacy-zionism-antisemitism; *see also* Joe Hernandez, *How Interpretations of the Phrase 'From the River to the Sea' Made It So Divisive*, NPR (Nov. 10, 2023), https://www.npr.org/2023/11/09/1211671117/how-interpretations-of-the-phrase-from-the-river-to-the-sea-made-it-so-divisive.

[70] Hernandez, *supra* note 69.

[71] *See* ROBERT PAPE, CHI. PROJECT ON SEC. & THREATS, UNDERSTANDING CAMPUS FEARS AFTER OCTOBER 7 AND HOW TO REDUCE THEM (2024), https://d3qi0qp55mx5f5.cloudfront.net/cpost/i/docs/CPOST_Understanding_Campus_Fears_-_Report.pdf?mtime=1709832445.

Israel.[72] All of these factors put a great burden on protest organizers to rebut a strong inference of antisemitism. Bottom line: This chant is experienced as antisemitic by many in the Jewish and Israeli communities at UCLA and beyond.

One march and rally, on November 8, 2023, organized by UCLA Divest and UCLA's Students for Justice in Palestine,[73] included hundreds of protesters rallying on Bruin Plaza, marching through Bunche Hall, disrupting classes and faculty research, reciting the chants described above. At one point, the marchers stopped to beat a piñata of Benjamin Netanyahu, while protesters cheered and numerous media outlets reported at least one protester chanting, "beat the f***king Jew!"[74] In addition to violating aforementioned rules, this was a terrifying chant for most Jewish students, faculty, and staff who heard it or learned of it. The student groups that organized this event likely



violated the UCLA Group Conduct Code prohibitions on terrorizing any university affiliate[75] and fostering a harmful environment.[76] These acts also violated UCLA Principles of Community.[77]

Image 7. A person wearing a yellow vest, mask, and Keffiyeh uses a stick to hit a Piñata with the face of Israeli Prime Minister Benjamin Netanyahu.[78]

---

[72] *See e.g.,* Images 13 and 14, *infra.*

[73] Dylan Winward & Catherine Hamilton, *Students for Justice in Palestine, UC Divest Host Rally in Support of Palestine,* DAILY BRUIN (Nov. 8, 2023), https://dailybruin.com/2023/11/08/students-for-justice-in-palestine-uc-divest-host-rally-in-support-of-palestine.

[74] At least one person sounds like they are shouting "beat that fucking jew" at 24-28 seconds of the video available at: Ryan Saavedra, "UCLA Students Hit Netanyahu Pinata on Campus: 'Beat That F***ing Jew!'," *The Daily Wire* (Nov. 10, 2023), https://www.dailywire.com/news/ucla-students-hit-netanyahu-pinata-on-campus-beat-that-fing-jew.

[75] *UCLA Student Group Conduct Code*, *supra* note 53, § 202.26, which provides, in relevant part: "Conduct, where the Student Group means to communicate a serious expression of intent to terrorize, or acts in reckless disregard of the risk of terrorizing, one or more University students, faculty, or staff."

[76] *Id.* § 202.30, which provides, in relevant part: "Conduct that fosters environments or group cultures that encourage or enable emotionally or physically harmful practices or illegal behavior among their members, including […] physical assault, harassment, sexual violence […]"

[77] UCLA Principles of Community provide, in relevant part: "[UCLA does] not tolerate acts of discrimination, harassment, profiling or other conduct causing harm to individuals on the basis of expression of race, color, ethnicity, gender, age, disability, religious beliefs, political preference, sexual orientation, gender identity, citizenship, or national origin among other personal characteristics. Such conduct violates UCLA's Principles of Community and may result in sanctions under campus policies governing students, staff, and faculty conduct." *UCLA Principles of Community,* UNIV. OF CAL. L.A. (Mar. 2011), https://www.ucla.edu/pdf/principles-of-community.pdf.

[78] Photo Credit: Screenshot of a frame of a video circulating on social media. Video available at *Id.*

During many of these marches and rallies, University affiliates and non-affiliates wore masks, often fashioned as keffiyehs covering their faces[79] or surgical masks, with the intent of hiding their identities[80] in violation of University and campus rules.[81]

Although UCLA leadership made some statements condemning the use of hate speech on UCLA campus, they did not interrupt these activities, describing them as a continuation of UCLA's tradition of free expression.[82] This inaction resulted in a failure to enforce numerous violations of University and campus rules regarding UCLA protests.

## B. The Encampment

On April 25, 2024, pro-Palestinian students, other affiliates, and non-affiliates set up an encampment on Royce Quad.[83] The encampment was reportedly organized by UC Divest, a coalition of UCLA-recognized student organizations,[84] including Students for

---

[79] *Id.*

[80] Dylan Winward & Catherine Hamilton, *Students for Justice in Palestine, UC Divest Host Rally in Support of Palestine,* DAILY BRUIN (Nov. 8, 2023), https://dailybruin.com/2023/11/08/students-for-justice-in-palestine-uc-divest-host-rally-in-support-of-palestine.

[81] See, e.g., *UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties,* UCLA STUDENT ORGANIZATIONS, LEADERSHIP & ENGAGEMENT Part IV.B.6 (Sept. 25, 2017), https://sole.ucla.edu/file/4efd2db6-2863-447e-acb3-ca109fa5b33c provides, in relevant part: "No person, while in or upon any University of California owned, operated, controlled or administered property, may wear a mask, personal disguise or otherwise conceal one's identity with the intent of intimidating any person or group, or for the purpose of evading or escaping discovery, recognition, or identification in the commission of violations of University policy, University regulations, or state, municipal or federal laws." Regulations Governing Conduct of Non-Affiliates in the Buildings and on the Grounds of the University of California, CAL. CODE REGS. tit. 5, § 100013 provides, in relevant part: "No non-affiliate on University property shall: [...] Wear a mask, personal disguise, or otherwise conceal his/her identity with the intent of intimidating any person or group, or for the purpose of evading or escaping discovery, recognition, or identification in the commission of violations of University policy, University regulations or municipal, state, or federal laws."

[82] *See* Gene D. Block, *Our Community is in Deep Pain,* UCLA CHANCELLOR (May 2, 2024), https://chancellor.ucla.edu/messages/our-community-is-in-deep-pain/; Gene D. Block, *Reflections on Several Very Difficult Weeks for Our Community,* UCLA CHANCELLOR (May 20, 2024), https://chancellor.ucla.edu/messages/reflections-on-several-very-difficult-weeks-for-our-community/. This glorification continued in the 2024-25 academic year with President Drake's message of August 19, 2024. Michael V. Drake, *Updates on UC Campus Climate Efforts,* UNIV. OF CAL. (Aug. 19, 2024), https://www.universityofcalifornia.edu/press-room/updates-uc-campus-climate-efforts.

[83] Richard Winton, Teresa Watanabe, Safi Nazzal, Matthew Ormseth, Grace Toohey & Jessica Garrison, *A Staggering Two Weeks at UCLA: Protest, Violence, Division Mark a 'Dark Chapter',* L.A. TIMES (May 7, 2024), https://www.latimes.com/california/story/2024-05-07/a-ucla-timeline-from-peaceful-encampment-to-violent-attacks-aftermath.

[84] *See Students for Justice in Palestine (SJP),* UCLA COMMUNITY, https://community.ucla.edu/studentorg/90; *Jewish Voice for Peace at UCLA,* UCLA COMMUNITY, https://community.ucla.edu/studentorg/3992; *Student Labor Advocacy Project,* UCLA COMMUNITY, https://community.ucla.edu/studentorg/5573.

Justice in Palestine, Jewish Voice for Peace at UCLA, and Student Labor Advocacy Project.[85]

From the outset, the encampment itself stood in violation of several University and campus rules. Tents were erected by affiliates and non-affiliates and remained on Royce Quad day and night, in violation of UC Office of the President (UCOP) regulations prohibiting non-affiliates from setting up or maintaining any tent[86] or camping overnight on University property;[87] UCOP Policies applying to Campus Activities, Organizations, and Students (PACAOS) prohibiting any use of University property by students or student organization in violation of time, place, and manner restrictions;[88] the UCLA Group Code of Conduct prohibitions on placement of temporary



Image 8. Aerial view of the encampment.[89]

---

[85] Purtill et al., *supra* note 54.

[86] Regulations Governing Conduct of Non-Affiliates in the Buildings and on the Grounds of the University of California, CAL. CODE REGS. tit. 5, § 100005 provides in relevant part: "No non-affiliate on University property shall, without authorization from a Designated University Official: […] B. Bring any tent or other housing structure on University property, or occupy any such tent or housing structure."

[87] *Id.* § 100007, provides in relevant part: "No non-affiliate shall enter or otherwise remain on University Property between the hours of midnight to 6:00 a.m., or at such other times as published or posted by the campus or University location."

[88] *UCOP Policies Applying to Campus Activities, Organizations, and Students*, *supra* note 50, §§ 40.30-.40, which provide, in relevant part: "On University grounds […] all persons may exercise the constitutionally protected rights of free expression, speech, assembly […] Such activities shall not interfere with the orderly operation of the campus and must be conducted in accordance with campus time, place, and manner regulations."

[89] Photo credit: Screenshot from a video posted to SJP at UCLA's Instagram profile, Students for Justice in Palestine, University of California Los Angeles (@sjpatucla), INSTAGRAM, https://www.instagram.com/stories/highlights/18034078045989219/.

structures on campus,[90] unauthorized extracurricular use of University facilities,[91] unauthorized holding an "interim major event not sponsored by a University unit;"[92] and several other UCLA regulations.[93]

Shortly after establishing the encampment, the demonstrators built a barrier around it, fashioned with sheets of plywood, some of which were affixed to metal bicycle racks[94] that were UCLA property and had been placed by the University on the periphery of the encampment. Attaching plywood to the bicycle racks violated UCOP regulations prohibiting the unauthorized erection of barriers and structures,[95] the UCLA Group Conduct Code prohibition on misuse of University property,[96] and other UCLA policies and procedures.[97]

---

[90] UCLA Procedure 850.1 provides, in relevant part: "[…] any plan to erect or place a Temporary Structure on campus property shall be reviewed by the UCLA Events Office. […] Temporary Structures include, but are not limited to, tents, sculptured objects, or similar assemblages erected on the campus for short periods of time, frequently in connection with a program, event, exhibition, instructional course, or other student initiated activity." *UCLA Procedure 850.1: Placement of Temporary Structures on the UCLA Campus*, UCLA ADMINISTRATIVE POLICIES & PROCEDURES (Oct. 19, 2009), https://www.adminpolicies.ucla.edu/APP/Number/850.1.

[91] At the time of the encampment, UCLA Policy 860 provided, in relevant part: "[…] University facilities may be made available for extracurricular purposes when such use is consistent with the mission of the University and when all of the prescribed conditions for such use are met. […] Extracurricular Use should not unreasonably interfere with the University's instructional or research programs, official University functions and activities, or relations with its neighboring community." *UCLA Policy 860: Extracurricular Use of University Facilities*, UCLA ADMINISTRATIVE POLICIES & PROCEDURES (Sept. 23, 2008), https://web.archive.org/web/20240520000229/https://www.adminpolicies.ucla.edu/APP/Number/860.0.

[92] At the time of the encampment, UCLA Policy 862 provided, in relevant part: "Interim major event not sponsored by a University unit. […] All Event Organizers must follow the following procedures to request and host a Major Event. […] *UCLA Policy 862: Interim Major Events Not Sponsored by a University Unit*, UCLA ADMINISTRATIVE POLICIES & PROCEDURES (May 8, 2018), https://web.archive.org/web/20240419025401/https://www.adminpolicies.ucla.edu/APP/Number/862.0.

[93] See *UCLA Student Group Conduct Code*, *supra* note 53, § 202.24, which prohibits: "Organizing or carrying out unlawful activity on University property." See also UCLA Student Conduct Code § 102.13 which prohibits: "Obstruction or disruption of teaching, research, administration, disciplinary procedures, or other University activities." *Student Conduct Code*, UCLA DEAN OF STUDENTS § 102.13 (Jan. 15, 2021), https://deanofstudents.ucla.edu/individual-student-code [hereinafter *UCLA Student Conduct Code*].

