# Exhibit 2

Third Declaration of Eric Rassbach



# Independent Investigation & After-Action Review of Encampment-Related Events at the University of California, Los Angeles, April 2024 through May 6, 2024: Recommendations

21ST CENTURY POLICING SOLUTIONS

November 2024

THIRD RASSBACH DECLARATION EXHIBIT 2
98

# RECOMMENDATIONS

Pursuant to this investigation's findings and conclusions, the following describes a number of measures that UCLA should adopt and implement to address shortcomings, performance failures, systems breakdown, and campus safety issues that emerged from the campus events of April and May 2024.

These recommendations are designed to ensure that UCLA's response to acts of civil disobedience aligns with its commitments to freedom of expression and the protection of the health, safety, and well-being of the UCLA community. In addition to resulting in a more effective response to acts of civil disobedience, implementation of these recommendations will support a more effective response to a wide range of low-frequency, high-impact emergencies events on campus, including potential natural disasters or acts of mass violence. Finally, implementing these measures will better enable UCLA to deliver a range of public safety services in a manner that is effective, that aligns with changing conceptions of the meaning of public safety, and that reflects the UCLA community's values and priorities.

As described below, in the long-term, UCLA will need to address the possibility of making fundamental, structural changes to its public safety ecosystem, including by engaging in a community-driven process to define public safety objectives and goals and by making expanded resources available beyond law enforcement to support those goals. In the short-term, however, UCLA must make immediate changes and develop plans to effectively respond to campus disruptions using existing resources. We are encouraged that UCLA already has begun work to implement these immediate changes.

### A. Recommendations for Immediate Implementation

**Primary Recommendation 1: UCLA should develop, implement, and train all relevant personnel on concrete, detailed, UCLA-specific campus safety plans for responding to acts of civil disobedience and other significant disruptions of University operations, which should include clear definitions of roles, decision-making authority, and lines of responsibility.**

Acts of civil disobedience on college campuses are part of a long and proud history of student protest in the United States. Colleges and universities have had decades to learn from this history and improve upon past practices to develop approaches that might support freedom of expression while protecting public safety and the rights of all students.

Within the UC system, much prior work has been done to foster an effective approach to responding to civil disobedience and campus disturbances. 2012's Robinson-Edley report sets forth substantial research and specific recommendations for UC campuses.

UCLA ostensibly adopted the recommendations in the report,[1] and it is apparent that UCLA administrators and personnel saw the approach as guiding their actions in response to the encampment and related protests and activity. Our review found, however, that UCLA has not effectively formalized or operationalized these recommendations, leading the University and administrators to repeat mistakes in April and May 2024 that the 2012 Robinson-Edley recommendations were designed to reduce.

As with the original Robinson-Edley report, the specific recommendations below are designed to "facilitate robust and peaceful discourse on our campuses, in keeping with [UCLA's] academic mission, while also protecting the health and safety of [its] students, faculty, staff, police, and the general public."[2]

> **Recommendation 1.1: UCLA should create detailed plans that guide decision-making and the exercise of discretion during campus disruptions and emergencies.**

In advance of the encampment, personnel at UCLA had developed a Tiered Response Matrix to guide its response to demonstrations and other disruptions of UCLA operations. A November 8, 2023 version of the plan set forth high-level principles to guide decision-making, for example that law enforcement would only be actively engaged when the activity in question "presents an imminent danger" – including an event "that is posing imminent risk to safety and health and significant risk to safety and health and significant disruption to university functions."[3]

However, it is not clear whether this Matrix was formally adopted, and our review indicated that it was not readily available to decision-makers. Even those aware of the plan lacked clarity on how to implement the plan's guidance. For example, Student Affairs Mitigators and Monitors ("SAMs"), to whom the Matrix assigns the role of intervening to encourage students to abide by campus policy, lacked clarity on what they should do if a protester ignored their warnings. Additionally, some UCLA administrators interpreted the guidance to mean police could not intervene until violence had already occurred, which was consistent with the widespread belief among ULCA Police Department officials that they were not allowed to take any action to respond to behavior that began as a policy violation.

Beyond this high-level Matrix document, UCLA did not, at the time of the encampment, have any plans for how to respond to campus disruptions and how decisions about University responses would be made.[4] Because no codified plans existed, UCLA administrators engaged in a chaotic process in which they needed to make difficult decisions – some appearing to be matter of first impression for many involved – in the midst of ongoing disruption, without clarity on who maintained final decision-making authority, lacking a commonly understood process for reaching decisions, and largely lacking the ability to react quickly to fast-changing events and dynamic circumstances on campus.

Consequently, UCLA administrators should develop detailed plans for addressing various classes of reasonably foreseeable campus disturbances and disruptions. The plans should set forth detailed response and intervention techniques, identify what specific actions and behaviors would warrant the deployment of specific resources and techniques at each tier, and articulate the threshold, if any, for active intervention by law enforcement.

The plans also should set forth *who* the decision-makers are for various types of events and, as described below, should be premised on an Incident Command Structure ("ICS"). Under this common emergency management structure, an Incident Commander is designated for campus disruptions who has overall responsibility for managing the entire incident, including setting objectives and managing the response. The Incident Commander makes decisions consistent with UCLA objectives, policies, and plans that were created in advance of the incident. In making decisions and directing action, the Incident Commander consults with and utilize the resources of impacted and affected entities, for example, student affairs, residential life, and facilities management. This Incident Command Structure fosters clear decision making in an emergency, provides clear lines of authority and information flow, and allows all actors to focus on their areas of expertise and supervision, resulting in a more effective and efficient response.

> **Recommendation 1.2: UCLA should clarify and rigorously operationalize the role of campus leaders during times of emergency, including the response to significant campus incidents and disturbances.**

During the encampment period, two groups of stakeholders mobilized and met regularly to respond to the encampment and related protests and counter-protests. However, the role of each group was not well-established or commonly understood; there were not clear processes for decision-making; and it was not clear who had authority for final decision-making. Combined with the lack of prior planning for such an event, even when an encampment of this sort was reasonably foreseeable based on events at other campuses both nationally and locally, this resulted in some institutional paralysis, a highly chaotic decision-making environment, and ultimately, an inability to effectively respond and protect students from violence.

One group that was convened to respond to the encampment was the Incident Response Team ("IRT"). The IRT meetings, held virtually, included a large number of campus stakeholders, including many who did not have formal decision-making roles. Although the IRT included police leadership, key administrative leaders did not routinely attend the IRT's meetings.

