# Exhibit 5

Third Declaration of Eric Rassbach



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

REGION IX

CALIFORNIA

50 UNITED NATIONS PLAZA
MAIL BOX 1200, ROOM 1545
SAN FRANCISCO, CA 94102

December 20, 2024

Sent via email only to: president@ucop.edu

Michael V. Drake, President
University of California
Office of the President
1111 Franklin Street
Oakland, California 94607

Re:    University of California, Los Angeles - OCR Case Numbers 09-22-2257, 09-24-2336, and
       09-24-2352
       University of California, Santa Barbara - OCR Case Number 09-24-2228
       University of California, San Diego - OCR Case Number 09-24-2092
       University of California, Davis - OCR Case Numbers 09-24-2038, 09-24-2283, and
       09-24-2312
       University of California, Santa Cruz - OCR Case Number 09-24-2224

Dear President Drake:

This is to notify you of the resolution of the cases opened by the U.S. Department of Education
(the Department), Office for Civil Rights (OCR) regarding allegations of discrimination against
students based on actual or perceived national origin (including shared ancestry and/or the
association with national origin/shared ancestry) under Title VI of the Civil Rights Act of 1964
(Title VI) in the above-referenced case numbers against the following five University of
California campuses - University of California, Los Angeles (UCLA), University of California,
Santa Barbara (UC Santa Barbara), University of California San Diego (UC San Diego),
University of California, Davis (UC Davis), and University of California, Santa Cruz (UC Santa
Cruz) (collectively referred to herein as the Universities).

OCR enforces Title VI of the Civil Rights Act of 1964 (Title VI), as amended, 42 U.S.C.
§§ 2000d-2000d-7, and its implementing regulations at 34 C.F.R. Part 100, which prohibit
discrimination on the bases of race, color, and national origin in programs and activities receiving
federal financial assistance. As recipients of federal financial assistance from the Department, the
Universities are subject to Title VI and its implementing regulations.

*The Department of Education's mission is to promote student achievement and preparation for
global competitiveness by fostering educational excellence and ensuring equal access.*

THIRD RASSBACH DECLARATION EXHIBIT 5

484

*www.ed.gov*

Page 2

This letter addresses nine open Title VI investigations of complaints that allege discrimination based on national origin, including shared ancestry, by five universities in the University of California system.  The complainants in these cases alleged that the respective university campuses were on notice of and failed to respond promptly or effectively to discrimination and harassment of students by employees and other students and employees that created a hostile environment for students based on actual or perceived national origin, including shared Jewish, Israeli, Palestinian, Arab, and/or Muslim ancestry, and/or the association with these national origins/shared ancestries.

OCR reviewed information provided by the complainants, the Universities, and publicly available information.  OCR also interviewed witnesses, including students and employees.  Based on the evidence gathered to date in its investigations, OCR identified compliance concerns that the Universities appear not to have responded promptly or effectively to notice of alleged national origin discrimination, including harassment, against its students and employees as required by Title VI by either not evaluating whether a hostile environment existed for students and employees based on their actual or perceived shared Jewish, Israeli, Palestinian, Muslim, and/or Arab ancestry and/or association with these national origins/shared ancestries, or by not taking prompt or effective steps to prevent recurrence of the harassment or to remedy the effects of a possible or apparent hostile environment on affected students.  OCR also identified a concern that UCLA, UC Santa Barbara, and UC San Diego appear to have engaged in different treatment of students based on actual or perceived national origin, including shared Jewish, Israeli, Palestinian, Muslim, and/or Arab ancestry and association with these national origins/shared ancestries.

Before OCR completed its investigation of these complaints, the University of California expressed an interest in voluntarily resolving in their entirety OCR case numbers 09-22-2257, 09-24-2336, 09-24-2352, 09-24-2228, 09-24-2092, 09-24-2038, 09-24-2283, 09-24-2312, and 09-24-2224 through a comprehensive resolution agreement (the Agreement) that would provide individual and school-wide remedies at the Universities where OCR identified compliance concerns and would require some UC system-wide policies, procedures, employee training, climate surveys, and reporting to OCR to promote Title VI compliance across all UC schools by ensuring prompt and effective responses to discrimination, including harassment and different treatment, based on national origin/shared ancestry.  OCR determined that it was appropriate to resolve OCR's compliance concerns in the above-referenced cases under Section 302 of OCR's Case Processing Manual (CPM) (July 18, 2022).  The University of California assures OCR that it and the respective Universities will take the actions specified in the Agreement to resolve the compliance concerns OCR has identified to date under Title VI and its implementing regulations at 34 C.F.R. Part 100.

Lastly, OCR found insufficient evidence to support a conclusion that UCLA subjected Student 1 to different treatment based on her shared Jewish ancestry under Title VI by allegedly denying her interest in auditing a class and by allegedly removing her from [redacted content] because she is Jewish.  OCR also found insufficient evidence to support a conclusion that UCLA engaged in different treatment by allegedly allowing a student group to admit pro-Palestinian students to a movie screening for free while charging other students.  There was insufficient evidence that the screening constituted a UCLA program or that UCLA had notice of the alleged different

admission practice of the group.  Consistent with Section 303(a) of OCR's CPM, OCR is dismissing these three allegations of different treatment by UCLA as of the date of this letter.

OCR's legal standards, summary of the allegations, facts gathered to date, and the concerns OCR identified are summarized below.

## I.    Legal Standards

The regulation implementing Title VI, at 34 C.F.R. § 100.3, provides that no person shall, on the basis of race, color, or national origin, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program to which Title VI applies.

Title VI's protection from national origin discrimination extends to students who experience discrimination, including harassment, based on their actual or perceived shared ancestry or ethnic characteristics, such as students of Jewish, Israeli, Palestinian, Muslim, and/or Arab descent or citizenship or residency in a country with a dominant religion or distinct religious identity, or their association with this national origin/shared ancestry.  The existence of a hostile environment based on national origin that is created, encouraged, accepted, tolerated, or left uncorrected by a recipient constitutes discrimination on the basis of national origin in violation  of Title VI.

To establish a violation of Title VI under the hostile environment theory, OCR must find that: (1) a hostile environment based on national origin existed; (2) the recipient had actual or  constructive notice of a hostile environment based on national origin; and (3) the recipient failed to take prompt and effective action to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

OCR interprets Title VI to mean that the following type of harassment based on national origin creates a hostile environment: unwelcome conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from a recipient's education program or activity.  Harassing acts need not be targeted at the complainant to create a hostile environment. The acts may be directed at anyone, and the harassment may also be based on association with others of a different national origin (e.g., the harassment might be referencing the shared ancestry of a sibling or parent, for example, that is different from the national origin of the person being harassed whose access to the school's program is limited or denied).

The harassment must in most cases consist of more than casual or isolated incidents based on national origin to establish a Title VI violation.  Whether harassing conduct creates a hostile environment must be determined from the totality of the circumstances.  OCR will examine the context, nature, scope, frequency, duration, and location of the harassment, as well as the identity, number, and relationships of the persons involved.  If OCR determines that the harassment was sufficiently severe or pervasive that it would have limited or denied the ability of a reasonable person, of the same age and national origin as the victim, under the same circumstances, from participating in or benefiting from some aspect of the recipient's education program or activity, OCR will find that a hostile environment existed.

A recipient may be found to have violated Title VI if it has effectively caused, encouraged, accepted, tolerated, or failed to correct a hostile environment based on national origin harassment

of which it has actual or constructive notice. A recipient is charged with constructive notice of a hostile environment if, upon reasonably diligent inquiry in the exercise of reasonable care, it should have known of the discrimination. In other words, if the recipient could have found out about the harassment had it made a proper inquiry, and if the recipient should have made such an inquiry, knowledge of the harassment will be imputed to the recipient.

A recipient violates Title VI if one of its employees or agents, acting within the scope of their official duties, has treated an individual differently on the basis of national origin in the context of an educational program or activity without a legitimate, nondiscriminatory reason so as to deny or limit the ability of the individual to participate in or benefit from the services, activities, or privileges provided by the recipient. If the alleged harasser is an agent or employee of a recipient, acting within the scope of their official duties, then the individual will be considered to be acting in an agency capacity and the recipient will be deemed to have constructive notice of the harassment. If an employee harasses a student outside of the scope of their official duties, OCR evaluates if the harassment created a hostile environment for the student, using the factors discussed above with respect to hostile environment harassment.

Once a recipient has actual or constructive notice of a hostile environment, the recipient has a legal duty to take reasonable steps to eliminate it. OCR evaluates the appropriateness of the responsive action by assessing whether it was reasonable, timely, and effective. The appropriate response to a hostile environment based on national origin must be tailored to redress fully the specific problems experienced as a result of the harassment.

## II.     Summary of the Allegations and the Evidence Gathered to Date

The University of California was founded in 1869 and currently has 10 campuses throughout the state of California - UC Berkeley, UC Davis, UC Irvine, UCLA, UC Merced, UC Riverside, UC San Diego, UC San Francisco, UC Santa Barbara, and UC Santa Cruz. Each of the campuses of the University of California has a chancellor who is overseen by the University of California President. The University of California President reports to the Board of Regents. Currently the universities that comprise the University of California system have more than 295,000 students and 265,000 faculty and staff.

### A.  UCLA

In the complaints filed with OCR against UCLA (case numbers 09-22-2257, 09-24-2336, and 09-24-2352), the complainants alleged the following to OCR:

- UCLA allegedly failed to respond to harassment of Jewish students based on their shared Jewish ancestry when: students hosted Palestine Liberation Week in April 2022 and continue to host similar events to the present; UCLA clubs passed resolutions stating they are against Zionism, and asserting their support of Palestinians; students participated in pro-Palestinian protests/marches after October 7, 2023; and pro-Palestinian demonstrators established the Palestine Solidarity Encampment on campus in spring 2024; and pro-Palestinian demonstrators harassed Jewish students verbally and physically (case number 09-22-2257).

Page 5

- UCLA allegedly failed to respond to different treatment of Jewish students based on national origin when: Students for Justice in Palestine (SJP) excluded a Jewish student (Student 1) based on her Jewish ancestry from attending [redacted content]; there was a [redacted content]; SJP organized a film screening in February 2024 that allegedly did not charge for "Palestinian [a]dmission" but charged $5 for "[r]egular [a]dmission;" and pro-Palestinian demonstrators denied Jewish and Israeli-American students access to University facilities when an encampment was established on campus during the spring 2024, including at times with the assistance of University-contracted security(case number 09-22-2257).

- Since October 2023 UCLA has allegedly (a) failed to respond to harassment of students, including law school students, by other students and members of the public based on their actual and/or perceived national origin (including Palestinian, Arab, and/or Muslim shared ancestry) and (b) engaged in different treatment of law school students based on their actual or perceived national origin (including shared Palestinian and/or Muslim ancestry) when: someone removed pro-Palestinian flyers from the law school student organization bulletin boards while inflammatory, pro-Israeli flyers were not removed; Palestinian and/or pro-Palestinian students experienced unwanted filming, doxing, and being followed both on and near UCLA's campus by other students and members of the public; counter-protestors made offensive, violent, and/or threatening comments to Palestinian and/or pro-Palestinian students, such as, "Hamas would kill you all," comparing them to supporters of Hitler and the Nazis, and calling them baby murderers and terrorists; a UCLA law school event was hosted at a venue that is known to raise money and send aid to Israel Defense Forces; and several UCLA students wearing a keffiyeh were harassed by other students or members of the public (case number 09-24-2336).

