1  MATTHEW R. COWAN (S.B. #281114)
2  mcowan@omm.com
   O'MELVENY & MYERS LLP
3  400 South Hope Street, 19th Floor
   Los Angeles, California  90071-2899
4  Telephone:  (213) 430-6000
   Facsimile:   (213) 430-6407
5
6  ANTON METLITSKY*
   ametlitsky@omm.com
7  JENNIFER SOKOLER*
   jsokoler@omm.com
8  O'MELVENY & MYERS LLP
   1301 Avenue of the Americas, Suite 1700
9  New York, NY 10019
   Telephone:  (212) 326-2000
10 Facsimile:   (212) 326-2061
11 MEAGHAN VERGOW*
   mvergow@omm.com
12 O'MELVENY & MYERS LLP
   1625 Eye Street, N.W.
13 Washington, D.C. 20006
   Telephone:  (202) 383-5300
14 Facsimile:   (202) 383-5414
15 *Attorneys for Defendants*
16 *Admitted pro hac vice*
17 [*Counsel continued on next page*]
18            UNITED STATES DISTRICT COURT
19            CENTRAL DISTRICT OF CALIFORNIA
             WESTERN DIVISION – LOS ANGELES
20
21 Frankel, et al.,                    Case No. 2:24-CV-4702-MCS-PD

22                 Plaintiffs,          **DEFENDANTS' MEMORANDUM OF
                                       POINTS AND AUTHORITIES IN
23       v.                             OPPOSITION TO PLAINTIFFS'
                                       MOTION FOR PARTIAL SUMMARY
24 Regents of the University of         JUDGMENT AND PERMANENT
   California, et al.,                  INJUNCTION**
25
                  Defendants.          Judge:      Hon. Mark C. Scarsi
26                                      Courtroom:  7C
                                       Hearing:    May 12, 2025, 9:00 AM
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[*Counsel continued from previous page*]

Charles Robinson (S.B. #113197)
Rhonda Goldstein (S.B. #250387)
Norman Hamill (S.B. #154272)
The Regents of the University of California
1111 Franklin Street, Floor 8
Oakland, California 94607-5201
Telephone:   (510) 987-9800
Facsimile:   (510) 987-9757

*Attorneys for Defendants*

DEFS.' MEM. IN OPP. TO PLFS.' MOT.
FOR PARTIAL SUMMARY JUDG.
CASE NO. 2:24-CV-4702-MCS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 7

BACKGROUND .................................................................................................. 9

I.     FACTUAL BACKGROUND ................................................................... 9

      A.    UCLA Condemns and Addresses Antisemitic Conduct
           Throughout the 2023-2024 Academic Year ................................ 9

      B.    UCLA's Response to the Royce Quad Encampment ............... 10

      C.    UCLA Strengthens Its Capacity to Respond to Protests ......... 12

      D.    UCLA Expands Its Efforts to Combat Antisemitism ............... 15

II.    PROCEDURAL HISTORY ................................................................... 16

LEGAL STANDARD ....................................................................................... 17

ARGUMENT .................................................................................................... 17

I.     DEFENDANTS ARE ENTITLED TO SOVEREIGN
      IMMUNITY ........................................................................................ 17

II.    PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT ON
      THEIR  FREE EXERCISE CLAIMS ................................................. 18

      A.    The Undisputed Record Does Not Show That Plaintiffs'
           Alleged Injuries Were Caused by Defendants' Actions ........... 18

      B.    There Is No Evidence That Defendants Took Action
           Targeting Plaintiffs' Religious Practice ................................... 21

      C.    Defendants' Response to the Encampment Was Narrowly
           Tailored to Promote Public Safety ........................................... 23

III.   PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SHOW
      THEY ARE ENTITLED TO A PERMANENT INJUNCTION ........ 25

CONCLUSION ................................................................................................. 28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Balboa Cap. Corp. v. Shaya Med. P.C. Inc.*,
   623 F. Supp. 3d 1059 (C.D. Cal. 2022)................................................17

*Cause & FX Ltd. v. Saban Films, LLC*,
   2021 WL 6104414 (C.D. Cal. Nov. 10, 2021) ..................................26

*Charlton v. Est. of Charlton*,
   841 F.2d 988 (9th Cir. 1988)................................................................25

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ............................................................................21

*Cont'l Airlines, Inc. v. Intra Brokers, Inc.*,
   24 F.3d 1099 (9th Cir. 1994) ..............................................................25

*Cuviello v. City of Vallejo*,
   944 F.3d 816 (9th Cir. 2019)...............................................................27

*Davidson v. Univ. of Haw.*,
   2021 WL 2697514 (D. Haw. June 30, 2021) .....................................17

*Davis v. John*,
   485 F. Supp. 3d 1207 (C.D. Cal. 2020)...............................................18

*Davis v. United States*,
   854 F.3d 594 (9th Cir. 2017)...............................................................17

*Feied v. Regents of Univ. of Cal.*,
   188 F. App'x 559 (9th Cir. 2006)........................................................18

*Felber v. Yudof*,
   851 F. Supp. 2d 1182 (N.D. Cal. 2011)...............................................19

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023)................................................................26

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021) ............................................................................22

*Garcia v. Cnty. of Alameda*,
   2024 WL 4476659 (N.D. Cal. Oct. 11, 2024)......................................23

*In re Patio Indus.*,
   220 B.R. 672 (C.D. Cal. 1996), *aff'd*, 141 F.3d 1178 (9th Cir. 1998)...............25

DEFS.' MEM. IN OPP. TO PLFS.' MOT.
FOR PARTIAL SUMMARY JUDG.
CASE NO. 2:24-CV-4702-MCS

# TABLE OF AUTHORITIES

**Page**

*Johnson v. City of San Jose,*
    591 F. Supp. 3d 649 (N.D. Cal. 2022).................................................................11

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ..........................................................................................21

*Klickitat Cnty. v. Columbia River Gorge Comm'n,*
    770 F. Supp. 1419 (E.D. Wash. 1991) ...............................................................25

*Lytle v. Wondrash,*
    182 F.3d 1083 (9th Cir. 1999)............................................................................17

