Dan Stormer, Esq. [S.B. #101967]
Hanna Chandoo, Esq. [S.B. #306973]
Bina Ahmad, Esq. [SB. #329387]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
         hchandoo@hadsellstormer.com
         bahmad@hadsellstormer.com

Attorneys for Amicus Curiae
JEWISH VOICE FOR PEACE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL; JOSHUA GHAYOUM; and EDEN SHEMUELIAN,<br><br>         Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA; MICHAEL V. DRAKE, President of the University of California; GENE D. BLOCK, former Chancellor, University of California, Los Angeles; DARNELL HUNT, Interim Chancellor & Executive Vice-President and Provost; MICHAEL BECK, Administrative Vice Chancellor; MONROE GORDEN, JR., Vice Chancellor; and RICK BRAZIEL, Assistant Vice Chancellor, each in both his official and personal capacities,<br><br>         Defendants. | Case No.: 2:24-cv-4702-MCS<br><br>[Assigned to the Honorable Mark C. Scarsi – Courtroom 7C]<br><br>**BRIEF OF *AMICUS CURIAE* FOR JEWISH VOICE FOR PEACE** |

BRIEF OF *AMICUS CURIAE* FOR JVP

# INTRODUCTION

## I. Amicus JVP

A Jewish Voice for Peace, Inc. ("JVP") is one of the largest progressive Jewish organizations in the world. JVP has worked for over 25 years to mobilize Jewish communities to fight for a just society in Palestine/Israel rooted in human rights rather than oppression, "equality rather than supremacy, dignity rather than domination, democracy rather than dispossession. A society where every life is precious." [1] Made up of 720,000 members and supporters, JVP's views represent an important, sizeable and vocal minority Jewish view of Judaism. Accordingly, Amicus has a unique perspective and specific experience that can assist the Court beyond what the parties can provide.[2] Amicus seeks to appear in opposition to Plaintiffs' Motion for Partial Summary Judgment ("MPSJ"), Doc. 128-1, and in support of Defendant's opposition to Plaintiffs' Motion for Partial Summary Judgment.

## II. Amicus's interest in this case

As one of the largest progressive Jewish organizations in the country, with chapters in nearly every state, JVP has grave concerns that this case requires the courts to define the Jewish faith, who is and who is not a Jew, what Jews are required to believe, and to redefine antisemitism as to include anti-Zionism and criticism of Israel.

The Court's order granting Plaintiffs' Preliminary Injunction clarifies exactly why JVP has grave concerns over this Court adopting Plaintiffs' definition of Judaism, stating "for purposes of this order, all references to the exclusion of Jewish students shall include exclusion of Jewish students based on religious beliefs concerning the Jewish state of Israel." Doc. 89 at 16. Plaintiffs argue in their MPSJ, "UCLA undisputedly burdened Plaintiffs' religious exercise: supporting Israel and its right to exist in its homeland." Doc. 128-1 at 17. Plaintiffs assert that "UCLA did not dispute that 'Jewish students were excluded from portions of the UCLA campus because they

---

[1] Jewish Voice for Peace, *Our Vision*, available at https://tinyurl.com/cemw6eb9.
[2] Decl. of Stefanie Fox.

refused to denounce their faith,'" and in UCLA's "Task Force to Combat Antisemitism and Anti-Israel Bias. . . found . . . that UCLA facilitated the rise of antisemitic check points" with such acts as protesters "'physically block[ing]'" Jews who "'refused to denounce' Israel.'" Id. at 1.

Plaintiffs argue that this is antisemitic because "these actions 'denied Jews and others free passage and access to campus classrooms and facilities' and 'resulted in Jews and others who would not renounce the State of Israel being hindered" from accessing the full campus Id. at 5. Plaintiffs assert the named "Plaintiffs' religious beliefs do not allow condemning Israel," Id. at 11, and thus argue that based on the fact their beliefs do not allow condemning Israel, denying Jews entry to a campus location because they would not condemn Israel is antisemitic and the court should make its preliminary injunction forbidding UCLA from offering campus programs and areas that "'are not fully and equally accessible to Jewish students.'" permanent. Id. at 2-3. Such a potentially narrow view of how one identifies as a Jewish person ignores decades of factual history and favors one "type" of Jew over another, and interferes with and severely limits JVP members, supporters and anyone holding similar views from exercising their constitutional rights. Many of the protests in this case are by Jewish students who oppose Israel's treatment of Palestinians in Gaza, including JVP member students who would be directly impacted by such a potential ruling.

