Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Reed M. Bartley (TX Bar No. 24125115)* ‡
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketfund.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

Elliot Moskowitz (NY Bar No. 4039160)*
Rebecca L. Harris (NY Bar No. 5607080)*
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*,<br><br>        Defendants. | Case No.: 2:24-cv-04702<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF GENUINE DISPUTES**<br><br>Judge: Hon. Mark C. Scarsi<br>Hearing: May 12, 2025, 9:00 a.m.<br>Courtroom: 7C |

*Admitted *pro hac vice*. ‡Not admitted to the D.C. Bar; admitted only in Texas. Supervised by licensed D.C. Bar members.

Plaintiffs Yitzchok Frankel, Eden Shemuelian, Joshua Ghayoum, and Dr. Kamran Shamsa submit the following Response to Defendants' Statement of Genuine Disputes. *See* L.R. 56-3.

At the outset, Plaintiffs make two observations.

First, on numerous occasions, Defendants' Statement of Genuine Disputes improperly lists in the right column "additional … facts that bear on, or relate to, the issues raised by the movant," instead of simply "disput[ing]" the facts raised by Plaintiffs or admitting that the facts are undisputed. Initial Standing Order for Civil Cases Assigned to Judge Mark C. Scarsi at 11, available at https://perma.cc/PLS5-U37T ("Initial Standing Order"). But under the standing order, any such "additional" facts "shall be filed in a *separate document* from the Statement of Genuine Disputes," not here. *Id.* (emphasis added). While Plaintiffs have elected, for the Court's convenience, to respond to some of these "additional" facts below, Plaintiffs note that they are not required to do so here and those facts could rightly be stricken as noncompliant with this Court's rules. To the extent that Defendants repeat these "additional" facts in their Statement of Additional Material Facts, Dkt.157-2, Plaintiffs respond to them there.

Second, UCLA has repeatedly relied on its own answer in trying to establish genuine disputes. It cannot do that at summary judgment, and thus the Court should disregard or strike all of UCLA's citations to its answer. *See* Fed. R. Civ. P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the record"); *Gen. Ins. Co. of Am. v. Hall*, 657 F.Supp.3d 1302, 1307 (C.D. Cal. 2023) ("the nonmoving party cannot simply rest on the pleadings").

Third, though Plaintiffs have offered "response[s] … to rebut the existence of a genuine dispute" in several places below, L.R. 56-3, Plaintiffs maintain that the disputes raised by UCLA are immaterial and do not preclude entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."); *see also* Reply.1, 3.

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Defendants and Their Roles | |
| 1.  Defendant Regents of the University of California is a public agency within the meaning of Cal. Gov't Code § 7920.525(a) and is empowered under the California Constitution, Article IX, Section 9, to administer the University of California, including the University of California, Los Angeles. The Board of Regents is the governing body for the University of California system and under Article IX, Section 9, of the California Constitution has full powers of organization and government.<br><br>Dkt.107 ¶47 (Answer). | 1. Undisputed. |
| 2. Defendant Dr. Michael V. Drake is the current President of the University of California and has | 2. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| served in that position since August 2020. As President, Drake oversees and is responsible for the operations of the entire University of California system, which includes UCLA, and sets systemwide policy guidance.<br><br>Dkt.107 ¶¶48, 57 (Answer) | |
| 3. Defendant Dr. Gene D. Block served as Chancellor of UCLA from August 2007 until July 31, 2024. As Chancellor, Block was the highest-ranking university official at UCLA, including during the 2023-2024 academic school year. Block's duties included establishing campus policies, goals, and strategy.<br><br>Dkt.107 ¶49 (Answer). | 3. Undisputed. |
| 4. Defendant Julio Frenk has served as Chancellor of UCLA since January 1, 2025. He is automatically substituted as Defendant for the official-capacity claims against Defendant Block. As Chancellor, Frenk is the highest-ranking university official at UCLA, and his duties include establishing campus policies, goals, and strategy. | 4. Disputed to the extent Defendant Julio Frenk did not start as Chancellor of UCLA until the week of January 6, 2025.<br><br>Frenk Decl. ¶ 2 ("My contract began on December 16, 2024, and my first week on the job was January 6, 2025."). |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 3d Rassbach Decl. Ex. 11 at 552; Fed. R. Civ. P. 25(d); Dkt.107 ¶49 (Answer). | |

| | |
|---|---|
| 4. **Plaintiffs' Reply**: Plaintiffs cited a press release on UCLA's website to establish that Frenk began as Chancellor on January 1, 2025. Nonetheless, Plaintiffs accept Defendants' representation that Frenk actually began during the week of January 6, 2025. The rest of this fact is undisputed. | |

| 5. Defendant Dr. Darnell Hunt is the current Executive Vice Chancellor and Provost of UCLA and also served in that role at all relevant times from September 2022 through July 31, 2024. Hunt also served as UCLA's Interim Chancellor from August 1, 2024 until December 31, 2024.<br><br>Dkt.107 ¶50 (Answer). | 5. Disputed to the extent Defendant Dr. Darnell Hunt served as UCLA's Interim Chancellor until Defendant Julio Frenk arrived.<br><br>Hunt Decl. ¶ 2 ("I was formerly the Interim Chancellor of UCLA from August 1, 2024 until Chancellor Julio Frenk arrived."); Frenk Decl. ¶ 2 ("My contract began on December 16, 2024, and my first week on the job was January 6, 2025."). |

| | |
|---|---|
| 5. **Plaintiffs' Reply**: Plaintiffs accept UCLA's representation that Hunt served as Interim Chancellor until Frenk arrived. Thus, nothing is disputed. | |

| 6. Defendant Michael J. Beck is the current Administrative Vice Chancellor of UCLA and has served in that position since March 2016. During this time and until May 5, 2024, the UCLA Police Department reported to and took direction from | 6. Undisputed that until May 5, 2024, Defendant Beck provided direction to the UCLA PD police chief and that UCLA PD reported to him. On May 5, 2024, UCLA created the Office of Campus Safety, and UCLA PD began |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| him. Beck has senior management responsibility for a broad spectrum of administrative, operational, and service units at UCLA and is responsible for developing policy, monitoring compliance, and overseeing campus operations.<br><br>Dkt.107 ¶51 (Answer); Dkt.62-3 ¶2 (Beck Decl.). | reporting to and taking direction from the Associate Vice Chancellor for Campus Safety.<br><br>2d Beck Decl. ¶ 2 ("Prior to May 2024, UCLA PD reported to my office, and I provided direction to the police chief."); Dkt. 62-5 ¶¶ 2, 13 (Braziel Decl.) ("The Chief of the University of California Police Department, UCLA … reports to and takes direction from me"; "On May 5, 2024, I was named the inaugural Associate Vice Chancellor for Campus Safety."). |
| 6. **Plaintiffs' Reply**: Plaintiffs accept Defendants' representations. Thus, nothing is disputed. | |
| 7. Defendant Monroe Gorden, Jr., is the current Vice Chancellor, Student Affairs, of UCLA and has served in that position since April 2018. Gorden oversees numerous functions relating to student life and well-being. His role spans the entire range of student needs and interests.<br><br>Dkt.107 ¶52 (Answer); Dkt.62-7 ¶2 (Gorden Decl.). | 7. Undisputed. |
| 8. Defendant Rick Braziel served as the Associate Vice Chancellor for Campus Safety at UCLA from May | 8. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 5, 2024 until January 31, 2025. In this role, Braziel served as the head of the newly created Office of Campus Safety at UCLA, which as of May 5, 2024, oversees the UCLA Police Department ("UCLA PD"). While employed by UCLA, Braziel reported directly to the Chancellor of the University and the Chief of the UCLA PD reported to Braziel. Braziel was involved with decision-making about how to address security and campus access issues.<br><br>Dkt.107 ¶¶53-54, 58 (Answer); Dkt.62-5 ¶¶2, 12-16, 21, 25, 27, 31 (Braziel Decl.); 3d Rassbach Decl. Ex. 12 at 556. | |
| 9. Defendant Steve Lurie serves as the Associate Vice Chancellor for Campus and Community Safety and has served in that position after taking over for Defendant Braziel on February 1, 2025. He is automatically substituted as Defendant for the official-capacity claims against Defendant Braziel. Lurie's job duties and lines of reporting are identical to those of Defendant Braziel while Braziel served in the role. | 9. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dkt.107 ¶¶53-54, 58 (Answer); Dkt.62-5 ¶¶2, 12-16, 21, 25, 27, 31 (Braziel Decl.); 3d Rassbach Decl. Ex. 12 at 556; Fed. R. Civ. P. 25(d). | |
| 10. Defendants Hunt, Beck, and Gorden serve on UCLA's "senior leadership team," as did Block during his tenure as Chancellor, and as does Frenk as UCLA's recently installed Chancellor.<br><br>Dkt.107 ¶55 (Answer). | 10. Undisputed. |
| 11. UCLA's senior leadership team is ultimately responsible for leading and running UCLA's campus.<br><br>Dkt.107 ¶56 (Answer). | 11. Undisputed. |
| 12. UCLA's senior leadership team managed and oversaw UCLA's response to antisemitism and demonstrations on campus during the 2023-24 academic year, including making critical strategic and operational decisions about UCLA's response to encampments that emerged on campus.<br><br>Dkt.107 ¶56 (Answer); Dkt.62-3 ¶¶4-7, 9-10, 17-19 (Beck Decl.). | 12. Disputed to the extent Plaintiffs allege there was ever more than one encampment. Otherwise, undisputed.<br><br>2d Beck Decl. ¶¶ 15-25 (describing how UCLA has "neutralized every subsequent protest event, ordering protesters engaged in unauthorized protest activity to voluntarily disperse and arresting those who refuse to do so"). |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 12. **Plaintiffs' Reply**: UCLA's own public statements refute its assertion that only one encampment formed on UCLA's campus. As one example, in addition to the original Royce Quad encampment, on June 10, 2024, activists set up what UCLA itself described as "unauthorized and unlawful encampments at … *three* locations." Dkt.48-58 at 112 (Rassbach Ex.21) (emphasis added);[1] *see also, e.g., infra* ¶¶116-18 (describing another encampment that formed on May 23, 2024, in which, as UCLA put it, demonstrators "began to erect barricades," "establish[] fortifications," and "block[] access to the area" (quoting Dkt.48-34 at 84 (Shemuelian Ex.26) and Dkt.48-33 at 83 (Shemuelian Ex.25)). | |
| 13. President Drake communicated with members of UCLA's senior leadership team during the 2023-24 academic year about UCLA's response to antisemitism and protest activity, and continues to do so today.<br><br>Dkt.107 ¶57 (Answer). | 13. Undisputed. |
| UCLA | |
| 14. The University of California, Los Angeles is a large public research university located in the Westwood neighborhood of Los Angeles, California, which is within the Central District of California. | 14. Undisputed. |

---

[1]    Each pincite to an exhibit in Plaintiffs' responses herein is to the page number added to the bottom of each page of the exhibit pursuant to L.R. 11-5.2, and not (as applicable) to the document's original page number.

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dkt.107 ¶60 (Answer). | |
| 15. UCLA is one of the largest universities in California, with over 33,000 undergraduate students and over 13,000 graduate students.<br><br>Dkt.107 ¶61 (Answer). | 15. Undisputed. |
| 16. UCLA is part of the 10-campus University of California system, which includes other universities such as the University of California, Berkeley.<br><br>Dkt.107 ¶62 (Answer). | 16. Undisputed. |
| 17. UCLA's campus is spread across 419 acres of publicly owned land that is, as a general matter, open to the public.<br><br>Dkt.107 ¶63 (Answer). | 17. Undisputed. |
| 18. UCLA has a significant number of Jewish students among its student population.<br><br>Dkt.107 ¶65 (Answer). | 18. Undisputed that 3% of UCLA students who responded to a University of California Undergraduate Experience Survey conducted in 2022 self-identified as Jewish.<br><br>Dkt. 107 ¶ 65 (Answer) ("Defendants admit that 3% of UCLA students who responded to a University of California |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Undergraduate Experience Survey conducted in 2022 self-identified as Jewish."). |
| 18. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶18, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 19. UCLA tells its students that its policies exist to "create and maintain a safe, supportive, and inclusive campus community that engages students in order to foster their academic success, personal growth and responsible citizenship." Dkt.48-71 at 139 (Rassbach Ex. 34). | 19. Undisputed. |
| 20. As a public university, UCLA maintains policies for public protests that include time, place, and manner restrictions. Dkt.107 ¶68 (Answer). | 20. Undisputed. |
| 21. For example, "[w]hile individuals may exercise the constitutionally protected rights of speech and assembly on university grounds that are generally open to the public, these activities must not interfere with the orderly operation of the campus and must be conducted in a manner that reasonably protects | 21. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| others from becoming involuntary audiences."<br><br>Dkt.48-70 at 137 (Rassbach Ex. 33). | |
| 22. Under UCLA's Regulations of Activities, Registered Campus Organizations, and Use of Properties, which was in effect from 2017 until September 3, 2024, persons may not "block entrances to or otherwise interfere with the free flow of traffic into and out of campus buildings," "knowingly and willfully interfere with the peaceful conduct of the activities of the campus or any campus facility by intimidating, harassing, or obstructing any University employee, student, or any other person having lawful business with the University," or "camp or lodge, except in authorized facilities or locations." Dkt.48-75 at 203-04 (Rassbach Ex. 38). | 22. Undisputed. |
| 23. Similarly, under UCLA's currently operative Interim Policy 850: General Use of UCLA Property, persons may not "block entrances to or otherwise interfere with the free flow of campus traffic (pedestrian or vehicular) into and out of campus facilities, or along walkways or roadways," "knowingly and willfully interfere with the peaceful conduct | 23. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| of activities or another individual's ability to participate in their educational program on UCLA Property," "engage in abusive, threatening, harassing, or intimidating conduct," "erect any Temporary Structure or encampment on UCLA Property," or "Camp overnight (between the hours of midnight and 6am)."<br><br>3d Rassbach Decl. Ex. 7 at 532. | |
| 24. UCLA's policies do not allow unauthorized protesters to exercise exclusive control over campus facilities or spaces.<br><br>Dkt.107 ¶71 (Answer). | 24. Undisputed. |
| 25. The University of California has an anti-discrimination policy that is in effect at UCLA and is intended to protect students and faculty from discrimination and harassment.<br><br>Dkt.107 ¶72 (Answer). | 25. Undisputed. |
| Antisemitic Protests at UCLA Following the October 7th Attack | |
| 26. After Hamas's terrorist attack on October 7, 2023, UCLA's campus experienced a "disturbing rise of antisemitism," including a number | 26. Undisputed that UCLA's campus experienced antisemitism in the wake of the attack on October 7, 2023, which it unequivocally condemned. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| of antisemitic incidents and events, of which UCLA was aware.<br><br>3d Rassbach Decl. ¶14 at 41:10-41:17 (providing website link to Defendant Block's May 23, 2024 congressional testimony); see also Dkt.107 ¶¶1, 3, 74-75, 77, 93, 97, 102-104 (Answer); 3d Rassbach Decl. Ex. 1 at 14, 31, 52-58 ("UCLA Antisemitism Task Force Report"). | 2d Beck Decl. ¶ 4 ("In the aftermath of the October 7 attack, UCLA immediately and unequivocally condemned displays of antisemitism on its campus. UCLA also affirmed its commitment to combating antisemitism and fostering an environment where all community members feel safe, secure, and welcome."). |
| 26. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶26, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 27. Indeed, "since October 7, 2023, disturbing antisemitic language was used and imagery was present at protests that occurred on UCLA's campus."<br><br>Dkt.107 ¶75 (Answer). | 27. Undisputed. |
| 28.    For    example,    during demonstrations on campus, there were chants of "kill the Jews," "from the river to the sea, Palestine will be free," and "Intifada."<br><br>Dkt.107 ¶¶75, 77, 86 (Answer); 3d Rassbach Decl. Ex. 1 at 54-57 (UCLA Antisemitism Task Force Report). | 28.    Disputed to the extent Plaintiffs allege all of these phrases    were    chanted. Undisputed    that    protesters chanted at least some of these phrases on campus.<br><br>Dkt.    107    ¶ 86    (Answer) (admitting    that    protesters chanted "at least some of these |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | phrases" but denying that they chanted all of these phrases on the basis of lacking knowledge or information sufficient to form a belief as to the truth of that allegation). |
| 28. **Plaintiffs' Reply**: UCLA does not submit any evidence to support any purported dispute over whether "all of these phrases were chanted," but instead simply cites its answer, which it cannot do at summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the record"); *Gen. Ins. Co. of Am. v. Hall*, 657 F.Supp.3d 1302, 1307 (C.D. Cal. 2023) ("the nonmoving party cannot simply rest on the pleadings"). Thus, SUF ¶28 is undisputed in its entirety. In addition, Plaintiffs note that UCLA's own Task Force Report found that there were chants of "kill the Jews," "from the river to the sea, Palestine will be free," and "Intifada." Dkt.128-5 at 54-57 (UCLA Antisemitism Task Force Report). | |
| 29. Swastikas were also seen around campus. 3d Rassbach Decl. Ex. 1 at 42, 48, 71 (UCLA Antisemitism Task Force Report); Dkt.107 ¶¶106 (Answer). | 29. Disputed to the extent Plaintiffs allege swastikas were generally seen around campus. Undisputed that, at discrete times, antisemitic imagery was seen on campus. Whenever graffiti displaying antisemitic imagery was found on campus, UCLA promptly removed it. <br><br> 2d Beck Decl. ¶ 4 (describing UCLA's unequivocal condemnation of antisemitism on campus and prompt removal of |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | antisemitic graffiti whenever it was found). |
| 29. **Plaintiffs' Reply**: UCLA does not submit any evidence to support a purported dispute over whether "swastikas were generally seen around campus," and thus this is undisputed. *See* Fed.R.Civ.P. 56(c)(1)(A); *James River Ins. Co. v. Medolac Lab'ys*, 290 F.Supp.3d 956, 962 (C.D. Cal. 2018) (party opposing summary judgment must "present significant probative evidence").<br><br>UCLA's assertion that "[w]henever graffiti displaying antisemitic imagery was found on campus, UCLA promptly removed it" is an "additional" fact that is improper to include in a Statement of Genuine Disputes. Initial Standing Order at 11. And Plaintiffs dispute UCLA's assertion. *See* Dkt.48-2 ¶31 (Frankel Decl.); Dkt.48-4 ¶¶26, 30-32 (Ghayoum Decl.); Dkt.48-5 at 8 (Ghayoum Ex.1); Dkt.48-8 ¶¶19, 102-03 (Shemuelian Decl.); Dkt.128-5 at 42, 48, 71 (UCLA Antisemitism Task Force Report) (describing widespread antisemitic imagery on UCLA's campus). | |
| 30. In one incident, an individual placed a disturbing antisemitic statue on campus, which depicted a several foot-tall pig holding a bag of money and a birdcage with a keffiyeh, alongside a bucket painted with a star of David.<br><br>Dkt.107 ¶102 (Answer). | 30. Undisputed. |
| 31. Other activists chalked Stars of David onto UCLA's sidewalks alongside directions to "Step Here." | 31. Undisputed that the Antisemitism and Anti-Israeli Bias at UCLA report (the "Task Force Report") states that "a chalk drawing on the ground |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 3d Rassbach Decl. Ex. 1 at 71 (UCLA Antisemitism Task Force Report). | appeared on campus depicting a Jewish star with the words 'step here'" and that Plaintiffs allege such chalking occurred only in connection with the Royce Quad encampment, not in connection with prior protests.<br><br>Dkt. 101 ¶¶ 126-27, 261, 310 (First Am. Compl.) (allegations referencing "Step Here" chalk drawings in connection with Royce Quad encampment). |
| 31. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶31, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 32. During an event on November 8, 2023, activists bashed a piñata depicting Israeli Prime Minister Benjamin Netanyahu while the crowd cheered and chanted "beat that fucking Jew."<br><br>3d Rassbach Decl. Ex. 1 at 57 (UCLA Antisemitism Task Force Report); Dkt.107 ¶87 (Answer). | 32. Disputed to the extent that Plaintiffs allege the crowd chanted "beat that fucking Jew." Undisputed that individuals struck a piñata bearing an image of Israel Prime Minister Benjamin Netanyahu.<br><br>Dkt. 107 ¶ 87 (Answer) (admitting that "individuals struck a piñata bearing an image of Israeli Prime Minister Benjamin Netanyahu" during a November 8, 2023 protest but denying that the crowd chanted "beat that fucking Jew" on the |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | basis of lacking knowledge or information sufficient to form a belief as to the truth of that allegation). |

