THOMAS B. HARVEY (SBN 287198)
Law Offices of Thomas B. Harvey
365 East Avenida de Los Arboles, #226
Thousand Oaks, CA 91360
Tel: (805) 768-4440
Email: tbhlegal@proton.me

Attorney for Proposed Intervenors

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL;<br>JOSHUA GHAYOUM;<br>EDEN SHEMUELIAN, and<br>DR. KAMRAN SHAMSA<br><br>Plaintiffs,<br><br>vs.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA; MICHAEL V. DRAKE, President of the University of California; GENE D. BLOCK, Chancellor, University of California, Los Angeles; DARNELL HUNT, Executive Vice-President and Provost; MICHAEL BECK, Administrative Vice Chancellor; MONROE GORDEN, JR., Vice Chancellor; and RICK BRAZIEL, Assistant Vice Chancellor, each in both his official and personal capacities,<br><br>Defendants. | ) Case No. 2:24-cv-04702-MCS-<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) (1) THIRD PARTY MOTION FOR<br>) LEAVE TO INTERVENE<br>)<br>)<br>)<br>)<br>)<br>) (2) MEMORANDUM OF POINTS<br>) AND AUTHORITIES IN SUPPORT<br>)<br>)<br>)<br>) **Judge: Hon. Mark C. Scarsi**<br>)<br>)<br>) |

# **TABLE OF CONTENTS**

**I.  INTRODUCTION**                                                      **5**

**II. STATEMENT OF FACTS**                                               **7**

**A.  Plaintiffs**                                                        **7**

**B.  Critically Ambiguous Allegations**                                 **8**
  1.  Unfounded Examples of Antisemitism                                 **8**
  2.  Leaving Zionism Undefined Allows Plaintiffs to Argue Anti-Zionism is the Equivalent to Antisemitism                                           **8**

**C.  Plaintiffs' Motion for Preliminary Injunction**                    **9**

**D.  The Court's Preliminary Injunction**                               **10**

**E.  UCLA Does Not Appeal the Preliminary Injunction**                  **11**

**F.  UC President's Statement on Frankel Injunction**                   **11**

**G.  Sukkah October 21, 2024**                                          **12**

**H.  November Walkout**                                                 **12**

**I.  Stipulated Protective Order**                                      **13**

**III. PROPOSED INTERVENORS**                                            **13**

**IV. ARGUMENT**                                                         **15**

**A.  Proposed Intervenors are Entitled to Intervene as a Matter of Right**  **21**
  1.  The Proposed Intervenors Have Significant Protectable Interests as to the Subject of this Action                                              **22**
  2.  The Disposition of this Action Has Already Impaired and Impeded the Proposed Intervenors' Ability to Protect Their Interests              **23**
  3.  The Proposed Intervenors' Motion is Timely                        **24**
  4.  The Existing Parties Will Not Represent the Proposed Intervenors' Interests  **25**

**B.  Permissive Intervention**                                          **26**

MOTION FOR LEAVE TO INTERVENE

# TABLE OF AUTHORITIES

**CASES**

*Acosta v. Huppenthal*, 2012 WL 1282994 (D. Ariz. Feb. 6, 2012) ...........................24

*Arakaki v. Cayetano*, 324 F.3d 1078  (9th Cir. 2003)………………………….21,23

*California ex rel. Lockyer v. United States*, 450 F.3d 436 (9th Cir. 2006)................22

*California v. Tahoe Regional Planning Agency*, 792 F.2d 775 (9th Cir. 1986) .........25

*Cherkin v. PowerSchool Holdings, Inc.* (N.D.Cal. Mar. 17, 2025, No. 24-cv-02706-JD) 2025 U.S.Dist.LEXIS 48424.........................................................................21

*County of Orange v. Air California*, 799 F.2d 535 (9th Cir. 1986) ...........................24

*Donnelly v. Glickman*, 159 F.3d 405 (9th Cir. 1998)................................................21

*Forest Conserv. Council v. U.S. Forest Serv.*, 66 F.3d 1489 (9th Cir. 1995)…22,25,26

*Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52 (1st Cir. 2002)................................20

*Sec. & Exch. Comm'n v. FAT Brands Inc.*, 2024 WL 5319127 (C.D. Cal. Dec. 13, 2024).......................................................................................................................21

*SFR Invs. Pool 1, LLC v. Newrez LLC*, 2023 WL 3341918 (D. Nev. May 10, 2023) 24

*Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326 (9th Cir. 1977) .................21

*Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir.2001) ....................20

*United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002) ...................21, 23

*United States v. Miami Univ.*, 294 F.3d 797 (6th Cir. 2002) .....................................20

**STATUTES**

The Family Educational Rights and Privacy Act of 1974 ("FERPA"), as amended, Pub. L. 93–380, 88 Stat. 1974, 20 U.S.C. § 1232g, and the implementing regulations thereunder, 34 C.F.R. Part 99 ................................................................14

Religious Freedom Restoration Act of 1993 ("RFRA"), Pub. L. No. 103-141, 107 Stat. 1488 (42 U.S.C. 2000bb et seq.)………………………………………….18

Religious Land Use and Institutionalized Persons Act of 2000 ("RFUIPA"), Pub. L. No. 106-274, 114 Stat. 803 (42 U.S.C. 2000cc et seq.)…………………………..18

**SUPREME COURT DECISIONS**

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267 (2022)...................24

*Gonzaga Univ. v. Doe*  536 U.S. 273 (2002)  ............................................................23

*Lackey v. Stinnie*, 145 S. Ct. 659 (2025)...................................................................24

*United States v. Cronic*, 466 U.S. 648, 656 (1984)...................................................27

MOTION FOR LEAVE TO INTERVENE

## **TO ALL PARTIES AND ATTORNEYS:**

PLEASE TAKE NOTICE THAT on June 30, 2025, at 9:00 AM in Courtroom 7C, Roes 1-5 will move this court for leave to intervene.

## **STATEMENT OF RELIEF SOUGHT, POSITION OF PARTIES**

The Proposed Intervenors ("Proposed Intervenors") seek intervention under Rule 24 because they have protectable interests inadequately represented by Defendants, and these interests warrant intervention of right under Rule 24(a), or permissive intervention under Rule 24(b).

