UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*, <br><br> Defendants. | Case No. 2:24-cv-04702-MCS-PD <br><br> **ORDER RE: MOTION FOR JUDGMENT ON THE PLEADINGS (ECF NO. 108)** |

Defendants Michael V. Drake, Gene D. Block, Darnell Hunt, Michael Beck, Monroe Gorden, Jr., and Rick Braziel ("Individual Defendants") filed a motion for judgment on the pleadings as to Plaintiffs Yitzchok Frankel, Joshua Ghayoum, Eden Shemuelian, and Dr. Kamran Shamsa's first amended complaint.[1] (Mot., ECF No. 108.) Plaintiffs opposed, (Opp'n, ECF No. 120), and Individual Defendants replied, (Reply, ECF No. 123). The United States of America filed a statement of interest. (Statement of Interest, ECF No. 139.) Both Plaintiffs and Individual Defendants responded to the Government's statement. (Pls.' Resp., ECF No. 146; Defs.' Resp., ECF No. 143.) The Court held a hearing on the motion and took it under submission. (Mins., ECF No. 148.)

## I. BACKGROUND

Plaintiffs are three Jewish students at the University of California, Los Angeles ("UCLA") and one Jewish UCLA faculty member. (FAC ¶¶ 43–46, ECF No. 101.) Defendants in this action include the Regents of the University of California education system, as well as UCLA administrators who Plaintiffs allege are "responsible for leading and running UCLA's campus." (*Id.* ¶¶ 47–56.) Plaintiffs bring state and federal law claims against all Defendants related to their response to nonparty activists' encampment in the center of UCLA's campus that Plaintiffs allege excluded Jewish students and faculty. (*Id.* ¶¶ 2, 4, 6, 9, 11, 22.)

According to the complaint, and relevant to this Order, on April 25, 2024, a group of activists established a physical encampment in the Royce Quad on UCLA's campus. (*Id.* ¶¶ 108–09.) The Quad is "one of the most-frequented areas on campus," and provides access to educational facilities including a library. (*Id.* ¶¶ 110–12.) Plaintiffs claim that the activists in the encampment promoted antisemitic images and slogans.

---

[1] The Regents of the University of California is also a named defendant in this action, but the motion is only brought on behalf of the Individual Defendants. The Court refers to both the Regents and the Individual Defendants collectively as "Defendants," but specifies when necessary.

2

(*Id.* ¶¶ 115–27.) The encampment was eventually "reinforced with barricades," which Plaintiffs allege were "checkpoints for the creation of a 'Jew Exclusion Zone.'" (*Id.* ¶ 128.) To pass through the checkpoints, "any person" would have to agree to a variety of demands, including that they profess "condemn[ation] [of] Israel." (*Id.* ¶ 129; *see also id.* ¶¶ 132–34.) Campus security staff also allegedly "turned away students and faculty," including Plaintiffs, if the activists did not approve of the individuals. (*Id.* ¶ 137.)

Plaintiffs claim that once the encampment arose, it "operated for a week without interference from Defendants, and . . . with their support via the failure to enforce [UCLA] policies or allow ordinary law enforcement intervention." (*Id.* ¶ 152.) Moreover, Defendant Beck allegedly "directed the installation of barriers made of bike racks around the encampment." (*Id.* ¶ 156.) Defendants purportedly instructed UCLA security "not to intervene" in the encampment, and to "discourage unapproved persons from attempting to cross through the area." (*Id.* ¶¶ 161–62.) Specifically, Plaintiffs claim that UCLA security, "acting as agents of Defendants, directed Jewish students and faculty away from the encampment and, in some cases, stated they needed permission from the activists to access the encampment." (*Id.* ¶¶ 163–64.) Plaintiffs contend that these were "exclusionary policies" that targeted Jewish students and faculty. (*Id.* ¶¶ 167–71.) Plaintiffs allege that Defendants Beck and Block were aware of the exclusionary policies, yet they did not "eliminate" the encampment. (*Id.* ¶¶ 175–98.) Instead, Defendants "instruct[ed] the UCLA [police] not to intervene," (*id.* ¶ 179), and closed buildings around Royce Hall, (*id.* ¶ 183). According to Plaintiffs, with their inaction Defendants acknowledged the threat to Jewish students and opted to close campus buildings rather than remove the encampment, thereby infringing on Jewish students and faculty's ability to traverse campus. (*Id.* ¶ 185.)