[94] Purtill et al., *supra* note 54.

[95] Regulations Governing Conduct of Non-Affiliates in the Buildings and on the Grounds of the University of California, CAL. CODE REGS. tit. 5, § 100014 provides, in relevant part: "No non-affiliate shall carry, transport or use signs, posters, placards or banners exceeding thirty inches (30") by thirty inches (30") in size, […] shall distribute any written or printed matter in violation of established campus directives regarding time, place and manner, […] No non-affiliate shall erect any structure or display, or bring a structure or display on to University property without prior written authorization from the Designated University Official."

[96] *See UCLA Student Group Conduct Code*, *supra* note 53, § 202.24.

[97] See, e.g., *UCLA Procedure 850.1*, *supra* note 90, which provides, in relevant part: […] "any plan to erect or place a Temporary Structure on campus property shall be reviewed by the UCLA Events Office […]." See also *UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties*, *supra* note 81, §§ IV.A.2, IV.F.11.a.ii, which provides, in relevant part: "No person on University property […] may: block entrances to or otherwise interfere with the free flow of traffic into and out of campus

Encampment protesters chanted, displayed posters, and painted and chalked graffiti on Royce Hall, Powell Library, and other University property with several slogans, such as "from the river to the sea, Palestine will be free,"[98] and "IDF are Nazis."[99] Painting, writing, or chalking graffiti on University property, violates California state law prohibiting vandalism, and the extent of damage that graffiti caused constituted felony vandalism;[100] violates the Student Conduct Code and University Group Conduct Code prohibitions of damage or destruction of University property;[101] and violates the UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties' prohibition against paint, chalk, or ink messages affixed to surfaces of campus buildings or structures.[102,103]

On April 29, 2024, the encampment protesters began using human phalanxes (with protesters shouting, "human chain") to block certain persons from moving freely through public areas of Royce Quad, and surrounded some other individuals to forcibly move them from areas in or adjacent to the encampment.[104,105] By April 30, students wearing a

---

buildings; knowingly and willfully interfere with the peaceful conduct of the activities of the campus or any campus facility by intimidating, harassing, or obstructing any University employee, student, or any other person having lawful business with the University; […] engage in the production of amplified or non-amplified sound that disrupts campus activities; camp or lodge, except in authorized facilities or locations; engage in physically abusive, threatening, or intimidating conduct toward any person; […] Use of outdoor areas must not interfere with the use of those areas by others for other than reasonably short periods, or unreasonably disrupt the orderly operation of the campus or official University functions, or unreasonably disrupt the peace and quiet of the campus and the community adjacent to the campus."

[98] Purtill et al., *supra* note 54; *See also* Image 2 and Image 5, *supra.*

[99] Jewish Fac. Resilience Grp., Antisemitism at UCLA, *supra* note 49, at 53 (2024) [hereinafter Jewish Fac. Resilience Grp., Antisemitism at UCLA].

[100]   Cal. Penal Code § 594(a)(1)-(3) (2023) provides, in relevant part: "Every person who maliciously commits any of the following act […] is guilty of vandalism: (1) Defaces with graffiti or other inscribed material; (2) Damages; (3) Destroys. Whenever a person violates this subdivision with respect to real property, vehicles, signs, fixtures, furnishings, or property belonging to any public entity […] it shall be a permissive inference that the person neither owned the property nor had the permission of the owner to deface, damage, or destroy the property."

[101] *UCLA Student Conduct Code*, *supra* note 93, § 102.04(b) provides, in relevant part: "[Students may be held accountable for] Damage or destruction of any University property, or the property of others while on University premises or at official University functions." See also *UCLA Student Group Conduct Code*, *supra* note 53, at § 202.04(b), which provides, in relevant part: "[Student Groups may be held accountable for] Damage or destruction of any University property, or the property of others while on University premises or at official University functions."

[102] *See UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties*, *supra* note 81, § IV.A.12.

[103] In addition to the violations described, the Encampment cost the university significant resources. According to the Daily Bruin, UCLA spent over $12 million on encampment security and campus clean-up. *See* Gabrielle Gillette and Shiv Patel, *UCLA Spends Millions on Pro-Palestine Protests, Considers Attendants to Fund Costs*, Daily Bruin (Jul. 29, 2023), https://dailybruin.com/2024/07/24/ucla-spends-millions-on-pro-palestine-protests-considers-attendants-to-fund-costs.

[104] Purtill et al., *supra* note 54.Jenny Jarvie, *'Are You a Zionist?' Checkpoints At UCLA Encampment Provoked Fear, Debate Among Jews*, L.A. Times (May 9, 2024, 4:33 AM), https://www.latimes.com/california/story/2024-05-09/are-you-a-zionist-checkpoints-at-ucla-encampment-provoked-debate-among-jewish-students; *See also* Image 9, *infra.*

[105] In the *Frankel* Complaint, this area is referred to as the "Jewish Exclusion Zone."

Star of David or a kippah,[106] or those refusing to denounce their Zionism[107] (which for many Jews, but not all, is akin to renouncing their Jewish faith), were physically blocked by the protesters' phalanxes from entering or passing through the occupied area of Royce Quad, entering Royce Hall, or entering Powell Library.[108] These actions violated the California Penal Code prohibition against willfully and maliciously obstructing the free movement of persons;[109] assault within the meaning of the California Penal Code;[110] a violation of the Student Code of Conduct prohibitions on discrimination,[111] harassment,[112] obstruction or disruption,[113] conduct that threatens health or safety,[114] and in some cases

---

[106] The Star of David and Kippot are religious symbols. *What is the Star of David?*, MY JEWISH LEARNING, https://www.myjewishlearning.com/article/star-of-david-hot-topic/ (last visited Oct. 4, 2024); *What Is A Kippah?*, MY JEWISH LEARNING, https://www.myjewishlearning.com/article/kippah/ (last visited Oct. 4, 2024).

[107] Zionism is the "movement for the self-determination and statehood for the Jewish people in their ancestral homeland, the land of Israel." Zionism derives from the biblical word "Zion," which includes Israel. While there has been a continual presence of Jews in their indigenous homeland of Israel for millennia, the desire for Jews living in the diaspora to return to their native land is significantly embedded into prayer, rituals, and culture, as a result of the forced exile of many Jews from their indigenous land thousands of years ago. The modern Zionist movement gained momentum in the 1800s, as a national movement. Today, Zionists maintain a wide range of political and social views and include people with both liberal and conservative ideologies. Many Zionists support a two-state solution. Zionism has been equated falsely to racism. Zionists include Jews across the racial spectrum—such as Indian, Ethiopian, Yemenite, Iraqi, Iranian, Egyptian, North African, Jews of Color, and white Jews. *See A Definition of Zionism*, JEWISH VIRTUAL LIBR., https://www.jewishvirtuallibrary.org/a-definition-of-zionism (last visited Oct. 4, 2024); *Zionism*, ANTI-DEFAMATION LEAGUE (Sept. 1, 2016), https://www.adl.org/resources/backgrounder/zionism; AM. JEWISH COMM., TRANSLATE HATE: ANTISEMITISM STARTS WITH UNDERSTANDING IT (2021), https://www.ajc.org/sites/default/files/pdf/2021-02/AJC_Translate-Hate-Glossary-2021.pdf.

[108] Caitlin Flanagan (@CaitlinPacific), *Blocking a Jewish Student from Entering the Library*, X (Apr. 30, 2024, 11:47 AM), https://x.com/CaitlinPacific/status/1785380488586354952. *See also* Frankel v. Regents of Univ. of California, No. 2:24-CV-04702, 2024 WL 3811250, at *2 (C.D. Cal. Aug. 13, 2024).

[109] CAL. PENAL CODE § 647c (2023) provides, in relevant part: "Every person who willfully and maliciously obstructs the free movement of any person on any street, sidewalk, or other public place or on or in any place open to the public is guilty of a misdemeanor."

[110] *Id.* § 240 provides, in relevant part: "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

[111] *UCLA Student Conduct Code*, *supra* note 93, § 102.11a provides, in relevant part: "Discrimination means the exclusion of an individual on the basis of race, color, national origin, religion, […], ancestry, […], citizenship, or service in the uniformed services (including protected veterans) from participation in any academic, research, or other University service, program, or activity."

[112] *Id.* § 102.11b provides, in relevant part: "Harassment means conduct that is sufficiently severe, pervasive, or persistent so as to interfere with or limit an individual's ability to participate in or benefit from the services, activities, or opportunities offered by the University; or that creates a work environment that is intimidating, hostile, or abusive. Sanctions may be enhanced where an individual was selected for harassment because of the individual's race, color, national or ethnic origin, citizenship, […], religion, […], ancestry, […], or perceived membership in any of these classifications."

[113] *Id.* § 102.13 provides, in relevant part: "Obstruction or disruption of teaching, research, administration, disciplinary procedures, or other University activities."

[114] *Id.* § 102.08 provides, in relevant part: "Conduct that threatens the health or safety of any person, including but not limited to, physical assault, threats that cause a person reasonably to be in sustained fear for one's own safety or the safety of one's immediate family, incidents involving the use or display of a weapon likely to cause great bodily harm, […] or other conduct that threatens the health or safety of any person."

unwanted personal contact;[115] and a violation of the UCLA Group Code of Conduct prohibitions on obstruction or disruption,[116] fostering a harmful environment,[117] and unwanted personal contact.[118] Moreover, it has long been understood that a public University's failure to stop the type of behavior described above denied,[119] in this case, Jews' Fourteenth Amendment guarantee of equal protection under the law,[120] their First Amendment right to free speech,[121] their First and Fourteenth Amendment rights to free exercise of religion,[122] and constituted violation of Title VI of the Civil Rights Act of 1964.[123]

We acknowledge that some believe that attacks on Israel and Israel-aligned students do not constitute discrimination against Jews. It was also the case that some Jewish people participated in the encampment. However, the Task Force notes two important factors. First, by establishing a zone where supporters of Israel were banned from accessing parts of campus and by targeting supporters of Israel, encampment organizers engaged in an activity with a disparate impact against Jews. The majority of American Jews are supportive of Israel (even if many do not endorse its government or all of its policies),

---

[115] *Id.* § 102.27 provides, in relevant part: "Contact (whether physical, verbal, written, face-to-face, telephonic, electronic, or by other means) that (1) a student knows or should know is unwanted; (2) is communicated directly to one or more specific students, student group, faculty, or staff; (3) constitutes severe and/or pervasive, and objectively offensive, conduct; and (4) does not constitute speech protected by the First Amendment to the U.S. Constitution (e.g., speech in a public forum on a matter of public concern)."

[116] *UCLA Student Group Conduct Code, supra* note 53, § 202.13, which provides, in relevant part: "[Student Groups may be held accountable for] Obstruction or disruption of teaching, research, administration, disciplinary procedures, or other University activities."

[117] *Id.* § 202.30 provides, in relevant part: "[Fostering Harmful Environment] Conduct that fosters environments or group cultures that encourage or enable emotionally or physically harmful practices or illegal behavior among their members, including but not limited to hazing, physical assault, harassment, sexual violence, or harmful use of alcohol or other drugs."

[118] *Id.* § 202.27 provides, in relevant part: "Unwanted personal contact: Contact (whether physical, verbal, written, face-to-face, telephonic, electronic, or by other means) that (1) a Student Group knows or should know is unwanted; (2) is communicated directly to one or more specific students, student group, faculty, or staff; (3) constitutes severe and/or pervasive, and objectively offensive, conduct; and (4) does not constitute speech protected by the First Amendment to the U.S. Constitution (e.g., speech in a public forum on a matter of public concern)."