Crucially, the purpose of the IRT meetings was not clear to all members. UCLA PD personnel appeared to understand that the IRT *was* a decision-making body and were frustrated by lack of clear leadership and direction in the meetings. At least one IRT meeting was led by Vice Chancellor for Strategic Communications, leaving some other UCLA personnel and police leadership to conclude, whether true or not, that public safety decisions were being made by the communications team rather than leaders with law enforcement experience and expertise.

However, several senior administrators indicated to the investigative team that the IRT *was not* a decision-making body and that, instead, the purpose of IRT meetings was largely to disseminate information. They reported that the

decision-making was done by the Emergency Management Planning Group.

The Emergency Management Planning Group ("EMPG") was a smaller group of senior administrators – primarily Vice Chancellors and a limited number of additional, senior personnel – that was convened and met regularly to make decisions about the University's response to the encampment and related protests. Like the IRT, it lacked clear leadership and decision-making processes. Meetings of the EMPG were characterized by free-flowing debate, internecine conflict, and a notable lack of decision-making. Decisions were delayed and continuously revisited, and administrators we spoke with expressed frustration at the lack of clear takeaways, action steps, and assigned responsibilities. The meetings did not include representation from the UCLA Police Department – which was coordinating the response of police and civilian, private security – and lacked an effective mechanism to ensure the EMPG had key information from the Police Department.

As described above, UCLA should engage in a planning process to make, memorialize, and convey in advance many decisions regarding the University's desired approach to foreseeable campus events and disruptions. Inevitably, however, the University will need to be nimble enough to apply the principles and general response algorithms embodied in the plans to changing circumstances in an emergency. To do that, the University will need to ensure that roles are clear and that all actors understand who the decision-makers are.

Consequently, UCLA should re-evaluate the roles of the IRT and EMPG structures within the context of implementing more traditional emergency management best practices. It is conceivable to the investigative team that the EMPG could continue to function, but individuals within it must understand it to be a consultative body – functioning as something akin to the Chancellor's cabinet, where views and ideas are suggested – but *not* as a collective, group decision-making body. Likewise, it is conceivable that the IRT could continue to be a valuable way of informing a wider group of campus stakeholders about the dynamics of an ongoing campus situation – but it must be clarified that is both (1) *not* a decision-making body, and (2) does not supplant the authority or work of mechanisms used by an Incident Commander, such as an Emergency Operations Center.

**Recommendation 1.3: The UCLA Police Department should develop comprehensive Incident Action Plans.**

Our review concluded that the UCLA Police Department lacked sufficiently detailed plans for responding to on-campus emergencies requiring mutual aid, resulting in an *ad hoc* and ineffective response when administrators asked the Police Department to engage. Indeed, the absence of advance tactical planning made the law enforcement response, when it was necessary on both April 28 and April 30, slower and more chaotic than it should have been. When UCLA's mutual aid partners responded to assist UCLA PD in response to the eruption of violence on the night of April 30, there were no plans to refer them to; UCLA PD did not exercise command and control over the law enforcement response; and there was not even an identified staging area to coordinate incoming support. Although UCLA PD personnel were present, no one from UCLA PD took command of the scene, and officials from the responding agencies described that it appeared no one was in charge. At the same time, the lack of strategic tactical plans for accomplishing ongoing security objectives with respect to the encampment also complicated the task of keeping the encampment safe – and would have benefitted from more detailed and codified operational plans.

Within this context, as this report has described, the two main responding agencies, LAPD and CHP, were left to devise an *ad hoc* plan without guidance from UCLA PD. However, officers and leadership from these agencies were unfamiliar with the geography of the campus; had no information about who the protesters were or about the type of resistance officers might meet; and were not familiar with UCLA's policies for responding to campus disruptions or the values that guided them. The lack of a clear plan and direction from UCLA PD also meant that the responding mutual aid agencies were not briefed on or otherwise familiar with UCLA policies regarding preferred techniques and tools for gaining compliance with police directives. Because UCLA PD did not provide this critical information, these outside law enforcement agencies decided amongst themselves how to engage.

That is not how the operation should have functioned. UCLA PD should have developed and trained on Incident Action Plans grounded in the Incident Command System. A UCLA PD official – the Chief or his designee – should have functioned as the Incident Commander, setting objectives for the incident; briefing all responding agencies

on available intelligence and the plan for responding, including by referring to maps of the campus, appropriate radio frequencies for communication, available resources and the roles of other entities such as facilities management and the fire department; and directing and coordinating the actions of all parties.

> **Recommendation 1.4: The UCLA Police Department should mandate training to its employees on the development and implementation of Incident Action Plans.**

To gain knowledge experience in the development of Incident Action Plans, UCLA PD should ensure its personnel are trained on how to develop and memorialize Incident Action Plans. Law enforcement entities across country have developed expertise in planning for major events, and UCLA PD should take advantage of the expertise of these law enforcement agencies, particularly local agencies that have significant experience dealing with large scale events.

One potential mechanism for obtaining this training and experience is to embed UCLA PD employees, both sworn and non-sworn, within another local municipal or campus police department as it plans for and responds to large scale events, which can provide real-world expertise in the areas of planning, operations, tactics, Emergency Operation Center operations, joint operations, and investigations. During our discussions with personnel at nearby external police agencies, representatives expressed willingness to provide that opportunity to UCLA PD officers.

> **Recommendation 1.5: The plans developed by UCLA and UCLA PD, and the University's overall response to disruptions and emergencies, should utilize and operationalize the Incident Command System.**

As this report has previously observed, a University's Chancellor, Vice Chancellors, and senior personnel are well-versed on the decision-making processes that work well for many routine aspects of University administration. Often, these decisions, even where they implicate important considerations and have significant outcomes, can be made over a longer time period, do not implicate urgent matters of physical safety, and involve less immediately dynamic circumstances.

Decision-making in times of emergency is different. It often requires the rapid collection of information and quick decision-making that implicates fundamental matters of safety, health, and well-being. Although what works in most other parts of University life is unlikely to work in an emergency response environment, national emergency response protocols can give UCLA a way of structuring its response and decision-making in a way that can account for the critical, fast-changing dynamics and challenges that unexpected, significant events on campus can pose.

The Incident Command System ("ICS") was developed in the late 1960s and 1970s following a series of catastrophic fires in California.[5] Subsequent review of the response to the fires determined that management failures, including unclear chains of command, poor communication and use of conflicting terminology, lack of an orderly planning process, failure to implement a management structure that enabled commanders to delegate responsibility, and lack of mechanisms to integrate interagency requirements contributed to the scope of the disaster.[6] The Incident Command System was developed to address these common failures – many of the type that this investigation and report identify as contributing to UCLA's response to the encampment – and has since been applied across all manner of emergencies.