- UCLA, through its campus police, failed to respond promptly or effectively to physical and verbal harassment of students based on their national origin, including their shared Palestinian and Muslim ancestry, when the police allegedly failed to protect them while they were protesting peacefully on the University campus, including on May 1, 2024, and were violently attacked, injured, and intimidated by counter-protestors, including third parties, (case number 09-24-2352).

### 1. 2022 Palestine Liberation Week at UCLA

UCLA's Office of Student Organizations, Leadership & Engagement (SOLE) oversees registered campus organizations. These organizations are independent of the University and the University does not refuse them recognition or funding based on a disagreement with the message they espouse. University regulations also explicitly state that registered organizations should not imply that the University sponsors them or their activities. SJP is a registered UCLA campus organization that is permitted to reserve space on campus to host events.

In April 2022, SJP organized Palestine Liberation Week at UCLA. According to UCLA, versions of Palestine Liberation Week have occurred at UCLA for over a dozen years. The Palestine Liberation Week activities consist of speakers, tabling/leafleting on UCLA's main plaza, and large panels that display art and messages in support of Palestinians. In 2022, the

Page 6

Palestine Liberation Week events also included off-campus workshops located at a space that UCLA has told OCR is not part of its campus, facility, or program.

On the [redacted content] day of Palestine Liberation Week in 2022, Student1, who is Jewish, went to UCLA's main plaza and [redacted content]. She stated that she wanted to attend the events [redacted content]. According to Student 1, SJP members pressured and intimidated [redacted content]. She stated that, a day or two later, she went back to the event on the main plaza, along with another Jewish student (Student 2) [redacted content], and they [redacted content] with several SJP members, during which SJP members called Student 2 a [redacted content] and stared at Student 1 in a menacing way.

Student 1 emailed the UCLA Dean of Students and SOLE and went to the Office of the Dean of Students (DOS) to ask if [redacted content]. In her email to SOLE, she stated that [redacted content]. Student 1 alleged that SJP members subsequently [redacted content]. Student 1 stated to OCR that she felt unsafe on campus [redacted content]. Student 1 [redacted content], the advocacy group sent UCLA an email asking whether the Palestine Liberation Week received university funding and whether it was open to all UCLA students. UCLA responded on the same day by email stating that the only on-campus event related to Palestine Liberation Week was held on the main plaza and was open to all students, and that any off-campus events received no university funding or support and were exclusively controlled by the student organization. [Redacted content] reported hearing chants such as "Intifada, intifada" and "from the river to the sea, Palestine will be free."

OCR's review of the evidence gathered to date does not indicate that the advocacy group or Student 1 reported to UCLA that [redacted content], or about the chants that the other student reported overhearing during Palestine Liberation Week in the student's email to the advocacy group. According to UCLA, it received no complaints in 2022 from any students about the Palestine Liberation Week or SJP. SOLE staff recalled a report by SJP members that a student [redacted content] and that they spoke with the student to inform him that SJP had reserved space on the plaza [redacted content] within view of SJP's table. According to UCLA, neither SJP nor the student raised any further concerns with SOLE and, UCLA did not receive any complaints against SJP until after the events of October 7, 2023.

## 2. UCLA Events in October and November 2023

After the Hamas attack on Israel on October 7, 2023, UCLA experienced increased occurrences of student rallies, walk-outs, protests, and counter-protests on campus regarding the attack and subsequent war in Gaza, as well as reported concerns by students, employees, and third parties about these types of activities and social media posts. According to UCLA, it "received hundreds of emails, online reports, and telephone calls about campus events and other activities." OCR reviewed a list of over 150 reports received in October and November 2023, many expressing concerns about "student organization event," "protest," "on-campus rally," social media posts, student safety, and "hate speech." Around 30 of the reports were from students, and the remainder were from concerned parents, staff, alumni, non-affiliates, or unknown individuals.

Page 7

For example, on October 10, 2023, a student reported to UCLA seeing a car near the UCLA
campus with swastikas and feeling unsafe. After SJP held an on-campus protest on October 25,
2023, UCLA received over 80 reports concerning rallies and protests in the two days (October 26
and 27) immediately following SJP's on-campus protest. Multiple students expressed concerns
for their safety to UCLA, including: three students expressing a desire to transfer or unenroll on
October 26, 2023; a student feeling unsafe and unsupported on October 30, 2023; four students
expressing concern for personal safety on November 1, 2023; and a student reporting feeling
unsafe to an administrator on November 2, 2023.

In October and November 2023, UCLA received eight complaints against SJP or its members,
alleging discrimination and/or harassment of Jewish students based on shared ancestry.
According to UCLA, all the complaints asserted that, at protests in October and November 2023
and through social media, SJP members had made comments and acted in ways that were
threatening to Jewish students. The eight complaints raised the following allegations:

- A faculty member and a student filed separate complaints about campus protests led by
  SJP on October 10 and October 12, 2023, respectively; their complaints reported hearing
  chants at these protests such as, "[T]here is no peace until they're dead," "death to
  Israel," "intifada now," "from the river to the sea Palestine shall be free," "all resistance
  is justified," and "there is only one solution."

- A student filed a complaint requesting that UCLA cancel an SJP protest planned for the
  following day on October 25, 2023, due to concerns over possible violence.

- Students and a faculty member filed three separate complaints in November 2023 about
  people (including students) beating an effigy of Israel's Prime Minister and shouting
  "beat that f*cking Jew" on the campus. OCR reviewed publicly posted video evidence
  confirming this incident.

- An anonymous student complained about SJP's social media posts bearing images of
  weapons in connection with the promotion of student protests on campus; the anonymous
  complaint stated that the social media posts were "extremely concerning" given an
  incident a week earlier when students used a stick to beat a piñata bearing the likeness of
  Israel's prime minister.

- The [redacted content] of a UCLA fraternity filed a complaint about SJP's social media
  posts.

OCR determined that the complaints above were not opened for investigation by the DOS, who
at the time was responsible for investigating complaints of discrimination against UCLA
students. According to UCLA, the DOS conducted an immediate initial review of the
complaints, including reviewing submitted evidence such as videos and social media messages.
Except for the last complaint filed by the fraternity [redacted content], the DOS determined that
the alleged conduct in the other complaints did not rise to a possible conduct violation based on
the DOS's initial review and that all the allegations involved speech protected under the First
Amendment. Additionally, UCLA stated to OCR that some complaints did not identify

Page 8

respondents, or the alleged misconduct had not yet occurred.  With respect to the complaint from
the fraternity [redacted content], UCLA told OCR that the DOS could not open an investigation
because the fraternity [redacted content] did not respond to the DOS's attempts to meet with him.
Information from UCLA shows that the DOS offered "support and resources" to two of the
students who filed complaints —the student who complained about the protest on October 12,
2023, and one of the students who reported the effigy.

In response to UCLA's increased reports and complaints received after October 7, 2023, as
described above, UCLA issued several statements to the community in October and November
2023 denouncing antisemitism and anti-Muslim discrimination; acknowledging the impact of
rhetoric heard at campus protests, online, and in classrooms; and providing information about
resources available to students.  Various schools within UCLA, such as the School of Law, the
School of Public Health, and the School of Management, issued similar messages to their own
school communities.

### 3.  The Spring 2024 Encampment at UCLA

From April 25, 2024, to May 2, 2024, pro-Palestinian demonstrators established an unauthorized
physical encampment on the UCLA campus (the Encampment).  As explained below, the
Encampment at UCLA was widely covered in the media, described at length in three reports
published by two UCLA Task Force committees in May, June, and October of 2024, and detailed
in a federal lawsuit, *Frankel et al. v. Regents of the University of California et al.* (C.D. Cal.
2004), filed by three Jewish students and a Jewish faculty member (the *Frankel* plaintiffs) in
June 2024, as well as the federal court's preliminary injunction against UCLA issued in the case
on August 13, 2024.  (*Frankel* Order re: Mot. for Prelim. Inj., Aug 13, 2024 (*Frankel* Order)).
These records describe physical and verbal harassment and different treatment of students based
on national origin, including their shared Jewish, Israeli, Palestinian, Muslim, and Arab ancestry.

### a.  A "Jew Exclusion Zone" at the Encampment

Videos widely distributed in the media showed that protestors in the Encampment maintained
checkpoints that excluded students of actual or perceived Jewish and/or Israeli shared ancestry
and/or the association with these national origins/shared ancestries from entering the
Encampment and physically barred these students from accessing parts of the UCLA campus.
OCR also interviewed a Jewish student at UCLA who recounted his first-hand experience trying
to enter one of the checkpoints.  He told OCR that he was denied entry on [redacted content], due
to being Jewish and a Zionist.  On April 30, 2024, the UCLA Chancellor issued a statement
acknowledging that "students on their way to class have been physically blocked from accessing
parts of the campus," and noting that "incidents have put many on our campus, especially our
Jewish students, in a state of anxiety and fear."

The *Frankel* complaint referred to the maintenance of a "Jew Exclusion Zone" at the
Encampment and included sworn declarations of the *Frankel* plaintiffs.  In August 2024, the
federal district court granted in part the *Frankel* plaintiffs' motion for preliminary injunction to
ensure that UCLA's "ordinarily available programs, activities, and campus areas" are equally
available to Jewish students as these programs, activities, and campus areas are to other students.

Page 9

(*Frankel* Order at 14). In granting the preliminary injunction, the court relied on the following "materially undisputed factual allegations" that UCLA did not dispute. (*Id.* at 3.) On April 25, 2024, a group of pro-Palestinian protesters set up an encampment on UCLA's campus in a major thoroughfare and gathering place called Royce Quad (*id.* at 3-4); "[t]he encampment was rimmed with plywood and metal barriers" (*id.* at 4); "[p]rotesters established checkpoints and required passersby to wear a specific wristband to cross them," (*id.*); "[n]ews reporting indicates that the encampment's entrances were guarded by protesters, and people who supported the existence of the state of Israel were kept out of the encampment" (*id.*); and "[p]rotesters associated with the encampment 'directly interfered with instruction by blocking students' pathways to classrooms" (*id.*). For example, Plaintiff Frankel and Plaintiff Shemuelian could not walk through Royce Quad, unlike other students. (*Id.* at 4, 5,12). The court also noted that UCLA's emails confirmed that "the May 6 and 23 events [involving the encampments in Royce Quad] disrupted access to several campus areas," (*id.* at 8), that on-campus disruptions continued to occur after the Encampment in May, and that a different encampment at the UCLA School of Law's Shapiro courtyard on June 10, 2024, "'disrupted final exams,' temporarily blocked off multiple areas of campus, and persisted from 3:15 p.m. to the evening," (*id.*).

The Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA issued a report dated October 16, 2024 (the Antisemitism Task Force Report), which further supports that students of shared Jewish ancestry were denied entry into the Encampment and barred from accessing parts of the campus because they were Jewish. For example, the Antisemitism Task Force Report stated that by April 30, 2024, "students wearing a Star of David or a kippah, or those refusing to denounce their Zionism" were blocked from entering or passing through the Encampment-occupied area and from entering campus buildings. (Antisemitism Task Force Report, Oct. 16, 2024, at 53-54, 62.) This report also stated that over 400 Jewish and Israeli members of the UCLA community completed an anonymous survey in June 2024, and that some of the survey respondents indicated that: they were denied entry to the Encampment due to being Jewish; their routes on campus were blocked due to the Encampment; and they were prevented from getting to class on time and utilizing campus resources due to the Encampment. (*Id.* at 27, 35.)