*Mandel v. Bd. of Trs. of Cal. State Univ.,*
    2018 WL 1242067 (N.D. Cal. Mar. 9, 2018) .....................................................24

*Meinecke v. City of Seattle,*
    99 F.4th 514 (9th Cir. 2024).......................................................................23, 24

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012)..............................................................................27

*Menotti v. City of Seattle,*
    409 F.3d 1113 (9th Cir. 2005)............................................................................23

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
    518 F. Supp. 2d 1197 (C.D. Cal. 2007).............................................................25

*Nelson v. NASA,*
    530 F.3d 865 (9th Cir. 2008), *rev'd & remanded on other grounds,*
    562 U.S. 134 (2011) ..........................................................................................27

*Patel v. Kent Sch. Dist.,*
    648 F.3d 965 (9th Cir. 2011)..............................................................................19

*Roberts v. AT&T Mobility LLC,*
    877 F.3d 833 (9th Cir. 2017)..............................................................................19

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ..........................................................................................20

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ............................................................................................22

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.,*
    450 U.S. 707 (1981) ..........................................................................................20

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022).............................................................................22

# TABLE OF AUTHORITIES

**Page**

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   582 U.S. 449 (2017) ................................................................21

*United States v. Rundo*,
   108 F.4th 792 (9th Cir. 2024) ................................................24

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ................................................................25

*Vanke v. Block*,
   2002 WL 1836305 (C.D. Cal. Aug. 8, 2002), *rev'd on other
   grounds*, 77 F. App'x 948 (9th Cir. 2003) ............................27

*W. Watersheds Project v. Abbey*,
   719 F.3d 1035 (9th Cir. 2013) ........................................17, 25

*Will v. Mich. Dep't of State Police*,
   491 U.S. 58 (1989) ................................................................17

## STATUTES

Cal. Penal Code § 409 ................................................................11, 20

Cal. Penal Code § 835a ................................................................11

## RULES

Fed. R. Civ. P. 25(d) ................................................................7

Fed. R. Civ. P. 56(a) ................................................................17

## INTRODUCTION

The University of California, Los Angeles ("UCLA") is steadfast in its commitment to combatting antisemitism and to maintaining a safe and inclusive environment for the entire campus community, including Jewish students and faculty. While UCLA has not been immune to the "disturbing rise of antisemitism that has occurred across our country since the horrific attack on Israel of October 7th," Additional Material Facts ("AMF") ¶ 5, it has been anything but complacent. UCLA and the Regents of the University of California ("UC" or "University") have worked tirelessly to respond to fast-paced events on campus ever since.

Here, Plaintiffs—three UCLA students and one UCLA faculty member—bring this action based principally on their claim that Defendants "affirmatively assisted" discriminatory conduct by activists who created encampments in Spring 2024 to protest the war between Israel and Hamas. FAC ¶ 445.[1] They have moved for summary judgment in part and for a permanent injunction based on their Free Exercise Claims. ECF 128. In order to succeed on their motion, Plaintiffs must show by undisputed facts that Defendants, rather than private parties, intentionally violated their constitutional rights. While it is possible to second-guess some of Defendants' judgments with the benefit of hindsight, what cannot be second-guessed is that—contrary to Plaintiffs' assertions—neither the University nor any Individual Defendant intentionally targeted Jewish students or intentionally burdened their free exercise of religion.

---

[1] Defendants include the University and the Individual Defendants, the administrators named in this lawsuit. The administrators are: Michael V. Drake, President of the University of California; Julio Frenk, Chancellor, University of California, Los Angeles; Darnell Hunt, Executive Vice-President and Provost; Michael Beck, Administrative Vice Chancellor; Monroe Gorden, Jr., Vice Chancellor; and Steve Lurie, Assistant Vice Chancellor; as well as Former Chancellor, Gene D. Block, and Former Vice Chancellor, Rick Braziel, to the extent Plaintiffs sue Mr. Block and Mr. Braziel in their personal capacities. *See* Fed. R. Civ. P. 25(d) (successors automatically substituted into case for official-capacity claims).

No one disputes that when tents were erected at the UCLA campus on April 25, 2024, UCLA faced a volatile challenge.  The encampment in Royce Quad needed to be disbanded, but that had to be done safely.  Consistent with long-standing UC guidance, UCLA implemented a tiered approach:  First, it attempted de-escalation to avoid violence.   When that approach proved untenable, UCLA called law enforcement, leading to the arrest of more than 200 people and the end of the encampment on May 2, 2024.  But there is *no* evidence that Defendants themselves participated in or assisted the protesters' exclusionary conduct.   And at bare minimum, Plaintiffs' contrary assertion is deeply disputed.  Plaintiffs' motion should be denied on that basis alone.  The motion should be denied for additional reasons:

- Sovereign immunity bars constitutional claims against the University.

- Plaintiffs' claims against Defendants independently fail because Plaintiffs cannot show (much less by undisputed facts) (i) that Defendants, rather than private parties, violated their constitutional rights; (ii) that Defendants targeted Jewish students or faculty based on their religious status; or (iii) that Defendants' response to the encampment was not narrowly tailored to promote public safety.

- Finally, the undisputed record does not support Plaintiffs' request for permanent injunctive relief.   Last summer, when the Court considered Plaintiffs' request for a preliminary injunction, it expressed concern that there would be protests on the UCLA campus that would "again restrict certain Jewish students' access to ordinarily available programs, activities, and campus areas."   ECF 89 at 13. The record, however, shows that since disbanding the Royce Quad encampment, Defendants have undertaken significant efforts to prevent and respond to unauthorized protests, and no such restrictions occurred.  Those efforts have succeeded in preventing subsequent efforts to occupy portions of the UCLA campus so permanent injunctive relief is not warranted.

1    For these reasons, and those below, the Court should deny Plaintiffs' partial
2    motion for summary judgment and injunctive relief.