## ARGUMENT

**III. The Original Purpose of the First Amendment and Establishment Clause Sought to Prevent Government Interference with Religion Telling Citizens How to Worship or Favoring One Sect Over Another.**

This case asks the Court to define what it is to be a Jew and what is antisemitism by asking this court to find that since Plaintiffs, subjectively, believe supporting Israel is required by Judaism, that restricting entry to parts of campus to those who support Israel is antisemitic. Id. By moving to make the Court's Preliminary Injunction permanent, this Court would be declaring that "the exclusion of Jewish students," as in

discrimination against Jews, shall include excluding Jews "based on religious beliefs concerning the Jewish state of Israel." Doc. 89 at 16. But asking this Court to decide what constitutes valid Jewish beliefs and what beliefs Judaism requires runs directly counter to the Establishment Clause of the First Amendment, its history and purpose.

In distinguishing between permissible and impermissible acts under the Establishment Clause, courts must be consistent "with history and faithfully reflec[t] the understanding of the Founding Fathers." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 535-536 (2022) (citation omitted). The First Amendment was adopted to ensure "that neither the power nor the prestige of the Federal Government would be used to control, support or influence" the kinds of worship Americans practice, guarding against "the pressures of government for change each time a new political administration is elected to office." Engel v. Vitale, 370 U.S. 421, 430-431 (1962).

The original purpose of the Establishment Clause "rested upon awareness of the historical fact that governmentally established religions and religious persecutions go hand in hand." Id. at 432. "[T]he First Amendment. . . . was written to quiet well-justified fears" when past governments had forced people to "speak only the religious thoughts that government wanted them to speak," Id. at 435, to "protect the integrity of individual conscience in religious matters" and "guard against the civic divisiveness that follows when the government weighs in on one side of religious debate." McCreary Cnty., Ky. v. ACLU of Ky., 545 U.S. 844, 876 (2005). James Madison, the primary author of the First Amendment, warned over 200 years ago: "Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects?. . . . [and] may force him to conform." Engel, 370 U.S. at 436; Memorial and Remonstrance Against Religious Assessments, James Madison, 1875, available at https://tinyurl.com/msbnc9r.

The Establishment Clause is violated when the courts involve themselves in internal religious affairs, or discriminate against minority faiths, and thus must remain

neutral. For instance, the Establishment Clause "bar[s] the government from interfering with the decision of a religious group" to reject or fire a fellow religious community member. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C, 565 U.S. 171, 181 (2012). Courts also violate the Establishment Clause when they discriminate based on "an aversion or bias. . . against minority faiths." Town of Greece v. Galloway, 572 U.S. 565, 585-86 (2014). Adhering to the Establishment Clause therefore "demands religious neutrality—government may not exercise a preference for one religious faith over another." Van Orden v. Perry, 545 U.S. 677, 709 (2005). If the government is to remain neutral, it should not endorse "the religious practices and beliefs of some citizens" as it sends a message "to nonadherents that they are outsiders or less than full members of the political community." Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 309-310 (2000), citing Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (conc. Opn. Of O'Connor, J.). This is why the Establishment Clause was originally designed to prevent the government "from appearing to take a position on questions of religious belief." County of Allegheny v. ACLU, 492 U.S. 573, 594 (1989), citing Lynch, 465 U.S. at 687 (conc. Opn. Of O'Connor, J).