32. **Plaintiffs' Reply**: UCLA disputes only that "the crowd chanted 'beat that fucking Jew.'" The rest of SUF ¶32 is therefore undisputed.

As for the chant, UCLA does not submit any contradictory evidence, but rather relies on a denial in its answer, which is necessarily insufficient at summary judgment, especially when that denial rests on lack of knowledge. *See* Fed.R.Civ.P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the record"); *Gen. Ins. Co. of Am. v. Hall*, 657 F.Supp.3d 1302, 1307 (C.D. Cal. 2023) ("the nonmoving party cannot simply rest on the pleadings"). And UCLA's own Task Force Report notes that "numerous media outlets reported at least one protester chanting, 'beat the f***king Jew!'" and that "[a]t least one person sounds like they are shouting 'beat that fucking jew'" in a video the Task Force reviewed. Dkt.128-5 at 57 & n.74 (UCLA Antisemitism Task Force Report); *see also* Dkt.48-8 ¶40 (Shemuelian Decl.).

| A Jew Exclusion Zone Is Established on Campus | |
|---|---|
| 33. In April 2024, "Palestinian Solidarity" encampments began appearing on university campuses across the country.<br><br>Dkt.62-3 ¶4 (Beck Decl.); Dkt.62-5 ¶23 (Braziel Decl.); Dkt.107 ¶107 (Answer). | 33. Undisputed that there were media reports of encampments beginning to appear at other colleges and universities in April 2024.<br><br>Dkt. 107 ¶ 107 (Answer). |

33. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶33, and thus it is undisputed. *See* Initial Standing Order at 11.

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 34. This came to include UCLA. On April 25, 2024, a group of activists "established an unauthorized physical encampment on part of Royce Quad" in the middle of the night.<br><br>Dkt.48-23 at 60 (Shemuelian Ex. 15); Dkt.62-3 ¶5 (Beck Decl.); Dkt. 107 ¶¶4, 113 (Answer); 3d Rassbach Decl. Ex. 1 at 58-59 (UCLA Antisemitism Task Force Report). | 34.    Undisputed that demonstrators established an unauthorized encampment on Royce Quad on April 25, 2024 and that UCLA leadership immediately began strategizing how to remove it safely and quickly.<br><br>Dkt. 62-3 ¶ 5 (Beck Decl.) ("Once the Royce Quad encampment was up, those in senior leadership were in agreement that it needed to be removed at some point. Throughout the day, we discussed several strategies for how to do so, mindful of the experiences of other schools that faced similar protest activity. We were aware, for example, of the events at the University of Southern California ("USC"), where police dismantled the encampment immediately, only to find the encampment reformed by students several days later. We were aware that other universities around the country, such as Columbia University, experienced challenges with their encampments, including when they immediately called law enforcement to remove them. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | We were also aware of other campuses where encampments existed on campus without significant disruption to campus operations. We wanted to avoid a situation where the encampment could 'spring up' again. Given these considerations, our strategy was to preserve the safety of those in our campus community while we developed a plan for the encampment to be peacefully and permanently removed."). |
| 34. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶34, and thus it is undisputed. *See* Initial Standing Order at 11.<br><br>As for UCLA's assertion that "UCLA leadership immediately began strategizing how to remove it safely and quickly" is an "additional" fact that is improper to include in a Statement of Genuine Disputes. Initial Standing Order at 11. And Plaintiffs note that the language UCLA quotes from Beck's declaration does not support that UCLA "immediately began strategizing how to remove [the encampment] safely and quickly"; instead, it states that UCLA believed that the encampment "needed to be removed *at some point*" and that it merely started to "develop[] a plan." Dkt.62-3 ¶5 (Beck Decl.) (emphasis added). The undisputed record shows that UCLA permitted the encampment to stand for a week and facilitated the exclusion of Jews from its campus. *See* Dkt.128-5 at 58, 61-62, 67-68 (UCLA Antisemitism Task Force Report); *infra* ¶¶47, 81. | |
| 35. Royce Quad, also known as Dickson Plaza, is a large, grassy | 35. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| space located between two buildings to its north (Royce Hall and Haines Hall), and two buildings to its south (Powell Library and Kaplan Hall), which represent the original four buildings of UCLA's campus.<br><br>Dkt.107 ¶109 (Answer); Dkt.48-38 at 5 (Rassbach Ex. 1). | |
| 36. Royce Quad is one of the most-frequented areas on campus where students gather during the day and between classes. It is also a thoroughfare that students and faculty routinely use to access the rest of UCLA's campus. It is also located a short walk from many academic buildings, including UCLA's business school and law school.<br><br>Dkt.107 ¶110 (Answer). | 36. Undisputed. |
| 37. Powell Library is UCLA's main undergraduate library and is a popular place to study on campus. It offers a wide variety of programming, including exhibits, concerts, dances, readings and other events.<br><br>Dkt.107 ¶112 (Answer). | 37. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 38. At times, the encampment extended as far west as the Janss Steps, a long staircase leading up to Royce Quad. | 38. Undisputed that at a certain point members of the encampment blocked the top of Janss Steps. |
| Dkt.107 ¶114 (Answer). | Dkt. 107 ¶ 114 (Answer) ("Defendants admit that at a certain point members of the encampment blocked the top of Janss Steps, which is a long staircase leading up to Royce Quad."). |
| 38. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶38, and thus it is undisputed. *See* Initial Standing Order at 11. ||
| 39. The encampment grew throughout the week it existed, at one point reaching "an estimated 250-300 tents inside the heavily fortified encampment" and "at least 500 individuals during the day." | 39. Undisputed that the encampment grew throughout the week and that it reached at least 500 people during the day, and undisputed that the Republican Staff Report on Antisemitism on College Campuses Exposed, Committee on Education & the Workforce, U.S. House of Representatives estimates that it grew to 250-300 tents. |
| 3d Rassbach Decl. Ex. 3 at 143 ("U.S. House Committee Report on Antisemitism"); Dkt.62-3 ¶¶6, 12 (Beck Decl.). | Dkt. 62-3 ¶¶ 6, 12 (Beck Decl.). |
| 39. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶39, and thus it is undisputed. *See* Initial Standing Order at 11. ||

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 40. Inside the encampment, activists chanted antisemitic slogans.<br><br>Dkt.107 ¶115 (Answer). | 40. Undisputed that some antisemitic slogans were changed inside the encampment.<br><br>Dkt. 107 ¶ 115 (Answer) ("Defendants lack knowledge or information sufficient to form a belief as to the truth of whether all the phrases listed in Paragraph 115 were chanted by those inside the encampment. Defendants admit that at least some of these phrases were chanted."). |
| 40. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶40, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 41. Activists also displayed antisemitic imagery on signs and graffiti.<br><br>3d Rassbach Decl. Ex. 1 at 61, 73, 78 (UCLA Antisemitism Task Force Report); Dkt.107 ¶¶117, 123 (Answer). | 41. Undisputed that antisemitic images were present at the encampment on Royce Quad and that graffiti and/or anti-Jewish slogans were found on UCLA's campus when the encampment on Royce Quad was removed. Whenever graffiti displaying antisemitic imagery was found on campus, UCLA promptly removed it.<br><br>Dkt. 107 ¶¶ 117, 123 (Answer) ("Defendants admit that antisemitic images were present |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | at the encampment on Royce Quad."; "Defendants admit that graffiti and/or anti-Jewish slogans were found on UCLA's campus when the encampment on Royce Quad was removed."); 2d Beck Decl. ¶ 4 (describing UCLA's unequivocal condemnation of antisemitism on campus and prompt removal of antisemitic graffiti whenever it was found). |
| 41. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶41, and thus it is undisputed. *See* Initial Standing Order at 11.<br><br>UCLA's assertion that "[w]henever graffiti displaying antisemitic imagery was found on campus, UCLA promptly removed it" is an "additional" fact that is improper to include in a Statement of Genuine Disputes. Initial Standing Order at 11. And Plaintiffs dispute UCLA's assertion. *See* Dkt.48-2 ¶ 31 (Frankel Decl.); Dkt.48-4 ¶¶26, 30-32 (Ghayoum Decl.); Dkt.48-5 at 8 (Ghayoum Ex.1); Dkt.48-8 ¶¶19, 102-03 (Shemuelian Decl.); Dkt.128-5 at 42, 48, 71 (UCLA Antisemitism Task Force Report) (describing widespread antisemitic imagery on UCLA's campus). | |
| 42. Activists established a perimeter around the encampment with metal barriers and plywood, using metal bicycle racks that UCLA had placed on the periphery of the encampment. | 42. Disputed to the extent Plaintiffs imply that UCLA's placement of metal bicycle racks near the encampment was not part of its effort to prevent conflict between those in the encampment and counter-demonstrators. UCLA installed |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 3d Rassbach Decl. Ex. 1 at 60 (UCLA Antisemitism Task Force Report); Dkt.107 ¶¶7, 128-29, 156 (Answer); Dkt.62-3 ¶¶6-7 (Beck Decl.); Dkt.123 at 7 (Defendants' Reply ISO Mot. for Judgment on the Pleadings) (conceding that Defendants "barricad[ed the] campus encampment"). | metal bicycle racks to prevent conflict between those in the encampment and counter-demonstrators and to discourage the encampment's expansion. Otherwise, undisputed.<br><br>Dkt. 107 ¶ 156 (Answer) (admitting that UCLA installed metal bike racks "around the encampment, with the goal of preventing conflict between those in the encampment and counterdemonstrators and discouraging the encampment's expansion"). |

42. **Plaintiffs' Reply**: Though UCLA purports to dispute portions of SUF ¶42, it does so only "nominally," referring to extraneous considerations about UCLA's intentions in placing bike racks. *Rockwell v. Air & Liquid Sys. Corp.*, No. 21-cv-3963, 2022 WL 18228256, at *1 n.2 (C.D. Cal. Sept. 1, 2022). In doing so, UCLA "fails to actually controvert the proffered 'undisputed' fact" and "disputes the fact on grounds not germane to the actual statement made by the initial proffering party"— i.e., Plaintiffs. *Id.* Thus, SUF ¶42 is undisputed in its entirety.