This motion follows the conference of counsel pursuant to L.R. 7-3, which took place on April 24-25, 2025. Plaintiffs oppose, and Defendants take no position on this Motion.

MOTION FOR LEAVE TO INTERVENE

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

While Plaintiffs' case purports to protect students' rights, it risks infringing on the fundamental rights of students, faculty, and community members—compelling this motion for leave to intervene. Plaintiffs seek to make the Court's narrowly defined Preliminary Injunction permanent, despite its conflation of anti-Zionism with antisemitism and ambiguities about its scope. If left unchallenged, this injunction will continue to be exploited by Defendants to chill protected expression, infringe on faculty members' right to teach and publish about Palestine, and interfere with students' opportunities to learn about or advocate for Palestine.

UCLA has failed to substantively defend the case beyond disclaiming responsibility for acts in the encampment. Because they do not dispute allegations of antisemitic conduct, there has been no meaningful adversarial process on crucial points. The absence of a defense skewed the record such that the Court held that "Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith" (ECF 89 at 2). Further illustrating the need for intervention, UCLA entered a Joint Stipulation anticipating the disclosure of non-parties' private disciplinary records. (ECF 133 at 2).

Proposed Intervenors include three Jewish UCLA community members, two of whom participated in the Palestine Solidarity Encampment that Plaintiffs allege was antisemitic and impaired their Free Exercise rights. Proposed Intervenors dispute that Jewish students were excluded from the Palestine Solidarity Encampment because of their faith, including under the legal standards applicable to Plaintiffs' Free Exercise claim. All Proposed Intervenors reject the notion that opposition to Zionism is antisemitic.

If Proposed Intervenors are granted intervention, they will be the only party defending the perspective of millions of Jews, including many within Israel, that there

is no contradiction between opposing genocide in Palestine and being Jewish.[1] This is true even if only a minority of Jews denounce the genocide or describe themselves as anti-Zionist, because this Court lacks authority under the First Amendment to define the tenets of Judaism.

More specifically, Plaintiffs' Free Exercise theory is fundamentally flawed. Defendants' failure to challenge that flaw only underscores the need for intervention. Plaintiffs consistently conflate the exclusion of someone who is Jewish with the exclusion of someone *because* they are Jewish. This is an elementary mistake. The mere fact that a person who is Jewish is excluded from a place does not tell us *why*.

For example, if a ticket is required to enter a place, and a Jewish person without a ticket is turned away, the bare fact that the person was Jewish is irrelevant, no matter how many times the fact of their Jewishness is repeated. Of course, it matters whether exclusion was really based on the lack of a ticket. But that conclusion is bolstered where Jewish ticket holders were readily admitted and non-Jews without a ticket were routinely excluded.

Here, Plaintiffs' overwrought characterization of the Palestine Solidarity Encampment—and other claimed instances of religious exclusion—as a "Jew Exclusion Zone" suffers from precisely this flaw. At most, they show that some people who were Jewish were excluded. But they fail to show that decisions to exclude were based on their being Jewish. To the contrary, it is not seriously disputed that many Jews—including some of the Proposed Intervenors and many who were specifically and publicly present *as Jews*—were present inside the encampment. It is undisputed that many non-Jews were likewise excluded. The basis for any exclusion is central to

---

[1] Leading human rights organizations have concluded that Israel's war on Gaza constitutes genocide. *See, e.g.,* Amnesty International, *Amnesty concludes Israel is committing genocide in Gaza*, December 5, 2024, https://www.amnesty.org/en/latest/news/2024/12/amnesty-international-concludes-israel-is-committing-genocide-against-palestinians-in-gaza/; Human Rights Watch, *Israel's Crime of Extermination, Acts of Genocide in Gaza*, December 19, 2024, https://www.hrw.org/news/2024/12/19/israels-crime-extermination-acts-genocide-gaza.

MOTION FOR LEAVE TO INTERVENE

this case and, unlike Defendants, Proposed Intervenors will develop those essential facts, of which some have personal knowledge.

Plaintiffs also rely on the narrower argument that exclusion based on commitment to Zionism—evenhandedly applied to Jews and non-Jews alike—nonetheless impairs their Free Exercise rights because it conditions access on conduct incompatible with their sincerely held religious beliefs. This, too, implicates factual questions about the precise basis for any exclusion and whether it corresponds to Plaintiffs' sincerely held religious beliefs.

Furthermore, this argument relies on a dubious interpretation of the Free Exercise Clause, one repeatedly rejected by the Supreme Court. *See Holt v. Hobbs*, 574 U.S. 352, 356-57 (2015) ("[*Employment Division v. Smith*, 494 U.S. 872 (1990)] held that neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment."). Defendants have not raised this legal deficiency.

Proposed Intervenors seek intervention to prevent (1) the weaponization of antisemitism to suppress free speech and dictate religious beliefs; (2) the disclosure of non-parties' private disciplinary records anticipated in the joint discovery order; and (3) UCLA's exploitation of the Preliminary Injunction to chill the exercise of free speech and assembly for all pro-Palestinian expression.

## II. STATEMENT OF FACTS

### A. Plaintiffs

The Plaintiffs are three Jewish students and one Jewish faculty member at UCLA who allege that to cross through the Palestine Solidarity Encampment would have required them to "disavow Israel" and "denounce their faith." (ECF 101 at 6, 456.) These allegations were not disputed by Defendants.

MOTION FOR LEAVE TO INTERVENE

**B.    Critically Ambiguous Allegations**

**1.    Unfounded Examples of Antisemitism**

The Plaintiffs filed their original Complaint on June 5, 2024 (ECF 1) and their amended complaint on October 22, 2024. (ECF 101.) Both focus on the Palestine Solidarity Encampment and pro-Palestinian protests, claiming that UCLA and the encampment were antisemitic, and alleging that UCLA not only condoned antisemitism but also facilitated it.