Plaintiffs further allege that after a few days, Defendants authorized UCLA police and outside law enforcement to intervene in the encampment. (*Id.* ¶ 186.) However, the encampment remained standing. (*Id.* ¶ 187.) On May 2, Defendant Block purportedly

emailed the UCLA community "acknowledging that the encampment was 'unlawful' and a 'breach of policy,'" and had resulted in "'[d]emonstrators directly interfer[ing] with instruction by blocking students' pathways to classrooms.'" (*Id.* ¶¶ 191, 193 (alterations in original).) This email also stated that Defendant Block directed the UCLA police and outside law enforcement to clear the encampment. (*Id.* ¶ 191.) Defendant Block then announced the creation of an Office of Campus Safety, as well as the creation of an advisory group to assist the new office. (*Id.* ¶¶ 195–96.) Plaintiffs claim that despite the removal of the encampment, a "wave of rampant antisemitism took hold, however, UCLA refused to address these threats and actions 'preemptively.'" (*Id.* ¶ 202.)

Each Plaintiff details specific injuries resulting from Defendants' allegedly improper actions.

Plaintiff Frankel alleges he was "directly impacted by UCLA's refusal to dismantle the initial Jew Exclusion Zone." (*Id.* ¶ 253.) Namely, he was unable to go through the encampment "without violating his faith by disavowing Israel," which impacted his ability to traverse the campus. (*Id.* ¶¶ 255–58.) He claims that activists in the encampment targeted him with slurs and signs, and also pushed him, but security failed to intervene and "actively assisted the encampment participants." (*Id.* ¶¶ 258–64.) More broadly, the antisemitism on UCLA's campus made him feel unsafe and impacted his ability to access the campus. (*Id.* ¶¶ 268–77.)

Plaintiff Ghayoum alleges he "personally" "experienced the effects" of the encampment. (*Id.* ¶ 304.) He claims he saw antisemitic images and heard derogatory slogans from the activists, and was "stopped twice at encampment checkpoints." (*Id.* ¶¶ 308–11.) The first time, he recounts that two security guards stopped him from entering, and the second time it was activists that stopped him. (*Id.* ¶¶ 312–17.) The encampments also limited his access to the library. (*Id.* ¶ 321.)

Plaintiff Shemuelian alleges she "was also personally impacted by UCLA's initial Jew Exclusion Zone." (*Id.* ¶ 365.) She claims the encampment prohibited her

from accessing parts of the campus she frequently visited, and she encountered antisemitic slurs. (*Id.* ¶¶ 367–70, 386–87.) She recounts that she "witnessed security . . . acting to stop individuals from passing through" the encampment. (*Id.* ¶ 371.) She also alleges that a security guard told her to move away from the barricades. (*Id.* ¶ 374.)

Finally, Plaintiff Shamsa alleges that he "attempted to enter the encampment," but UCLA security guards told him he could not go in. (*Id.* ¶¶ 414–15.) Another time, he recounts that as he approached the Quad, "a large, masked man approached him and aggressively pushed him to the ground," but security did not take action. (*Id.* ¶¶ 421–23.) Dr. Shamsa alleges that when he tried to get law enforcement involved to remove the encampment, "[h]e was told by the dispatcher that LAPD could not intervene unless requested to do so by UCLA administration." (*Id.* ¶¶ 429–30, 433.)

On these allegations, Plaintiffs collectively assert that "Defendants knowingly allowed activists to establish a Jew Exclusion Zone," and took no action to disband the encampment, thereby choosing "to enact an exclusionary policy that allowed the encampment to persist and to permit the exclusion of Jews from parts of campus." (*Id.* ¶¶ 434–35.) Based on this, Plaintiffs bring 42 U.S.C. § 1983 claims for violations of the Equal Protection Clause, First Amendment, and the Free Exercise Clause. (*Id.* ¶¶ 441–99 (Counts 1–6).) Plaintiffs also seek relief under 42 U.S.C. § 2000d for violation of Title VI of the Civil Rights Act, under 42 U.S.C § 1985 for conspiracy to interfere with civil rights, and under 42 U.S.C. § 1986 for failure to prevent conspiracy. (*Id.* ¶¶ 500–25 (Counts 7–9).)[2] Plaintiffs bring additional claims under state law for violation of