[119] The federal judge in Frankel held, in relevant part: "Plaintiffs assert that they are likely to succeed on the merits of their federal equal protection, free speech, free exercise, and Title VI claims… Because analysis of Plaintiffs' free exercise claim resolves this motion, the Court addresses only that claim in the interest of judicial economy." The judge went on to find likelihood of success on the merits (a necessary element of the legal standard for an injunction). *See* Frankel v. Regents of Univ. of California, No. 2:24-CV-04702, slip op. at 11, 13, 2024 WL 3811250, at *5-8 (C.D. Cal. Aug. 13, 2024); Plaintiff's Memorandum in Support of a Motion for Preliminary Injunction, *Frankel*, No. 2:24-CV-04702, 2024 WL 3811250,

https://storage.courtlistener.com/recap/gov.uscourts.cacd.928715/gov.uscourts.cacd.928715.48.1_1.pdf.

[120] U.S. Const. amend. XIV, § 1.

[121] U.S. Const. amend. I.

[122] U.S. Const. amend. I; U.S. Const. amend. XIV, §1.

[123] Title VI of the Civil Rights Act of 1964: 42 U.S.C. § 2000d.

especially after October 7th,[124] and are significantly more likely to feel an attachment to Israel than non-Jewish students. As discussed previously in Section III, our survey reveals that most Jewish and Israeli respondents have an attachment to Israel. Hence as a practical matter, the encampment's denial of passage and access to certain parts of campus to "supporters of Israel" ended up targeting Jews. Banning supporters of Israel (or "Zionists") from parts of campus open to all constitutes de facto discrimination against a protected class.

Also, by targeting those who support Israel, preventing them from accessing parts of campus supposedly open to all, and disrupting their activities, the encampment engaged in discrimination on the basis of political opinion, which also constitutes a violation of University rules. It would be appalling if an encampment targeted Democrats or Republicans or libertarians or Marxists. The same principle must apply to Zionism when used to describe a political belief. Zionism is a political conviction that deserves equal concern and respect as any other in a University that honors diversity of opinion, and it violates the core principles of University conduct to discriminate against it. The Regents of the University of California have prohibited indoctrination[125] and discrimination on the basis of political opinion.



Image 9. Protestors wearing masks and forming a human chain, with campus-sponsored security standing in front of protestors. A Palestinian flag is in the background of the photo, with words written on the ground.[126]

As with other protests on campus, many in the encampment, including participants forming the phalanxes described above, wore masks, sometimes surgical masks (even though COVID rates were low at the time, the protesters were outdoors, and very few

---

[124] *AJC Survey Shows American Jews are Deeply and Increasingly Connected to Israel*, Am. Jewish Comm. (June 10, 2024), https://www.ajc.org/news/ajc-survey-shows-american-jews-are-deeply-and-increasingly-connected-to-israel.

[125] *See Regents Policy § 2301: Policy on Course Content, supra* note 156.

[126] Photo credit: Photograph posted to SJP at UCLA's Instagram profile, Students for Justice in Palestine, University of California Los Angeles (@sjpatucla), Instagram, https://www.instagram.com/stories/highlights/18034078045989219/.

UCLA affiliates were wearing such masks at the time), and often a keffiyeh wrapped around their face. Affiliates and nonaffiliates are prohibited from wearing a mask on campus to "conceal his/her identity with the intent of intimidating any person or group, or for the purpose of evading or escaping discovery, recognition, or identification in the commission of violations of" policies and law.[127] Wearing a mask in the commission of a public offense, including misdemeanor penal code violations, to evade identification is itself a crime under California law.[128]

Violence was documented at the encampment and the surrounding area as early as April 25, 2024, with some Jews, Israelis, and pro-Israel protestors assaulted. For example, a Native American Jewish woman described being assaulted by a stick.[129,130] A large counterprotest occurred at the encampment site on April 28, 2024. Despite some efforts to keep the groups separated, some violent clashes occurred. A child of a Holocaust survivor recounted being sprayed with pepper spray by encampment participants.[131] A Jewish student and her mom shared how the student was knocked to the ground and

---

[127] *UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties*, *supra* note 81, § IV.B.6, which provides, in relevant part: "No person, while in or upon any University of California owned, operated, controlled or administered property, may wear a mask, personal disguise or otherwise conceal one's identity with the intent of intimidating any person or group, or for the purpose of evading or escaping discovery, recognition, or identification in the commission of violations of University policy, University regulations, or state, municipal or federal laws." Regulations Governing Conduct of Non-Affiliates in the Buildings and on the Grounds of the University of California, CAL. CODE REGS. tit. 5, § 100013, provides, in relevant part: "No non-affiliate on University property shall […] Wear a mask, personal disguise, or otherwise conceal his/her identity with the intent of intimidating any person or group, or for the purpose of evading or escaping discovery, recognition, or identification in the commission of violations of University policy, University regulations or municipal, state, or federal laws."

[128] CAL. PENAL CODE § 185 (2023) provides, in relevant part: "It shall be unlawful for any person to wear any mask […] for the purpose of: […] Evading or escaping discovery, recognition, or identification in the commission of any public offense [or] concealment, flight, or escape, when charged with, arrested for, or convicted of, any public offense. Any person violating any of the provisions of this section shall be deemed guilty of a misdemeanor."

[129] Tzvi Joffre, *Anti-Israel Protesters at UCLA attack Native American Woman Opposing Hamas*, JERUSALEM POST (Apr. 28, 2024), https://www.jpost.com/diaspora/antisemitism/article-798915.

[130] It is important to note that acts of violence, discrimination, and restriction of movement directed at a group, in this case Jews, Israelis, and Zionists, effects all groups, not only Jews and Israelis. In an Instagram post reflecting on the incident, another Native American man who had at the time been standing in solidarity with Encampment protestors wrote: "Two Indigenous ppl supporting 2 different cultures today set an example while everyone else dared to say we couldn't speak to each other nor shake hands because she was on the Jewish side and not on the Palestinians side with us. That triggered us and this indigenous woman spoke up and stood her ground on indigenous land. She was even beaten by Palestinian men. I'm not for that nor will allow nor tolerate any of that especially on our women or lands. I am grateful to have met this warrior woman and standing firm while surrounded by Palestinians who tried kicking her off our own lands. How dare they tell us on our lands we can talk to each other. Wtf? Don't get it twisted .. YOU ARE ON INDIGENOUS LAND!!!!" *Id.*

[131] *Jewish Demonstrator Pepper Sprayed at UCLA Protest*, FOX 11 LOS ANGELES, https://www.youtube.com/watch?v=Qezhyo1sq1g (last visited Oct. 11, 2024).

kicked by encampment participants. The student was initially unconscious with an open wound on her head, and she was taken to the hospital for treatment.[132]

Encampment protesters began to arm themselves with weapons, including pepper spray and lumber because "we keep us safe."[133] Encampment protesters also obtained helmets and goggles.[134] Protesters were seen brandishing tasers and a sword.[135] On May 1, 2024, a request was posted on social media, said to be from the "UCLA Palestine Solidarity Encampment," to provide the encampment with "BDS compliant" "Airsoft goggles," "skater helmets," "knee and elbow pads," "Super bright flashlights with strobe," and food—but "NO bagels."[136,137] Student possession or use of a weapon on campus violates the Student Conduct Code,[138] as does student display of a weapon on campus;[139] similarly, storage, possession, or use of a weapon on campus violates the UCLA Group Conduct

---

[132] *Jewish Student Recounts Injury During UCLA Protest*, NBC LA (May 1, 2024), https://www.youtube.com/watch?v=ecD39KFX6oU (last visited Oct. 11, 2024).

[133] SJP at UCLA social media posts and protest guides use the phrase "we keep each other safe" and "we keep us safe." For example: "Self defense/ security training happening at the Palestine solidarity encampment ⚕ we keep each other safe⚕" and "UCLA students have taken more and more ground at UCLA and built/ extended the barriers themselves. We keep us safe!" Students for Justice in Palestine, University of California Los Angeles (@sjpatucla), INSTAGRAM, https://www.instagram.com/stories/highlights/18034078045989219/. As an additional example, the first section of the *Safety Tips for Protest* guide, posted by grad_sjpatucla in October 2024 is called "WE KEEP US SAFE." *Safety Tips for Protestors* (@grad_sjpatucla), INSTAGRAM, https://www.instagram.com/grad_sjpatucla/p/DA1ra0TTzvh/.

[134] Winton et al., *supra* note 83.

[135] JEWISH FAC. RESILIENCE GRP., ANTISEMITISM AT UCLA, *supra* note 49, at 15; Ronny Reyes, *Pro-Israel Protestor Attacked, Threatened with Taser at UCLA as Campus Security Stood Feet Away,* NEW YORK POST, https://nypost.com/2024/04/30/us-news/pro-israel-protester-attacked-threatened-with-taser-at-ucla/ (last visited Oct. 11, 2024); *UCPD Draws Gun Against Protestor with a Sword*, R/UCLA, REDDIT, https://www.reddit.com/r/ucla/comments/1cfllry/ucpd_draws_gun_against_protester_with_a_sword/  (last visited Oct. 11, 2024). *The New York Post's* reporting assumes the sign held by the counter-protestor was the victim's sign; however, the sign reportedly belonged to someone in the encampment.

[136] Banning foods associated with Jews demonstrates clear antisemitic sentiment and should not be interpreted as an act of boycotting a country, as bagels are mass produced by many companies worldwide. Bagels are strongly associated with Jewish culture and religion, with the first written reference to Bagels in 1610 as part of a guidance regarding how to avoid persecution resulting from Jewish ritual circumcisions for newborn boys. The creation of bagels is associated with an act of resistance to a discriminatory ban prohibiting Jewish people from baking bread in Poland during the Middle Ages. *See* Yvette Alt Miller, *The Origins and Jewish History of Bagels*, AISH, https://aish.com/bagels-a-surprising-jewish-history/ (last visited Oct. 12, 2024).

[137] Aviva Klompas (@AvivaKlompas), *This Is the List of Supplies That the UCLA Pro-Terror Tykes are Crowdsourcing*, X (May 1, 2024, 1:00 PM), https://x.com/AvivaKlompas/status/1785761352281170340.

[138] *UCLA Student Conduct Code, supra* note 93, § 102.20a, provides, in relevant part: "Except as expressly permitted by law, possession, use, storage or manufacture of a firearm or other weapon capable of causing bodily injury is prohibited."

[139] *Id.* § 102.08, provides, in relevant part: "[Students may be held accountable for] conduct that threatens the health or safety of any person including […] incidents involving the use or display of a weapon likely to cause great bodily harm […] or other conduct that threatens the health or safety of any person."

Code[140] and UCLA Policy.[141] When police eventually broke up the encampment on May 2, 2024, they were met with bursts of pepper spray, protesters wielding fire extinguishers against them, bright strobe lights, and protesters wearing helmets and goggles.[142] That behavior violated several provisions of California criminal law, including assault on police officers, a felony under California law.[143]

On April 30, 2024, UCLA declared the encampment illegal and directed all those involved to leave or face discipline. From that moment on, the student groups that were maintaining the encampment stood in violation of additional rules, including Student Group Conduct Code prohibitions on disturbing the peace,[144] failure to comply,[145] and UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties.[146] Late that night, counter protesters attacked the encampment and violent skirmishes ensued.[147] At 6:00 pm the next day, May 1, police issued an unlawful assembly order, yet hundreds of encampment protesters failed to comply,[148] and at 3 a.m. on May 2, police finally broke up the encampment.[149]

*It should go without saying that the Task Force condemns the counter-protestors' violence in the strongest possible terms. We strongly believe that anyone who committed violence*

---

[140] *UCLA Student Group Conduct Code*, *supra* note 53, at § 202.20a, provides, in relevant part: "Except as expressly permitted by law, possession, use, storage, or manufacture of a firearm or other weapon capable of causing bodily injury is prohibited."

[141] UCLA Policy 131, provides, in relevant part: "[…] no person shall bring to or possess on University Property or areas adjacent to University Property, a loaded or unloaded Firearm, Generally Prohibited Weapon, Lethal Weapon, Less Lethal Weapon, Stun Gun, Imitation Firearm, Fireworks or other Incendiary or Destructive Device. […] Any person, who possesses a Firearm […] maybe subject to criminal penalties and/ or disciplinary action under University policies […]." *UCLA Policy 131: Weapons on University Property*, UCLA ADMINISTRATIVE POLICIES & PROCEDURES (Jan. 5, 2016), https://www.adminpolicies.ucla.edu/APP/Number/131.