In 1993, ICS became a national model for responding to emergencies when it was formally used in New York at the first attack of the World Trade Center.[7] The Department of Homeland Security formally adopted ICS within the National Incident Management System ("NIMS") – mandating that all government agencies seeking federal funding use the NIMS/ICS model in their local emergency management organizations and policies. As of 2024, ICS is the "gold standard" for emergency response coordination.

UCLA should formally use ICS in its response to emergencies and disruptions on campus, and its plans for response should be based on the ICS system. While UCLA's comprehensive adoption of ICS within the context of all campus incidents that implicate safety will take time,[8] UCLA should immediately develop plans for response to reasonably foreseeable campus disruptions and situations that incorporate some of the key components of the Incident Command System. Critically, the plans and response should clearly identify, and ensure, an Incident Commander who has overall authority for managing the entire incident, including responsibility over the overall incident safety and providing information to internal and external stakeholders. The Incident Commander will be responsible for making decisions consistent with specific incident objectives and ensuring the implementation of

clear strategies. All entities responding to and affected by the incident will share and receive information as appropriate in light of evolving circumstances and at the direction of the Incident Commander, fostering cooperation and accountability among diverse disciplines and entities.

As described below, UCLA already is working to develop these plans in a manner that is consistent with ICS, even as UCLA's comprehensive implementation of all ICS protocols and processes remains an intermediate- to long-term endeavor.

> **Recommendation 1.6: UCLA should maintain, in the short- and intermediate-term, clearer mechanisms for ensuring that information is appropriately shared during an incident to those who need it.**

Also contributing to the chaotic response to the encampment was a relative lack of clear channels for communication among University personnel and relevant response entities. Beyond the IRT and EMPG meetings, information was dispersed through informal means, such as through text messages and *ad hoc* meetings of varying groups of senior administrators. In some instances, it appears that key information may not have been clearly provided to decision-makers.

Certainly, during a fast-moving and dynamic situation, text messages can be an effective means of reaching others quickly – and it appears this is why University officials and employees, including the police department, relied heavily on text messages as the primary means of conveying information and communicating important updates. However, this form of communication also contributed to some confusion and delay. The investigation identified a number of instances where text messages with important information or questions received no response, and others where one multi-member text chain engaged with significant details but others, with substantially similar but not identical membership, did not receive the same information. Combined with a lack of clarity around who was making decisions, the sheer volume of text messages that administrators and PD personnel sent during the encampment period appeared to complicate attempts to ensure common facts and implement collectively understood decisions.

Going forward, UCLA will need to develop an effective, formal mechanism for communication as events are unfolding to ensure key information gets to those who need it in real time. This will also help provide transparency regarding UCLA's response and allow for regular, internal review of the responses to continuously strengthen practices going forward. If UCLA decides to continue to use text messaging for this purpose, it should consider creating pre-determined members of text groups to ensure critical actors are not inadvertently omitted from key communications, and that information reaches key actors in real time.

It must be noted that this recommendation should be addressed within the context of UCLA's long-term need to more fully utilize its Emergency Operations Center, outlined below.

> **Recommendation 1.7: Starting now, and proceeding across a longer implementation timetable, UCLA should better operationalize the use of its Emergency Operations Center.**

The prior recommendation addresses UCLA's need to ensure better and more organized exchange of information among University stakeholders during emergencies and public safety incidents and is geared toward ensuring that, in the next several months, the University can address any on-campus situations in way that is not unduly hampered by the same challenges with respect to information exchange and flow as the events in Spring 2024.

However, the challenges inherent in ensuring that relevant personnel and entities have the information necessary to coordinate elements of a response for which they are responsible is not a novel consideration. Within standard emergency management paradigms, an Emergency Operations Center ("EOC") "is a location from which leaders of a jurisdiction or organization coordinate information and resources to support incident management activities (on-scene operations)."[9] An EOC addresses the information-sharing and coordination challenges by gathering the right leaders and personnel in the same "physical, virtual or hybrid" location.[10] Rather than needing to interface with a large number of scattered personnel and resources, and determine complicated mechanisms for ensuring the flow of information among key resources, an EOC allows them to be in the same place – speeding information flow, facilitating decision-making, and allowing for better communication among critical stakeholders. That is, having all campus resources and key leaders present in one place obviates the need for elaborate

communications protocols – because everyone is, quite literally, in the same room.

Although UCLA has technically maintained structures and physical space allocated to an EOC, the emergency management function at UCLA, which is responsible for the EOC, has tended to be under-resourced and marginalized.  During the encampment period, a true Emergency Center was not, as noted previously, established until May.  Even when that EOC was finally activated, it was utilized to its full potential, in part because key leaders tend to send other personnel as proxies – minimizing the value of the EOC because central authorities were not present.

To address this, UCLA should develop and rigorously update, enhance, and implement policies for the use of an Emergency Operations Center in manner consistent with national best practices for emergency management.  Those policies and procedures should specifically address EOC activation, deactivation, management, and personnel roles and responsibilities.  Most importantly, they should situate an EOC as a key venue for senior leaders to meet and manage emergent campus situations, including protest-related disturbances, in real-time – not at a remove from each other but, instead, in the same operational space.

> **Recommendation 1.8: Administrators and the UCLA Police Department should engage in regular exercises to ensure that response plans are effective and in line with the UCLA community's values and priorities.**

In developing and implementing plans to respond to campus disruptions, UCLA administrators must have a basic working understanding of policing concepts in response to emergencies and disruptions, including the incident command system, the specific tools and techniques available to UCLA PD, and agreements and commitments from outside law enforcement agencies, including response times and personnel. At the same time, the Police Department must have a clear understanding of the administration's values, priorities, and resources.

The investigation found that, in addition to overall challenges with respect to the exchange of information among stakeholders, there were, specifically, insufficiently effective mechanisms for information flow between administrators and the UCLA police department. Throughout the encampment period, UCLA administrators approached the engagement of law enforcement in a highly siloed manner.  The police were almost entirely uninvolved in decision-making – no one with extensive law enforcement management experience was present in the EMPG meetings to raise issues, provide feedback on proposed strategies, and gauge when and how police may be asked to intervene.  This left law enforcement without a clear understanding of the University's objectives, the principles upon which University leaders were making decisions, and University leadership's balancing of implicated risks.

At the same time, administrators lacked knowledge of basic police techniques and technology, the resources and personnel available to the Police Department, and the Incident command System that should have been operationalized during an emergency.  Again, this created a frenzied decision-making process and left University leaders ill-equipped to guide and gauge the level of police intervention, including by influencing the techniques used, timing the intervention to reduce the need for force and arrest, and ensuring sufficient police were available to stop violence and protect public safety.