### b. Physical and Verbal Harassment at the Encampment

In a statement to the community on April 30, 2024, the UCLA Chancellor described the tactics of some demonstrators and counter-demonstrators at the Encampment as "shocking and shameful," and referred to "instances of violence" that were "completely at odds" with UCLA's values as an institution. OCR interviewed a Jewish student at UCLA who reported witnessing incidents of "physical violence" and other "physical encounters" between student protesters and counter-protesters at the Encampment. He also told OCR that Jewish students were hurt in these encounters.

The Antisemitism Task Force Report and the two reports of the Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism dated May 13, 2024, and June 28, 2024 (the Anti-Palestinian Task Force reports), all described instances of physical and verbal harassment of student protesters and student counter-protesters at the Encampment prior to the attack on the Encampment on April 30, 2024. For example, the Antisemitism Task Force Report stated that as early as April 25, 2024, incidents of violence against Jews, Israelis, and pro-Israel protestors had

Page 10

been documented and Encampment protestors had begun arming themselves with weapons, including pepper spray, tasers, and lumber and protective gear including helmets and goggles (Antisemitism Task Force Report at 57-58.)

The May 2024 Anti-Palestinian Task Force Report stated that: On the first day of the Encampment on April 25, 2024, counter-protestors who self-identified as Zionists heckled people inside the Encampment with racial slurs such as, "you're a jihadist," and "you're a terrorist," and some of them entered the Encampment without authorization and physically attacked the students (Anti-Palestinian Task Force Report, May 13, 2024, at 6); the students complained about the dangers they faced from agitators "from day one," with some students calling campus police, others contacting administrators and/or trusted faculty, and several students filing reports with UCLA's Equity, Diversity, and Inclusion (EDI) office (*id.* at 8); the protesters at the Encampment were subjected to a growing number of counter-protesters and escalating taunts such as shouts of "here to finish what Hitler started" and "Palestine is a graveyard," as well as physical harassment when several agitators broke through the Encampment barriers and attacked students and pepper sprayed one of UCLA's security guards (*id.* at 7-8).  According to the two Anti-Palestinian Task Force Reports, Task Force members communicated with one or more UCLA administrators about the escalating violence against the pro-Palestinian protesters at the Encampment as early as April 27, 2024.  (Anti-Palestinian Task Force Report, May 13, 2024, at 4; Anti-Palestinian Task Force Report, June 28, 2024, at 14.) These reports also stated that, "[c]ampus security made no effort to keep the mobs away from the encampment," despite student complaints about the dangers they faced from counter-protestors. (Anti-Palestinian Task Force Report, May 13, 2024, at 8.)

### c.  Law Enforcement Intervention at the Encampment

It was widely reported in the news media that the Encampment was attacked by counter-protestors on the night of April 30, 2024.  For example, according to the May 2024 Anti-Arab Task Force report, "agitators launched a coordinated assault" on the Encampment with "bear mace and other chemical irritants, hammers, knives, stink bombs, high grade fireworks, baseball bats, metal and wooden rods," and reportedly, one had a gun; and protestors "begged campus security to intervene but were refused."  (Anti-Palestinian Task Force Report, May 13, 2024, at 10.)  After midnight, at 12:12 a.m. in the morning of May 1, 2024, UCLA issued a statement that law enforcement had been dispatched.  (*Id.* at 11.)  However, the May 2024 Anti-Palestinian Task Force report states that: law enforcement did not intervene for hours; when law enforcement began moving in, "they allowed the attackers to pass through unmolested" and "did not interrogate a single member of the mob;" and law enforcement did not arrest any person for attacking the Encampment.  (*Id.* at 11.)

On May 1, 2024, in response to the events the prior night in the Encampment at UCLA, the Chancellor issued a statement that referred to the physical violence against those advocating for Palestinian rights and expressed "sincere sympathy to those who were injured…and to all those who [had] been harmed or [had] feared for their safety in recent days" and acknowledged the "trauma" experienced on campus.  On May 1 and 2, 2024, law enforcement disbanded the Encampment.  On May 2, 2024, the Chancellor issued another statement stating several of the University's guiding principles with respect to the Encampment, including: "the need to support

Page 11

the safety and wellbeing of Bruins, the need to support the free expression rights of our community, and the need to minimize disruption to our teaching and learning mission."  He acknowledged that the Encampment had become "a focal point for serious violence as well as a huge disruption to our campus" and the "violent clashes between demonstrators and counter-demonstrators…created an environment that was completely unsafe for learning."  He further acknowledged that "[d]emonstrators directly interfered with instruction by blocking students' pathways to classrooms" and the "violence related to the encampment led to the closure of academic buildings and the cancellation of classes."

According to the May 2024 Anti-Palestinian Task Force Report, a couple of hours after the Chancellor issued the statement about the attack on the Encampment on May 1, 2024, he "announced plans to clear the encampment by 6:00 PM."  (Anti-Palestinian Task Force Report May 13, 2024, at 12.)  Like the night prior on April 30, 2024, a mob had gathered the night of May 1, 2024, both bigger and more violent, and was using rocks, pieces of the barricade, and chemical agents to attack the pro-Palestine protestors. (*Id.* at 12-13).  The Anti-Palestinian Task Force Reports described law enforcement "shooting rubber bullets at people trying to protect the encampment," (*id.* at 13), shooting "regular volleys of stun grenades," (*id.*), beating protestors with batons (*id.*), "approach[ing] kneeling protestors with [40mm] launchers aimed at point-blank range," (Anti-Palestinian Task Force Report, June 28, 2024, at 11), firing beanbag projectiles, (*id.* at 11), and arresting over 200 pro-Palestinian protestors (Anti-Palestinian Task Force Report, May 13, 2024, at 5.)

The May 2024 Anti-Palestinian Task Force Report also alleged several forms of discrimination by UCLA against pro-Palestinian protestors at the Encampment, including when compared to the alleged treatment of Jewish and pro-Israel protestors.  For example, the alleged discriminatory treatment included: the "egregious failure" of campus police to intervene to protect the pro-Palestinian students at the Encampment from the mob attack on April 30, 2024 (Anti-Palestinian Task Force Report, May 13, 2024, at 12); the "five nights of police and administration inaction" that allegedly only emboldened the mob to attack the Encampment on April 30, 2024 (*id.* at 12); the violent manner in which law enforcement, including campus police, disbanded the Encampment on May 1-2, 2024 (*id.*); injuries to pro-Palestinian protesters, including chemical burns, when law enforcement failed to intervene and protect them (*id.* at 13); and law enforcement's arrest or citation of pro-Palestinian protesters only, without arresting a "single attacker from the mob" (*id.* at 13).

The Antisemitism Task Force report stated that the Antisemitism Task Force received several reports of faculty who excused attendance to class or excused assignments because students or the faculty themselves were participating in the Encampment.  (Antisemitism Task Force Report, Oct. 16, 2024, at 62.)  The Antisemitism Task Force also received reports of faculty offering extra credit to students for attendance at the Encampment or related events.  (*Id.* at 62.)

Page 12

### 4. Events at the UCLA Law School

UCLA received at least three reports of alleged doxing of UCLA law school students in October
and November 2023. First, on October 30, 2023, during a rally in support of Israel when flyers
were "blanketed" on student organization bulletin boards, a person unaffiliated with UCLA
accused two law students wearing hijabs of tearing down the flyers; the person filmed the two
students and posted the video online, which amassed over 100 comments that according to an
OCR complaint filed by a UCLA law student, "disparaged [the students], subjected them to
Islamophobic abuse, and called for their death, persecution, expulsion, and other horrific forms
of violence." According to UCLA, the DOS reached out to the reporting students, who did not
respond, and UCLA could not identify who made the recording. Second, on November 8, 2023,
law students participating in a pro-Palestinian protest and/or wearing keffiyehs were filmed
without their consent which they reported was for the purposes of doxing. Third, on November
16, 2023, pro-Palestinian student protestors were filmed, and the videos were posted online. In
response to these two incidents reported in November 2023, the DOS met with and informed
students about the availability of mental health and counseling services through CAPS, and
issued a "no contact" letter in response to the second incident. OCR interviewed two student
witnesses who stated that students who were referred to CAPS for counseling and mental health
support may not have been able to access those services due to a lack of health insurance or
financial means or due to long wait times for an appointment. For both incidents that were
reported in November 2023, the DOS determined that the allegation did not rise to a level of a
policy violation under the DOS' purview.

In response to these reports of UCLA law school students being doxed, the UCLA law school
hosted a public meeting to discuss online safety and doxing on November 15, 2023, and sent
advisories to the law school community on or about November 2 and November 20, 2023,
regarding the posting and removal of materials, policies on recording, and how to report various
concerns including a link to an online form to report incidents of discrimination and harassment.

In February 2024, the Law School's Associate Dean of Students was copied on an email sharing
concerns about the posting and removal of flyers, doxing, and filming of students. The DOS met
with students who requested information about how the Student Code of Conduct applied to
doxing-based harassment and asked for the dissemination of the conduct policies and procedures
on these areas of concern. According to UCLA, the Associate Dean provided the requested
information, and the DOS confirmed that the conduct policies and procedures "had already been
disseminated to the Law School community two times."

### 5. Student 1's Allegations of Different Treatment

Student 1 alleged that UCLA subjected her to different treatment based on her shared Jewish
ancestry in a number of ways. First, she alleged that she was not permitted to audit a course that
taught "antisemitic" viewpoints because she is Jewish. OCR reviewed evidence showing that in
[redacted content], Student 1 sent the course professor an email expressing an interest in auditing
the course in the [redacted content] quarter. The professor replied that the course was full.
When Student 1 asked if she was being denied the opportunity to audit because she is Jewish, the
professor reiterated that the course was full, that her policy was not to add any more students
(either officially enrolled or auditing) when the course was full, that her decision was unrelated

Page 13

to Student 1's Jewish identity, and that Student 1 could talk with the chair of the department to discuss any further concerns.  According to UCLA's records, the course was capped at 20 students, and 32 students attempted to enroll in the course for the [redacted content] quarter, resulting in students being placed on a waitlist.  By the time Student 1 expressed her interest in auditing the course, there were already 21 students enrolled in the course with three students on the waitlist.

Second, Student 1 alleged that she was removed as the [redacted content].  Information provided shows that in [redacted content].  [Redacted sentence].  [Redacted sentence].

Lastly, Student 1 alleged that SJP discriminated against her and other non-Palestinian students, when, according to the online registration form for a film screening event on February 29, 2024, SJP charged no admission fee for Palestinian students and $5 for all other students.  However, the online registration form provided by Student 1 did not indicate where this film screening took place, including whether it was on campus or off campus.  Students were required to complete the online form to receive the location of the film screening.

### 6.  Steps Taken by UCLA to Respond to Shared Ancestry Harassment

In response to the violence experienced by the UCLA community when the Encampment was attacked and then disbanded, UCLA took several steps to assess its handling and response to the increase in tension on campus since the Hamas attack on October 7, 2023, including its handling of the Encampment.  UCLA described these steps in a letter to OCR, dated July 31, 2024, and OCR learned more about these initiatives in an interview with UCLA's Assistant Vice Chancellor of the EDI-Civil Rights Office.  UCLA's initiatives include the following:

Under the Anti-Discrimination Policy, described below, UCLA's EDI Civil Rights Office has opened an "Other Inquiry" into "reports of shared ancestry, antisemitic, and/or anti-Arab or Islamophobic discrimination" that it received from October 7, 2023, through the end of the 2023-2024 academic year, which would include reports of discrimination based on national origin, including shared ancestry, associated with the Encampment.  UCLA has engaged an outside, independent law firm to conduct the review.  The law firm will review individual reports of discrimination and harassment and, if the reports meet the appropriate criteria for a "Formal Investigation" under the Anti-Discrimination Policy, the law firm will refer them to UCLA's EDI-Civil Rights Office.  The law firm also will assess whether circumstances in the aggregate created a hostile environment based on national origin, including shared ancestry, at UCLA.  UCLA explained to OCR that if the "Other Inquiry" process finds that a hostile environment based on national origin existed, UCLA will take prompt and effective steps to address it.