3                                    **BACKGROUND**

4    **I.    FACTUAL BACKGROUND**

5           UCLA rejects antisemitism and is committed to equal treatment of all
6    "individuals on the basis of expression of race, color, ethnicity, gender, age,
7    disability, religious beliefs, political preference, sexual orientation, gender identity,
8    citizenship or national origin, among other personal characteristics." AMF ¶ 1; FAC
9    ¶ 19.[2]  The University's policies prohibit discrimination based on protected traits.
10   AMF ¶ 2; *see* FAC ¶¶ 19, 66-67.  As a public university, the University must also
11   comply with the First Amendment.   AMF ¶ 3; *see* FAC ¶ 66.   Thus, while the
12   University has adopted restrictions that limit when, where, and how students may
13   protest, AMF ¶ 4; *see* FAC ¶¶ 68-69, it does not and cannot limit the content or the
14   viewpoints expressed during on-campus protests, *see* AMF ¶ 4.

15          The past academic year put these time-honored principles to the test.   On
16   October 7, 2023, Hamas launched an unprecedented terrorist attack on Israel, FAC
17   ¶ 74, a tragic event that sparked a rise in antisemitism across universities nationwide,
18   *id.*, including UCLA, AMF ¶ 5.

19          **A.    UCLA Condemns and Addresses Antisemitic Conduct
20                  Throughout the 2023-2024 Academic Year**

21          Following the October 7 attack, UCLA sought to curb antisemitism on campus.
22   UCLA unequivocally condemned displays of anti-Jewish hostility on campus and
23   affirmed its commitment to combating antisemitism and fostering an environment
24   where all community members feel safe, secure, and welcome.  AMF ¶ 6; FAC ¶ 84.
25   In a campus-wide message in October 2023, Chancellor Block stated that while the
26   "ongoing conflict in the Middle East" had "stirred very deep emotions in many of
27   us," those emotional responses did not "give anyone in our community—or anyone

28   _____
     [2] Unless otherwise stated, all emphasis is added, alterations and quotations omitted.

DEFS.' MEM. IN OPP. TO PLFS.' MOT.
FOR PARTIAL SUMMARY JUDG.
CASE NO. 2:24-CV-4702-MCS

visiting our campus—license to make our students, staff or faculty feel unsafe." AMF ¶ 7; *see* FAC ¶ 84.  Chancellor Block affirmed that UCLA "unequivocally reject[s] bigotry and hate," including antisemitism, and promised that UCLA was engaged in "protect[ing] the safety and well-being of all Bruins."  AMF ¶ 8.

Throughout the academic year, Chancellor Block reaffirmed UCLA's commitment to creating a safe learning environment for all students, pledging to "work against" antisemitism.  AMF ¶ 9; *see* FAC ¶ 90.  For instance, Chancellor Block denounced "hateful behavior" and "despicable Antisemitic language" at a protest on November 8, 2023.  AMF ¶ 10; *see* FAC ¶ 89.  UCLA reaffirmed that these hateful viewpoints, even if protected by the First Amendment, were "abhorrent and completely unacceptable," promising that it would "review[] the actions at the event" and hold accountable anyone found to have violated UCLA's code of conduct.  AMF ¶ 11.  Whenever graffiti was found on campus displaying antisemitic symbols, it was promptly removed by university officials.  AMF ¶ 12.  Beyond "denounc[ing] bigotry," UCLA joined with the entire UC system to also "actively work against it," including through "systemwide initiatives" to "address the current university climate."  AMF ¶ 13.  While these efforts have not purged the campus of antisemitism, they improved the climate for much of the year.

### B.    UCLA's Response to the Royce Quad Encampment

In April 2024, pro-Palestinian protest encampments appeared on campuses across the country.  *See* AMF ¶ 14.  UCLA Administrators monitored these developments and discussed strategies for making a plan if a similar protest were to erupt at UCLA.  AMF ¶ 15.

In the early hours of April 25, protesters began erecting tents in Royce Quad at the center of UCLA's main campus.  AMF ¶ 16.  Given the UCLA Police Department's ("UCLA PD") level of resources at that time, it was not operationally feasible for UCLA PD to dismantle the encampment immediately.  AMF ¶ 17.

That morning, senior UCLA leaders convened to discuss strategies to end the

encampment.  AMF ¶ 18.  UCLA's goal was always to *disband* the encampment—not to facilitate the unauthorized protest.  AMF ¶ 19.  The hard question was how to do so safely, effectively, and permanently.  AMF ¶ 19.  Mindful that schools like the University of Southern California and Columbia University had recently called law enforcement to end similar protests, only to have new encampments rebuilt within days, UCLA decided to first attempt a de-escalation strategy to have the encampment removed peacefully and durably.  AMF ¶ 20.

De-escalation is a reliable, effective, and commonly used strategy to respond to protest activity.  AMF ¶¶ 21-22.  De-escalation is also consistent with California law, which requires law enforcement to take certain steps before arresting people for unlawful assembly, *see* Cal. Penal Code § 409 (requiring dispersal order and time to disperse), and federal and state restrictions on the lawful use of force, *see Johnson v. City of San Jose*, 591 F. Supp. 3d 649, 662-63 (N.D. Cal. 2022) (denying qualified immunity where officers used non-lethal projectiles to disperse an unlawful protest); Cal. Penal Code § 835a (use of force must be "exercised judiciously").

In accordance with the de-escalation strategy, on April 25, UCLA installed metal bike racks around the encampment to discourage an expansion of its footprint. AMF ¶ 23.  Even during the de-escalation phase, law enforcement monitored the encampment.  AMF ¶ 24.

The following day, on April 26, UCLA received and granted a request from the Israeli American Council to hold a pro-Israel rally on April 28, 2024, directly opposite the encampment.  AMF ¶ 25.  In anticipation of that demonstration, UCLA increased the number of metal bike racks surrounding the encampment and specifically established two "neutral zones" to help maintain campus safety by preventing clashes between the two opposing groups of protesters.  AMF ¶¶ 26-27. UCLA's security team, which included third-party security and crowd management personnel, was instructed to prevent anyone from accessing the neutral zones.  AMF ¶ 28.  The security team was also instructed to attempt to de-escalate any direct

confrontations between those in the encampment and counter-protesters.  AMF ¶ 29.