Plaintiffs ask this Court to involve itself in internal Jewish religious affairs by asking the Court to adopt Plaintiffs' subjective religious opinion that Jews must support Israel, and discriminate against a minority group in Judaism by using the Federal Governments' "power" and "prestige" "to control, support or influence" the kinds of worship and beliefs Zionist Jews hold to the "exclusion of all other Sects," here anti-Zionist Jews, non-Zionist Jews and any Jews who do not pledge fealty to the nation state of Israel. Engel, 370 U.S. at 430-431. Plaintiffs boldly declare that "Plaintiffs' [subjective] religious beliefs do not allow condemning Israel" and even "prohibits speaking ill of or defaming the land of Israel and. . . as a matter of [] religious faith, [Plaintiff] must support Israel." Doc. 128-1 at 11. Asking Plaintiffs to denounce Israel is thus, according to one sect of Judaism's analysis, against the Jewish faith. Id. This position does not represent the views of all Jews and certainly not the views of JVP.

      Plaintiffs then take their argument a step further stating because they subjectively believe "being a faithful Jew means supporting Israel's right to exist," that denouncing Israel is antisemitic. Id. at 5, 11, 14, 16-17. Yet Plaintiffs themselves acknowledge this is a "large majority of Jews," yet not all Jews, and point to no mandatory tenet of Judaism or binding law to support such a claim. Id. at 11. In addition, Plaintiffs ignore the "shifting opinion on Israel/Palestine" among American Jews,[3] including that a 2021 Jewish Electorate poll showed that Jewish voters believed that "intense criticism of Israel is generally not seen as antisemitic," 31% felt Israel is committing genocide against Palestinians (this was before the 2023 genocide),[4] and according to Jewish organization J Street's 2024 National Jewish Voters Survey, 71% of Jewish voters do not "believe that criticism of how Israeli is conducting the war in Gaza is antisemitic."[5] Nor do Plaintiffs address the fact that Judaism is a millennia old religion, and Plaintiffs claim that this ancient religion requires complete and uncompromising loyalty to Israel, a nation-state just 77 years old. Plaintiffs cannot deny the existence of a significant number of Jews opposing Israel's policies, like those in JVP and thousands in the Jewish diaspora outside of Israel, who do not view their Jewish faith as requiring support for Israel or Zionism, and in fact believe the opposite: that their faith compels them to *oppose* Israel's policies and Zionism. Plaintiffs impermissibly ask this court to "take a position on questions of religious belief" in violation of the Establishment Clause. County of Allegheny, 492 U.S. at 594.

      By asking this Court to take the extraordinary step of finding that ones' support of Israel and Zionism are religious requirements of the Jewish faith, the Court would

---

[3] Caroline Morganti, *Recent Polls of US Jews Reflect Polarized Community: Trying to Keep Up with Shifting Opinion on Israel/Palestine, Surveys of American Jews are Beginning to Ask Questions,* Jewish Currents, June 29, 2023, available at https://tinyurl.com/4hcu5dn9.

[4] Jewish Electorate Institute: National Survey of Jewish Voters, July 2021, at 5, 36, available at https://tinyurl.com/yjrac6fw.

[5] J Street, 2024 National Jewish Voters Survey, available at https://tinyurl.com/4ejfpbps.

BRIEF OF *AMICUS CURIAE* FOR JVP       -5-

1  then be declaring who is a "valid" Jew and who is not by endorsing "the religious
2  practices and beliefs of some [Jews]" while sending a message to the "nonadherent[]"
3  Jews who oppose Israel's policies "that they are outsiders or less than full members of
4  the political community." Santa Fe Indep. Sch. Dist., 530 U.S. at 309-310. This type of
5  government interference defining what are valid religious beliefs and what are not is
6  exactly what the Founding Fathers and drafters of the First Amendment and the
7  Establishment Clause sought to prevent.

8  Plaintiffs' case would accomplish three religious-based constitutional violations
9  and government intrusions at once: (1) codify Plaintiffs' subjective belief that
10 supporting Israel is a requirement to be a Jew, and by finding as such, (2) define being
11 *against* Israel policies and behavior in Gaza and the West Bank as *not* being a Jew, and
12 (3) define opposing or objecting to the policies and actions of the Israeli government as
13 *not* being a Jew and inherently antisemitic even if one is a Jew. If such a ruling were
14 sustained, it would "make [anti-Zionist Jews opposing the Israeli government's
15 policies] speak only the religious thoughts that government wanted them to speak" to
16 still be considered Jews. Engel, 370 U.S. at 435. All of these arguments are
17 incompatible with the First Amendment and the Free Exercise Clause. Amicus are not
18 asking this Court to find that Plaintiffs' beliefs are *not* Judaism, but rather asking the
19 Court to refrain from ruling on and defining what is and is not Judaism.