Even setting aside that problem, UCLA does not provide any evidence to support its claim that it "installed metal bicycle racks to prevent conflict between those in the encampment and counter-demonstrators and to discourage the encampment's expansion"; instead, it merely cites its answer, which is insufficient at summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| record"); *Gen. Ins. Co. of Am. v. Hall*, 657 F.Supp.3d 1302, 1307 (C.D. Cal. 2023) ("the nonmoving party cannot simply rest on the pleadings"). | |
| 43. "As early as April 25, violence was documented within and around the encampment." | 43.    Undisputed    that    minor skirmishes occurred on April 25. |
| 3d Rassbach Decl. Ex. 3 at 142 (U.S. House    Committee    Report    on Antisemitism). | 2d Beck Decl. ¶ 10 ("There were minor skirmishes in the area surrounding the encampment on April 25, but no major physical altercations occurred that day."). |
| 43. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶43, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 44. Activists "began using human phalanxes (with protesters shouting, 'human chain') to block certain persons from moving freely through public areas of Royce Quad, and surrounded some other individuals to forcibly move them from areas in or adjacent to the encampment." | 44. Undisputed that third-party protesters limited access to the encampment, and, at times, the area nearby. |
| 3d Rassbach Decl. Ex. 1 at 61-64, 68, 70, 81 (UCLA Antisemitism Task Force Report); see also Dkt.107 ¶¶4, 128-33 (Answer); Dkt.48-23 at 60 (Shemuelian Ex. 15); 3d Rassbach Decl. Ex. 4 at 447-448 ("U.S. House Antisemitism Report"). | Dkt.    107    ¶    129    (Answer) ("Defendants    admit    that protestors constructed barriers around    the    encampment    and limited    access    to    the encampment."). |
| 44. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶44, and thus it is undisputed. *See* | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Initial Standing Order at 11. In addition, even if UCLA had disputed something in SUF ¶44—it hasn't—it relies solely on its answer, which is insufficient at summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the record"); *Gen. Ins. Co. of Am. v. Hall*, 657 F.Supp.3d 1302, 1307 (C.D. Cal. 2023) ("the nonmoving party cannot simply rest on the pleadings"). | |
| 45. Jews "wearing a Star of David or a kippah" or "refusing to denounce" Israel "were physically blocked by the protesters' phalanxes from entering or passing through the occupied area of Royce Quad, entering Royce Hall, or entering Powell Library." | 45. Disputed to the extent Plaintiffs allege that UCLA community members were unable to access academic buildings via alternate entrances. Undisputed that third-party protesters limited access to the encampment, and, at times, the area nearby. |
| 3d Rassbach Decl. Ex. 1 at 61-64, 68, 70, 81 (UCLA Antisemitism Task Force Report); see also Dkt.107 ¶¶4, 128-33 (Answer); Dkt.48-23 at 60 (Shemuelian Ex. 15); 3d Rassbach Decl. Ex. 4 at 447-448 (U.S. House Antisemitism Report). | Dkt. 107 ¶¶ 6, 129 (Answer) ("Defendants deny that Jewish students or faculty were "segregat[ed]" or that Jewish students and faculty in particular were prevented from accessing classrooms or the main undergraduate library" and "Defendants admit that protestors constructed barriers around the encampment and limited access to the encampment."). |
| 45. **Plaintiffs' Reply**: UCLA does not provide any evidence to support a claimed dispute over whether "UCLA community members were unable to access academic buildings via alternate entrances"; instead, it simply cites its answer, which is insufficient at summary judgment. *See* | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Fed.R.Civ.P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the record"); *Gen. Ins. Co. of Am. v. Hall*, 657 F.Supp.3d 1302, 1307 (C.D. Cal. 2023) ("the nonmoving party cannot simply rest on the pleadings"). Even if UCLA's own answer were a valid source of evidence for UCLA to cite at summary judgment—it isn't—neither of the paragraphs cited by UCLA say anything about alternate entrances to campus facilities. Nor does UCLA dispute anything else in SUF ¶45, including that Jews wearing a star of David or a kippah or refusing to denounce Israel were physically blocked. Thus, SUF ¶45 is undisputed in its entirety. | |
| 46. These actions "denied Jews and others free passage and access to campus classrooms and facilities" and "resulted in Jews and others who would not renounce the State of Israel being hindered in their efforts to freely and fully avail themselves of campus offerings."  3d Rassbach Decl. Ex. 1 at 68, 70, 81 (UCLA Antisemitism Task Force Report); see also Dkt.107 ¶¶4, 128-33 (Answer); Dkt.48-23 at 60 (Shemuelian Ex. 15). | 46. Disputed to the extent Plaintiffs allege that UCLA community members were unable to access academic buildings via alternate entrances. Undisputed that third-party protesters limited access to the encampment, and, at times, the area nearby.  Dkt. 107 ¶¶ 6, 129 (Answer) ("Defendants deny that Jewish students or faculty were "segregat[ed]" or that Jewish students and faculty in particular were prevented from accessing classrooms or the main undergraduate library" and "Defendants admit that protestors constructed barriers around the encampment and limited access to the encampment."). |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 46. **Plaintiffs' Reply**: UCLA does not provide any evidence to support a claimed dispute over whether "UCLA community members were unable to access academic buildings via alternate entrances"; instead, it simply cites its answer, which is insufficient at summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the record"); *Gen. Ins. Co. of Am. v. Hall*, 657 F.Supp.3d 1302, 1307 (C.D. Cal. 2023) ("the nonmoving party cannot simply rest on the pleadings"). Even if UCLA's own answer were a valid source of evidence for UCLA to cite at summary judgment—it isn't—neither of the paragraphs cited by UCLA say anything about alternate entrances to campus facilities. Nor does UCLA dispute anything else in SUF ¶46. Thus, in light of UCLA's failure to validly dispute SUF ¶46, it is undisputed in its entirety. | |
| 47. "[A]fter social media posts about Jewish students being excluded from portions of campus went viral, administrators were inundated with complaints and concerns from parents, politicians, and community members about why the University was allowing it to continue."<br><br>3d Rassbach Decl. Ex. 2 at 108 ("UCLA Independent Investigation Report"). | 47. Undisputed. |
| 48. "[T]he encampment's denial of passage and access to certain parts of campus to 'supporters of Israel' ended up targeting Jews" and "constitutes de facto discrimination against a protected class." | 48. Disputed to the extent SUF ¶ 48 contains argument, legal principles, and conclusions of law. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 3d Rassbach Decl. Ex. 1 at 64 (UCLA Antisemitism Task Force Report); see also Dkt.107 ¶¶4, 128-33 (Answer); Dkt.48-23 at 60 (Shemuelian Ex. 15). | |
| 48. **Plaintiffs' Reply**: SUF ¶48 does not contain "argument, legal principles, and conclusions of law." It is a direct quote of UCLA's own Task Force Report. *See Banks v. St. Francis Health Ctr., Inc.*, No. 15-cv-2602, 2016 WL 6905581, at *8 n.35 (D. Kan. Nov. 21, 2016); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). Thus, SUF ¶48 is undisputed in its entirety. <br><br> In addition, Plaintiffs note that insofar as UCLA disputes anything in SUF ¶48, it is only plausibly the last clause in the sentence: "and 'constitutes de facto discrimination against a protected class.'" Thus, at minimum, the remainder of SUF ¶48 is undisputed: "[T]he encampment's denial of passage and access to certain parts of campus to 'supporters of Israel' ended up targeting Jews …." | |
| 49. Indeed, "the denial of common rights or access to supporters of Israel constitutes a form of de facto or structural antisemitism and should be viewed as discrimination against a protected class." <br><br> 3d Rassbach Decl. Ex. 1 at 81 (UCLA Antisemitism Task Force Report); see also Dkt.107 ¶¶4, 128-33 (Answer); Dkt.48-23 at 60 Shemuelian Ex. 15). | 49. Disputed to the extent SUF ¶ 49 contains argument, legal principles, and conclusions of law. |
| 49. **Plaintiffs' Reply**: SUF ¶49 does not contain "argument, legal principles, and conclusions of law." It is a direct quote of UCLA's own | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Task Force Report. *See Banks v. St. Francis Health Ctr., Inc.*, No. 15-cv-2602, 2016 WL 6905581, at *8 n.35 (D. Kan. Nov. 21, 2016); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). Thus, SUF ¶49 is undisputed in its entirety. | |
| 50. "In so far as conditions on campus resulted in Jews and others who would not renounce the State of Israel being hindered in their efforts to freely and fully avail themselves of campus offerings, the University also failed in its legal obligation to protect First Amendment rights to the free exercise of religion ...."<br><br>3d Rassbach Decl. Ex. 1 at 81 (UCLA Antisemitism Task Force Report). | 50. Disputed to the extent SUF ¶ 50 contains argument, legal principles, and conclusions of law. |
| 50. **Plaintiffs' Reply**: SUF ¶50 does not contain "argument, legal principles, and conclusions of law." It is a direct quote of UCLA's own Task Force Report. *See Banks v. St. Francis Health Ctr., Inc.*, No. 15-cv-2602, 2016 WL 6905581, at *8 n.35 (D. Kan. Nov. 21, 2016); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). Thus, SUF ¶50 is undisputed in its entirety.<br><br>In addition, Plaintiffs note that insofar as UCLA disputes anything in SUF ¶50, it is only plausibly the last clause in the sentence: "the University also failed in its legal obligation to protect First Amendment rights to the free exercise of religion." Thus, at minimum, the remainder of SUF ¶50 is undisputed: "conditions on campus resulted in Jews and others who would not renounce the State of Israel being hindered in their efforts to freely and fully avail themselves of campus offerings." | |
| 51. Some UCLA "faculty members supported the encampment." | 51. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dkt.107 ¶140 (Answer) | |
| 52. "[T]he administration was informed that instructors were moving their classes (many of which were the final review sessions before midterm exams) into the encampment." <br><br> 3d Rassbach Decl. Ex. 3 at 143 (U.S. House Committee Report on Antisemitism). | 52. Disputed to the extent Plaintiffs imply that the administration condoned the attempt by some instructors to move their classes into the encampment. As soon as the Academic Affairs and Personnel Office became aware of such behavior, it directed those academic personnel and staff to stop such behavior. Otherwise, undisputed. <br><br> Hunt Decl. ¶ 5 ("During the Royce Quad encampment, as soon as the Academic Affairs and Personnel Office became aware of reports of some academic personnel or staff moving classes into the encampment, calling for the excusal of student absences related to participation in the encampment, or offering extra credit for attendance at the encampment or related events, they promptly directed those academic personnel and staff to stop such behavior."). |
| 52. **Plaintiffs' Reply**: Though UCLA purports to dispute portions of SUF ¶52, it does so only "nominally," referring to extraneous | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| considerations about whether UCLA "condoned" the faculty's behavior. *Rockwell v. Air & Liquid Sys. Corp.*, No. 21-cv-3963, 2022 WL 18228256, at *1 n.2 (C.D. Cal. Sept. 1, 2022). UCLA thus "fails to actually controvert the proffered 'undisputed' fact" and "disputes the fact on grounds not germane to the actual statement made by the initial proffering party"—i.e., Plaintiffs. *Id.* In doing so, UCLA also improperly includes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). Thus, SUF ¶52 is undisputed in its entirety. ||
| 53. Indeed, the activists involved in blocking students included UCLA faculty, who "entered the encampment in support of its activities" and "participat[ed] in the encampment activities including denial of campus access to Jews and those supporting Israel" and thus "participated in and abetted discrimination against and harassment of Jews and supporters of Israel."<br><br>3d Rassbach Decl. Ex. 1 at 70 (UCLA Antisemitism Task Force Report); see also Dkt.107 ¶140 (Answer). | 53. Undisputed that some faculty members entered the encampment and that the Task Force Report states that they "participat[ed] in the encampment activities including denial of campus access to Jews and those supporting Israel" and "participated in and abetted discrimination against and harassment of Jews and supporters of Israel." |
| 53. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶53, including, without limitation, that "the activists involved in blocking students included UCLA faculty." Thus, SUF ¶53 is undisputed in its entirety. *See* Initial Standing Order at 11. ||

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 54. Faculty members called for fellow faculty to excuse student absences related to presence at the encampment, and reports indicated that some faculty offered "extra credit for attendance at the encampment or related events."<br><br>3d Rassbach Decl. Ex. 1 at 70 (UCLA Antisemitism Task Force Report); see also Dkt.107 ¶143 (Answer). | 54. Disputed to the extent Plaintiffs imply that the administration condoned excusal of student absences related to presence at the encampment or offers of "extra credit for attendance at the encampment or related events." As soon as the Academic Affairs and Personnel Office became aware of such behavior, it directed those academic personnel and staff to stop such behavior. Otherwise, undisputed.<br><br>Hunt Decl. ¶ 5 ("During the Royce Quad encampment, as soon as the Academic Affairs and Personnel Office became aware of reports of some academic personnel or staff moving classes into the encampment, calling for the excusal of student absences related to participation in the encampment, or offering extra credit for attendance at the encampment or related events, they promptly directed those academic personnel and staff to stop such behavior."). |

54. **Plaintiffs' Reply**: Though UCLA purports to dispute portions of SUF ¶54, it does so only "nominally," referring to extraneous considerations about whether UCLA "condoned" the faculty's behavior.

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| *Rockwell v. Air & Liquid Sys. Corp.*, No. 21-cv-3963, 2022 WL 18228256, at *1 n.2 (C.D. Cal. Sept. 1, 2022). In doing so, UCLA "fails to actually controvert the proffered 'undisputed' fact" and "disputes the fact on grounds not germane to the actual statement made by the initial proffering party"—i.e., Plaintiffs. *Id.* In doing so, UCLA also improperly includes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). Thus, SUF ¶54 is undisputed in its entirety. | |
| UCLA Facilitates the Anti-Jewish Segregation | |
| 55. By April 23, 2024, members of UCLA's senior leadership team had discussed plans for confronting a potential encampment. "The initial discussions were about what steps [UCLA] could take to prevent an encampment from being formed on campus." <br><br> Dkt.62-3 ¶4 (Beck Decl.); see also Dkt.107 ¶151 (Answer). | 55. Undisputed. |
| 56. On the morning of April 25, 2024, members of the senior leadership team became aware that an encampment had formed on UCLA's campus. <br><br> Dkt.107 ¶154 (Answer). | 56. Undisputed. |
| 57. "From the beginning, ... it was obvious to many campus leaders that the encampment on Royce Quad | 57. Disputed. Senior leadership did not believe the encampment presented danger to Jewish |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| violated a long list of University policies and presented a clear and present danger to Jewish students."<br><br>3d Rassbach Decl. Ex. 3 at 142 (U.S. House Committee Report on Antisemitism). | students when it was first established.<br><br>Hunt Decl. ¶ 4 ("On or around April 25, 2024, students erected an encampment on Royce Quad … in the middle of the night. I became aware of the Royce Quad encampment in the early morning. While those in senior leadership were in agreement that it needed to be removed, it was not obvious to us at that time that it posed a clear and present danger."). |

57. **Plaintiffs' Reply**: UCLA does not dispute that, as SUF ¶57 states, "[f]rom the beginning, … it was obvious to many campus leaders that the encampment on Royce Quad violated a long list of University policies …." Nor does UCLA dispute that, as SUF ¶57 states, "it was obvious to many campus leaders that the encampment on Royce Quad … presented a clear and present danger to Jewish students."

Instead, UCLA disputes only that it was obvious "*when it was first established*" that the encampment presented such a danger to Jews. (Emphasis added.) Regardless, the undisputed evidence shows that UCLA permitted the encampment to stand despite its awareness that the encampment activists were excluding Jews from parts of the campus and after numerous instances of violence. *See, e.g.*, *supra* ¶47 (admitting that "administrators were inundated with complaints" about "Jewish students being excluded"); *infra* ¶81 (admitting April 30, 2024 email in which Defendant Block acknowledged "students on their way to class [being] physically blocked from accessing parts of the campus" and that "[t]hese incidents" had "put many on our campus, especially our Jewish

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| students, in a state of anxiety and fear"); Dkt.128-5 at 58, 61-62, 67-68 (UCLA Antisemitism Task Force Report). | |
| 58. As of that day, the senior leadership team "agree[d]" that the encampment "needed to be removed at some point" but did not make specific plans to remove it "immediately."<br><br>Dkt.62-3 ¶5 (Beck Decl.). | 58. Disputed to the extent Plaintiffs allege UCLA leadership did not immediately begin to strategize how to remove the encampment safely and quickly. Undisputed that senior leadership agreed the encampment needed to be removed.<br><br>Dkt. 62-3 ¶ 5 (Beck Decl.) ("Once the Royce Quad encampment was up, those in senior leadership were in agreement that it needed to be removed at some point. Throughout the day, we discussed several strategies for how to do so, mindful of the experiences of other schools that faced similar protest activity. We were aware, for example, of the events at the University of Southern California ("USC"), where police dismantled the encampment immediately, only to find the encampment reformed by students several days later. We were aware that other universities around the country, such as Columbia University, experienced challenges with |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | their encampments, including when they immediately called law enforcement to remove them. We were also aware of other campuses where encampments existed on campus without significant disruption to campus operations. We wanted to avoid a situation where the encampment could 'spring up' again. Given these considerations, our strategy was to preserve the safety of those in our campus community while we developed a plan for the encampment to be peacefully and permanently removed."). |
| 58. **Plaintiffs' Reply**: The quoted language from Beck's declaration does not support that UCLA "immediately beg[a]n to strategize how to remove the encampment safely and quickly"; instead, it states that UCLA believed that the encampment "needed to be removed *at some point*" and that it merely started to "develop[] a plan." Dkt.62-3 ¶5 (Beck Decl.) (emphasis added). In any event, the undisputed record shows that UCLA permitted the encampment to stand for a week, knew about the exclusion of Jews, and facilitated that exclusion through its own actions. *See* Dkt.128-5 at 58, 61-62, 67-68 (UCLA Antisemitism Task Force Report); *supra* ¶47; *infra* ¶81. | |
| 59. Also on April 25, Defendants directed the installation of metal bike racks around the encampment. More bike racks were installed two days later, again at Defendants' direction. | 59. Undisputed that UCLA had metal bike racks installed near the encampment to prevent conflict between the encampment and counterdemonstrators and to |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dkt.107 ¶156 (Answer); Dkt.62 at 3 (Defs.' Opp. to Mot. for Prelim. Inj.); 3d Rassbach Decl. Ex. 1 at 60 (UCLA Antisemitism Task Force Report); Dkt.62-3 ¶¶6-7 (Beck Decl.); Dkt.123 at 7 (Defendants' Reply ISO Mot. for Judgment on the Pleadings) (conceding that Defendants "barricad[ed] the] campus encampment"). | discourage the encampment's expansion.<br><br>Dkt. 107 ¶ 156 (Answer) ("Defendants had metal bike racks installed around the encampment, with the goal of preventing conflict between those in the encampment and counter-demonstrators and discouraging the encampment's expansion."); Dkt. 62-3 ¶¶ 6-7 (Beck Decl.) (describing goals of "preventing conflict between those in the encampment and counter-protestors and discouraging its expansion" and "maintain[ing] safety on campus and prevent[ing] the two groups from clashing with each other"); Lurie Decl. ¶ 8 ("In my experience in law enforcement, it is standard practice to keep opposing groups separate during protest and counterprotest activity. This includes through the use of barriers and other crowd control techniques and by creating and enforcing 'neutral zones' to keep opposing factions separate to prevent violence."). |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 59. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶59, making SUF ¶59 undisputed in its entirety. *See* Initial Standing Order at 11.<br><br>Plaintiffs note that no matter what UCLA's motives in installing the bike racks may have been, it is undisputed that the bike racks did not "discourage the encampment's expansion" or "prevent conflict between the encampment and counter-demonstrators." *See supra* ¶39 (admitting "the encampment grew throughout the week"); *supra* ¶42 (not disputing that activists "us[ed the] metal bicycle racks that UCLA had placed on the periphery of the encampment" to "establish[] a perimeter around the encampment"); *infra* ¶¶78-81, 90-91, 96 (admitting violence between activists and counter-protesters). | |
| 60. "[A]dministrators" also "acted to make it easier for the encampment to remain in place: the sprinklers on Royce Quad were turned off, and University leadership was informed by facilities staff that they would stay off for the duration of the encampment."<br><br>3d Rassbach Decl. Ex. 3 at 141-42 (U.S. House Committee Report on Antisemitism). | 60. Disputed to the extent Plaintiffs allege that any decision to turn off the sprinklers was intended to facilitate the encampment's proliferation. The sprinklers were turned off for student safety. Undisputed that sprinklers on Royce Quad were turned off during the encampment.<br><br>2d Beck Decl. ¶ 13 ("During the several days it took for law enforcement to assemble the resources required to remove the encampment safely, UCLA's senior leadership team took action in response to reports that the encampment was preventing |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | students, faculty, and staff from accessing entrances to certain buildings adjacent to Royce Quad. UCLA increased the security presence in the area to ensure that all students could continue to attend classes in those buildings even before the encampment could be removed and took interim steps like turning off the sprinklers in Royce Quad to protect the safety of students in the area."). |
| 60. **Plaintiffs' Reply**: UCLA draws a false distinction between "facilitat[ing] the encampment's proliferation" and facilitating "student safety." Undisputedly, by allowing the encampment activists to remain comfortable and dry, UCLA "ma[d]e it easier for the encampment to remain in place." Dkt.128-7 at 141-42 (U.S. House Committee Report on Antisemitism). | |
| 61. UCLA repeatedly issued campus-wide communications stating that it was "actively monitoring this situation to support a safe and peaceful campus environment that respects our community's right to free expression while minimizing disruption to our teaching and learning mission." Dkt.48-16 at 53 (Shemuelian Ex. 8); *see also* Dkt.48-17 at 54 (Shemuelian Ex. 9); Dkt.48-18 at 55 (Shemuelian | 61. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Ex. 10); Dkt.48-19 at 56 (Shemuelian Ex. 11). | |
| 62. UCLA stationed security personnel, which included third-party security and crowd-management personnel, around the encampment.<br><br>Dkt.107 ¶12 (Answer); Dkt.48-18 at 55 (Shemuelian Ex. 10); Dkt.48-19 at 56 (Shemuelian Ex. 11); Dkt.48-20 at 57 (Shemuelian Ex. 12); Dkt.62-3 ¶¶7-8 (Beck Decl.). | 62. Undisputed. |
| 63. An April 27, 2024 campus-wide alert announced that UCLA had placed "[s]afety personnel" wearing certain "uniforms ... around the encampment site" and that "CSC security teams [were] also located throughout campus."<br><br>Dkt.48-18 at 55 (Shemuelian Ex. 10). | 63. Undisputed. |
| 64. CSC stands for Contemporary Services Corporation, which is a private security company with experience managing crowds and providing event security, including at colleges and universities.<br><br>Dkt.107 ¶158 (Answer). | 64. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 65. Part of the role of outside security personnel like CSC is to "enforce boundaries by ensuring barriers remain in place and telling people where they are allowed to go."<br><br>3d Rassbach Decl. Ex. 2 at 110 (UCLA Independent Investigation Report). | 65.    Disputed    to    the    extent Plaintiffs   imply   that   security personnel near the encampment performed their role to support the    encampment's    existence. Undisputed    that    security personnel may use barriers and enforce neutral zones to promote safety and prevent violence.<br><br>Lurie   Decl.   ¶   8   ("In   my experience in law enforcement, it is   standard   practice   to   keep opposing groups separate during protest    and    counterprotest activity.  This  includes  through the  use  of  barriers  and  other crowd control techniques and by creating  and  enforcing  'neutral zones' to keep opposing factions separate to prevent violence."). |

65. **Plaintiffs' Reply**: Instead of disputing matters actually proffered in SUF ¶65, UCLA improperly includes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). Thus, SUF ¶65 is undisputed in its entirety.