Plaintiffs' antisemitism allegations range from the unsupported to the unsupportable. Without intervention, however, these assertions risk becoming the official record of the Palestine Solidarity Encampment because UCLA did not dispute them, including dozens of questionable claims that Jewish people were asked to denounce their faith or disavow Israel to enter the encampment. The Court notes in its Preliminary Injunction that the evidence supporting Plaintiffs' motion "may be inadmissible for many reasons, including as hearsay" (ECF 89 at n.1) but that it exercised its discretion to consider it "because Defendants do not place the key facts upon which this Order relies in material dispute." *Id*. Without intervention, these allegations will remain unchallenged.

Proposed Intervenors include people who were present in the Palestine Solidarity Encampment, participated in Seder and Shabbat ceremonies with other Jewish members of the encampment, worked on the safety team, and can testify to the safety protocols showing that none included denying entry based on religion.

**2.    Leaving Zionism Undefined Allows Plaintiffs to Argue
Anti-Zionism is Antisemitism**

Plaintiffs use "Zionist" throughout without ever defining it. (*See, e.g.,* ECF 101 at 98, 99, 118, 132, 133.) This is a critical failure. For Proposed Intervenors, Zionism is the insistence that Israel remain a Jewish ethnostate, a project that requires ongoing dispossession and violence against Palestinians. It is a political, not religious belief.

While antisemitism is deeply rooted in American society, not all criticism of Israel and
Zionism is antisemitic. It is nonsensical to claim that anti-Zionism equals antisemitism
when the former is part of an embedded moral, political, and intellectual tradition that
is very much part of Jewish heritage and history.[2]

Leading Jewish intellectuals sharply criticized Israel, including Albert Einstein:
"I have never favored a Jewish State in Palestine but  a binational state, held under
strict United Nations government as long as national antagonisms are prevailing
there."[3] When Menachem Begin, the future Prime Minister of Israel and then leader of
"a terrorist, right-wing chauvinist organization"[4] visited the US in 1948, Einstein,
Hannah Arendt, and Primo Levi wrote the New York Times warning that "Today they
speak of freedom, democracy and anti-imperialism, whereas until recently they openly
preached the doctrine of the Fascist state. It is in its actions that the terrorist party
betrays its real character; from its past actions we can judge what it may be expected
to do in the future."[5]

Were Einstein, who considered himself a Zionist, a student or professor at UCLA
in 2025, he would live in constant fear of being branded an antisemite and face
expulsion or termination, as Plaintiffs claim that exposure to such speech infringes their
religious rights.

## C.    Plaintiffs' Motion for Preliminary Injunction

On June 24, 2024, Plaintiffs filed a Motion for Preliminary Injunction, calling
the Palestine Solidarity Encampment—which was created by people from all faiths,
including Jewish students and faculty—a "Pro-Hamas" "Jew Exclusion Zone." (ECF

---

[2] Daniel Denvir, *Zionism's History Is Also a History of Jewish Anti-Zionism*, JACOBIN, January 28,
2024, https://jacobin.com/2024/01/shaul-magid-interview-zionism-anti-zionism-judaism-history
("Zionism does not fulfill the messianic idea on Orthodox anti-Zionists' reading, according to the
traditional sources. Zionism becomes the very thing that Jews need to resist.")
[3] Fred Jerome, *Einstein on Israel and Zionism: New Enriched Edition* 186 (2024).
[4] *Id*. at 212-214.
[5] *Id*.

MOTION FOR LEAVE TO INTERVENE

48 at 3-4.) Plaintiffs' baseless claims faced no pushback from UCLA, which seeks to distance itself from pro-Palestinian, anti-genocide protestors, and not correct the record.

UCLA filed its Memorandum of Points and Authorities in Opposition on July 8, 2024. (ECF 62.) UCLA's primary argument was that anti-genocide protestors were not state actors, making Plaintiffs' claims non-actionable "non-state action." *Id.* at 13-15. This defense confirms that UCLA has no incentive to correct the factual record regarding anti-genocide protestors.

### D.    The Court's Preliminary Injunction

On August 13, 2024, the Court issued its Preliminary Injunction, finding that Jewish students were excluded from portions of campus "because they refused to denounce their faith," noting that "UCLA does not dispute this." (ECF 89 at 2.) The Court issued a facially narrow order, prohibiting UCLA from "offering any ordinarily available programs, activities, or campus areas to students if Defendants know the ordinarily available programs, activities, or campus areas are not fully and equally accessible to Jewish students." *Id*. at 15-16. The Order continues "all references to the exclusion of Jewish students shall include exclusion of Jewish students based on religious beliefs concerning the Jewish state of Israel." *Id.*

This last sentence has proven to be problematic for two primary reasons. First, it leaves the Court as the arbiter of what constitutes a religious belief, and which "religious beliefs" are (or are not) "Jewish."  Due to the lack of a meaningful adversarial process, no one reminded the Court that although the Supreme Court "has discussed the concept of 'religion' in several cases, it has not provided a specific definition to govern cases arising under the religion clauses."[6] That the Supreme

---

[6] Ben Clements, *Defining Religion in the First Amendment: A Functional* Approach, 74 CORNELL L. REV. 532, 552 (1989), http://scholarship.law.cornell.edu/clr/vol74/iss3/4 (footnote omitted).

MOTION FOR LEAVE TO INTERVENE

Court has refrained from defining what constitutes religion confirms that lower courts are not equipped to determine what any specific faith means or does not mean.

Second, by calling Zionism a Jewish religious belief, the Court conflates Judaism with the state of Israel and creates an equivalency between anti-Zionism and antisemitism. As such, political perspective becomes a protected religious belief. This conflation fails to grapple with the fact that beliefs concerning the state of Israel's conduct are not intrinsically religious. Instead, they are "neutral" in the relevant Free Exercise sense that they may be held by persons of any religion, even though some people may hold them for religious reasons, just like other political positions that may or may not be religiously motivated.

### E. UCLA Does Not Appeal the Preliminary Injunction

Consistent with the lack of adversarial process here, UCLA dismissed its appeal. (ECF 95). Other than denying responsibility for what happened in the encampment, UCLA offered no meaningful defense.