---

[2] The parties appear to agree that the Eleventh Amendment bars most claims against Individual Defendants in their official capacities. (Mot. 18; Opp'n 7 n.4.) As an exception, the parties note that the Regents waived their sovereign immunity defense to the Title VI claim, but they disagree as to whether the Individual Defendants can be sued under Title VI. (Mot. 18; Opp'n 7 n.4.) The Court addresses the Title VI issue *infra* but construes the remaining claims as individual capacity claims.

California's Equal Protection Clause, California's Free Exercise Clause, California's Education Code for prohibition of discrimination, the Ralphs Civil Rights Act of 1976, and the Tom Bane Civil Rights Act. (*Id.* ¶¶ 526–67 (Counts 10–14).)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion challenges the legal sufficiency of the pleadings. Judgment under this rule is proper when, taking all of the pleaded material facts as true, the moving party is entitled to judgment as a matter of law. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). The standard for judgment under Rule 12(c) is essentially the same as under Rule 12(b)(6). *See Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III. DISCUSSION

### A. Constitutional Law Claims (Claims 1–6, 8–9)

Individual Defendants assert that all the federal constitutional claims for damages against them must be dismissed because they enjoy qualified immunity. (Mot. 18–26.)

///

1. Standard for Qualified Immunity

Qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, to overcome a qualified immunity defense, a plaintiff must show (1) that a government official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged conduct. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013). While a plaintiff's allegations must satisfy both prongs of the qualified immunity analysis, courts are given discretion to begin their analysis with either prong. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *George v. Morris*, 736 F.3d 829, 837 (9th Cir. 2013) ("Usually we can start with the second prong of qualified immunity if we think it advantageous.").

In this case, the Court's inquiry begins—and ends—with the second prong. "A constitutional right is 'clearly established' if 'every reasonably official would have understood that what he is doing violates that right' at the time of his conduct." *Sampson v. County of Los Angeles*, 974 F.3d 1012, 1018–19 (9th Cir. 2020) (quoting *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (per curiam)). Claims "alleging violation of extremely abstract [constitutional] rights" are insufficient to overcome the second prong. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Instead, courts must narrowly look at "whether the [official] had fair notice that her conduct was unlawful, [and] reasonableness is judged against the backdrop of the law at the time of the conduct." *Sampson*, 974 F.3d at 1019 (internal quotation marks omitted). Therefore, while plaintiffs do not need to provide courts with "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Barkes*, 575 U.S. at 822); *see Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016) ("Hence, a plaintiff must prove that 'precedent on the books' at the time the officials acted 'would have made it clear to [them] that [their actions] violated the

Constitution.'" (alterations in original) (quoting *Barkes*, 575 U.S. at 827)). Simply put, "according to the Supreme Court, state officials are entitled to qualified immunity so long as none of [its] precedents squarely governs the facts here." *Hamby*, 821 F.3d at 1091 (internal quotation marks omitted).

### 2. Individual Defendants Are Entitled to Qualified Immunity

The dispositive question before this Court is not whether Plaintiffs have alleged violations of constitutional rights such as free exercise or free speech. Of course, as this Court opined in its preliminary injunction order, Plaintiffs have likely met this bar, and they may be entitled to permanent injunctive relief should they prove those allegations. (Preliminary Injunction Order 11–12, ECF No. 89.) Instead, the qualified immunity inquiry is narrower and requires this Court to assess whether controlling precedent has placed it "beyond debate" that Individual Defendants' specific action or inaction in response to the encampment amounted to a violation of Plaintiffs' constitutional rights. Plaintiffs have not overcome this hurdle.