[142] Winton et al., *supra* note 83.

[143] CAL. PENAL CODE § 241(c) (2023), provides, in relevant part: "When an assault is committed against the person of a peace officer […] and the person committing the offense knows or reasonably should know that the victim is a peace officer [...] the assault is punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment."

[144] *UCLA Student Group Conduct Code*, *supra* note 53, at § 202.15, provides, in relevant part: "[Student Groups may be held accountable for] Participation in a disturbance of the peace or unlawful assembly."

[145] *Id.* § 202.16, provides, in relevant part: "[Student Groups may be held accountable for] Failure to […] comply with directions of a University official or other public official in the performance of her or his duties while on University property […]."

[146] *See UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties*, *supra* note 81, § IV.A.2.

[147] Winton et al., *supra* note 83.

[148] Student failure to comply with that order violated *UCLA Student Conduct Code*, *supra* note 93, § 102.16, which provides, in relevant part: "[Students may be held accountable for] Failure to […] comply with directions of, a University official or other public official acting in the performance of one's duties while on University property or at official University functions, or resisting or obstructing such University or other public officials in the performance of or the attempt to perform their duties."

[149] Winton et al., *supra* note 83.

*should be prosecuted to the fullest extent of the law, whether or not they were members of the UCLA community and regardless of their religious, political, ancestral, or ethnic identity. Nothing we present here should be construed as anything other than zero tolerance for instances of violence against Muslim, Arab, Palestinian, or any other group at UCLA.*

However, until April 30, 2024, instead of ordering enforcement of state laws, or UC and campus rules, or fulfilling their legal obligation to protect the Constitutional rights of Jews at UCLA, campus leadership allowed the encampment and related denial of campus access to continue. The failure to enforce campus rules instead enabled the events of April 30, 2024. Put another way, the rules exist for a reason: they protect rights. And the failure to enforce those rules undermines rights.

The UCLA administration demonstrated a reluctance to take action against those in the encampment unless violence erupted. UCLA Police Department Chief stated on May 2, 2024, that he had advised UCLA leadership, from the beginning, not to allow the encampment since it violated campus rules against overnight camping and he feared it could lead to problems, but University leadership decided to allow it "as an expression of students' First Amendment rights."[150] Campus officials continued to refuse to break up the encampment even after the protesters denied Jews and others free passage and access to campus classrooms and facilities on grounds that allowance of such behaviors and activities was part of their "de-escalation strategy."[151]

## C. Faculty Behavior

In the several months following the October 7th attacks, numerous UCLA faculty engaged in and/or openly supported anti-Israeli bias or antisemitic activities in a manner that

---

[150] Teresa Watanabe, *UCLA's Top Cop, Accused of Security Lapse, Faces Calls to Step Aside. He Defends His Actions*, L.A. TIMES (May 3, 2024), https://www.latimes.com/california/story/2024-05-03/before-mob-attack-ucla-police-chief-was-ordered-to-create-security-plan-but-didnt-sources-say.

[151] Plaintiffs' Reply in Support of Motion for Preliminary Injunction at 1, 4-5, Frankel v. Regents of Univ. of California, No. 2:24-CV-04702, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024), https://storage.courtlistener.com/recap/gov.uscourts.cacd.928715/gov.uscourts.cacd.928715.64.0_1.pdf.

violated UC Regents' policies,[152] the Academic Personnel Manual (APM),[153] UCOP policies, and terms of the NSF Collective Bargaining Agreement.[154]

The Task Force heard several reports of faculty teaching of content unrelated to a course, in violation of the APM prohibition on significant intrusion of material unrelated to a course,[155] and the Regents' Policy on Course Content, which prohibits "Misuse of the classroom by, for example, allowing it to be used for political indoctrination, for purposes other than those for which the course was constituted…"[156] For example, as part of a mandatory "Structural Racism and Health Equity" course in the first-year medical school curriculum, a session entitled, "Housing (In)justice in LA: Addressing Unhousing and Practicing Solidarity," an invited speaker[157] reportedly instructed students to touch the floor, engage in prayer to "mama earth" and our "ancestors," and shouted, "at this point, I must say 'Free, Free Palestine!'" Reportedly, over half of the class echoed the chant. The speaker later repeated the prayer; some students who did not want to engage in prayer due to religious beliefs or personal preferences remained seated. A UCLA staff member was reportedly observed questioning at least one student who refrained, asking them to identify themself, which some students perceived as a form of discipline, singling them out while pressuring them to recite speech with which they disagreed or that violated their religious beliefs. The course professors failed to intervene, enabling inappropriate,

---

[152] *Regents Policy § 2301: Policy on Course Content*, REGENTS OF THE UNIV. OF CAL. (Sept. 22, 2005), https://regents.universityofcalifornia.edu/governance/policies/2301.html, provides, in relevant part: "Misuse of the classroom by, for example, allowing it to be used for political indoctrination, for purposes other than those for which the course was constituted, or for providing grades without commensurate and appropriate student achievement, constitutes misuse of the University as an institution."

[153] *APM - 015: The Faculty Code of Conduct,* UNIV. OF CAL. OFF. OF THE PRESIDENT, ACAD. PERS. MANUAL (Sept. 23, 2020), https://www.ucop.edu/academic-personnel-programs/_files/apm/apm-015.pdf, provides, in relevant part: "[Types of unacceptable conduct] Failure to meet the responsibilities of instruction, including: […] (b) significant intrusion of material unrelated to the course."

[154] Univ. of Cal. & Am. Fed'n of Tchrs., *Non-Senate Instructional Contract*, UCNET art. 3, https://ucnet.universityofcalifornia.edu/wp-content/uploads/labor/bargaining-units/ix/docs/ix_03_academic-responsibility_2016-2020.pdf (last visited Sept. 4, 2024) provides, in relevant part: "[…] certain conduct by NSFs is unacceptable and is inconsistent with their role as instructional faculty. Such unacceptable conduct includes but is not limited to: […] discrimination, including harassment, against a student on political grounds, or for reasons of race, color, religion, […] or for other arbitrary or personal reasons."

[155] *APM - 015: The Faculty Code of Conduct,* UNIV. OF CAL. OFF. OF THE PRESIDENT, ACAD. PERS. MANUAL (Sept. 23, 2020), https://www.ucop.edu/academic-personnel-programs/_files/apm/apm-015.pdf, provides, in relevant part: "[Types of unacceptable conduct] Failure to meet the responsibilities of instruction, including: […] (b) significant intrusion of material unrelated to the course."

[156] *Regents Policy § 2301: Policy on Course Content*, REGENTS OF THE UNIV. OF CAL. (Sept. 22, 2005), https://regents.universityofcalifornia.edu/governance/policies/2301.html, provides, in relevant part: "Misuse of the classroom by, for example, allowing it to be used for political indoctrination, for purposes other than those for which the course was constituted, or for providing grades without commensurate and appropriate student achievement, constitutes misuse of the University as an institution."

[157] Regardless of the course or lecture topic, faculty have a responsibility to ensure that they maintain control over the content delivered in a class. Safeguards must be put in place in advance to ensure the relevancy of the material delivered as part of a guest lecture. During the class, faculty should address any issues as they arise, with appropriate follow-up after the class when needed.

anti-Israeli bias and indoctrination.[158,159] The Task Force also received several reports of faculty who excused class attendance or assignments due to students or the faculty themselves participating in the encampment. There were also reports of courses offering extra credit for attendance at the encampment or related events.[160] Doing so violated the UC Regents Policy on Course Content, which prohibits faculty from interrupting "progress of an academic course or to modify grading procedures" for purposes of political indoctrination or discussion of matters unrelated to course content.[161]

Mainstream media widely reported that some faculty participated in or openly supported the encampment.[162] As described above, beginning April 29, 2024, encampment protestors prevented those who refused to state their opposition to the State of Israel, or those wearing a kippah, a Star of David, or other Jewish symbols from passing through most of Royce Quad. The participation by Senate faculty violated the APM – 015 prohibition on discrimination or harassment,[163] and participation by Non-Senate Faculty (NSF) breached Article 3 of the Non-Senate Instructional Contract.[164] Many faculty who entered the encampment had to know of this discriminatory behavior due to widespread media reports of it. Nonetheless, they entered the encampment in support of its activities. By participating in the encampment activities including denial of campus access to Jews and those supporting Israel, those faculty participated in and abetted discrimination against and harassment of Jews and supporters of Israel.

Despite the anti-Israeli or antisemitic nature of faculty behaviors that violated University and campus rules, the Task Force is not aware of any faculty who have been disciplined.

---

[158] Aaron Sibarium, *UCLA Med School Requires Students to Attend Lectures Where Speaker Demands Prayer for 'Mama Earth,' Leads Chants of 'Free Palestine'*, WASH. FREE BEACON (Apr. 2, 2024), https://freebeacon.com/campus/ucla-med-school-requires-students-to-attend-lecture-where-speaker-demands-prayer-for-mama-earth-leads-chants-of-free-palestine/.

[159] JEWISH FAC. RESILIENCE GRP., ANTISEMITISM AT UCLA, *supra* note 49, at 79-84.

[160] *Id.* at 81-82; Similar reports were also received via open-ended responses to the UCLA Task Force to Combat Antisemitism and Anti-Israeli Bias Survey on Antisemitism and Anti-Israeli Bias (June 2024) and communications between UCLA affiliates and Task Force members.

[161] *See Regents Policy § 2301: Policy on Course Content*, *supra* note 156.

[162] Winton et al., *supra* note 83.

[163] *APM - 015: The Faculty Code of Conduct, supra* note, provides, in relevant part: "[Types of unacceptable conduct] Discrimination, including harassment, against a student on political grounds, or for reasons of race, color, religion, […] ethnic origin, national origin, ancestry […]."

[164] Univ. of Cal. & Am. Fed'n of Tchrs., *Non-Senate Instructional Contract*, UCNET art. 3, https://ucnet.universityofcalifornia.edu/wp-content/uploads/labor/bargaining-units/ix/docs/ix_03_academic-responsibility_2016-2020.pdf (last visited Sept. 4, 2024) provides, in relevant part: "[…] certain conduct by NSFs is unacceptable and is inconsistent with their role as instructional faculty. Such unacceptable conduct includes but is not limited to: […] discrimination, including harassment, against a student on political grounds, or for reasons of race, color, religion, […] or for other arbitrary or personal reasons."

## D. Other Incidents on Campus

Several other incidents reported to the Task Force have contributed to a strong sense among faculty, students, and staff of antisemitism and anti-Israeli bias at UCLA.



After October 7, 2024, there were multiple reports of graffiti and drawings (apart from those in the encampment) that were blatantly antisemitic and anti-Israeli. For example, there were multiple reports and photos of swastikas appearing at different locations on campus.[165] Amid protests organized by UCLA student groups over the Israel-Hamas war, a chalk drawing on the ground appeared on campus depicting a Jewish star with the words "step here."[166,] Such graffiti and drawings are not only offensive to many, but they also violate several laws[167] and University and campus rules.[168]

Image 10. Jewish Star drawn on the ground surrounded by the words "STEP HERE." [169]

---

[165] For example, swastikas appeared spray painted on walls at the Arthur Ashe Student Health Center and Institute for Applied and Pure Mathematics. JEWISH FAC. RESILIENCE GRP., ANTISEMITISM AT UCLA, *supra* note 49, at 58. *See also* Images 1, 3, 4, and 6, *supra.*

[166] JEWISH FAC. RESILIENCE GRP., ANTISEMITISM AT UCLA, *supra* note 49, at 67. *See also* Table 8 *Supra* Section III.

[167] CAL. PENAL CODE § 594(a) (2023), provides, in relevant part: "Every person who maliciously commits any of the following acts with respect to any real or personal property not his or her own, in cases other than those specified by state law, is guilty of vandalism: (1) Defaces with graffiti or other inscribed material; (2) Damages; (3) Destroys."