After administrators and police develop the type of response plans described above, they should conduct regular, mandatory, announced and unannounced training exercises to simulate their implementation, creating a feedback loop between the two groups.  The investigation determined that, historically, training exercises and response simulations have not been a priority at UCLA.  They have occurred infrequently and, when they did occur, several participants described them as short, perfunctory, and often not receiving the undivided attention of participants.

Relevant UCLA administrators and UCLA PD personnel should develop a structured program of scheduled exercises so that they can be meaningfully conducted at a regular cadence.  They should include a particular focus on command and control, internal and external communications, use of technology, and roles and responsibilities.  These trainings will allow plans to be modified based on lessons learned in the exercise, increase decision makers' knowledge about the techniques and resources available, reduce surprises regarding the impact of particular decisions, ensure that plans align with the University's values, and can increase the likelihood of an effective response consistent with University objectives. As the Robinson-Edley Report noted:

> The University's response to protests can also be handled better and more efficiently by building strong working relationships between police officials and administrators or improving existing relationships. Interactions between protesters and police in the midst of a demonstration will be less fraught if these groups have an opportunity to interact and learn about each other *before* the demonstration.[11]

UCLA has already been working to implement these urgent recommendations. UCLA is engaging in a collaborative process in which stakeholders are developing specific operational plans for classes of foreseeable campus disturbances. Personnel with a significant role and responsibility in direct safety response are convening to consider specific situations, what the response options should be, how decisions will be made, and how information will be communicated. One goal of the working groups is to identify "bright lines" or other critical conditions that may dictate specific responses or changes in responses. The goal is for administrators and safety personnel in a crisis to be able to focus on implementing previously codified plans and decision-making processes rather than thinking through issues as a matter of first impression during a time of crisis. As a result of this process, UCLA has developed some working operational plans that memorialize the operational response plans for general classes of predictable campus disturbances and disruptions. UCLA should continue to develop these plans to include additional detail and to expand the range of incidents for which plans have been developed.

> **Recommendation 1.9: UCLA and the UCLA PD should conduct an after-action review and a written report after each protest, demonstration, or incident of civil disobedience to which law enforcement responds that addresses both administrative and law enforcement responses, as applicable.**

Each incident to which law enforcement responds provides an opportunity to improve practices and the overall University response. Regardless of the amount of planning, training, and practicing UCLA conducts, there will inevitably be opportunities to improve performance. UCLA should conduct a structured after-action process after each of these incidents, directed by the Associate Vice Chancellor for Campus Safety to identify gaps, training needs, and other areas for improvement. The findings should be memorialized in a written report and a detailed plan with timelines for completion should be developed to address deficiencies identified in the report. We observe that this directly reiterates Recommendation 43 of the Robinson-Edley Report.[12]

**Primary Recommendation 2: UCLA should take necessary steps to ensure effective campus safety leadership.**

> **Recommendation 2.1: UCLA should maintain the role of Associate Vice Chancellor for Campus Safety and to continue to ensure the position is held by someone with extensive law enforcement leadership experience.**

To improve the exchange of information, increase coordination, and direct an effective response to threats to campus safety, UCLA in May 2024 created the position of Associate Vice Chancellor of Campus Safety ("AVC for Campus Safety"), whose sole responsibility is campus safety. Under this structure, the Associate Vice Chancellor for Campus Safety reports directly to the Chancellor and oversees all campus safety entities, including police, non-police public safety personnel, fire, and emergency management. The current Associate Vice Chancellor for Campus Safety has significant law enforcement leadership experience, which includes planning for and responding to large-scale events and disruptions.

Already, the AVC for Campus Safety has been able to provide administrators with important considerations with respect to response to major incidents, including the underpinnings and importance of an Incident Command System. He has used experience with developing emergency operation plans to work with the UCLA Police Department to draft these plans.

Most critically, the current AVC for Campus Safety has demonstrated a capacity to serve as a bridge and connector between University administrators, staff, police, and other public safety responders. Especially as UCLA may contemplate the expansion of non-police public safety response resources in the future, it will be critical for a senior University leader to help coordinate the many types of potential response services available to ensure that campus issues and problems are appropriately and effectively addressed.

Accordingly, UCLA should maintain this structure and should continue to ensure that, in the long-term, the person holding the position has the expertise to continue to serve as an ongoing link between University administrators and public safety personnel.

> **Recommendation 2.2: The University of California should create an Associate Vice President for Campus Safety within the Office of the President to coordinate the work of the various UC police departments, including ensuring appropriate training, professional standards, and policies.**

The investigative team understands that each University of California campus is unique, has its own set of values, and exists within its own community. This has historically led UC to allow each campus to develop its own public safety policies and operate its own public safety agencies, with the Office of the President typically issuing broader expectations and guidelines to which individual campuses and their Police Departments add necessary details.

Even within this framework, UC can better ensure each campus' public safety agency has access to resources, training, and policies that are applicable University-wide. For instance, the Office of the President can help to ensure that each campus police department has access to high quality training and policies, is aware of agreed upon best practices, and is not required to "reinvent the wheel" when developing plans and procedures to respond to circumstances that arise system-wide. It can also help ensure that each campus public safety agency is operating consistent with the values and priorities of the University of California system.

To do this, a position of Associate Vice President for Campus Safety should be responsible for ensuring that all UC Police Departments are aware of and adopt policies and procedures containing agreed upon best practices, including with respect to best practices in emergency management. Currently, a Director of Campus Safety works within the Office of the President who has appeared to be a notably helpful and effective resource and convener. Other current positions and structures also aim to provide campuses with assistance. Going forward, we recommend the creation of a senior position who, reporting directly to the President of the University of California, can serve as a centralized hub for best practices, planning assistance, and guidance on campus safety response issues.

**Primary Recommendation 3: The UCLA Police Department should formalize concrete mutual aid arrangements and commitments.**

Throughout UCLA's response to the encampment, there was significant confusion regarding commitments that had been made regarding securing assistance from other police departments, the type and level of assistance that would be provided, and the length of time it would take for resources to arrive. This confusion was caused, in part, by the lack of decision-making by administrators and the lack of detailed operation plans, as described above, and by communication challenges between law enforcement and the administration. Ultimately, however, a substantial cause of the overall confusion stemmed from the UCLA Police Department's own confusion about mutual aid and the process for obtaining law enforcement assistance from other departments.