In May 2024, UCLA created the Office of Campus Safety to holistically coordinate safety efforts and to administer its policing operations and emergency management program.  The office is headed by the associate vice chancellor for campus safety, who oversees the campus police and the Office of Emergency Management, and who reports directly to the UCLA Chancellor.  The associate vice chancellor's responsibilities include reviewing UCLA's responses to the spring demonstration activities and creating systems for notifying the campus quickly and effectively when security issues arise.  UCLA credits the efforts of the Office of Campus Safety for ensuring

that commencement activities at the end of the Spring 2024 quarter were not disrupted or subjected to violence.

In May 2024, the President of the University of California announced that 21st Century Policing ("21CP") Solutions would conduct an independent investigation of the actions that led to violence on the UCLA campus in spring 2024. UCLA told OCR that 21CP has substantial experience helping higher education institutions enhance community safety, and that 21 CP's investigation will include events at UCLA relating to the various on-campus demonstrations, protests, counter-protests, and other related events, as well as UCLA's police and public safety planning and response relating to those events. UCLA anticipates that 21CP will conduct a thorough investigation of what occurred on UCLA's campus and make recommendations on potential ways to improve its processes. If 21CP receives information regarding UCLA's alleged different treatment of students based on national origin/shared ancestry or law enforcement's response under Title VI, this information will be referred and assessed under the Anti-Discrimination Policy.

## B. University of California, Santa Barbara

The complaint filed with OCR against UC Santa Barbara (case number 09-24-2228) alleged that UC Santa Barbara discriminated against students on the basis of their national origin (shared Jewish ancestry) when the University failed to respond adequately to targeted antisemitic signs posted at UC Santa Barbara's MultiCultural Center (the Center) and similar messages posted to the Center's social media account, dorm rooms of Jewish students being vandalized, a Jewish group on campus being harassed during the spring 2024 semester, and a [redacted content] Professor's social media posts " publicly endorsing terrorism" including posting "a cartoon celebrating the October 7 attack, specifically the bulldozing of the fence that allowed Hamas terrorists to invade Israel and murder, capture, and kill innocent Jewish civilians" (case number 09-24-2228).

### 1. The Center at UC Santa Barbara

On February 25 and 26, 2024, the Center was hosting a two-day conference. On February 25, 2024, someone posted signs at the Center with messages stating, "Zionists are not welcomed," and "It was never about Hamas, never will be." Jewish students had scheduled to use the Center for a Shabbat meal that weekend, and one of the signs included the message, "Stay away from our kitchen too!" Several individuals made reports of the signs appearing at the Center to several UC Santa Barbara campus offices. According to UC Santa Barbara, the signs initially did not mention any individual students. Photos taken of the signs appearing at the Center were posted on the Center's official Instagram account with the caption, "In case we aren't clear, let us spell it out." Soon thereafter, UC Santa Barbara temporarily turned off or unpublished the webpage for the Center, as well as its social media pages. UC Santa Barbara also removed the signs from the exterior of the Center on February 25, 2024.

On February [redacted content], 2024, a group of students who, according to UC Santa Barbara, were affiliated with Santa Barbara Hillel came to the Center to protest the signs. Videos appeared on social media of a Jewish student who was [redacted content] inside the Center asking students to stop filming her [redacted content]. The video of the incident shows that

Page 15

while she was [redacted content].  More individuals arrived and the interactions grew heated.  A Jewish student (Student 4) who was [redacted content], attempted to talk with the pro-Palestinian supporters about Zionism.  According to UC Santa Barbara, administrators who were present tried to intervene to ease tensions, and some students whom the University described as "pro-Zionist" agreed to leave; however, the remaining pro-Palestinian contingent "expressed an unwillingness to leave or engage constructively with the administration."  Eventually UC Santa Barbara's police department responded to a report that Jewish students were being surrounded.

According to Student 3, someone posted posters on the Center walls that were directly targeting [redacted content].  According to UC Santa Barbara's records produced to OCR and other complaints received by OCR against the University, signs appeared at the Center that also targeted Student 4, which included statements such as, [redacted content].  Student 4 posted on her [redacted content] account that she did not feel safe on campus.  She also posted, "[redacted content]?"  Student 4 also reached out to the UC Santa Barbara police department stating that she felt unsafe [redacted content].  In response to Student 4's report, the UC Santa Barbara police increased patrols of the exterior of the building and reminded Student 4 of the availability of safety escorts.  Student 4 sent a text message with images of the social media posts directly to the Vice Chancellor for Student Affairs, who responded the same evening stating, "We are just finding out about this. More soon."  Multiple other students also reported the social media posts to various UC Santa Barbara administrators directly by email and through the Student Life bias reporting tool.

Other signs posted at the Center over the course of those two days included, "From the River to the Sea, end UC complicity," "My tuition should never fund a genocide," "Palestinians have the right to defend themselves," "Zionist support genocide," and "When people are occupied resistance is justified."  According to UC Santa Barbara, it closed the Center on February 26, 2024, due to the escalating tensions because the university saw no other option, and the Center employees worked remotely.  In addition, UC Santa Barbara removed the Center's social media credentials from the students [redacted content] and who had authorization to post online on behalf of the Center at that time.

On the evening of February 26, 2024, the UC Santa Barbara Chancellor and Vice Chancellors issued a statement stating that UC Santa Barbara removed the signs from the Center and noting that the campus was "conducting a bias incident review based on possible discrimination related to protected categories that include religion, citizenship, and national or ethnic origin."

On [redacted content], 2024, Student 3 sent an email to several UC Santa Barbara administrators, including the Executive Director of the Associated Students, about what had happened at the Center over the weekend, explaining that [redacted content].  Student 3's email also alleged she was discriminated against on basis of her shared Jewish ancestry and Zionism on two other occasions during the 2023-2024 academic year.  The Executive Director of the Associated Students responded to Student 3 acknowledging that the behavior Student 3 described was unacceptable and offering support by providing Student 3 with her phone numbers to call if ever needed.  The Executive Director asked whether Student 3 would like her to follow up with the offices that investigate bias incident reports on campus to inquire about the status.  She also informed Student 3 that she planned to reach out to Student 4 [redacted content] "to see what

efforts [redacted content] may collectively pursue to support and engage the campus in anti-hate initiatives to bring awareness and change."

On February 28, 2024, the Chancellor and Vice Chancellors again posted a statement denouncing "antisemitic incidents targeting Jewish students with hateful signs and messages" and stating that the University was investigating the incidents and would hold those responsible accountable. In response to the incidents, the UC Santa Barbara police department also developed a security plan for Associated Student Senate meetings and reviewed video footage of the Center during February 25 and 26, 2024.

UC Santa Barbara contacted the local District Attorney's office to inquire if any of the messages/signs posted at the Center constituted a crime. UC Santa Barbara was told that the signs were not sufficient to charge someone with a crime. According to UC Santa Barbara, it also attempted to reach out to some of the "impacted parties" who were unresponsive. The university informed OCR that based on the District Attorney's Office's assessment, UC Santa Barbara determined that the conduct related to the signs at the Center amounted to First Amendment protected speech, and that due to the unresponsiveness of impacted parties, UC Santa Barbara did not have sufficient information to determine if the alleged conduct violated its anti-discrimination policy. For this reason, UC Santa Barbara did not initiate investigations to determine whether the incidents at the Center constituted discrimination or harassment on the basis of national origin.

On April 1, 2024, UC Santa Barbara reopened the Center. The Vice Chancellor for Student Affairs by email offered Center staff a series of convenings with the Assistant Director of Counseling and Psychological Services (CAPS) to provide "a space for reflection, healing, and shared understanding" open only to active Center student staff and interns. Upon the reopening, the UC Santa Barbara police department provided safety planning and coordination as well as de-escalation training for the Center.

## 2. Dorm Room Vandalism Incident at UC Santa Barbara

On [redacted content], a Jewish student (Student 5) discovered graffiti on his dorm door in black ink stating, "[redacted content]." When reporting the vandalism incident, Student 5 described to the Residential Assistant (RA) that he had a religious symbol outside of his door. Student 5 had a [redacted content] mounted on his dorm room door frame. The RA filed an advocate incident report with university housing and notified the Resident Director of what had occurred. The RA's notes of her discussion with Student 5 indicate that Student 5 described the climate on campus as heated and mentioned the posters at the Center. The Resident Director reported the vandalism incident to the Equal Opportunity & Discrimination Prevention Office (EODP Office). The Director of the EODP Office contacted the Resident Director requesting Student 5's contact information so he could meet with him about the incident. When the Resident Director emailed Student 5, he responded stating, "I'm mainly unaffected by the incident, just wanted it cleaned!" UC Santa Barbara then closed the case. According to UC Santa Barbara, the university police department determined that the vandalism was "likely . . . a targeted vandalism against a Jewish person" and therefore constituted "hate crime vandalism" but that no one was charged because the university police were not able to identify a suspect. According to

Page 17

UC Santa Barbara's records produced to OCR, the police case remains "suspended pending leads." The Resident Director also reported the incident to the university Clery Act Coordinator who determined that the vandalism constituted a hate crime for the purposes of the Clery Act and entered the incident into the Daily Crime Log required by the Clery Act.

### 3. Other Alleged Incidents of Harassment at UC Santa Barbara

UC Santa Barbara received these other reports alleging harassment of students based on their shared ancestry summarized below:

- On [redacted content], Student 4 reported to administration via email that she experienced harassment online and in person. According to UC Santa Barbara, Student 4 provided screenshots of online messages she received through social media "denouncing her support for Israel, her alleged complicity in the genocide in Palestine, [redacted content]. The Office of Student Conduct reviewed the online messages and met with Student 4 [redacted content]. The UC Santa Barbara's Office of Student Conduct concluded that the reported behavior "did not meet the threshold for individual conduct review" and informed Student 4 that any reports submitted after [redacted content], were being shared with the EODP office to determine whether the reported behavior violated UC Santa Barbara's anti-discrimination policy. The Office of Student Conduct also contacted [redacted content] and filled out a harassment/ bullying incident report on behalf of Student 4. In addition, a staff member from the Office of Title IX Compliance and Discrimination and Harassment Prevention (the Title IX Office) at UC Santa Barbara reached out to Student 4 by email on [redacted content], but Student 4 did not respond, according to the UC Santa Barbara.

- On February 28, 2024, several individuals sent multiple UC Santa Barbara administrators emails regarding graffiti at the Girvetz School of Education that stated, [redacted content]. The emails also included reports about the incidents and signage at the Center that occurred on February 25 and 26, 2024. UC Santa Barbara police photographed the graffiti and filed an incident report but were unable to identify a suspect and therefore suspended the police case pending additional leads. On April 16, 2024, the Title IX Office submitted an incident report to the UC Santa Barbara police regarding the graffiti, and the police determined that the graffiti vandalism met the threshold for a Clery Hate Crime (vandalism, bias based on religion).

- On [redacted content], a Jewish student (Student 6) reported to the University that "a group of SJP-affiliated students made threatening gestures [redacted content] at me and told me "[redacted content]," a man outside of Student 6's [redacted content] asked whether he had family in Israel and then stated that he hoped Student 6's family died, and a keffiyah-wrapped student yelled 'f*** you Zionist' at Student 6 on campus. Student 6 also reported that anonymous social media messages had been posted about him online and that an "[redacted content]" told him that "to me, you're KKK."