Despite UCLA's efforts to maintain order, violence broke out during the April 28 counter-protest.  AMF ¶ 30.  Based on this experience, UCLA decided that the de-escalation strategy could not be given any more time, and decided to pursue a law enforcement response.  AMF ¶ 31.  UCLA PD projected that due to the size of the encampment, it would take days to assemble the necessary resources to do so.  AMF ¶ 32.  In other words, events that took place after April 28 occurred *after* UCLA sought law enforcement assistance.

On or around Monday, April 29, UCLA learned that individuals in the encampment had moved metal barriers and blocked certain entrances to university buildings around Royce Quad, including an entrance on the western side of Powell Library.  AMF ¶ 33.  When UCLA became aware of these blockages, it had them removed.  AMF ¶ 33.  UCLA also stationed personnel to help students navigate around the encampment and access campus buildings through other pathways that remained open.  AMF ¶ 34.  UCLA continued to increase the security presence in the area during this time.  AMF ¶ 34.

The next day, protesters in the encampment received notice that the encampment was unlawful, and that they should disperse—a prerequisite for law enforcement to remove them.  AMF ¶ 35.  By this time, the encampment had grown to at least 500 individuals during the day.  AMF ¶ 36.  Before a critical mass of police could be assembled to remove the encampment, assailants violently attacked the encampment that night.  AMF ¶ 37.  It took several hours for law enforcement to subdue the violence.  AMF ¶ 37.

On May 1, more than 200 protesters refused to leave the encampment and were arrested.  AMF ¶ 39.  The Royce Quad encampment was removed by law enforcement late that night into the morning of May 2.  AMF ¶ 40.

**C.    UCLA Strengthens Its Capacity to Respond to Protests**

Since UCLA removed the Royce Quad encampment, it has significantly

enhanced its capacity to respond to protests and successfully prevented numerous attempts to reoccupy portions of its campus.

<u>Office of Campus and Community Safety ("OCS")</u>.  Just days after the Royce Quad encampment was disbanded, UCLA announced the creation of OCS, led by an Associate Vice Chancellor ("AVC") who reports directly to the Chancellor, AMF ¶ 43, and subsequently reassigned the Chief of UCLA PD at the time of the Royce Quad encampment, AMF ¶ 44.  Additionally, the University of California Office of the President retained a nationally recognized law enforcement consulting firm to conduct an independent review of UCLA's security measures.  AMF ¶ 45.  The law enforcement consulting firm completed its investigation in November 2024, and UCLA is reviewing its recommendations.  AMF ¶ 45.

The inaugural AVC of OCS was Rick Braziel, who brought to this role 33 years of experience in the Sacramento Police Department and expertise reviewing law enforcement response to significant incidents, including, for example, the riots in Ferguson, Missouri.  AMF ¶ 46.  UCLA hired AVC Braziel to an interim position to launch OCS's operations, and, on February 1, 2025, Steve Lurie took the helm. AVC Lurie, like AVC Braziel, brings invaluable experience to the role.  AMF ¶ 47. AVC Lurie served 27 years with the Los Angeles Police Department ("LAPD"), most recently as a commander.  During his time with LAPD, AVC Lurie served as LAPD's liaison to Los Angeles's Jewish community, was a commander in LAPD's Office of Constitutional Policing and Policy, and led a citywide incident management team. AMF ¶ 48.

Since the creation of OCS last May, UCLA's day-to-day responsibility for campus safety incident response has shifted to an Emergency Operations Center that is empowered to make critical decisions about responding to protests on campus. AMF ¶ 49.  Indeed, Plaintiffs themselves acknowledge that UCLA spent last summer "proactively put[ting] strategies in place to respond to potential civil unrest."  SUF ¶ 126.  Under OCS's leadership, UCLA is finalizing an Emergency Operations Plan

for expressive activity, which includes flowcharts with procedures for responding to various expressive activities, event checklists, a major events tracker, internal procedures for escalation, and designating a single person to be in charge of the response. AMF ¶ 50. OCS holds bi-weekly meetings to debrief on any incidents. AMF ¶ 51.

Updating and Enforcing Time, Place, and Manner Rules. In addition to strengthening its capacity to respond to unrest on campus, UCLA has implemented an August 19, 2024, directive from University of California President Michael Drake requiring all campuses to update their rules regarding the time, place, and manner of expressive activities. AMF ¶ 53. Consistent with this directive, on September 4, 2024, UCLA announced revised policies regarding, among other things: (i) unapproved camping or encampments, (ii) unauthorized structures, (iii) activities restricting free movement of individuals on campus, and (iv) wearing a mask or face covering with the intent of intimidating any person or group or to evade identification. AMF ¶ 54. Although these efforts were underway prior to this Court's preliminary injunction order, these changes are in line with the requirements of that order. *See* ECF 89.

Protest Activity on Campus After the Royce Quad Encampment. The improvements that UCLA has made to its campus safety infrastructure and policies have achieved their intended results. Plaintiffs' motion references scattershot protests from the 2024-25 academic year that it dubs exclusionary "encampments." Mot. 9. But the underlying record shows that since May 2024, there has been *no* protest on the UCLA campus that looks anything like the Royce Quad encampment. That is because, on no fewer than ten occasions, UCLA intervened to end unauthorized protest activity on campus within a matter of hours, including by arresting around 70 protesters who refused to disperse. AMF ¶ 55. When, for example, protesters attempted to erect an "encampment" on Kerckhoff Patio, law enforcement swiftly intervened and unauthorized protesters were ordered to stay

away from campus for fourteen days pursuant to the California Penal Code. AMF ¶ 56. Other unauthorized protest events were treated similarly—more than 40 individuals were arrested on May 6, 2024; 27 individuals were arrested on June 10, 2024; and three individuals were arrested on November 19, 2024. AMF ¶¶ 57, 58, 60. Additionally, disciplinary action has been taken or is pending for 163 community members who were involved in the Royce Quad encampment and subsequent protests on campus. AMF ¶ 61.