20 **IV.  Amicus's Religious Freedom is Guaranteed Under International Law, an
21      Area of Law Their Religious Community Helped Build**

22 International law enshrines Amicus's right to their religious beliefs free of
23 government intrusion through several instruments, such as the International Covenant
24 on Civil and Political Rights ("ICCPR") Articles 18 and 27 guaranteeing religious
25 freedom and the rights of religious minorities.[6] It is Amicus's very Jewish religious
26 community who helped build international law into what it is today. Amicus's faith

---

28 [6] ICCPR, U.N. General Assembly Treaty Series, vol. 999, Dec. 1966, Art. 27, 18, available at https://tinyurl.com/37hph8wp.

compels upholding international human rights, and Amicus asks this Court not to interfere with or contravene international law.

Similar to the history and origins of the First Amendment and Establishment Clause, religious organizations played a key role in launching and sustaining the human rights movement including paving the way for the Universal Declaration of Human Rights ("UDHR"), so much so that "the U.N. Human Rights Office in 2017 launched an initiative called 'Faith for Rights' to engage religious leaders in an effort to build peaceful societies that uphold human dignity and equality, and embrace diversity."[7] Amicus are a part of the Jewish community, a community whose suffering and persecution in the Nazi Holocaust led to the enactment of the Genocide Convention in 1948.[8] Compelled by this history, many Jews including Amicus believe it is their duty to uphold the very principles their community helped enact. Article 2 of the Genocide Convention defines genocide as acts committed with the intent to destroy, in whole or in part, a national, ethnical, racial or religious group, including (a) killing members of the group; (b) causing serious bodily or mental harm to members of the group; (c) deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; (d) imposing measures intended to prevent births within the group; or (e) forcibly transferring children of the group to another group.[9] Article 3 of the Genocide Convention defines punishable acts as not only genocide, but also conspiracy to commit genocide, incitement to commit genocide and complicity in genocide.[10] The Genocide Convention built the foundation of numerous international human rights and humanitarian laws and principles celebrated today, such

---

[7] Press Release, "Universal Declaration of Human Rights at 70: 30 Articles on 30 Articles-Article 18," Office of the High Commissioner for Human Rights, Nov. 27, 2018, available at https://tinyurl.com/5bca6s3x.
[8] Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), General Assembly Resolution 260 A (III), Dec. 9, 1948, entry into force Jan. 12, 1951, available at https://tinyurl.com/swuvmz96.
[9] Genocide Convention, Art. 2.
[10] Genocide Convention, Art. 3.

BRIEF OF *AMICUS CURIAE* FOR JVP          -7-

as the Fourth Geneva Conventions and its mandate for occupying powers to protect children, hospitals, the sick and injured, ensure food and medicine, and its prohibition against forced displacement, the Convention on the Elimination of All Forms of Racial Discrimination ("ICERD"), and the Convention on the Suppression and Punishment of the Crime of Apartheid.[11]

Building from "generations . . . before [them, Amicus] fight[s] for the liberation of all people."[12] Amicus's religious beliefs compel them to uphold the Genocide Convention's principles not only prohibiting genocide but also complicity in it. Based on their beliefs, Amicus oppose Israel's genocide of Palestinians and violations of international human rights and humanitarian law, such as targeting Palestinian children and civilians,[13] destroying hospitals,[14] forcing starvation by withholding humanitarian