In any event, as for UCLA's asserted dispute over whether "security personnel near the encampment performed their role to support the encampment's existence," UCLA provides no evidence to support the existence of a genuine dispute. *See* Fed.R.Civ.P. 56(c)(1)(A); *James River Ins. Co. v. Medolac Lab'ys*, 290 F.Supp.3d 956, 962 (C.D. Cal. 2018)

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| (party opposing summary judgment must "present significant probative evidence"). And in fact, the record demonstrates that UCLA's security personnel, acting as agents of UCLA, in fact *did* "perform[] their role to support the encampment's existence." *See* Dkt.48-2 ¶¶33-35, 42 (Frankel Decl.); Dkt.48-4 ¶¶34-36 (Ghayoum Decl.); Dkt.48-8 ¶¶104-110 (Shemuelian Decl.); Dkt.64-3 ¶¶8-10 (Shamsa Decl.) (in each case, describing UCLA security's actions in blocking Jews from accessing campus, assisting encampment activists, and declining to intervene to stop discrimination); *see also* Dkt.128-5 at 76 & n.193 (UCLA Antisemitism Task Force Report) (noting that "the presence of campus security at the encampment" only "muddied whatever clear signal [of concern] the Chancellor may have sought to transmit" because "discriminatory incidents" were "tak[ing] place in plain sight"). | |
| 66. An April 28, 2024 campus-wide alert further noted that UCLA "ha[d] safety teams who are wearing Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs) and CSC security uniforms throughout the demonstration site."<br><br>Dkt.48-19 at 56 (Shemuelian Ex. 11). | 66. Undisputed. |
| 67. This alert also noted that UCLA had "taken several steps to help ensure people on campus know about the demonstration so they can avoid the area if they wish," including by "having student affairs representatives stationed near Royce [Q]uad to let Bruins and visitors know about the encampment, redirect them if | 67. Undisputed |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| desired and to serve as a resource for their needs." <br><br> Dkt.48-19 at 56 (Shemuelian Ex. 11). | |
| 68. An April 29, 2024 campus-wide alert stated that UCLA had "increased the numbers of our safety team members on site, including our uniformed Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs), CSC and campus security." <br><br> Dkt.48-20 at 57 (Shemuelian Ex. 12). | 68. Undisputed. |
| 69. UCLA's security staff participated in limiting access to the encampment. UCLA admits that it "instructed" the "security staff" "to prevent anyone from accessing" so-called "'neutral zones' between the encampment and counter-demonstrators." <br><br> Dkt.107 ¶161 (Answer); *see also* Dkt.62-3 ¶¶7-8 (Beck Decl.). | 69. Disputed to the extent Plaintiffs imply that security personnel near the encampment solely prevented Jewish students from accessing the portion of the campus occupied by the encampment. Undisputed that security personnel used barriers and prevented anyone from entering neutral zones to promote safety and prevent violence. <br><br> Dkt. 62-3 ¶ 7–8 (Beck Decl.) ("We specifically established two 'neutral zones' between the pro-Palestinian encampment and the pro-Israeli counter- |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | demonstration with the intent this would maintain safety on campus and prevent the two groups from clashing with each other. … Our security team, which included third-party security and crowd management personnel, was instructed to prevent anyone from accessing the neutral zones. When individuals from the encampment, or counter-protestors, attempted to cross into the neutral zone between the two designated areas, our security team prevented them from entering. The exclusion of individuals from the neutral zones was not based on their viewpoint or the content of their expression."); Lurie Decl. ¶ 8 ("In my experience in law enforcement, it is standard practice to keep opposing groups separate during protest and counterprotest activity. This includes through the use of barriers and other crowd control techniques and by creating and enforcing 'neutral zones' to keep opposing factions separate to prevent violence."). |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 69. **Plaintiffs' Reply**: Notably, UCLA does not dispute that "UCLA's security staff participated in limiting access to the encampment." While UCLA claims it "instructed" its security "to prevent anyone from accessing the neutral zones," Dkt.62-3 ¶8 (Beck Decl.), it provides no evidentiary support for its claim that security personnel actually did "prevent[] *anyone* from entering." (Emphasis added.) *See* Fed.R.Civ.P. 56(c)(1)(A); *James River Ins. Co. v. Medolac Lab'ys*, 290 F.Supp.3d 956, 962 (C.D. Cal. 2018) (party opposing summary judgment must "present significant probative evidence").<br><br>And in fact, the record demonstrates that UCLA security acted specifically to exclude Jews. *See* Dkt.48-8 ¶107 (Shemuelian Decl.) (security informed Plaintiff Shemuelian that she could not approach the encampment "unless you're going in"—i.e., unless she had the activists' permission to enter); *supra* ¶39 (admitting that "the encampment"—whose admissions criteria expressly discriminated against Jews—"grew throughout the week").<br><br>Regardless, at minimum, security officers participated in the encampment's denial of Jews' access to campus. *See* Dkt.48-2 ¶¶33-35, 42 (Frankel Decl.); Dkt.48-4 ¶¶34-36 (Ghayoum Decl.); Dkt.48-8 ¶¶104-110 (Shemuelian Decl.); Dkt.64-3 ¶¶8-10 (Shamsa Decl.) (in each case, describing UCLA security's actions in blocking Jews from accessing campus, assisting encampment activists, and declining to intervene to stop discrimination). | |
| 70. These "neutral zones" were located to the immediate east and west of the location of the encampment on Royce Quad.<br><br>Dkt.62-3 ¶7 (Beck Decl.). | 70. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 71. UCLA also directed the UCLA PD not to intervene in the encampment.<br><br>3d Rassbach Decl. Ex. 1 at 68 (UCLA Antisemitism Task Force Report); 3d Rassbach Decl. Ex. 2 at 100, 112 (UCLA Independent Investigation Report). | 71. Disputed to the extent Plaintiffs allege UCLA PD was directed not to intervene in the encampment under any circumstances and to the extent Plaintiffs infer that a directive not to intervene implies that UCLA was not actively trying to remove the encampment. UCLA followed longstanding University of California guidance set forth in a report colloquially known as the Robinson-Edley report, which enumerates recommendations for responding to demonstrations and managing protests. That guidance calls, in part, for de-escalation, which is a reliable, effective, and commonly used strategy for managing protest activity. It is standard practice for law enforcement employing de-escalation tactics to refrain from intervening directly in protest activity at the outset. Further disputed to the extent Plaintiffs allege that UCLA directed UCLA PD not to intervene for the entirety of the encampment. By April 28, 2024, UCLA had instructed UCLA PD to devise a strategy to remove the encampment safely and quickly. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
|  | Dkt. 62-3 ¶ 14 (Beck Decl.) ("One important guiding principle in our strategy for engagement with student protestors is the Robinson-Edley Report, which enumerates recommendations for responding to demonstrations and managing protests. Because Robinson-Edley sets forth guidance, it is a flexible tool for managing protests on campus. Robinson-Edley distinguishes nonviolent and minimally invasive civil disobedience from conduct that 'significant[ly] interfere[s] with [a] campus' academic mission' and may require police intervention. 'Significant interference with [a] campus' academic mission' is a flexible standard that allows UCLA to make informed judgments based on the context of each situation."); Dkt. 107 ¶ 171 (Answer) ("Defendants admit that in September 2012, in the wake of physical violence between University police and protestors at 2011 demonstrations, the University of California adopted a report entitled 'Response to Protests on |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | UC Campuses,' colloquially known as the Robinson-Edley report. This report set forth guidance for all UC campuses on the question 'How should our University respond to protest activity that is not violent, but violates the law or campus regulations and that may negatively impact the University's mission.' Robinson-Edley sets forth guidance and is a flexible tool for managing protests on campus."); Lurie Decl. ¶ 9 ("In my experience in law enforcement, it is also standard practice to use de-escalation tactics to manage protest activity. De-escalation is a reliable, effective, and commonly used strategy for managing protest activity that aims to defuse tensions through limited law enforcement presence and intervention, among other things. During my time at LAPD, the department adopted de-escalation techniques for use in situations that are tense, uncertain, and rapidly changing. The objective was to reduce the intensity of an encounter with law enforcement to gain either voluntary |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | compliance or mitigate the need to use a higher level of force."); Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."). |

71. **Plaintiffs' Reply**: UCLA's response admits that UCLA issued a "directive not to intervene" and "refrain[ed] from intervening." UCLA takes issue only with asserted "impli[cations]" of that directive. Thus, SUF ¶71 is undisputed in its entirety.

UCLA also submits no evidence to support a claimed dispute over whether "UCLA directed UCLA PD not to intervene for the entirety of the encampment." *See* Fed.R.Civ.P. 56(c)(1)(A); *James River Ins. Co. v. Medolac Lab'ys*, 290 F.Supp.3d 956, 962 (C.D. Cal. 2018) (party opposing summary judgment must "present significant probative evidence"). "[I]nstructing UCLA PD to devise a strategy to remove the

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|

encampment" is plainly not a directive to intervene, but rather a directive to develop a *plan* to intervene. And, as Defendant Block publicly acknowledged, it was not until May 2, 2024—the last day of the encampment—when UCLA "*made the decision* to direct UCPD and outside law enforcement officers to enter and clear the encampment." Dkt.48-27 at 68 (Shemuelian Ex.19) (emphasis added).

Similarly, the record contradicts UCLA's claim that it was "actively trying to remove the encampment." The senior leadership team repeatedly announced to the campus that it was "actively monitoring this situation"—that is, the encampment—"to support a safe and peaceful campus environment that respects our community's right to free expression while minimizing disruption to our teaching and learning mission." Dkt.48-16 at 53 (Shemuelian Ex. 8); *see also* Dkt.48-17 at 54 (Shemuelian Ex.9); Dkt.48-18 at 55 (Shemuelian Ex.10); Dkt.48-19 at 56 (Shemuelian Ex.11). And on May 2, 2024—the day the encampment was finally cleared—Chancellor Block told the UCLA community that UCLA had "approached the encampment with the goal of maximizing our community members' ability to make their voices heard on an urgent global issue" and had "had allowed [the encampment] to remain in place so long as it did not jeopardize Bruins' safety or harm our ability to carry out our mission." Dkt.48-27 at 68 (Shemuelian Ex.19).

The remainder of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead).

| | |
|---|---|
| 72. There was a "widespread belief among UCLA Police Department officials that they were not allowed to take any action to respond to | 72. Disputed to the extent Plaintiffs allege that members of UCLA PD believed throughout the encampment's entire duration that they could not |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| behavior that began as a policy violation." <br><br> 3d Rassbach Decl. Ex. 2 at 100 (UCLA Independent Investigation Report). | "take any action to respond to behavior that began as a policy violation." Starting on April 28, 2024, UCLA instructed UCLA PD to respond to the encampment. Further disputed to the extent Plaintiffs imply that law enforcement was not present and monitoring the encampment during the de-escalation phase. Undisputed that the Independent Investigation & After-Action Review of Encampment-Related Events at the University of California, Los Angeles, April 2024 through May 6, 2024: Recommendations suggests that members of UCLA PD believed they could not respond to the encampment prior to April 28, 2024. <br><br> Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."); 2d Beck Decl. ¶ 12 ("Even during the de-escalation phase, law enforcement also monitored the encampment."). |

72. **Plaintiffs' Reply**: Nothing UCLA says here, even if true, contradicts anything in SUF ¶72, which quotes a finding of a UCLA-commissioned investigative report. Nor does UCLA cite any evidence that contradicts anything in SUF ¶72. *See* Fed.R.Civ.P. 56(c)(1)(A); *James River Ins. Co. v. Medolac Lab'ys*, 290 F.Supp.3d 956, 962 (C.D. Cal. 2018) (party opposing summary judgment must "present significant probative evidence"). Thus, SUF ¶72 is undisputed in its entirety.

Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead).

| | |
|---|---|
| 73. "[T]he UCLA administration was responsive to ... requests" from "[e]ncampment members" who "made clear throughout the encampment period they did not want to engage with police or to see | 73. Disputed to the extent Plaintiffs imply that UCLA never asked UCLA PD to intervene despite encampment members' alleged requests not to engage with police. By April 28, 2024 UCLA had instructed UCLA PD to devise a strategy to remove the |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| police in or around the encampment." <br><br> 3d Rassbach Decl. Ex. 2 at 112 (UCLA Independent Investigation Report). | encampment safely and quickly. Further disputed to the extent Plaintiffs imply that law enforcement was not present and monitoring the encampment during the de-escalation phase. Undisputed that UCLA's communication with protesters during the encampment was part and parcel of its de-escalation strategy and that, at first, UCLA attempted not to involve law enforcement because it aimed to end the encampment without resorting to use of force. <br><br> Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | the encampment, it would take days to assemble the necessary resources to remove it safely."); 2d Beck Decl. ¶ 12 ("During this phase, UCLA deploys Student Affairs Mitigators/Monitors ("SAMs") to interact with protesters using specific communications strategies. SAMs aim to cultivate relationships with students so that if conflicts arise, they can be addressed more readily through communication and de-escalation, thereby mitigating tensions. Even during the de-escalation phase, law enforcement also monitored the encampment."); Lurie Decl. ¶ 9 ("In my experience in law enforcement, it is also standard practice to use de-escalation tactics to manage protest activity. De-escalation is a reliable, effective, and commonly used strategy for managing protest activity that aims to defuse tensions through limited law enforcement presence and intervention, among other things. During my time at LAPD, the department adopted de-escalation techniques for use in situations that are tense, |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
|  | uncertain, and rapidly changing. The objective was to reduce the intensity of an encounter with law enforcement to gain either voluntary compliance or mitigate the need to use a higher level of force."). |
| 73. **Plaintiffs' Reply**: Nothing UCLA says here, even if true, contradicts anything in SUF ¶73, which quotes a finding of a UCLA-commissioned investigative report. Nor does UCLA cite any evidence that contradicts anything in SUF ¶73. *See* Fed.R.Civ.P. 56(c)(1)(A); *James River Ins. Co. v. Medolac Lab'ys*, 290 F.Supp.3d 956, 962 (C.D. Cal. 2018) (party opposing summary judgment must "present significant probative evidence"). Thus, SUF ¶73 is undisputed in its entirety.<br><br>Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). ||
| 74. Indeed, "there is general agreement across most accounts that police were instructed to remain wholly unseen by protesters."<br><br>3d Rassbach Decl. Ex. 2 at 112 (UCLA Independent Investigation Report). | 74. Disputed to the extent Plaintiffs imply that UCLA PD was instructed "to remain wholly unseen by protestors" throughout the encampment's entire duration. Starting on April 28, 2024, UCLA instructed UCLA PD to respond to the encampment. Further disputed to the extent Plaintiffs imply that law enforcement was not present and monitoring the encampment during the de-escalation phase. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."); 2d Beck Decl. ¶ 12 ("Even during the de-escalation phase, law enforcement also monitored the encampment."). |

74. **Plaintiffs' Reply**: Nothing UCLA says here, even if true, contradicts anything in SUF ¶74, which quotes a finding of a UCLA-commissioned investigative report. Nor does UCLA cite any evidence that contradicts anything in SUF ¶74. *See* Fed.R.Civ.P. 56(c)(1)(A); *James River Ins. Co. v. Medolac Lab'ys*, 290 F.Supp.3d 956, 962 (C.D. Cal. 2018) (party opposing summary judgment must "present significant probative evidence"). Thus, SUF ¶74 is undisputed in its entirety.