### F. UC President's Statement on Frankel Injunction

On October 1, 2024, UC President Michael Drake issued a statement tying UCLA's policy changes to the Frankel injunction.[7] These policy changes, announced three weeks after the injunction, represent its direct outgrowth. They include a campus-wide ban on all encampments and new regulations severely limiting areas zoned for public expression to less than two percent of the campus: Bruin Walk—the thoroughfare linking central campus to the dorms—and outside of Murphy Hall, the central administration building.[8]

---

[7] *Statement on UCLA Reply Filing in Frankel v. Regents of the University of California,* UC Office of the President, October 1, 2024, https://www.universityofcalifornia.edu/press-room/statement-ucla-reply-filing-frankel-v-regents-university-california

[8] *BruinPost: Interim Updated Time Place Manner Policies*, September 3, 2024, https://adminvc.ucla.edu/news/bruinpost-interim-updated-time-place-manner-policies.

### G. Sukkah October 21, 2024

Following President Drake's statement, anti-Zionist Jewish organizers observed the Jewish holiday of Sukkot by setting up a sukkah on campus on October 21, 2024. A staff member from Student Affairs informed student organizers that their sukkah violates the university's new Time, Place, and Manner (TPM) policies and the fire code.[9] The representative told students that if they failed to move, the matter would be delegated to the Office of Campus Safety.[10] On the same day, Chabad at UCLA put up its sukkah, but was not cited for violating TPM restrictions or investigated by the Fire Marshal.

### H. November Walkout

On November 19, 2024, students organized a silent walkout on campus. As protesters picketed on Bruin Walk, police in riot gear responded. Police stated that protesters could not block sidewalks. There were no reports or even allegations that protesters prevented Jewish students, or any other protected class, from accessing campus resources, buildings, or programming. Despite this, UCPD arrested four people hours after the protest, alleging that they blocked the sidewalk.[11] University officials referenced a federal lawsuit in response to questions about why UCPD had responded so aggressively to this protest. (Roe 6 Decl. at 7.) Student affairs and UCPD repeatedly stated that protesters could use amplified sound, protest, and otherwise remain in the area, but that they were extremely concerned about blocking pathways. *Id.*

---

[9] Dylan Winward, *UCPD sweeps Gaza solidarity sukkah in Dickson Court, one protester arrested*, DAILY BRUIN, Oct. 23, 2024, https://dailybruin.com/2024/10/23/ucpd-sweeps-gaza-solidarity-sukkah-in-dickson-court-one-protester-arrested.

[10] *Id.*

[11] *UCLA Police Department Arrests Four Individuals Following Demonstration Blocking Bruin Walk*, November 20, 2024 https://ucla.app.box.com/v/Arrest-242234-11192024

## I.  Stipulated Protective Order

On March 4, 2025, the parties entered into a Stipulated Protective Order: "The parties also anticipate that discovery in this matter may involve disclosure of personally identifiable information protected by The Family Educational Rights and Privacy Act of 1974 ("FERPA"), …***including from students who are not parties to this litigation***." (ECF  133 at 2) (emphasis added internal citation omitted).

## III.  PROPOSED INTERVENORS

Proposed Intervenors are UCLA students and faculty who have moral, political, cultural, and religious reasons for their anti-Zionism. Their First Amendment rights are under attack in a lawsuit falsely characterizing their actions as "antisemitic," threatening to expose their private records to Plaintiffs (as well as the records of every other student or faculty member who has faced discipline), incorrectly redefining anti-Zionism as antisemitism, and ultimately chilling all pro-Palestinian First Amendment speech.

All Proposed Intervenors oppose genocide and the rise and normalization of fascism here and abroad, including in the state of Israel; defend free speech and academic freedom; and condemn the efforts to victimize and stigmatize pro-Palestinian students and student associations supporting Palestinian advocacy. They include individuals who participated in the Palestine Solidarity Encampment who can testify that there never was a "Jew Exclusion Zone," and that checkpoints to the Palestine Solidarity Encampment were established in response to continuous and escalating violence from self-proclaimed Zionists and white supremacists.

This violence culminated in a brutal attack lasting hours, beginning on the evening of April 30 and concluding in the early morning hours of May 1.[12] Scores of

---

[12] Blake Ellis, et al., *Unmasking counterprotesters who attacked UCLA's pro-Palestine encampment,* CNN US, May 16, 2024. https://www.cnn.com/2024/05/16/us/ucla-student-protests-counterprotesters-invs/index.html.

MOTION FOR LEAVE TO INTERVENE

students and faculty members sustained serious injuries because of this mob's violence, yet UCPD inexplicably failed to intervene.[13] After the attack, safety measures changed, but none contemplated exclusions based on religion. (Roe 3 Decl. at 12.) Even some faculty and students who had been in the encampment were denied entry until properly vetted or granted a wristband. (Roe 5 Decl. at 12, Roe 3 Decl. at 12.)

Proposed Intervenors also include people subject to student discipline who fear their private records will be disclosed. (Roe 3 Decl. at 17.) They believe their FERPA rights should apply and that other non-parties to the case should not have their information disclosed. *Id*. at 18.

Roe 1[14] is a first-year student and an anti-Zionist. She is concerned about how the Court's preliminary injunction conflates anti-Zionism with antisemitism, which will chill her right to free expression. (Roe 1 Decl. at 6.) She witnessed aggressive police responses to pro-Palestine protest, even when  no allegations of blocking because of faith were made. *Id*. at 7. She is also deeply concerned that her private records will be disclosed. *Id*. at 8.

Roe 2 is an anti-Zionist Jewish graduate student in at UCLA. (Roe 2 Decl. at 3.) Roe 2 was active in the Palestine Solidarity Encampment. *Id*. at 6. Roe 2 organized a Seder and Shabbat services in the Palestine Solidarity Encampment. *Id*. at 7. After reading that UCLA had entered into a joint stipulation anticipating the disclosure of FERPA-protected records, Roe 2 fears that his student records might be unlawfully shared, causing him harm at UCLA and after graduation. *Id*. at 17.