As a preliminary matter, most of the relevant allegations in Plaintiffs' first amended complaint relate to the activists', not Individual Defendants', conduct. For example, regarding Plaintiffs' equal protection arguments, it was nonparty activists, not Individual Defendants, who allegedly created the encampments that purportedly excluded Plaintiffs from campus facilities. (FAC ¶¶ 108–12.) Moreover, Plaintiffs readily concede that the encampments had checkpoints where "any person" would be subject to the same requirements to access the area, (*id.* ¶ 129), and that security "turned away students and faculty," rather than explicitly targeting Jewish community members' access, (*id.* ¶ 137). Indeed, Plaintiffs' first amended complaint consists almost entirely of actions that people *other than Individual Defendants* took that allegedly violated Plaintiffs' constitutional rights. Therefore, what the Court is left to consider is whether Individual Defendants should have known based on the law at the time that their specific actions in this context violated Plaintiffs' clearly established

constitutional rights. However, Plaintiffs fail to offer this Court any instructive case law that would support such a conclusion.

The cases Plaintiffs do offer are readably distinguishable. For example, Plaintiffs cite *Brown v. Board of Education*, 347 U.S. 483 (1954), for the proposition that university administrators are not permitted to provide discriminatory access to educational facilities. (Opp'n 17.) Of course, unlike here, in *Brown*, the Supreme Court grappled with the constitutionality of state-sponsored segregation by race in public schools. *Brown*, 347 U.S. at 493. The Supreme Court concluded that state-sponsored segregation is a per se denial of the equal protection of the laws, and that educational institutions may not implement programs or offer facilities that segregate based on race. *Id.* at 495.

Plaintiffs also cite *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), and *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), to support their contention that schools may not discriminate against individuals by depriving them of access to public services based on their religious beliefs. (Opp'n 17.) These cases also miss the mark. *Trinity Lutheran* revolved around whether the state can withhold grants from religious organizations, and the Court concluded that state policies that "expressly discriminate[]" on the basis of religion are unconstitutional. *Trinity Lutheran*, 582 U.S. at 453–54, 462. *Fulton*, also inappositely, dealt with whether the state could stop referring children to foster care agencies that did not certify same-sex couples to be foster parents, and the Court concluded, among other things, that laws cannot "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton* 593 U.S. at 526, 534.

Plaintiffs further point to *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018), for the claim that the government may not limit access to public benefits only to those who hold a specific viewpoint. (Opp'n 17.) However, in *Becerra*, the Supreme Court considered whether a state can instruct a medical provider to provide notices to patients regarding abortions, and concluded that the

9

notices are state acts "compelling individuals to speak a particular message." *Becerra*, 585 U.S. at 761, 766.

Plaintiffs' complaint does not allege anything close to the direct, state actor conduct that resulted in the constitutional violations in the cited cases. Indeed, in each case, it was the state actor that adopted and implemented a policy that was explicitly discriminatory or restrictive of free speech principles. In this case, Plaintiffs do not aver that Individual Defendants engaged in deliberate segregation of Jewish students, like in *Brown*; nor do they claim that Individual Defendants expressly discriminated against them while permitting secular conduct, like in *Trinity Lutheran* or *Fulton*; nor do they allege that Individual Defendants forced them to denounce their faith, thereby compelling them to speak a particular message, like in *Becerra*. Instead, it was the activists that engaged in each of these activities.

In sum, Plaintiffs' arguments and allegations, even under the broadest constructions, are insufficient to show that Individual Defendants' *specific* conduct in *this case* amounted to a constitutional right violation. Therefore, the Court finds that Plaintiffs have not identified precedent that "place[s] the statutory or constitutional question beyond debate," *Sampson*, 974 F.3d at 1019 (internal quotation marks omitted), such that it is clear that Individual Defendants knowingly violated a clearly established constitutional right, *Hamby*, 821 F.3d at 1091. As such, while the Court takes no position on whether Individual Defendants' actions were appropriate, it does conclude that they are entitled to qualified immunity on Plaintiffs' constitutional law claims for damages. Claims 1–6 and 8–9 are dismissed insofar as they seek monetary damages. *See Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012) ("Qualified immunity is only an immunity for money damages, and does not provide immunity from a suit seeking declaratory or injunctive relief.").[3]

---

[3] Consistent with the preliminary injunction order, Plaintiffs are still entitled to seek injunctive or declaratory relief if they believe their constitutional rights are at risk.

### B. Title VI Claim (Claim 7)

Individual Defendants argue that the Court must dismiss the Title VI claim against them because the claim may only be asserted against the university, not its administrators. (Mot. 28–29.) Plaintiffs disagree, contending that they may bring Title VI claims against Individual Defendants in their official capacities. (Opp'n 20–22.) The Court acknowledges the law on this issue is discordant, and that the Ninth Circuit has not provided clear guidance, but concludes that Title VI claims can be asserted only against the Regents, not Individual Defendants.