[168] *UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties*, *supra* note 81, § IV.A.12 reads as follows: "No sign, poster, paint, chalk or ink messages may be placed, affixed or applied to the walls, windows, floors or other surfaces of campus buildings or structures, streets, walkways, utility poles, construction fences, trees or shrubbery, except as provided for in Section IV, D. and Appendix 1-A." UCLA Principles of Community apply here, as well, with the relevant language reads as follows: "[UCLA does] not tolerate acts of discrimination, harassment, profiling or other conduct causing harm to individuals on the basis of expression of race, color, ethnicity, gender, age, disability, religious beliefs, political preference, sexual orientation, gender identity, citizenship, or national origin among other personal characteristics. Such conduct violates UCLA's Principles of Community and may result in sanctions under campus policies governing students, staff, and faculty conduct." *UCLA Principles of Community*, *supra* note 77.

[169] Photo Credit: didigo22708, *Antisemitic Graffiti on Campus*, REDDIT (May 2, 2024), https://www.reddit.com/r/ucla/comments/1cimrik/antisemitic_graffiti_on_campus/?rdt=44811.

The Task Force received several reports of posters with images of Israeli hostages, headlined, "KIDNAPPED," being torn down from bulletin boards or destroyed across



campus in October and November of 2023. Some posters had been affixed to public bulletin boards; others had been affixed to the bulletin boards of professors, mostly Jewish or Israeli professors, and student organizations, including Jewish student organizations.[170] The act of tearing down or destroying the posters, particularly from bulletin boards of Jewish organizations or Jewish professors, likely constitutes harassment, within the meaning of both the UCOP Anti-Discrimination Policy[171] and the Student Conduct Code,[172] as well as violations of the Student Conduct Code prohibitions on theft[173] and damage or destruction of property.[174]

Image 11. Individuals wearing masks and wielding knives on campus, while reportedly removing signs of kidnapped civilians.[175]

---

[170] *See* Table 8, *supra*, for survey responses describing posters being removed from a Jewish organization's bulletin board.

[171] *Anti-Discrimination Policy*, UNIV. OF CAL. OFF. OF THE PRESIDENT § II.A.1 (Aug. 29, 2024), https://policy.ucop.edu/doc/1001004/Anti-Discrimination [hereinafter *UCOP Anti-Discrimination Policy*], provides, in relevant part: "Unwelcome conduct based on an individual's actual or perceived Protected Category […] that is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, denies, or adversely limits an individual's participation in or benefit from the education, employment, or other programs or activities of the University, and creates an environment that a reasonable person would find to be intimidating or offensive."

[172] *UCLA Student Conduct Code*, *supra* note 93, § 102.11b, provides, in relevant part: "Harassment means conduct that is sufficiently severe, pervasive, or persistent so as to interfere with or limit an individual's ability to participate in or benefit from the services, activities, or opportunities offered by the University, or creates a work environment that is intimidating, hostile, or abusive. Sanctions may be enhanced where an individual was selected for harassment because of the individual's race, color, national or ethnic origin, citizenship, […] religion, […]. ancestry, […], or perceived membership in any of these classifications."

[173] *Id.* § 102.04a, provides, in relevant part: "Theft includes taking without expressed permission or, misappropriation of, any property or services of the University or property of others while on University premises or at official University functions; or possession of any property that the Student had knowledge or reasonably should have had knowledge was stolen."

[174] *Id.* § 102.04b, provides, in relevant part: "Damage or destruction of any University property, or the property of others while on University premises or at official University functions."

[175] Photo credit: Screenshot of X post depicting anti-Israel protestors at UCLA, one of which is wearing a surgical mask, carrying knives and walking through campus. Original post from @visegrad24, X.COM (Nov. 28, 2023, 12:38 PM), https://twitter.com/visegrad24/status/1729600584800411894.



On May 1, 2024, a van displaying the Star of David inside a Nazi swastika, along with antisemitic writing referring to Jews as "puppet masters," was parked on UCLA's campus in support of the encampment. The van loudly broadcast antisemitic rants blaming American Jews for the death of George Floyd.[176]

Subsequent to breaking up the encampment, UCLA called law enforcement to respond to protest activity on at least three occasions when UCLA determined that protestors were willfully disrupting campus operations.[177,178]

Image 12. A van with a swastika embedded in a Jewish star, a Palestinian flag, and other writing.[179]

[176] *See* JEWISH FAC. RESILIENCE GRP., ANTISEMITISM AT UCLA, *supra* note 99, at 50; *see also* Sam Yebri (@samyebri), INSTAGRAM (May 1, 2024), https://www.instagram.com/reel/C6dBXxwLnhZ/. Survey respondents also mentioned this van, *see* Table 7 and 8, *supra.* This incident violates several University and campus rules, cited above, as it harassed Jews and interfered with the operation of University activities.

[177] *UCLA Protesters Had Heavy Tools, Planned to Take Over Building, Campus Police Say*, L.A. DAILY NEWS (May 10, 2024), https://www.dailynews.com/2024/05/09/ucla-protesters-had-heavy-tools-planned-to-take-over-building-campus-police-say/.

[178] On May 6, 2024, forty-two pro-Palestinian protesters were arrested for plans to break in and occupy a building; many reportedly possessed bolt-cutters, super glue, padlocks, heavy-duty chains and metal pipes, along with printed materials "encouraging vandalism and violence." On May 23, pro-Palestinian protesters attempted to erect an encampment on Kerckhoff Patio, but willingly dispersed after they were informed that they would face arrest and disciplinary action if they failed to do so. Finally, on June 10, twenty-seven individuals were arrested for disrupting the Shapiro Fountain and Moore Hall. The students who were arrested received stay-away orders, which prevented them from being on campus for fourteen days. Declaration of Rick Braziel in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ¶¶ 27-30, Frankel v. Regents of Univ. of California, No. 2:24-CV-04702, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024), https://storage.courtlistener.com/recap/gov.uscourts.cacd.928715/gov.uscourts.cacd.928715.62.5.pdf; *see also* Complaint, *supra* note 47, ¶¶ 177-78.

[179] Photo Credit: Sahar Tartak (@sahar_tartak), X.COM (May 2, 2024, 8:00 AM), https://x.com/sahar_tartak/status/1786048145278849496.

## E. Disciplinary Procedures and Enforcement

The Task Force heard reports of difficulties navigating University and campus rules and procedures for purposes of enforcement, and in some cases resistance to enforcement by University administrators, even when there was strong evidence that affiliates were responsible for violations of University or campus rules. In some instances, Jewish students or faculty asked deans for guidance on enforcement of rules, but they were rebuffed or discouraged from attempting to initiate disciplinary procedures.[180]

Several students, Task Force members, and survey respondents reported that complaints of antisemitism and discrimination were ignored, minimized, or were not taken seriously by faculty or staff.[181] Lack of enforcement of University and campus rules, based on viewpoint or identity of perpetrators or victims, constitutes discrimination that violates UCOP Anti-Discrimination Policy,[182] as well as Jewish affiliates Constitutional guarantee of equal protection under the law,[183] and Title VI of the Civil Rights Act of 1964.[184] Such refusals, especially noteworthy given the vast anti-discrimination infrastructure the University has erected in and around its EDI office, also contributed to the widespread perception by Jews at UCLA of antisemitic and anti-Israeli bias by the University itself.

The Task Force also heard reports that applicable University and campus rules, and procedures for complaints and enforcement, are complicated and difficult for students and faculty to identify and understand. In part, this might be due to fractionalized rules and procedures, depending on whether they apply to students, staff, Senate faculty, non-Senate faculty, or some or all of the foregoing. There are strong rationales for different rules and procedures across these groups, but that does not obviate the need for a means of making disciplinary and enforcement mechanisms more transparent and accessible to University affiliates. The complaint process is further inaccessible due to fears of retaliation and safety concerns, as outlined in open-ended responses to the Task Force survey, which are described earlier in Section III of this report.

---

[180] Evidence supporting these assertions was reported to the Task Force, including through responses in the UCLA Task Force to Combat Antisemitism and Anti-Israeli Bias's 2024 survey.

[181] *See, e.g.*, Milagro Jones (@daddymilagro), INSTAGRAM (Sept. 16, 2024), https://www.instagram.com/daddymilagro/p/DAAS4NlMplB/?img_index=1; *see also* survey results *supra* Section III.

[182] *UCOP Anti-Discrimination Policy*, *supra* note 170, Section II.A.1: Harassment, University of California Office of the President.

[183] U.S. CONST. amend. XIV, § 1, applied to the states and public institutions.

[184] 42 U.S.C. § 2000d to 2000d-7.

## F. University Response in *Frankel v. Regents*

The Task Force is troubled by the defense that was offered by the University in *Frankel et al. v. Regents of the University of California et al.*[185] The plaintiffs are three Jewish students at UCLA. Their initial pleading alleges dozens of antisemitic acts at UCLA, including those identified in this report and more, and the University's failure to act to protect the plaintiffs from injury attributable to those acts.[186] The plaintiffs seek declaratory, injunctive, compensatory, punitive, and nominal relief.

The Task Force regrets that the University did not settle this case at the outset. Other universities have been subject to similar lawsuits. In the case of NYU, a settlement was reached with students that (1) agreed to remedies for the plaintiffs and those similarly situated, (2) committed to enforcing the law and its own policies, and (3) agreed to develop a comprehensive plan for doing so.[187] Jews and Israelis have been victims of discrimination and harassment on the UCLA campus, and the University should commit to remediation, rather than fighting the case. Feedback from many in the Jewish community at UCLA was that the University's initial decision to appeal the federal court's August 13, 2024, injunction that sought to block exclusion of campus communities, was offensive. Thus, we believe that the University's reversal of course by withdrawing the appeal was the right decision.

In addition to not settling the case and initially opposing the injunction, several of the defenses asserted by the University to fight the injunction had the effect of reinforcing a perception of its bias against Jews and/or supporters of Israel and seemed to discount the equal protection of Jews at UCLA. For example, in response to the motion for an injunction to allow Jewish students equal access to the campus, the University repeatedly argued that its decision to allow the encampment to continue was an appropriate and reasonable "de-escalation" tactic.[188] The argument that discrimination against a protected class (i.e., Jewish religion and Israeli national origin) is an appropriate or reasonable tactic for achieving any objective is problematic. It is doubtful that the University would make such an argument to rationalize discrimination against any other identity category protected by state or federal law. Appropriately, the court rejected UCLA's defense and issued the injunction, banning UCLA from "knowingly or allowing or facilitating the

---

[185] Frankel v. Regents of Univ. of California, No. 2:24-CV-04702, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024).

[186] *Id.* at *2-6.

[187] *See, e.g.*, Sharon Otterman, *N.Y.U. Settles Lawsuit by Students Who Claimed Antisemitic Harassment*, N.Y. TIMES (July 9, 2024), https://www.nytimes.com/2024/07/09/nyregion/nyu-antisemitism-settlement.html.

[188] *See* Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction at 1, 3-4, 10, 12, 15, 17-18, Frankel v. Regents of Univ. of California, No. 2:24-CV-04702, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024), https://storage.courtlistener.com/recap/gov.uscourts.cacd.928715/gov.uscourts.cacd.928715.62.0_1.pdf.

exclusion of Jewish students from ordinarily available portions of UCLA's programs, activities, and campus areas, whether as a result of a de-escalation strategy or otherwise."[189]

The University proffered several other defenses to the plaintiffs' initial filing, defenses that suggest the University knew it had erred in its handling of post-October 7 events but did not want any remedies for those harmed by its errors. For example, the University defended its action by arguing that it lacked "control" over third parties in the encampment that engaged in discrimination and criminal acts against Jews and persons with political opinions that differed from their own.[190] However, that defense is undermined by the fact that the University eventually gave up on its de-escalation strategy and organized a breakup of the encampment and arrest of the protesters. UCLA could have decided to end the encampment when it was established, but it expressly decided to let the encampment protest and violations of law and University rules continue.[191] Additionally, UCLA could have marshalled the resources to end it much sooner than May 2, albeit at the risk of escalation, which is evidence of its "control."