Although UCLA PD has historically maintained mutual aid agreements with other agencies, those agreements lacked detail, and it appears they did not reflect or govern actual operations at UCLA. UCLA PD also was not familiar with the state-wide process for obtaining mutual aid dictated by the California Law Enforcement Mutual Aid Plan, referred to as the "Blue Book." Instead of using this formal system for securing mutual aid, the Department requested aid through informal channels, including by sending text messages to various contacts at other agencies. As this report has described, this created confusion among personnel at other police agencies – with multiple people within a single agency receiving texts from UCLA PD personnel requesting mutual aid over the course of days and each request including different needs and timing.

UCLA should refine and implement mutual aid policies and agreements to ensure clear and effective processes for large-scale events and emergencies and to ensure they reflect the goals and values of the university.

> **Recommendation 3.1: UCLA should update and refine its mutual aid agreements with the law enforcement agencies within its mutual aid group.**

The California Office of Emergency Services has developed a law enforcement mutual aid plan to coordinate the provision of mutual aid services among law enforcement agencies in California. It has also dedicated funding to support mutual aid for emergency mutual aid needs. Under that plan, UCLA PD is a member of the Area

A platoon of the Los Angeles County Mutual Aid Organization. The Area A platoon includes the police departments of Santa Monica, Beverly Hills, and Culver City.

Although UCLA PD has maintained mutual aid agreements with these other agencies previously, those agreements were either not sufficiently detailed or were out-of-date. To ensure a mutually agreed upon, effective response to events in which UCLA PD needs the assistance of area law enforcement agencies, UCLA PD should work with these agencies to update and refine these agreements. The Department and University should ensure that those mutual aid agreements are regularly reviewed and revised or updated as necessary.

> **Recommendation 3.2: UCLA should develop an agreement with LAPD that includes clear commitments regarding the circumstances under which LAPD will respond, response times, and personnel and that is substantively reviewed and updated on a defined, regular schedule.**

UCLA should continue its policy, consistent with the UC Public Safety Plan's Guidelines, of first seeking non-urgent mutual aid from UC campuses before calling outside law enforcement agencies. However, as demonstrated by the events at UCLA this spring, the police departments at the other UC campuses are similarly small agencies that may not be able to assist, particularly if there are significant protest actions also taking place on other campuses. At the same time, the law enforcement agencies in the Area A platoon of the Los Angeles County Mutual Aid Organization are small and may only be able to commit a small number of officers. Reliance on other UC campus agencies and Area A mutual aid, therefore, is appropriate and effective in many instances but may be insufficient to protect public safety across all instances and, in particular, in response to large-scale events or major incidents.

LAPD is *not* part of the Area A platoon of the Los Angeles County Mutual Aid organization. Consequently, it has previously only committed to providing resources to UCLA in response to emergencies. It has not formally agreed to commit resources to help respond to planned events, and UCLA PD and LAPD have not together developed plans for ensuring public safety during large major events or emergencies. At the same time, however, UCLA PD and LAPD personnel affirmed that the agencies have a close working relationship given that LAPD is responsible for policing Westwood and other areas immediately adjacent to UCLA's main campus – with LAPD often providing backup, assistance, or access to more specialized functions and UCLA PD allowing LAPD to focus resources elsewhere knowing that the campus department's resources will address core campus issues.

UCLA should work with LAPD to develop agreements that set forth the circumstances under which LAPD will assist, the type of assistance it will provide, and the amount of personnel it will commit. These agreements should include commitments that UCLA PD will exercise command and control over all law enforcement actions on the UCLA campus, and that LAPD will abide by UCLA PD policies in providing support.

> **Recommendation 3.3: UCLA should evaluate whether the mutual aid commitments it secures are sufficient to supplement UCLA PD resources in the event of a large-scale event or emergency.**

Again, because the UCLA Police Department is a small agency, it is exceptionally foreseeable there will inevitably be instances in which it needs support from other agencies – to respond to large-scale disruptions, emergencies that require a specialized response, or disruptions that last for an extended period of time. As discussed previously, other UC police departments or small local law enforcement agencies may not be able to provide the necessary resources. However, it may also be that LAPD may not always be able to commit to providing adequate resources in all instances—it has its own jurisdiction, its own budget and funding sources, and its own personnel limitations. To ensure adequate response assistance in the event that it is necessary, UCLA should consider whether there are other entities that may be able to assist.

> **Recommendation 3.4: UCLA should ensure that its regular training exercises include personnel from agencies that have made mutual aid commitments.**

Previous recommendations indicate that UCLA PD should develop operational plans to guide its response to large-scale events and disruptions to University operations and should simulate implementation of these plans through regular training exercises. Some of these training exercises should include a mutual aid component and should include personnel from agencies included in a potential response. This can provide all agencies with a clear and common

understanding of the plan for response, identify gaps in communication or other components of the response, and develop relationships between personnel, helping to ensure the agencies work effectively together.

**Primary Recommendation 4: UCLA should address and enhance its ability to share information, and share information to community stakeholders, during and after critical incidents.**

Some of this report's prior recommendations address one type of communication during a campus incident or disturbance: *information exchange* among critical stakeholders that is pertinent to the nature and implementation of the University's response.

At the same time, during a major campus incident, individuals and entities beyond those who have a role in the response may be impacted by the situation and may otherwise want to know about what is transpiring. This might be best operationalized as *communications* to broader internal and external stakeholders.

UCLA's chaotic decision-making during the ongoing campus disruption resulted in a disjointed, erratic provision of information to affected stakeholders. Because UCLA did not have a clear plan for responding to the encampment, it was unable to provide information to students, their parents, legislators, the press, and other stakeholders about how it planned to respond.

Our review of emails and other electronic communications revealed that, once the encampment was established, administrators were bombarded with questions from within and outside the UCLA community about how it planned to respond. Particularly after social media posts about Jewish students being excluded from portions of campus went viral, administrators were inundated with complaints and concerns from parents, politicians, and community members about why the University was allowing it to continue.

Administrators, including communications professionals, scrambled to respond. As with other aspects of the University's response, it was often unclear who the final decision-makers were, which led to some conflict between administrators and communications professionals. At the same time, the lack of clear response objectives and plans led to a muddled communication response that, at times, prioritized optics over other interests.

UCLA should provide stakeholders, both within and outside the UCLA community, with timely, accurate information about incidents on campus as they are unfolding and after they have resolved to provide individuals with necessary information, ensure transparency, and to foster continuous quality improvement. To achieve this, UCLA should ensure that its campus safety plans include provisions assigning responsibility for these communications as directed by the Incident Commander and, as appropriate, the legal advisor.