- On [redacted content], following the poster incidents at the Center, Student 3 [redacted content] sent an email to UC Santa Barbara administration that raised three allegations.

Page 18

First, Student 3 alleged that in [redacted content] she was "personally questioned about my view on the conflict and why I am supporting Israel" by a professor in a lecture [redacted content]. Student 3 explained in her email that she submitted a bias report to the University alleging this incident on [redacted content]. UC Santa Barbara's documentation shows that the University administration responded by contacting Student 3 and provided her with some resources. According to Student 3, she never received an update addressing the concerns she raised about the professor. Second, Student 3's email alleged that on [redacted content], two student staff members wearing keffiyehs at the Center, where she was trying to study, followed her into the lounge and stood on either side of her watching her and other Jewish students studying. According to Student 3, approximately 20 minutes later, an individual whom she believes was a Center employee and could have been the Center Director approached her and her peers and told them that the Center was open to all students but if anything were to escalate, they would have to shut it down. As described above, the situation at the Center did escalate a few hours later during the second day of the signs being posted. Student 3's email alleged that when pro-Palestinian students were crossing into the lounge and chanting and shouting into the Center's microphone, she asked the Center employee who had approached her earlier whether the Center would be closed, and the Center employee informed her that nothing could be done because it was the students' right to free speech. Student 3 alleged that she later saw the same Center employee outside speaking with administration and a student with a mask and keffiyeh was shouting at him, "Tell them what you really think, you tell us all the time! Tell them!" Lastly, Student 3's email alleged that [redacted content].

- On [redacted content], Student 3 sent UC Santa Barbara administration another email reporting that she heard from a student that another student was talking about her in another class and that she was "condemned" in the other class.

### 4.  Steps Taken by UC Santa Barbara to Respond to Shared Ancestry Harassment

According to UCSB, it has taken several steps to respond to alleged shared ancestry harassment on its campus. For example, UCSB reported to OCR that it combined its Title IX, equal opportunity, and nondiscrimination and harassment functions into one centralized office, the Office for Title IX Compliance & Discrimination and Harassment Prevention (Title IX/DHP Office), to improve students' and employees' access to policies, procedural options, and supportive measures and to facilitate UCSB's prompt and equitable response to reports and complaints of shared ancestry discrimination. UCSB migrated all such reports and complaints to a shared database case management tool to be better positioned to recognize discriminatory trends that might indicate a hostile environment on campus. After October 7, 2023, the UCSB police department expanded its in-person patrols and allocated additional resources to serve as standby support for numerous campus events, including Hillel-sponsored Shabbat dinners and numerous other rallies, demonstrations, walkouts, and vigils (both in support of Israel and Palestine) that have occurred on campus. UCSB also formed an operational team to manage campus climate issues, including developing collaborative strategies to respond to events on campus. In addition, UCSB established the Kosher/Halal Dining Committee to support students

Page 19

who observe Kosher and Halal dietary practices and to connect them with UCSB's employees who handle campus dining. To improve employees' responses to shared ancestry discrimination campus wide, UCSB also implemented a series of trainings, including: training for its faculty and staff to better equip them in understanding key issues and navigating tough conversations, such as the "Crucial Conversations" workshops in October 2024 for department chairs and center directors; a training for faculty and staff in December 2024 on managing conversations among people with different perspectives; and a three-part training sponsored by the campus Human Resources department on navigating effective communication across diverse perspectives, which began on December 9, 2024 and will continue through February 2025.

### C.  University of California, San Diego

The complaint against UC San Diego (OCR case number 09-24-2092) alleged that UC San Diego discriminated against students on the basis of their national origin (shared Jewish ancestry) by failing to respond adequately to antisemitic comments and actions by students and professors during incidents that occurred in October 2023 and afterwards. These alleged incidents included: a walk to "honor the martyrs of Hamas"; anti-Israeli graffiti written on UC San Diego's freedom of speech wall; a Jewish student had a Mezuzah torn down from his apartment doorway; another Jewish student was verbally attacked when wearing a kippah to a lecture; posters depicting the faces of the hostages held by Hamas were torn down; SJP carried the "Islamic Jihad flags" throughout campus; students and faculty held strikes in support of Palestine; students received academic credit for attending anti-Israel protests; UC San Diego medical residents made a statement criticizing Israel and opposing the war in Gaza; and the [redacted content] Department's professional listserv/email was used to list letters and/or emails critical of Israel, framing the conflict in Gaza as a "genocide within the larger Zionist project," and generally supporting Palestinian causes.

### 1.  [Redacted content] Department at UC San Diego

On March 17, 2024, a UC San Diego employee who was an alumnus of the [redacted content] Department sent a flyer to two [redacted content] Department listservs with the subject line, "Invitation to fundraiser in solidarity with Palestine and our collective liberation." Later that evening, a professor sent the Dean of the School of Arts and Humanities a message inquiring if it was appropriate for the listserv to be used for political causes, given the polarization surrounding the events of October 7, 2023, and because it could alienate Jewish students and staff. On March 18, 2024, the Department Chair, the interim Chief Academic Officer, and the Associate Chair investigated the incident and determined that the email was sent inappropriately from a Department alumna [redacted content]. That same day, the Department Chair emailed the professor to apologize for the incident, explained that the email came from an alumnus, and that they were updating the listserv to prevent a recurrence. In response to the incident, UC San Diego administration began internal discussions on the appropriate use of Department listservs and the [redacted content] Department is in the process of developing a specific policy to address the use of listservs.

On May 15, 2024, following student campus protests, the Department Chair issued a statement to the Department community in support of the rights of the students to protest. On June 27, 2024,

Page 20

the Department Chair learned that comments by a University student criticizing the University's
handling of antisemitism on campus had been read and entered into the record at a Congressional
hearing.  On July 18, 2024, the Department Chair contacted the named student to offer support and
assistance.  The student did not respond to the Chair's outreach and did not file a discrimination
complaint with the University.

## 2.  Other Complaints Alleging Harassment at UC San Diego

According to UC San Diego, from October 8, 2023, to January 30, 2024, UC San Diego received
25 complaints of discrimination, including harassment, on the basis of shared Jewish ancestry.

In October 2023, the Office for Prevention of Harassment & Discrimination (OPHD) received an
anonymous complaint reporting that there were swastikas at Geisel Library.  On November 9,
2023, OPHD closed the complaint because the swastikas were part of an art installment about
Nazis and fascism.  OPHD determined that the complaint did not identify a violation of UC San
Diego's nondiscrimination policy because the alleged incident involved speech protected by the
First Amendment.

On October 20, 2023, OPHD also received an anonymous complaint alleging that the
Department of Ethnic Studies promoted antisemitic messaging and allowed a professor to
promote "hate speech" by placing a poster on their door that stated, "I love Hamas."  OPHD
found that the Department of Ethnic Studies posted a statement on its website announcing a Day
of Action and would be suspending classroom sessions on that day.  In response, the UC San
Diego leadership emailed all campus departments reminding them that the "law and university
policy" prohibit departments from making statements on University-owned websites.  In
December 2023, OPHD requested that the UC San Diego Committee on Academic Freedom
determine whether the posting exceeded the academic freedom principles set forth in University
of California policy.  On January 18, 2024, the Committee on Academic Freedom made a
determination that the Department's posting of the statement was permitted under law and
University of California policy.  On February 12, 2024, UC San Diego issued to its faculty
guidance reminding them of the University policy and the importance of ensuring that students
are not made to feel intimidated, threatened, and/or excluded in their classes.  The guidance
noted, among other things, that the University policy prohibited the canceling of classes to
encourage students to participate in protests or rallies, and that intrusion of material unrelated to
course content was prohibited.

According to UC San Diego, it also received 25 complaints alleging discrimination based on
shared ancestry that are still being assessed.  The complaints include:

- Complaints about a Vigil: A Jewish student complained that during a memorial vigil for
  [redacted content] who were slain during the attack in Israel on October 7, 2023,
  members of SJP and members of the Middle Eastern North African Student Association
  (MENASA) at UC San Diego spat on the student and called the student a "dirty filthy
  Jew."  Another student complained about the same incident.

- Complaints about pro-Palestinian protests: Several students, parents, and members of the

public complained about the pro-Palestinian protests, statements made at the protests, or symbols used at the protests. Several individuals (students, parents, or members of the public) complained about professors canceling class to allow students to attend a Pro-Palestinian march or offering extra-credit to attend protests. Several persons complained about statements made at protests such as that the violence that happened in Israel was "justified," chants of "Intifada Revolution" and "From the river to the sea," and the display of flags that were "Jihadist" or pro-Hamas. One complaint from a member of the public asked that UC San Diego remove SJP from campus. Several students complained that the Associated Students endorsed the SJP views.

- Complaint about the removal of flyers or posters: Three complaints were about flyers of Israeli hostages or other pro-Israel posters being torn down. A fourth complaint alleged that posters were replaced with posters of a star of David covered in blood.

- Complaints alleging harassing comments or imagery outside the context of protests: A student complained about comments made on Snapchat messages such as photos of persons with Israeli flags captioned, "the jokes write themselves," another post that stated, "Israel and all its supporters can suck my big fat c***," and another post of a gathering at the Geisel Library with Israeli flags in view and the caption, "It's ironic how they put up the missing persons signs when Israel clearly doesn't give a shit about the missing people… Israel has in fact killed more than 20 of the hostages during this genocide in Gaza." Another student complained about unidentified faculty making anti-Israel comments such as "Israel is a colonialist and apartheid state" and using the listserv to disseminate a pro-Palestinian protest flyer. A student complained about experiencing harassment [redacted content] when she was filmed without her consent while she shared "the story of [redacted content] who was murdered by terrorists" and then it was posted without her consent. A parent complained about a professor giving a speech criticizing Israel who chose to cancel class to allow students to attend a pro-Palestinian march, and prior to doing so chose to give a speech on occupation and apartheid. The parent stated that while Israel was not specifically mentioned, the speech was understood to be referencing Israel.

According to UC San Diego, OPHD had opened investigations of 4 of the 35 complaints by March 14, 2024: (1) a student complaint alleging that SJP and MENASA members spat on a Jewish student who set up a vigil and called students "dirty filthy Jews"; (2) a parent complaint about a professor cancelling class and giving a speech criticizing Israel; (3) a student complaint against multiple individuals regarding social media messages and against a faculty member for cancelling class; and (4) a student complaint against a faculty member and unknown student regarding the SJP rally and the Associated Student's endorsement of SJP views. At the time UC San Diego provided OCR with information about these complaints, UC San Diego had not yet completed these investigations.

UC San Diego informed OCR that when complaints involve conduct that also may violate other policies, OPHD will refer complaint information to other departments. For example, cases involving allegations of faculty misconduct that may violate policies other than the nondiscrimination policy are referred to the Academic Personnel Services (APS) for review and

Page 22

possible investigation. In December 2023, the APS opened investigations of seven professors to determine whether their alleged conduct (including cancelling class, issuing statements, and disputes about curriculum) violated University policies. OPHD also shared safety concerns with the UC San Diego police department when it had notice of upcoming protests, posting of swastikas, and the displaying of the Islamic Jihad flag. OPHD also referred cases of student misconduct that may violate policies other than the nondiscrimination policy to the Office of Student Life.