### D. UCLA Expands Its Efforts to Combat Antisemitism

In addition to taking concrete steps to prevent protest activity from endangering UCLA's community and interfering with its educational mission, UCLA also ramped up its efforts to combat antisemitism in all the ways it manifests. In February 2024, Executive Vice Chancellor and Provost Darnell Hunt appointed faculty to a Task Force to Combat Antisemitism and Anti-Israeli Bias (the "Task Force"), which he charged with: (i) preparing a report on antisemitism and anti-Israeli bias at UCLA and (ii) making recommendations for how UCLA could better serve Jewish and Israeli community members. AMF ¶ 62. The Task Force released its report on October 16, 2024. AMF ¶ 63.

In January 2025, Dr. Julio Frenk became UCLA's new chancellor. AMF ¶ 64. Frenk is a fourth-generation physician whose paternal grandparents fled Germany in the early 1930s to build a new life in Mexico. AMF ¶ 65. On March 10, 2025, Frenk announced a new Initiative to Combat Antisemitism and appointed the professor who chaired the Task Force—Distinguished Professor Stuart Gabriel of the UCLA Anderson School—to lead it. AMF ¶¶ 66-67. The initiative will implement the Task Force's recommendations, with a focus on enhancing relevant training and education, improving UCLA's system of tracking and addressing complaints, bolstering enforcement of applicable laws and policies, and strengthening cooperation with interested stakeholders. AMF ¶ 68.

## II.    PROCEDURAL HISTORY

Plaintiffs are two Jewish law students, one Jewish undergraduate student, and one Jewish faculty member at UCLA.  SUF ¶¶ 132, 136, 139 143.  The student-plaintiffs filed this lawsuit on June 5, 2024, asserting 13 causes of action: (i) 42 U.S.C. § 1983 claims for violation of the Equal Protection Clause, Free Speech Clause, and Free Exercise Clause (Counts I-V); (ii) derivative conspiracy claims under 42 U.S.C. §§ 1985 and 1986 (Counts VII-VIII); (iii) a discrimination claim under Title VI of the Civil Rights Act of 1964 (Count VI); and (iv) state law claims for related statutory and constitutional violations (Counts IX-XIII).  Compl. ¶¶ 32-38, 320-430.

Plaintiffs moved for a preliminary injunction on June 24, 2024.  *See* ECF 48.  Defendants opposed.  *See* ECF 62.  The Court granted the motion on August 13, 2024.  *See* ECF 89.  As relevant, the Court held that Plaintiffs had established a likelihood of success on their Free Exercise claim and had satisfied the other factors warranting a preliminary injunction, including likelihood of irreparable injury.  *Id.* at 8-14.  The Court issued an injunction that, *inter alia*, prohibits UCLA from "offering any ordinarily available programs, activities, or campus areas to students if Defendants know the ordinarily available programs, activities, or campus areas are not fully and equally accessible to Jewish students."  *Id.* at 15.

On October 1, 2024, Defendants answered the complaint on behalf of UCLA and all Individual Defendants.  ECF 97.  On October 22, Plaintiffs filed the FAC, which added one plaintiff (the faculty member, Plaintiff Shamsa) and one count (Count V, an additional Free Exercise claim).  ECF 101.  The amendments to the complaint do not alter Plaintiffs' core factual allegations or legal theories.

On November 26, 2024, the Individual Defendants moved for judgment on the pleadings.  ECF 108-1, 120, 123.  That motion remains under submission.  On February 28, 2025, Plaintiffs filed a partial summary judgment motion, seeking a permanent injunction based on their Free Exercise claims.  ECF 128.

DEFS.' MEM. IN OPP. TO PLFS.' MOT.
FOR PARTIAL SUMMARY JUDG.
CASE NO. 2:24-CV-4702-MCS

## LEGAL STANDARD

Summary judgment is only appropriate when the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017) (moving party bears burden of proof). The presence of a valid immunity defense such as sovereign or qualified immunity means that a plaintiff is not entitled to summary judgment "as a matter of law." *See Lytle v. Wondrash*, 182 F.3d 1083, 1086 (9th Cir. 1999) (reversing district court's denial of defendants' summary judgment motion after concluding defendants were entitled to qualified immunity); *Davidson v. Univ. of Haw.*, 2021 WL 2697514, at *3 (D. Haw. June 30, 2021) ("Defendant's Eleventh Amendment immunity is a matter of law. Summary judgment is thus warranted … on the basis of sovereign immunity."). "In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor." *Balboa Cap. Corp. v. Shaya Med. P.C. Inc.*, 623 F. Supp. 3d 1059, 1065 (C.D. Cal. 2022).

A party seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1054 (9th Cir. 2013).

## ARGUMENT

## I.    DEFENDANTS ARE ENTITLED TO SOVEREIGN IMMUNITY

The Eleventh Amendment protects states from suits brought by private citizens. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989) (Eleventh Amendment bars suits against "States or governmental entities that are considered 'arms of the state.'"). As this Court previously concluded, the University is

considered an "arm of the state" entitled to immunity, including for claims under the First Amendment.  ECF 89 at 13 n.5 ("The Court does not issue the injunction against Defendant Regents of The University of California."); *see, e.g.*, *Feied v. Regents of Univ. of Cal.*, 188 F. App'x 559, 561 (9th Cir. 2006) ("This court has repeatedly held that The Regents are an arm of the state entitled to Eleventh Amendment immunity.") (collecting cases); *Davis v. John*, 485 F. Supp. 3d 1207, 1215 (C.D. Cal. 2020) (dismissing Free Exercise claim against California state employee in his official capacity on sovereign immunity grounds).

## II. PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT ON THEIR FREE EXERCISE CLAIMS

Plaintiffs cannot show—much less by undisputed facts—that (i) Defendants, rather than private parties, took any action that impeded their religious exercise; (ii) Defendants took any action targeting Jewish students or faculty; or (iii) that the actions that the Defendants took in response to the encampment were not narrowly tailored to promote public safety.  Accordingly, the Court should deny Plaintiffs' partial motion for summary judgment and a permanent injunction based on their Free Exercise Claim.