/ / /

/ / /

/ / /

---

[11] The 1949 Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention), Aug. 12 1949, 75 UNTS 287, Art. 14, 16, 18, 20, 23 (requiring occupying powers safeguard hospitals, access to hospitals and safety of sick and injured people), Art. 24, 50 (requiring occupying powers protect and ensure the safety of children), Art. 49 (prohibiting occupying powers from forcibly transferring and deporting protected persons from occupied territory), Art. 55 (mandating the occupying power ensure food and medicine to the occupied population), Art. 32, 33 (prohibiting torture and collective punishment by any nation state); 1966 International Convention on the Elimination of All Forms of Racial Discrimination, Treaty Series, 660, 195, (prohibiting racial discrimination, racial segregation and apartheid), available at https://tinyurl.com/fjzy2c59); The 1976 International Convention on the Suppression and Punishment of the Crime of Apartheid, U.N. Doc. A/9030, available at https://tinyurl.com/yc7kfj9x.
[12] Jewish Voice for Peace, *Our Vision*, available at https://tinyurl.com/cemw6eb9.
[13] Chris McGreal, '*Not a Normal War': Doctors Say Children Have Been Targeted by Israeli Snipers in Gaza*, The Guardian, Apr. 2, 2024
[14] Medecins Sans Frontieres, *How the Israeli Army Besieged and Attacked Nasser Hospital*, Apr. 3, 2024, available at https://tinyurl.com/2r7yddw9.

aid,[15] forcibly displacing Palestinians in Gaza,[16] and operating an apartheid regime.[17] The international movement to oppose this genocide and follow the Genocide Convention's mandate led to the International Court of Justice's ("ICJ") January 26, 2024 ruling ordering Israel to abide by its own obligations under the Genocide Convention, prevent genocide, serious bodily harm, incitement to genocide and take immediate measures to ameliorate their harms inflicted on Palestinians in Gaza.[18] As Israel failed to abide by the order, anti-Zionist Jews opposing Israel's policies continued following their beliefs and opposing Israel's violations of the Genocide Convention, leading to the U.N. issuing another order demanding Israel's compliance.[19]

/ / /

/ / /

/ / /

---

[15] Jaroslav Lukiv and Paul Adams, *Israel blocks Entry of All Humanitarian Aid Into Gaza*, BBC, Mar. 2, 2025, available at https://tinyurl.com/3h6ud45n.

[16] *Over 140,000 Displaced in a Week in Gaza Amid Renewed Israeli Attacks: UN*, Al Jazeera, Mar. 26, 2025, available at https://tinyurl.com/yhxdfr4f; *"Hopeless, Starving, and Besieged," Israel's Forced Displacement of Palestinians in Gaza*, Human Rights Watch, Nov. 14, 2024, available at https://tinyurl.com/mrz4pxk8.

[17] B'tselem: The Israeli Information Center for Human Rights in the Occupied Territories, *A Regime of Jewish Supremacy from the Jordan River to the Mediterranean Sea: This is Apartheid*, Jan. 12, 2021, available at https://www.btselem.org/apartheid; United Nations Human Rights Office of the High Commissioner, Press Release, "Israel's 55-year Occupation of Palestinian Territory is Apartheid-UN Human Rights Expert," Mar. 25, 2022, available at https://tinyurl.com/5n768m3k; Amnesty International, *Israel's Apartheid Against Palestinians*, Feb. 1, 2022, available at https://tinyurl.com/bdfaayu5.

[18] ICJ Order of Jan. 26, 2024, Doc. No. 192-20240126-ORD-01-00-EN, Case 192-Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel), available at https://www.icj-cij.org/node/203447.

[19] ICJ Press Release on modification of the Order of Mar. 28 2024 – Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel).

## CONCLUSION

Amicus are following their Jewish faith and the Genocide Convention's mandate by opposing Israel's policies and behavior in Gaza and the West Bank and Zionism. Amicus beseech this Court to not declare that in order for them to be Jews, they must support Zionism, and that Jews opposing the Israeli government's policies are not Jews, are antisemitic and discriminatory towards themselves and their own people. Amicus request this Court deny Plaintiffs' MPSJ to make the Court's Preliminary Injunction permanent.

Dated: April 4, 2025

Respectfully Submitted,

HADSELL STORMER RENICK & DAI LLP

By: \_\_\_/s/ *Bina Ahmad*_____
      Bina Ahmad
      Dan Stormer
      Hanna Chandoo
Attorneys for Amicus Curiae
JEWISH VOICE FOR PEACE