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). ||
| 75. In one incident, "when protesters objected to officers' presence in a nearby building, where they had positioned themselves to gain information about the state of the encampment, administrators instructed officers to leave."<br><br>3d Rassbach Decl. Ex. 2 at 112 (UCLA Independent Investigation Report). | 75. Undisputed that the Independent Investigation & After-Action Review of Encampment-Related Events at the University of California, Los Angeles, April 2024 through May 6, 2024: Recommendations states that "when protesters objected to officers' presence in a nearby building, where they had positioned themselves to gain information about the state of the encampment, administrators instructed officers to leave." |
| 75. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶75, and thus it is undisputed. *See* Initial Standing Order at 11. ||
| 76. UCLA repeatedly informed the campus community that "University of California systemwide policy guidance" requires it "not to request law enforcement involvement preemptively," but "only if absolutely necessary to protect the physical safety of our campus community."<br><br>Dkt.48-19 at 56 (Shemuelian Ex. 11); Dkt.74-2 (Suppl. Rassbach Ex. 2). | 76. Undisputed that UCLA informed the campus community of this guidance, which was intended to serve the "equally important principles" of supporting campus safety, supporting free expression, and minimizing disruption to teaching and learning. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Dkt. 48-19 at 56 (Shemuelian Ex. 11) ("Our approach continues to be guided by several equally important principles: the need to support the safety and wellbeing of Bruins, the need to support the free expression rights of our community, and the need to minimize disruption to our teaching and learning mission. These same long-standing principles have allowed UCLA to uphold a history of peaceful protest. UCLA is following University of California systemwide policy guidance, which directs us not to request law enforcement involvement preemptively, and only if absolutely necessary to protect the physical safety of our campus community."). |
| 76. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶76, and thus it is undisputed. *See* Initial Standing Order at 11. UCLA's attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant" is improper. Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 77. This statement of UCLA's policy not to request preemptive assistance refers to the senior leadership team's | 77. Undisputed that some members of the senior leadership |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| interpretation of the Robinson-Edley Report, a document published by the University of California system that, according to UCLA, "affords UC campuses broad discretion to respond to protests."<br><br>Dkt.62 at 10-11 (Defs.' Opp. to Mot. for Prelim. Inj.); *see also* Dkt.107 ¶171 (Answer); Dkt.62-6 at 4-161 (Braziel Ex. 2) (Robinson-Edley report). | team interpreted Robinson-Edley this way. |
| 77. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶77, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 78. On April 28, 2024, "physical altercations broke out among demonstrators on Royce Quad," as UCLA acknowledged in a campus-wide message.<br><br>Dkt.48-20 at 57 (Shemuelian Ex. 12). | 78. Undisputed. |
| 79. The violence included "the child of a Holocaust survivor" being "pepper sprayed by encampment participants" and "a Jewish student" being "thrown to the ground by members of the encampment and repeatedly kicked in the head."<br><br>3d Rassbach Decl. Ex. 3 at 143 (U.S. House Committee Report on | 79. Disputed to the extent Plaintiffs' allege "encampment participants" engaged in these actions. UCLA permitted the Israeli American Council to hold a counterdemonstration on Royce Quad, near the encampment, on April 28, 2024. Pro-Palestinian protesters gathered in Gateway Plaza, away from the |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Antisemitism); *see also* 3d Rassbach Decl. Ex. 1 at 65-66 (UCLA Antisemitism Task Force Report). | encampment, and marched to the pro-Israeli demonstration. Clashes broke out between the pro-Israeli protesters and the pro-Palestinian protesters who had assembled in Gateway Plaza. Otherwise, undisputed.<br><br>2d Beck Decl. ¶ 11 ("As mentioned in my prior declaration, on or around Friday, April 26, 2024, the day after the encampment was erected, UCLA permitted the Israeli American Council to hold on April 28, 2024 a counterdemonstration on Royce Quad, near the encampment. My understanding is that Pro-Palestinian protesters gathered in Gateway Plaza, away from the encampment, and marched to the pro-Israeli demonstration. Clashes broke out between the pro-Israeli protesters and thee pro-Palestinian protesters who had assembled in Gateway Plaza."). |

79. **Plaintiffs' Reply**: Though UCLA purports to dispute whether the encampment's activists "engaged in these actions"—meaning pepper spraying the child of a Holocaust survivor and kicking a Jewish student in the head—UCLA does not submit any evidence to place it into dispute. Thus, SUF ¶79 is undisputed in its entirety. *See* Fed.R.Civ.P. 56(c)(1)(A); *James River Ins. Co. v. Medolac Lab'ys*, 290 F.Supp.3d 956,

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 962 (C.D. Cal. 2018) (party opposing summary judgment must "present significant probative evidence").<br><br>Indeed, the evidence that UCLA cites does not support a dispute about the identity of those involved in the violence. Nothing in Defendant Beck's cited statement—which appears not to be based on personal knowledge ("[m]y understanding is")—contradicts that the encampment's activists perpetrated these violent incidents. *See* Fed.R.Civ.P. 56(c)(4). | |
| 80. While UCLA increased the number of security staff around the encampment, it did not immediately clear the encampment.<br><br>Dkt.48-20 at 57 (Shemuelian Ex. 12); 3d Rassbach Decl. Ex. 1 at 65-66 (UCLA Antisemitism Task Force Report). | 80. Disputed to the extent Plaintiffs allege preparations to remove the encampment were not yet underway on April 28, 2024. While the encampment was not removed as part of the immediate intervention that occurred that day, on April 28, 2024, UCLA PD was instructed to develop a plan to remove the encampment safely and quickly.<br><br>Dkt. 62-3 ¶ 10 (Beck Decl.) ("That same day, on April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."); Dkt. 107 ¶¶ 186-87 (Answer) (explaining that "by this time UCLA PD had been instructed to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly"). |
| 80. **Plaintiffs' Reply**: UCLA's response confirms that SUF ¶80 is undisputed in its entirety, as UCLA admits that "the encampment was not removed" on April 28, 2024. The information UCLA includes is merely another inappropriate insertion of additional facts under the guise of a dispute. *See* Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 81. On April 30, 2024, Defendant Block sent a campus-wide email addressing the encampment. Block acknowledged that the "unauthorized physical encampment" had led to "shocking and shameful" "tactics." He stated that the encampment had given rise to "instances of violence completely at odds with our values" and had resulted in "students on their way to class [being] physically blocked from | 81. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| accessing parts of the campus." "These incidents," Block continued, "have put many on our campus, especially our Jewish students, in a state of anxiety and fear." <br><br> Dkt.48-23 at 60 (Shemuelian Ex. 15). | |
| 82. The same day that Defendant Block sent his message, UCLA acknowledged that the encampment was impeding access to certain parts of campus. <br><br> Dkt.48-21 at 58 (Shemuelian Ex. 13). | 82. Undisputed that a BruinALERT sent at 8:01 AM mentioned that "access to Royce Quad [was] limited" and provided information on accessing certain academic buildings. As Chancellor Block's email at 5:01 PM that same day explained, UCLA promptly removed "barriers that demonstrators used to block access to buildings." By that point, UCLA had also already instructed UCLA PD on April 28, 2024 to devise a strategy to remove the encampment safely and quickly and UCLA PD had advised that it would "take days to assemble the necessary resources" to do so. <br><br> Dkt. 48-21 at 58 (Shemuelian Ex. 13) ("The access to Royce Quad is limited and as such, please enter Powell and Kaplan Hall from the south-facing entrances; Royce and Haines Hall are accessible |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | through the north or west entrances."); Dkt.48-23 at 60 (Shemuelian Ex. 15) ("The barriers that demonstrators used to block access to buildings have been removed, and we have staff located around Royce Quad to help ensure that they will not go up again."); Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."). |
| 82. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶82, and thus it is undisputed. *See* Initial Standing Order at 11. | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). In any event, Plaintiffs note that Block's 5:01pm email does not state that UCLA removed barriers "promptly." Dkt.48-23 at 60 (Shemuelian Ex. 15). | |
| 83.  Specifically, UCLA sent a Campus Activity Update announcing that "access to Royce Quad is limited and as such, please enter Powell and Kaplan Hall from the south-facing entrances; Royce and Haines Hall are accessible through the north or west entrances."<br><br>Dkt.48-21 at 58 (Shemuelian Ex. 13). | 83.  Undisputed that a BruinALERT sent at 8:01 AM mentioned that "access to Royce Quad [was] limited" and provided information on accessing certain academic buildings. As Chancellor Block's email at 5:01 PM that same day explained, UCLA promptly removed "barriers that demonstrators used to block access to buildings." By that point, UCLA had also already instructed UCLA PD on April 28, 2024 to devise a strategy to remove the encampment safely and quickly and UCLA PD had advised that it would "take days to assemble the necessary resources" to do so.<br><br>Dkt. 48-21 at 58 (Shemuelian Ex. 13) ("The access to Royce Quad is limited and as such, please enter Powell and Kaplan Hall from the south-facing entrances; Royce and Haines Hall are accessible through the north or west |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | entrances."); Dkt.48-23 at 60 (Shemuelian Ex. 15) ("The barriers that demonstrators used to block access to buildings have been removed, and we have staff located around Royce Quad to help ensure that they will not go up again."); Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."). |

83. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶83, and thus it is undisputed. *See* Initial Standing Order at 11.

Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). In any event, Plaintiffs note that neither Block's 5:01pm email nor any of the other cited language states that UCLA removed barriers "promptly." Dkt.48-23 at 60 (Shemuelian Ex. 15). | |
| 84. The update also stated that UCLA had "stationed" "student affairs representatives ... near Royce [Q]uad" to, among other things, "redirect" "Bruins and visitors ... if desired."<br><br>Dkt.48-21 at 58 (Shemuelian Ex. 13). | 84. Undisputed that UCLA responded to the encampment by, in part, placing student affairs representatives "near Royce quad to let Bruins and visitors know about the encampment, redirect them if desired and to serve as a resource for their needs." UCLA further "enhanced security measures and increased the numbers of our safety team members on site, including our uniformed Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs), CSC and campus security." By that point, UCLA had also already instructed UCLA PD on April 28, 2024 to devise a strategy to remove the encampment safely and quickly and UCLA PD had advised that it would "take days to assemble the necessary resources" to do so.<br><br>Dkt. 48-21 at 58 (Shemuelian Ex. 13) ("We have enhanced security measures and increased the numbers of our safety team |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | members on site, including our uniformed Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs), CSC and campus security. . . . student affairs representatives [are] stationed near Royce quad to let Bruins and visitors know about the encampment, redirect them if desired and to serve as a resource for their needs."); Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."); 2d Beck Decl. ¶ 12 (describing |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | role of SAMs during de-escalation). |
| 84. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶84, and thus it is undisputed. *See* Initial Standing Order at 11.<br><br>Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 85. The update further noted that UCLA would "continue to ensure people on campus know about the demonstration so they can avoid the area if they wish."<br><br>Dkt.48-21 at 58 (Shemuelian Ex. 13). | 85. Undisputed. |
| 86. That same afternoon, UCLA announced that Royce Hall would be closed through that Friday and Powell Library until the following Monday.<br><br>Dkt.48-22 at 59 (Shemuelian Ex. 14). | 86. Undisputed. |
| 87. The same announcement again noted that "[s]tudent affairs representatives" were "stationed near Royce Quad" and that UCLA had "increased the numbers of our safety team members on site." | 87. Undisputed that UCLA responded to the encampment by, in part, placing student affairs representatives "near Royce Quad to let Bruins and visitors know about the encampment and closed buildings, redirect them if |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dkt.48-22 at 59 (Shemuelian Ex. 14). | desired and to serve as a resource for their needs." UCLA further "enhanced security measures and increased the numbers of our safety team members on site, including our uniformed Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs), CSC and law enforcement officers." By that point, UCLA had also already instructed UCLA PD on April 28, 2024 to devise a strategy to remove the encampment safely and quickly and UCLA PD had advised that it would "take days to assemble the necessary resources" to do so.<br><br>Dkt. 48-22 at 59 (Shemuelian Ex. 14) ("Student affairs representatives, along with signage, are stationed near Royce Quad to let Bruins and visitors know about the encampment and closed buildings, redirect them if desired and to serve as a resource for their needs." We have also enhanced security measures and increased the numbers of our safety team members on site, including our uniformed Student Affairs Mitigators (SAMs), Public Safety Aides (PSAs), CSC and |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | law enforcement officers."); Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."); 2d Beck Decl. ¶ 12 (describing role of SAMs during de-escalation). |

87. **Plaintiffs' Reply**: UCLA's response does not indicate that it affirmatively disputes anything in SUF ¶87, and thus it is undisputed.

Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead).

| 88. The announcement did not direct activists to remove the barricades | 88. Disputed to the extent Plaintiffs imply that UCLA had |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| around the encampment or to permit access to campus facilities.<br><br>Dkt.48-22 at 59 (Shemuelian Ex. 14). | not already instructed UCLA PD on April 28, 2024 to devise a strategy to remove the encampment safely and quickly and that UCLA PD had advised that it would "take days to assemble the necessary resources" to do so. Undisputed that a BruinALERT sent at 4:25 PM did not direct protesters to remove barricades or permit access to campus facilities. As Chancellor Block's email at 5:01 PM explained, however, UCLA promptly removed "barriers that demonstrators used to block access to buildings" and took measures to "ensure that they [would] not go up again."<br><br>Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."); Dkt.48-23 at 60 (Shemuelian Ex. 15) ("The barriers that demonstrators used to block access to buildings have been removed, and we have staff located around Royce Quad to help ensure that they will not go up again."). |
| 88. **Plaintiffs' Reply**: UCLA's response confirms that the "BruinALERT sent at 4:25 PM did not direct protesters to remove barricades or permit access to campus facilities." Thus, SUF ¶88 is undisputed in its entirety.<br><br>Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). In any event, Plaintiffs note that Block's 5:01pm email does not state that UCLA removed barriers "promptly." Dkt.48-23 at 60 (Shemuelian Ex. 15). | |
| 89. That evening (on April 30, 2024), "[w]hen campus administrators attempted to close Royce Hall and Powell Library ..., a UCPD lieutenant reported that encampment members were 'controlling' the east entrance, | 89. Undisputed that the Republican Staff Report on Antisemitism on College Campuses Exposed, Committee on Education & the Workforce, U.S. House of Representatives states that "[w]hen campus |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| allowing encampment members unrestricted access to the building and its bathrooms." 3d Rassbach Decl. Ex. 3 at 144 (U.S. House Committee Report on Antisemitism). | administrators attempted to close Royce Hall and Powell Library ..., a UCPD lieutenant reported that encampment members were 'controlling' the east entrance, allowing encampment members unrestricted access to the building and its bathrooms." |
| 89. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶89, and thus it is undisputed. *See* Initial Standing Order at 11. ||
| 90. Later that evening (on April 30, 2024), a violent confrontation arose between the encampment activists and counter-protesters. Dkt.48-24 at 62 (Shemuelian Ex. 16). | 90. Undisputed. |
| 91. In response to this confrontation, Defendants instructed UCLA PD and LAPD to intervene, which they did. Dkt.48-24 at 62 (Shemuelian Ex. 16); Dkt.107 ¶¶186-87 (Answer). | 91. Undisputed. Even then, amidst an actively violent confrontation, it took several hours for law enforcement to respond. Dkt. 62-3 ¶ 12 (Beck Decl.) ("On April 30, 2024, individuals in the Royce Quad encampment were provided with written notice that the encampment was unlawful, and that they should disperse. By this time, the encampment had grown to at least 500 individuals |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | during the day. Before a critical mass of police could be assembled to remove the encampment, assailants violently attacked the encampment that night. It took several hours for law enforcement to subdue the violence. The law enforcement present that night was not prepared to conduct the operation required to end the encampment."). |
| 91. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶91, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 92. UCLA PD and LAPD did not "remove the Royce Quad encampment" as part of the intervention.<br><br>Dkt.107 ¶¶186-87 (Answer); see also Dkt.48-24 at 62 (Shemuelian Ex. 16); Dkt.62-3 ¶¶12-13 (Beck Decl.). | 92. Disputed. While the encampment was not removed as part of the immediate intervention that occurred on the evening of April 30, planning was already underway to remove it safely and quickly. UCLA PD and LAPD did not have the capacity to remove the encampment that night.<br><br>Dkt. 62-3 ¶¶ 10, 12 (Beck Decl.) ("That same day, on April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."; describing how the "law enforcement present that night was not prepared to conduct the operation required to end the encampment"); Dkt. 107 ¶¶ 186-87 (Answer) (explaining that "by this time UCLA PD had been instructed to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly"). |

92. **Plaintiffs' Reply**: UCLA's response confirms that "the encampment was not removed as part of the immediate intervention that occurred on the evening of April 30." Thus, SUF ¶92 is undisputed in its entirety.

The remainder of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead).