Roe 3 is an anti-Zionist Jewish professor at UCLA. (Roe 3 Decl. at 2-3.) She was present every day in the Palestine Solidarity Encampment, and can testify to the

---

[13] *Id.*

[14] To avoid retaliation without an opportunity to prove the merits of their positions, Proposed Intervenors wish to proceed anonymously at the motion stage, but if permitted to intervene and thus participate in the adversarial process on a level field, they agree to disclose their identities.

14

safety measures in the encampment, the threat that self-proclaimed Zionists posed to the group, and that there never was a "Jew Exclusion Zone" *Id*. at 6, 8, 11-12.

Roe 4 is an anti-Zionist Jewish professor at UCLA. (Roe 4 Decl. at 3, 5.) He grew up in a Jewish home and attended Hebrew school. Jewish identity is central to who he is. *Id*. at 5. Roe 4 is a direct descendant of Holocaust survivors. "Never Again" is central to his understanding of Jewish morality, as are the embrace of immigrants and a commitment to critical inquiry that includes contentious disagreement over matters of importance. *Id.*at 6. These Jewish values compel him to speak out against the state of Israel's apartheid, Jewish supremacy, and its ongoing genocide of Palestinians. He does so in part because Israel purports to engage in these crimes on his behalf as a Jew, and he considers it important to affirm "not in my name." *Id.* at 7. Roe 4 is concerned about the Frankel injunction's dangerous conflation of anti-Zionism with antisemitism and fears that, if made permanent, it will further suppress anti-Zionist and other criticism of Israel, including his own. *Id.* at 9. He experiences this as an attack on his own Jewish identity. *Id.* at 12.

Roe 5 is a Palestinian professor at UCLA. (Roe 5 Decl. at 3.) He was present in the encampment and can testify to the safety measures. *Id*. at 12. He is also a scholar who writes extensively on Palestine and fears the Court's Preliminary Injunction becoming permanent would significantly harm his research and publication as well as his ability to remain free from a hostile work environment at UCLA. *Id*. at 10-11. He has already been the victim of numerous anti-Palestinian discriminatory acts at UCLA that impact both his personal and professional life. *Id*. at 11.

## IV.    ARGUMENT

There are two significant problems with Plaintiffs' claims that, given their sincerely held religious beliefs, exclusion from the encampment based on their professed position concerning Israel is tantamount to being excluded based on their religion, contrary to their Free Exercise rights. The factual problem—especially severe

at the current stage—is whether the basis for exclusion in fact maps onto conduct incompatible with their sincerely held religious beliefs. This depends both on the basis for exclusion and the scope of the sincerely held religious beliefs.

At some points, Plaintiffs appear to characterize their religious beliefs as prohibiting any criticism of Israel. Plaintiffs refer to a religious prohibition on "speaking ill … of Israel" (ECF 128-1 at 11.) In other words, they are religiously committed to the idea that Israel can do wrong.

At other points, the religious prohibition is described more narrowly: forswearing Israel's "right to exist" *Id*. There is a huge gap between the two, as there are many people and institutions who simultaneously affirm Israel's "right to exist" as a Jewish state but nonetheless criticize, often severely, practices of its current and past governments.

If the basis for exclusion is narrower than the religious belief in question, then exclusion does not turn on those beliefs. For instance, if exclusion were based on support for the current practices of the Israeli government in Gaza, that might exclude any Plaintiff religiously committed to the notion that Israel can do wrong. However, it would leave ample room for persons religiously committed to Israel's existence as a Jewish state, yet critical of its conduct. Someone who supported Israel's conduct as a political and moral judgment, but not because their religious beliefs commanded unqualified support, would be excluded based on their political views rather than their religious commitment to the existence of a Jewish state. Similarly, if the basis for exclusion was the intent to physically harm encampment participants to express disagreement with them, we would need to know whether Plaintiffs' sincerely held religious belief was that encampment members ought to be brutally attacked for their beliefs. The actual basis for the alleged exclusions is not established by the undisputed

MOTION FOR LEAVE TO INTERVENE

1  facts between the existing parties, but it is one to which some Proposed Intervenors can

2  speak based on personal knowledge.

3         Moreover, Plaintiffs' position would be legally flawed even on the facts most

4  favorable to them. At most, Plaintiffs might show exclusion based on refusing to affirm

5  a political position that their religious beliefs require them to reject. But so what?

6  Assume that entry required denouncing the appropriateness of a specifically Jewish

7  state in Israel/Palestine, one that systematically privileges Jews over Palestinians. And

8  grant for the sake of argument that Plaintiffs' religious beliefs prohibited such a

9  denunciation. The policy is a general one, applicable to Jews and non-Jews alike. Anti-

10  Zionist Jews, including some of the Proposed Intervenors, could still be admitted, and,

11  vice versa, Zionist non-Jews would, like Plaintiffs, be excluded.

12         To overcome this problem, Plaintiffs rely upon *Sherbert v. Verner*, 374 U.S. 398,

13  409-10 (1963) and the line of cases following it, holding that only a compelling

14  government interest can justify even a generally applicable policy that nonetheless

15  "substantially burdened" their exercise of religion. And this Court likewise relied

16  on *Sherbert* in granting a preliminary injunction. (ECF 101 at 11.) Plaintiffs neglect to

17  acknowledge that *Sherbert* was repudiated in relevant part by the Supreme Court

18  in *Employment Division v. Smith*, where it rejected the proposition that the Free

19  Exercise Clause "bars application of a neutral, generally applicable law to religiously

20  motivated action." *Smith*, 494 U.S. 872, 882 (1990).

21         More recently, in *Holt v. Hobbs*, 574 U.S. 352 (2015), the Supreme Court

22  reviewed the development of this area of law as follows: "[*Smith*] held that neutral,

23  generally applicable laws that incidentally burden the exercise of religion usually do

24  not violate the Free Exercise Clause of the First Amendment. *Smith* largely repudiated

25

26

27

28

MOTION FOR LEAVE TO INTERVENE

the method of analysis used in prior free exercise cases like *Wisconsin v. Yoder* and *Sherbert v. Verner*" (citations omitted). *Holt*, 574 U.S. at 356–57.