Title VI states, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Ninth Circuit courts disagree on whether university officials can be sued under Title VI. A smattering of courts have concluded that plaintiffs may bring official capacity claims against individuals under Title VI. *See, e.g., Rios-Diaz v. Butler*, No. CV-13-77-BU-DLC-CSO, 2014 U.S. Dist. LEXIS 193101, at *5 (D. Mont. July 25, 2014) ("[W]hen a Title VI claim is brought against an individual acting in his official capacity, and the parties are seeking injunctive relief as opposed to monetary damages, courts have allowed the claims to survive a motion for dismissal."); *Akins v. San Diego Cmty. Coll. Dist.*, No. 12cv00576 BTM (WVG), 2013 U.S. Dist. LEXIS 1013, at *9 (S.D. Cal. Jan. 2, 2013) (sustaining Title VI claims against individual defendants in their official capacity); *Mendoza v. Inslee*, No. 3:19-cv-06216-BHS, 2020 U.S. Dist. LEXIS 46166, at *11 (W.D. Wash. Mar. 17, 2020) (noting that plaintiff could only bring her Title VI claim against the individual defendants in their official capacities).

However, many other district courts have persuasively arrived at the opposite conclusion. *See, e.g., Wentworth v. Cal. Connections Acad.*, No. 21-cv-01926-BAS-AGS, 2022 U.S. Dist. LEXIS 82067, at *8 (S.D. Cal. May 5, 2022) (stating that the school receiving the federal funds is the proper defendant, not an individual); *Annu El*

11

*v. Sea Mar Cmty. Health Ctrs.*, No. 23-cv-2007-JNW, 2025 U.S. Dist. LEXIS 61118, at *12 (W.D. Wash. Mar. 31, 2025) ("Title VI claims cannot be brought against individuals."); *Ogando v. Natal*, No. 23-cv-02221-JSC, 2023 U.S. Dist. LEXIS 210469, at *21 (N.D. Cal. Nov. 27, 2023) ("There is no private right of action against individual defendants under [Title VI]."); *Currie v. Maricopa Cnty. Cmty. College Dist.*, No. CV-07-2093-PHX-FJM, 2008 U.S. Dist. LEXIS 48071, at *7–8 (D. Ariz. June 19, 2008) (concluding "that Title VI does not impose liability on an individual instructor who is not the recipient of federal funds," and therefore dismissing a Title VI claim against an individual defendant in both his official and individual capacities); *Lanier v. Fresno Unified Sch. Dist.*, No. CIV F 09-1778 AWI SKO, 2011 U.S. Dist. LEXIS 103037, at *15 (E.D. Cal. Sept. 9, 2011) (finding that Title VI claims cannot be asserted against individuals because they do not receive federal funds). At least two appellate courts considering this issue have also come to the same conclusion. *See Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir. 1996) (finding that plaintiff could only sustain a Title VI claim against the entity allegedly receiving the financial assistance); *Shotz v. City of Plantation*, 344 F.3d 1161, 1170 (11th Cir. 2003) ("[T]he text of Title VI also precludes liability against those who do not receive federal funding, including individuals.").

Based on a review of the case law, and considering the parties' arguments at the motion hearing, the Court is convinced that Title VI claims are only applicable against the university and not against university officials. Indeed, Title VI prohibits "discrimination under any program or activity *receiving* Federal financial assistance." 42 U.S.C. § 2000d (emphasis added). In other words, the receipt of federal funds is a condition precedent to liability under Title VI. In this case, there are no allegations that any of the Individual Defendants received federal funds. Instead it was the Regents that received the funds and administered the relevant programs and activities. (FAC ¶ 502.) Plaintiffs encourage this Court to find a distinction between Title VI claims brought against officials in their individual capacities versus their official capacities, and suggest

that official capacity claims can survive. (Opp'n 20.) However, the Court is not persuaded that bringing an official capacity claim under Title VI overcomes the threshold inquiry, which is whether the defendant sued under Title VI receives federal funds. Moreover, as Plaintiffs' counsel conceded at oral argument, (3/31 Tr. 31, ECF No. 152), there is little practical difference in Title VI claims brought against defendants in their individual versus official capacities. Claim 7 against Individual Defendants is dismissed.