Further, the University's argument that it maintains a non-discrimination policy[192] is irrelevant. Not many firms or private organizations, and presumably no public entities, have stated policies of discrimination or exclusion. Existence of a non-discrimination policy does not render those entities immune from responsibilities to ensure discriminatory incidents do not occur and certainly do not recur—particularly when those incidents take place in plain sight and are swiftly and widely reported.[193]

We support the University's recent decision to withdraw its appeal of the federal district court injunction. The Task Force urges the University to stop fighting the *Frankel* case, and instead invest resources in improving the climate on campus. The University should work with plaintiffs and other Jewish stakeholders at UCLA, including this Task Force, to develop a comprehensive plan to dampen or stop antisemitic and anti-Israeli bias on

---

[189] *Frankel*, No. 2:24-CV-04702, 2024 WL 3811250, at *21 (C.D. Cal. Aug. 13, 2024).

[190] Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction, *supra* note 188, at 18-19.

[191] *Id.* at 15.

[192] *Id.* at 12.

[193] Additionally, UCLA defends against the Title VI claims by arguing plaintiffs could prevail only if peer-on-peer harassment was caused or enabled by the school's deliberate indifference. *Id.* at 18-19. The Chancellor's Office presumably was not "deliberately indifferent," But the presence of campus security at the encampment, and the support extended by UCLA faculty and staff, muddied whatever clear signal the Chancellor may have sought to transmit. It is quite possible that offending "third parties" were emboldened by the physical presence and rhetorical and institutional support of faculty and staff. If one's professor or TA moved classes, office hours, or review sessions to the encampment or excused assignments, it is not unreasonable for "third parties" to think they have at least some institutional support, which may embolden them.

campus. The Task Force also cautions the use of legal arguments that can further exacerbate distrust and antisemitic tensions on campus.

## G. Summary of the Post-October 7 Experience at UCLA

The incidents, activities, and behavior outlined above in aggregate portray an environment of harassment, bias, and discrimination against Jews and Israelis on the UCLA campus and in the wake of the events of October 7, 2023. We have provided evidence of University and campus officials' failure to enforce, delayed enforcement of, and in some instances express decisions not to enforce many rules and laws, resulting in lack of protection of the Constitutional rights of Jews on campus. In some instances, failures to act denied Jewish affiliates of the University equal protection under the law, as guaranteed by the Fourteenth Amendment to the U.S. Constitution; violated the Free Exercise Clause of the First Amendment to the U.S. Constitution; violated Title VI of the Civil Rights Act of 1964; constituted for Jewish faculty and staff a "hostile work environment" within the meaning of Title VII of the Civil Rights Act of 1964; and contravened UC Regents, University, and campus rules and policies. Further, UC Principles of Community have been violated and the Bruin Principle of Accountability has not been followed. Failure by University and campus officials to enforce the law, or University and campus rules, in a timely manner, and express decisions by officials to not enforce the foregoing, enabled antisemitic and anti-Israeli behaviors and events on campus. Those violations typically occurred without consequence to perpetrators. Further, those incidents have resulted in legal decisions against the Regents, the University, and campus officials.

The incidents and behaviors such as those described above likely contributed to the widespread perceptions of antisemitic and anti-Israeli bias at UCLA as documented in our survey of the UCLA Jewish and Israeli communities (Section III). As discussed, specific survey responses demonstrate a perceived rise in antisemitism and anti-Israeli behaviors post-October 7th, causing many Jewish and Israeli affiliates to intentionally avoid campus and consider leaving UCLA. Most survey respondents felt the University is not doing enough to combat antisemitism and anti-Israeli bias.

While efforts have been made during this current 2024-2025 academic year to address some of the problems identified in this report, anti-Jewish and anti-Israeli bias and actions continue to be an issue on campus.[194] For example, on the one-year anniversary of the

---

[194] For example, the *Daily Bruin* reported that on October 7, 2024, people kicked and trampled Israeli flags displayed as part of a permitted memorial for terrorist victims. *Anniversary of Oct.7 Attacks,* DAILY BRUIN (Oct. 7, 2024, 9:12 p.m.), https://dailybruin.com/2024/10/07/live-anniversary-of-oct-7-attacks.

deadliest terror attack per capita worldwide since at least the 1970s,[195] UCLA's Undergraduate Student Association Council (USAC) Cultural Affairs Commission posted a series of images and statements[196] that depicted paragliders and inverted red triangles, which are used by Hamas as symbols to indicate Israeli targets and are now associated with torture, rape, and murder of unarmed civilian victims.[197] The inverted triangles in the images posted by the USAC Cultural Affairs Commission were aimed at civilian homes with Israeli flags. The USAC Cultural Affairs Commission also posted images of media reports of Hamas having killed babies and women that were stamped "FALSE." Extensive documentation, including video footage taken by the Hamas perpetrators, forensic evidence, and eyewitness testimony exists to support those media claims.[198]

These USAC images and statements constitute a disinformation campaign that dehumanizes Jews and Israelis and images and statements also celebrate overt violence against Israeli civilians.[199] Not only are these actions reprehensible and deeply offensive to many Jews and Israelis, they may also constitute harassment within the meaning of the Student Conduct Code, as well as harassment and fostering a harmful environment under the Student Group Conduct Code. Further, they were posted by USAC, which is funded by mandatory undergraduate student fees.[200]

---

[195] Daniel Byman, Riley McCabe, Alexander Palmer, Catrina Doxsee, Mackenzie Holtz, and Delaney Duff, *Hamas's October 7 Attack: Visualizing the Data*, CENTER FOR STRATEGIC AND INTERNATIONAL STUDIES (Dec. 19, 2023), https://www.csis.org/analysis/hamass-october-7-attack-visualizing-data.
[196] Cultural Affairs @ UCLA (@culturalaffairs), INSTAGRAM (Oct. 7, 2024), https://www.instagram.com/culturalaffairs/. The posts by the cultural affairs commission also encourage affiliates to violate University policy by promoting a guide that instructs protestors to avoid surveillance by "conceal[ing] high contrast (mainly mouth and jaw) areas with a loose fitting mask." The guide is available at: grad_sjpatUCLA, *Safety Tips for Protest,* INSTAGRAM (Oct. 7, 2024), https://www.instagram.com/p/DA1ra0TTzvh/?img_index=1.
[197] Mira Fox, *Watermelon, Dogtags, Red Hands – A Guide to the Symbols of Oct. 7 and Its Aftermath*, FORWARD (Sept. 29, 2024), https://forward.com/culture/658086/watermelons-dogtags-red-hands-a-guide-to-the-symbols-of-oct-7-and-its-aftermath/.
[198] Yoni Michanie, *Israel-Hamas War: Denying Oct. 7 Massacre is New Form of Antisemitism*, THE JERUSALEM POST (Nov. 26, 2023, 1:44 PM), https://www.jpost.com/opinion/article-775199; Cathryn J. Prince, *Are Conspiracy Theories about Oct. 7 a New Form of Holocaust Denial? Experts Weigh In*, TIMES OF ISRAEL (Jan. 29, 2024, 5:09 PM), https://www.timesofisrael.com/are-conspiracy-theories-about-oct-7-a-new-form-of-holocaust-denial-experts-weigh-in/.
[199] *Id.*
[200] "The Council shall not support or affiliate with any organization which legally discriminates on the basis of: race, creed, sex (except as exempt from Title IX), age, national origin, religion, physical handicap, or sexual orientation." Council members are also considered responsible employees under UCLA guidelines for Title IX. *Bylaws,* ASUCLA UNDERGRADUATE STUDENTS ASSOCIATION, https://static1.squarespace.com /static/6508fc8793db9d26ceab8952/t/66c6684feb5dd87268b5d1d5/1724278864510/bylaws.pdf. The Cultural Affairs Commission is part of USAC and likely receives a stipend for their work that is funded by mandatory undergraduate fees. Each council member may earn up to $14,826.24. Mandatory undergraduate fees contribute to a $10.6 million operating budget. Shiv Patel, *USAC Approves $10.6M Budget, including officer raises, for 2024-2025 fiscal year*, DAILY BRUIN (Jul. 11, 2024), https://dailybruin .com/2024/07/11/usac-approves-10-6m-budget-including-officer-raises-for-2024-2025-fiscal-year;

Moreover, on October 7, 2024, the UCLA student group, Students for Justice in Palestine, organized and held a demonstration in North Dixon Court, advertised by SJP as requiring masks, in violation of campus time, place, and manner restrictions, and other campus and University rules.[201] No disciplinary actions have been taken against these student groups or individuals who are in violation of campus policies. More must be done by the University to create a culture of inclusion and to protect Jews, Israelis, and Zionists on campus.

 

Images 13 and 14. Screenshots of the Cultural Affairs Commission's October 7, 2024, Instagram posts, which feature paragliders, inverted red triangles, and images of newspaper articles with a stamp reading *false*.[202]

---

[201] For example, the *Daily Bruin* reported that on October 7, 2024, people kicked and trampled Israeli flags displayed as part of a permitted memorial for terrorist victims. *Anniversary of Oct.7 Attacks,* DAILY BRUIN (Oct. 7, 2024, 9:12 p.m.), https://dailybruin.com/2024/10/07/live-anniversary-of-oct-7-attacks.
[202] Photo Credit: Although the original posts are no longer visible, screenshots were taken on October 7, 2024 from: Cultural Affairs @ UCLA (@culturalaffairs), INSTAGRAM (Oct. 7, 2024), https://www.instagram.com/culturalaffairs/.

# V.    Policy and Procedural Recommendations

UCLA, like most other American universities, strongly supports freedom of speech and assembly, and our success as a university depends on the free exchange and debate of ideas. Peaceful protest can be part of the process of freely exchanging and debating ideas. As President Drake noted recently, the University of California has a storied history of peaceful protest movements.[203]

Even peaceful protest movements can express hate and bias against protected groups. While the University of California has long countenanced peaceful protest, no major protest movement at UCLA has been associated with bias or hate against a protected class of University affiliates, nor have those protesters committed criminal acts targeting those affiliates—until now. To the contrary, in UCLA's "Century of Activism," protests have supported what are now recognized as protected classes, including Mexican Americans, Japanese Americans, Native Americans, and Black Americans, and have never advanced hate or bias against a national, ethnic, or religious group[204]—until now. The post-October 7th protest movement is different from past movements: it claims to be aimed at protecting Palestinians and demanding greater accountability from the Israeli government, but it has at the same time unleashed hate speech and symbols, bias, and illegal and offensive behavior against Jews and Israelis on campus. Further, while the more subtle forms of bias, such as assumptions, microaggressions, and feelings of marginalization are hard to quantify, they were captured in our survey.

Moreover, while the First Amendment protects most speech, certain behaviors are not protected and are not conducive to meaningful discourse.[205,206] University and campus rules require faculty and staff to sustain an environment conducive to sharing, extending, and critically examining knowledge and values. Members of the UCLA community are expected to demonstrate respect and professionalism in the exchange of ideas, opinions,

---

[203] *See* Drake, *supra* note 82.

[204] *UCLA's Century of Activism*, UCLA OUR STORIES OUR IMPACT, https://ourstoriesourimpact.irle.ucla.edu/uclas-century-of-activism (last visited Sept. 4, 2024).

[205] These include assault; blocking public pathways, especially when those blocked are members of a protected identity group; possession or use of weapons; vandalism; destruction of property; theft; wearing a mask while engaged in any of the foregoing; disrupting normal university operations, such as class meetings, research activities, administrative work, student group meetings, symposia, colloquia, and faculty-sponsored activities; harassment; discrimination based on religious or national identity; violations of campus time, place and manner restrictions; placement of temporary structures on campus without authorization; tearing down authorized postings on student group or faculty bulletin boards; etc.

[206] To be clear: as a Task Force, we strongly support protest as a form of activism, and many of us have participated in protests as well, including to bring peace to the Middle East. While many of those protesting Israeli actions, or U.S. or University policies, have done so respectfully and in accordance with laws and University and campus rules, some affiliated individuals and organizations engaged in activities exhibiting antisemitic or anti-Israeli bias have violated University or campus rules, or local, state, or federal law.

and criticisms, and to remain objective in their professional communications and interactions. Those rules clearly state that discrimination or harassment based on nationality or religious identity; participating in or deliberately supporting the disruption of university activities; or misuse of the classroom for political indoctrination are inconsistent with these expectations.

There is also a widespread perception among Jews and Israelis at UCLA that the University failed to enforce laws and rules against such behavior when the context is anti-Israeli or antisemitic, while those laws and rules would be swiftly and consistently enforced when aimed at other groups, particularly those recognized as part of another protected class. This perceived inconsistency is seen as a violation of UCLA's obligations under the 14th Amendment to the U.S. Constitution and Title VI of the Civil Rights Act of 1964. In so far as conditions on campus resulted in Jews and others who would not renounce the State of Israel being hindered in their efforts to freely and fully avail themselves of campus offerings, the University also failed in its legal obligation to protect First Amendment rights to the free exercise of religion and free speech. Note that Jewish support of a nation-state in their historic homeland of Israel (the Zionist ideal) is integral to religious belief and identification among a large majority of Jews. Hence, the denial of common rights or access to supporters of Israel constitutes a form of de facto or structural antisemitism and should be viewed as discrimination against a protected class.

In light of the findings described in this report, we recommend the approach described below.

## A. Implement and Enhance Relevant Training and Education Initiatives

A lack of understanding of the diversity of Jewish identity and beliefs has led to assumptions and negative stereotyping of Jewish and Israeli members of the community. Jewish members of the community at UCLA feel marginalized. Across diverse views, Jews and Israelis must be allowed to define and narrate their own experiences of antisemitism without being accused of manipulation or "victimhood." We suggest that more education is needed not only about Jews and Israel, but in respecting various ways of being Jewish at UCLA as well as related campus rules and relevant laws.

- The Chancellor, deans, and senior campus administrators should consistently emphasize to students, faculty, and staff that UCLA aspires to be a beacon of the free exchange of ideas in pursuit of truth and understanding. While the University supports freedom of speech and assembly, these principles are subject to the laws and policies identified in Section IV. Administrators should clearly describe and

explain these policies and consequences for their violation. Online mini-courses on relevant University protocol and policy should be prepared and course completion made mandatory for all University affiliates.

- Faculty should be reminded regularly by campus administrative leadership and the Academic Senate of their responsibility to advance the free exchange of ideas and that political indoctrination from any particular perspective is both anathema to that mission and a violation of University rules. Faculty who violate this principle of education should be held accountable for violating University rules and should be counseled for failing to create and support an inclusive learning environment.

- Given the identification of teaching assistants as perpetrators of expressions of bias within the classroom environment (see Section III), specific educational initiatives directed at teaching assistants should be undertaken.

- In classroom discussions or consideration of matters pertaining to Israel-Palestine, faculty should welcome different points of view and implement discussion guardrails, providing clear norms and boundaries for discussion, given the sensitivity of the topic.[207] We note that such guidelines and guardrails are common in university settings; we simply recommend that such guidelines and guardrails be employed in discussion of questions concerning Jews and Israel.

- We recommend implementing a comprehensive program to cultivate norms and skills of critical, mutually respectful discourse among all current and incoming students. In this regard, we welcome the strengthening of the *Dialogue Across Differences* initiative in the new UCLA Bedari Kindness Institute. Related programs could begin online prior to student matriculation and continue during new student orientation, featuring sessions where incoming students engage in discussions within small, diverse groups across social, cultural, and geographic lines.

- Given the centrality of campus culture to campus experience, faculty, teaching assistants, administrators, and entities that more informally help shape campus norms and culture such as Student Affairs and the EDI Office, should better understand and communicate the history and contemporary manifestations of antisemitism and the complexities of understanding it given the—largely overlooked—national, religious, ethnic and racial diversity of the Jewish people. Informal norms and culture are important in creating an environment in which bigotry will either fester or wither. While, for example, racism, sexism and

---

[207] *See, e.g.*, *Guidelines for Classroom Interactions*, Ctr. for Rsch. on Learning and Teaching, Univ. of Mich., https://crlt.umich.edu/examples-discussion-guidelines (last visited Sept. 2, 2024).

homophobia cannot be legislated out of existence, the default culture of UCLA's campus rightly frowns upon and discourages them. Antisemitism should not be accepted by the same campus culture that aspires, even imperfectly, to embody the values of belonging, equity, diversity and inclusion. It is accepted that unconscious racism and implicit bias impact modern life—from the interpersonal to the institutional. It follows that unconscious forms of antisemitism, which is a type of bigotry that has persisted for thousands of years across the globe, is also present in contemporary society and at UCLA.

- While UCLA cannot adjudicate competing narratives, UCLA can and should help the community better understand the context of those narratives. UCLA should prioritize honest dialogue, mutual understanding, and commitment to coexistence and to the dignity, freedom and well-being of both Israelis and Palestinians. UCLA cannot solve the Israeli-Palestinian conflict and should not stifle discussion of it. But in a time when rising hostility and polarization around the conflict are fueling antisemitism, we should recognize that simple paradigms cannot fairly be imposed on a conflict involving two diverse minority groups, with deep historical ties to the same land, which have both endured persecution in multiple countries.

## B. Overhaul Means of Enforcement and UCLA Complaint System

Many students, staff, and faculty who feel victimized by antisemitic or anti-Israeli behavior are often unaware of campus or university procedures for filing complaints, seeking enforcement of rules, or pursuing remedies. Additionally, there is a perception that campus offices responsible for enforcing such rules are indifferent or resistant to complaints related to antisemitism or anti-Israeli bias. The enforcement responsibilities for such rules are also spread across multiple campus units, making it difficult to know where to file complaints, and sometimes require multiple complaints across different units for a single incident. Accordingly, we recommend the following:

- The campus should appoint a single individual responsible for overseeing complaints alleging violations of law or policy perceived as antisemitic or anti-Israeli bias. This individual would oversee channeling complaints through the appropriate campus and law enforcement procedures for investigation and enforcement and would ensure that the complaint process remains transparent and free of bias.

- Quarterly reports should be issued to the Chancellor and made publicly available regarding the number, nature, and disposition status of complaints. The report should include alleged and confirmed acts of antisemitic and anti-Israeli bias.

- We laud campus leadership for establishing an Office of Campus Safety, led by an Associate Vice Chancellor. In addition to their current responsibilities, the Office and the Associate Vice Chancellor leading it should be charged with investigating alleged violations of relevant law perceived by any complainant as antisemitic or anti-Israeli, and lead UCLA's coordination and cooperation with authorities responsible for prosecuting individuals charged with such violations of law.

- The system for reporting antisemitic and/or anti-Israeli bias should be easily accessible for all and complainants should be able to track the progress of their complaint. Although all complaints may not warrant follow-up (i.e. if they are not in violation of a law or University policy), the reporting system should be simplified and with transparent follow up for the complainant.

- We emphasize that the University should respond to violations of law or policy, not speech. People may have the right to express antisemitic ideas outside the classroom setting, however they cross the line where they violate laws and regulations.

## C. Consistent, Timely, and Effective Enforcement of Laws and Rules

We welcome recent directives by the Regents, President Drake, and the University to enforce various existing University and campus rules, such as those that prohibit camping or encampments, unauthorized structures, restrictions on free movement, masking to conceal identity, and refusing to reveal one's identity when asked to do so by University personnel. However, we note that these rules were on the books yet were not enforced by UCLA campus leadership during most of the 2023-24 academic year, so the value of the recent directives will be judged from experience in the coming years.

Moreover, enforcement of only those existing rules identified by the Regents and President Drake is not enough: all federal and state laws, and all University and campus rules must be fully enforced, consistently, and in a timely manner. Any decision not to do so in the context of the Israeli-Palestinian conflict would be a decision to discriminate in application of laws and rules based on viewpoint or identity; would undermine the purposes for which the laws and rules are maintained; and would be interpreted as permission to continue to violate such rules.

Accordingly, we recommend that the campus:

- Enforce all published UC Regents policies, UC Office of the President rules, and UCLA campus rules promptly and consistently, and apply them to students, faculty, staff, and non-affiliates for any violations, including those mentioned in this report.

- Discipline faculty or staff who engage in discrimination or harassment of any student or colleague perceived as Jewish or Israeli or misuse the classroom for political indoctrination.

- Fully comply with the August 13, 2024, injunction ordered by the federal district court in *Frankel et al. v. Regents of the University of California, et al.* University compliance should include no tolerance for and imposition of penalties in accordance with University and campus rules, for any person or organization that denies persons identifying as Jewish or as a supporter of Israel from full and equal access to any ordinarily available program, activity, or campus area. University efforts to restore full and equal access should be immediate, and those efforts should include disciplining any University affiliate denying full or equal access to protected persons.

- Maintain an adequate force of campus safety officers or other capacity to respond quickly to fully enforce violation of law or University or campus rules.

- Not issue retroactive permits or permission for activity that violates University or campus rules, such as time, place, and manner rules.

## D. Rule Clarification and Cooperation with Jewish and Israeli Stakeholders

We much appreciate recent efforts by the University and campus to modify or clarify some rules, the full enforcement of which might dampen antisemitic or anti-Israeli bias or events on campus. However, these rules and clarifications do not go far enough.

We note the following:

- We applaud University for having issued updated interim Time, Place, and Manner rules on September 4, 2024, now subject to a 60-day comment period. We further suggest that the University clarify implementation of the updated rules, issuing further UCLA guidance and expectations on student, staff, and faculty conduct, including examples and explanations of key policies concerning discrimination and

harassment, to help the UCLA community better understand not only what the rules say but how they are applied.[208]

- The September 4, 2024, message in which the new policies are set forth states that "non-compliance [with the rules] *may* lead to penalties or discipline." [Emphasis added.] We believe that the appropriate approach and language should be that noncompliance *will* lead to penalties or discipline. As shown throughout this report, permissiveness and ambiguity about rule enforcement are some of the main reasons the campus now finds itself perceived by many as hostile to Jews and Israelis.

- The interim proposed UCLA Policy 850, Part IV.C.7.c degrades current campus and University policies, and is inconsistent with the language in California Penal Code section 626.4, concerning activity that disrupts campus operations, by modifying the current policy prohibiting disruption to now declare that sound levels may not "*substantially*" disrupt campus operations. "Substantially" raises the threshold, allowing some disruption. Moreover, the interim standard of "substantial" disruption adds still more ambiguity about campus leaders' intentions concerning rule enforcement.

- The Interim proposed UCLA Policy 850, Part IV.C.7.c should specify that that chants, speeches, music, or other sound from rallies, marches, demonstration or events (regardless of whether they take place in locations otherwise identified as permissible in time, place, and manner rules) that are plainly audible in classrooms where teaching is taking place, libraries where studying is taking place, labs where research is being conducted, or faculty offices during normal business hours, constitutes disruption of and interference with the orderly operation of the campus and University activities and so violate campus rules.[209]

---

[208] *See, e.g.*, *NYU's Guidance and Expectations on Student Conduct*, New York University, https://www.nyu.edu/students/student-information-and-resources/student-community-standards/nyu-guidance-expectations-student-conduct.html (last visited Sept. 2, 2024).
[209] The proposed clarification is consistent with various University and campus rules that prohibit disruption of or interference with University activities. See, e.g., *UCOP Policies Applying to Campus Activities, Organizations, and Students*, *supra* note 50, §§ 40.30-.40, which provide, in relevant part: "On University grounds open to the public generally […] all persons may exercise the constitutionally protected rights of free expression […] Such activities shall not interfere with the orderly operation of the campus and must be conducted in accordance with campus time, place, and manner regulations"; see also *UCLA Student Conduct Code*, *supra* note 93, § 102.13, which prohibits: "Obstruction or disruption of teaching, research, administration, disciplinary procedures, or other University activities"

- The interim "areas for public expression" include places where protests will disrupt students and faculty engaged in activities central to the mission of the university, such as reading, writing, research, and teaching. Of concern are the following designated interim areas: the lawns or walkways on the east side of Powell Library and between the Student Activities Center and Powell Library, where protests would disrupt those working in Powell Library; the areas west and north of Moore Hall, where protests would disrupt teaching taking place there, as well as research, writing, and teaching that take place in Physics and Astronomy, and affiliates working in Powell Library.

- Campus administrators now require that any person or organization that uses sound amplification equipment on campus outside of designated locations and hours and in the course of a demonstration, rally, or any outdoor event must obtain approval from the appropriate campus authorities in advance of its use. Such permits should specify the times, places, and manners in which that sound equipment may be used to ensure that its use does not interfere with or disrupt normal University activities.

## E. Implementation of New State Laws and Other Actions to Protect and Support Jewish and Israeli Community Members

We recognize that there is a wide range of beliefs, even within our Task Force, as to the role of Zionism as central to Judaism. There appears to be a great need for a better understanding of the diversity of the Jewish community at UCLA, including religious practices, race, and political views about Israel. It is important that the University includes Jewish and Israeli affiliates as part of the design, implementation, and evaluation of the recommendations in this plan. Below, we provide several additional recommendations to support inclusion and to improve the campus climate:

- We urge the Administration to promptly implement AB 2925 as was recently signed into law by Governor Newsom.[210] The legislation requires that the top 5 most targeted groups – which consistently includes the Jewish community – be included in higher education anti-discrimination and DEI trainings. UCLA's Office of Equity, Diversity, and Inclusion (EDI) should extend to individuals identifying as Jewish all the rights, privileges, and support currently afforded to other protected classes. The campus should officially and publicly declare and recognize Jewish identity as a protected class.

---

[210] Assemb. B. 2925, 2024 Leg., Reg. Sess. (Cal. 2024),
https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240AB2925.

- Campus mental health professionals should be informed of the issues raised in this report, and the mental health service providers on campus should undergo professional development to better support students affected by perceived acts of antisemitism or anti-Israeli bias.

- UCLA and its administrative units should adhere to a strict principle of not making statements about public matters that do not directly affect the university's core function,[211] including contested public and international policy issues related to Israel-Palestine. Any other stance or policy would undermine the free exchange of ideas on contested public and international policy issues, and likely would be seen as institutional bias against certain stakeholders, advocates, or scholars. Policies on institutional neutrality should also cover departments and department chairs.

- UCLA should vigorously enforce the Regents Policy on Public and Discretionary Statements by Academic Units May 2024, and the Regents Policy on Use of University Administrative Websites, disciplining all those responsible for violating them.

- The Chancellor should develop and issue a comprehensive plan of action, including (but not limited to) all of the foregoing elements, to combat antisemitism and anti-Israeli bias. That plan should include full implementation of California SB 1287 legislation as recently signed into law by Governor Newsom.[212] The new law offers a critical tool to ensuring Jewish students are safe from violence, intimidation, and harassment on California college campuses by requiring campuses to develop a code of conduct to respond to such incidents.

- The administration should identify schools, departments, divisions, and units that have demonstrated hotspots of antisemitism and anti-Israeli bias. It should require that each identified school, department, division, or unit develops a comprehensive plan of action that is consistent with the Chancellor's plan and takes additional steps necessary to remediate and combat antisemitism and anti-Israeli bias that has taken or is taking place. Jewish and Israeli stakeholders in those schools or units, including faculty and students, should be included in the process of developing those plans.

---

[211] *See, e.g.*, INSTITUTIONAL VOICE WORKING GRP., REPORT ON INSTITUTIONAL VOICE IN THE UNIVERSITY, https://provost.harvard.edu/sites/hwpi.harvard.edu/files/provost/files/institutional_voice_may_2024.pdf (last visited Sept. 2, 2024).
[212] S.B. 1287, 2024 Leg., Reg. Sess. (Cal. 2024), https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202320240SB1287.

- The Administration should appoint a standing version of the current task force to provide ongoing input to University leaders on policy, protocol, education, training, and enforcement related to matters of antisemitism and anti-Israeli bias. The Administration should also work with other Jewish and Israeli stakeholder groups, on campus, including but not limited to Hillel, the Nazarian Center, the Jewish Faculty Resilience Group, and others to provide ongoing input on these matters. The task force and stakeholders should be engaged for input on any proposed new campus rules that would help address antisemitic or anti-Israeli bias before those rules are adopted.

- The University should continue to evaluate Jewish and Israeli experiences on campus. This could in part be done via the Hillel Campus Climate Initiative.

- Funding should be made available to support the Task Force or future committees on campus for educational initiatives and other interventions, ongoing evaluation, and related reports.

- The University should develop a plan to address the issues and recommendations outlined in this report and make the plan publicly available. The University should also provide periodic updates to the community on progress towards implementation of the plan.

# VI.  Conclusion

This report offers new survey-based evidence of a marked rise in antisemitism and anti-Israeli bias at UCLA during 2023-2024, demonstrates that the University has frequently failed to adequately address violations of laws and policies pertinent to protecting Jewish and Israeli community members, and provides recommendations for better outcomes. Our emphasis is on actions and polices to enhance knowledge, reduce incidents of bias and discrimination, and improve overall campus climate.

The report presents detailed findings of our spring 2024 survey of perceptions of antisemitism and anti-Israeli bias by Jewish and Israeli faculty, staff, and students at UCLA. While Jewish and Israeli survey respondents are diverse in beliefs, religious denomination, experience, race, ethnicity, and attachment to Israel, most report being negatively impacted by antisemitism and anti-Israeli bias at UCLA. Among salient findings, the large majority of respondents reported that antisemitism and anti-Israeli bias is a "problem" or a "serious problem" at UCLA. Three-quarters of respondents felt that antisemitism is taken less seriously than other forms of hate and discrimination at UCLA. Nearly 40% of respondents noted that they experienced antisemitic discrimination at

UCLA. Almost half of the undergraduate student respondents reported that teaching assistants engaged in behaviors that included offensive comments, attacks, or discrimination, and the majority reported that their peers engaged in these behaviors. Overall, bias against Jewish people and Israelis was experienced by most respondents in the form of stress and negative impacts on well-being. Based on these experiences, roughly 40% of respondents indicated that they had thought about leaving UCLA due to antisemitism or anti-Israeli bias. Also, most respondents did not have confidence that reporting discrimination to UCLA would lead to any effective action by the campus. Despite experiencing stressors, Jewish and Israeli members of the UCLA community expressed pride in their identities and want to persist to make UCLA a safe and welcoming place for all.

It is important that the University address these matters to assure that Jews and Israelis feel safe on campus and to mitigate hatred, racism, discrimination, and antisemitism at UCLA. To reduce bias and to promote a more inclusive space for Jewish people, Israelis, and all members of the UCLA community, the Task Force recommends the following approach: (1) implement and enhance relevant training and education initiatives among UCLA community members, (2) overhaul the complaint and reporting system, (3) enforce laws, rules, and policies in a consistent, timely, and effective manner, (4) clarify rules and policies, and (5) implement new state laws and other actions to protect and support Jewish and Israeli community members. These issues must be addressed to provide a safe, accessible, and non-discriminatory environment for all community members and to ensure that UCLA adheres to and advances its community goals.

We look forward to participating in the *Dialogue Across Differences Initiative* at UCLA in an effort to further University values and deepen understanding and connection with other campus groups.

# Appendix

# A. 2023-24 Registered Campus Organizations and UCLA Centers (Jewish, Israel)

Alpha Epsilon Pi Fraternity (AEPi)
Bruins For Israel
Chabad at UCLA
Hillel at UCLA
Jewish Faculty Resilience Group (JFrg)
Jewish Graduation Committee 2024
Jewish Law Students Assn.
Jewish Medical Student Association (JMSA)
Jewish Voice for Peace at UCLA
Jewish-Muslim Alliance (JMA)
JMED
J Street U at UCLA
Leve Center for Jewish Studies
Luskin Jewish Caucus
Nazarian Center for Israel Studies
Olami UCLA
Persian Community at Hillel (PCH)
Students Supporting Israel (SSI)
TAMID Group at UCLA
Zeta Beta Tau Fraternity (ZBT)

## B. Invitation Letters

## Invitation Letter for Organizations

Dear _____,

As members of the *Taskforce on Anti-Semitism and Anti-Israeli Bias at UCLA* convened by UCLA Executive Vice Chancellor and Provost Darnell Hunt last fall, we reach out to you in your capacity as a leader of (name of organization).

Our purpose is to enlist your active support and participation in dissemination of the attached **invitation e-mail with a link to an anonymous** survey of Jewish and Israeli students, faculty, administrators, and staff at UCLA. The survey is completely anonymous and seeks to gather information at this difficult moment from the Jewish and Israeli community to allow for a broad understanding and assessment of experiences of antisemitism and anti-Israeli bias at UCLA.

We seek the widest possible dissemination of this survey and hope that you will assist in circulating our **invitation and survey link** (attached) via your organization's email list and as soon as possible. We are aiming to have the survey completed by June 18th.

We would appreciate if we could let the taskforce know once you have distributed the email invitations with survey link by responding to this email. Please let us know as well if you have any further questions.

We truly appreciate your support of this important information-gathering endeavor.

Thanks again and sincerely yours,

The Taskforce on Antisemitism and Anti-Israeli Bias at UCLA
Antisemitism.taskforce@ucla.edu

## Follow up Email

Dear ____ (person or org)

I hope this message finds you well in difficult times.

As part of the Provost's committee on Antisemitism and Anti-Israeli bias, I am writing to encourage distribution of our campus wide survey for Jewish and/or Israeli students, staff, and faculty. We also have some graphics to distribute as well as the invitation email, and very much appreciate your help.

If you have already distributed the survey, it would be great if you to send a reminder to your constituents.

Please let us know if you have questions.

My best,

XXX

## Final Reminder

**Dear ____**

Thank you for your support in our outreach efforts. We have collected over 400 survey responses!
We ask that you do one more push to your listservs and colleagues. It is important that we have a wide range of responses to inform the new Chancellor of some of the challenges we are facing.
We have written a sample email below.
The survey will close June 21.
Thank you!


**The UCLA Taskforce on Antisemitism and Anti-Israeli bias is closing its important survey on June 21.**
**Please take 10-15 minutes to complete the survey and share your experiences.**
**The survey is anonymous.**

**Many thanks for your participation!**

## C: Invitations to Participate in the Survey

Template Email

Greetings,

We invite all self-identified Jewish and Israeli members of the UCLA community (students, faculty, staff and administrators) to share your experiences and perceptions of antisemitism and anti-Israeli bias on campus. We hope you will use this survey to tell us about your experience, particularly in this important historical moment.

This survey is anonymous and should take no longer than 10-15 minutes of your time.

The survey is designed by the UCLA Task Force to Combat Antisemitism and Anti-Israeli bias, established by the Office of the Executive Vice Chancellor and Provost Dr. Darnell Hunt. The Task Force will be analyzing the responses, along with other data, to formulate recommendations for the campus.

The survey requires a Single Sign On (SSO) login to verify that you are a member of the UCLA community. The survey is confidential and SSO information will be decoupled from survey results. When completing the survey please do not include your name or names of others.

Please access the SURVEY HERE

Please know that this survey is NOT a formal complaint mechanism. If you have experienced any type of harassment, bias, or discrimination, please report the incident to UCLA's EDI-Civil Rights Office.

If you have any questions about the survey, please contact antisemitism.taskforce@ucla.edu.

Thank you for your participation. Please complete the survey by June 18th.

Sincerely,
The UCLA Taskforce to Combat Antisemitism and Anti-Israeli Bias

'

Graphics for Messaging





**Task Force to Combat Antisemitism
and Anti-Israeli Bias at UCLA**

antisemitism.taskforce@g.ucla.edu

# October 16, 2024