> **Recommendation 4.1: UCLA should provide effective communication to all stakeholders during disruptions and large-scale events on campus.**

When an event is occurring on campus that is disrupting typical University operations, a large number of stakeholders may be affected or otherwise require information. During the encampment, this included local, state, and federal government officials; other law enforcement agencies; alumni; students; parents; UCLA employees and officials, including the academic senate and the events office; residents of the surrounding community, and the press.

UCLA must ensure it has a plan to provide clear information to all affected stakeholders in an organized manner. Consistent with standard practices in emergency management, as an incident is unfolding, the nature of the communications should be directed by the Incident Commander, in consultation with communications professionals. Responsibility for developing and distributing the communications should be clear.

> **Recommendation 4.2: Following resolution of an incident of campus disruption, UCLA should provide information to stakeholders to explain what happened, why the University took the action it did, and to seek input to improve practices going forward.**

Once an incident has been resolved, UCLA should provide information to explain what happened and why it took the actions it did. The investigation identified a fair amount of misunderstanding and misreporting about what happened within both the University and broader communities, contributing in some instances to unnecessary frustration and anger. Providing clear, timely information about what occurred and why can help reduce that frustration, increase transparency and trust, and set the stage for the provision

of feedback and improved practices going forward. UCLA should work to establish and implement a formal process and procedure for providing this information to internal stakeholders, including the Academic Senate, student government, and others, to explain how the policies and procedures worked in practice and to seek input on how practices could be improved going forward.

**Primary Recommendation 5: UCLA should ensure that the process of approving and/or permitting on-campus events involves consultation among a broader array of implicated campus resources and stakeholders.**

The decision whether to issue a permit for an event on campus and the parameters of the permitted activity should involve all reasonably affected campus entities and stakeholders, including law enforcement. However, the investigation learned that the standard process for issuing a permit does require consultation with the police but that, in practice, this consultation does not routinely occur.

According to policies effective at the time of the encampment, and revised following the events of April and May 2024, some events may be classified as "major events" because of the number of individuals expected, the presence of alcohol, and other factors, which is supposed to activate a security assessment by the Police Department and various University entities to weigh in during the approval process. UCLA Police Department officials told the investigative team that they were not consulted before a permit was issued for the counter-protest on April 28. Had they been consulted, they may have been able to alert administrators to the danger of the two protest groups being so close to one another, and to the danger that a third protest group—counter-counter-protesters, in this case—could enter the permitted event from the back side, creating a volatile situation. Instead, UCLA PD reports it was not informed of the event until the permit already had been issued.

As of this writing, the issue does not appear to have been entirely resolved. UCLA PD reports it still is not always being timely consulted on the decision of whether to issue permits or the parameters of permits. The Police Department has experience and expertise in planning for events, and may have specific intelligence about the planned events, or other events or actions that will coincide with the event for which a permit is being sought. Additionally, UCLA may need to utilize the police in the event permitted activities become violent or otherwise violate the law. Consequently, UCLA should ensure the Police Department and public safety personnel are consulted as part of the process of issuing permits for large events.

At the same time, it appears that the Events Office itself is not singularly in charge of approving events across the campus, as other smaller or more specialty entities also are in charge of some events. To ensure that security, First Amendment, and other considerations can be uniformly applied regardless of where events occur on campus, UCLA should streamline its events function.

**B.    Long-Term Reforms to Re-Imagine and Support Campus Safety at UCLA**

**Primary Recommendation 6: UCLA should ensure that a range of resources beyond sworn law enforcement are available to support community safety and to allow for a true tiered response aimed at matching the right response with the right community issue or problem.**

> **Recommendation 6.1: UCLA should create a response entity of full-time, non-sworn university employees to address community safety and well-being.**

Consistent with University of California guidance, UCLA has adopted a tiered response model to resolve incidents on its campus that violate community norms, University policy, or the law. Under this model, UCLA attempts to address issues and resolve incidents without active engagement of law enforcement – only enlisting the active engagement of law enforcement when certain thresholds have been met, such as to prevent significant disruption to University operations or to protect health and safety.

One significant impediment to UCLA's successful implementation of this model is the absence of a range of comprehensive resources outside of police to effectively resolve encounters. To fill this role, UCLA's during the encampment period involved, and currently still involves, three functions: Public Safety Aides (PSAs) and Campus Service Officers (CSOs), private security officers, and Student Affairs Mediators and Mitigators (SAMs).

The Public Safety Aids ("PSAs"), as summarized previously, are non-sworn employees of the police department. PSAs wear police department uniforms and carry pepper spray,

but otherwise are unarmed. There are as few as six PSAs, however, and their role is limited – they serve largely as "additional eyes and ears of the police department."[13] They work limited hours, and there is usually no overnight coverage. PSAs are stationed in University buildings, serve as a liaison between the police department and students, and can attempt to deescalate minor disruptions on campus. For the most part, however, PSAs observe conduct on campus and call sworn officers if they observe criminal or suspicious activity.

Meanwhile, campus Security Officers ("CSOs") are students who work part-time for the UCLA police department. They provide escorts to students after hours, are stationed in University buildings, act as a liaison between students and the police department, and act as additional eyes and ears of the police department. Like PSAs, CSOs do not engage physically. If they observe criminal or suspicious activity, they hand the matter over to sworn police officers.[14]

The University also relies heavily on unarmed, civilian security officers to provide security services. UCLA hires these security officers through third-party companies. Although they can be hired to be available around the clock, they are not available at all times and also serve a limited function. They can help deter conduct by providing a physical presence, can provide direction about what is and is not permitted, and can help enforce boundaries by ensuring barriers remain in place and telling people where they are allowed to go. Beyond this, however, these unarmed security personnel also largely serve as observers – contacting police when they observe or suspect criminal activity.

During the protest activity at UCLA this spring, UCLA contracted for a large presence of security officers around the encampment. Security officers were instructed to "observe and report." Some evidence suggests that, when individuals observed violence or criminal activity and asked for help, security officers were not always helpful – either not responding at all or telling the person seeking assistance that they needed to all the police.

UCLA relies on Student Affairs staff to play a critical role in its tiered response plan, although what role these staff play does not seem to be commonly understood. These employees fall into two categories: Student Affairs Monitors and Student Affairs Mitigators, although both are referred to as "SAMs." These employees do not work full-time as SAMs; rather, they are full-time employees who hold other positions but agree to add serving as a SAM to their other full-time responsibilities. There are approximately 20 Student Affairs Monitors who serve only as observers and reporters. There also are approximately 10 to 15 Student Affairs Mitigators, who do intervene and provide warnings and information and attempt to de-escalate situations. Neither Monitors nor Mitigators are available around-the-clock.

SAMs were created as part of the University's tiered response program, conceptualized as staff members who will build and maintain relationships with students, and who can serve as the first level in a tiered response system to respond to some student behavior that violates community norm and rules. The tiered response plan calls for SAMs to intervene with students who are violating rules at sporting events or who are engaging in time limited protest activity, like disrupting a speaker. In instances like these, the SAM would approach the student, explain they are breaking a rule, and warn them that, if they do not stop, they will be asked to leave and/or will be disciplined and if the behavior persists, police may be called.

Numerous campus stakeholders indicated to this investigation that events on campus this spring made clear that having SAMs serve as the first engagement in a tiered response model works very well in the more typical scenarios described above – but is ineffective and potentially inappropriate as a response to lengthy campus disruptions, disruptive behavior by non-students, and during encounters that may turn violent.

SAMs were dispatched to the encampment to try to de-escalate tensions between protesters within and outside the encampment and to remind students of the rules. However, non-students who were present had no reason to listen or respond to SAMs – they are unaffected by the threat of student discipline and have made no commitments to abiding by community norms. SAMs described that their attempts to engage with non-students were ignored or otherwise ineffective.

SAMs also were ill-equipped to respond to some of the behaviors they encountered and there were instances in which they felt unsafe. As events unfolded on April 30, for example, SAMs were calling their supervisors reporting that they heard explosives, that people were wearing masks, and that they did not know what to do.

One common refrain that surfaced during the investigation is that the University needs to develop interventions and

resources that can be called upon when intervention by SAMs is inappropriate, unavailable, or ineffective – but where a law enforcement response is not yet necessary. In short, UCLA asked its SAMs to shoulder too much of the response and security burden during the encampment, and, in even beyond large-scale campus disturbances, asking SAMs to be the only entity that responds to a host of campus issues beyond the police is logistically untenable in the long-run.

Public safety is not a synonym for police. Campus safety and well-being must be preserved and promoted through any of an array of diverse campus resources – all interacting consistent with policies and protocols aimed at ensuring that the right campus response resource is provided to address the right circumstances or problems. Although the University's concept of a "tiered response" system wants to embody these critical assumptions and insights, in terms of entities or individuals who will actively respond to individuals and situations on campus where and when they occur, however, UCLA's options are either (a) a few classes of individuals whose job is to monitor and report, or (b) the UCLA PD. Among those entities and personnel whose job is to be "eyes and ears," many are not full-time positions (SAMs, CSOs) and others (security personnel) are employees of other companies, not UCLA. Although PSAs come closest to the type of institutionalized, full-time, non-officer response that many administrators and community members seem to want, PSAs are (a) currently incredibly few in number, and (b) employees of the Police Department, which complicates their ability to be seen and understood by community members as a public safety response distinct and apart from traditional law enforcement.

Consequently, in the intermediate- to long-term, UCLA needs to develop a cadre of full-time, non-sworn, un-armed public safety employees who can serve as a distinct "middle option" in UCLA's tiered response – a group of professionals who can work to address safety issues and help solve community problems that do not warrant law enforcement involvement but require more significant involvement or training than the volunteer SAMs can provide.

These public safety staff will develop relationships with students, student groups, and other members of the UCLA community; develop policies and practices in line with community values and priorities; and partner with the community to help enforce community norms and support community safety. The entity should be sufficiently staffed and comprised of professional, well-trained staff who can help support the public safety eco-system by responding to situations that disrupt community well-being but that do not require an armed law enforcement response.

This entity should be viewed as an integral component of UCLA's campus safety eco-system that is directed by the Associate Vice Chancellor for Campus Safety. Its central role will focus on avoiding the active engagement of sworn law enforcement, both by working with the community to reduce campus safety risks and responding to developing incidents and de-escalating them. Its full role, scope, and supervision can be defined as part of the reimaging of UCLA's campus safety support, described below.

> **Recommendation 6.2: UCLA PD should increase the number of Public Safety Aides it employs.**

The establishment of a full-time, non-police, professional alternative response entity on campus does not obviate the need for other resources to be available; instead, a dynamic response system benefits from an array of entities that can assist in addressing campus issues and safety problems.

To this end, UCLA's Public Safety Aides can play an important role in fostering community well-being, but they have remained under-utilized because they are so limited in number. Beyond the encampment context, PSAs play an important role in responding to and helping to de-escalate and resolve minor disruptions. PSA personnel are rightly proud of their contributions to community well-being, and it appears that many community members are generally receptive to their help. Therefore, as part of UCLA's work to expend the type and number of resources available to support community safety, UCLA should expand the number of unarmed PSAs so that they are available during more hours and can be called upon more readily.

**Primary Recommendation 7: UCLA should engage in a community-driven, stakeholder-informed process to consider the role of law enforcement in supporting campus safety and promoting community well-being.**

Our investigation found significant evidence that there was not a common understanding of the appropriate role of law enforcement in supporting public safety on the UCLA campus. Fundamental questions about what the appropriate role of police should be on UCLA's campus led to conflicting demands on law enforcement that ultimately left the Police Department ill-equipped to meet those demands, and reinforced many community members' view

that police will not and cannot protect them – and that the presence of presence automatically undermines community safety.

UCLA PD purports to employ "community policing."[15] Although the term "community policing" has been used to describe a range of policing methods and techniques, and "has suffered from conceptual confusion in both research and practice,"[16] community policing generally refers to a philosophy of policing that includes building collaborative partnerships with the individuals and organizations the agency serves to develop solutions to problems and increase trust in police, and organizing the agency to support community partnerships and proactive problem solving.[17]

Inherent in the concept of community policing is that police officers are regularly visible and routinely engage with community members proactively, not simply to enforce the law. This is not the role that UCLA PD currently plays at UCLA. Because of changing norms and evolving ideas around the meaning of public safety, including a strong feeling among some community members that the presence of police contributes to a *lack of safety,* the UCLA Police Department has been asked to play a different role.

This expectation that UCLA PD remain less visible and engaged with the community was demonstrated in UCLA's response to the encampment. Encampment members, as discussed previously, made clear throughout the encampment period they did not want to engage with police or to see police in or around the encampment, and the UCLA administration was responsive to these requests. Although there are some conflicting accounts about how this translated into direction to police – with the UCLA PD reporting that they were told to stay entirely off campus, while some administrators told us that the police were not told to stay off campus but rather were told to stay out of sight – there is general agreement across most accounts that police were instructed to remain wholly unseen by protesters. This played out during the encampment period in many ways and instances, such as when protesters objected to officers' presence in a nearby building, where they had positioned themselves to gain information about the state of the encampment, administrators instructed officers to leave. UCLA PD therefore was handicapped in its ability to gain information about the encampment, its size, whether there were any weapons within the encampment, and whether protesters around the encampment were posing a growing danger to those within the encampment. When administrators instructed the police department to engage, the police lacked critical information that could have helped it determine the lowest level intervention necessary to accomplish its goals.

This approach to police presence, engagement, and involvement predated the encampment, which meant that the Police Department did not have relationships with students, faculty, campus organizations, and other community members in advance of the encampment. This hampered UCLA PD's ability to understand the evolving dynamics of the various protests and gave it no ability to leverage existing relationships of trust to work with protesters to develop agreements and processes to keep protesters inside, and outside, the encampment safe.

The University did, however, call on the police to intervene once administrators realized that the ongoing encampment and the presence of counter protesters posed a safety risk to its students. By then, the encampment was large, and intervention required significant planning and personnel. This style of policing – in which police are brought in only when there is violence or imminent physical violence, to enforce the law, without any prior engagement with community members, without established relationships of trust so the police can work with demonstrators to develop plans designed to promote safety, and without intelligence about safety threats – risks a higher level of police intervention. In this case, the results reinforced the view of some encampment members that police were not interested in protecting them, and rather intervened only to violently suppress their right to protest.

This central tension – whether and how police provide public safety, and for whom – is part of a national conversation about the role of police and the meaning of public safety. UCLA has thus far responded to this tension ineffectively, by functionally excluding police from planning and engagement but then asking law enforcement to engage once tensions have escalated to violence.

The right balance, however, cannot be resolved in this report. Instead, UCLA must engage in a structured, inclusive, rigorous process of engagement with community stakeholders to understand their concerns, values, experiences, and priorities to determine the role of the police in fostering public safety, including by exploring what other resources are available or could be created. As part of this process, UCLA may need to re-examine longstanding assumptions about policing and consider fundamental, significant changes to how communities provide for the well-being and safety of its members. This

process could result in recommendations to significantly expand the type and number of resources that are available to support public safety on campus, to design a realignment of the role of the police in supporting campus safety, to expand or alter the role of sworn police officers, or to implement any number of additional ideas.

As an academic institution committed to the exploration of ideas, the University community needs to reach a better alignment on what the role of police on campus should be so that its response systems, expectations, policies, and protocols can align with those considerations. The failure to do so will continue to place UCLA PD, and other response resources, in the nearly impossible situation of being excluded from campus safety conversations, responses, and planning only until there are no other options – and being expected to perform flawlessly with less involvement, information, and community relationships than necessary to ensure successful outcomes.

Whatever the result, UCLA must ensure that it is clear – within the administration and in communicating outward – on the role of the police to ensure the foundation for a responsive, equitable, and effective safety system of campus safety in the future.

# NOTES

[1] Christopher F. Edley, Jr. and Charles F. Robinson, *Response to Protests on UC Campuses: A Report to University of California President Mark G. Yudof* 56 (Sept. 13, 2012), https://campusprotestreport.universityofcalifornia.edu/documents/protest-report-091312.pdf [hereinafter the "Robinson-Edley Report"].

[2] *Id.* at 6.

[3] "UCLA Time, Place and Manner Response Matrix for Demonstrations and Organized/Major Events" (Nov. 8, 2023).

[4] Our investigation identified a UCLA Emergency Action Plan that appears to have been adopted in January 2019. The Plan is referenced in UCLA's Time, Place, and Manner policies and is available at https://ucla.app.box.com/s/gsqaiewodjbjidcoafhbtgrc74y8n44a. However, this plan does not reflect actual operations at UCLA and was never referenced or provided to us by UCLA despite our repeated requests for any such plans, including in our initial documents request and in subsequent meetings with police leadership and the administration.

[5] Kimberly S. Stambler & Joseph A. Barbera, "Engineering the Incident Command and Multiagency Coordination Systems," 8 *Journal of Homeland Security and Emergency Management* 1 (2011).

[6] United States Department of Agriculture, "ICS 100 – Incident Command System," https://www.usda.gov/sites/default/files/documents/ICS100.pdf.

[7] United States Homeland Security, *The World Trade Center Bombing: Report and Analysis* 6 (1993), https://www.usfa.fema.gov/downloads/pdf/publications/tr-076.pdf.

[8] United States Department of Homeland Security, FEMA, *Incident Action Planning Guide* 3 (rev. July 2015), https://www.fema.gov/sites/default/files/2020-07/Incident_Action_Planning_Guide_Revision1_august2015.pdf (defining "incident" per NIMS as any "occurrence, natural or manmade, that requires a response to protect life or property").

[9] United States Department of Homeland Security, FEMA, *National Emergency Management System: Emergency Operations Center How-to Quick Reference Guide* 2 (Oct. 2022), https://www.fema.gov/sites/default/files/documents/fema_eoc-quick-reference-guide.pdf.

[10] *Id.*

[11] Robinson-Edley Report at 13 (emphasis in original).

[12] *Id.* at 43 ("[W]e recommend that our campus police prepare an after-action report each time they respond to a demonstration – even if the vent does not result in the use of force by police.").

[13] Andy Pei, University of California, Los Angeles, Police Department, "UCPD Launches New Public Safety Aide Program" (Oct. 26, 2023), https://police.ucla.edu/blog/ucpd-launches-new-public-safety-aide-program.

[14] University of California, Los Angeles, Police Department, "Community Service Officers," https://police.ucla.edu/cso (last visited Oct. 1, 2024).

[15] University of California, Los Angeles, Police Department, "About," https://police.ucla.edu/about-ucla-pd/operations-bureau/uniformed-patrol-division (last visited Oct. 7, 2024) ("UCLA PD embraces the philosophy of Community Oriented Policing.")

[16] A. Gersamos Ginakis, et al, "Reinventing or Repackaging Public Services? The Case of Community-Oriented Policing," 58 *Public Administration Review* 485, 485 (1998).

[17] *See generally* The Leadership Conference on Civil and Human Rights, *New Era for Public Safety: A Guide to Safe and Effective Community Policing* 2–32 (2019), https://civilrights.org/wp-content/uploads/Policing_Full_Report.pdf; *Final Report of the President's Task Force for 21st Century Policing* 41–50 (May 2015), https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.



Matthew Barge
Christine Cole
Terry Gainer
Emily Gunston
Nola Joyce
Charles H. Ramsey
Sean Smoot
Teresa Towey
Jim Whalen

**InvestigativeTeam**