In January 2024, UC San Diego created a new dedicated cross-departmental Support Team that considers, identifies and implements appropriate support for individuals affected by the Israel-Hamas conflict. According to UC San Diego, for any complaints identifying one or more harmed students, OPHD "has generally offered the resources of its new Support Team" to those students. UC San Diego also told OCR that the Support Team is part of UC San Diego's efforts to prevent hostile environments and to provide support in situations in which particular conduct may not violate policy because it constitutes speech protected by the First Amendment.

In addition to complaints received by OPHD, UC San Diego informed OCR that their Student Accountability, Growth, and Education (SAGE) team receives reports of student non-compliance with University policies and offers consulting and advising to the campus community. Following the events on October 7, 2023, SAGE received reports of several incidents involving SJP members. Specifically, there was an allegation that an SJP student harassed a member of another student group to sign SJP's petition. SAGE issue mutual no-contact orders between the two students and is evaluating whether further action is needed. SAGE also reviewed information that SJP members were blocking ingress/egress to the Giesel Library entrance in November 2023, holding up large tarps at the library and a balcony of a residential building. SAGE required SJP members to meet with their organization advisory "for educational conversations."

In addition to responding to complaints, UC San Diego responded to the events after October 7, 2023, by publicly condemning discrimination and offering resources and supports. For example, the UC San Diego Chancellor issued public statements on October 9 and 10, 2023, and offered information about resources and support for the campus community and condemning antisemitism and anti-Muslim discrimination on November 7 and 10, 2023. Additionally, UC San Diego conducted outreach to students offering counseling and other services, sponsored educational events and campus-wide dialogue sessions, issued guidance to the UC San Diego community explaining academic freedom principles, and collaborated with Hillel of San Diego on events.

UC San Diego also informed OCR that it continues initiatives to promote a safe campus climate that were in existence prior to October 7, 2023. For example, UC San Diego requires all new students to complete mandatory training covering multiple topics including the University's prohibition of discrimination and harassment based on shared ancestry. The training includes examples of discrimination against students who are Jewish, Muslim, Arab, or Palestinian. The training informs students that they may report allegations of discrimination, including harassment, to OPHD. The campus participates in the Hillel's Campus Climate Initiative which includes frequent meetings to review campus climate issues. The campus requires student club

THIRD RASSBACH DECLARATION EXHIBIT 5

Page 23

and organization leaders to complete the Art of Inclusive Communication. UC San Diego also has designated a CAPS liaison to Hillel.

### D.  University of California, Davis

The complaints filed with OCR against UC Davis (case numbers 09-24-2038, 09-24-2283, and 09-24-2312) alleged the following:

- UC Davis allegedly failed to respond to notice of harassment of, and a hostile environment for, students of shared Jewish and/or Israeli ancestry when following October 7, 2023, a faculty member posted on her private social media account that "Zionist journalists who spread propaganda & misinformation" were a group that was easily accessible to the public, noting that they have houses with addresses and kids in school, and the faculty member further stated, "they can fear their bosses, but they should fear us more" and posted emojis of a knife, hatchet, and three blood drops (case number 09-24-2038).

- UC Davis failed to respond appropriately to harassment and different treatment of Jewish students since October 7, 2023, when SJP reposted on social media messages threatening violence and mocking Jewish students and Zionists, and made threatening comments to Jewish and Israeli students at protests and other events; Jewish and/or Israeli students were subjected to physical assaults, graffiti, signage hostile to them; faculty members and students made statement against Jewish and/or Israeli students on social media, in mass emails to UC Davis students and alumni, and during campus events; and SJP and Jewish Voices for Peace do not have to comply with policies for "major events," while other organizations do, and Jewish and/or Israeli students are excluded from campus events, programs, and activities (case number 09-24-2283).

- UC Davis discriminated against students on the basis of their actual or perceived national origin (shared Palestinian, Arab, and/or Muslim ancestry) or association with Palestinian students by failing to respond adequately to complaints or reports of numerous instances of threats, doxing, non-consensual recording, and incendiary comments made to Palestinian, Arab, and Muslim students and others associated with Palestinian students, as well as alleged unwarranted surveillance and harassment of students at rallies and other campus events, and being cut off, yelled at, and silenced in class when trying to express their views with no support from their professor(s).  The complaint also alleged that Palestinian, Muslim, and Arab students have experienced retaliation for raising concerns of discrimination with the University, including heightened levels of surveillance, which leads to underreporting of discrimination against these students.  The complaint further alleged that the University has applied its policies differently to pro-Palestinian student groups, like Students for Justice in Palestine, and campus events than it has to other student groups, organizations, and events (case number 09-24-2312).

Page 24

### 1. The Faculty Member's Social Media Post

On October 10, 2023, a UC Davis faculty member (the Professor) posted on her personal social media account, "one group of ppl we have easy access to in the US is all these Zionist journalists who spread propaganda & misinformation they have houses w addresses, kids in school they can fear their bosses, but they should fear us more." She did not identify her affiliation with UC Davis in the post. According to UC Davis, it first became aware of the Professor's post on October 17, 2023, when it received an inquiry from a journalist, and by October 18, 2023, the post with information about her University department profile "went viral." On October 19, 2023, the UC Davis Chancellor issued a statement denouncing the Professor's post stating that UC Davis rejects all forms of violence and discrimination, and that when the university receives a complaint that a faculty member may have violated the Faculty Code of Conduct, UC Davis reviews the matter through the faculty discipline procedures. He further stated that they were forwarding the matter to the departments that investigate harassment, discrimination and faculty conduct, in consultation with UC Davis legal counsel regarding First Amendment rights.

The same day, the Professor's post was referred for review to the UC Davis Police Department, which connected with the FBI. Both law enforcement agencies assessed the post, determined it did not qualify as a threat, and referred the incident to the campus threat assessment team on October 20, 2023. The campus threat assessment team similarly concluded that there was no likely threat of violence to the campus community.

According to the UC Davis, it received five reports from students regarding the Professor's post, and hundreds of reports primarily from individuals not affiliated with the university. Of the five reports made by students, the UC Davis Office of the Provost responded to four of them. The response addressed concerns about safety, provided information about support resources available to students, and referred individuals to the University's Report Hate and Bias website to file concerns about hate, bias, discrimination, or harassment. The response also referred to statements by the UC Davis Chancellor, which in turn provided information about how to file harassment or discrimination complaints with the Office of Harassment & Discrimination Assistance and Prevention (HDAPP). None of the students submitted complaints.

The Provost informed the complainants that the matter would "be referred to the appropriate campus departments that investigate harassment, discrimination, and faculty conduct, in consultation with legal counsel regarding First Amendment rights." The fifth complaint went directly to HDAPP, and HDAPP responded to that student with similar information on November 9, 2023. According to UC Davis, it conducted an initial assessment to determine whether the reports alleged "conduct that is sufficiently severe, persistent or pervasive that it unreasonably denies, adversely limits, or interferes with a person's participation in or benefit from the education, employment or other programs or activities of the University, and creates an environment that a reasonable person would find to be intimidating or offensive when based on [protected] categories."

According to UC Davis, after its initial assessment process, UC Davis concluded that the Professor's social media post did not meet the policy standard for harassment and closed the complaints. However, it opened an investigation on November 6, 2023, into whether the

Professor violated the Faculty Code of Conduct and placed her on involuntary leave during that process which requires that she not interact with University of California students and not come to campus.  The Professor was not teaching any classes or advising any students in Fall 2023.  None of the five students who filed concerns reported being in her classes or being assigned to her as a graduate advisor.  According to UC Davis, none of the students were in the same area of study as the Professor or would ever need to take a class from her.  However, one student who was in their [redacted content] indicated that they had been thinking of changing their major to [redacted content], which is the same field of study in which the Professor teaches.

## 2.  Other complaints alleging harassment at UC Davis in October 2023

UC Davis reported receiving two reports in October 2023 of possible alleged discrimination based on shared ancestry.  On [redacted content], a student (Student 7) filed a complaint with HDAPP alleging that, on October [redacted content], 2023, another student (Respondent 1) called Student 7 a "f***ing right wing Zionist" in a social media post, stated that she wanted to [redacted content] her, and posted a photo of someone with an Israeli flag over their face [redacted content].  Student 7 noted in her complaint that she was studying [redacted content] and not on campus.

According to UC Davis, HDAPP acknowledged receipt of the report the same day, provided information to Student 7 about support resources, including Counseling Services and the Ombuds Office, reviewed the complained-of social media posts, and concluded that the posts represented protected speech that the University was unable to prohibit and did not qualify as harassment under University policy.  HDAPP closed the case on October 19, 2023.

On October 27, 2023, Student 7 asked for the case to be reopened because of what she perceived as the threatening nature of the speech.  HDAPP reopened the case and offered to explore supportive measures with Student 7.  Student 7 again stated that [redacted content] so there were no supportive measures needed.  She asked for disciplinary measures to be taken against Respondent 1.  HDAPP again reviewed the content of the social media posts and surrounding circumstances and determined that the language did not constitute a "true threat" under the First Amendment.  HDAPP informed Student 7 of this determination.  The University concluded that it could not investigate this matter because, while the speech was unwelcome and offensive, there was no information suggesting that the speech was so severe or pervasive that it limited or denied Student 7's ability to participate in her educational program.  HDAPP reiterated the availability of resources and supportive measures and provided Student 7 with additional information about the actions UC Davis was taking to address antisemitism on campus.  The case was closed for a second time on February 15, 2024.

## 3.  UC Davis Responses to October 7th and Subsequent Alleged Harassment

On October 8, 2023, the day after the attacks in Israel, the UC Davis Chancellor sent a statement acknowledging its impact and reminding the campus community about support resources available to students, faculty, and staff.   Two days later, on October 10, 2023, he sent another statement further acknowledging the events and their impact on the campus community, reiterating available support resources and providing information about how to report

Page 26

discrimination and harassment to the HDAPP. Since October 10, 2023, the UC Davis Chancellor issued several additional statements that reiterated the campus principles and condemned bigotry and hate speech.

According to UC Davis, following a November 2023 protest in which a building and campus art were vandalized, UC Davis made disciplinary referrals for students responsible. Then, the Chancellor met with campus leaders, including the Associated Students of UC Davis (student government) and members of graduate student leadership, to review campus protocols for protests, including those addressing student expression, expressing disagreement and civil disobedience, planning events and protests, and reporting violations and concerns. UC Davis also promoted meetings for students and faculty to discuss their concerns, including meetings with Davis Faculty for Israel, student leaders from Aggies for Israel, and meetings with the UC Davis Advisory Council on Jewish Student Life (the Council), which was established with Hillel of Davis and Sacramento in 2021. UC Davis has sponsored multiple events to promote a nondiscriminatory campus environment, including Hillel Campus Climate Initiative Orientations, speakers addressing antisemitism and anti-Muslim discrimination, and events/trainings designed to foster bridge-building and discussions and address conflict.

### E.  University of California, Santa Cruz

The complaint to OCR against UC Santa Cruz (case number 09-24-2224) alleged that UC Santa Cruz discriminates against students based on shared Jewish ancestry by failing to respond to reports that the Critical Race and Ethnic Studies Department (CRES) posted "anti-Zionist propaganda" on UC Santa Cruz's website, CRES faculty shut down the CRES department encouraging students to boycott classes and participate in protests in late 2023, and SJP created a hostile environment for Jewish students by demanding that UC Santa Cruz cut ties with all Zionist institutions, and that students celebrated Adolf Hitler's birthday on campus in April.

On June 4, 2024, the UC Santa Cruz Chancellor issued a statement regarding the University's decision to take formal action to remove an encampment, noting that it had an "unquantifiable impact to the educational progress for students" as well as other costs due to vandalism, repairs, and debris removal. The Chancellor stated that UC Santa Cruz's decision was because the "unlawful actions" harmed the campus community and created unsafe conditions.

As for UC Santa Cruz's handling of the allegations raised in the OCR complaint and its handling of complaints about discrimination based on shared ancestry, OCR has not yet received UC Santa Cruz's responses to OCR's requests for data.

### F.  University of California Policies and Procedures

While each University of California campus has non-discrimination policies and procedures for addressing discrimination complaints, each of the campuses is in the process of implementing the new University of California systemwide Anti-Discrimination Policy and Interim Guidance on Addressing Discrimination and Offering Support (the Interim Guidance). The University of California issued the Interim Guidance on January 17, 2024. The University of California also

Page 27

provides campus discrimination offices guidance about responding to discrimination, including harassment and retaliation, and First Amendment protections, including academic freedom. This guidance also includes how to conduct an initial assessment of a report of discrimination, including initial fact-gathering and identifying appropriate supportive measures for members of university communities. Under the Interim Guidance, UC institutions are expected to take appropriate steps to address the effects of the reported incident and prevent the creation of a hostile environment, including providing supportive measures, while ensuring that any such steps do not infringe on First Amendment rights or academic freedom protections. These measures may include services, accommodations, or other measures to provide support, restore, or preserve access to a campus program or activity or to deter discrimination and/or retaliation (e.g., tutoring; counseling; health and mental health assistance; housing assistance; schedule adjustments; offering an alternative class; counter speech; training).

The University of California also implemented a new Anti-Discrimination Policy. The Anti-Discrimination Policy is a result of a three-year multi-campus, multi-disciplinary systemwide working group review of existing UC policies and practices related to the handling of allegations of harassment and discrimination based on all protected classes, which includes discrimination on the basis of national origin and shared ancestry. The new Anti-Discrimination Policy applies across the UC System and became effective on February 20, 2024. The Anti-Discrimination Policy provides definitions of discrimination, harassment, and retaliation based on protected categories, and provides detailed procedures for responding effectively to complaints.

Key points of the University of California's new Anti-Discrimination Policy include:
1. Establishing the Anti-Discrimination Policy's coverage over harassment, discrimination, and retaliation by and against students, employees, and third parties at university campuses or in connection with university employment, programs, or activities;
2. Examples of prohibited conduct such as "antisemitic, anti-Arab, and Islamophobic" discrimination or harassment;
3. Describing "Responsible Employee" reporting obligations;
4. Describing "Supportive Measures" designed to restore or preserve access to university programs or activities for the Complainant, Respondent, or other members of the university community; and
5. Setting forth prompt and equitable procedures for resolving reports of harassment, discrimination and retaliation and a commitment to take appropriate action to stop, prevent, correct, or discipline behavior that violates the Anti-Discrimination Policy.

In a letter dated July 31, 2024, UCLA told OCR that the University of California's Systemwide Office of Civil Rights planned to provide a Title VI overview and investigatory training to the Local Implementing Officers at each campus on August 12, 2024. In addition, the Systemwide Office of Civil Rights is developing custom content to add to UCLA's mandatory online student Title IX training regarding the new Anti-Discrimination Policy's coverage of discrimination and harassment based on national origin, including shared ancestry and ethnic characteristics, and is exploring adding such examples to employee training. Furthermore, in the 2024-2025 academic year, the Systemwide Office expects to issue model implementation procedures for the new Anti-Discrimination Policy and additional related guidance documents addressing topics, such as responsible employees, alternative resolutions, timeliness of investigations, and data protocols.

Page 28

## III.    OCR's Compliance Concerns Based on the Evidence to Date

Based on the evidence gathered to date, OCR identified multiple compliance concerns.  First, some of the Universities appear to have failed to respond promptly or effectively to a possible or apparent hostile environment based on national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry, on their campuses when one or more of the Universities determined that the alleged harassing conduct or protests involved protected speech under the First Amendment without evaluating if the alleged conduct nonetheless created a hostile environment in a university program or activity for affected students.  Second, OCR has a concern, based on the information OCR obtained to date, that some of the Universities' responses to alleged harassment based on shared ancestry appear not to have been prompt or not to have involved consideration of the totality of the circumstances, which may have resulted in a University campus's failure to recognize when a hostile environment existed and related failures to remedy the effects of a hostile environment on certain students and to prevent a recurrence of the alleged harassment.

Third, OCR identified a compliance concern that students appear to have been subjected to different treatment based on national origin, including shared Jewish ancestry, when their access to parts of the campus or university programs was limited during the Encampment at UCLA in May 2024, and the Center at UC Santa Barbara in February 2024, and both Universities appear to have failed to ensure their equal access to these programs and parts of campus.  Fourth, OCR identified a concern that UC Santa Barbara appears to have engaged in different treatment of Jewish students based on their shared ancestry because UC Santa Barbara does not appear to have taken steps to ensure their equal access to the Center in February 2024.  Fifth, OCR has a concern that some UC San Diego faculty appear to have provided academic credit to students for participating in anti-Israel protests or to have canceled classes to encourage student participation in anti-Israel protests and that this apparent different application of a University policy prohibiting such conduct may have denied Jewish students equal access to academic credit opportunities or their classes, based on their shared Jewish ancestry, under Title VI.

Lastly, OCR found insufficient evidence to support a conclusion that UCLA engaged in different treatment of Student 1 based on her shared Jewish ancestry in violation of Title VI and its regulations.  OCR found insufficient evidence to support a conclusion that UCLA engaged in different treatment under Title VI by denying her interest in auditing a course or [redacted content].  OCR also found insufficient evidence to support a conclusion that UCLA engaged in different treatment by allegedly allowing a student group to admit pro-Palestinian students to a movie screening for free while charging other students.

### A.  Notice of a Possible Hostile Environment Based on Shared Ancestry

OCR found that each of the five Universities had notice of alleged harassment of students based on their national origin, including shared Jewish, Palestinian, Arab, and/or Muslim ancestry in the 2023-2024 academic year, and at least a possible hostile environment for these students.

With respect to UCLA, the evidence to date show that UCLA had notice of severe and pervasive verbal and physical harassment, including physical violence, of students of shared Palestinian,

Page 29

Arab, Muslim, Jewish, and Israeli ancestry at the Encampment in April and May 2024 and a possible hostile environment on its campus based on national origin/shared ancestry for each of these groups of students. For example, widely disseminated media accounts of the violent counter-protestor attack on protestors at the Encampment on April 30, 2024, notified UCLA of this apparent hostile environment for students of shared Palestinian, Arab, and Muslim ancestry. The Anti-Palestinian Task Force report, issued on May 13, 2024, provided additional notice of this. In addition, media coverage and other reports notified UCLA that students of Jewish and Israeli ancestry did not feel safe traversing Royce Quad due to the Encampment and that some were denied access to this quad and other parts of campus where their classes were held due to checkpoints, as confirmed by the Chancellor's public statements. For example, the UCLA Chancellor's statement, dated April 30, 2024, described the Encampment as placing Jewish students "in a state of anxiety and fear." This was confirmed by the Antisemitism Task Force report's summary of the survey responses from 400 Jewish and Israeli members of the UCLA community and the report's descriptions of checkpoints set up at the Encampment for Jewish students who refused to "denounce their Zionism," as well as the report's discussion of incidents of violence against Jews, Israelis, and pro-Israel counter-protestors by "armed" protesters at the Encampment. (Antisemitism Task Force Report at 11, 53-54, 57-58, 62.) Then, after the counter-protestors' assault on the pro-Palestinian protesters at the Encampment on April 30, 2024, and the subsequent UCLA police and other law enforcement removal of the pro-Palestinian protestors on May 1 and 2, 2024, the UCLA Chancellor issued two more statements acknowledging the violence and the protestor and counter-protestor students who had been injured, otherwise harmed, and rendered afraid, further confirming notice of an apparent hostile environment based on students' shared ancestry on campus.

Even before receiving notice of the verbal and physical harassment based on shared ancestry stemming from the Encampment, UCLA received over 150 reports in the two months (October and November 2023) following the Hamas attack on October 7, 2023, including more than 80 complaints about protests and rallies in the two days following one of SJP's protests on October 25, 2023. In addition, UCLA received eight formal complaints on behalf of Jewish students against SJP in October and November 2023. UCLA also received repeated complaints about doxing of law students based on their actual or perceived Palestinian, Muslim, or Arab ancestry. UCLA's official communications to the community in October and November 2023, referring to acts of antisemitism, anti-Muslim discrimination, bigotry, and intimidation, as well as the fear and anxiety experienced by members of the campus community, indicate that UCLA, including its law school, had actual notice of an apparent hostile environment for students based on their shared ancestry.

Similarly, UC Santa Barbara, UC Davis, UC San Diego, and UC Santa Cruz all had incidents widely reported in the media regarding alleged discrimination based on national origin, including shared ancestry. At UC Santa Barbara, there was significant media coverage of the posters at the Center stating, among other things, that Zionists were not welcome, and targeting some specific Jewish students. In addition, UC Santa Barbara received a complaint of antisemitic vandalism at a dorm room and alleged antisemitic activities of SJP members or others. The evidence to date also shows that UC San Diego and UC Davis received complaints about students witnessing or experiencing antisemitic comments or actions by students and professors at protests, online, and/or in campus departments. Like UCLA, the Chancellors at UC Santa Barbara, UC San

Diego, UC Davis, and UC Santa Cruz made statements to their respective campus communities noting hate speech, antisemitism, anti-Muslim discrimination, and/or other harms that students on their respective campuses have experienced, indicating that these four universities also had actual notice of alleged harassment based on shared ancestry and the possible resulting hostile environment for affected students.

### B. The Universities' Responses to the Notice

OCR identified two compliance concerns under Title VI with regard to the Universities' response to notice of a hostile environment. First, OCR identified a compliance concern because the Universities appear to have failed to take steps reasonably calculated to eliminate and prevent the recurrence of any possible or apparent hostile environment based on national origin, including shared ancestry, when the alleged conduct or University-confirmed conduct involved protected speech. Second, OCR identified a compliance concern that the Universities' responses to notice of a possible or apparent hostile environment may not have been effective at stopping the harassment, preventing its recurrence, and remedying its effects.

With regard to the Universities' responses to reported or witnessed conduct likely constituting protected speech, OCR identified several examples that underly its concern. In April 2024, UCLA effectively allowed the Encampment to occur and to persist on campus because it determined that it involved protected speech under the First Amendment even after learning that individuals at the Encampment were limiting some students' equal access to classes and other UCLA programs based on their shared Jewish and Israeli ancestry. The Chancellor's statements expressed concern for the safety of Jewish and Israeli students on April 30, 2024, acknowledged instances of violence at the Encampment and concerns for student safety involving pro-Palestinian demonstrators on May 1, 2024, and for both pro-Palestinian and pro Jewish and pro-Israeli counter-demonstrators at the Encampment on May 2, 2024. While these statements were well-intentioned, they do not appear to have been effective at stopping the violence or other physical and verbal harassment.

The evidence to date also raises a concern that UCLA appears to have failed to respond promptly or effectively to notice of pro-Palestinian demonstrators being forcefully attacked in the night by counter-protestors. The UCLA Chancellor acknowledged that the "violent clashes between demonstrators and counterdemonstrators […] created an environment that was completely unsafe for learning." While the rallies, walk-outs, and various protests, including the Encampment, likely included facets that were protected by the First Amendment, UCLA appears to have failed to examine whether these events created a hostile environment for students based on their shared ancestry. Further, with regard to the counter-protestors' attack on the protestors at the Encampment the night of April 30, 2024, that resulted in injuries for students of shared Palestinian, Muslim, and Arab ancestries, apparently due in part to UCLA's police delayed and/or ineffective response to this violence, followed by an apparent violent law enforcement removal of the Encampment on May 2, 2024, UCLA's police response appears to have exacerbated the hostile environment for these students. Lastly, UCLA's response to the hostile environment stemming from the Encampment appears not to have been sufficiently prompt because UCLA is still, more than four months later, assessing how to respond to protests like this

Page 31

and as part of a process UCLA has contracted with an external firm to conduct, which began in October 2024.

Similar to these compliance concerns about the Encampment at UCLA, OCR also has a concern that after rallies, walk-outs, protests and counter-protests occurred at the UCLA campus in the immediate aftermath following October 7, 2023, the UCLA DOS appears to have ended its inquiry when it made determinations that certain reported incidents involved protected speech under the First Amendment, without having evaluated whether the incidents nonetheless created a hostile environment for affected students.  Some reports that UCLA received during this time period alleged concerns about student safety, "hate speech," and swastikas.  This concern is heightened for UCLA's responses to students expressing concerns about possible violence on campus, including a student who asked that a protest be canceled due to possible violence, various students who reported feeling unsafe on campus, reports of chants at protests such as "there is no peace until they're dead," and SJP social media posts alluding to the use of violence at protests.

OCR also has a concern that when UC Santa Barbara determined that the posting of signs at the Center amounted to protected speech, UC Santa Barbara appears based on the record produced to date not to have evaluated if the signs nonetheless created a hostile environment for Jewish students at the Center.  OCR identified a similar concern about UC San Diego's determination that an art installment including swastikas was protected speech given the apparent failure to evaluate if the installment created a hostile environment for Jewish students.  This concern extends to UC Davis's determination that social media posts by a student stating a desire to [redacted content] a student described as a "f*** Zionist" constituted protected speech.

While some of the alleged incidents of harassment based on shared ancestry at the Universities likely constituted protected speech, to the extent these incidents contributed to or created a hostile environment based on national origin, including shared ancestry, OCR is concerned that the Universities have not demonstrated in the record produced to date that they fulfilled their legal obligation under Title VI to promptly evaluate if such a hostile environment existed, and if so, how to redress its effects.

OCR also has a compliance concern that the Universities' responses to notice of a possible hostile environment at UCLA and a possible hostile environment on the other campuses appear not to have been effective at stopping the harassment, preventing its recurrence, and remedying its effects.  For example, after October 7, 2023, UCLA received repeated concerns about on-campus protests and rallies, including more than 80 reports in the two days following one of these protests.  Despite this volume, information reviewed by OCR to date does not indicate that UCLA looked at these reports cumulatively to assess if the totality of the circumstances created a hostile environment for certain students based on their national origin, including shared ancestry, rather than treating each report as a single isolated incident.  The fact that the UCLA Chancellor issued repeated statements to the community in October and November 2023, indicates that the reported incidents of alleged antisemitism, anti-Muslim sentiment, bigotry, and intimidation to which the Chancellor alluded, were continuing to occur on campus and were continuing to be reported to UCLA.  This evidence suggests that these campus-wide advisories and other actions that UCLA was taking at the time to address the unrest on its campus were not effective in

THIRD RASSBACH DECLARATION EXHIBIT 5

stopping these types of alleged incidents of harassment and different treatment based on shared Jewish, Palestinian, Muslim, and/or Arab ancestry.

Similarly, it appears that the UCLA Law School's response to reports of doxing, including issuing two advisories to the law school community, did not stop and prevent their recurrence, as evidenced by this issue being raised again in February 2024.

The evidence also shows that UCLA received reports from students who expressed feelings of unsafety and a desire to transfer or unenroll due to their safety concerns; however, documentation produced to OCR to date did not indicate if UCLA offered those students supports to preserve or restore their equal access to UCLA's programs and activities.  While the evidence revealed instances when UCLA informed students of supports available through CAPS, OCR heard from two students that those resources were not financially accessible to some students or were not available in practice due to long waits, reinforcing OCR's concern that the steps UCLA took in response to these reports may not have been effective.

With respect to UC Santa Barbara, the evidence shows that Student 4 was repeatedly the target of harassment as evidenced by the posters and graffiti targeting [redacted content] at the Center and at the School of Education in [redacted content], as well as her reports of online and in-person harassment earlier in [redacted content] 2023.  Similarly, Student 3 reported being filmed despite asking students to stop while [redacted content] in the Center, finding posters with derogatory language about [redacted content], and later being followed and watched as she was in the Center trying to study.  Student 6 reported feeling threatened by students when students made threatening gestures of [redacted content], another person wished Student 6's family in Israel died, another person compared Student 6 to the KKK, and another student wearing a keffiyeh yelled "f*** you Zionist" at Student 6.  While UC Santa Barbara took some steps to address individual incidents, it did not provide OCR with evidence indicating that it evaluated or determined whether Student 3, Student 4, or Student 6 were subjected to a hostile environment based on the totality of the events that they experienced.  Nor did UC Santa Barbara provide OCR with evidence of having determined whether a hostile environment was created for other students who witnessed these events.

Lastly, while OCR recognizes that UC San Diego promptly and effectively addressed the listserv incident, the evidence to date does not indicate that UC San Diego evaluated whether the listserv messages, coupled with several other alleged harassing incidents based on shared Jewish ancestry on campus such as protests, create a hostile environment for affected Jewish students or faculty.  This is another example raising OCR's concern that the Universities appear not to be evaluating whether the totality of the circumstances involving allegations of harassment based on shared ancestry have rendered the educational environment hostile to students of that shared ancestry and require prompt and effective steps to eliminate it, prevent its recurrence, and remedy its effects on affected students.

### C.  Different Treatment

Based on the evidence to date, OCR has a compliance concern that UCLA, UC Santa Barbara, and UC San Diego may have failed to ensure equal access to their educational programs and

facilities for students based on national origin, including shared ancestry, as required by Title VI and its regulations.

With regard to the Encampment, UCLA appears to have failed to take prompt or effective action upon notice that students were being physically blocked from accessing parts of the campus based on their actual or perceived Jewish and/or Israeli shared ancestry and/or the association with these national origins/shared ancestries.  For example, evidence to date indicates that UCLA had notice that protestors within the Encampment maintained checkpoints that barred students of actual or perceived Jewish and/or Israeli shared ancestry from entering the Encampment and accessing parts of the UCLA campus, including the Jewish student OCR interviewed who stated that he was denied entry at a checkpoint on [redacted content], due to being Jewish and a Zionist. The Chancellor's statement on April 30, 2024, acknowledged that "students on their way to class have been physically blocked from accessing parts of the campus," and OCR is concerned that UCLA does not appear to have taken prompt and effective steps to restore this access for students of shared Jewish ancestry.  This apparent failure is strongly indicated by the findings in the *Frankel* court order and its injunction requiring UCLA to ensure Jewish students' equal access to its "ordinarily available programs, activities, and campus areas."  (*Frankel* Order at 14.)  This apparent failure is also indicated by the Antisemitism Task Force Report, which stated that some of the surveyed UCLA students reported being denied entry to the Encampment due to being Jewish, having their routes on campus blocked due to the Encampment, and being prevented from getting to class on time and utilizing campus resources due to the Encampment.

OCR also identified a concern about apparent different treatment of students based on their national origin/shared ancestry at UC Santa Barbara in February 2024.  The evidence to date indicates that UC Santa Barbara appears to have failed to ensure that Jewish students had equal access to use of the Center.  The Center housed various UC Santa Barbara programs and the [redacted content].  In late February 2024, signs appeared at the Center explicitly stating that Zionists were not welcomed and that Jewish students should "stay away" from the Center kitchen, likely in reference to a Shabbat meal planned at the Center.  Given that the messaging was also posted on the Center's official website, albeit briefly, this may have communicated to Jewish students that the Center supported the message that Jewish students were not welcome. This message may have been further communicated by Center staff members because Student 3 reported to OCR being followed by Center student staff members wearing keffiyehs as she was trying to study and that these staff members followed her, stood on either side of her, and watched her and other Jewish students as they tried to use the Center to study.  These reports raise a concern that Jewish students may have been denied equal access to the Center based on their shared ancestry.

At UC San Diego, University policy prohibits the canceling of classes to encourage student participation in protests, and yet the evidence to date raises a concern that UC San Diego faculty may have engaged in different treatment of students based on shared ancestry in the application of this policy.  The evidence indicates that UC San Diego received reports that faculty were providing academic credit to students for attending anti-Israel protests and that UC San Diego found that the Department of Ethnic Studies suspended classroom sessions on a day in which there was an anti-Israel protest.  OCR has a concern that some UC San Diego faculty appear to have provided academic credit to students for participating in anti-Israel protests or to have

canceled classes to encourage student participation in anti-Israel protests and that this apparent different application of the policy prohibiting such conduct may have denied Jewish students equal access to academic credit opportunities and the educational class programming, based on their shared Jewish ancestry.

Regarding Student 1's three allegations of different treatment by UCLA, OCR found insufficient evidence to support a conclusion that UCLA failed to comply with Title VI or its regulations. Specifically, by the time Student 1 expressed her interest in auditing the course, there were already 21 students enrolled in the course with three students on the waitlist. The information provided by UCLA corroborates the professor's proffered reason for not allowing Student 1 to audit the course, which was that the course was full and oversubscribed; and not due to any alleged different treatment of Student 1 based on her shared Jewish ancestry. Similarly, with regard to Student 1's allegation of SJP's movie screening, there was insufficient evidence that the movie screening was part of the program or activities offered by UCLA or that that UCLA had notice of the alleged different admission fee being charged. Finally, the information Student 1 provided regarding her removal [redacted content.] was insufficient to establish different treatment based on national origin/shared ancestry under Title VI. The [redacted content] to remove Student 1 [redacted content] was based not on Student 1's shared Jewish ancestry but based on action that [redacted content].

## IV.    Conclusion

This concludes OCR's consideration of the cases opened for investigation at the Universities identified in the case numbers on the first page of this letter.

To address the complaint allegations and OCR's concerns identified in the investigations, the University of California, without admitting to any violation of law, entered into the enclosed Agreement. Through the Agreement, the University of California and the Universities will provide for OCR's review and approval any changes to their nondiscrimination policies and procedures, conduct annual training, audit complaints and reports of discrimination, conduct climate assessments, communicate its commitment to university communities to address discrimination including harassment, and remedy individual instances of discrimination.

Based on the commitments made in the enclosed resolution agreement, OCR is closing the investigations of the complaints as of the date of this letter and notifying the parties concurrently. When fully implemented, the Agreement will address OCR's identified compliance concerns. OCR will monitor the implementation of the Agreement until the University of California is in compliance with its terms and the statutes and regulations at issue in the case.

This letter sets forth OCR's determination in individual OCR cases. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

OCR would like to make you aware that individuals who file complaints with OCR may have the right to file a private suit in federal court whether or not OCR finds a violation.

Page 35

Please be advised that the University of California and the Universities must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law enforced by OCR.  If this happens, the individual may file a retaliation complaint against the Universities with OCR.

Under the Freedom of Information Act (FOIA), it may be necessary to release this document and related correspondence and records upon request.  If OCR receives such a request, OCR will seek to protect, to the extent provided by law, personally identifiable information that could reasonably be expected to constitute an unwarranted invasion of personal privacy if released.

If you have any questions about this letter, please call our office at 415-486-5404 or me at Anamaria.Loya@ed.gov.

Sincerely,


/s/

Anamaria Loya
Chief Regional Attorney


Enclosure: Agreement