### A. The Undisputed Record Does Not Show That Plaintiffs' Alleged Injuries Were Caused by Defendants' Actions

Plaintiffs' Motion doubles down on the flawed theory that Defendants are liable for the actions taken by the protesters in the Royce Quad encampment because UCLA chose to pursue a de-escalation strategy rather than calling law enforcement to remove the encampment immediately.  *See* Mot. 6-7; SUF ¶¶ 61-71.  But this is now the summary judgment stage.  And there is *no* evidence that UCLA affirmatively assisted the encampment—much less that each of the Individual Defendants personally engaged in discriminatory conduct.  At the very least, the factual record shows this to be a disputed issue, meaning summary judgment is inappropriate.

The law is clear that Plaintiffs cannot bring a Free Exercise claim based on

*private parties'* conduct. *Roberts v. AT&T Mobility LLC*, 877 F.3d 833, 837 (9th Cir. 2017) (dismissing First Amendment claims for lack of state action). And, unlike Title VI, the Constitution does not extend to alleged failures to act. Under the Fourteenth Amendment, a "state is not liable for its omissions" even where state action is "necessary to secure life, liberty, or property interests," *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011).

In issuing a preliminary injunction, this Court suggested that UCLA engaged in state action—at least for purposes of the Free Exercise claims—by continuing to provide "access" to its campus for the protesters in the encampment, even as those protesters denied access to other students. ECF 89 at 11-12. But as Plaintiffs' counsel recognized, that is merely "the other side of the same coin" as an allegation that the University failed to immediately clear the encampment by force. *See* Cowan Decl. Ex. B at 17:23-18:2.[3] And under the law, Defendants did not engage in state action by failing to forcibly remove the protesters earlier. *See Felber v. Yudof*, 851 F. Supp. 2d 1182, 1186 (N.D. Cal. 2011) (holding that "state actors," including universities, "have no constitutional obligation to prevent private actors from interfering with the constitutional rights of others").

As explained in the Individual Defendants' motion for judgment on the pleadings, the cases this Court cited are not to the contrary. They stand for the proposition that a State cannot "exclud[e] individuals from public benefits based on their religious status." ECF 89 at 12 (collecting cases). For the reasons set forth below, *infra* at 21-23, Defendants did not exclude any individual "based on their religious status," ECF 89 at 12. Plaintiffs repeatedly suggest that the protesters were the relevant actors. *See, e.g.*, Mot. 2 ("*activists* limited access to the encampment"); *id.* at 5 ("*activists* established a perimeter with plywood and metal barriers"); *id.* ("*activists* established checkpoints"). Those actions cannot be attributed to

---

[3] Pursuant to L.R. 11-52, pincites are to the page number added to the bottom of each page of the exhibit, not the original document's page numbers.

Defendants simply because UCLA did not immediately resort to physical force to remove the protesters. There will always be some period—even if only hours—before law enforcement can remove protesters—indeed, California law expressly contemplates that by requiring notice and a voluntary dispersal period. Cal. Penal Code § 409. But Defendants did not provide the protesters an affirmative "benefit" during that time. Rather, the record confirms that Defendants actively sought to prevent violence and to end the encampment, which it ultimately did with the help of law enforcement, who arrested more than 200 people. AMF ¶ 39. What is more, the record that has developed since the Court issued a preliminary injunction contains no evidence that Defendants assisted the activists in maintaining the encampment or excluding Jewish students, let alone specific actions taken by each Individual Defendant. This case is thus nothing like those in which state officials affirmatively provided public benefits to some constituents but not others. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (denial of unemployment benefits to Seventh-day Adventist violated Constitution); *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 709, 720 (1981) (similar).

At a minimum, there is a material dispute of fact regarding the relationship between any of the Defendants' actions and Plaintiffs' alleged injuries. For instance, while it is undisputed that Defendants took certain actions to implement a de-escalation strategy, e.g., installing bike racks, increasing security presence around Royce Quad, and mitigating tensions through specific communication strategies, there is a dispute regarding whether the purpose of those actions was to aid the encampment rather than to maintain order so that the encampment could be peacefully disbanded. AMF ¶¶ 23, 24, 26, 34.

Accordingly, because Plaintiffs cannot satisfy the first step of proving that Defendants violated the Free Exercise Clause—state action—Plaintiffs' summary judgment motion should be denied. Holding otherwise, at this juncture and on this record, would upend decades of settled case law requiring state action for a Free

Exercise claim.

### B.    There Is No Evidence That Defendants Took Action Targeting Plaintiffs' Religious Practice

Even setting aside the lack of state action, Plaintiffs' Free Exercise claims fail for additional reasons.  As Plaintiffs concede, the Free Exercise Clause subjects to strict scrutiny only government action that "target[s] religious observers based on their religious status."  Mot. 14 (citing *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017)); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).  To prevail on summary judgment, Plaintiffs must therefore show that Defendants acted pursuant to (i) an "official expression[] of hostility" toward Jewish people or (ii) a policy that is "not neutral toward religion or generally applicable."  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 & n.1 (2022.  Plaintiffs cannot make either showing.

First, as explained above, there is no evidence that by attempting to end the Royce Quad encampment through de-escalation Defendants "actively facilitated the exclusion of students and faculty based on their Jewish faith."  Mot. 14, 15-16.  And Plaintiffs identify no "official expressions of hostility" or discriminatory policies underlying Defendants' de-escalation approach.  *See Kennedy*, 597 U.S. at 525 n.1. To the contrary, the "evidence" that Plaintiffs contend shows that UCLA targeted Jewish students and faculty—that UCLA established barriers around the encampment to prevent violence, deployed security teams who directed students toward open pathways, and initially refrained from directing law enforcement to intervene, Mot. 16 (citing SUF ¶¶ 42-74)—reflects the opposite: Defendants enacted these measures to keep *all* students and faculty safe until the encampment could be removed, regardless of religious identity.  AMF ¶ 41.  Plaintiffs cannot point to any evidence suggesting that Defendants directed the *activists'* exclusionary conduct. Nor could they: Defendants have consistently condemned antisemitic conduct, including during the encampment, as "shocking," "despicable," "abhorrent," and

DEFS.' MEM. IN OPP. TO PLFS.' MOT.
FOR PARTIAL SUMMARY JUDG.
CASE NO. 2:24-CV-4702-MCS

"completely unacceptable." AMF ¶¶ 10, 11, 38.  This Court has observed that "none of us thinks UCLA wants to have Jewish students excluded." Cowan Decl. Ex. B at 12:4-5.  The record has borne that out.

Second, Plaintiffs cannot show that Defendants treated "comparable secular activit[ies] more favorably than religious exercise." Mot. 17 (citing *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)).  Plaintiffs argue that the encampment burdened their right to support Israel while no "similar burden" was placed on "supporting any other country in the world." Mot. 17 (citing SUF ¶¶ 44-49).  But to the extent any such burden existed, it was created by the "activists" in the encampment who blocked Jewish students and faculty from accessing the portion of Royce Quad that they controlled, not Defendants. *Id.*  Nor is there evidence whatsoever that Defendants would have responded differently to a protest encampment that impacted secular groups or that Defendants instructed security officers to single out Jewish students for different treatment.  The record shows the opposite: that Defendants told security to direct *all* students and faculty around the encampment while they worked to disband it. AMF ¶¶ 28, 42.  Thus, Plaintiffs have not shown that Defendants treated secular activity better than religious activity.

Finally, Plaintiffs assert that the University's policies were not "generally applicable" because they afforded administrators "broad discretion" in deciding how to respond to the encampment. Mot. 18.  As the Individual Defendants explained in their motion for judgment on the pleadings, Plaintiffs' argument misunderstands the law. Dkt. 108-1 at 23; Dkt. 123 at 12-13.  The cases upon which Plaintiffs rely hold that a policy is not generally applicable when it contains a "formal mechanism for granting exceptions" that does not constrain a decisionmaker's discretion. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021).  But Plaintiffs identify no *exceptions* in applicable UC policies, including Robinson-Edley, which guides UCLA's response to *all* unauthorized expressive activity. *See* AMF ¶ 52; *see also Tingley v. Ferguson*, 47 F.4th 1055, 1088 (9th Cir. 2022) (rejecting Free Exercise

claim where challenged law did "not provide a formal and discretionary mechanism for individual exceptions"). There is also no factual basis for Plaintiffs' claim that the Robinson-Edley report "invites the government to treat secular interests with greater solicitude than religious ones," Mot. 19—which is perhaps why Plaintiffs do not reference any part of the report to support this assertion. Similarly, the record provides no support for Plaintiffs' argument that Defendants opted not to "enforce" their "written policies" against the encampment. Mot. 19. To be sure, the record shows that Defendants attempted to enforce the University's and UCLA's policies through de-escalation, but doing so was entirely consistent with the policies themselves.

### C. Defendants' Response to the Encampment Was Narrowly Tailored to Promote Public Safety

Even if Defendants' response to the Royce Quad encampment somehow burdened Plaintiffs' religious rights (it did not), Plaintiffs would still not be entitled to summary judgment because Defendants' actions were narrowly tailored to further a compelling government interest—promoting "public safety and security" on UCLA's campus.

Courts in the Ninth Circuit have repeatedly recognized that public safety and security are compelling interests, including in analogous contexts involving crowd control during contentious protests. *See Meinecke v. City of Seattle*, 99 F.4th 514, 525 (9th Cir. 2024) ("public safety and security are compelling interests"); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1143 n.57 (9th Cir. 2005) (city's interest in "restoring and maintaining safety and security" is compelling); *Garcia v. Cnty. of Alameda*, 2024 WL 4476659, at *6 (N.D. Cal. Oct. 11, 2024) ("public safety is a well-recognized compelling governmental interest").

Moreover, UCLA's actions were narrowly tailored to serve that compelling objective—as Plaintiffs' own motion makes clear. Plaintiffs argue that, "[a]t the very least," the "Defendants could have directed campus security teams and the UCLA

DEFS.' MEM. IN OPP. TO PLFS.' MOT. FOR PARTIAL SUMMARY JUDG. CASE NO. 2:24-CV-4702-MCS

PD to protect Jewish students and faculty by facilitating their access or escorting them through the area." Mot. 22. But that is *exactly* what Defendants did. UCLA installed barricades, posted security guards, and took other steps to protect the UCLA community, *including Plaintiffs*, while it sought to end the encampment. *Id.*; *see* AMF ¶¶ 19-24, 26-29, 34. Plaintiffs contend these actions were done to "facilitate[]" the exclusion of Jewish students rather than to "protect[]" them, Mot. 22, but—as explained above—that conclusion is deeply contested. There is ample evidence in the record that Defendants sought to minimize the risk of violence while they worked to clear the encampment. AMF ¶¶ 19-24, 26-29, 34.

Indeed, the specific measures that UCLA took, including temporary fencing and the enforcement of neutral zones, are commonplace crowd control measures. To accept Plaintiffs' theory—that such measures give rise to a constitutional claim—would hamper law enforcement's ability to protect public safety during contentious protests, rallies, and the like. *See United States v. Rundo*, 108 F.4th 792, 797 (9th Cir. 2024) ("[T]he authorities had set up fencing between rally attendees and counter-protestors[.]"); *Meinecke*, 99 F.4th at 525 (approving use of a "free speech barricade" during a "dynamic situation" such as a heated protest over a contentious issue); *Mandel v. Bd. of Trs. of Cal. State Univ.*, 2018 WL 1242067, at *3 (N.D. Cal. Mar. 9, 2018) (noting university police plans to "erect barriers and have a designated protest area outside" of an event); AMF ¶ 27 (noting "it is standard practice to keep opposing groups separate during protest and counterprotest activity. This includes through the use of barriers and other crowd control techniques and by creating and enforcing 'neutral zones' to keep opposing factions separate to prevent violence").

In short, because UCLA's actions were narrowly tailored to promote campus safety and security, they pass strict scrutiny. Plaintiffs are not entitled to summary judgment on their Free Exercise claims for this independent reason.

### III.    PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SHOW THEY ARE ENTITLED TO A PERMANENT INJUNCTION

Even if Plaintiffs were entitled to summary judgment on their Free Exercise claims, they could not satisfy the other factors necessary for permanent injunctive relief.

As a threshold matter, permanent injunctions are generally entered after a "trial on the merits." *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 391 (1981); *Cont'l Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1102 (9th Cir. 1994). That is because the factual underpinnings of injunctive relief must be sufficiently clear and detailed to indicate whether an injunction is proper. S*ee Klickitat Cnty. v. Columbia River Gorge Comm'n*, 770 F. Supp. 1419, 1426 (E.D. Wash. 1991) ("an injunction will not be awarded in doubtful cases"); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (stating that, in issuing an injunction, "[t]he devil is in the details"); *In re Patio Indus.*, 220 B.R. 672, 679 (C.D. Cal. 1996), *aff'd*, 141 F.3d 1178 (9th Cir. 1998) ("the issuance of a permanent injunction requires findings of fact and conclusions of law sufficiently detailed to indicate the factual basis for the trial court's ultimate conclusion"). A permanent injunction is premature where there are outstanding issues of material fact. *Charlton v. Est. of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988). Here, at the very least, there is a significant factual dispute regarding whether Defendants themselves took any action to exclude Jewish students from entering the encampment. That dispute alone should prevent the Court from granting permanent injunctive relief.

In any event, Plaintiffs' request for permanent equitable relief should be denied because Plaintiffs do not (and cannot) show: (1) that without such relief they will suffer irreparable harm; (2) that monetary damages are inadequate to compensate them for their alleged injury; (3) that the balance of equities tip in Plaintiffs' favor; and (4) that a permanent injunction serves the public interest. *See W. Watersheds Project*, 719 F.3d at 1054 (noting factors).

Irreparable harm.  Plaintiffs argue that they satisfy this factor because "'the loss of First Amendment freedoms ... unquestionably constitutes irreparable injury.'" Mot. 23 (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023)).  But Plaintiffs cannot show—especially on the developed record—that Defendants violated their First Amendment rights. And while the Court previously found that Plaintiffs were likely to suffer irreparable injury "given the risk that protests [would] return in the fall that [would] again restrict certain Jewish students' access to ordinarily available programs," ECF 89 at 13, the record shows that risk did not materialize.  Over the last eleven months, UCLA has continued to improve its capacity to respond to protests, and it has repeatedly succeeded in preventing protesters from occupying portions of the UCLA campus— both before and after this Court's preliminary injunction order.  *See supra* at 12-15. *See Cause & FX Ltd. v. Saban Films, LLC*, 2021 WL 6104414, at *4 (C.D. Cal. Nov. 10, 2021) ("[I]t simply does not appear equitable to" enter injunction where "Plaintiff has not adequately shown a likelihood of irreparable harm.").  Indeed, even prior to this Court's order, UCLA had:

- launched the Task Force to Combat Antisemitism;
- created the Office of Campus and Community Safety and hired Rick Braziel as Associate Vice Chancellor;
- retained a law enforcement consulting firm to conduct an independent review of UCLA's security measures;
- spent the summer—as Plaintiffs acknowledge—"proactively put[ting] strategies in place to respond to potential civil unrest," SUF ¶ 126; and
- expeditiously responded to violations of UCLA policies in May and June 2024, leading to the arrest of scores of individuals.

*See supra* at 12-15.  In these circumstances, notwithstanding that Plaintiffs obtained preliminary relief, they cannot show that without a permanent injunction their free exercise rights are likely to be impaired by another protest encampment.  *Vanke v.*

DEFS.' MEM. IN OPP. TO PLFS.' MOT.
FOR PARTIAL SUMMARY JUDG.
CASE NO. 2:24-CV-4702-MCS

*Block*, 2002 WL 1836305, at *1 (C.D. Cal. Aug. 8, 2002) (denying motion to make preliminary injunction permanent where evidence showed that defendants had "instituted measures designed to ensure compliance with the preliminary injunction"), *rev'd on other grounds*, 77 F. App'x 948 (9th Cir. 2003).

Inadequacy of monetary damages. Plaintiffs' only argument for why monetary damages are insufficient is that "'constitutional violations cannot be adequately remedied through damages.'" Mot. 23 (quoting *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd & remanded on other grounds*, 562 U.S. 134 (2011)). But as explained above, Defendants' actions in response to the Royce Quad encampment did not violate Plaintiffs' constitutional rights.

Moreover, the cases that Plaintiffs rely on in support of this argument are inapposite. Some concern *continuing* constitutional violations, in which case monetary compensation was inadequate because it would not change that the plaintiff's rights were *still* being violated. *See Cuviello v. City of Vallejo*, 944 F.3d 816, 834 (9th Cir. 2019) ("the permit requirement has chilled Cuviello's free speech rights and will continue to do so absent preliminary injunctive relief"). And others are distinguishable on their facts. *See Nelson*, 530 F.3d at 882 (NASA employees who refused to submit to an in-depth background check would be fired with attendant "emotional damages and stress, which cannot be compensated by mere back payment of wages").

Balance of equities and public interest. Once again, Plaintiffs' sole argument for why a permanent injunction would serve the balance of equities and public interest is that an injunction is necessary to "'prevent the violation of a party's constitutional rights.'" Mot. 23 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). But again: there was no constitutional violation, much less one that is ongoing.

\*       \*       \*

While Defendants maintain that permanent injunctive relief is not warranted

at this juncture for the reasons stated above, UCLA is unwavering in its commitment to combating antisemitism and maintaining campus safety. UCLA has implemented substantial improvements to its policies and procedures since April 2024, and continues to work diligently to ensure all students and faculty can safely access campus resources regardless of their religious identity. Defendants do not object to the preliminary injunction remaining in place while the litigation proceeds, and are prepared to work cooperatively with Plaintiffs to take appropriate steps that both protect students' rights and respect the University's legitimate interests in campus management.

## CONCLUSION

The Court should deny Plaintiffs' motion for partial summary judgment and a permanent injunction.

Dated:  April 4, 2025                    Respectfully submitted,

By:      */s/ Matthew R. Cowan*
MATTHEW R. COWAN
*Attorney for Defendants*

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,870 words, which complies with the word limit of L.R. 11-6.1.

Dated:  April 4, 2025                     Respectfully submitted,

                                          By:      */s/ Matthew R. Cowan*
                                                   MATTHEW R. COWAN
                                                   *Attorney for Defendants*