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 93. The next day—May 1, 2024—Chancellor Block sent a campus-wide email condemning the "attack [on] the encampment that has been established ... to advocate for Palestinian rights" and stating that "I can assure you that we will conduct a thorough investigation that may lead to arrests, expulsions and dismissals."<br><br>Dkt.48-24 at 62 (Shemuelian Ex. 16). | 93. Undisputed. |
| 94. This email did not condemn the encampment or the conduct of those involved with the encampment, including the exclusion of supporters of Israel from campus. It also did not mention disbanding the encampment.<br><br>Dkt.48-24 at 62 (Shemuelian Ex. 16). | 94. Disputed. Chancellor Block's campus-wide email acknowledged that the attack on the encampment "add[ed] to other abhorrent incidents" that had taken place at UCLA in recent days. It also expressed sympathy "to all those who have been harmed or feared for their safety in recent days," echoing, for example, his email from the previous day, which acknowledged that "shocking and shameful" "tactics" had "put many on our campus, especially our Jewish students, in a state of anxiety and fear." Undisputed that this particular email did not mention disbanding the encampment, though steps had already been taken to disperse it, |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | including that individuals in the encampment had been provided notice that they should disperse on April 30, 2024. |
| | Dkt. 48-23 at 60 (Shemuelian Ex. 15) ("Many of our demonstrators, as well as counter-demonstrators who have come to the area, have been peaceful in their activism. But the tactics of others have frankly been shocking and shameful. . . . UCLA supports peaceful protest, but not activism that harms our ability to carry out our academic mission and makes people in our community feel bullied, threatened and afraid. These incidents have put many on our campus, especially our Jewish students, in a state of anxiety and fear."); Dkt. 48-24 at 62 (Shemuelian Ex. 16) (acknowledging that the attack on the encampment had "shaken our campus to its core and – adding to other abhorrent incidents that we have witnessed and that have circulated on social media over the past several days – further damaged our community's sense of security. I want to express my sincere |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | sympathy to those who were injured last night, and to all those who have been harmed or have feared for their safety in recent days"); Dkt. 62-3 ¶¶ 12-13 (Beck Decl.) (explaining that "individuals in the Royce Quad encampment were provided with written notice that the encampment was unlawful, and that they should disperse" on April 30, 2024, and that they "were provided with a final opportunity to leave voluntarily" on May 1, 2024). |
| 94. **Plaintiffs' Reply**: UCLA merely points to vague language in Block's email, which certainly does not, as SUF ¶94 states, "condemn the encampment or the conduct of those involved with the encampment, including the exclusion of supporters of Israel from campus." By contrast, Block's email explicitly condemns the "instigators" of "the attack on the encampment," while saying nothing explicit about the "instigators" of discrimination against and exclusion of Jews. Dkt.48-24 at 62 (Shemuelian Ex. 16). UCLA also expressly admits that the "email did not mention disbanding the encampment." ||
| 95. The encampment remained in place that day (May 1, 2024).<br><br>Dkt.107 ¶190 (Answer). | 95. Disputed to the extent Plaintiffs allege that the encampment's disbandment was not underway on May 1, 2024. By that time, UCLA PD was developing a plan to remove the encampment safely and quickly. Individuals in the encampment had been provided notice that |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | they should disperse on April 30, 2024, followed by several warnings and a final opportunity to leave voluntarily on May 1, 2024. Over 300 protesters left voluntarily.

Dkt. 107 ¶ 190 (Answer) ("[B]y this time, UCLA PD had been instructed to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly."); Dkt. 62-3 ¶¶ 12-13 (Beck Decl.) (explaining that "individuals in the Royce Quad encampment were provided with written notice that the encampment was unlawful, and that they should disperse" on April 30, 2024, and that they "were provided with a final opportunity to leave voluntarily" on May 1, 2024); Dkt. 48-27 at 68 (Shemuelian Ex. 19) ("Those who remained encamped last night were given several warnings and were offered the opportunity to leave peacefully with their belongings before officers entered the area. Ultimately about 300 protestors voluntarily left, while more than 200 resisted orders to disperse and were arrested."). |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 95. **Plaintiffs' Reply**: UCLA's response nowhere disputes that the encampment remained in place on May 1, 2024. "[D]eveloping a plan to remove the encampment" is not the same thing as removing it. Thus, SUF ¶95 is undisputed in its entirety.<br><br>The remainder of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). In addition, UCLA impermissibly relies on its own answer, which it cannot do at summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the record"); *Gen. Ins. Co. of Am. v. Hall*, 657 F.Supp.3d 1302, 1307 (C.D. Cal. 2023) ("the nonmoving party cannot simply rest on the pleadings"). | |
| 96. The same day, UCLA cancelled "all classes" because of the "distress caused by the violence that took place on Royce Quad."<br><br>Dkt.48-25 at 64 (Shemuelian Ex. 17); see also Dkt.107 ¶190 (Answer). | 96. Undisputed. |
| 97. And later that day, UCLA announced that people should "continue to avoid campus and the Royce Quad area" and that classes would be held remotely on May 2 and 3.<br><br>Dkt.48-26 at 65 (Shemuelian Ex. 18); see also Dkt.107 ¶190 (Answer). | 97. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 98. "[E]arly" in the "morning" on May 2, 2024, Defendants "made the decision to direct UCPD and outside law enforcement officers to enter and clear the encampment."<br><br>Dkt.48-27 at 68 (Shemuelian Ex. 19). | 98. Disputed to the extent Plaintiffs allege that the encampment's disbandment was not underway on May 1, 2024. By that time, UCLA PD was developing a plan to remove the encampment safely and quickly. Individuals in the encampment had been provided notice that they should disperse on April 30, 2024, followed by several warnings and a final opportunity to leave voluntarily on May 1, 2024. Over 300 protesters left voluntarily.<br><br>Dkt. 62-3 ¶ 10 (Beck Decl.) ("That same day, on April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | the encampment, it would take days to assemble the necessary resources to remove it safely."); Dkt. 107 ¶ 190 (Answer) ("[B]y this time, UCLA PD had been instructed to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly."); Dkt. 62-3 ¶¶ 12-13 (Beck Decl.) (explaining that "individuals in the Royce Quad encampment were provided with written notice that the encampment was unlawful, and that they should disperse" on April 30, 2024, and that they "were provided with a final opportunity to leave voluntarily" on May 1, 2024); Dkt. 48-27 at 68 (Shemuelian Ex. 19) ("Those who remained in the encampment last night were given several warnings and were offered the opportunity to leave peacefully with their belongings before officers entered the area. Ultimately about 300 protestors voluntarily left, while more than 200 resisted orders to disperse and were arrested."). |
| 98. **Plaintiffs' Reply**: SUF ¶98 is a quote of a public statement made by Defendant Block. And nothing UCLA says in response contradicts anything in SUF ¶98. Though UCLA purports to dispute portions of | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| SUF ¶98, it does so only "nominally," referring to extraneous considerations about developing plans to clear the encampment, the provision of a notice to disperse, and the behavior of some activists. *Rockwell v. Air & Liquid Sys. Corp.*, No. 21-cv-3963, 2022 WL 18228256, at *1 n.2 (C.D. Cal. Sept. 1, 2022). In doing so, UCLA "fails to actually controvert the proffered 'undisputed' fact" and "disputes the fact on grounds not germane to the actual statement made by the initial proffering party"—i.e., Plaintiffs. *Id.* Thus, SUF ¶98 is undisputed in its entirety.<br><br>Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 99. In another email to the campus community, delivered that day, Defendant Block acknowledged that "the encampment on Royce Quad was both unlawful and a breach of policy," which his administration "had allowed ... to remain in place," resulting in "[d]emonstrators directly interfer[ing] with instruction by blocking students' pathways to classrooms."<br><br>Dkt.48-27 at 68 (Shemuelian Ex. 19). | 99. Undisputed that Chancellor Block's email contains the language quoted in SUF ¶ 99 and that when "violent clashes between demonstrators and counter-demonstrators put too many Bruins in harm's way" and "[d]emonstrators directly interfered with instruction," the encampment "needed to come to an end," and UCLA developed a plan to bring about that result.<br><br>Dkt. 48-27 at 68 (Shemuelian Ex. 19) ("Several days of violent clashes between demonstrators and counterdemonstrators put too many Bruins in harm's way.... Demonstrators directly |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | interfered with instruction by blocking students' pathways to classrooms.... [The encampment] needed to come to an end."); Dkt. 107 ¶ 190 (Answer) ("[B]y this time, UCLA PD had been instructed to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly."). |
| 99. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶99, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 100. Defendant Block described how his administration had met with "demonstration leaders to discuss options for a peaceful and voluntary disbanding of the encampment," but "that meeting did not lead to an agreement."<br><br>Dkt.48-27 at 68 (Shemuelian Ex. 19). | 100. Undisputed that UCLA's communication with protesters during the encampment was part and parcel of its de-escalation strategy and that, at first, UCLA attempted not to involve law enforcement because it aimed to end the encampment without resorting to use of force.<br><br>Lurie Decl. ¶ 9 ("In my experience in law enforcement, it is also standard practice to use de-escalation tactics to manage protest activity. De-escalation is a reliable, effective, and commonly used strategy for managing protest activity that aims to defuse tensions through limited law enforcement |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | presence and intervention, among other things. During my time at LAPD, the department adopted de-escalation techniques for use in situations that are tense, uncertain, and rapidly changing. The objective was to reduce the intensity of an encounter with law enforcement to gain either voluntary compliance or mitigate the need to use a higher level of force.")[;] 2d Beck Decl. ¶ 12 ("During this phase, UCLA deploys Student Affairs Mitigators/Monitors ("SAMs") to interact with protesters using specific communications strategies. SAMs aim to cultivate relationships with students so that if conflicts arise, they can be addressed more readily through communication and de-escalation, thereby mitigating tensions. Even during the de-escalation phase, law enforcement also monitored the encampment."). |
| 100. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶100, and thus it is undisputed. *See* Initial Standing Order at 11. | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| The remainder of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 101. Defendant Block also described the "carefully developed" "plan" that law enforcement used to clear the encampment, which included "giv[ing]" the activists "several warnings" and "offer[ing] the opportunity to leave peacefully with their belongings before officers entered the area."<br><br>Dkt.48-27 at 68 (Shemuelian Ex. 19). | 101. Undisputed. UCLA PD developed a plan to remove the encampment safely and quickly. The plan needed to comply with California law requiring notice and an opportunity to disperse prior to making arrests of unlawful assembly.<br><br>Dkt. 107 ¶ 190 (Answer) ("[B]y this time, UCLA PD had been instructed to develop a plan for law enforcement to remove the Royce Quad encampment safely and quickly."); Lurie Decl. ¶ 10 ("California law requires law enforcement to take certain steps before immediately arresting people for unlawful assembly, such as a dispersal order and sufficient time to disperse."). |
| 101. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶101, and thus it is undisputed. *See* Initial Standing Order at 11.<br><br>The remainder of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| (such facts must be set forth in a separate filing instead). Moreover, UCLA's remark that "[t]he plan needed to comply with California law requiring notice and an opportunity to disperse prior to making arrests of unlawful assembly" is a legal conclusion improper for a Statement of Genuine Disputes. *See* Initial Standing Order at 11.<br><br>In addition, Plaintiffs note that UCLA has cited its own answer—which it does throughout this document—even though it cannot rely on its own pleadings in opposing summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A) (party must "cit[e] to particular parts of materials in the record"); *Gen. Ins. Co. of Am. v. Hall*, 657 F.Supp.3d 1302, 1307 (C.D. Cal. 2023) ("the nonmoving party cannot simply rest on the pleadings"). | |
| 102. The "UCLA Police Department Chief stated on May 2, 2024, that he had advised UCLA leadership, from the beginning, not to allow the encampment since it violated campus rules against overnight camping and he feared it could lead to problems, but University leadership decided to allow it 'as an expression of students' First Amendment rights.'"<br><br>3d Rassbach Decl. Ex. 1 at 68 (UCLA Antisemitism Task Force Report). | 102. Undisputed that the LA Times reported that Chief Thomas expressed these statements in an interview.<br><br>3d Rassbach Decl. Ex. 1 at 68 n.150 (UCLA Antisemitism Task Force Report) (citing to LA Times article). |
| 102. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶102, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 103. Defendant Block subsequently admitted that the "encampment was against policy" and "violated time, | 103. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| place, and manner" restrictions, and that UCLA "should have been prepared to immediately remove the encampment if and when the safety of our community was put at risk." 3d Rassbach Decl. ¶14 at 2:45:21-2:45:27, 45:03:00-45:08:00 (providing website link to Defendant Block's May 23, 2024 congressional testimony). | |
| 104. Indeed, "[c]ampus officials continued to refuse to break up the encampment even after the protesters denied Jews and others free passage and access to campus classrooms and facilities on grounds that allowance of such behaviors and activities was part of their 'de-escalation strategy.'" 3d Rassbach Decl. Ex. 1 at 68 (UCLA Antisemitism Task Force Report). | 104. Disputed to the extent Plaintiffs allege that campus officials did not forgo de-escalation and initiate the removal of the encampment by instructing UCLA PD to devise a strategy to remove it safely and quickly on April 28, 2024. Dkt. 62-3 ¶ 10 (Beck Decl.) ("[O]n April 28, 2024, after clashes broke out between demonstrators with opposing viewpoints, senior leadership decided that de-escalation was no longer working, and that the encampment needed to be removed with the assistance of law enforcement. Senior leadership asked Chief John Thomas of the UCLA UCPD to develop a plan for law |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | enforcement to remove the Royce Quad encampment safely and quickly. The Police Department projected that due to the size of the encampment, it would take days to assemble the necessary resources to remove it safely."). |
| 104. **Plaintiffs' Reply**: UCLA purports to dispute SUF ¶104 by arguing that it "instruct[ed] UCLA PD to devise a strategy to remove [the encampment] … on April 28, 2024." But even assuming that is true, telling the campus police to start working on a strategy is not the same thing as "break[ing] up the encampment," Dkt.128-5 at 68 (UCLA Antisemitism Task Force Report), which UCLA did not decide to do until May 2, 2024, *see* Dkt.48-27 at 68 (Shemuelian Ex. 19) (Defendant Block's statement that UCLA "*made the decision* to direct UCPD and outside law enforcement officers to enter and clear the encampment" on May 2 (emphasis added)); Dkt.48-24 at 62 (Shemuelian Ex. 16) (Defendant Block's statement noting that, on *April 30, 2024*, UCLA had "requested support from external law enforcement agencies to help end" an "attack on the encampment" but not the encampment itself). Thus, SUF ¶104 is undisputed in its entirety. | |
| 105. UCLA "failed to issue any suspensions or probations against students for conduct related to antisemitic protests, disruptions, and harassment[.]"<br><br>3d Rassbach Decl. Ex. 3 at 184 (U.S. House Committee Report on Antisemitism). | 105. Disputed to the extent Plaintiffs allege that UCLA has taken no disciplinary action in response to the encampment. UCLA PD arrested 94 students, and all of those students received Agreement of Resolution letters. The Office of Student Conduct has resolved 91 student conduct cases related to the encampment and other protest activity via those Agreements of Resolution, |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | which bind students from engaging in future misconduct. Agreements of Resolution mandate compliance with specific provisions of the Student Conduct Code and participation in specified educational programs and community service activities. Students who signed an Agreement of Resolution but subsequently violate UCLA policies or the Student Conduct Code enter the student conduct process and a student conduct case for both the subsequent offense and the student's arrest at the encampment would be opened. The Office of Student Conduct also has approximately 57 cases pending against individual students and 10 similar cases pending against student groups related to other protest activity.<br><br>2d Gorden Decl. ¶¶ 4-7 (providing data on arrests, Agreements of Resolution, and conduct cases and explaining that students "who signed an AOR Letter but subsequently violate UCLA policies or the Student Conduct Code would enter the student |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | conduct process, and a student conduct case for both the subsequent offense and the student's arrest at the encampment would be opened."). |
| 105. **Plaintiffs' Reply**: UCLA's response does not dispute that, as SUF ¶105 puts it, UCLA "failed to issue any *suspensions* or *probations* against students for conduct related to antisemitic protests, disruptions, and harassment[.]" (Emphasis added.) Thus, SUF ¶105 is undisputed in its entirety. | |
| 106. "Of the 96 UCLA students arrested on May 2, 2024, following their refusal to leave the school's unlawful encampment, 92 signed an agreement with the Office of Student Conduct that allowed them to evade discipline in return for stating they would refrain from future violations of the Student Conduct Code." "Of the four students [who] did not sign the agreement, three of them are listed as 'graduation hold in place,' while one remains enrolled at UCLA."<br><br>3d Rassbach Decl. Ex. 3 at 184 (U.S. House Committee Report on Antisemitism); see also 3d Rassbach Decl. Ex. 4 at 454 (U.S. House Antisemitism Report). | 106. Disputed to the extent that Plaintiffs allege 96 students were arrested at the encampment, that 92 of them signed Agreements of Resolution, and that those students evaded discipline. UCLA PD arrested 94 students, and all of those students received Agreement of Resolution letters. The Office of Student Conduct has resolved 91 student conduct cases related to the encampment and other protest activity via those Agreements of Resolution, which bind students from engaging in future misconduct. Agreements of Resolution mandate compliance with specific provisions of the Student Conduct Code and participation in specified educational programs and community service |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | activities. Students who signed an Agreement of Resolution but subsequently violate UCLA policies or the Student Conduct Code enter the student conduct process and a student conduct case for both the subsequent offense and the student's arrest at the encampment would be opened. Otherwise, undisputed.<br><br>2d Gorden Decl. ¶¶ 4-7 (providing data on arrests, Agreements of Resolution, and conduct cases and explaining that students "who signed an AOR Letter but subsequently violate UCLA policies or the Student Conduct Code would enter the student conduct process, and a student conduct case for both the subsequent offense and the student's arrest at the encampment would be opened."). |
| 106. **Plaintiffs' Reply**: UCLA's response admits that those who signed agreements evaded discipline in return for promising to refrain from future violations, as SUF ¶106 states. As UCLA puts it, the "Agreements of Resolution … bind students from engaging in future misconduct[,]" "mandate compliance with specific provisions of the Student Conduct Code[,]" and mandate "participation in specified educational programs and community service activities." Thus, SUF ¶106 is undisputed as to its substance, even if there is a minor and immaterial dispute over the precise number of arrests and agreements. | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 107. "No UCLA students were disciplined for blocking Jewish students from accessing public areas of UCLA's campus during the encampment[,]" and "UCLA has failed to identify any of those responsible for the blocking [of] Jewish students from accessing these areas."<br><br>3d Rassbach Decl. Ex. 3 at 184 (U.S. House Committee Report on Antisemitism); see also Rassbach Decl. Ex. 4 at 454 (U.S. House Antisemitism Report). | 107. Disputed. UCLA PD arrested 94 students, and all of those students received Agreement of Resolution letters. The Office of Student Conduct has resolved 91 student conduct cases related to the encampment and other protest activity via those Agreements of Resolution, which bind students from engaging in future misconduct. Agreements of Resolution mandate compliance with specific provisions of the Student Conduct Code and participation in specified educational programs and community service activities. Students who signed an Agreement of Resolution but subsequently violate UCLA policies or the Student Conduct Code enter the student conduct process and a student conduct case for both the subsequent offense and the student's arrest at the encampment would be opened. The Office of Student Conduct also has approximately 57 cases pending against individual students and 10 similar cases pending against student groups related to other protest activity. UCLA also |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | initiated an "Other Inquiry"—a civil rights investigation pursuant to the University of California's antidiscrimination policy.<br><br>2d Gorden Decl. ¶¶ 4-7 (providing data on arrests, Agreements of Resolution, and conduct cases and explaining that students "who signed an AOR Letter but subsequently violate UCLA policies or the Student Conduct Code would enter the student conduct process, and a student conduct case for both the subsequent offense and the student's arrest at the encampment would be opened."); Hunt Decl. ¶ 6 (explaining that UCLA's Civil Rights Office can "conduct a new type of investigation, called an 'Other Inquiry,' into allegations of harassment and discrimination when there is not an identified respondent."). |
| 107. **Plaintiffs' Reply**: While UCLA describes arrests and Agreements of Resolution, it nowhere states—let alone provides evidence to support—that these actions were taken against students who blocked Jews from accessing campus. Thus, SUF ¶107 is undisputed. | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Radical Groups Continue Constructing Encampments on UCLA's Campus, and UCLA Fails to Respond | |
| 108. Further demonstrations and encampments have appeared on campus since the first one.<br><br>3d Rassbach Decl. Ex. 1 at 73 & n.178 (UCLA Antisemitism Task Force Report); Dkt.62-5 ¶¶27-30 (Braziel Decl.); 3d Rassbach Decl. Ex. 8 at 546- 47; Dkt.48-61 at 126 (Rassbach Ex. 24); Dkt.48-62 at 127 (Rassbach Ex. 25); Dkt.48-63 at 128 (Rassbach Ex. 26); Dkt.48-33 at 83 (Shemuelian Ex. 25); Dkt.48-34 at 84 (Shemuelian Ex. 26); Dkt.48-35 at 86-87 (Shemuelian Ex. 27); Dkt.48-36 at 88 (Shemuelian Ex. 28). | 108. Disputed to the extent Plaintiffs allege additional encampments have become entrenched on UCLA's campus. While additional demonstrations have occurred since the Royce Quad encampment, UCLA has responded successfully to each such demonstration, preventing further encampments from forming. Undisputed that additional demonstrations have occurred on campus since the Royce Quad encampment.<br><br>2d Beck Decl. ¶¶ 15-25 (describing how UCLA has "neutralized every subsequent protest event, ordering protesters engaged in unauthorized protest activity to voluntarily disperse and arresting those who refuse to do so"); Lurie Decl. ¶ 12 (similar). |
| 108. **Plaintiffs' Reply**: UCLA purports to dispute that "additional encampments have become entrenched on UCLA's campus" and claims that it has "prevent[ed] further encampments from forming." But as set forth below, the undisputed evidence demonstrates that other encampments did form—in fact, UCLA's own public alerts describe them as such. *See infra* ¶¶115-125. Thus, SUF ¶108 is undisputed in its entirety. | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 109. Early in the morning on May 6, 2024, "a group of approximately 40 individuals" occupied a parking structure on UCLA's campus while "wearing masks and in possession of metal pipes" and other "tools and items that could be used to unlawfully enter and barricade a building," such as "bolt cutters" and "heavy-duty chains." <br><br> 3d Rassbach Decl. Ex. 8 at 546. | 109. Disputed that the group of individuals UCLA PD detained in a parking structure on May 6, 2024 "occupied" that building. UCLA PD arrested more than 40 individuals in the parking structure, thwarting an apparent attempt to barricade an academic building on campus. <br><br> 3d Rassbach Decl. Ex. 8 at 546 ("It became apparent that the individuals at Parking Structure 2 had formed a plan to use bolt cutters, padlocks, epoxy adhesive, super glue, heavy duty chains, and metal poles to break into Moore Hall to occupy and vandalize the location. As a result, 42 individuals were taken into custody."); 2d Beck Decl. ¶ 16 (explaining that over 40 individuals were arrested on May 6, 2024). |
| 109. **Plaintiffs' Reply**: Regardless of whether the actions of these activists can properly be described as an "occup[ation]," UCLA does not dispute the facts stated in SUF ¶109, which is therefore undisputed in its entirety. | |
| 110. Around the same time that morning, "while the group at Parking Structure 2 was still detained, a group of at least 30 | 110. Undisputed that UCLA responded promptly to demonstrators' attempt to occupy Moore Hall on May 6, 2024 and |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| individuals were seen inside Moore Hall," which "was closed to the public at that time." "UCPD learned via social media that a UCLA registered student organization had just posted a statement encouraging people to occupy Moore Hall."<br><br>3d Rassbach Decl. Ex. 8 at 546. | that UCLA's prompt response prevented any such occupation from occurring.<br><br>3d Rassbach Decl. Ex. 8 at 546 ("[UCLA PD] [o]fficers responded to the building . . . with the assistance of the Los Angeles Police Department, . . . and with UCLA Student Affairs present."); Dkt. 62-5 ¶ 28 (Braziel Decl.) ("UCLA UCPD responded to these incidents, with the assistance of LAPD and UCLA Student Affairs. The protestors were informed that if they did not disperse, they would face arrest and possible disciplinary action. The group of individuals ultimately disbanded."). |

110. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶110, and thus it is undisputed. *See* Initial Standing Order at 11.

While UCLA asserts that "UCLA's prompt response prevented any ... occupation from occurring," UCLA's own press release states that "a group of at least 30 individuals were seen inside Moore Hall," which "was closed to the public at that time." Dkt.128-12 at 546 (3d Rassbach Decl. Ex. 8) (emphasis omitted).

| | |
|---|---|
| 111. "Officers responded to the building and ... secured the perimeter to prevent additional | 111. Undisputed that UCLA responded promptly to demonstrators' attempt to occupy |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| access into the building. UCPD officers announced eight times that the building was closed and that all occupants were required to leave. After approximately 25 minutes of announcements, ... a group of about 60 individuals exited the building and left the area."<br><br>3d Rassbach Decl. Ex. 8 at 546. | Moore Hall on May 6, 2024 and that UCLA's prompt response prevented any such occupation from occurring.<br><br>3d Rassbach Decl. Ex. 8 at 546 ("[UCLA PD] [o]fficers responded to the building . . . with the assistance of the Los Angeles Police Department, . . . and with UCLA Student Affairs present."); Dkt. 62-5 ¶ 28 (Braziel Decl.) ("UCLA UCPD responded to these incidents, with the assistance of LAPD and UCLA Student Affairs. The protestors were informed that if they did not disperse, they would face arrest and possible disciplinary action. The group of individuals ultimately disbanded."). |

111. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶111, and thus it is undisputed. *See* Initial Standing Order at 11.

While UCLA asserts (again) that "UCLA's prompt response prevented any … occupation from occurring," UCLA's own press release states that "a group of at least 30 individuals were seen inside Moore Hall," which "was closed to the public at that time." Dkt.128-12 at 546 (3d Rassbach Decl. Ex. 8) (emphasis omitted).

| 112. "[T]he group of ... individuals who left Moore Hall marched to | 112. Undisputed. |
|---|---|

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dodd Hall and entered that building, which was open to the public and being used for midterm exams. The group created a disturbance inside the building and interrupted at least one midterm exam." <br><br> 3d Rassbach Decl. Ex. 8 at 547. | |
| 113. "As officers were preparing to enter the building, the group exited, joined a crowd of about 150 protesters outside, and started to protest outside the building" before then "march[ing] to Bruin Plaza, where they eventually dispersed." <br><br> 3d Rassbach Decl. Ex. 8 at 547. | 113. Undisputed that UCLA's prompt response to demonstrators' protest activity in Dodd Hall on May 6, 2024 led to that group's swift dispersal. <br><br> 3d Rassbach Decl. Ex. 8 at 547 ("After approximately 10 minutes of protesting, the group marched to Bruin Plaza, where they eventually dispersed."); Dkt. 62-5 ¶ 28 (Braziel Decl.) ("UCLA UCPD responded to these incidents, with the assistance of LAPD and UCLA Student Affairs. The protestors were informed that if they did not disperse, they would face arrest and possible disciplinary action. The group of individuals ultimately disbanded."). |
| 113. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶113, and thus it is undisputed. *See* Initial Standing Order at 11. | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 114. In response, UCLA required classes to be held remotely from May 6 to May 10, 2024.<br><br>Dkt.48-62 at 127 (Rassbach Ex. 25); Dkt.48-63 at 128 (Rassbach Ex. 26); Dkt.107 ¶204 (Answer). | 114. Undisputed that classes were held remotely from May 6 to May 10, 2024 "to prevent opportunity for further disruption," while ensuring the continuity of students' coursework.<br><br>Dkt. 62-5 ¶ 28 (Braziel Decl.) ("Classes were moved remote from May 6 through May 10 to prevent the opportunity for further disruption."). |
| 114. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶114, and thus it is undisputed. *See* Initial Standing Order at 11. | |
| 115. Another encampment arose a couple of weeks later.<br><br>Dkt.48-57 at 111 (Rassbach Ex. 20); Dkt.48-33 at 83 (Shemuelian Ex. 25); Dkt.48-34 at 84 (Shemuelian Ex. 26). | 115. Disputed to the extent Plaintiffs allege an additional encampment formed on UCLA's campus.<br><br>2d Beck Decl. ¶¶ 15-25 (describing how UCLA has "neutralized every subsequent protest event, ordering protesters engaged in unauthorized protest activity to voluntarily disperse and arresting those who refuse to do so"); Lurie Decl. ¶ 12 (similar). |
| 115. **Plaintiffs' Reply**: As set forth in more detail below, on May 23, 2024—and as reported in UCLA's own public alerts—activists erected barricades, established fortifications, and blocked access to multiple | |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| locations on campus—i.e., they established encampments, no matter their duration. *See* Dkt.48-34 at 84 (Shemuelian Ex. 26); Dkt.48-33 at 83 (Shemuelian Ex. 25). | |
| 116. On May 23, 2024, "shortly before 7 a.m., demonstrators arrived on the Kerckhoff patio and began to erect barricades," "establishing fortifications," "blocking access to the area and nearby buildings and disrupting regular campus operations."<br><br>Dkt.48-34 at 84 (Shemuelian Ex. 26); Dkt.48-33 at 83 (Shemuelian Ex. 25). | 116. Disputed to the extent Plaintiffs allege that demonstrators actually erected an encampment on Kerckhoff patio on May 23, 2024. After the demonstrators were immediately asked to disperse and warned that they would face arrest or disciplinary action for failing to disperse, the demonstrators on Kerckhoff patio dispersed. Undisputed that demonstrators engaged in protest activity on Kerckhoff patio on May 23, 2024.<br><br>Dkt. 48-34 at 84 (Shemuelian Ex. 26) ("Our Office of the Administrative Vice Chancellor, in partnership with my Office of Campus Safety, asked [the demonstrators on Kerckhoff patio] to disperse immediately. Demonstrators were informed that if they did not disperse, they would face arrest and possible disciplinary action, as well as an order to stay away from campus for seven days. Demonstrators willingly dispersed, and no arrests were made."); Dkt. 48-33 |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | at 83 (Shemuelian Ex. 25) (similar); Dkt. 62-5 ¶ 29 (Braziel Decl.) (similar). |
| 116. **Plaintiffs' Reply**: UCLA's response does not dispute anything actually proffered in SUF ¶116, and thus it is undisputed. *See Rockwell v. Air & Liquid Sys. Corp.*, No. 21-cv-3963, 2022 WL 18228256, at *1 n.2 (C.D. Cal. Sept. 1, 2022) (fact is only "nominally disputed" where opposing party "fails to actually controvert the proffered 'undisputed' fact" or "disputes the fact on grounds not germane to the actual statement made by the initial proffering party"). Per UCLA's own public alerts, activists erected barricades, established fortifications, and blocked access to multiple locations on campus—i.e., they established encampments, no matter their duration. *See* Dkt.48-34 at 84 (Shemuelian Ex. 26); Dkt.48-33 at 83 (Shemuelian Ex. 25). | |
| 117. After being told to "disperse," the activists relocated to Dodd Hall, again "barricad[ing] access" and "committ[ing] acts of vandalism" before being ordered to "disperse." Dkt.48-34 at 84 (Shemuelian Ex. 26). | 117. Undisputed that some protesters relocated to Dodd Hall. 2d Beck Decl. ¶ 17 (explaining that protesters attempted to occupy Dodd Hall but were stopped from doing so by law enforcement). |
| 117. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶117, which is a quote of a public alert issued by UCLA. Thus, SUF ¶117 is undisputed. *See* Initial Standing Order at 11. | |
| 118. "The group was ordered to disperse and, while some | 118. Undisputed that UCLA's prompt response prevented |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| demonstrators left, ultimately UCPD cleared the building."<br><br>Dkt.48-34 at 84 (Shemuelian Ex. 26). | demonstrators from actually occupying Dodd Hall.<br><br>2d Beck Decl. ¶ 17 (explaining that protesters attempted to occupy Dodd Hall but were stopped from doing so by law enforcement). |

118. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶118, which is a quote of a public alert issued by UCLA. Thus, SUF ¶118 is undisputed. *See* Initial Standing Order at 11.

| | |
|---|---|
| 119. Then, on June 10, 2024, activists "set up an unauthorized and unlawful encampment" at "the walkway at the top of the Janss Steps" with "tents, canopies, wooden shields, and water-filled barriers."<br><br>Dkt.48-58 at 112 (Rassbach Ex. 21); see also Dkt.48-35 at 86 (Shemuelian Ex. 27). | 119. Disputed to the extent Plaintiffs allege an additional encampment formed on UCLA's campus.<br><br>2d Beck Decl. ¶¶ 15-25 (describing how UCLA has "neutralized every subsequent protest event, ordering protesters engaged in unauthorized protest activity to voluntarily disperse and arresting those who refuse to do so"); Lurie Decl. ¶ 12 (similar). |

119. **Plaintiffs' Reply**: UCLA's own public alert uses the word "encampment" to describe these demonstrations no fewer than six times—including the observation that there were "unauthorized and unlawful encampments at … *three* locations." Dkt.48-58 at 112 (Rassbach Ex. 21) (emphasis added). UCLA does not dispute anything else in SUF ¶119, and thus it is undisputed in its entirety.

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 120. The group "restricted access to the general public" and "disrupted nearby final exams."<br><br>Dkt.48-58 at 112 (Rassbach Ex. 21). | 120. Disputed to the extent Plaintiffs imply that UCLA did not promptly respond to this incident.<br><br>Dkt. 62-5 ¶ 30 (Braziel Decl.) ("Twenty-seven individuals were arrested on June 10, 2024 when a group of individuals dyed Shapiro Fountain red and another group of individuals attempted to disrupt final exams in Moore Hall. The students who were arrested were served fourteen-day stay-away orders, under section 626.4 of the California Penal Code, preventing them from being on campus to take classes or participate in commencement ceremonies."). |

120. **Plaintiffs' Reply**: UCLA's response does not dispute anything actually proffered in SUF ¶120, and thus it is undisputed. *See Rockwell v. Air & Liquid Sys. Corp.*, No. 21-cv-3963, 2022 WL 18228256, at *1 n.2 (C.D. Cal. Sept. 1, 2022) (fact is only "nominally disputed" where opposing party "fails to actually controvert the proffered 'undisputed' fact" or "disputes the fact on grounds not germane to the actual statement made by the initial proffering party"). In addition, UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead).

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 121. After "multiple dispersal orders," "[t]he group then marched to the Kerckhoff [P]atio, where they set up an unauthorized and unlawful encampment with tents, canopies, and barricades," "restricted access to the general public," "enter[ed] Moore Hall," and "disrupted nearby final exams."<br><br>Dkt.48-58 at 112 (Rassbach Ex. 21). | 121. Disputed to the extent Plaintiffs allege an additional encampment formed on UCLA's campus. Undisputed that UCLA's prompt response caused demonstrators on June 10, 2024 to leave the walkway at the top of Janss steps.<br><br>Dkt. 48-58 at 112 (Rassbach Ex. 21) ("After UCPD issued multiple dispersal orders, the group began to leave the area."); 2d Beck Decl. ¶¶ 15-25 (describing how UCLA has "neutralized every subsequent protest event, ordering protesters engaged in unauthorized protest activity to voluntarily disperse and arresting those who refuse to do so"); Lurie Decl. ¶ 12 (similar). |
| 121. **Plaintiffs' Reply**: The description of these demonstrations as an "encampment" is a quote from an alert issued by UCLA. Dkt.48-58 at 112 (Rassbach Ex. 21). UCLA does not dispute anything else in SUF ¶121. | |
| 122. After more "dispersal orders," "[t]he group then marched to the courtyard between Dodd Hall and the School of Law, where they set up another unauthorized and unlawful encampment," "restricted access to | 122. Disputed to the extent Plaintiffs allege an additional encampment formed on UCLA's campus. Undisputed that UCLA's prompt response caused demonstrators on June 10, 2024 |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| the general public," and "disrupted nearby final exams." | to leave Kerckhoff patio and Moore Hall. |
| Dkt.48-58 at 112 (Rassbach Ex. 21). | 2d Beck Decl. ¶¶ 15-25 (describing how UCLA has "neutralized every subsequent protest event, ordering protesters engaged in unauthorized protest activity to voluntarily disperse and arresting those who refuse to do so"); Lurie Decl. ¶ 12 (similar); Dkt. 48-58 at 112 (Rassbach Ex. 21) ("After UCPD issued multiple dispersal orders, the group began to leave the area."). |

122. **Plaintiffs' Reply**: The description of these demonstrations as an "encampment" is a quote from an alert issued by UCLA. Dkt.48-58 at 112 (Rassbach Ex. 21). UCLA does not dispute anything else in SUF ¶122.

| | |
|---|---|
| 123. "As a result of the unauthorized and unlawful encampments at the three locations, the group damaged the Shapiro fountain, spray-painted brick walkways, tampered with fire safety equipment, damaged patio furniture, stripped wire from electrical fixtures, and vandalized vehicles." | 123. Disputed to the extent Plaintiffs allege an additional encampment formed on UCLA's campus. Undisputed that UCLA's prompt response to the events of June 10, 2024 resulted in the arrest of approximately 27 individuals. |
| Dkt.48-58 at 112 (Rassbach Ex. 21). | 2d Beck Decl. ¶¶ 15-25 (describing how UCLA has "neutralized every subsequent protest event, ordering protesters |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | engaged in unauthorized protest activity to voluntarily disperse and arresting those who refuse to do so"); Lurie Decl. ¶ 12 (similar); Dkt. 62-5 ¶ 30 (Braziel Decl.) ("Twenty-seven individuals were arrested on June 10, 2024 when a group of individuals dyed Shapiro Fountain red and another group of individuals attempted to disrupt final exams in Moore Hall. The students who were arrested were served fourteen-day stay-away orders . . . preventing them from being on campus to take classes or participate in commencement ceremonies."). |

123. **Plaintiffs' Reply**: The description of these events as "encampments at … three locations" is a quote from an alert issued by UCLA. Dkt.48-58 at 112 (Rassbach Ex. 21). UCLA does not dispute anything else in SUF ¶123. And the remainder of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead).

| | |
|---|---|
| 124. Further, the June 10 encampments resulted in "the blocking of student access to parts of campus," with some students "miss[ing] finals because they were blocked from entering classrooms" and others "ha[ving] to be evacuated | 124. Disputed to the extent Plaintiffs allege an additional encampment formed on UCLA's campus. Further disputed to the extent Plaintiffs imply UCLA did not respond promptly and to the extent Plaintiffs allege that |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| in the middle of taking their final exams."<br><br>Dkt.48-35 at 86 (Shemuelian Ex. 27). | protesters blocked access to parts of campus for any meaningful period of time. Undisputed that UCLA's prompt response to the events of June 10, 2024 resulted in the arrest of approximately 27 individuals and that an email from then Associate Vice Chancellor Braziel to the Bruin Community "Condemning Monday's Violence on Campus" contains the language included in SUF ¶ 124.<br><br>2d Beck Decl. ¶¶ 15-25 (describing how UCLA has "neutralized every subsequent protest event, ordering protesters engaged in unauthorized protest activity to voluntarily disperse and arresting those who refuse to do so"); Lurie Decl. ¶ 12 (similar); Dkt. 62-5 ¶ 30 (Braziel Decl.) ("Twenty-seven individuals were arrested on June 10, 2024 when a group of individuals dyed Shapiro Fountain red and another group of individuals attempted to disrupt final exams in Moore Hall. The students who were arrested were served fourteen-day stay-away orders . . . preventing them from being |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | on campus to take classes or participate in commencement ceremonies."); Dkt. 48- 35 at 86 (Shemuelian Ex. 27) (June 11, 2024 email from then Associate Vice Chancellor Braziel with subject line "Condemning Monday's Violence on Campus"). |
| 124. **Plaintiffs' Reply**: The term "encampment" is taken directly from an alert issued by UCLA. Dkt.48-58 at 112 (Rassbach Ex. 21). Nor does UCLA offer any evidence to contradict the fact that "protesters blocked access to parts of campus for a[] meaningful period of time." *See* Fed.R.Civ.P. 56(c)(1)(A); *James River Ins. Co. v. Medolac Lab'ys*, 290 F.Supp.3d 956, 962 (C.D. Cal. 2018) (party opposing summary judgment must "present significant probative evidence"). UCLA does not dispute anything else in SUF ¶124, which is therefore undisputed in its entirety. And the remainder of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 125. Moreover, "[t]hroughout the evening, there were also violent attacks on safety personnel and law enforcement, resulting in at least six injuries to UCPD personnel and other safety officers."<br><br>Dkt.48-35 at 86 (Shemuelian Ex. 27). | 125. Undisputed. UCLA's prompt response to the events of June 10, 2024 resulted in the arrest of approximately 27 individuals.<br><br>Dkt. 62-5 ¶ 30 (Braziel Decl.) ("Twenty-seven individuals were arrested on June 10, 2024 when a group of individuals dyed Shapiro Fountain red and another group of individuals attempted to disrupt final exams in Moore Hall. The students who |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | were arrested were served fourteen-day stay-away orders . . . preventing them from being on campus to take classes or participate in commencement ceremonies."). |
| 125. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶125, and thus it is undisputed. *See* Initial Standing Order at 11. In addition, UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| Antisemitic Chaos Continues in the 2024-2025 School Year | |
| 126. Defendant Braziel spent the summer months preceding the new 2024-25 academic year "run[ning] through various scenarios with the senior leadership and experts to proactively put strategies in place to respond to potential civil unrest."<br><br>Dkt.62-5 ¶31 (Braziel Decl.). | 126. Undisputed. |
| 127. "[I]ndividuals disrupted a portion of the September 19, 2024 meeting of The Regents of the University of California."<br><br>Dkt.107 ¶228 (Answer). | 127. Undisputed that law enforcement promptly intervened and protesters voluntarily dispersed. There were no reported incidents of physical violence. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
|  | 2d Beck Decl. ¶ 18 ("Individuals disrupted a portion of the September 19, 2024 Regents of the University of California meeting. Law enforcement intervened and protesters voluntarily dispersed. There were no reported incidents of physical violence."). |
| 127. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶127, and thus it is undisputed. *See* Initial Standing Order at 11. In addition, UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 128. On October 7, 2024—the one-year anniversary of Hamas's terrorist attacks on Israel—"UCLA's Undergraduate Student Association Council (USAC) Cultural Affairs Commission," which is part of the university and "is funded by mandatory undergraduate student fees," "posted a series of images and statements that depicted paragliders and inverted red triangles, which are used by Hamas as symbols to indicate Israeli targets and are now associated with torture, rape, and murder of unarmed civilian victims" which "dehumanizes Jews and | 128. Disputed to the extent Plaintiffs imply UCLA did not address complaints about this incident. For example, the Office of Student Conduct met with a student who complained about the incident, offered them resources, and referred their concerns to the UCLA Civil Rights Office. Undisputed that the Task Force Report states that UCLA's Undergraduate Student Association Council posted images as described in SUF ¶ 128. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Israelis and ... celebrate[s] overt violence against Israeli civilians." <br><br> 3d Rassbach Decl. Ex. 1 at 78 (UCLA Antisemitism Task Force Report) (footnotes omitted). | 2d Gorden Decl. ¶ 8 (describing UCLA's response to a complaint made about the images described in SUF ¶ 128). |
| 128. **Plaintiffs' Reply**: UCLA's comments on its efforts to "address complaints about this incident" do not address anything actually proffered in SUF ¶128, and thus SUF ¶128 is undisputed in its entirety. *See Rockwell v. Air & Liquid Sys. Corp.*, No. 21-cv-3963, 2022 WL 18228256, at *1 n.2 (C.D. Cal. Sept. 1, 2022) (fact is only "nominally disputed" where opposing party "fails to actually controvert the proffered 'undisputed' fact" or "disputes the fact on grounds not germane to the actual statement made by the initial proffering party"). In addition, UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 129. Also on October 7, 2024, "the UCLA student group, Students for Justice in Palestine, organized and held a demonstration in North Di[cks]on Court ... in violation of campus time, place, and manner restrictions, and other campus and University rules." "No disciplinary actions have been taken against these student groups or individuals who are in violation of campus policies." | 129. Disputed to the extent Plaintiffs imply UCLA did not promptly respond to the demonstrations on October 7, 2024. No event was disturbed and there were no major confrontations between protesters and counter-protesters on October 7, 2024. Further disputed that no disciplinary actions have been taken against any student groups or individuals in violation of campus policies. On March 28, 2025, UCLA indefinitely banned |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 3d Rassbach Decl. Ex. 1 at 79 (UCLA Antisemitism Task Force Report). | Students for Justice in Palestine as a campus organization and suspended Graduate Students for Justice in Palestine for four years. Undisputed that demonstrations took place on October 7, 2024. Otherwise, undisputed.<br><br>2d Beck Decl. ¶¶ 19, 23 ("On October 7, 2024, a play, 'October 7,' which drew from interviews with survivors of the October 7 attack, premiered at Fowler Museum on campus. There were protests and counter-protests, to which UCLA PD responded, but there was no disturbance of the event, no major confrontations between the two groups, and no major disruptions to UCLA's campus activity."; explaining that Students for Justice in Palestine and Graduate Students for Justice in Palestine received interim suspensions pending investigations that ultimately "concluded with a recommendation of a revocation of Student for Justice in Palestine's student group status—a removal of the student group's affiliation with the |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
| --- | --- |
| | University; and a four-year suspension for GSJP"). |
| 129. **Plaintiffs' Reply**: UCLA purports to dispute the finding of its own Task Force that no disciplinary actions were taken in connection with the unlawful October 7, 2024 demonstrations. But the only evidence UCLA cites is that two student groups were suspended in February 2025—i.e., four months later—for their actions in connection with an *entirely different* demonstration outside the home of a UC Regent. *See* Dkt.157-7 ¶23 (2d Beck Decl.). Thus, UCLA has not validly disputed the discussion of discipline in SUF ¶129. UCLA's remaining comments in response to SUF ¶129 do not relate to anything actually addressed in SUF ¶129, and thus SUF ¶129 is undisputed in its entirety. *See Rockwell v. Air & Liquid Sys. Corp.*, No. 21-cv-3963, 2022 WL 18228256, at *1 n.2 (C.D. Cal. Sept. 1, 2022) (fact is only "nominally disputed" where opposing party "fails to actually controvert the proffered 'undisputed' fact" or "disputes the fact on grounds not germane to the actual statement made by the initial proffering party"). Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 130. There was another "unauthorized demonstration" on UCLA's campus "on October 21, 2024" when demonstrators set up "unauthorized structures" in Dickson Court North before dispersing after orders from UCLA PD. | 130. Undisputed that UCLA's prompt response resulted in the dispersal of approximately 40 demonstrators and the arrest of one demonstrator who refused to disperse. 3d Rassbach Decl. Ex. 9 at 549 ("One person was arrested |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dkt.107 ¶232 (Answer); 3d Rassbach Decl. Ex. 9 at 549. | tonight for failure to disperse at Dickson Court North following a dispersal order for an unauthorized demonstration involving about 40 people. The area is now clear."); 2d Beck Decl. ¶ 20 (similar); Dkt. 107 ¶ 232 (Answer) (describing that this demonstration was resolved the same day). |
| 130. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶130, and thus it is undisputed. *See* Initial Standing Order at 11. In addition, UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| 131. And on November 19, 2024, "approximately 75 people" involved in "protest activity" "formed a human chain by linking their arms together" and "block[ing] pedestrian access on Bruin Walk," "the main pedestrian thoroughfare on campus." Law enforcement eventually cleared the blockade.<br><br>3d Rassbach Decl. Ex. 10 at 551. | 131. Undisputed that UCLA's prompt response ensured pedestrian access to Bruin Walk and resulted in the arrest of several demonstrators.<br><br>3d Rassbach Decl. 10 at 551 ("Four people were taken into custody Tuesday evening following protest activity at Bruin Plaza. . . . Our officers responded to ensure people could use Bruin Walk, the main pedestrian thoroughfare on campus."); 2d Beck Decl. ¶ 22 ("On November 19, 2024, three |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | Pro-Palestine protestors were arrested for obstructing access to Bruin Walk and conducting an unauthorized protest."). |
| 131. **Plaintiffs' Reply**: UCLA's response does not affirmatively indicate that it disputes anything in SUF ¶131, and thus it is undisputed. *See* Initial Standing Order at 11. Indeed, much of UCLA's response is an improper attempt to include in its Statement of Genuine Disputes "additional" facts "that bear on, or relate to, the issues raised by the movant." Initial Standing Order at 11 (such facts must be set forth in a separate filing instead). | |
| Plaintiffs' Religious Exercise | |
| 132. Yitzchok Frankel is a third-year law student at UCLA School of Law.<br><br>Dkt.107 ¶233 (Answer). | 132. Undisputed. |
| 133. Frankel is an Orthodox Jew.<br><br>Dkt.48-2 ¶3 (Frankel Decl.). | 133. Undisputed. |
| 134. Frankel seeks to follow Jewish law (halacha), which prohibits speaking ill of or defaming the land of Israel. Thus, Frankel believes, as a matter of his religious faith, that he must support Israel.<br><br>Dkt.48-2 ¶11 (Frankel Decl.). | 134. Undisputed. |
| 135. Disavowing Israel's right to exist would directly contravene Frankel's Jewish faith. | 135. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dkt.48-2 ¶¶38, 49 (Frankel Decl.). | |
| 136. Joshua Ghayoum is a junior at UCLA.<br><br>Dkt.107 ¶286 (Answer). | 136. Undisputed. |
| 137. Ghayoum is Jewish.<br><br>Dkt.48-4 ¶3 (Ghayoum Decl.). | 137. Undisputed. |
| 138. Ghayoum believes support for Israel is a religious obligation, and thus he cannot in good conscience forswear Israel and its right to exist.<br><br>Dkt.48-4 ¶¶11, 44 (Ghayoum Decl.). | 138. Undisputed. |
| 139. Eden Shemuelian attended UCLA as an undergraduate and is a third-year student at UCLA School of Law.<br><br>Dkt.107 ¶332 (Answer). | 139. Undisputed. |
| 140. Shemuelian is Jewish.<br><br>Dkt.48-8 ¶4 (Shemuelian Decl.). | 140. Undisputed. |
| 141. For Shemuelian, Judaism is synonymous with supporting Israel, and being a faithful Jew means supporting Israel's right to exist. | 141. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dkt.48-8 ¶11 (Shemuelian Decl.). | |
| 142. As a matter of her Jewish faith, Shemuelian cannot disavow her beliefs about Israel.<br><br>Dkt.48-8 ¶¶111, 120 (Shemuelian Decl.). | 142. Undisputed. |
| 143. Dr. Kamran Shamsa is currently an Associate Clinical Professor at UCLA.<br><br>Dkt.107 ¶404 (Answer). | 143. Undisputed. |
| 144. Since 2011, Shamsa has been a member of the UCLA faculty in the David Geffen School of Medicine and the Department of Medicine/Division of Cardiology. Prior to joining the faculty, Shamsa completed an internship in Medicine/Pediatrics in 2005, a residency in Internal Medicine/Pediatrics in 2008, and a fellowship in Adult Cardiovascular Disease in 2011, all at the David Geffen UCLA School of Medicine.<br><br>Dkt.107 ¶¶404-05 (Answer). | 144. Undisputed. |
| 145. Shamsa received a Bachelor of Science in Physiological Science from UCLA in 1998. | 145. Undisputed. |

| Plaintiffs' Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| Dkt.107 ¶406 (Answer). | |
| 146. Shamsa is an observant Jew, and his Jewish faith and identity are at the core of who he is.<br><br>Suppl. Shamsa Decl. ¶2. | 146. Undisputed. |
| 147. As a matter of his Jewish faith, Shamsa believes that Israel has a right to exist, that it is the homeland of the Jewish people, and that he must support Israel as a homeland for Jews.<br><br>Suppl. Shamsa Decl. ¶8. | 147. Undisputed. |
| 148. Shamsa's Jewish faith does not allow him to disclaim Israel or its right to exist.<br><br>Suppl. Shamsa Decl. ¶8. | 148. Undisputed. |
| 149. "Jewish support of a nation-state in their historic homeland of Israel ... is integral to religious belief and identification among a large majority of Jews."<br><br>3d Rassbach Decl. Ex. 1 at 81 (UCLA Antisemitism Task Force Report). | 149. Undisputed. |

Dated: April 28, 2025

Respectfully submitted,

/s/ *Eric C. Rassbach*
Eric C. Rassbach (CA SBN 288041)
Mark L. Rienzi (DC Bar No. 494336)*
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)*
Jordan T. Varberg (DC Bar No. 90022889)*
Amanda G. Dixon (DC Bar No. 90021498)*
Reed M. Bartley (TX Bar No. 24125115)* ‡
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketfund.org

Paul D. Clement (DC Bar No. 433215)*
Erin E. Murphy (DC Bar No. 995953)*
Matthew D. Rowen (CA SBN 292292)
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

Elliot Moskowitz (NY Bar No. 4039160)*
Rebecca L. Harris (NY Bar No. 5607080)*
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

*Attorneys for Plaintiffs*

\* Admitted *pro hac vice*.

‡ Not admitted to the D.C. Bar; admitted only in Texas.
   Supervised by licensed D.C. Bar members.