*Holt* goes on to explain how Congress has attempted, through the Religious Freedom Restoration Act (RFRA) and Religious Land Use and Institutionalized Persons Act (RLUIPA), to reinstate the *Sherbert* principle by statute in some circumstances. *Id.* Misleadingly, Plaintiffs cite *Holt* for the proposition that, in this case, there is a Free Exercise violation absent a policy that was "compelling as to 'the particular claimant whose sincere exercise of religion is being substantially burdened'" (ECF 128-1 at 21, quoting *Holt*, 574 U.S. 352 at 363). But that passage in *Holt* explicitly referred not to the Free Exercise Clause under *Smith*, but instead to what "RLUIPA, like RFRA, contemplates." *Holt*, 574 U.S. at 362-63. Plaintiffs, however, rely only on the Free Exercise Clause governed by *Smith*, not statutory claims under RFRA (which was struck down by *City of Boerne v. Flores,* 521 U.S. 507 (1997)), nor under RLIUPA, which governed *Holt*.

The Supreme Court's approach in *Smith* is particularly compelling in cases where, as here, the religious belief in question concerns holding or articulating political positions about deeply contested topics. Although Plaintiffs emphasize instances of alleged physical exclusion or blockage of access, their Free Exercise claim appears to cast a much wider net. They appear to allege that mere exposure to expression of positions with which they disagree, for religious reasons, constitutes a denial of access to places where that expression occurs.

For example, the complaint lists chants heard at every pro-Palestine protest, such as "from the river to the sea, Palestine will be free," "there is only one solution, intifada revolution," and "UCPD, KKK, IDF, they are all the same"—all of which at a minimum have contested meanings—as examples of antisemitism. (ECF 101 at 251, 261, 348.) To be sure, Ghayoum alleges at least two chants that, if true, would be unequivocally wrongful ("'death to Israel' and 'Death to Jews'" (*Id.* at 308), but even

this allegation is bereft of any details. Ghayoum alleges he heard "activists" making such a chant on "one occasion." *Id.*

Frankel says that "his knowledge that he could not go through the encampment without violating his faith by disavowing Israel" stopped him from enjoying campus life. (ECF 101 at 257, 282-285.) Ghayoum similarly claims he "felt" that he could not enter the encampment without disavowing Israel and that he "believed" anti-genocide protesters would make him denounce his faith to enter the encampment (ECF 101 at 314, 318, 319.)

Shemuelian similarly references chants, signs, and a sense of unease being Jewish at UCLA. Like Frankel and Ghayoum, she simultaneously claims she was afraid enough to skip all her law school classes because of the encampment **and** that she walked right up to it to observe its activities. (ECF 101 at 369.) Shemuelian says she feared going to the encampment would require her to disavow "her beliefs about Israel" or "violate her faith by disavowing Israel's right to exist." (ECF 101 at 379, 386.)

Importantly, no Plaintiff ever claims that anyone actually asked them directly to disavow Israel or denounce their faith, only that they believed they would have to in order to cross the Palestine Solidarity Encampment.

Perhaps most illustrative of the problem Plaintiffs' claims pose, Shemuelian demands that UCLA create a "safe space" for her where she will never have to see students wearing keffiyehs, which she calls "terrorist scarves," (ECF 101 at 353) or hear students chant in favor of Palestinian freedom. (ECF 101 at 387-389.)

These free speech problems underlie Intervenors' interest in the scope of any injunctive relief. This Court's preliminary injunction barred "allowing or facilitating the exclusion of Jewish students from ordinarily available portions of UCLA's programs, activities, and campus areas" and defined "exclusion of Jewish students" to include "exclusion of Jewish students based on religious beliefs concerning the Jewish state of Israel." Insofar as "exclusion" includes exposure to speech to which Plaintiffs

have religious objections, it poses an extraordinary threat to free expression at UCLA, including to instructional settings that include exploration of critiques of Israel.

Moreover, the Preliminary Injunction does not define the concept of being "fully and equally accessible to Jewish students" and does not limit its scope to physical obstruction of access. In light of Plaintiffs' allegations that classrooms and other campus locations were made inaccessible to them as Jews because entering them would require being in the presence of criticisms of Israel and expressions of Palestinian solidarity, this relief, and any permanent counterpart, risks being invoked to suppress speech to which Plaintiffs' object anywhere they seek to go at UCLA. Is a student meeting discussing Israel's decision to prevent aid from entering Gaza, to destroy its healthcare and university system, and to deny Palestinians water, prohibited as a so-called "Jew Exclusion Zone"? Can students and faculty at UCLA host and speak on a panel on Jewish Critiques of Anti-Zionism, or would this be interpreted as a place requiring Zionist Jews to "denounce their faith" to enter the room?

In sum, Plaintiffs claim violations of the Free Exercise clause rooted in UCLA's failure to prevent expressions of anti-Zionist belief or Palestinian solidarity. This is an extraordinary claim that would permit Plaintiffs to become walking Free Speech Suppression Zones, whereby anywhere they went, UCLA would become obligated to prevent others from disagreeing with them. This would raise severe First Amendment problems of its own.

Likewise, with both sides openly anticipating that Defendants will compromise students' and faculty members' most sensitive private information, the Proposed Intervenors must protect it. The Family Educational Rights and Privacy Act (FERPA) was passed by Congress to "assure parents of students . . . access to their educational records and to protect such individuals' rights to privacy by limiting the transferability of their records without their consent." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67-68 (1st Cir. 2002) (omission in original) (quoting 120 Cong. Rec. 39,862 (1974)

(joint statement of Sens. Pell and Buckley)); *see United States v. Miami Univ.*, 294 F.3d 797, 806 (6th Cir. 2002) ("For the last quarter of a century, FERPA has helped protect the privacy interests of students and their parents."). *Cherkin v. PowerSchool, Inc.* (N.D. Cal. Mar. 17, 2025, 24-cv-02706-JD) 2025 U.S.Dist.LEXIS 48424, at *6-7.

Intervention is governed by Rule 24 of the Federal Rules of Civil Procedure, which "traditionally receives liberal construction in favor of applicants for intervention." *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003), as amended (May 13, 2003), citing *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998). Courts are guided primarily by practical and equitable considerations. *Id*. "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene as true absent sham, frivolity, or other objections." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

### A.    Proposed Intervenors are Entitled to Intervene as a Matter of Right

As this Court recognized just a few months ago, "Rule 24 traditionally receives liberal construction in favor of applicants for intervention." *Sec. & Exch. Comm'n v. FAT Brands Inc.*, 2024 WL 5319127, at *2 (C.D. Cal. Dec. 13, 2024) (Scarsi, J.). Courts "are guided primarily by practical and equitable considerations" and "construe [Rule 24] broadly in favor of proposed intervenors." *United States v. City of Los Angeles*, 288 F.3d 391, 397 (9th Cir. 2002). This liberal construction applies to four requirements for intervention as of right under Rule 24(a) and three requirements for permissive intervention under Rule 24(b). As set forth below, the Proposed Intervenors satisfy all requirements for both forms of intervention.

A movant seeking to intervene must satisfy four requirements to do so as of right:

(1) it has a significant protectable interest as to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its

interest; (3) the application is timely; and (4) the existing parties may not adequately meet the applicant's interest.

*SEC*, 2024 WL 5319127, at *2 (internal citations and quotations omitted).

"A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts. By allowing parties with a practical interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court." *Forest Conserv. Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 n. 8 (9th Cir. 1995) (quoting *Greene v. United States*, 996 F.2d 973, 980 (9th Cir. 1993) (Reinhardt, J., dissenting)).

The Proposed Intervenors easily meet the four criteria for intervention as a matter of right.

### 1.    The Proposed Intervenors Have Significant Protectable Interests as to the Subject of this Action

The Ninth Circuit has explained that an interest is "significantly protectable" if: (a) the movant asserts an interest that is protectable under law; and (b) there is a relationship between the legally protected interest and the plaintiffs' claims. *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006).

Proposed Intervenors have a protectable interest in their First Amendment right to freedom of expression: "Speech is protected by ensuring its full expression even when the government participates, for the very object of some of our most important speech is to persuade the government to adopt an idea as its own." *Lee*, 505 U.S. at 591. "[T]here can be no question but that the First Amendment protects expressions in opposition to national foreign policy . . . ." *Bond v. Floyd*, 385 U.S. 116, 132 (1966). Likewise, it violates the First Amendment for the government to restrict classroom instruction "based upon reasons that violate the First Amendment" and such prohibited

reasons undoubtedly include those related to religion.  *Epperson v. State of Ark.*, 393 U.S. 97, 107 (1968).

Proposed Intervenors' freedom to express themselves without governmental interference is protectable under the law. It is equally clear that the Court's preliminary injunction order conflating Judaism with support for the state of Israel confirms a relationship between this protectable interest and Plaintiffs' claims, as Plaintiffs are now seeking to make this preliminary prescription permanent. Nor may the state directly or indirectly restrict classroom instruction based on anyone's religious beliefs, yet that is the threat Proposed Intervenors presently face.

Additionally, the Proposed Intervenors are concerned about their private records being protected from Plaintiffs and the Department of Justice. As FERPA does not create a private right of action, intervention in this matter is required to protect the privacy of student disciplinary records. *See Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002).

### 2. The Disposition of this Action Has Already Impaired and Impeded the Proposed Intervenors' Ability to Protect Their Interests

A judicial decision that "may" impair the movant's rights "as a practical matter" is sufficient impairment. *United States v. City of Los Angeles, Cal.*, 288 F.3d 391, 401 (9th Cir. 2002) (holding that it is sufficient if a ruling "may" impair rights "as a practical matter" and that there is no requirement that the outcome will "necessarily" impair that interest); *see also Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) ("The burden on proposed intervenors in showing inadequate representation is minimal, and would be satisfied if they could demonstrate that representation of their interests 'may be' inadequate").

The moment the Court declared that anti-Zionism is equivalent to antisemitism, the Court empowered UCLA to condemn speech by the Proposed Intervenors to be anti-Jewish, which can lead to disciplinary proceedings, expulsion, and loss of work—

all for exercising their right to free speech consistent with Jewish traditions and their morality, which demand that they denounce all forms of dispossession, occupation, discrimination, and oppression regardless of the identity of the state committing it.

### 3.    The Proposed Intervenors' Motion is Timely

Though the Court entered its Order eight months ago, it remains a ***preliminary*** injunction.  As the Supreme Court recently explained, that is a far cry from a final judgment. "Preliminary injunctions [] do not conclusively resolve legal disputes. In awarding preliminary injunctions, courts determine if a plaintiff is *likely* to succeed on the merits—along with the risk of irreparable harm, the balance of equities, and the public interest." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025) (emphasis in original) As a result, "we have previously cautioned against improperly equat[ing] 'likelihood of success' with 'success' and treating preliminary injunctions as "tantamount to decisions on the underlying merits." *Id.* (alteration in original).

Consistent with this reality, Courts have confirmed the timeliness of motions to intervene filed after a preliminary injunction.  *See, e.g., SFR Invs. Pool 1, LLC v. Newrez LLC*, 2023 WL 3341918, at *2 (D. Nev. May 10, 2023) (post-injunction request timely despite nearly completed discovery because the resolution of the liability and remedies phase not imminent); *Acosta v. Huppenthal*, 2012 WL 1282994, at *2 (D. Ariz. Feb. 6, 2012) (finding the stage of the proceedings did not weigh against intervention where the court had already ruled on the plaintiffs' motion for preliminary injunction and motion to dismiss).

The most important circumstance relating to timeliness is when it becomes clear the intervenor's interests "would no longer be protected by the parties in the case." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 279–80 (2022) (request filed after five years of litigation "was timely because it was filed soon after the movant learned that the class representatives would not appeal").  Prejudice to other

parties and the reasons for the delay are also important considerations. *County of Orange v. Air California*, 799 F.2d 535, 537 (9th Cir. 1986).

There has been little delay in the filing of the application for intervention. Proposed Intervenors recently learned of the parties' Joint Stipulation for Discovery on March 5, 2025. That agreement anticipates "discovery in this matter may involve disclosure of personally identifiable information protected by the Family Educational Rights and Privacy Act of 1974 ("FERPA") . . . including from students who are not parties to this litigation." (Docket 133 at 2.) Granting the Proposed Intervenors' motion will not prejudice any party, since it has been filed before any substantive rulings and before the commencement of discovery.

### 4.    The Existing Parties Will Not Represent the Proposed Intervenors' Interests

In determining the adequacy of representation, courts "consider whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; whether the present party is capable and willing to make such arguments; and whether the intervenor would offer any necessary elements to the proceedings that other parties would neglect." *Forest Conserv. Council*, 66 F.3d at 1498-99 (citing *California v. Tahoe Regional Planning Agency*, 792 F.2d 775, 778 (9th Cir. 1986)).

UCLA has failed to dispute or test any of Plaintiffs' factual allegations about antisemitism or interference with their Free Exercise rights. It also has failed to contest the legal merits of Plaintiffs' invocation of "sincerely held religious belief" to attack even neutral, generally applicable practices. This has left no existing party to raise key questions about how the conflation of Zionism and Judaism, or Anti-Zionism and antisemitism, would infringe on the free speech rights and religious freedom of anti-Zionist Jews or anyone else who criticized Zionism as a political project.

The UC Defendants will not adequately defend the Proposed Intervenors' First Amendment right to criticize U.S. and Israeli policy, or to support Palestine. The

Plaintiffs' pleadings repeatedly quote UC officials who either agree with Plaintiffs on the core issue of this case or refuse to dispute it: that the Palestine Solidarity Encampment, along with other pro-Palestine protests, were and are "antisemitic." (ECF 107 at 75,117.)

Moreover, despite three reports from the Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism detailing the rampant and pervasive discrimination against pro-Palestinian speech, UCLA has not commented on the research of its own internationally recognized faculty and staff.[15] While ignoring those findings, Chancellor Frenk created a campus-wide initiative to combat antisemitism, adopting that Antisemitism Task Force's recommendations in full.[16]

It would be unjust to exclude the Proposed Intervenors from this case. At present, Jewish supporters of the state of Israel's genocidal policies are represented, but opponents of those policies who are Jews and of all religious faiths and philosophies have no voice. The Plaintiffs present a grossly distorted picture of the Palestine Solidarity Encampment, one that UCLA makes zero effort to correct. Accordingly, it is clear that the UCLA will not "make all the intervenor's arguments" and is not "willing to make such arguments." *Forest Conserv. Council*, 66 F.3d at 1498-99.

## B.    Permissive Intervention

Federal Rule of Civil Procedure 24(b)(1) provides that, "[o]n timely motion, the court may permit anyone to intervene who: ... has a claim or defense . . .that shares with the main action a common question of law or fact."

---

[15] Gaye Theresa Johnson and Sherene H. Razack, co-chairs of the UCLA Task Force on Anti-Palestinian, Anti-Muslim and Anti-Arab Racism. *Open Letter To Chancellor Julio Frenk*, March 10, 2025, https://uclaracismtaskforce.com/wp-content/uploads/2025/01/open-letter-to-chancellor-frenk-march-20-2025.pdf

[16] UCLA Chancellor Julio Frenk, *UCLA announces Initiative to Combat Antisemitism*, UCLA Newsroom, March 10, 2025, https://newsroom.ucla.edu/ucla-announces-initiative-to-combat-antisemitism.

1    Permissive intervention is also justified where the intervenors' participation will
2  facilitate an equitable result. See *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d
3  1326, 1329 (9th Cir. 1977) (court may consider whether intervenors "will significantly
4  contribute to full development of the underlying factual issues in the suit and to the just
5  and equitable adjudication of the legal questions presented").

6    As detailed above, there is no doubt that Proposed Intervenors have claims,
7  rights, and interests that share many common questions of law and fact.  This case has
8  significant First Amendment implications, including local national policies regarding
9  speech on university campuses and religious freedom, as well as FERPA adherence.
10  Resolution of these crucial issues and rights demands "the crucible of meaningful
11  adversarial testing."  *United States v. Cronic*, 466 U.S. 648, 656 (1984).  The Court,
12  Proposed Intervenors, and the millions of affected members of the public deserve no
13  less.

14    Accordingly, at a minimum, the Court should grant permissive intervention.

15    By the Proposed Intervenors' Attorney,

19  DATED: May 2, 2025

20                              BY: /s/ Thomas B. Harvey
21                              THOMAS B. HARVEY (SBN 287198)
22                              Law Offices of Thomas B. Harvey
                                Attorney for Proposed Intervenors

MOTION FOR LEAVE TO INTERVENE

## CERTIFICATE OF SERVICE

I am a resident of the State of California and over 18 years of age, and am not a party to this action. My business address is 365 E. Avenida de Los Arboles, #226, Thousand Oaks, CA 91360, which is located in the county where any non-personal service described below took place.

I hereby certify that on May 2, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Central District of California by using the CM/ECF System.

Participants in the case who are registered CM/ECF Users will be served by the CM/ECF System.

On May 2, 2025, I also served a copy of the following document(s) on:
Eric C. Rassbach
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
202-955-0095 tel.
202-955-0090 fax
erassbach@becketlaw.org
*Attorneys for Plaintiffs*

Jennifer Sokoler
Matthew Cowan
O'Melveny & Myers LLP
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
212-326-2162
jsokoler@omm.com
*Attorneys for Defendants*

Service was accomplished **by e-mail**. By transmitting via e-mail or electronic transmission the document(s) listed above to the person at the e-mail address set forth above. Executed on May 2, 2025, at Thousand Oaks, California.

/s/ *Thomas B. Harvey*
Thomas. B. Harvey

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel Proposed Intervenors certifies that this Memorandum of Points and Authorities contains 6,998 words, which complies with the word limit of L.R. 11-6.1.

Dated: May 2, 2025                          LAW OFFICES OF THOMAS B. HARVEY


By:___/s/___Thomas B. Harvey_____
            Thomas B. Harvey

Attorney for Proposed Intervenors

MOTION FOR LEAVE TO INTERVENE