### C. Supplemental Jurisdiction

Individual Defendants request that the Court decline supplemental jurisdiction over Plaintiffs' state law claims. (Mot. 28 n.8.) Plaintiffs fail to respond to this request, signaling their nonopposition. *See, e.g.*, *John-Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (deeming issue waived where party "failed to develop any argument"); *City of Arcadia v. EPA*, 265 F. Supp. 2d 1142, 1154 n.16 (N.D. Cal. 2003) ("[T]he implication of this lack of response is that any opposition to this argument is waived.").

Pursuant to 28 U.S.C. § 1367(c)(1), the Court declines supplemental jurisdiction over the state law claims because the claims raise novel or complex issues of California law. *See Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 31–32 (2025) (stating that the decision to exercise supplemental jurisdiction under § 1367(c) is discretionary). Although the Court is not required to provide a reason for this decision, *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 478 (9th Cir. 1998), it notes that neither side offered this Court applicable or analogous case law providing guidance as to whether Individual Defendants' conduct violated state law. While this Court has held that Individual Defendants are entitled to qualified immunity for the federal law claims, it is not inclined to create a new, potentially precedential, standard regarding California educational institutions' obligations under California state law, especially in the absence of any case that is closely analogous to the facts here. *See Crowley v.*

*CyberSource Corp.*, 166 F. Supp. 2d 1263, 1273 (declining supplemental jurisdiction under § 1367(c)(1) where the parties relied on "general principles rather than analogous authority" to make their arguments); *see also S.C. v. County of Los Angeles*, No. CV 21-6163-MWF (PDx), 2023 U.S. Dist. LEXIS 140800, at *14 (C.D. Cal. Aug. 11, 2023) (declining supplemental jurisdiction, in part, because "there [we]re strong state interests implicated by th[e] action"). Therefore, the Court finds that these claims applied to these facts present novel and complex questions of law that are better left for the state court system to resolve, and declines to exercise supplemental jurisdiction.

### D. Defendant Braziel

Individual Defendants argue Defendant Rick Braziel is entitled to judgment on all claims because he was not employed by UCLA during the alleged events, (Mot. 29–30), and left UCLA in January 2025, (Reply 15). At the motion hearing, counsel for Plaintiffs conceded that the personal capacity claims against Mr. Braziel should be dismissed, but argued that official capacity claims should remain against his successor in office. (3/31 Tr. 25.) Counsel for Defendants agreed. (*Id.*) Therefore, the Court dismisses all claims against Rick Braziel. To the extent Plaintiffs maintain official capacity claims against the individual who currently holds Mr. Braziel's former office, substitution has occurred under Federal Rule of Civil Procedure 25(d).

### E. Punitive Damages

Individual Defendants move for a dismissal of Plaintiffs' request for punitive damages. (Mot. 30–31.) Plaintiffs respond that they are entitled to such damages under § 1983. (Opp'n 25.) The Court has dismissed the constitutional law claims seeking damages against Individual Defendants, so this argument for dismissal of the prayer for punitive damages is moot. *See Hydrick*, 669 F.3d at 939–40; *see also Hermansen v. Thompson*, 678 F. App'x 321, 326 n.1 (6th Cir. 2017) ("[Q]ualified immunity, where it

applies, protects against liability for monetary damages, whether compensatory or punitive.").

## IV. CONCLUSION

Individual Defendants' motion is granted in substantial part. Claims 1–6 and 8–9 are dismissed insofar as Plaintiffs seek monetary and punitive damages against Individual Defendants. Claim 7 against Individual Defendants is dismissed. Plaintiffs do not request leave to amend, but regardless, amendment would be futile given the Court's determinations that Individual Defendants are entitled to qualified immunity, and that the Title VI claim is incognizable. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). All claims against Defendant Rick Braziel in his individual capacity are dismissed. Pursuant to 28 U.S.C. § 1367(c)(1), the Court declines to retain supplemental jurisdiction over the state law claims.

**IT IS SO ORDERED.**

Dated: May 21, 2025

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE